IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| BRITTANY MARLOWE HOLBERG, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 2:15-CV-285 |
| | § | (Death Penalty Case) |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

**RESPONDENT'S ANSWER TO PETITIONER'S
AMENDED PETITION FOR WRIT OF HABEAS CORPUS**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

TRAVIS G. BRAGG
Assistant Attorney General
*Counsel of Record*

Post Office Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1400
Fax: (512) 320-8132
Email: Travis.Bragg@oag.texas.gov

*Counsel for Respondent*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Local Rule 7.4, the undersigned counsel of record certifies that the following listed persons and entities as described in Local Rule 3.1(c) have an interest in the outcome of this case. These representations are in order that the judges of this court may evaluate possible disqualification or recusal.

Respondent–Appellee
William Stephens, Director, Texas Department of Criminal Justice, Correctional Institutions Division

Counsel for Respondent–Appellee
Travis G. Bragg, Assistant Attorney General
Office of the Attorney General of Texas

Prior counsel for the State of Texas (state court)
James A. Farren, District Attorney
David Blount, Assistant District Attorney
Robert A. Love, Assistant District Attorney
Wesley G. Clayton, Assistant District Attorney
Kristy Wright, Assistant District Attorney
Warren Clark, Special Prosecutor
Randall County District Attorney's Office

Matthew Paul, State Prosecuting Attorney
Office of the State Prosecuting Attorney

Leslie K. Kuykendall, Assistant Attorney General
Matthew D. Ottoway, Assistant Attorney General
Travis G. Bragg, Assistant Attorney General
Office of the Attorney General of Texas

Petitioner–Appellant
Brittany Marlowe Holberg

Counsel for Petitioner–Appellant
Philip Wischkaemper, Attorney at Law, Lubbock, TX
Alan J. Lazarus, Drinker Biddle & Reath LLP

Prior counsel for Defendant (state court)
Catherine Brown, Attorney at Law, Amarillo, TX
Candace Norris, Attorney at Law, Canyon, TX
David L. Botsford, Attorney at Law, Austin, TX
Walter C. Long, Attorney at Law, Austin, TX

Kent Birdsong, Attorney at Law, Amarillo, TX
Selden B. Hale, III, Attorney at Law, Amarillo, TX
Thomas W. Pulliam, Jr., Drinker Biddle & Reath LLP
Alan J. Lazarus, Drinker Biddle & Reath LLP
Christian L'Orange, Drinker Biddle & Reath LLP
Karl Saddlemire, Drinker Biddle & Reath LLP
Sally White, Drinker Biddle & Reath LLP

*s/ Travis G. Bragg*
TRAVIS G. BRAGG
Assistant Attorney General

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................................................. i

TABLE OF CONTENTS .......................................................................................... iii

INDEX OF AUTHORITIES ..................................................................................... ix

ANSWER ................................................................................................................. 1

JURISDICTION ....................................................................................................... 1

PETITIONER'S ALLEGATIONS .............................................................................. 2

GENERAL DENIAL ................................................................................................ 4

STATEMENT OF THE CASE ................................................................................... 4

I.      Facts of Holberg's Capita Murder ................................................................. 4

II.     Holberg's Postconviction Proceedings .......................................................... 5

ARGUMENT .......................................................................................................... 10

I.      Standard of Review ..................................................................................... 10

II.     Preliminary Legal Issues Relevant to all Claims for Relief ........................... 15

        A.      The SHDC's findings and conclusions are merits adjudications
                and, thus, entitled to deference under AEDPA. .................................... 15

        B.      Holberg did not properly present to the state courts several of the
                grounds for relief she now raises in her federal habeas petition;
                thus, these claims are unexhausted and procedurally barred from
                federal habeas relief. ......................................................................... 20

                1.      Holberg is procedurally barred from federal habeas relief
                        from those claims that were either unexhausted or raised
                        in a procedurally deficient manner in state court. ..................... 20

                2.      The CCA's dismissal of Holberg's filings as subsequent
                        applications rested on an independent and adequate state
                        law ground. ............................................................................. 23

        C.      Most of Holberg's claims fail because they are inadequately
                briefed and are nothing more than conclusory allegations. ................. 27

III.  For Holberg's Various Claims of Prosecutorial Misconduct During the Guilt Phase, She Either Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations of Those Claims were Unreasonable (Claim 1). ................................................................... 29

    A.  Holberg fails to show that the state court was unreasonable in concluding that the State did not intentionally elicit false testimony from Vicki Kirkpatrick (Claim 1a). ...................................... 29

        1.  Kirkpatrick's testimony at trial .................................... 30

        2.  Kirkpatrick's testimony during her deposition ......................... 31

        3.  Holberg cannot overcome the SHDC's credibility determinations that favor DA Farren over Kirkpatrick. ........... 32

        4.  Holberg's remaining "corroborating evidence" fails to show the state court's extensive findings or conclusions are unreasonable. ................................................................. 37

    B.  Holberg's claim that the State intentionally elicited false testimony from Donald Owens is procedurally barred and meritless (Claim 1b). ................................................................. 42

    C.  Holberg's claim of witness intimidation by the State is procedurally barred and meritless (Claim 1c)...................................... 48

    D.  For her claim that the State failed to disclose exculpatory evidence, Holberg either fails to show the state court decision was unreasonable or cause and prejudice to excuse the procedural bar (Claim 1d). ................................................................. 51

    E.  Holberg's "catch all" Brady claim is unexhausted, procedurally barred, and without merit (Claim 1e). .................................. 56

IV.  Holberg Likewise Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations Were Unreasonable for her Claims of Prosecutorial Misconduct During the Punishment Phase (Claim 2). ......... 58

    A.  Holberg's Giglio/Napue claim regarding the testimony of Katina Dickson and Mary Burnett is procedurally barred and meritless (Claim 2a). ................................................................. 58

    B.  The SHDC was not unreasonable in finding the State did not knowingly elicit false testimony from Kirkpatrick during the guilt phase (Claim 2b)..................................................... 61

iv

C.    The SHDC was not unreasonable in finding the State did not fail to disclose exculpatory evidence regarding key witnesses (Claim 2c). ................................................................................ 62

D.    Holberg's "catch all" Brady claim is procedurally barred and without merit (Claim 2d). ....................................................... 68

V.    For Holberg's Various Claims of IATC During the Guilt Phase, She Either Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations were Unreasonable (Claim 3). .......................... 69

A.    Holberg's claim that counsel failed to investigate and present key facts are, in part, procedurally barred; further, she fails to show both deficiency and prejudice (Claim 3a). ............................................. 69

1.    The witnesses Holberg would now proffer to support her theory of self-defense are not credible and are largely cumulative. .............................................................. 71

2.    Holberg fails to show how Counsel was deficient in defending against the burglary/robbery aggravator. ................. 78

3.    Holberg fails to show trial counsel deficiently challenged the State's forensic case.............................................. 79

B.    Holberg fails to show the CCA was unreasonable in finding counsel was not deficient for not challenging juror Carpenter for cause (Claim 3b). ....................................................... 82

C.    The SHDC was not unreasonable in finding that trial counsel was not deficient in how they challenged Kirkpatrick's testimony (Claim 3c). ................................................................ 83

D.    Holberg's claim that counsel failed to challenge the testimony of various State's witnesses is in part procedurally barred; further, she fails to show the state court was unreasonable in denying those grounds properly raised (Claim 3d). ............................................. 84

E.    Holberg fails to show the unreasonableness of the state court's decision that trial counsel was not deficient in presentation of Connie Baker (Claim 3e). ....................................................... 90

F.    Holberg also fails to show the unreasonableness of the state court's decision that trial counsel was not deficient regarding Susan Lawrence (Claim 3f). ..................................................... 92

G.    This Court may not disturb the CCA's holding where it is based on the state law admissibility of evidence; further counsel cannot be deficient where the admission of Holberg's confessions did not violate Supreme Court precedent (Claim 3g)........................................ 93

H.    Holberg fails to show the unreasonableness of the CCA's decision that counsel was not deficient in not requesting a supplemental charge when one was not warranted, which was based on a determination of state law (Claim 3h).................................................... 94

I.    Holberg fails to show the CCA was unreasonable in holding that counsel was not deficient for any perceived errors in educating the jury on the distinction between the aggravators of robbery/burglary and theft after the fact (Claim 3i)............................. 96

J.    Because there are no errors in the guilt phase to cumulate, Holberg cannot show the CCA was unreasonable in denying her cumulative IATC ground for relief (Claim 3j). ...................................... 96

VI.    Holberg Likewise Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations Were Unreasonable for her Claims of IATC During the Punishment Phase (Claim 4)........................................... 97

A.    Holberg's claim that trial counsel failed to hold the State to its burden in proving Holberg's prior bad acts and offenses was in part deemed meritless by the CCA and in part procedurally barred by the SHDC, and Holberg can overcome neither determination (Claim 4a)...................................................... 97

B.    Holberg fails to show the state court was unreasonable in their determination that trial counsel did object to Burnett and Norrell's testimony, and further, they were not deficient in their performance (Claim 4b)......................................................... 99

C.    Holberg's claim that trial counsel failed to prepare for Dr. Coons is procedurally barred and meritless (Claim 4c)................................. 100

D.    Holberg fails to demonstrate the state court was unreasonable in finding that trial counsel was not deficient in their mitigation investigation and preparation of Dr. Patel (Claim 4d). ....................... 103

E.    Holberg cannot show the state court was unreasonable in finding that trial counsel never resolved to "throw the trial" (Claim 4e)....... 123

F.      Holberg fails to show the state court was unreasonable in their determination under state law that counsel was not deficient for not objecting to the State's closing arguments (Claim 4f). ................ 123

VII.    The CCA Held that the Evidence at Trial was Legally Sufficient as to Each of the Two Aggravating Factors, and Holberg Fails to Show This Decision was Unreasonable (Claim 5) ........................................................... 128

VIII.   Holberg's Claim that the State Made Direct Appeals to a Retributive Religious Sentiment Throughout her Trial is Procedurally Barred and Meritless (Claim 6) ........................................................................................... 130

IX.     Holberg Fails to Show the CCA's Decision was Unreasonable Where it Held that Veniremember Balderas was Properly Excused for Cause (Claim 7). ..................................................................................................... 131

X.      Holberg's Claim that juror Carpenter Should Have Been Excluded for Cause is Procedurally Barred and Meritless (Claim 8). ............................... 132

XI.     Holberg Fails to Show the Unreasonableness of the CCA's Decision, based on state law, that the Trial Court Did not Err in Regards to the Questioning of Veniremember Barbara Fritzmeyer (Claim 9). .................... 134

XII.    Holberg's Claims that the Texas Death Penalty Statutory Scheme is Unconstitutional, Both Facially and as Applied, Are Foreclosed by Supreme Court or Fifth Circuit Precedent, Procedurally Barred in Part, and Otherwise Meritless (Claims 10 & 11). .................................................. 135

XIII.   Holberg Fails to Show the CCA Was Unreasonable in Holding that the Trial Court Properly Excluded Impact Testimony from her Family and Friends (Claim 12). ............................................................................................ 139

XIV.    Holberg Fails to Show the CCA was Unreasonable in Holding that the Trial Court Properly Denied the Defense from Informing the Jury about the Result of a "Holdout" Juror (Claim 13). .................................................... 140

XV.     Holbeg's Claim that Texas's Definition of Mitigating Evidence is Unconstitutional Has Been Squarely Rejected by the CCA and Fifth Circuit (Claim 14). ............................................................................................ 141

XVI.    Holberg Fails to Show the CCA's Decision Was Unreasonable Regarding the Jury Instruction Definitions (Claim 15). ................................................. 141

XVII.   Holberg Cannot Show the CCA Was Unreasonable in Denying Based on State Law Her Claim that the Trial Court Erred in Failing to Require the State to Prove Lack of Provocation by Towery (Claim 16)..................... 142

XVIII. Holberg Fails to Show the CCA's Decision Was Unreasonable in Denying Her Claim that the Trial Court Prevented the Jury from Considering Provocation as Mitigating Evidence (Claim 17). ........................................... 143

XIX.    Holberg's Claim of Total Cumulative Error is Procedurally Barred and Meritless (Claim 18) ..................................................................................... 144

XX.    Holberg's Fundamental Miscarriage of Justice Claim is Procedurally Barred, Not Cognizable, and Meritless (Claim 19) ....................................... 145

CONCLUSION ............................................................................................................ 146

CERTIFICATE OF SERVICE ................................................................................... 148

# INDEX OF AUTHORITIES

## Cases

*Adams v. Texas*, 448 U.S. 38, 46 (1980) .................................................................. 131

*Alejandro v. State*, 493 S.W.2d 230 (Tex. Crim. App. 1973) .................................... 124

*Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000) ................................................ 140

*Alexander v. McCotter*, 775 F.2d 595 (5th Cir. 1989) ............................................... 129

*Allen v. Stephens*, 805 F.3d 617 (5th Cir. 2015) .............................. 130, 133, 136, 137

*Anderson v. Collins*, 18 F.3d 1208 (5th Cir. 1994) ............................................. 95, 142

*Anderson v. Harless*, 459 U.S. 4 (1982) .......................................................... 21, 48, 56

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) .......................................................... 142

*Atkins v. Virginia*, 536 U.S. 304 (2002) .................................................................... 16

*Baldree v. Johnson*, 99 F.3d 659 (5th Cir. 1996) ...................................................... 17

*Balentine v. Thaler*, 609 F.3d 729 (5th Cir. 2010) .................................................... 24

*Balentine v. Thaler*, 626 F.3d 842 (5th Cir. 2010) ............................................... 24, 25

*Banks v. Dretke*, 540 U.S. 668 (2004) .............................................................. passim

*Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055 (N.D. Tex. July 7, 2015) ................................................................................................................... 136

*Barefoot v. Estelle*, 463 U.S. 880 (1983) .......................................................... 101, 102

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) ................................................ 30

*Bartee v. Quarterman*, 574 F. Supp. 2d 624 (W.D. Tex. 2008) ........................ 141, 144

*Batson v. Kentucky*, 476 U.S. 79 (1986) .................................................................... 27

*Blackmon v. Scott*, 22 F.3d 560 (5th Cir. 1994) ........................................................ 51

*Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011) ..................................................... 16, 141

*Bousley v. United States*, 523 U.S. 614 (1998) ........................................................ 145

*Boyle v. Johnson*, 93 F.3d 180 (5th Cir. 1996) ......................................................... 29

*Bradford v. Whitley*, 953 F.2d 1008 (5th Cir. 1992) .................................................. 71

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................ passim

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) ............................................................ 30

*Brown v. Collins*, 937 F.2d 175 (5th Cir. 1991) ..................................................... 129

*Buxton v. Lynaugh*, 879 F.2d 140 (5th Cir. 1989) ...................................................... 17

*Byrne v. Butler*, 845 F.2d 501 (5th Cir. 1988) ........................................................ 133

*Castillo v. Johnson*, 141 F.3d 218 (5th Cir. 1998) ..................................................... 52

*Catalan v. Cockrell*, 315 F.3d 491 (5th Cir. 2002) ..................................................... 12

*Chamberlain v. State*, 998 S.W.2d 230 (Tex. Crim. App. 1999) ................................. 98

*Charles v. Thaler*, 629 F.3d 494 (5th Cir. 2011) ................................................. passim

*Chase v. Epps*, 74 F. App'x 339 (5th Cir. 2003) ....................................................... 28

*Clark v. Johnson*, 202 F.3d 760 (5th Cir. 2000) ................................. 17, 100, 102, 127

*Cobb v. Wainwright*, 666 F.2d 966 (5th Cir. 1982) ................................................. 129

*Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010) ......................................... 101

*Coleman v. Thompson*, 501 U.S. 722 (1991) ...................................................... passim

*Collier v. State*, 959 S.W.2d 621 (Tex. Crim. App. 1997) ....................................... 134

*Conley v. Gibson*, 355 U.S. 41 (1957) ...................................................................... 27

*Cortez v. State*, 683 S.W.2d 419 (Tex. Crim. App. 1984) ........................................ 127

*Couch v. Booker*, 632 F.3d 241 (6th Cir. 2011) ...................................................... 115

*Cullen v. Pinholster*, 563 U.S. 170 (2011) .......................................................... passim

*Daubert v. Merrell Dow Pharm'als*, 509 U.S. 579 (1993) ................................. 101, 102

*Davis v. Scott*, 51 F.3d 457 (5th Cir. 1995) ............................................................ 140

*Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009) .................................................... 39

*Devoe v. Davis*, No. 1:14-CV-151-SS, 2016 WL 5408169 (W.D. Tex. Sept. 26, 2016) .................................................................................................................... 102

*Dorsey v. Quarterman*, 494 F.3d 527 (5th Cir. 2007) .................................................. 98

*Dowthitt v. Johnson*, 230 F.3d 733 (5th Cir. 2000) .............................. 22, 72, 105, 145

*Dupuy v. Butler*, 837 F.2d 699 (5th Cir. 1988) .......................................................... 21

*Early v. Packer*, 537 U.S. 3 (2002) ............................................................................ 12

*Eldridge v. State*, 940 S.W.2d 646 (Tex. Crim. App. 1996) ...................................... 134

*Espada v. State*, No. AP-75,219, 2008 WL 4809235 (Tex. Crim. App. Nov. 5, 2008) .................................................................................................................................... 101

*Ex parte Gardner*, 959 S.W.2d 189 (Tex. Crim. App. 1996) ................................ 98, 99

*Fairman v. Anderson*, 188 F.3d 635 (5th Cir. 1999)................................................. 146

*Figueroa v. Dretke*, No. 4:05-CV-074-Y, 2005 WL 1108109 (N.D. Tex. May 5, 2005) .................................................................................................................................... 145

*Finley v. Johnson*, 243 F.3d 215 (5th Cir. 2001)...................................................... 145

*Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000)...................................................... 102

*Ford v. Wainwright*, 477 U.S. 399 (1986) .................................................................. 15

*Frazier v. Dretke*, 145 F. App'x 866 (5th Cir. 2005)........................ 130, 133, 136, 137

*Fuller v. Johnson*, 158 F.3d 903 (5th Cir. 1998)................................................. passim

*Fuller v. State*, 827 S.W.2d 919 (Tex. Crim. App. 1992) ......................................... 139

*Garland v. Maggio*, 717 F.2d 199 (5th Cir. 1983).................................................... 116

*Giglio v. United States*, 405 U.S. 150 (1972) ..................................................... passim

*Gonzales v. Stephens*, 606 F. App'x 767 (5th Cir. 2015) .......................................... 102

*Harrington v. Richter*, 562 U.S. 86 (2011) ......................................................... passim

*Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995)............................................. 116

*Herrera v. Collins*, 506 U.S. 390 (1993) ................................................................. 145

*Hines v. Texas*, 129 F. App'x 100 (5th Cir. 2005)...................................................... 27

*Hughes v. Johnson*, 191 F.3d 607 (5th Cir. 1999).................................................... 130

*Hughes v. Quarterman*, 530 F.3d 336 (5th Cir. 2008) .......................................... passim

*Hutch v. State*, 922 S.W.2d 166 (Tex. Crim. App. 1996) .......................................... 126

*Jackson v. Dretke*, 450 F.3d 614 (5th Cir. 2006) ...................................................... 139

*Jackson v. Johnson*, 194 F.3d 641 (5th Cir. 1999) .................................................... 124

*Jackson v. State*, 17 S.W.3d 664 (Tex. Crim. App. 2000) ........................................ 124

*Jackson v. Virginia*, 443 U.S. 307 (1979) .................................................................... 129

*Jernigan v. Collins*, 980 F.2d 292 (5th Cir. 1992) ....................................................... 70

*Johnson v. Puckett*, 176 F.3d 809 (5th Cir. 1999) ....................................................... 43

*Johnson v. Texas*, 509 U.S. 350 (1993) ........................................................................ 135

*Jones v. Butler*, 864 F.2d 348 (5th Cir. 1988) ............................................................ 123

*Jones v. United States*, 527 U.S. 373 (1999) .............................................................. 140

*Jurek v. Texas*, 428 U.S. 262 (1976) ............................................................................ 135

*Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992) ................................................................ 21

*King v. Cockrell*, No. 3:02-CV-2197, 2002 WL 31906378 (N.D. Tex. Dec. 27, 2002) 145

*Kinsel v. Cain*, 647 F.3d 265 (5th Cir. 2012) .............................................................. 20

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) .................................... 29, 100, 102, 127

*Kyles v. Whitley*, 514 U.S. 419 (1995) .......................................................................... 51

*Ladd v. State*, 3 S.W.3d 547 (Tex. Crim. App. (1999) .............................. 137, 138, 141

*Lambert v. Blackwell*, 387 F.3d 210 (3d Cir. 2004) .................................................... 17

*Leavitt v. Arave*, 646 F.3d 605 (9th Cir. 2011) ......................................................... 121

*Lockhart v. McCree*, 476 U.S. 162 (1986) ................................................................... 136

*Lockyer v. Andrade*, 538 U.S. 63 (2003) ....................................................................... 11

*Mann v. Scott*, 41 F.3d 968 (5th Cir. 1994) ...................................................... 131, 132

*Martinez v. Ryan*, 132 S. Ct. 1309 (2012) ................................................................. 101

*Mayle v. Felix*, 545 U.S. 644 (2005) .......................................................................... 28

*McClain v. Hall*, 552 F.3d 1245 (11th Cir. 2008) ..................................................... 116

*McFarland v. State*, 928 S.W.2d 482 (Tex. Crim. App. 1996) ................................ 139

*Mendiola v. Schomig*, 224 F.3d 589 (7th Cir. 2000) .................................................. 17

*Michael Williams v. Taylor*, 529 U.S. 420 (2000) ...................................................... 14

*Millard v. Lynaugh*, 810 F.2d 1403 (5th Cir. 1987) .................................................. 20

*Montelongo v. State*, 644 S.W.2d 710 (Tex. Crim. App. 1980) ................................ 124

*Moore v. Quarterman*, 526 F. Supp. 2d 654 (W.D. Tex. 2007) ........................ 137, 138

*Morales v. Thaler*, 714 F.3d 295 (5th Cir. 2013) ................................................ passim

*Moreno v. Estelle*, 717 F.2d 171 (5th Cir. 1983) ......................................................... 92

*Morris v. State*, 940 S.W.2d 610 (Tex. Crim. App. 1996) ....................................... 134

*Morrow v. Dretke*, 367 F.3d 309 (2004) ...................................................................... 18

*Napue v. Illinois*, 360 U.S. 264 (1959) ................................................................. passim

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002) ................................... 12, 105, 121, 122

*Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995) ................................................... 20, 124

*Nickleson v. Stephens*, 803 F.3d 748 (2015) ............................................................. 144

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997) .............................................. passim

*Ogan v. Cockrell*, 297 F.3d 349 (5th Cir. 2002) ................................................. passim

*Panetti v. Quarterman*, 551 U.S. 930 (2007) ...................................................... 15, 16

*Patton v. Yount*, 467 U.S. 1025 (1984) ............................................................... passim

*Payne v. Tennessee*, 501 U.S. 808 (1981) ................................................................. 139

*Pemberton v. Collins*, 991 F.2d 1218 (5th Cir. 1993) ............................................. 129

*Picard v. Connor*, 404 U.S. 270 (1971) .............................................................. passim

*Ramey v. State*, No. AP-75678, 2009 WL 335276 (Tex. Crim. App. Feb. 11, 2009) 101

xiii

*Rector v. Johnson*, 120 F.3d 551 (5th Cir. 1997)........................................................ 51

*Rhode Island v. Innis*, 446 U.S. 291 (1980) ................................................................ 94

*Riles v. State*, 595 S.W.2d 858 (Tex. Crim. App. 1980) ............................................. 95

*Ring v. Arizona*, 536 U.S. 584 (2002) ....................................................................... 142

*Rivera v. Quarterman*, 505 F.3d 349 (5th Cir. 2007) ................................................. 16

*Roach v. Quarterman*, 220 F. App'x 270 (5th Cir. 2007)......................................... 140

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012) .............................................. 102, 120

*Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010)............................................ 23, 25, 145

*Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005)....................................................137, 143

*Runnels v. Stephens*, No. 2:12-CV-0074-J-BB, 2016 WL 1274132 (N.D. Tex. Mar. 15, 2016) ......................................................................................................................... 138

*Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006)....................................................... 98

*Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001) .................................................. 12

*Sawyer v. Whitley*, 505 U.S. 333 (1992) ........................................................... 145, 146

*Schaetzle v. Cockrell*, 343 F.3d 440 (5th Cir. 2003)...................................... 71, 94, 106

*Scheannette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007)...................................... 143

*Schlup v. Delo*, 513 U.S. 298 (1995) ........................................................................ 146

*Schriro v. Landrigan*, 550 U.S. 465 (2007) ............................................................... 14

*Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010) ............................................................ 17

*Sims v. Brown*, 425 F.3d 560 (9th Cir. 2005).......................................................... 116

*Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) ..................................................... 116

*Strickland v. Washington*, 466 U.S. 668 (1984)................................................. passim

*Strickland*........................................................................................................... 121

*Strickler v. Greene*, 527 U.S. 263 (1999) ............................................................ 43, 51

*Styron v. Johnson*, 262 F.3d 438 (2001)................................................................. 123

xiv

*Sykes v. Dretke*, No. 3:02-CV-784-G, 2004 WL 1856826 (N.D. Tex. Aug. 19, 2004) 145

*Tanner v. United States*, 483 U.S. 107 (1987) .................................................. 133, 134

*Teague v. Lane*, 489 U.S. 288 (1989) .................................................... passim

*Terry Williams v. Taylor*, 529 U.S. 362 (2000) .................................... passim

*Teti v. Bender*, 507 F.3d 50 (1st Cir. 2007) .................................................. 17

*Trevino v. Thaler*, 133 S. Ct. 1911 (2013) ................................................. 101

*Tuilaepa v. California*, 512 U.S. 967 (1994) ........................................... 138

*Turner v. Quarterman*, 481 F.3d 292 (5th Cir. 2007) ..................................... 138, 140

*United States v. Agurs*, 427 U.S. 97 (1976) ................................................. 51

*United States v. Bagley*, 473 U.S. 677 (1985) ............................................. 51

*United States v. Bell*, 367 F.3d 452 (5th Cir. 2004) ................................... 97, 127, 144

*United States v. Cyprian*, 197 F.3d 736 (5th Cir. 1999) ........................... 129

*United States v. Fishel*, 747 F.2d 271 (5th Cir. 1984) ................................ 27

*United States v. Green*, 180 F.3d 216 (5th Cir. 1999) ............................... 129

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998) .............................. 135

*United States v. Jones*, 172 F.3d 381 (5th Cir. 1999) .............................. 145

*United States v. Martinez-Mercado*, 888 F.2d 1484 (5th Cir. 1989) ......... 29

*United States v. Snarr*, 704 F.3d 368 (5th Cir. 2013) .............................. 139

*United States v. Stalnaker*, 571 F.3d 428 (5th Cir. 2009) ......................... 28

*United States v. Washington*, 44 F.3d 1271 (5th Cir. 1995) ...................... 30

*Vail v. Procunier*, 747 F.2d 277 (5th Cir. 1984) ...................................... 19

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ......................... 13, 15, 128

*Wainwright v. Witt*, 469 U.S. 412 (1985) .................................................. 131

*Warger v. Shauers*, 135 S. Ct. 521 (2014) ............................................... 134

*Webb v. Collins*, 2 F.3d 93 (5th Cir. 1993) ................................................................ 140

*Weeks v. Scott*, 55 F.3d 1059 (5th Cir. 1995) ........................................................ passim

*West v. Johnson*, 92 F.3d 1385 (5th Cir. 1996) ........................................................... 52

*Westley v. Johnson*, 83 F.3d 714 (5th Cir. 1996)........................................ 52, 96, 127, 144

*Whittington v. State*, 580 S.W.2d 845 (Tex. Crim. App. 1979)................................. 127

*Wiggins v. Smith*, 539 U.S. 510 (2003) ..................................................................... 119

*Wilder v. Cockrell*, 274 F.3d 255 (5th Cir. 2001) ........................................................ 21

*Wiley v. Epps*, 625 F.3d 199 (5th Cir. 2010) ............................................................... 20

*Wilkerson v. Collins*, 950 F.2d 1054 (5th Cir. 1992)................................................... 70

*Williams v. Collins*, 16 F.3d 626 (5th Cir. 1994) ...................................................... 133

*Williams v. Scott*, 35 F.3d 159 (5th Cir. 1994) ........................................................... 52

*Williams v. State*, 575 S.W.2d 30 (Tex. Crim. App. 1979)....................................... 127

*Williams v. Stephens*, 761 F.3d 561 (5th Cir. 2014) ................................................. 101

*Witherspoon v. Illinois*, 391 U.S. 510 (1968)................................................... 131, 132

*Wong v. Belmontes*, 130 S. Ct. 383 (2009)................................................................ 121

*Woodford v. Visciotti*, 537 U.S. 19 (2002)........................................................... 11, 12

*Woods v. Cockrell*, 307 F.3d 353 (5th Cir. 2002)....................................................... 138

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) ..................................................... 11, 13

**Statutes**

28 U.S.C. § 124(a)(5) ........................................................................ 1

28 U.S.C. § 2241(d) .......................................................................... 1

28 U.S.C. § 2254 ........................................................................... 1, 15

28 U.S.C. § 2254(b) ......................................................................... 20

28 U.S.C. § 2254(b)(1) ..................................................................... 22

28 U.S.C. § 2254(c) ......................................................................... 20

28 U.S.C. § 2254(d) ................................................................... passim

28 U.S.C. § 2254(d)(1) ..................................................... 11, 13, 14, 37

28 U.S.C. § 2254(d)(2) ..................................................................... 13

28 U.S.C. § 2254(e)(1) ........................................................... 13, 15, 18

28 U.S.C. § 2254(e)(2) ............................................................... 13, 14

*Raby v. State*, 970 S.W.2d 1 (Tex. Crim. App. 1998) ...................... 143, 144

Tex. Code Crim. Proc. art. 11.071 ......................................................... 6, 7

Tex. Code Crim. Proc. art. 11.071, § 5 .............................................. 24, 99

Tex. Code Crim. Proc. art. 11.071, § 5(a)(1) ........................... 24, 25, 26, 27

Tex. Code Crim. Proc. art. 11.071, § 5(e) .............................................. 26

Tex. Code Crim. Proc. art. 37.071 ........................................... 135, 136, 142

Tex. Code Crim. Proc. art. 37.071, § 2(e)(1) ................................... 137, 143

Tex. Code Crim. Proc. art. 37.0711 ..................................................... 142

Tex. Code Crim. Proc. art. 37.0711, § 3(b)(3) ..................................... 142

Tex. Code Crim. Proc. art. 38.22, § 3(a) ............................................... 93

Tex. Code Crim. Proc. art. 64.01 ................................................ 7, 44, 46

Tex. Penal Code § 19.03 .......................................................... 135, 142

## Rules

Fed. R. Civ. P. 8(a) ................................................................................ 27

Fed. R. Evid. 606(b) ....................................................................... 133, 134

Fed. R. Evid. 802 ................................................................................... 38

N.D. Tex. Civ. R. 56.6(b) ....................................................................... 5, 8

N.D. Tex. Civ. R. 7.5(a) .......................................................................... 10

Rule 2(c), 28 U.S.C. foll. § 2254 ............................................................. 27

Rule 2(c), 28 U.S.C. foll. § 2254 advisory committee's note ....................... 28

Rule 4, 28 U.S.C. foll. § 2254 advisory committee's note ........................... 28

Tex. R. Evid. 802 .................................................................................. 38

Texas Rule of Evidence 702 .................................................................. 101

*United States v. Ortiz*, 942 F.2d 903 (5th Cir. 1991) ................................ 134

*United States v. Ruggerio*, 56 F.3d 647 (5th Cir. 1995) ............................ 134

## Miscellaneous

43 George E. Dix & John M. Schmolesky, *Texas Practice Series: Criminal Practice and Procedure* § 45:9 (3rd ed. 2010) .................................................... 124

*Find a Lawyer*, https://www.texasbar.com/Template.cfm?Section=Member_Directory &template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=215062 (last visited Dec. 9, 2016) .................................................. 36

Jim McBride, *State Bar Denies Grievance Against DA*, Amarillo Globe-News (Mar. 31, 2015), http://amarillo.com/news/local-news/2015-03-31/state-bar-denies-grievance-against-da ............................................................................ 37

## ANSWER

Petitioner Brittany Marlowe Holberg was properly convicted of the capital murder of 80-year-old A.B. Towery, Sr. (Towery), in the course of committing a robbery/burglary and sentenced to death. She now challenges this conviction and sentence through her amended petition for writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254. Several of her claims were either unexhausted or procedurally barred in state court; she also asserts grounds for relief that are not cognizable on federal habeas review. Further, all of her claims are ultimately meritless. Because she fails to meet her burden under AEDPA showing the state court unreasonably denied those claims properly presented therein, and because she otherwise raises procedurally barred or uncognizable claims for which there is no relief, this Court should dismiss with prejudice Holberg's petition and deny her a Certificate of Appealability (COA).

## JURISDICTION

A court has jurisdiction over the subject matter and parties in the district where the petitioner was originally convicted in state court. 28 U.S.C. § 2241(d). Holberg was convicted of capital murder in the 251st District Court of Randall County, Texas, in cause number 11,492-C. 8.CR.1734–37.[1] Randall County is within the Amarillo Division of the Northern District of Texas. 28 U.S.C. § 124(a)(5). Thus, jurisdiction is proper in this Court.

---

[1] CR refers to the Clerk's Record of pleadings and documents filed in the state trial court for Holberg's direct appeal, AP-73,127. It is preceded by the volume number and followed by the relevant page numbers.

1

## PETITIONER'S ALLEGATIONS

Respondent Lorie Davis (the Director) understands Holberg to assert the following grounds for relief:

1. Prosecutorial misconduct during the guilt phase:

    a. The prosecution intentionally elicited false testimony from Vicki Kirkpatrick;
    b. The prosecution intentionally elicited false testimony from Donald Owens;
    c. The prosecution intimidated or coerced witnesses during trial and during the state habeas proceedings;
    d. The prosecution failed to disclose exculpatory evidence regarding key witnesses; and
    e. The prosecution failed to disclose other key evidence to trial counsel;

2. Prosecutorial misconduct during the punishment phase:

    a. The prosecution intentionally elicited false testimony from Katina Dickson and Mary Burnett;
    b. The prosecution used the false testimony from Kirkpatrick during the guilt phase;
    c. The prosecution failed to disclose exculpatory evidence regarding key witnesses; and
    d. The prosecution failed to disclose other key evidence;

3. Ineffective assistance of trial counsel (IATC) during the guilt phase:

    a. Counsel failed to investigate and present facts key to her defense;
    b. Counsel failed to challenge for cause juror Bill Carpenter;
    c. Counsel failed to challenge and counter Kirkpatrick's testimony;
    d. Counsel failed to effectively cross-examine several other witnesses;
    e. Counsel failed to effectively examine Connie Baker and object to the State's improper cross;
    f. Counsel failed to present Susan Lawrence as a witness;
    g. Counsel failed to move to suppress Holberg's pretrial confessions;
    h. Counsel failed to seek a supplemental charge on burglary and robbery and failed to object to the given supplemental charge;
    i. Counsel failed to prepare the jury in voir dire, seek an instruction from the court, and discuss in closing arguments the distinction between robbery-murder and murder-then-theft; and
    j. Counsels errors, when viewed cumulatively, amount to IATC;

4.   IATC during the punishment phase:

   a.   Counsel failed to hold the State to its burden in proving prior bad acts and unadjudicated extraneous offenses;
   b.   Counsel failed to preserve error regarding surprise witnesses Burnett and Norrell;
   c.   Counsel failed to investigate, prepare for, and cross-examine Dr. Coons;
   d.   Counsel failed to investigate, prepare, and present mitigating evidence;
   e.   Counsel resolved to "throw the trial" and abandoned Holberg; and
   f.   Counsel failed to object to several statements by the State during closing arguments;

5.   One of the aggravating factors on which Holberg's conviction rested was legally insufficient;

6.   The State made a direct appeal to retributive religious sentiment;

7.   The trial court erred in granting the State's challenge for cause for Veniremember Arlene Balderas;

8.   Juror Billy Carpenter should have been excluded from the jury;

9.   The trial court erred in granting the State's challenge for cause for Veniremember Barbara Fritzemeyer;

10.  Texas's death penalty statutory scheme is unconstitutional;

11.  Texas's death penalty statutory scheme, as applied to Holberg, is unconstitutional;

12.  The trial court erred by excluding impact testimony from Holberg's family and friends;

13.  The trial court erred when it prevented the jury from knowing the effect of a holdout juror;

14.  Texas's mitigating evidence definition does not include evidence of a defendant's rehabilitation;

15.  The jury instructions failed to properly distinguish between capital murder with the robbery/burglary aggravator and murder followed by theft;

16.  The trial court failed to require the State to prove lack of provocation by the victim;

3

17.    The trial court prevented the jury from considering lack of provocation by the victim as mitigating evidence;

18.    Cumulative error of the above claims; and

19.    Her conviction and sentence are a fundamental miscarriage of justice.

Am. Pet. for Writ of Habeas Corpus 29–148, ECF No. 65 (Pet.).

## GENERAL DENIAL

The Director denies each allegation of fact made by Holberg except those supported by the record and those specifically admitted herein.

## STATEMENT OF THE CASE

### I.    Facts of Holberg's Capita Murder

The State presented 21 witnesses (law enforcement personnel, friends and relatives of both the victim and [Holberg], the county medical examiner, etc.) and numerous exhibits (including [Holberg]'s incriminating written statement[FN4]) at the guilt/innocence stage in an attempt to prove its case, and [Holberg] presented eleven witnesses (including herself) and numerous exhibits in her defense.

> [FN3] In her written statement, given to police shortly after her arrest, [Holberg] admitted killing the victim but claimed she did so in self-defense.]

* * *

[The evidence and testimony showed that a]t approximately 4:30 p.m., November 13, 1996, in Randall County, 80-year-old A.B. Towery, Sr., purchased groceries at an Albertson's store and then walked back to his apartment [at the Princess Apartments]. As he neared his home, Towery was approached by [Holberg]—a 23-year-old prostitute and drug addict—who asked to use his telephone. Towery consented, and the two proceeded into his apartment. Once inside, [Holberg] asked Towery for money, but he refused. [Holberg] then tried to take Towery's money by force, and the two struggled. In the course of the struggle, [Holberg] grabbed several objects (a cast iron skillet, a steam iron, a hammer, a paring knife, a butcher knife, and two forks) and used them to beat and stab Towery, fatally injuring him.[FN4] After Towery fell to the floor, dying, [Holberg] shoved the base of a lamp five inches down his throat,

4

choking him and hastening his death. [Holberg] then searched Towery's pants pockets, found his wallet, and took $1,400 in cash. After showering and changing into some of Towery's clothes, [Holberg] left. She spent the evening using Towery's money to buy cocaine, which she snorted with a friend.

[FN4] Towery sustained 58 stab wounds and numerous blunt force injuries.

\* \* \*

The State presented seven witnesses at the punishment stage . . ., and [Holberg] presented twelve witnesses in rebuttal. . . . [T]he evidence . . . established that (1) sometime prior to November 6, 1995, [Holberg] struck the head of her elderly "sugar daddy," E.R. Williams, with a cane, rendering him unconscious, because he would not give her money for illicit drugs; (2) while awaiting trial in the instant case, [Holberg] repeatedly solicited a cell-mate to kill Vickie Marie Kirkpatrick, a key prosecution witness; and (3) [Holberg] was once convicted of theft. In addition, Dr. Richard E. Coons, a psychiatrist, testified that, based on [Holberg]'s record, there was a "significant probability that [she] would commit criminal acts of violence in the future."

*Holberg v. State*, No. AP-73,127, 38 S.W.3d 137, 139 (Tex. Crim. App. 2000)

(published in part); App.A.2–3, 4–5.[2]

## II.    Holberg's Postconviction Proceedings

On March 26, 1998, Judge Pirtle entered a judgment of conviction for capital

murder and sentence of death. 8.CR.1734–37. On direct appeal Holberg raised fifty

points of error. App.A.2. The CCA affirmed the conviction and sentence on November

---

[2] The CCA's opinion on direct appeal was only published in part. As such, most of the Westlaw document is not sufficiently paginated for purposes of pinpoint citations. For the convenience of the Court and because she refers to this opinion throughout her brief, the Director has attached the opinion as Appendix A. Local Rule 56.6(b) requires that appendices be numbered in the lower right-hand corner. N.D. Tex. Civ. R. 56.6(b). However, for continuity purposes with Appendix B, this Appendix is numbered in the lower left-hand corner. *See infra* FN4.

29, 2000. *Id.* The United States Supreme Court denied her petition for a writ of certiorari. *Holberg v. Texas*, 122 S. Ct. 394 (2001).

Holberg filed her initial state habeas application on July 19, 2000, raising thirty-five claims. 1/2.SHCR.Supp.10–268.[3] On October 6, 2006, the state habeas district court (SHDC) granted Holberg's motion to substitute counsel. 1.SHCR.1–9. This counsel, now serving as federal habeas counsel, filed a "Reply in Support of Application for Writ of Habeas Corpus" on October 19, 2006. 2.SHCR.10–164; *see also* 2.SHCR.165–18.SHCR.4758 (exhibits and other supporting documents). The SHDC dismissed this filing as a subsequent application pursuant to the Texas Code of Criminal Procedure Article 11.071 and forwarded it to the CCA. However, the CCA found this filing was not a subsequent application as it did not add new claims; rather, it merely expanded on those grounds for relief already raised in the initial application. *Ex parte Holberg*, No. WR-68,994, 2008 WL 152725, at *1 (Jan. 16, 2008).

On August 22, 2011, Holberg filed "Applicant's Motion for Post-Conviction Fingerprint and Blood Testing of the Interior of a Wallet" as part of her state habeas

---

[3] SHCR refers to the original eighteen-volume State Habeas Clerk's Record for state writ number WR-68,994. It is preceded by the volume number and followed by the relevant page numbers.

During the fourteen years of state habeas litigation, there were five separate supplements to the State Habeas Clerk's Record filed in the CCA, each with a different number of volumes:
- __/2.SHCR.Supp refers to a two-volume supplement filed in the CCA on February 5, 2007.
- __/29.SHCR.Supp refers to a twenty-nine-volume supplement filed in the CCA on May 29, 2012.
- __/5.SHCR.Supp refers to a five-volume supplement filed in the CCA on September 18, 2012.
- __/6.SHCR.Supp refers to a six-volume supplement filed in the CCA on January 8, 2014.
- __/1.SHCR.Supp refers to a one-volume supplement filed in the CCA on August 15, 2014.
Each reference is preceded by the specific volume and followed by the relevant page numbers.

Finally, SHCR.Subq refers to a single-volume subsequent State Habeas Clerk's Record filed in the CCA on January 11, 2013. It is followed by the relevant page numbers.

proceedings. 18/29.SHCR.Supp.5545–79. Because Article 11.071 does not create an avenue for DNA testing, the SHDC denied the motion. 20/29.SHCR.Supp.6280. Holberg appealed this order, but the CCA held that such an interlocutory appeal was not authorized under Texas law and dismissed it. *Ex parte Holberg*, No. AP-76,668, 2011 WL 6102886, at *1 (Tex. Crim. App. Dec. 7, 2011) (*Holberg 11.071 DNA*). In November 2012, Holberg filed a proper motion for DNA testing of Towery's wallet under the Texas Code of Criminal Procedure Chapter 64. *Holberg v. State*, No. AP-77,023, 425 S.W.3d 282, 283–84 (2014) (*Holberg Ch. 64 DNA*); *see* Tex. Code Crim. Proc. art. 64.01. The trial court denied the motion, and the CCA affirmed this decision on April 2, 2014. *Id.* at 284–88.

Also on August 22, 2011, the same day Holberg filed her motion for DNA testing under Code of Criminal Procedure Article 11.071, she filed "Applicant's Motion for Reconsideration, Bill of Exceptions and Assignments of Error, and Offer of Proof" (Motion for Reconsideration). 5/29.SHCR.Supp.948–1238; *see also* 6/29.SHCR.Supp.1239–17/29.SHCR.Supp.5544, 18/29.SHCR.Supp.5590–20/29.SHCR.Supp.6237 (exhibits and other supporting documents). On May 14, 2012, Judge Estevez, the state habeas judge, found that this motion, at least in part, raised new claims and, thus, was a subsequent application. 28/29.SHCR.Supp.8574–79.

On that same day, Judge Estevez, after due consideration of both parties' proposed Findings of Fact and Conclusions of Law (FFCLs), entered 128 pages of FFCLs ultimately finding all of Holberg's claims lacked merit.

28/29.SHCL.Supp.8580–707; App.B.001–128.[4] After the district clerk filed these FFCLs with the CCA, Holberg filed yet another pleading on December 14, 2012: "Additional Evidence in Support of Applicant's Prosecutorial Misconduct Claims and Supplemental Request for Evidentiary Hearing," (Additional Evidence). SHCR.Subq.1–10. Judge Estevez ordered that this document be sent directly to the CCA as a subsequent application. *Id.* at 18–21.

On May 15, 2013, the CCA remanded a single IATC claim—that counsel failed to conduct a proper mitigation investigation and, thus, failed to properly prepare their expert, Dr. Patel—back to the district court for an evidentiary hearing. *Ex parte Holberg*, No. WR-68,994, 2013 WL 2120253, at *1 (Tex. Crim. App. May 15, 2013). The CCA explicitly ordered:

> We remand this application for the trial court to direct trial counsel Catherine Dodson and Candace Norris and defense investigators Jim Patterson and Kathy Garrison to respond to these claims in a live evidentiary hearing. Dodson and Norris shall explain their efforts to investigate and present mitigating evidence at the punishment phase of [Holberg]'s trial. Patterson and Garrison shall also explain their involvement, if any, in the investigation of evidence pertaining to the mitigation special issue. Following the receipt of live, testimonial evidence, the trial court shall make any findings of fact and conclusions of law relevant and appropriate to the disposition of these claims.

*Id.*

Later that same day, Judge Estevez set an evidentiary hearing for July 8, 2013.

*See* 1/6.SHCR.Supp.8 (Resp't's Mot. for a Continuance of the July 8, 2013 Evidentiary

---

[4] For the convenience of the Court and because she refers to these FFCLs throughout her brief, the Director has attached this document as Appendix B. Local Rule 56.6(b) requires that appendices be numbered in the lower right-hand corner. N.D. Tex. Civ. R. 56.6(b). However, for legibility purposes Appendix B is numbered in the lower left-hand corner.

Hr'g). Shortly thereafter, Holberg filed a motion to recuse Judge Estevez from the state habeas proceedings. *Id.* at 17–78. In a written order Judge Estevez denied Holberg's specious allegations and found the motion had no merit; however, due to her own docket demands and the time constraints of the CCA, Judge Estevez voluntarily recused herself. *Id.* at 109.

Judge Dambold, the new state habeas judge, reset the evidentiary hearing for October 7, 2013. *Id.* at 175. Over the course of two weeks, Judge Dambold heard live testimony from trial counsel (Catherine Dodson and Candace Norris) and the defense investigators (Jim Patterson and Kathy Garrison) regarding the defense team's mitigation investigation and preparation of their expert, Dr. Patel. *See* 1.SHRR.3–7 (Master Index).[5] Based on this testimony and additional proposed FFCLs from both parties, Judge Dambold entered supplemental FFCLs finding the single remanded claim meritless. 6/6.SHCR.Supp.1195–283; App.C.001-089.[6] The CCA adopted both sets of FFCLs, denied all claims raised in Holberg's initial application, and dismissed it. *Ex parte Holberg*, Nos. WR-68994-01, -02, -03, 2014 WL 5389907, at *1 (Tex. Crim. App. Sept. 17, 2014). The CCA further determined that Holberg's "Motion for Reconsideration" and "Additional Evidence" filings were subsequent applications and barred them as abuses of the writ because they failed to meet any of the statutory exceptions. *Id.*

---

[5] SHRR refers to the Reporter's Record from the state habeas hearing for writ number WR-68,994. It is preceded by the volume number and followed by the relevant page numbers.

[6] For the convenience of the Court and because she refers to these FFCLs throughout her brief, the Director has attached this document as Appendix C. For continuity purposes with Appendix B, this Appendix is also numbered in the lower left-hand corner. *See supra* FN 4.

One year later, Holberg filed her federal habeas petition with this court. Pet. for Writ of Habeas Corpus 1, ECF No. 1. This petition was 725 pages long with 514 exhibits consisting of 22,420 pages of documents and a videotape. Mem. Op. and Order for Am. Pet. with Scheduling Order 1, ECF No. 53 (Sched. Order). This Court ordered that Holberg file an amended petition complying with the page limits of the local rules of the Northern District of Texas. Sched. Sched. Order 4–5; *see also* N.D. Tex. Civ. R. 7.5(a). Holberg then filed her current amended petition. Pet.29–148.

## ARGUMENT

## I.    Standard of Review

Under § 2254(d) a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless:

> it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of this Court; or that it 'involved an unreasonable application of' such law; or that it 'was based on an unreasonable determination of the facts' in light of the record before the state court.

*Harrington v. Richter*, 562 U.S. 86, 100 (2011) (citations omitted). A state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent, yet reaches an opposite result. *Terry Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end a state court unreasonably applies

Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. In order to determine if the state court made an unreasonable application a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 88. This is the "only question that matters under § 2254(d)(1)." *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

Thus "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter*, 562 U.S. at 88 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d) creates a "doubly" difficult to surmount deferential assumption that favors the state court denial. *Richter*, 562 U.S. at 102.

11

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.*

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.* (citations omitted). It is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). State courts are presumed to know and follow the law. *Visciotti*, 537 U.S. at 24. Even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Richter*, 562 U.S. at 102.

If the Supreme Court has not "broken sufficient legal ground to establish . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *Terry Williams*, 529 U.S. at 381. Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102–03. A federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand" because such a process suggests the proposed rule is not clearly established. *Alvarado*, 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner. 28 U.S.C. § 2254(d)(2). Review pursuant to § 2254(d)(1)

"is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

Finally, an evidentiary hearing is precluded unless (1) a petitioner's claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) the petitioner establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. 28 U.S.C. § 2254(e)(2). A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence. *Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000). For example, a petitioner who does not present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2). *Id.* at 433. However, § 2254(e)(2) has "force [only] where § 2254(d)(1) does not bar federal habeas relief." *Pinholster*, 563 U.S. at 185.

Accordingly, even if a petitioner can leap the § 2254(e)(2) hurdle, "evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 1400. And whatever discretion remains after *Pinholster* to hold an evidentiary hearing, it is still appropriate to deny such a hearing if sufficient facts exist to make an informed decision on the merits. *Schriro v. Landrigan*, 550 U.S. 465, 474–75 (2007). Holberg has not met this standard.

14

## II.    Preliminary Legal Issues Relevant to all Claims for Relief

### A.    The SHDC's findings and conclusions are merits adjudications and, thus, entitled to deference under AEDPA.

At the outset Holberg lodges several complaints regarding her state habeas proceedings. Pet.20–29. She asserts that for the SHDC's FFCLs to qualify as a merits adjudication, "the state court must have provided a full and fair hearing" on which it evaluates the evidence and grounds for relief. Pet.21. However, 28 U.S.C. § 2254(e)(1) (the statute imposing a presumption of correctness) does not refer to a hearing in state court as a precondition for its application. Indeed, the law in this circuit runs counter. "[W]e hold that a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." *Valdez*, 274 F.3d at 951.

To support her claim Holberg completely distorts the holding in *Panetti v. Quarterman*, 551 U.S. 930 (2007). *Panetti* itself is founded on *Ford v. Wainwright*, 477 U.S. 399 (1986), which simply confirmed that a death-sentenced inmate had a constitutional right to competence at the time of execution. *Panetti*, 551 U.S. at 949 ("Justice Powell's opinion [in *Ford*] constitutes 'clearly established' law for purposes of § 2254."). In the competence-to-be-executed context an inmate, after making a "substantial threshold showing of insanity," is "afforded by *procedural due process* . . . a 'fair hearing' in accord with fundamental fairness." *Panetti*, 551 U.S. at 949 (emphasis added).[7] In other words, an inmate challenging his competency to be

---

[7] Assuming that the difference between a claim of categorical prohibition from the death penalty and all other claims does not distinguish *Panetti*, the actions of the state court in that case make it inapposite. Despite making a substantial threshold showing of incompetence the state court did not

executed has a constitutional right to certain procedures should he make a requisite showing in state court that he is categorically exempt from the death penalty.

Predicated on *Panetti*, and in the context of a claim of mental retardation, the Fifth Circuit has found a constitutional basis in the procedures afforded an inmate if they make a prima facie showing of mental retardation in state court:

> Even though *Atkins*[ *v. Virginia*, 536 U.S. 304 (2002)] did not specifically mandate any set of procedures, it was decided against the backdrop of the Supreme Court's and lower court's due process jurisprudence. The lesson we draw from *Panetti* is that, where a petitioner has made a prima facie showing of retardation as Rivera did, the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally due.

*Rivera v. Quarterman*, 505 F.3d 349, 358 (5th Cir. 2007). The Fifth Circuit clarified that the rule in *Rivera* "stems from the fact that *Atkins* created and protects a significant substantive liberty interest, a liberty interest that entitles the petitioner to a set of core procedural due process protections." *Blue v. Thaler*, 665 F.3d 647, 657 (5th Cir. 2011) (footnote omitted).[8] Like *Panetti*, this line of cases supports the proposition that inmates with death-sentence impunity have a *constitutional* right to specific fact-finding procedures should a requisite showing be made in state court.

With regard to Judge Estevez (her first state habeas judge whose FFCLs are owed deference in dispatching with the vast majority of claims now raised), Holberg asserts that the judge necessarily should have conducted a hearing because she did

---

provide Panetti with his own expert, failed to transcribe the proceedings, based its decision solely on court-appointed experts, and denied Panetti a hearing *despite entitlement to one under Texas law*. *Panetti*, 551 U.S. at 948–52. Holberg cannot allege similar faults in her extensive state habeas process; thus, *Panetti* has no application to this case.

[8] Holberg also misappropriates *Blue* without giving context to its actual holding. Pet.27.

not preside over the original trial. Pet.22–24. Citing *Baldree v. Johnson*, 99 F.3d 659 (5th Cir. 1996), Holberg claims the judge "had no foundation for determining credibility solely on the papers." Pet.23. Again, Holberg warps the true holding of this case. There, the Fifth Circuit held that the state habeas judge was in an "optimal position" to assess the credibility of affidavits because that judge also sat during the trial. *Baldree*, 99 F.3d at 663. Indeed, Fifth Circuit law provides an "especially strong" presumption where the trial judge and state habeas judge are one and the same. *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000); *Buxton v. Lynaugh*, 879 F.2d 140, 146 (5th Cir. 1989). However, this necessarily implies that a state habeas judge who did not preside over trial is still in position to assess the credibility of affidavits without a hearing and is owed the presumption of correctness under AEDPA.

The rule that Holberg suggests is also counter to case law in a number of other circuits. *See Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010) ("AEDPA does not make deference to state court fact-finding dependent on the adequacy of the procedures followed by the state court."); *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("As Professors Fallon, Meltzer, and Shapiro have noted, these changes suggest that 'the presumption of correctness now applies across the board.'"); *Lambert v. Blackwell*, 387 F.3d 210, 238 (3d Cir. 2004) ("[T]he habeas statute no longer explicitly conditions federal deference to state court factual findings on whether the state court held a hearing."); *Mendiola v. Schomig*, 224 F.3d 589, 592–93 (7th Cir. 2000) ("[I]f the state court's finding is supported by the record, even though not by a 'hearing on the merits

of [the] factual issue,' then it is presumed to be correct."). Moreover, the law in this circuit is clear:

> The presumption of correctness under AEDPA is accorded adjudications by state courts. If the state has rejected a petitioner's habeas claim on its merits, it has adjudicated the claim. The AEDPA requires that we presume correct the state court's findings of fact unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." This is so even if the hearing was a "paper" hearing and may not have been full and fair.

*Morrow v. Dretke*, 367 F.3d 309, 315 (2004) (quoting 28 U.S.C. § 2254(e)(1)).

As to Judge Dambold, Holberg essentially complains that she could not convince the judge to wholly disregard the CCA's explicit order and allow any and all testimony, including testimony supporting claims expressly not before the SHDC. Pet.24–29. As discussed above,[9] the CCA clearly remanded a single claim of IATC regarding the mitigation investigation and subsequent preparation of defense expert Dr. Patel. *Ex parte Holberg*, 2013 WL 2120253, at *1. The state high court specifically told "the trial court to direct trial counsel Catherine Dodson and Candace Norris and defense investigators Jim Patterson and Kathy Garrison to respond to these claims in a live evidentiary hearing." *Id.*

Holberg mistakenly refers to these four as "State's witnesses." Pet.27. They inevitably could not be the State's witnesses as the State did not bear any burden of proof. Indeed, Holberg called each and every witness because she alone bore the burdens of production, proof, and persuasion. She also erroneously claims she had "a severely constrained cross-examination . . . ." Pet.27. Once more, she took each

---

[9] *Supra* Statement of the Case II.

witness on direct. And her description of a "severely constrained" examination is, unsupported. Her examinations for all four witnesses covered 1,094 pages of the 1,574 total pages of testimony. *See* 3.SHRR.58–211, 4.SHRR.7–195, 5.SHRR.5–106 (Kathy Garrison, 287 of 446 pages); 5.SHRR.107–242 (Jim Patterson, 109 of 136); 6.SHRR.5–182, 7.SHRR.5–193, 8.SHRR.5–151 (Catherine Dodson, 397 of 518); 8.SHRR.152–227, 9.SHRR.9–225, 10.SHRR.7–187 (Candace Norris 301 of 474).

Indeed, her claims that no court has heard her evidence or evaluated her arguments are ludicrous. The clerk's record from her state habeas proceedings alone is sixty-one volumes comprising tens-of-thousands of pages. She received a two week hearing contained in a twenty-seven-volume reporter's record. The entirety of her state court postconviction review, from the date of conviction (March 26, 1998) to the CCA's final order on state habeas review (September 17, 2014), covers sixteen years of truly continuous litigation. It is inconceivable that this was anything but a full and fair adjudication on the merits. At their core Holberg's objections to her lengthy state habeas review are simply that the courts did not rule in her favor. Instead of believing her specious allegations of complete prosecutorial corruption or of wholesale abandonment by trial counsel supported by incredible affidavits, the state courts ruled against her and affirmed a proper conviction and sentence.

Finally, to the extent Holberg seeks federal habeas relief because the state habeas court did not conduct a "full and fair hearing," years of precedent foreclose this claim. "Infirmities in state habeas corpus proceedings do not constitute grounds for federal habeas relief." *Vail v. Procunier*, 747 F.2d 277, 277 (5th Cir. 1984). "An

attack on a state habeas proceeding does not entitle the petitioner to habeas relief in respect to his conviction, as it 'is an attack on a proceeding collateral to the detention and not the detention itself.'" *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995) (citing *Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987)); *see also Kinsel v. Cain*, 647 F.3d 265, 273 (5th Cir. 2012); *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010). As her petition attacks the state habeas proceedings, it does not raise a ground for relief cognizable on federal habeas review.

> **B.    Holberg did not properly present to the state courts several of the grounds for relief she now raises in her federal habeas petition; thus, these claims are unexhausted and procedurally barred from federal habeas relief.**

>> **1.    Holberg is procedurally barred from federal habeas relief from those claims that were either unexhausted or raised in a procedurally deficient manner in state court.**

Holberg avers that she "does not raise any grounds [in her federal habeas petition] not presented to the Texas courts." FWP.29. This is untrue. Claims 18 (cumulative error) and 19 (actually innocence) are presented for the first time here to this Court. She did not raise either during direct appeal or in her state habeas proceedings as a ground for relief. Further, several of Holberg's federal habeas claims were presented for the first time during her state habeas proceedings in her "Motion for Reconsideration" and "Additional Evidence" filings. These documents were expressly dismissed by the CCA as subsequent applications. *Holberg*, 2014 WL 5389907, at *1.

To satisfy the exhaustion requirement of 28 U.S.C. § 2254(b) and (c), a Texas prisoner must *fairly and properly* present her claims to the CCA by petition for

discretionary or state habeas review. *Picard v. Connor*, 404 U.S. 270, 276–77 (1971); *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001). This exhaustion requirement reflects a policy of comity between the federal and state courts. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8–10 (1992). The purpose "is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Id.* at 10. Thus, the state court must be given a fair opportunity to pass on the claims, which in turn requires the applicant to present all issues before the state court in a *procedurally proper manner*. *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988).

In order for a claim to be exhausted, the state court system must have been presented with the same facts and legal theory upon which the petitioner bases his assertions. *Picard*, 404 U.S. at 275–77; *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997). "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). Where a "petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement." *Wilder*, 274 F.3d at 259 (quotation omitted).

Moreover, state court remedies are not exhausted when "material additional evidentiary support [is presented] to the federal court that was not presented to the state court," even if the evidence "came into existence after the state habeas relief

21

had been denied." *Dowthitt v. Johnson*, 230 F.3d 733, 745–46 (5th Cir. 2000). Exhaustion "requires a state prisoner to present the state courts with the same claim he urges upon the federal courts." *Picard*, 404 U.S. at 276. Holberg gave the state court no such opportunity with regards to those claims raised in her state habeas "Motion for Reconsideration" and "Additional Evidence" or those raised for the first time on federal habeas.

For those claims presented for the first time to this Court, the Fifth Circuit has consistently found unexhausted claims procedurally barred when they would also be barred by the Texas abuse-of-the-writ doctrine if raised in a subsequent state habeas petition. *Ogan v. Cockrell*, 297 F.3d 349, 358 n.6 (5th Cir. 2002); *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998). Although federal habeas corpus review is available when administrative remedies either are unavailable or wholly inappropriate to the relief sought, Holberg's failure to properly exhaust these administrative remedies was due to neither "an absence of a state corrective process," nor circumstances rendering that process "ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(i)–(ii). Therefore, these claims are also barred from federal habeas relief. For those federal habeas claims raised for the first time in Holberg's "Motion for Reconsideration" and "Additional Evidence" filings, they were procedurally barred by the CCA as subsequent applications and, thus, are likewise barred in federal court. *Holberg*, 2014 WL 5389907, at *1; *see Nobles*, 127 F.3d at 423.[10]

---

[10] The Director will address the cause-and-prejudice tests to overcome the procedural bar with the individual barred claims.

### 2. The CCA's dismissal of Holberg's filings as subsequent applications rested on an independent and adequate state law ground.

Holberg argues that the procedural bar does not apply to the single claim raised in her "Additional Evidence" document—prosecutorial misconduct with regard to the State's witness, Donald Owens[11]—because the CCA's disposition of this document was not based on an independent and adequate state ground (IASG).[12] Pet.39–43. Holberg alleges that the CCA's dismissal as a subsequent application is not an IASG because: (1) the opinion "did not indicate the underlying reasoning" for the dismissal; (2) the "CCA did not identify the Additional Evidence as raising any particular new claims;" and (3) the evidence supporting the Owens claim was not known to Holberg at the time of filing the initial application. Pet.40–41. Holberg reasons, therefore, that "the CCA must have decided the Additional Evidence constituted a subsequent application *on the merits . . . .*" Pet.41 (emphasis in original).

"If a state court clearly and expressly bases its dismissal of a prisoner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the prisoner has procedurally defaulted his federal habeas claim." *Nobles*, 127 F.3d at 420 (citing *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991)); *see also Rocha v. Thaler*, 626 F.3d 815, 820–21 (5th Cir. 2010). Texas's abuse-of-the-writ doctrine, codified in the Code of Criminal Procedure Article 11.071,

---

[11] *See infra*, Argument III.B.

[12] Holdberg only attacks the CCA's disposition of the "Additional Evidence" document. She does not apply this same argument to the "Motion for Reconsideration." The procedural bar applies to the latter document based on the same case law and legal reasoning as the former.

23

Section 5, is a state procedural rule that provides an independent and adequate ground for dismissal. *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008).

Despite Holberg's tenuous assertions to the contrary, the CCA explicitly dismissed the "Additional Evidence" document pursuant to the Section 5 bar because it was untimely filed and raised a new claim. *Holberg*, 2014 WL 5389907, at *1; *see* Tex. Code Crim. Proc. art. 11.071, § 5(a)(1). Indeed, the filing only raised one issue, the Owens claim (presented here as Claim 1b), which was not previously raised in her initial habeas application, 1/2.SHCR.Supp.10–268, or Reply, 2.SHCR.10–164. SHCR.Subq.1–10. Therefore, the CCA's opinion is clearly based on an IASG and cannot be considered a decision on the merits.

Even if this Court reads the opinion as perfunctory in nature, the Fifth Circuit has affirmed this still satisfies the IASG requirement. *Balentine v. Thaler*, 626 F.3d 842, 857 (5th Cir. 2010) (*Balentine II*). In the previous iteration of *Balentine*, the panel held that the CCA's use of "boilerplate language" in dismissing a subsequent application "must be construed as having reached the merits of the federal constitutional issue." *Balentine v. Thaler*, 609 F.3d 729, 743 (5th Cir. 2010) (*Balentine I*). However, the Fifth Circuit rejected this initial position because it was

> inconsistent with the Supreme Court's refusal in Coleman to create a "conclusive presumption of no independent and adequate state grounds in every case in which a state prisoner presented his federal claims to a state court, regardless of whether it fairly appears that the state court addressed those claims."

*Balentine II*, 626 F.3d at 854 (quoting *Coleman*, 501 U.S. at 738–39). The court reasoned that even if the CCA at times reaches the merits in dismissing an

application, that action "cannot, consistent with Coleman's admonition, be the basis for a presumption that the state court actually reached the merits." *Id.*

Holberg argues that the CCA erroneously dismissed her filing as a subsequent application because Holberg was not aware of the evidence needed to raise the Owens claim. Pet.41. However, she failed to show previous unavailability under Section 5(a)(1). The CCA applies Section 5(a)(1)'s two requirements sequentially. *Rocha*, 626 F.3d at 834. That court first examines whether the factual or legal basis of the claim was unavailable at the time of the original application or earlier subsequent writ application. *Id.*

"Only if the applicant can surmount the unavailability hurdle does the CCA proceed to ask whether the application makes out a claim that is prima facie meritorious." *Id.* Thus, as a matter of law the CCA necessarily reaches the threshold availability question and considers the evidence offered on the issue anytime it dismisses a subsequent application under Section 5(a)(1). *Id.* "If an applicant fails to satisfy the unavailability requirement, the § 5(a)(1) inquiry is over, and no merits determination takes place." *Id.*; *see also Hughes*, 530 F.3d at 342. Moreover, it is well-settled that the correctness of a state court's application of its own procedural rules is not an issue which this Court may entertain. *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011).

Contrary to Holberg's assertion, the CCA was not at all unreasonable in concluding that she did not make the required threshold unavailability showing under Section 5(a)(1). It is worth noting at the outset that, although she misleadingly

titled her document "Additional Evidence . . .," she did not address the issue that her Owens claim had not yet been raised in her prior filings. Further, in her federal habeas petition she correctly points out that Subsection (a)(1) allows for a subsequent application if the factual basis of a claim is unavailable at the time of filing an initial habeas application. Pet.41. However, she neglects another key subsection of the statute: "For purposes of Subsection (a)(1), a factual basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable through the *exercise of reasonable diligence* on or before that date." Tex. Code Crim. Proc. art. 11.071, § 5(e) (emphasis added).

In 2000, Holberg's initial state habeas counsel alleged prosecutorial misconduct with regards to witnesses Vicki Kirkpatrick and Becky Bates. 1/2.SHCR.Supp.188–90. In 2006, new state habeas counsel, now serving as federal habeas counsel, asserted newly uncovered evidence of prosecutorial misconduct with regards to Kirkpatrick, Bates, and six other witnesses or potential witnesses. 2.SHCR.118–40. Almost six years later, on May 14, 2012, Judge Estevez entered 128 pages of FFCLs ultimately finding all of Holberg's claims lacked merit. App.B.001–128. Only after the district clerk filed these FFCLs with the CCA did Holberg file her "Additional Evidence" document on December 14, 2012. SHCR.Subq.1–10.

Thus, after alleging prosecutorial misconduct regarding witness testimony in 2000 and again in 2006, she asked the CCA and now this Court to believe that she could not discover this same issue with Donald Owens, another witness in the case, until six years later. Further, Owens executed his first declaration on October 31,

2012. Pet.39. Yet, they did not file their "Additional Evidence" with the SHDC until December. SHCR.Subq.1–10. The CCA's necessary decision that she did not make the required threshold unavailability showing under Section 5(a)(1) cannot then be said to be unreasonable. Because the CCA's dismissal of Holberg's "Additional Evidence" filing, as well as her "Motion for Reconsideration," rested on an IASG, she has procedurally defaulted all claims raised therein.

### C. Most of Holberg's claims fail because they are inadequately briefed and are nothing more than conclusory allegations.

In Claims 5 through 19 Holberg asserts a litany of grounds for relief ranging from trial court errors, to fault during voir dire, and even constitutional challenges to several Texas statutes. Pet.137–48. Yet, these claims cover twelve pages *total*. The briefing for each claim ranges from a little over a single page, *see* Pet.137–38 (Claim 5), to merely two sentences long, *see* Pet.141 (Claim 10). The briefing is insufficient to adequately raise claims and, as such, fails as conclusory and speculative. *See Hines v. Texas*, 129 F. App'x 100, 101–02 (5th Cir. 2005) (denying a *Batson*[13] claim because it was, in part, conclusory); *United States v. Fishel*, 747 F.2d 271, 273 (5th Cir. 1984) (denying a claim of governmental misconduct because it was "conclusory and speculative").

In discussing proper notice pleading for the purposes of relation back, the Supreme Court has held:

> Under Rule 8(a), applicable to ordinary civil proceedings, a complaint need only provide "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41[](1957). Habeas Corpus Rule 2(c) is more demanding. It provides that the

---

[13] *See Batson v. Kentucky*, 476 U.S. 79 (1986).

27

> petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground." *See also* Advisory Committee's Note on subd. (c) of Habeas Corpus Rule 2, 28 U.S.C., p. 469 ("In the past, petitions have frequently contained mere conclusions of law, unsupported by any facts. [But] it is the relationship of the facts to the claim asserted that is important ... ."); Advisory Committee's Note on Habeas Corpus Rule 4, 28 U.S.C., p. 471 ("'[N]otice' pleading is not sufficient, for the petition is expected to state facts that point to a real possibility of constitutional error." (internal quotation marks omitted)).

*Mayle v. Felix*, 545 U.S. 644, 655 (2005); *see also United States v. Stalnaker*, 571 F.3d 428, 439–40 (5th Cir. 2009); *Chase v. Epps*, 74 F. App'x 339, 343 (5th Cir. 2003).

Throughout her petition, and indeed for most of these claims, Holberg cites to her original federal habeas petition "[f]or additional detal." *E.g.*, Pet.48, 77, 139, 147. To be fair, early in her brief she clarifies in a footnote: "All references herein to the availability of additional detail in Holberg's Original Petition are solely for the Court's information, if the Court for any reason desires further elaboration." Pet.35 n.14. However, this Court was explicit in its original order for an amended petition: "The amended petition shall not use incorporation of or reference to separate documents or appendices to avoid the page limit." Sched. Order at 5. In a later order granting Holberg's request for an extension of the page limit this Court again specified: "All the instructions concerning the presentation of the claims, which are contained in [the Sched. Order] remain in effect." Order 2–3, Feb. 2, 2016, ECF No. 60. Thus, any such references do not save these inadequately briefed claims.

III. **For Holberg's Various Claims of Prosecutorial Misconduct During the Guilt Phase, She Either Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations of Those Claims were Unreasonable (Claim 1).**

A. **Holberg fails to show that the state court was unreasonable in concluding that the State did not intentionally elicit false testimony from Vicki Kirkpatrick (Claim 1a).**

In her first substantive claim for relief Holberg alleges that the prosecution, specifically Randall County District Attorney [DA] James Farren, coerced Vicki Kirkpatrick into fabricating her statements to law enforcement and then knowingly elicited those false statements during trial. Pet.29–35. The State may not knowingly use perjured testimony or allow perjured testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Giglio v. United States*, 405 U.S. 150, 154 (1972). To obtain relief based on the State's use of perjured testimony, a habeas petitioner "must show: 1) that the witness's testimony was actually false; 2) that the testimony was material; and 3) that the prosecution had knowledge that the witness's testimony was false." *Boyle v. Johnson*, 93 F.3d 180, 185 (5th Cir. 1996) (citations omitted). Mere discrepancies in witness testimony does not equate to perjury. *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990). Contradictory or inconsistent testimony from witnesses should be resolved by the trier of fact and does not suffice to establish perjury. *Id.* Likewise the omission of facts from the reports and written statements of State's witnesses is not enough to put the prosecution on notice of perjury, nor can it establish such perjury in fact occurred. *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989).

Further, on federal habeas review, the demanding *Brecht* harmless error standard also applies. *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000) (applying the harmless error standard from *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). A petitioner must show "actual prejudice" resulted from the perjured testimony. *Id.* Perjured testimony is material only when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* Where allegedly perjured statements "have nothing to do with [the defendant's] guilt or innocence" and evidence of guilt is "overwhelming," the materiality prong is not satisfied. *United States v. Washington*, 44 F.3d 1271, 1282 (5th Cir. 1995).

### 1.    Kirkpatrick's testimony at trial

Kirkpatrick testified that she spoke with law enforcement and signed a written statement regarding conversations she had with Holberg while they were in jail together. 19.RR.231.[14] However, she did not meet DA Farren until just briefly before she took the stand. *Id.* Kirkpatrick stated that she knew who Holberg was, having seen her on the streets for the past two years. 19.RR.232. However, they never really talked until they were in the same cell along with several other inmates. *Id.*

Kirkpatrick testified that Holberg talked to her about Towery's murder. 19.RR.233. Holberg said that Towery was one of her old "sugar daddies" and that he had taken care of her for years by giving her money. 19.RR.234. Holberg did not say that she lived with Towery. 19.RR.235. Holberg received money from Towery earlier on the day of the murder, spent it on drugs, and then returned to Towery later to get

---

[14] RR refers to the Reporter's Record from the trial. This is preceded by the volume number and followed by the relevant page numbers.

more money; but he would not give it to her. 19.RR.234–35. She saw money in Towery's shirt pocket and reached for it; but Towery grabbed her arm, and they started struggling. 19.RR.235, 244.

Holberg said that she picked up a fork and started to stab Towery, and once she started stabbing she could not stop. 19.RR.236. After stabbing him numerous times, he was making gurgling or pain noises, and she was tired of hearing them; so she shoved a lamp shaft down Towery's throat. 19.RR.234, 236–37. Holberg said that, afterward, she took a shower, cleaned up, and was not in a hurry to get away. 19.RR.237. Holberg also said that when she left, she did not take all the money. *Id.* Holberg told Kirkpatrick that she would do anything to get drugs. *Id.* Holberg said the copious amounts of blood flowing from Towery was "pretty" and looked "like a fountain." 19.RR.236. She also described the murder as "fun" and "amazing." 19.RR.237. Kirkpatrick testified that Holberg showed no remorse. 19.RR.238.

### 2.    Kirkpatrick's testimony during her deposition

Over a decade after the trial, Kirkpatrick utterly recanted almost her entire testimony during a deposition. *See* Pet.Ex.D. Kirkpatrick was arrested on a burglary charge approximately eight months prior to Holberg's trial. Pet.32–33. She asserted that DA Farren met with her shortly after the arrest and told her to get information from Holberg while they were in jail together. *Id.* Kirkpatrick claimed that she could not get Holberg to say anything, so DA Farren instructed Kirkpatrick on what to say. *Id.* She maintained that he threatened to send Kirkpatrick to jail if she did not give him what he wanted but also offered her a deal if she cooperated. *Id.* She said that

even after she gave her first statement, DA Farren altered the statement himself to reflect certain facts. *Id.*

Kirkpatrick claimed that she, as well as Holberg, previously engaged in money-for-sex liaisons with Towery. *Id.* She believed Towery to be violent and a drunk. *Id.* Kirkpatrick said that Holberg never used the descriptors "fountain," "pretty," "fun," or "amazing" when discussing the murder. *Id.* Rather, Kirkpatrick stated Holberg seemed remorseful and sad about the death. *Id.* Kirkpatrick also said that Holberg believed she acted out of self-defense and fear of what Towery, an 80-year-old, would do to her. *Id.*

### 3. Holberg cannot overcome the SHDC's credibility determinations that favor DA Farren over Kirkpatrick.

During Kirkpatrick's bench trial for her burglary charge, both she and DA Farren testified. Citing to the Reporter's Record from the Kirkpatrick trial, Holberg asserts: "Farren testified at Kirkpatrick's bench trial that she was offered five years and the offer had been disclosed in Holberg's trial, Ex. A 166-67 [DA Farren's testimony during the Kirkpatrick trial], but there is no such disclosure in the trial record. RR v. 19 at 229-49 [Kirkpatrick's testimony during the Holberg trial]." Pet.33. However, Farren did not state that the disclosure came during Kirkpatrick's testimony at the Holberg trial. Rather, he simply testified that he informed the trial court and trial counsel that the five-year offer was made in the course of regular plea negotiations and had nothing to do with her potential testimony in Holberg's case. 2/2.SHCR.Supp.579.

Indeed, Farren's testimony (from the Kirkpatrick trial) when questioned by Kirkpatrick's counsel on direct completely cuts against Holberg's claim.

Q.    Do you know [Kirpatrick]?

A.    She -- two ways. She has a case pending in our – through our office, and she testified as a witness in the Brittany Holberg capital murder trial.

Q.    And did you -- did your office subpoena her to testify in the Holberg trial?

A.    Yes, we did.

Q.    Okay. And did you actually interview her personally?

A.    No, I did not. I reviewed a written statement that she provided prior to the trial. I did take her testimony, or I did question her under oath in the presence of the jury during the trial.

Q.    Was she cooperative with your office?

A.    Yes, she was.

Q.    Did she testify truthfully?

A.    To the best of my knowledge, she testified truthfully at the trial and uh -- was very cooperative and did so without ever asking for any kind of promise or deal with us of any kind?

Q.    So she never asked you to cut her a deal?

A.    No, she did not.

Q.    Okay. Have you ever had any -- have there ever been any problems in regard to you trying to elicit information out of her in regard to the Holberg evidence?

A.    No. She's never tried to back up on what she said. She never suggested in any way that her memory would be better if we made her a deal or any of the things that we sometimes run into. She simply cooperated, and to the best of my knowledge, she testified truthfully.

Q.    Okay. And I believe that you have made a recommendation or plea offer to me earlier, five years to do. Is that correct?

33

> A.    One of my assistants, Robert Love, is handling the case. And Robert made the offer of five years in this case. He and I have discussed that offer, and I'm certainly aware of the offer and aware of why it was done.
>
> Q.    And is it your office policy to not change the offer after a witness testifies in a case, because it would basically look bad for your office?
>
> A.    We feel ethically, if nothing else, it would create an appearance of impropriety, and it would create the appearance that he had perhaps not been truthful with the Court and the Defense in the Holberg case, if we were to change our offer at this time.
>
> Q.    Okay.
>
> A.    The issue came up during the trial, and we represented to the Court in good faith and to the Defense counsel that the offer of five years had absolutely nothing to do with -- with her testifying in the Holberg case.
>
> Q.    Okay.
>
> A.    And it was even suggested that uh -- you know, that's the offer now but it might get better after the trial. And so we're very concerned that it might create an appearance of impropriety if we changed our offer.

*Id.* at 577–79. Later, when asked by her counsel if she testified truthfully in the

Holberg trial, Kirkpatrick answered yes. *Id.* at 585. Her counsel followed up:

> Q.    "Did you testify thinking that that would help you get a better deal in this case?
>
> A.    No, ma'am. I didn't ask for any kind of deal. I'm the one who went to them. They didn't come to me asking me what I knew about it. As soon as she told me what had happened, I went to the police myself willingly and made a statement. I didn't ask for no deal. If I had wanted any kind of a favor, I would have asked it before I made a statement. I didn't. She was wrong, just like I'm wrong, just like I'm willing to admit that I was wrong. She was wrong, as well.

*Id.*

34

DA Farren also provided an affidavit to the SHDC addressing Kirkpatrick's allegations wherein he reasserted the facts he testified to during Kirkpatrick's trial. 4/29.SHCR.Supp.946–47. In reviewing the testimony at Holberg's trial, the testimony during Kirkpatrick's bench trial, Kirkpatrick's deposition, and the rebuttal affidavit from Farren denying all these allegations, the SHDC found "that Kirkpatrick's testimony is not credible" and "that Farren's testimony regarding this matter is credible." App.B.106. Holberg cannot now overcome such a credibility determination on federal habeas review. "[T]he state courts would not have been 'objectively unreasonable' to believe one party over another about a he-said, she-said disagreement. AEDPA does not allow federal habeas courts to gainsay state courts' assessments of credibility on a cold paper record." *Morales v. Thaler*, 714 F.3d 295, 303 (5th Cir. 2013) (citing *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (reasoning that trial court determinations of credibility and demeanor, which are entitled to "special deference" on direct review, deserve "no less" respect in habeas proceedings)). This alone defeats Holberg's claim.

Indeed, this defeats all of Holberg's specious claims of prosecutorial misconduct that were exhausted in state court. Holberg alleges several illicit and criminal acts by DA Farren with regard to multiple trial witnesses or potential witnesses. These fallacious accusations all amount to a he-said, she-said between DA Farren and the individual witness. For each of these, the state courts made either an explicit or necessarily implicit credibility determination in favor of DA Farren.

35

And such a decision was completely reasonable. Simply put, Kirkpatrick is a liar. She either lied on the stand twice (Holberg's trial and during her own trial for burglary, *see* 2/2.SHCR.Supp.585), or she is lying over a decade later when claimed that DA Farren coerced her into falsifying her statement to law enforcement and even altered the statement to his own liking. Further, Kirkpatrick was a drug addict, convicted burglar, and convicted forger. 2/2.SHCR.Supp.562–77.

The State Bar of Texas website shows that DA Farren has "No Public Disciplinary History" for the past ten years. *Find a Lawyer*, https://www.texasbar.com/Template.cfm?Section=Member_Directory&template=/Cu stomsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=215062 (last visited Dec. 9, 2016). Moreover, Holberg provides no other context in which DA Farren engaged in witness tampering or other misconduct. Yet, Holberg asks this Court to believe that DA Farren, a well-respected and tenured prosecutor, engaged in truly nefarious, malevolent, and criminal witness tampering that permeated throughout this entire trial, but only did so for this one case. Such a scenario was too implausible for the SHDC. The Office of Chief Disciplinary Counsel also found these accusations to be hollow when it denied a complaint against DA Farren raising the same allegations of prosecutorial misconduct Holberg now asserts in her petition.[15] Jim McBride, *State Bar Denies Grievance Against DA*, Amarillo Globe-News (Mar.

---

[15] The Director does not assert that the decision of the Chief Disciplinary Counsel is entitled to AEDPA deference. The Director also recognizes that this was not information before the SHDC when it issued its FFCLs; thus, it is not evidence on which to base the reasonableness of their decision. However, were this Court to review this claim, or any other exhausted claim of prosecutorial misconduct, de novo as Holberg asks, then this would be evidence properly considered by the Court. Further, were this Court to review the merits of any of Holberg's unexhausted or procedurally barred claims of prosecutorial misconduct, this would also be proper evidence to consider.

31, 2015), http://amarillo.com/news/local-news/2015-03-31/state-bar-denies-grievance-against-da. Ultimately, Holberg cannot overcome the SHDC's assessments of credibility favoring DA Farren over Kirkpatrick; thus, the claim fails.

### 4. Holberg's remaining "corroborating evidence" fails to show the state court's extensive findings or conclusions are unreasonable.

In support of the Kirkpatrick claim Holberg proffers three other affiants: Melissa Wiseman, Michelle Lucero, and Roger Speir. Pet.33–34. Melissa Wiseman attested that she shared a cell with Holberg and Kirkpatrick. 13/29.SHCR.Supp.3891–93. She stated that she never overheard Holberg tell Kirkpatrick the things to which Kirkpatrick later testified. *Id.* First, this affidavit was submitted with Holberg's "Motion for Reconsideratoin," and as such, it is barred from consideration by *Pinholster.* As stated above, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. Because section 2254(d)(1) requires a "backward-looking" examination of the state court's decision, "[i]t follows that the record under review is limited to the record in existence at that same time *i.e.*, the record before the state court." *Id.* (emphasis in original). Thus "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id.* at 1400.

The SHDC noted that Wiseman's affidavit was untimely filed. App.B.35. In the context of an IATC claim regarding Kirkpatrick's testimony[16] the SHDC found trial

---

[16] *See infra* Argument III.C.

counsel's affidavits credible.[17] *Id.* Trial counsel averred they did not seek to impeach Kirkpatrick's testimony with Wiseman because "Wiseman was not in the same cell with Kirkpatrick and Holberg when Holberg made the incriminating statements to Kirkpatrick[.]" *Id.* (citing 24/29.SHCR.Supp.7331 (Dodson's affidavit), 7342 (Norris's affidavit)). Further, Wiseman's affidavit is riddled with hearsay; thus, it cannot carry weight here on federal habeas review, and her potential future testimony would draw successful hearsay objections. *See id.*; *see also* Fed. R. Evid. 802; Tex. R. Evid. 802.

Michelle Lucero also averred that, while in jail with Holberg and Kirkpatrick, Holberg never made the statements about which Kirkpatrick later testified. 7/29.SHCR.Supp.1744–45. It fails for all the same reasons as the Wiseman affidavit. It was submitted with Holberg's "Motion for Reconsideration," and thus, is barred from consideration. *See Pinholster*, 563 U.S. at 181. It too is fraught with hearsay, therefore it is not competent evidence.

Finally, Holberg submits the affidavit of Roger Speir. 2/18.SHCR.Supp.288–89. He attested that Kirkpatrick told him she was "working with the cops." *Id.* From this he presumed that she would lie to the cops simply to secure a better deal. *Id.* Unlike the two prior declarations, this was properly before and considered by the SHDC in denying this claim. Regarding Speir, the SHDC found:

> that Roger Speir's affidavit is based largely on hearsay and is not competent evidence. Further the Court finds that Speir's affidavit is not credible. The Court finds that Speir also does not state that he was available at the time of Holberg's capital murder trial or that he would have been willing to testify at those proceedings. The Court finds that it

---

[17] It is important to note that the SHDC based any and all findings here on the properly presented affidavits of trial counsel. The same is true regarding Michelle Lucero; indeed the SHDC made no findings regarding Lucero's affidavit. Thus, it cannot be argued that these affidavits were considered.

should disregard Speir's affidavit offered in support of [this] ground for relief.

App.B.100. Holberg fails to overcome AEDPA's deference to this finding. *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

Indeed, Holberg fails to overcome that deference to the SHDC's extensive findings in dismissing this claim:

14.    The record shows that Kirkpatrick testified at the guilt-innocence stage of Holberg's capital murder trial. 19.RR.231–49.[18] Because Kirkpatrick had pending charges against her, she was accompanied by her lawyer, Greta Crofford. 19.RR.229, 223. [Summation of Kirkpatrick's testimony at Holberg's trial.]

15.    The record also shows that Assistant District Attorney [ADA] Blount opened for the State during final argument at guilt innocence. He made no reference to Kirkpatrick's testimony. 22.RR.6–28. Rather, the first reference to Kirkpatrick's testimony came from defense counsel, whose argument followed Blount's. 22.RR.57–59. Norris argued that Kirkpatrick's testimony was not credible. Noting that insofar as Kirkpatrick testified that Holberg had said that Towery's blood was spurting, counsel argued that Kirkpatrick's testimony was a "little fishy" because the State's crime scene officer had testified that there were no blood spatter patterns consistent with arterial bleeding. 22.RR.57–59. In rebuttal, as to Kirkpatrick's testimony, [DA] Farren told the jury that the purpose of Kirkpatrick's testimony had not been to show that Holberg enjoyed stabbing Towery, but that in telling Kirkpatrick about the murder, Holberg had revealed details about the scene that only the murderer would know:

Do l think that- in reality even Brittany Holberg is so callous and uncaring that she actually really did enjoy stabbing [Towery], that she actually really did think the blood was pretty in a fountain? *No I don't. That's jailhouse talk. That's what you tell your roommate to let them know you're bad.* "You [can't] jack with me, I'm bad. Why, when I butchered A.B. Towery, that blood was pretty, it was like a fountain."

Is that really the way she felt? *I'm not suggesting that to you. That's jailhouse talk. But that's what she told Vickie*

---

18 Cites to the record are altered to be consistent with the citation formatting in this brief.

*Kirkpatrick*. And the way you can tell Ms. Kirkpatrick is telling the truth is, she also in the midst of all this puffery, all of this attempt to enhance her status, Ms. Holberg also included details, there's no way Ms. Kirkpatrick could know. Details there is no way [Kirkpatrick] could have known unless she learned them from her. And so, [Kirkpatrick] did talk to [Holberg] and she did tell her those things.

*I'm not trying to sell you on the fact that [Holberg] actually is like a vampire and thought the blood was pretty, but I am telling you she really did talk to Ms. Kirkpatrick and she really did tell her about these things.*

Jailhouse puffery, but in the meantime, as is always with liars, [Holberg] made some mistakes and this time the mistake was kind of reversed. She included some details that she had been better off to have left out.

22.RR.76–79 (emphasis added).

16.    The record shows that the State did not refer to Kirkpatrick's testimony in its closing argument at the punishment phase. 25.RR.175–91, 218–34. The only reference to Kirkpatrick's testimony came from the defense during its closing argument. Defense counsel reiterated that the State's own evidence did not support a finding that there had been spurting of arterial blood, and therefore, if anyone described it that way, it could not be true. Defense counsel argued that if Holberg did make the statement to Kirkpatrick, it was simply a "Don't mess with me" attempt, but that it was more likely that Kirkpatrick was not truthful about the conversation she had with Holberg. 25.RR.199–200.

17.    [The transcript from Kirkpatrick's trial was attached as an exhibit.]

18.    The Court finds that Kirkpatrick was represented in cause number 11,566-A by attorney Greta Crofford, the same attorney who was present with Kirkpatrick when Kirkpatrick testified at Holberg's trial, and that Kirkpatrick pleaded guilty to Burglary of a Habitation. Answer, Ex. A at 5–6.

19.    The Court finds that [ADA] Robert Love represented the State in cause number 11,566-A. Answer, Ex. A at 5.

20.    The Court finds that there was no plea agreement reached between the State and Kirkpatrick; the trial court acknowledged that there had been a five-year offer made in the case but that in light of

Kirkpatrick's election to enter an open plea, the Court would not be bound by the rejected five year offer. Answer, Ex. A at 7–8, 20.

21.    As pertinent to Holberg's thirty-third ground for relief, Kirkpatrick testified at her plea hearing that in regards to her testimony at the Holberg trial: Crofford, Kirkpatrick's attorney, was present when Kirkpatrick testified; Kirkpatrick testified truthfully at Holberg's trial; Kirkpatrick did not testify at Holberg's trial thinking that it would help her get a better deal on her own charges; Kirkpatrick did not ask for any kind of deal; the State did not come asking Kirkpatrick what she knew about the case; Kirkpatrick is the one who initiated the contact with the State about Holberg; that right after Holberg made the statements, Kirkpatrick went to the police herself willingly and made a statement. Answer, Ex. A at 32. Kirkpatrick asked the trial court for probation. Answer, Ex. A at 20, 34.

22.    [Summation of [DA] Farren's testimony at Kirkpatrick's trial.]

23.    The Court finds that in cause number 11,566-A, Love vigorously examined Kirkpatrick and argued to the Court to sentence Kirkpatrick close to the maximum sentence of twenty years. State's Answer, Ex. A at 9–16, 35–36, 45–50, 54, 72.

24.    The Court has reviewed the videotaped deposition of Kirkpatrick taken on August 15, 2011, and the rebuttal affidavit of [DA] Farren, dated August 19, 2011. The Court finds that Kirkpatrick's testimony is not credible. The Court finds that Farren's testimony regarding this matter is credible.

25.    The Court finds that Holberg has failed to establish any error by the prosecution in regard to Kirkpatrick's testimony, as it finds her allegations regarding her thirty-third ground for relief have no basis in fact.

26.    The Court finds that Kirkpatrick's testimony regarding Holberg's statements about Towery's blood looking like a fountain were not misleading. The State took pains to point out that to the jury that the purpose of presenting Kirkpatrick's testimony, which included statements in which Holberg described Towery's blood as creating a "fountain" was not that Towery's blood had actually spurted like a fountain or that Holberg enjoyed seeing Towery's blood, but rather to show that Holberg revealed details about the crime that Kirkpatrick could not have known without Holberg having told her about them. Further, the defense emphasized that the forensic evidence did not support a finding that Towery's blood had spurted like a fountain. The

41

Court finds no prosecutorial error or prejudice regarding this aspect of Holberg's thirty-third ground for relief.

App.B.101–07 (emphasis in original).[19] Ultimately, the SHDC concluded that "Holberg has failed to show that the State obtained her conviction or death sentence through the intentional or unintentional use of false testimony." App.B.126. Holberg cannot show the SHDC was unreasonable because her claim is meritless.

### B. Holberg's claim that the State intentionally elicited false testimony from Donald Owens is procedurally barred and meritless (Claim 1b).

In her second ground for relief Holberg accuses DA Farren of coercing Donald Owens into testifying falsely at trial. Holberg first presented this claim to the state courts in her "Additional Evidence" document. As discussed above,[20] the CCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. Therefore, the claim is barred from federal habeas relief. *Nobles*, 127 F.3d at 423.

Generally speaking, this Court may excuse Holberg's procedural default if she can show: (1) cause for the procedural default and actual prejudice as a result of the alleged violation of federal law; or (2) the failure to consider her claims will result in

---

[19] Due to space limitations, the Director does not include all pertinent findings for every latter claim as she does here. However, this particular ground serves as a prime example of just how thorough both state habeas judges were in their FFCLs.

[20] *Supra* Argument II.B.

42

a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50. Holberg fails to make the requisite showing of a fundamental miscarriage of justice.[21]

> "Cause and prejudice" in this case "parallel two of the three components of the alleged *Brady*[22] violation itself." Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes.

*Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 282 (1999) (internal citations omitted)). This analysis flows to *Giglio/Napue* claims as well. *Johnson v. Puckett*, 176 F.3d 809, 815–16 (5th Cir. 1999). Of course, it plainly requires an examination of the merits. However, because this claim is meritless, she necessarily fails to satisfy the overlapping cause and prejudice standard. Therefore, this Court should dismiss the claim as procedurally barred.

At trial, Owens, an Amarillo cab driver, testified that he picked up Holberg at 4:05 or 4:10 p.m. on November 13, 1996, in response to a call. 19.RR.39–40. Owens testified that he did not know Holberg at the time, and he later identified her from a photo line-up. 19.RR.41, 49–53. At Holberg's direction, Owens stopped at Homeland, a grocery store with a pharmacy. 19.RR.42. Holberg told him that she needed to fill a prescription, got out of the cab, spent about fifteen minutes in the store, and then returned. 19.RR.42–43. Holberg told Owens that the pharmacy would not fill her prescription without first speaking to her doctor. 19.RR.44.

---

[21] *See infra* Argument XI.

[22] *Brady v. Maryland*, 373 U.S. 83 (1963).

Owens then took Holberg from to the Princess Apartments, where Towery lived. *Id.* Holberg told Owens that her boyfriend lived there and he would pay for the ride. *Id.* Owens testified that they arrived at 4:45 or 4:50 p.m. 19.RR.44. After Holberg failed to open the security perimeter door, she had Owens drive her to the office. 19.RR.47–48. She said after the maintenance man let her into her boyfriend's apartment, she would get Owens his money. 19.RR.48. Owens waited in the cab while Holberg went into the office. *Id.* After approximately fifteen minutes, Owens went in to look for Holberg. *Id.* A woman behind the office desk said that a girl walked through the office and left by a door that led to the Princess Apartments I complex. 19.RR.49.

Over fourteen years later, Holberg submitted two affidavits from Owens with her application for DNA testing under Chapter 64. 1.DNACR.134–38 (executed October 31, 2012), 140–43 (executed November 17, 2012).[23] In the first affidavit Owens averred that: (1) although Holberg had him stop at the Homeland grocery store, she never told him it was to fill a prescription; (2) Holberg seemed high on crack; (3) he knew Holberg was an exotic dancer and prostitute; and (4) he left the Princess Apartments closer to 4:30 p.m., not 5:05 p.m. as he testified at trial.[24] *Id.* at 134–36. Like Kirkpatrick, he also accused DA Farren of attempting to influence and change Owens's testimony. *Id.* at 137. He recalled DA Farren taking him to lunch three times, once "to Joe's Crabshack [sic]" for "a good steak." *Id.*

---

[23] DNACR refers to the two-volume Clerk's Record for Holberg's DNA proceedings under Chapter 64, number AP-77,023. It is preceded by the volume number and followed by the relevant page numbers.

[24] Holberg also claims that DA Farren suppressed Owens's cab logs. Pet.38. She cites to pages she claims are these logs. 2.DNACR.510–11. However, they do not contain a business records affidavit or any other authentication; thus, they are not competent evidence. Further, Holberg does not provide evidence of actual suppression.

In his second affidavit, executed three weeks later, he said that DA Farren called him "out of the blue" on November 7th and was angry about the lies in his first affidavit. *Id.* at 140. DA Farren said he would type a new affidavit and have Owens sign it. *Id.* Owens said DA Farren threatened him with retaliation. *Id.* at 140–41. Owens stated that two days later DA "Farren's investigator" came to his house, spoke with his stepson Phillip about the new affidavit, and left after his stepson told him Owens was not there. *Id.* at 141. Then, one week later, he remembered new and greater details about his meetings with DA Farren and the police. *Id.* at 141–43. For example, he remembered that his three meals with Farren were at "Joe's Crabshack [sic] and Dryers Bar B Que." *Id.* at 142.

That Owens would now change his testimony is not the crucial issue. Indeed, his changes are relatively insubstantial when compared to the rest of the testimony at trial. He would still testify that he drove Holberg to the Homeland grocery store and then to the Princess Apartments the afternoon that Towery was murdered. He would still say that she went through the office and then, apparently, into the courtyard of the apartments, stiffing him on the fare. However, because these affidavits are presented in support of a *Giglio/Napue* claim, the central statements are those regarding Owens's interactions with DA Farren.

And those allegations are simply too incredible to be credible. The veracity of both declarations are questionable because he suddenly added several "facts" of his meetings with DA Farren in his second affidavit executed just three weeks prior to the first. Further, they are full of logical inconsistencies. For example, Owens

asserted he felt threatened and pressured to testify at trial and get it "right." *Id.* at 136–37. If Owens is to be believed, DA Farren even went so far as to give him the answers. *Id.* Yet, he claimed "the police" told him to testify he saw Holberg with a knife, and he readily admitted he did not do so. *Id.*

His affidavits also seemingly contain factual inaccuracies. One detail that was in both affidavits was their meeting at Joe's Crab Shack. DA Farren provided an affidavit to rebut Owens's accusations as part of the Chapter 64 proceedings. *Id.* at 438–42. In it he stated: "the only 'Joe's Crab Shack' restaurant that ever existed in Amarillo, Texas opened on April 20, 1998 and closed December 28, 2009. The Holberg trial began on January 7, 1998 and concluded on March 26, 1998, nearly one month *before* Joe's Crab Shack opened for business." *Id.* at 439 (emphasis in original). Holberg has never rebutted this assertion.

DA Farren also had a different account of the November 7th phone call. DA Farren stated that Owens called his office, unsolicited, on November 6, 2012, about a completely unrelated matter. *Id.* at 440. Owens was concerned about drug activity at a particular motel. *Id.* DA Farren asked Bill Redden, an investigator, to look into the matter. *Id.* The next day DA Farren learned of and read Owens's October 31st affidavit. *Id.* Thereafter, he spoke with Owens on the phone. *Id.* Redden was present and the conversation was on speaker. *Id.*

DA Farren informed Owens that he had "forfeited his credibility with [the] office," and therefore, they could not move forward with an investigation based solely

46

on Owens's word.[25] *Id.* Owens seemed not to understand, so DA Farren relayed the contents of Owens's affidavit. "[Owens] responded that he had been contacted by Holberg's 'representatives' and that he signed a statement that he had not even read." *Id.* "[DA Farren] asked if [Owens] would provide another statement reiterating the information he had just provided. He said he would. He later refused to provide the requested clarification." *Id.*

In his affidavit DA Farren consistently reiterated that he did not meet with witnesses alone, that he almost always met with them at the office, and that he never coerced or suggested testimony. *Id.* at 440–41. He averred, "I have never suborned perjury; nor have I knowingly presented false testimony or false evidence of any kind in any of the more than 200 criminal trials in which I have participated." *Id.* at 441. Owens specious allegations to the contrary in this case simply do not withstand any level of scrutiny. Because the claim is meritless, Holberg also necessarily fails to overcome the procedural bar, and her claim should be dismissed as such.

---

[25] It is interesting to note something Owens said about this conversation: "When Farren announced that I perjured myself, I understood what he really meant—namely, that he could get a warrant and arrest me whenever he wanted to do so." 1.DNACR.140. DA Farren averred he told Owens that Owens "provid[ed] perjured testimony." *Id.* at 440. And, like Kirkpatrick, it is now unquestionable that Owens indeed perjured himself. He either lied to the jury during the trial, or he lied to the SHDC and continues to lie to this Court through his unrecanted affidavit. That Owens felt frightened by this is appropriate. However, Owens did not say that Farren actually threatened to have him arrested for perjury.

### C.    Holberg's claim of witness intimidation by the State is procedurally barred and meritless (Claim 1c)

In her third claim of prosecutorial misconduct during the guilt stage of trial, Holberg asserts that the State, again specifically DA Farren, intimidated and attempted to coerce testimony from three women who were in jail with Holberg, none of whom appeared at trial: Lynette Voss Tucker, Heather Woodward, and Michelle Lucero. Pet.43–44. Holberg first presented this ground for relief with regard to Tucker and Lucero in her "Motion for Reconsideration." 5/29.SHCR.Supp.1164–78. As discussed above,[26] the CCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. Therefore, the claim is barred from federal habeas relief. *Nobles*, 127 F.3d at 423.

Holberg never presented to the state courts this claim with regard to Woodward. Holberg first submitted Woodward's affidavit with the "Amended Proposed [FFCLs]." 27/29.SHCR.Supp.8529–31. The affidavit was executed on November 14, 2011, almost three weeks after her "Motion for Reconsideration" was filed on August 22nd. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Harless*, 459 U.S. at 6.

Exhaustion requires the same facts and legal theory to be presented contemporaneously. *Picard*, 404 U.S. at 275–77; *Nobles*, 127 F.3d at 420. This claim is now procedurally defaulted in state court as it would be barred by Texas's abuse-

---

[26] *Supra* Argument II.B.

48

of-the-writ doctrine; thus, it is barred from federal habeas relief. *Ogan*, 297 F.3d at 358 n.6; *Fuller*, 158 F.3d at 906. This Court may excuse the procedural default; however, the cause-and-prejudice analysis is entwined with the merits of the claim. *Banks*, 540 U.S. at 691. Because the claim is meritless, it is also procedurally barred.

To prove DA Farren intimidated Tucker, she offers two affidavits from Tucker. The first, executed on June 29, 2000, was proffered with Holberg's state habeas application in support of her Kirkpatrick claim.[27] 1/2.SHCR.Supp.188–89, 259. In a single page affidavit she claimed she "was approached twice by the people from the District Attorney's Office . . ." who wanted her to testify that Holberg bragged about murdering Towery and that she knew Holberg longer than she actually did. *Id.* at 259. Over eleven years later she executed a second affidavit on August 26, 2011, this time over three pages replete with a litany of specific details not present in her original affidavit. 20/29.SHCR.Supp.6269–72. She asserted that Holberg was remorseful of the crime and, again, did not brag about it. *Id.* Also, she specifically named DA Farren and claimed he attempted to coerce her into falsely testifying. *Id.*

In dismissing the Kirkpatrick claim, the SHDC found both affidavits not credible. App.B.100. This finding is reasonable considering the passage of eleven years during which Tucker's memory become inexplicably better. Holberg also proffers notes from an interview between trial counsel and Tucker. 27/29.SHCR.Supp.8527. Holberg points to a specific line as proof of DA Farren's malice: counsel "warned her to tell the truth or [face contempt] of court or perjury."

---

[27] *See supra* Argument III.A.

*Id.* It is incomprehensible how trial counsel's recommendation to tell the truth (something every testifying witness avers to do in open court) and admonishment of the law is an ominous portent.

Woodward's and Lucero's affidavits make the same assertions: that Holberg was sad about the murder, that she did not brag about it, and that law enforcement attempted to coerce them into giving false statements (Woodward names DA Farren, Lucero simply says "the police"). 27/29.SHCR.Supp.8529–31 (Woodward affidavit); 7/29.SHCR.Supp.1744–45 (Lucero affidavit). As discussed at length above,[28] this comes down to a he-said, she-said credibility determination. Holberg would ask this Court to believe declarations of three women with criminal pasts (one who's memory gets better with the passage of time) over the continued denials of a tenured district attorney. While the repetitive credibility determinations of the SHDC in favor of DA Farren do not receive deference under AEDPA for this unexhausted claim, they certainly can and should inform this Court's decision. These four affidavits simply cannot be believed. Thus, not only is this claim meritless, but it is inevitably procedurally barred. This Court should dismiss it as such.

---

[28] *Supra* Argument III.A.3.

### D. For her claim that the State failed to disclose exculpatory evidence, Holberg either fails to show the state court decision was unreasonable or cause and prejudice to excuse the procedural bar (Claim 1d).

In her fourth claim of prosecutorial misconduct, Holberg alleges that the state failed to disclose information regarding the testimony of Owens, Kirkpatrick, Becky Bates, Speir, and John Sneed. Pet.45–48. To establish a due process violation arising from the State's failure to disclose evidence, a petitioner must demonstrate: 1) the prosecution willfully or inadvertently suppressed evidence; 2) the evidence was favorable to him because it was exculpatory or impeaching; and 3) the evidence was material either to guilt or punishment. *Strickler*, 527 U.S. at 281–82; *Brady*, 373 U.S. at 87; *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997). But, the prosecution has no duty "to make a complete and detailed accounting to defense counsel of all investigatory work done." *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994).

Moreover, evidence is constitutionally "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 677, 682 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109–10 (1976). Rather, the suppression must reasonably cast "the whole case in a different light so as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

51

*Brady* evidence that does not constitute "significant new evidence" does not warrant habeas relief. *Westley v. Johnson*, 83 F.3d 714, 725 (5th Cir. 1996). *Brady* claims only encompass "the discovery of information which had been known to the prosecution but unknown to the defense." *Id.* at 103. "Under *Brady*, the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of reasonable diligence." *Castillo v. Johnson*, 141 F.3d 218, 223 (5th Cir. 1998). There is no *Brady* violation if the defendant, using due diligence, could have obtained the information. *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994); *see also West v. Johnson*, 92 F.3d 1385, 1399 (5th Cir. 1996) ("Evidence is not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.").

Holberg presented this claim in her initial state habeas application and reply in regards to all witnesses raised here except Owens. As discussed above,[29] the CCA held the "Additional Evidence" document, where Holberg presented the Owens claim, was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. That Holberg presented a similar claim regarding different facts (i.e., witnesses at trial) did not preserve this claim. *Picard*, 404 U.S. at 275–77; *Nobles*, 127 F.3d at 420. Therefore, the claim is barred from federal habeas relief. *Nobles*, 127 F.3d at 423.

---

[29] *Supra* Argument II.B.

52

This Court may excuse the procedural default; however, the cause-and-prejudice analysis is entwined with the merits of this claim. *Banks*, 540 U.S. at 691. For Owens, Holberg simply asserts the State suppressed the evidence of DA Farren's coercion of Owens's testimony. As discussed above,[30] this is a wholly meritless claim. Therefore, Holberg cannot overcome the procedural bar.

Holberg also slights the prosecution for failing to disclose the fallacious coercion of Kirkpatrick. As discussed above,[31] Kirkpatrick's allegations are completely without merit. Further, Holberg cannot overcome the extensive FFCLs quoted above which the SHDC relied on in dismissing this claim. *See* App.B.119. Holberg adds one new allegation here: "the State *never* revealed Kirkpatrick's extensive history as a police informant . . . ." Pet.46 (emphasis in original). Holberg cites to pages ten, sixteen, and seventeen of Kirkpatrick's deposition and paragraph six in her affidavit. *Id.* However, those citations only discuss the supposed coercion by DA Farren. They do not discuss any other "extensive history as a police informant." Therefore, they do not support her claim.

Similarly, Holberg fails to cite applicable evidence in the state court records to support her allegations regarding Becky Bates. Holberg cites to "WR. Appl. for Writ of Habeas Corpus at 15," which addresses a constitutional challenge to the Texas capital murder statutory scheme, and "AP-76,668 CR v. 1/2 at 51-53 ¶¶ 2, 5, 6, 9," which is the affidavit of Jimmy Lee Campbell. But neither involve Bates.

---

[30] *Supra* Argument II.B.

[31] *Supra* Argument III.A.

Regardless, Bates supplied two affidavits in state court. The first was executed on July 18, 2000, and submitted with Holberg's state habeas application. 1/2.SHCR.Supp.260–61. There, Bates, a friend of Holberg's, stated that she was always the aggressor when she and Holberg fought. *Id.* Bates also introduced E.R. Williams, another "sugar daddy" who Holberg beat unconscious with a cane. *Id.* She claimed to have received a call from someone who a guard claimed was DA Farren. *Id.* Of course, this is hearsay without exception. However, assuming arguendo it was at least someone from the DA's office, Bates simply told that person what she knew about Holberg. *Id.* Finally, the affidavit also included several hearsay and double hearsay statements about John Sneed. *Id.*

The second affidavit was executed on August 31, 2006, and submitted with Holberg's reply. 2.SHCR.169–171. Bates's memory apparently improved after the passage of six years. She recounted her conversation with the DA's office in the same way, but she added several new facts regarding Towery and his relationship with Holberg. *Id.* She described Towery as mean, abusive, violent, and perverted. *Id.* She also said he and Holberg had an ongoing sexual relationship. *Id.*

In response, all three prosecutors involved in Holberg's trial submitted affidavits. 4/29.SHCR.Supp.938–39 (ADA Charles D. Blount), 940–42 (ADA Love), 943–45 (DA Farren). All three denied having any knowledge or contact with Bates. *Id.* In denying this claim the SHDC found all three to be credible and found Bates was not. App.B.111–10. Holberg cannot overcome the deference owed to this credibility determination. *See Yount*, 467 U.S. at 1038; *Morales*, 714 F.3d at 303.

54

Holberg also contends that the State did not disclose a conversation between Roger Speir and the DA's office. Pet.47. In his affidavit Speir alleges that Kirkpatrick told him she was "working with the cops" as part of a deal in her case. 2.SHCR.288–89. Based on this, Speir assumed Kirkpatrick was planning to lie. *Id.* The SHDC found Speir's affidavit was based largely on hearsay, was not competent evidence, and was not credible. App.B.120. Moreover, the court found that Speir did not state he was available or willing to testify at Holberg's trial. *Id.* Based on these findings, the state court correctly disregarded the affidavit. *Id.*

Holberg claims that John Sneed "knew Towery to engage young prostitutes and to have a habit of hitting them with his fists." Pet.47. Per Sneed's affidavit, he did not know Towery; rather, Sneed was friends with E.R. Williams who knew Towery. 2/18.SHCR.Supp.236. As it regards Towery,[32] Sneed's entire affidavit is hearsay based on comments from Williams to Sneed (double hearsay where Williams told Sneed what Towery told him). Based on this alone, the affidavit can carry no evidentiary weight here, and the claim fails. The SHDC also found the affidavit to be uncredible due to the hearsay on this particular point. App.B.112–15. The SHDC further found that Sneed did not say he was available or willing to testify at Holberg's trial. *Id.*

For this claim based on all witnesses properly raised in state court, the SHDC ultimately concluded: "Holberg has failed to show that the State violated its obligations under *Brady v. Maryland*." App.B.127. Holberg fails to show this decision

---

[32] Holberg also discusses Sneed's affidavit in relation to Williams in her claims of prosecutorial misconduct during the punishment phase. *See supra* Argument IV.C.

was unreasonable. As this claim regards Donald Owens, it is procedurally defaulted and, further, meritless. Therefore, this Court should deny, and dismiss where appropriate, this ground for relief.

### E. Holberg's "catch all" *Brady* claim is unexhausted, procedurally barred, and without merit (Claim 1e).

In her final ground for this category Holberg alleges that current counsel's investigation during the state habeas proceedings uncovered boxes from the State that they assert were not turned over to trial counsel. Pet.48–53. Holberg asserts that her state habeas team received five boxes from the State in 2009 and four boxes in 2010. Pet.48. Without foundation, Holberg surmises this comprises "approximately 60% of the prosecution files currently known to habeas counsel . . . ." *Id*. Holberg then lists a litany of documents she asserts would have aided in her defense. Pet.49–50. Finally, she proffers a laundry list of missing or empty file folders. Pet.50–51. She claims "many additional *Brady* violations are strongly implied by the architecture of the State's file . . . ." Pet.50.

Holberg never presented this specific catch all claim to the state court; as such it is unexhausted, procedurally defaulted and barred from federal habeas relief. *See Picard*, 404 U.S. at 275–77; *Ogan*, 297 F.3d at 358 n.6; *Nobles*, 127 F.3d at 420. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Harless*, 459 U.S. at 6. Further, she cannot show cause and prejudice to excuse the default. *See Coleman*, 501 U.S. at 749–50. For almost every piece of evidence listed, Holberg never actually says trial counsel was not provided with that evidence. She merely asserts

that her habeas counsel did not see it until 2009 or 2010. Only once does she claim trial counsel requested something that was not provided to them: the tenant manifest for the Princess Apartments. Pet.52. However, she offers no proof of this claim.

Conversely, both trial counsel testified in open court during the state habeas hearing. Dodson averred that she regularly reviewed the State's file. 6.SHRR.64–65; 8.SHRR.189–92, 194. Norris said the same. 9.SHRR.17–20. Further, on direct examination Holberg took her through an extensive list of documents from the State's file and asked her if she had seen them. *Id.* at 20–52. She answered yes every time. *Id.* Garrison, one of their investigators, testified that Dodson and Norris regularly examined the State's files. 4.SHRR.176–77. Holberg simply cannot show that the State actually suppressed material evidence. Moreover, this claim is unexhausted. This court should dismiss this ground along with all claims for relief (based on a procedural bar where appropriate) alleging prosecutorial misconduct during the guilt phase of trial.

IV.    **Holberg Likewise Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations Were Unreasonable for her Claims of Prosecutorial Misconduct During the Punishment Phase (Claim 2).**

A.    **Holberg's *Giglio/Napue* claim regarding the testimony of Katina Dickson and Mary Burnett is procedurally barred and meritless (Claim 2a).**

Holberg turns her attention to supposed prosecutorial misconduct during the punishment phase, first asserting that the State intentionally elicited false testimony from Katina Dickson[33] and Mary Burnett. Pet.54–56. Holberg presented this to the state courts in her "Motion for Reconsideration." 5/29.SHCR.Supp.1164–78. As discussed above,[34] the CCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. Therefore, the claim is barred from federal habeas relief. *Nobles*, 127 F.3d at 423. This Court may excuse the procedural default; however, the cause-and-prejudice analysis is entwined with the merits of the claim. *Banks*, 540 U.S. at 691. Thus, because the claim is meritless, it is also necessarily procedurally barred.

As a State's witness at trial, Dickson testified that she met Holberg while in the Randall County jail. 23.RR.35. Indeed, Dickson detailed for the jury her many misdemeanor and felony offenses. 23.RR.34–35. Dickson had previously met Kirkpatrick while in the Potter County jail. 23.RR.36. Holberg told Dickson that she

---

[33] Katina Dickson's last name is spelled "Dixon" in the Reporter's Record from Holberg's trial. She also goes by Yolanda English.

[34] *Supra* Argument II.B.

and Kirkpatrick were once good friends but she was afraid Kirkpatrick was going to testify for the State against her. *Id.* Dickson stated that Holberg asked her to "shut Vicki up." 23.RR.37–38. At that time, Dickson thought Holberg was just blowing off steam and did not take her seriously. *Id.*

Later, during a Bible study, Holberg wrote Dickson a note which said, "They broke his jaw." 23.RR.38. "His" referred to Chuck, a male inmate who called Holberg a murderer. *Id.* Holberg said she paid some male inmates, one of them named Kelly, to beat up Chuck. *Id.* Dickson learned that Chuck's jaw had in fact been broken. *Id.* Dickson then believed Holberg did want her to kill Kirkpatrick. 23.RR.39–41. However, she did not take Holberg up on the offer because she did not think she could ever kill someone. *Id.* She now believed Holberg was actually just blowing off steam. 23.RR.41–42. She also testified that she and Holberg were at one time more than just friends. 23.RR.56.

In her 2001 affidavit Dickson averred that DA Farren interviewed her in his office. 5.SHCR.710–11. She claimed that DA Farren led her to believe that she was in "big trouble" for not reporting the threat to Kirkpatrick sooner, made her believe she could go to prison for this, and "some how [sic] pushed [her] into this situation." *Id.* Holberg does not mention this affidavit in her federal habeas petition, and for good reason. Instead, Holberg only proffers Dickson's 2011 affidavit. *See* 7/29.SHCR.Supp.1581–85.

Like so many of Holberg's witnesses, Dickson's memory got better with the passing decade. Her page-and-a-half affidavit in 2001 was converted into a four-and-

a-half page declaration by 2011. The 2011 affidavit included a new accusation that the guards harassed Holberg in jail. *Id.* at 1581. The single meeting with DA Farren suddenly morphed into three meetings. *Id.* at 1582. In 2011 Dickson claimed that DA Farren told her to say she and Holberg were in a relationship. *Id.* at 1583. He also apparently fed her a script of answers for other questions. *Id.* But Holberg did not omit the 2001 affidavit because of these implied incongruities.

Rather, the 2011 affidavit directly contradicts sworn-to statements in the 2001 affidavit. In 2001 Dickson said she had no reason to believe Holberg was involved in the fight that occurred among male inmates that resulted in "Kelly" breaking Chuck's jaw. 5.SHCR.711. But Dickson averred: "Brittany wrote a note in bible study to say Kelly broke Chuck's jaw." *Id.* In 2011 Dickson swore:

> I also testified at trial about a note that Brittany supposedly passed me in Bible study in jail that said Brittany paid Kelly and some guys to beat up Chuck Collins' [sic] and break his jaw. This testimony was also false. I actually learned from a guard in jail that Chuck Collins' jaw had supposedly been broken, and Brittany was with me when I heard this. I did not learn about this from any note that Brittany passed in Bible study, and I honestly do not recall this note in any great detail at this time. I do know I never received or saw any note from Brittany regarding a murder for hire. Brittany had nothing to do with Chuck Collins broken jaw. It was Mr. Farren's idea to connect this note to Brittany at trial.

7/29.SHCR.Supp.1584.

To the extent Holberg would claim fear of DA Farren caused Dickson to lie in 2001, that does not hold water. She specifically named DA Farren in 2001. Further, in 2011 she admitted that she was not so scared of DA Farren to deviate from his supposed script during trial. *Id.* Yet, for her transgression DA Farren did not "put [her] away for a very long time" or employ some other retaliation. *Id.* at 1585. Rather,

"his face . . . got red in the courtroom." *Id.* Based on the incongruences and flat contradictions of her affidavits, the SHDC was certainly reasonable in finding Dickson not credible. App.B.119.

Holberg also asserts the State knowingly elicited false testimony from Mary Lynn Burnett. The Director addresses the allegations surrounding Burnett at length below.[35] Suffice it to say that Burnett also supplied two declarations: a one-page affidavit in 2006 and a six-page affidavit in 2011 with extensively greater detail. 2.SHCR.195 (2006); 27/29.SHCR.Supp.8491–97 (2011). DA Farren and ADA Love directly counter Burnett's spurious allegations. 4/29.SHCR.Supp.940–42 (ADA Love), 943–45 (DA Farren). In dismissing Holberg's *Brady* claim regarding Burnett, the SHDC found her not to be credible. App.B.120. Because Holberg's *Giglio/Napue* claims regarding Burnett and Dickson are meritless, Holberg also necessarily fails to overcome the procedural bar; thus, her claim should be dismissed as such.

### B.     The SHDC was not unreasonable in finding the State did not knowingly elicit false testimony from Kirkpatrick during the guilt phase (Claim 2b).

Holberg once again asserts the State knowingly elicited false testimony from Kirkpatrick which was then used during the punishment phase examinations and arguments. Pet.56–57. As discussed at length above,[36] Holberg fails to show that the SHDC was unreasonable in concluding that the State did not intentionally elicit false testimony from Kirkpatrick. Thus, this claim should be denied.

---

[35] *Infra* Argument IV.C.

[36] *Supra* Argument III.A.

### C. The SHDC was not unreasonable in finding the State did not fail to disclose exculpatory evidence regarding key witnesses (Claim 2c).

In her third ground Holberg asserts the State failed to disclose exculpatory evidence regarding Dickson, Burnett and Corena Norrell,[37] and Sneed. Pet.57–60. Regarding Dickson, Holberg first asserts that the State did not disclose evidence of DA Farren's coercion of her testimony. As discussed above,[38] this allegation has no merit. Holberg also claims the State suppressed Dickson's criminal history, specifically "charges for theft by check . . . ." Pet.58. However, her criminal history was thoroughly covered at the beginning of her examination including, during the third question/answer exchange:

> Q.    What are you in the County Jail for?
>
> A.    For theft by check.

23.RR.34. Moreover, the SHDC found Dickson not credible in denying this specific claim. App.B.119. Holberg cannot overcome the deference owed to this credibility determination. *See Yount*, 467 U.S. at 1038; *Morales*, 714 F.3d at 303.

Burnett and Norrell both testified at trial regarding a physical altercation between Holberg and E.R. Williams, one of her "sugar daddies." 23.RR.60–72 (Burnett), 73–84 (Norrell). Burnett met Holberg in the Randall County jail. 23.RR.61. This all occurred *before* Holberg murdered Towery. 23.RR.63–64. Burnett testified that while in jail Holberg became concerned "when they would call her name . . . ."

---

[37] Burnett and Norrell's testimony during trial were linked for reasons which will become apparent; so too is this claim as it regards that testimony.

[38] *Supra* Argument IV.A.

23.RR.63. Holberg told Burnett she had been living with Williams and buying drugs with his money. 23.RR.63–65. One day she asked him for money to get more drugs, and he refused. *Id.* Holberg said there was an argument, they began pushing and shoving, and then she struck him on the head with a cane. *Id.* Holberg was worried that she had killed him and that the police would soon find out. *Id.* At the time Burnett believed Holberg was just trying to bluster. 23.RR.65. However, after she learned of Towery's murder, she immediately called her probation officer, Richard Bernal, and told him what she had heard. 23.RR.68.

Norrell met Holberg while in a Substance Abuse Felony Punishment Facility (SAFP). While there, she and Holberg became good friends. 23.RR.76–77. One day Holberg confided in Norrell that she was worried because of the Williams altercation. 23.RR.77. However, Holberg's account differed in that she said she broke into Williams's house to steal the money. *Id.* After he caught her, she fought him and struck him on the head with a cane. *Id.* She was worried that she had killed him. *Id.* Norrell did not believe Holberg at the time because she had a tendency to act tougher than she was. 23.RR.78. However, after she read about Towery's death in the paper, she also told Bernal, her probation officer. 32.RR.79, 83.

Both women testified on the first day of the punishment phase.[39] Before the proceedings began that day, DA Farren advised the trial court that while preparing Bernal (a State's witness because he was also Holberg's probation officer) during the prior week, he informed the prosecution team of the calls he received from Burnett

---

[39] There was a week-long break between the guilt and punishment phases of trial. 22.RR.1; 23.RR.1.

and Norrell. 23.RR.2–3. DA Farren said he advised the defense team as soon as he learned of this and of their whereabouts. *Id.* Norris asked for a continuance based on the short notice. 23.RR.4. She said that Garrison, their investigator, had the chance to interview Norrell, but that Burnett had not returned any of their phone calls. 23.RR.4–5. The trial court ruled against the continuance and allowed the trial to proceed. 23.RR.6–7.

In 2006 Burnett submitted a single-page affidavit alleging she met with DA Farren at his office three to four weeks prior to trial and told him about Holberg's altercation with Williams.[40] 2.SHCR.195. She stated that DA Farren said not to tell anyone they met. *Id.* In 2011 Burnett executed a five-page affidavit with significantly more detail. 27/29.SHCR.Supp.8491–97. She now claimed that she could not recall if Holberg said she hit Williams or one of her friends did. *Id.* She claimed that shortly after she told Bernal about what Holberg said, Burnett's dad informed her that an FBI agent contacted him regarding the Holberg case. *Id.* According to her father, the agent accepted an invitation to come eat dinner (chicken fried steak) at their house that evening, though the agent never showed. *Id.* She included numerous elements of her meetings with DA Farren and the prosecution team, all to support the idea that DA Farren threatened and coerced her into falsely testifying. *Id.*

Norrell supplied an affidavit in 2006. 2.SHCR.256–57. She alleged that she also met with representatives from the DA's office approximately one month before

---

[40] Burnett states she was familiar with DA Farren because she dated an ADA in his office. However, where the affidavit has typed "his Randall County" DA's office, Randall is scratched out and "Potter" is written in pen with Burnett's initials. Of course, DA Farren is not the DA in Potter County.

trial. *Id.* She claimed she told two men (she did not remember their names) about the Williams assault. *Id.* The men told her not to tell anyone, but she went home and told her husband. *Id.* She then met with a "state official" the week before she testified. *Id.* Jay Frazier, Norrell's husband, also provided an affidavit in 2006. 1/5.SHCR.Supp.208. He confirmed that, approximately one month before the Holberg trial (or a decade prior to signing the affidavit), his wife told him two men from the DA's office met with her to discuss the Williams assault. *Id.*

All three prosecutors executed affidavits in response to the 2006 declarations. 4/29.SHCR.Supp.938–39 (ADA Blount), 940–42 (ADA Love), 943–45 (DA Farren). ADA Blount stated he did not meet Norrell or Burnett until the day they testified. *Id.* at 938. DA Farren averred that he too did not have contact with either woman until the day they testified. *Id.* at 943. He did recall that their investigator, Darrell Dewey, and ADA Love interviewed them the week prior. *Id.* ADA Love declared he was not aware of Norrell or Burnett until the Friday before trial. *Id.* at 940. He and Investigator Dewey met with both witnesses that day. *Id.* at 941. Trying to make sense of the specious allegation that both women were told not to talk to anyone about the meeting, ADA Love surmised he may have told them not to talk to other witnesses, especially considering they were in the middle of trial and The Rule was invoked, although he cannot remember specifically saying this. *Id.*

In taking all this into account the SHDC found Burnett, Norrell, and Frazier were not credible. App.B.87.[41] And this is a reasonable conclusion. Frazier's affidavit

---

[41] In deciding Holberg's punishment-phase *Brady* claims the SHDC incorporated its findings in relation to a related IATC claim. *See infra* Argument VI.a, b.

is pure hearsay and inadmissible. Norrell can swear over eight years later that her meeting with the two men occurred one month before the trial. She can describe them with specificity, but she cannot remember their names. Further, some of the details simply do not make sense. She stated that the morning of the trial, "the medium build" man assured her that no one would know she testified, right before she was about to walk into open court. 2.SHCR.256. Burnett's affidavits include similarly nonsensical details, they are rife with hearsay, and, as with so many other witnesses, her memory inexplicably got better with the passage of time.

Moreover, the SHDC found the prosecution team credible based on their affidavits and their averments during the trial. App.B.84, 87. Based on this, the court found the State acted in good faith regarding the disclosure of the witnesses. App.B.87. The court also found that, because probation officers are employees of the judicial branch and not part of the police force or DA's office, any knowledge possessed by Bernal could not be imputed to the State. *Id.*

Holberg's complaint regarding Sneed is tied up in the Williams testimony. Sneed provided an affidavit in 2006 attesting to his relationship with Williams. 2/18.SHCR.286. He claimed to be good friends with Williams and to be with him when he died of cancer in hospice care. *Id.* He also stated that around the time of Holberg's arrest, a detective from the Sheriff's Department contacted him and asked about Holberg allegedly killing Williams. *Id.*

The SHDC found Sneed's affidavit credible only to the extent he asserted that he was friends with Williams, took Williams to hospice, and believes Williams died of

66

cancer. App.B.114. The court also found that Sneed's vaguely described communication with an unidentified Sheriff's detective was not enough to impute knowledge to the State. *Id.* Of utmost importance, the court found "that Sneed's affidavit [was] not material because it possesse[d] little relevance or probative value in relation to Norrell's and Burnett's testimony; Sneed [could not] state that he had any personal knowledge of what Holberg did or did not say about Williams to Norrell and Burnett." *Id.*

Indeed, Norrell and Burnett's testimony at trial was not that Holberg actually killed Williams. Rather, it was that Holberg told each of them of the assault. The State noted this distinction in it's opening statements:

> Now, you'll learn in this trial that we don't know whether she killed E.R. Williams or not. He passed away, he had cancer, his body apparently was cremated. At least that's some of the information we've been given. No autopsy was performed on him.
>
> But when you hear that evidence, it will demonstrate for you that either she did assault E.R. Williams with a cane and believes that she killed him or may have killed him, or it's at least how she thinks.

23.RR.10–12. Moreover, Dodson averred in her affidavit that "Holberg indicated she had had an altercation with Mr. Williams, did not know how he died, and was upset that she might have caused his death." 24/29.SHCR.Supp.7333.

Regarding all these witnesses, the SHDC ultimately concluded: "Holberg has failed to show that the State violated its obligations under *Brady v. Maryland*." App.B.127. Holberg fails to show this decision was unreasonable. Further, she fails to overcome the extreme deference owed to the court's credibility determination on

this issue. *See Yount*, 467 U.S. at 1038; *Morales*, 714 F.3d at 303. Therefore, this Court should deny this ground for relief as meritless.

### D.    Holberg's "catch all" *Brady* claim is procedurally barred and without merit (Claim 2d).

Finally, Holberg again alleges that current counsel's investigation during the state habeas proceedings uncovered relevant, material evidence. Pet.60–63. Holberg presented this to the state courts in her "Motion for Reconsideration." 5/29.SHCR.Supp.1164–78. As discussed above,[42] the CCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. Therefore, the claim is barred from federal habeas relief. *Nobles*, 127 F.3d at 423. This Court may excuse the procedural default; however, the cause-and-prejudice analysis is entwined with the merits of the claim. *Banks*, 540 U.S. at 691. Thus, because the claim is meritless, it is also necessarily procedurally barred.

Holberg ties this evidence to three areas of the punishment case: the Williams assault, the "Chuck" assault, and witness impeachment. As discussed above,[43] none of this evidence, if believed suppressed, was truly material. Regarding the Williams assault, the issue at trial was not whether Holberg actually beat Williams, but if she told Norrell and Burnett this. Further, Dodson's recollection that Holberg told them she assaulted Williams cuts against all of it. Similarly, the testimony regarding the "Chuck" assault was whether Holberg told Dickson this happened, not if it actually

---

[42] *Supra* Argument II.B.

[43] *Supra* Argument IV.C.

happened. And Dickson's countermanding affidavits destroy all credibility on this issue. Finally, Holberg complains about the State suppressing criminal histories of witnesses. Pet.62–63. Yet, all witnesses complained of were examined on the stand regarding those histories, as demonstrated with Dickson. Because this claim is wholly meritless, it is also necessarily procedurally barred. This court should dismiss this ground along with all claims for relief (based on a procedural bar where appropriate) alleging prosecutorial misconduct during the punishment phase of trial.

## V.    For Holberg's Various Claims of IATC During the Guilt Phase, She Either Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations were Unreasonable (Claim 3).

### A.    Holberg's claim that counsel failed to investigate and present key facts are, in part, procedurally barred; further, she fails to show both deficiency and prejudice (Claim 3a).

In her first ground alleging IATC Holberg asserts a whole host of challenges to counsel's investigation and preparation for the guilt phase of trial. Pet.65–74. Although Holberg raised this ground for relief in part in her initial state application and reply brief, her claims that counsel failed to investigate the forensic evidence and that counsel failed to effectively challenge the State's experts were first presented in her "Motion for Reconsideration." 5/29.SHCR.Supp.948–1238. As discussed above,[44] the CCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. Holberg fails to show cause and prejudice to now overcome this procedural error. *See Coleman*, 501 U.S. at 749–50.

---

[44] *Supra* Argument II.B.

Therefore, the claim is barred from federal habeas relief. *Nobles*, 127 F.3d at 423. Further, the claim is meritless.

To prove ineffective assistance of counsel a defendant must show counsel's performance was deficient and the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. A reviewing court may dispose of a claim if either counsel rendered reasonably effective assistance or there was a lack of prejudice. *Id.* If one is found dispositive, the court need not address the other. *Id.* at 697. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim" because without proof of both elements "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 700.

As to this first prong, courts "must be highly deferential" to counsel's conduct, and a petitioner must show counsel's performance fell below "an objective standard of reasonableness." *Id.* at 688–89. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Stated differently, a court must presume "the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). Every effort must be made to eliminate the "distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

A petitioner attacking the effectiveness of trial counsel in a habeas corpus proceeding bears the burden of proving that ineffectiveness by a preponderance of the evidence. *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). In order to overcome

the presumption of competency, a petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.

*Id.* at 689.

With regard to the second prong, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. One may not simply allege but must "affirmatively prove" prejudice. *Id.* at 693. *Strickland* cannot be sated by mere speculation and conjecture. *Bradford v. Whitley*, 953 F.2d 1008, 1012 (5th Cir. 1992). Finally a *Strickland* claim must be viewed through the lens of § 2254(d) creating a "doubly" difficult to surmount presumption that favors the state court denial. *Richter*, 562 U.S. at 102. Therefore, the question is whether the state court reasonably determined the ineffective assistance claims failed to satisfy either prong of *Strickland*. *Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003).

### 1. The witnesses Holberg would now proffer to support her theory of self-defense are not credible and are largely cumulative.

Holberg chastises counsel for not investigating or otherwise discovering witnesses which she asserts would support that she and Towery were in a relationship (thus, bolstering her claim she did not burglarize him) and that Towery

71

had a "dark side" (thereby strengthening her case for self-defense). The same presumption of reasonableness announced in *Strickland* guides the analysis with regard to assessing counsel's investigation prior to trial. *Terry Williams*, 529 U.S. at 390. The question of the effectiveness of pretrial investigation is one of degree; it is not subject to precise measurement. *Strickland*, 466 U.S. at 680; *Dowthitt*, 230 F.3d at 743. Thus, even if counsel did not discover a potentially helpful witness, Holberg still has not proven deficiency.

Holberg proffers a number of affidavits from witnesses and potential witnesses alike. Included in this group are Gregory Swain and Michael Tietz. Their affidavits were not properly presented to the state habeas court when it decided this claim, and that court neither considered nor discussed these affidavits. Therefore, as Holberg presents them now to this Court, they are barred from consideration by *Pinholster*, 563 U.S. at 181.

First, Holberg asserts trial counsel was ineffective for not discovering Bates. Bates's affidavits and the numerous problems with their veracity were discussed above.[45] Relevant to his claim as it was presented on state habeas, the SHDC found that in her 2000 affidavit Bates did not state she was available or willing to testify at Holberg's trial. App.B.54. In 2006, after her memory had the benefit of time with which to significantly improve, she did state she would have testified if called. App.B.55. However, Bates never alleged that she contacted Holberg or the trial team. *Id.* Based on trial counsel's affidavits, the court further found that, despite giving her

---

[45] *Supra* Argument III.D.

counsel two lists with approximately forty-five names on it, Holberg never gave counsel Bates's name or told them what she supposedly knew. App.B.56; *see* 24/29.SHCR.Supp.7332. The court found Bates was not credible, trial counsel in their affidavits were credible, and Holberg failed to show deficient performance or prejudice with regard to Bates.[46]

Next, Holberg points to Jimmy Campbell. In a 2000 affidavit Campbell stated that he accompanied Holberg to the Princess Apartments on two separate occasions and that each time Holberg returned with money saying she hooked with an "old man" there. 1/2.SHCR.Supp.230–31. Over a decade later, Campbell executed an affidavit in 2011 after his memory had a stark improvement. 7/29.SHCR.Supp.1551–52. Therein he claimed to have recently identified Towery from a photograph as the old man he saw with Holberg. *Id.*

The SHDC found Campbell was not credible. App.B.49. It did, however, find that counsel was credible on this issue. *Id.* Based on their affidavits, the court found that Holberg did not inform counsel that Campbell knew about or otherwise could identify Towery nor did she say where he was. App.B.50. Holberg did tell counsel that Campbell raped her in 1994. App.B.49. Counsel attempted to locate Campbell through various channels but eventually gave up concluding that his testimony would add little value since he could not identify Towery and also because he would probably

---

[46] As with her prosecutorial misconduct claims, where the SHDC made credibility determination between trial counsel and another affiant, Holberg cannot overcome the deference owed to this determination. *See Yount*, 467 U.S. at 1038; *Morales*, 714 F.3d at 303.

deny any rape occurred. App.B.50. Based on this, the court found that Holberg failed to establish deficient performance or prejudice regarding Campbell. *Id.*

Holberg then submits a litany of witnesses from "Babes," the strip club where she worked. Mark Hunter executed two affidavits, one in 2000 and a significantly longer one in 2011 after his memory improved with time. 1/2.SHCR.Supp.247–48 (2000); 7/29.SHCR.Supp.1592–95 (2011). Hunter attested that Holberg danced at Babes, he knew Towery to frequent strip clubs including Babes, on more than one occasion dancers had complained about Towery to the extent he was asked to leave, and that Towery was Holberg's sugar daddy. *Id.* The SHDC specifically found the 2011 document not credible to the extent it departed from his prior declaration. App.B.95. It also found both affidavits not material because similar testimony was admitted at trial through Connie Baker, 20.RR.144, Diane Wheeler, 21.RR.196, Johnny Scott Deaver, 20.RR.101, and Kirkpatrick, 19.RR.231. Thus, the court found that Holberg failed to establish prejudice with regard to Hunter.

Loretta Warren-Martinez also filed two affidavits in this case. 5/18.SHCR.Supp.717–19 (2001); 13/29.SHCR.Supp.3885–89 (2011). Stacy Mock executed an affidavit in 2001. 5/18.SHCR.Supp.715. And with her initial state application, Holberg proffered notes from a phone interview with Amber Terry, which was unsworn hearsay. 1/2.SHCR.Supp.217–19. Again, all three offer largely similar statements to the testimony that was elicited at trial. The SHDC noted that neither Terry nor Mock averred they were willing and available to testify at the time of trial.

App.B.97. Moreover, with regard to all three, the SHDC found that Holberg failed to show deficient performance or prejudice. App.B.59, 97.

Holly Ruffin executed two declarations as well, separated by only six years. 1/2.SHCR.Supp.232–33 (2000); 2/18.SHCR.Supp.292–93 (2006). In both affidavits Ruffin stated that she told Jim Patterson, one of Holberg's investigators, about a person named Dawn[47] whom Ruffin claimed had seen Holberg at the Princess Apartments on a regular basis and had seen Holberg at Towery's apartment, also on a regular basis. *Id.* Ruffin also asserted she knew Towery as a patron of the strip club, she had gone with Holberg to Towery's apartment several times, and Holberg had told her on other occasions that she was going to Towery's for prostitution. *Id.* Finally, Ruffin alleged that she knew A.B. Towery, Jr. (Rocky) from an Alcoholics Anonymous class, that Rocky described his dad as abusive, and that he blamed his dad for his mother's suicide. 2/18.SHCR.Supp.292–93 (2006).

The SHDC found that Ruffin's 2000 affidavit was only credible to the extent that a defense investigator interviewed her before trial. App.B.52. The court further found her 2006 affidavit was not credible because of the variations from her original declaration. *Id.* The court found trial counsel to be credible on this issue. *Id.* Both attorneys discussed Ruffin in their affidavits. 24/29.SHCR.Supp.7331 (Dodson), 7349–50 (Norris). They averred they met with Ruffin prior to the trial. *Id.* She told them she recognized Towery as a patron of the strip club and that she might know someone who could place Holberg at the Princess Apartments. *Id.*

---

[47] In her 2000 affidavit the name is written as "Donn."

75

However, she told them she had no knowledge of a relationship between Holberg and Towery. She also did not tell them about any incidents at the strip club involving Towery. *Id.* When Patterson tried to meet her and "Dawn," that person left before Patterson got there, and when Patterson did arrive, Ruffin could not provide the person's real name, her address, or any other information he could use to locate that person. *Id.* The court ultimately determined Holberg failed to establish deficient performance or prejudice with regard to Ruffin. App.B.54.

Holberg next points to a document that purports to be a police report from November 19, 1996. 1/2.SHCR.Supp.212–13. Apparently on that day Mark Fields, a cab driver, flagged down Officer Richardson. *Id.* He told the officer that during the prior week he picked up Holberg from the Princess Apartments. *Id.* She could not pay for the ride, so she told him to keep her bags, that she was going to get some money, and she would call him after she had the money and retrieve her bags then. *Id.* Fields agreed and kept the bags. *Id.* Then on November 19th, he saw Holberg's photograph at a truck stop, realized the police were looking for her, flagged down Officer Richardson, and gave him the bags. *Id.*

The SHDC first noted that neither Fields nor Officer Richardson have presented an affidavit saying they were willing and available to testify at trial. App.B.61. Moreover, the document was not competent evidence because it was not authenticated and rife with hearsay. App.B.62. Assuming it was, the court found that Fields would merely be able to testify that Holberg was familiar with the Princess

Apartments, testimony that was already given at trial. *Id.* Thus, the court found that counsel was neither deficient nor Holberg prejudiced. *Id.*

Finally, Holberg proffers a 2011 affidavit from Jamie Shuffield Tietz. 13/29.SHCR.Supp.3862–65. She worked at the Princess Apartments for several years. In her affidavit she avers, "[Towery] was a very strong man and in good health – not feeble at all." Holberg admits she testified, but claims she "was never question on this . . . ."[48] Pet.69. In fact Tietz was questioned about this at trial and her affidavit now directly contradicts that testimony. She testified on direct that Towery had lived at the apartments for years. 19.RR.130. He was "friendly" and a "very nice man." 19.RR.130. He was never angry, gruff, or hostile towards Tietz. 19.RR.130. She never saw any evidence, such as women coming and going from his apartment, that made her think he procured prostitutes. 19.RR.131.

She further testified that he was one of their oldest tenants and did not get around all that well. 19.RR.131–32. "He walked slow with his head down, kind of scooted his feet, sort of a shuffle." 19.RR.132. Moreover, on cross trial counsel got her to admit she could not see Towery's door from her desk and she really had no way of knowing who all was coming and going from his apartment. 19.RR.139. She also testified Holberg knew her way around the complex. 19.RR.142. Counsel cannot be held ineffective if Tietz has a different memory thirteen years after she testified at

---

[48] Holberg also complains that trial counsel failed to attack the State's timeline. She points to several of these witnesses, such as Tietz, to support of a slightly different time frame for when Holberg was in Towery's apartment (approximately fifteen minute difference). However, as already discussed, the affidavits fail to provide competent and credible evidence, as do other documents which Holberg proffers (e.g., the supposed cab logs, *see supra* Argument III.B).

trial. Indeed, counsel's cross of Tietz helped support their theory at trial. The SHDC was certainly reasonable in finding that Holberg again failed to show deficient performance or prejudice with regard to Tietz. App.B.62. visit

### 2.    Holberg fails to show how Counsel was deficient in defending against the burglary/robbery aggravator.

Holberg next asserts that counsel failed to conduct a sufficient investigation into witnesses which helped establish the burglary or robbery aggravator necessary for her capital punishment conviction. Here, Holberg focuses on Towery's wallet, which was found open, empty, and on his chest. The State believed this supported the theory that she went to Towery's apartment for money and drugs and killed him in the process of taking those things. 22.RR.24–28. The implication of the wallet obviously was that Holberg took money out of the wallet before she left his apartment.

Holberg first complains that counsel did not do more to demonstrate that someone else could have taken the money. She chastises counsel for first not accusing Rocky (Towery's son who found his father brutally stabbed and beaten with a lamp sticking out of his throat), Officer Christian (the first responding officer), and any of the unnamed, faceless rabble that live in the "crime ridden" apartments. The first two or plainly preposterous, and counsel might risk alienating a jury with the accusation. As for not pursuing testimony to show the criminal element that existed at the Princess apartments, there was in fact that very testimony at trial. 18.RR.316–19; 19.RR.161–62; 21.RR.250–51.

Holberg also asserts counsel failed to investigate Misty Votaw, Cody Mayo, and Demitrius Pettis, three witnesses who say they saw Holberg with several $100 bills

shortly after the murder. 19.RR.164–80 (Mayo), 186–99 (Votaw), 202–18 (Pettis). However, Holberg does not point to any specific evidence or testimony that was not offered at trial that should have been. Moreover, Holberg claims counsel "failed to . . . cross-examine" these witnesses. Pet.71. Yet, counsel crossed each and every one. 19.RR.180–82 (Mayo), 199–200 (Votaw), 218–28 (Pettis). Indeed, counsel attacked the credibility of their statements regarding the money.[49] 22.RR.50. Counsel also argued the possibility of theft after the fact, another thing Holberg incorrectly claims did not happen. 22.RR.60; *see* Pet.72. The SHDC specifically found counsel was not ineffective in their preparation for and cross-examining of these witnesses. App.B.74

### 3. Holberg fails to show trial counsel deficiently challenged the State's forensic case.

Next, Holberg condemns counsel for not challenging the State's forensic evidence and expert witnesses. This claim was first raised in Holberg's "Motion for Reconsideration" and is procedurally barred. Moreover, counsel did cross-examine the State's expert witnesses. *See, e.g.,* 18.RR.223–59, 68–73, 275–76 (Holmes); 20.RR.70–82 (McCord). Yet, trial counsel used some of their testimony in Holberg's favor (i.e., that there was no blood on the wallet). Further, Holberg's arguments wholly ignore the fact that the State also put on evidence that Holberg took Towery's prescription medication.

In affirming the trial court's denial of a motion for DNA testing, the CCA held:

Thus, in applying these concepts to the facts of this case, the jury could reasonably have found that the appellant committed the capital-murder

---

[49] Counsel could not attack their credibility too hard because they were also the witnesses who saw Brittany bleeding from her hands, a fact that counsel played up during closing arguments to explain why she necessarily could not have opened the wallet that had no blood on it. 22.RR.42.

aggravator of robbery even if it also believed that the appellant did not leave Towery's apartment with the $1,400 cash contained in the wallet. Indeed, the jury could reasonably have concluded that the appellant committed a robbery even if it believed that she did not take possession of the cash or wallet at all, but nevertheless had the intent to take possession (and, in furtherance of that intent, inflicted bodily injury on Towery). In either of these scenarios, the bodily injury inflicted on Towery, which ultimately resulted in his death, would have been carried out while the appellant was "in the course of committing" the theft, notwithstanding any exculpatory DNA evidence tending to indicate that she never in fact "rifled" through the wallet.

Moreover, even if exculpatory DNA evidence made it crystal clear that the appellant did not remove the $1,400 cash from Towery's wallet, the prosecution's alternate theory—that the appellant committed robbery by stealing the large quantity of prescription medications scattered throughout Towery's apartment—was thoroughly explored at trial. Witnesses testified that Towery had as many as "seven to ten" bottles, and "at times" more than ten bottles, of prescription pain medications scattered in plain view throughout his apartment. Indeed, "at times" there were so many prescription bottles that "it was hard to count" because "he had a lot." The jury learned that it "would be very unusual" if there were only two bottles of prescription pain pills in plain view at Towery's apartment, as was the case at the time police arrived. Much of the trial, moreover, centered around the appellant's history of prescription pain medication abuse and addiction.

*Holberg Ch. 64 DNA*, 425 S.W.3d at 287-88.[50]

Most importantly, all of the testimony to which Holberg points, in this IATC claim and the ones to follow, simply could not overcome the facts of the crime—facts which came directly from Holberg. Regarding the aggravator, the State focused on one piece of her confession to the police when they were driving back from Memphis. Sergeant (Sgt.) Modeina Holmes testified that Holberg, during her spontaneous confession, stated: "why would she rob and kill a man for $1,400 when she was

---

[50] Again, the Director does not assert that this decision receives AEDPA deference. The Director simply cites it as instructive to this claim.

making $2,000 a day and had a $900 a day drug addiction." 19.RR.73. The State found it interesting that she would have a specific number in mind, especially one that is in line with Votaw and Mayo's testimony that Holberg had ten to twelve $100 bills after the murder and Towery's children who stated their father kept over $1,000 in cash in his apartment, cash that was never found after the murder. 22.RR.72.

Holberg also testified extensively at trial. 20.RR.175–264; 21.RR.2–177. Both on direct and cross she retraced her steps through the brutal assault, which she claimed was self-defense. There is one particular exchange on cross that exemplifies the steep, uphill battle that trial counsel was fighting. At one point during the melee—in which Holberg used various objects to stab Towery fifty-eight times and cause numerous blunt-force traumas—she testified that the 80-year-old Towery was slumped in the chair bleeding profusely.[51] 21.RR.127–28. She claimed they each have a knife in their hands. *Id.* She asked him if he was hurt, and he said yes. *Id.* The prosecution then asked:

> Q.     This man who was sitting in the recliner, bleeding all over, stab wounds, hurt, you have a knife in your hand, he has a knife in his hand, but you can't retreat?
>
> A.     Sir, I don't think I believed so. If I could have got out of that house or if I thought I could have at that time, I would have. I think about that every day. I wish I would have run out of that house.

21.RR.129. Given all this, Holberg fails to show that counsel was deficient in their preparation and that she was prejudice. Therefore, this Court should dismiss as barred where appropriate and deny as meritless this ground for relief.

---

[51] This was before she tied him up with an electrical cord.

**B.     Holberg fails to show the CCA was unreasonable in finding counsel was not deficient for not challenging juror Carpenter for cause (Claim 3b).**

In her second ground[52] Holberg condemns trial counsel for not challenging for cause juror Bill Carpenter. Pet.74. She does not cite to anything he actually said during individual voir dire. Rather, she simply cites to two answers in his juror questionnaire. *Id.* The CCA held on direct review:

> The record reflects that Carpenter said nothing during the voir dire questioning that indicated he rejected rehabilitation as a factor to consider when answering the punishment issues. He also said nothing that indicated his adherence to a "blood atonement" theory of retribution. In other words, the record does not show the basis on which [Holberg] claims trial counsel should have challenged Carpenter for cause. Therefore, [Holberg] has failed to show that trial counsel's failure to challenge Carpenter for cause constituted deficient performance.

App.A.23.

All of Carpenter's answers during voir dire, when questioned by both the State and defense, indicated an unbiased juror. 14.RR.132–71 (State), 171–88 (defense). In fact, there were some answers which trial counsel could have reasonably believed were defense friendly. After getting caught vandalizing a car, his son went through the criminal justice system in Randall County. 14.RR.159. When asked about Texas's criminal justice system, he responded that it does not always take into consideration all aspects of the situation. 14.RR.162. He then proceeded to give a specific, real-life example where he thought a defendant's punishment was too harsh and believed the judge did not consider all the facts of the case. 14.RR.163. The prosecution pressed

---

[52] Holberg includes this claim under the heading of "[IATC] - GUILT PHASE." However, she indicates that this claim is "relating to the punishment phase . . . ." Pet.74.

further on his thoughts about that case, he clarified the defendant "needs to be put in a place where he can be helped, not just thrown away . . . ." 14.RR.164.

When asked what he would change about the criminal justice system, he responded: "Have a better system of accountability of lawyers, judges and other officials of the system." 14.RR.165. The Fifth Circuit, in reversing a district court's grant of habeas relief, has held that a state court was reasonable when if found that counsel in a death penalty case was not deficient when they elected to not use a strike on a veniremember who was an ADA in the very district attorney's office that was prosecuting the defendant. *Morales*, 714 F.3d at 306. It stands to reason that the CCA also was reasonable here where the juror gave trial counsel no reason to challenge for cause. Thus, this claim should be denied.

### C. The SHDC was not unreasonable in finding that trial counsel was not deficient in how they challenged Kirkpatrick's testimony (Claim 3c).

In her third ground Holberg claims trial counsel failed to challenge and counter Kirkpatrick's testimony. Pet.75–77. Holberg starts with the presumption that DA Farren coerced Kirkpatrick to falsely testify. Holberg faults trial counsel for not objecting to DA Farren's leading questions, which of course were used to keep her on the script he himself wrote. The speciousness of this claim was addressed above.[53] She also asserts counsel was deficient for not countering her testimony through other witnesses or potential witnesses, specifically Wiseman, Lucero, and Speir. As

---

[53] *Supra* Argument III.A.

discussed above,[54] the affidavits of all three are not credible. Wiseman actually testified at trial; however, Holberg notes this was a stroke of luck as counsel saw her in the hallway of the courthouse during trial. Holberg fails to mention that, on direct examination, Wiseman admitted that counsel had left several messages for her and that she did not return them. 25.RR.104.

Holberg also contends counsel was deficient in their cross examination of Kirkpatrick because they should have "approach[ed] the subject more artfully . . . ." Pet.77. It is certainly easy, sitting in front of a cold Reporter's Record, for one to claim they could now conduct a better cross-examination. However, this is why *Strickland* forbids a simple backwards-looking hindsight. Holberg also faults trial counsel's affidavits on state habeas review for their "post-hoc 'assumption[s].'" Pet.76. Yet, this is precisely the basis of her claim. Counsel was not deficient in dealing with Kirkpatrick's testimony. Moreover, Holberg fails to show the state court was unreasonable in that determination. *See* App.B.34–38. Therefore, this Court should deny the claim.

### D.     Holberg's claim that counsel failed to challenge the testimony of various State's witnesses is in part procedurally barred; further, she fails to show the state court was unreasonable in denying those grounds properly raised (Claim 3d).

Holberg next asserts that counsel failed to conduct effective cross-examination of and present exculpatory and corroborative evidence through several State's witnesses. Pet.78–86. Holberg first presented this ground for relief with regard to Garry Crisp, Pamela Schwartz, Sgt. Modeina Holmes, and Dr. Jeffrey Barnard in her

---

[54] *Supra* Argument III.A.4.

"Motion for Reconsideration." 5/29.SHCR.Supp.948–1238. As discussed above,[55] the CCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. Holberg fails to show cause and prejudice to now overcome this procedural error. *See Coleman*, 501 U.S. at 749–50. Therefore, the claim is barred from federal habeas relief. *Nobles*, 127 F.3d at 423. Further, the claim is meritless.

First, Holberg claims trial counsel should have accused Rocky (Towery's son who found him dead) of stealing his father's money while his father's cold, lifeless body lay on the floor with a lamppost protruding from out his mouth. Holberg asserts a fresh version of the events that show Rocky had "motive, opportunity and knowledge" to take the cash and run. Rocky testified that his father had $1,200 to $1,300 in $100 bills and that his father showed him the money two days before his death. 18.RR.308–10. This was part of the State's theory of burglary/robbery as an aggravator. Trial counsel took a more tactful, indeed wizened, approach. They pointed out that Rocky was simply assuming his father still had the cash, but that he in fact did not know the case was still in his wallet. 19.RR.18. Holberg also castigates counsel for not attacking Russell Towery (Rusty) on the stand regarding Towery's violent behavior toward his family and his alcohol and pill addiction.

---

[55] *Supra* Argument II.B.

Trial counsel's affidavits address Holberg's ridiculous stratagem. 24/29.SHCR.Supp.7330–31 (Dodson), 7352–56 (Norris). The SHDC found theses affidavits to be credible. In denying these claims, the court found:

> that counsel made a strategic and extremely intelligent decision to limit the aggressiveness of their questioning when cross-examining Towery's survivors because counsel reasonably concluded that an over-aggressive cross-examination would risk alienating the jury.
>
> * * *
>
> Counsel reasonably assessed that challenging Towery's survivors too aggressively on any subject presented grave risks to Holberg's defense, as it threatened to severely alienate the jury. They reasonably judged that, where Holberg had made several statements admitting that she had obtained money from Towery and credible witnesses had testified that they had seen Holberg immediately after the murder with a large sum of cash, it would be devastating to Holberg's defense to suggest that Rocky Towery took money from his father's brutally beaten body or that some unknown third party took the money from Towery's body while Rocky was seeking help; the suggestion would likely have provoked a response of outrage from the jury. Counsel moreover reasonably judged that any suggestion that Rocky or Rusty Towery took Towery's money would moreover have been pointless because Holberg admitted and would in fact testify that Towery had given her money. The Court finds that the defense reasonably concluded that such a tactic would cause them to lose all credibility with the jury.

App.B.64–66, *see also* 71–74.

Holberg next asserts counsel was deficient in their cross of Jamie Tietz. As discussed above,[56] counsel conducted a rather proficient cross-examination, Tietz's uncredible affidavit runs completely counter to her testimony at trial, and the state court was reasonable in finding no deficiency in counsel's performance. *See* App.B.62.

---

[56] *Supra* Argument V.A.1.

Holberg's claim regarding Crisp is procedurally barred. Holberg contends that counsel should have elicited two pieces of information from him: (1) that when he saw Rocky the next morning speaking with police, he was calm; and (2) that Towery's sons did not take his car away from him. As to the first point, this could be easily dispelled on redirect. He did not know what was in Rocky's mind; indeed, Rocky could have been in full blown shock by that point. Further, the State could have eviscerated his testimony on that matter by recalling Rocky to the stand. To the second point, his affidavit specifically said that Towery did not park his car at the apartments and he did not know where the car was when Towery was not driving it. 7/29.SHCR.Supp.1572. Thus, Towery's sons could certainly have taken the car from their father without his knowledge. Crisp's affidavit on these issues is simply not credible. Therefore, Holberg fails to show counsel was deficient in their decision to not cross Crisp.

The testimony of Mayo, Votaw, and Pettis; counsel's cross of these witness; and the state court's reasonable finding that counsel was not deficient in this regard were discussed above.[57] Kirkpatrick's testimony has also been discussed above.[58] Holberg next rebukes trial counsel for their handling of Holberg's mother, Pamela Schwartz. She faults trial counsel for not "address[ing] their handling of Schwartz in their affidavits." Pet.84. While this is true, mainly because she executed her affidavit on the same day as Dodson and only a few days before Norris, trial counsel thoroughly

---

[57] *Supra* Argument V.A.2, 3.

[58] *Supra* Argument V.C.

discussed their interactions with Schwartz during the two-week state habeas hearing dealing with state habeas "Claim 28."[59]

As mentioned, this claim regarding Schwartz is procedurally barred. While this Court may not owe AEDPA deference to the state court's Supplemental FFCLs on this particular issue, it does owe said deference in later claims. That court found that Dodson interviewed Schwartz on February 25, 1997. App.C.43; *see* 6.SHRR.66. Dodson performed several follow up calls with Schwartz and John Schwartz, her husband. App.C.44–45; *see* 6.SHRR.68–69. In particular the state court found:

> Garrison and the attorneys also determined that even some family members and close friends who could potentially serve as mitigation witnesses might do more harm than good. Holberg's mother, Pam, could have testified regarding Holberg's history before and after her involvement with drugs. But Garrison and trial counsel believed that Pam was hostile towards Brittany, was paranoid that testimony concerning her own drug use would jeopardize her job, and could have given very damaging testimony. 4.SHRR.153.[[60]]

App.C.28.

Indeed, trial counsel's investigation uncovered rampant drug abuse by both Pam and John Schwartz, especially during Holberg's childhood. App.C.45–46. The court further found:

> Pam Schwartz was not utilized as a witness for several reasons, according to Norris. First, the trial team was concerned that Pam Schwartz, a deputy sheriff with Potter County, would provide information to law enforcement authorities. 10.SHRR.42–43. Second, Pam Schwartz expressed concern that she would miss her vacation if she were called to testify. 10.SHRR.43–44. Third, Holberg stated that

---

[59] Addressed *infra* Argument VI.D.

[60] Cites to the record are altered to be consistent with the citation formatting in this brief.

she did not trust Pam Schwartz. 8.SHRR.174; RX.4 at 152. The decision not to call Pam Schwartz was a reasonable strategic decision.

App.C.67.

Finally, Holberg challenges trial counsel cross-examinations of Sgt. Holmes, the lead investigator, and Dr. Barnard, the Chief Medical Examiner. The claim as it regards both witnesses is procedurally barred. For Sgt. Holmes, Holberg complains that she was allowed to testify outside of her expertise. However, after being cross-examined on this very point, the State clarified this issue during re-direct:

> Q.   Now, you have been asked a lot of questions about bloodstains, bloodstain patterns and so forth. You are not testifying as a bloodstain or a blood pattern expert, are you?
>
> A.   No, I'm not.
>
> Q.   You are testifying as an expert in the area of crime scene reconstruction?
>
> A.   That's correct.
>
> Q.   And you have received some training and you certainly have knowledge about bloodstains and blood patterns, but you're not testifying as an expert in that specific field.
>
> A.   That's correct.

18.RR.261. In general, trial counsel conducted vigorous cross-examinations of Sgt. Holmes. 18.RR.223–59, 268–73, 275.

Turning to Dr. Barnard, Holberg's only complaint is trial counsel "did not object to the State's misleading presentation" that Dr. Barnard conducted the autopsy. Pet.85. They point to the autopsy report to support this conclusion. *See* 3/29.SHCR.Supp.675–92. However, that report clearly indicated that several examiners took part in the autopsy, including Dr. Barnard, and they literally signed

off on the opinion in that report. *Id.* at 687. On the stand, the State asked: "Did you and other representatives of the medical examiner's office perform an autopsy on A.B. Towery, Sr. on November 15th of 1996?" to which Dr. Barnard answered yes. 19.RR.285. In regards to Dr. Barnard, as with all witnesses raised here, Holberg fails to show deficient performance and prejudice. Moreover, she fails to overcome the procedural bar for those claims not properly raised, and she fails to show the state court was unreasonable for those claims that were. Therefore, this Court should dismiss as barred where appropriate and deny as meritless this ground for relief.

### E. Holberg fails to show the unreasonableness of the state court's decision that trial counsel was not deficient in presentation of Connie Baker (Claim 3e).

In her fifth ground under this claim Holberg alleges that trial counsel were deficient in their examination of defense witness Connie Baker and in their failure to object to the State's cross. Pet.86. Specifically, she faults counsel for not eliciting testimony on direct review demonstrating Towery's "dark side" and for not objecting to the State's cross-examination of Baker. In fact, the defense had Baker testify to that very issue. In her affidavit addressing this issue Norris explained: "The only evidence wanted by defense counsel was that an individual outside the area of influence for several months and someone who did not know Holberg could readily identify [Towery] as a [sic] securing the services of prostitutes. This supports the Defense theory of the case." 24/29.SHCR.Supp.7356.

To that end Baker testified at trial. 20.RR.144–72. She stated that she was a prostitute while living in Amarillo, but she no longer did this now that she lived in Oklahoma City. 20.RR.145–46. She described one particular encounter she had with

Towery at the Princess Apartments. 20.RR.146–47. Baker testified that Towery called a person, who was seemingly her pimp, and asked that a female be brought to his apartment. *Id.* Baker, accompanied by her boyfriend, went to the apartment and met Towery. *Id.* When asked if they engaged in sex, she averred: "No, I refused to do what he wanted done." 20.RR.146. However, Towery still paid her $25 for her time getting to the apartment. 20.RR.147. She could not remember exactly when this was, but she remembered it was before November 13, 1996. *Id.*

On cross-examination, the State asked Baker about prior statements she gave to the police and why she did not share this information then. 20.RR.148–49. They asked her about her relationship with Victor Miles and Holberg's relationship with Bruce Edward Scott, other murder suspects. 20.RR.151–52. They also sought to impeach her regarding her prostitution, her drug use, and her past criminal convictions. 20.RR.160–62. On re-direct, trial counsel clarified that when the police questioned Baker, they did not ask specifically about the Towery murder; rather, they asked about a number of unsolved murders of prostitutes in the Amarillo area. 20.RR.163.

Indeed, she had no information regarding the actual murder, but, as Norris averred in her affidavit, that wasn't the point of calling her. 24/29.SHCR.Supp.7356. The SHDC found trial counsel's affidavits on this issue credible. App.B.39. The court found that counsel effectively cleared up any confusion regarding her interviews with the police. App.B.40–43. Further, the court found that the State's impeachment

regarding her prior bad acts had minimal effect since most of the witnesses at trial had engaged in prostitution, drug use, or had other bad acts in their past. *Id.*

Moreover, the court found that the State's questions and impeachment evidence were proper under state law. *Id.* Thus, it found that any objection by counsel would have been overruled. *Id.* This Court must defer to those state court determination of state law. *See Weeks v. Scott*, 55 F.3d 1059, 1062–63 (5th Cir. 1995); *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983). Ultimately, the SHDC found that trial counsel was not deficient nor that Holberg was prejudiced. App.B.40–43. Holberg fails to show this determination was unreasonable; thus, this Court should dismiss the claim.

**F.    Holberg also fails to show the unreasonableness of the state court's decision that trial counsel was not deficient regarding Susan Lawrence (Claim 3f).**

Next, Holberg raises a similar claim that trial counsel were deficient because they failed to present the testimony of Susan Lawrence. Pet.87–88. Based on trial counsel's affidavits, which the SHDC found credible, and exhibits in the record, the SHDC in its original FFCLs found that indeed counsel subpoenaed Lawrence for March 9, 1998, but did not call her until the following day. App.B.44. Counsel did not attempt to call her again. *Id.* Dodson's account of Lawrence's purported testimony shows that it is repetitive of Baker's testimony. 24/29.SHCR.Supp.7331. Further, Norris detailed several concerns trial counsel had about her potential testimony, including attacks for impeachment. *Id.* at 7344–47.

Based on this, the SHDC found that trial counsel decided not to pursue her as a witness based on reasonable trial strategy, therefore, counsel was not deficient.

App.A.45–46. The court further found that her testimony was largely cumulative of other witnesses, thus, Holberg was not prejudiced by any supposed deficiency. *Id.* In its Supplemental FFCLs (again, dealing with a separate punishment phase issue) the SHDC entered findings based on live testimony during the two-week hearing. Specifically, the court found:

> Susan Lawrence was not called as a witness because of inaccuracies in her recollection. In attempting to corroborate some of her information, when the trial investigators took her to the apartment complex occupied by A.B. Towery she went to the wrong building. 9.SHRR.211–12. The decision not to call Susan Lawrence was a reasonable strategic decision.

App.C.79–80. Holberg fails to show these findings were unreasonable; thus, the Court should deny this claim.

### G. This Court may not disturb the CCA's holding where it is based on the state law admissibility of evidence; further counsel cannot be deficient where the admission of Holberg's confessions did not violate Supreme Court precedent (Claim 3g).

After her arrest in Memphis, Officers Campos and Hudson drove her back to Amarillo. 19.RR.71–77. During this drive, Holberg made spontaneous and voluntary confessions. *Id.* Holberg asserts state law precluded the admission of this at trial, and counsel was deficient for not seeking to suppress the confessions. Pet.88–89. The CCA squarely disagreed with this assertion:

> Article 38.22, § 3(a), applies only to oral statements made during custodial interrogation. The only relevant evidence in the trial court (the testimony of two police officers) was that appellant made the oral statements in question voluntarily and spontaneously. In other words, the record shows no basis on which trial counsel might have sought suppression of the oral statements."

App.A.24.

Because the state court determined the confession was admissible under state evidentiary law and, thus, counsel was not deficient for not raising a meritless objection, "a federal habeas court may not conclude otherwise." *Charles*, 629 F.3d at 500. "[W]e defer to [the CCA's] determination of state law. 'It is not our function as a federal appellate court in a habeas proceeding to review a state's interpretation of its own law . . . .'" *Schaetzle*, 343 F.3d at 448–49 (citation omitted). Further, Holberg cannot show that the CCA's decision was an unreasonable application of Supreme Court precedent. The high Court has held that statements by a defendant while under arrest and in the back of a police car were a spontaneous and voluntary confession and, thus, admissible at trial, even where the police may have engaged in "subtle compulsion." *Rhode Island v. Innis*, 446 U.S. 291, 303 (1980). Therefore, this Court should deny the claim.

**H.     Holberg fails to show the unreasonableness of the CCA's decision that counsel was not deficient in not requesting a supplemental charge when one was not warranted, which was based on a determination of state law (Claim 3h).**

In her eighth ground of IATC during the guilt phase Holberg contends that counsel was deficient in their failure to request a supplemental charge based on two jury questions and "to object to the given supplemental charge . . . ." Pet.89–90. As the CCA noted, the court only issued one charge; no supplemental charge was given to which counsel could object. App.A.23. The high state court also held that there was "no basis on which trial counsel should have sought supplemental jury instructions" because the jury instructions provided the necessary definitions and tracked the

statutory language of the crimes. *Id.* Incorporating their discussion on Holberg's direct challenge to the jury instructions,[61] the court stated:

> The record reflects that the trial court instructed the jury accurately on the pertinent statutory elements of capital murder, murder, manslaughter, robbery, burglary, and theft. The trial court also instructed the jury accurately on the pertinent statutory definitions of "attempt to commit," "bodily injury," "appropriate," "unlawfully appropriate," "owner," "possession," "effective consent," "enter," and "habitation." Finally, the trial court instructed the jury accurately that "[t]he term 'in the course of committing' an offense means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense." *See Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980).
>
> We see no merit to [Holberg]'s argument. The trial court's charge, which accurately tracked the relevant statutes, gave the jury clear guidance on the distinction between murder in the course of robbery (a capital offense), murder in the course of burglary (a capital offense), and the lesser included offense of murder (a non-capital offense), and the charge gave the jury the option of finding appellant guilty of any, or none, of those offenses. Therefore, if the jury believed that appellant murdered Towery and only afterward decided to commit theft, then the jury, as it was charged, could have found appellant guilty of the lesser included offense of murder. *See Anderson v. Collins*, 18 F.3d 1208, 1221–1223 (5th Cir. 1994).

App.A.11–12.

As this decision is based on a determination of state law, this Court must wholly defer to the CCA. *Charles*, 629 F.3d at 500; *Weeks*, 55 F.3d at 1062–63. Further, Holberg fails to show the CCA was unreasonable in finding counsel was not deficient in forgoing a supplemental charge where none was warranted. Thus, this Court should dismiss this ground for relief.

---

[61] *See infra* Argument XVI.

### I.    Holberg fails to show the CCA was unreasonable in holding that counsel was not deficient for any perceived errors in educating the jury on the distinction between the aggravators of robbery/burglary and theft after the fact (Claim 3i).

Holberg next asserts that trial counsel failed to instruct the jury during voir dire, to seek an instruction from the court, and to point out in closing the distinction between robbery or burglary as an aggravator for capital murder and theft after the fact. Pet.90–91. As discussed above,[62] the CCA found that trial counsel was not deficient for not requesting an instruction when none was warranted. App.A.23. The CCA, assuming arguendo that counsel focused on the self-defense theory over this legal distinction, said that counsel could not be deficient in making such an strategic choice. App.A.24.

However, the record shows counsel did not wholly abandon educating the jury on the important distinction between robbery/burglary and murder and murder-then-theft. Counsel covered this distinction during voir dire. *See, e.g.,* 14.RR.175–78. They also discussed this with the jury during their closing arguments. 22.RR.60–61. Holberg's argument merely amounts to the type of hindsight and second-guessing that *Strickland* prohibits; thus, the Court should deny this claim.

### J.    Because there are no errors in the guilt phase to cumulate, Holberg cannot show the CCA was unreasonable in denying her cumulative IATC ground for relief (Claim 3j).

Finally, Holberg argues that, "[t]aken together, [counsels] errors establish constitutionally deficient representation." Pet.91–92. However, there are no errors to cumulate. *See Westley v. Hudson*, 83 F.3d 714, 726 (5th Cir. 1996) (holding that

---

[62] *Supra* Argument V.I.

"[m]eritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated, regardless of the total number raised") (citation omitted); *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004) (reversal under cumulative error doctrine unwarranted where claims did not "so fatally infect the trial that they violated the trials's fundamental fairness."). As such, the CCA denied this claim, and Holberg cannot show that decision was unreasonable. *See* App.A.45. As Holberg's other claims of IATC are meritless, so too is this one. Therefore, this Court should deny all claims for relief (or dismiss based on a procedural bar where appropriate) alleging IATC during the guilt phase of trial.

## VI. Holberg Likewise Fails to Overcome the Procedural Bar or Fails to Show that the State Court Determinations Were Unreasonable for her Claims of IATC During the Punishment Phase (Claim 4).

### A. Holberg's claim that trial counsel failed to hold the State to its burden in proving Holberg's prior bad acts and offenses was in part deemed meritless by the CCA and in part procedurally barred by the SHDC, and Holberg can overcome neither determination (Claim 4a).

In her first ground asserting IATC during the punishment phase, Holberg asserts that trial counsel was deficient because it did not hold the State to its burden of proof when it introduced Holberg's prior bad acts and unadjudicated extraneous offenses (UEOs). Pet.92–96. Holberg argues the State did not offer clear proof; however, she also argues the State did not prove up these acts beyond a reasonable doubt. On direct appeal, Holberg only argued the "clear proof" standard, and the CCA squarely rejected this argument:

> Before a trial court may admit evidence of uncharged misconduct (also known as "extraneous offenses" or "extraneous misconduct"), the State must "clearly prove" that the misconduct occurred and that the

> defendant was the perpetrator. *Chamberlain v. State*, 998 S.W.2d 230, 235 (Tex. Crim. App. 1999)[.] We hold that [Holberg]'s out-of-court admissions that she committed acts of misconduct constituted such "clear proof." Thus, the record shows no basis for concluding that trial counsel's failure to object to the State's proof constituted deficient performance.

App.A.29–30. As this holding is based on a determination of state law, this Court may not disturb the CCA's decision. *Charles*, 629 F.3d at 500; *Weeks*, 55 F.3d at 1062–63.

She also raised this ground on state habeas review. App.B.27. However, in her reply she included a new and novel argument that she also presents to this Court: that the State, through comments made during a pretrial hearing outside the presence of the jury, agreed to shoulder a "reasonable doubt" standard. App.B.28. The SHDC correctly found that Holberg raised this claim generally on direct appeal (though only in regards to the "clear proof" standard), she did not make this record-based argument there, and that nothing prevented her from making that argument. *Id.* Thus, the court dismissed the claim as procedurally barred. *Id.*

Holberg argues this procedural bar should not apply because the CCA deemed her reply brief was not a subsequent application. *See Ex parte Holberg*, 2008 WL 152725, at *1. But, Holberg completely confounds the procedural bar at play. Texas's courts require that record-based claims be raised on direct appeal or not at all. *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996). This procedural rule has been repeatedly upheld as adequate and independent. *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007); *see also Sanchez-Llamas v. Oregon*, 548 U.S. 331, 351 (2006) ("Normally, in our review of state-court judgments, [the failure-to-raise-a-

claim-on-direct-appeal bar] constitute[s] an adequate and independent state-law ground preventing us from reviewing the claim.").

The *Gardner* bar is independent from Article 11.071's Section 5 bar. Thus, the CCA's ruling did not disturb that finding. Accordingly, the claim is likewise barred from federal habeas review and must be dismissed. Further, Holberg cites no Supreme Court authority allowing the State to agree to raise the legal burden of proof in this way, and none exists. This Court should deny the claim as it asserts the "clear proof" standard and dismiss as procedurally barred the claim as it asserts the "reasonable doubt" standard.

**B.    Holberg fails to show the state court was unreasonable in their determination that trial counsel did object to Burnett and Norrell's testimony, and further, they were not deficient in their performance (Claim 4b).**

In her next ground Holberg alleges that trial counsel failed to object to or otherwise preserve error for State's punishment witnesses Burnett and Norrell. Pet.96–98. As this claim reasserts accusations of prosecutorial misconduct, this was thoroughly discussed above.[63] Norris addressed the perceived failure to object in her affidavit. 24/29.SHCR.Supp.7357. Norris averred she in fact objected while approaching the bench; however, it was not until reviewing the record in preparation for her affidavit that she realized her objection was only noted as a hearing outside the presence of the jury. *Id.*

The SHDC found Norris credible on this point. App.B.84. The court also found the prosecution's affidavits credible in that they timely disclosed their discovery of

---

[63] *Supra* Argument IV.C., *see also* Argument IV.A (*Giglio/Napue* claim regarding Burnett).

the witnesses.[64] *Id.* Holberg cannot overcome the deference owed to those determination. *See Yount*, 467 U.S. at 1038; *Morales*, 714 F.3d at 303. Assuming arguendo that Norris did not properly object, the SHDC further found that any objection would have been overruled since the witnesses were timely disclosed. App.B.87. A. "[C]ounsel is not required to make futile motions or objections." *Koch*, 907 F.2d at 529. "[F]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite." *Clark*, 19 F.3d at 966 (5th Cir. 1994). Holberg fails to undermine the state court's findings; as such, this Court should deny the claim.

### C. Holberg's claim that trial counsel failed to prepare for Dr. Coons is procedurally barred and meritless (Claim 4c).

In her third ground Holberg contends that trial counsel was deficient in their preparation and cross-examination of the State's expert witness at punishment, Dr. Coons. Pet.98–102. Holberg presented this to the state courts in her "Motion for Reconsideration." 5/29.SHCR.Supp.948–1238. As discussed above,[65] the CCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, at *1. This dismissal was based on an IASG. *Hughes*, 530 F.3d at 342; *Nobles*, 127 F.3d at 420. Holberg fails to show cause and prejudice to now overcome this procedural error. *See Coleman*, 501 U.S. at 749–50. Therefore, the claim is barred from federal habeas relief.[66] *Nobles*, 127 F.3d at 423. Further, the claim is meritless.

---

[64] *See supra* Argument IV.C.

[65] *Supra* Argument II.B.

[66] Holberg argues: "To the extent the Eighth Amendment Claim was procedurally barred, there is cause and prejudice to consider it under *Trevino* due to ineffective assistance of initial habeas counsel,

Holberg argues that counsel was ineffective for failing to challenge Dr. Coons's qualifications as an expert and methodology in the area of future dangerousness. She asserts that, had counsel raised this objection, "the defense would have been vindicated" because of the CCA's ruling in *Coble v. State*, wherein the CCA held Dr. Coons's testimony was inadmissible under Texas Rule of Evidence 702. 330 S.W.3d 253, 270–80 (Tex. Crim. App. 2010). However, the CCA handed down that decision over a decade after Holberg's trial. In fact, as late as 2009, the CCA had upheld Dr. Coons's testimony on future dangerousness. *Ramey v. State*, No. AP-75678, 2009 WL 335276, at *14–15 (Tex. Crim. App. Feb. 11, 2009) (unpublished); *see also Espada v. State*, No. AP-75,219, 2008 WL 4809235, at *8–10 (Tex. Crim. App. Nov. 5, 2008) (unpublished).

The Supreme Court has also upheld similar testimony from Dr. Gripon. *Barefoot v. Estelle*, 463 U.S. 880, 898–99 (1983).[67]

> In *Barefoot*[], the Supreme Court held that psychiatric testimony predicting a capital defendant's future dangerousness is not per se improper. [463 U.S.] at 898–99[]. Gonzales's arguments to the contrary notwithstanding, our court has consistently held that *Daubert*[68] did not overrule *Barefoot* for the proposition that expert testimony regarding future dangerousness is permissible. *See, e.g.*, *Williams v. Stephens*, 761 F.3d 561, 571 (5th Cir. 2014) (maintaining that expert future dangerousness testimony is permissible under *Barefoot* and stating that petitioner's "contention that the Supreme Court may overrule *Barefoot*

---

who prepared the original writ without it." Pet.102. However, *Trevino* and its twin case *Martinez* are explicit: the narrow exception created by these cases only applies to IATC claims under the Sixth Amendment. *Trevino v. Thaler*, 133 S. Ct. 1911, 1921 (2013); *Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012).

[67] Holberg also complains that DA Farren essentially testified during a "14-page monologue" in his examination with Dr. Coons. In fact, this was a lengthy hypothetical used to procure Dr. Coons's opinion. 23.RR.137–53. This practice was upheld in *Barefoot*, 463 U.S. at 905.

[68] *Daubert v. Merrell Dow Pharm'als*, 509 U.S. 579 (1993).

> in light of *Daubert* is completely speculative"); *Roberts v. Thaler*, 681 F.3d 597, 608–09 (5th Cir. 2012) ("*Barefoot* stands for the proposition that expert testimony predicting a defendant's future dangerousness is not per se inadmissible."); *Flores v. Johnson*, 210 F.3d 456, 456 n.1 (5th Cir. 2000) (per curiam). Because expert evidence predicting a capital defendant's future dangerousness is permissible under *Barefoot*, jurists of reason would not debate whether the CCA reasonably determined that Dr. Gripon's testimony was properly allowed.

*Gonzales v. Stephens*, 606 F. App'x 767, 774–75 (5th Cir. 2015) (unpublished). Indeed, another Texas federal district court just this year recognized the Fifth Circuit's stance on this issue regarding Dr. Coons when it denied federal habeas relief. *Devoe v. Davis*, No. 1:14-CV-151-SS, 2016 WL 5408169, at *19–22 (W.D. Tex. Sept. 26, 2016) (unpublished). Holberg cannot in 2016 castigate 1998 counsel for failing to raise what would have been a frivolous objection. *Koch*, 907 F.2d at 527; *Clark*, 19 F.3d at 966.

Moreover, counsel conducted a thorough cross-examination of Dr. Coons highlighting the various fallacies of his opinion. 23.RR.157–64. Counsel demonstrated that Dr. Coons only based his opinion on cold records. 23.RR.157–59. However, he seemed to give greater weight to those records that supported his opinion while dismissing records that undermined it. 23.RR.160–61. He did not interview Holberg, her family, her friends, nor anyone else. 23.RR.160–62. Perhaps of utmost importance, his analysis did not necessarily take into account when someone became aggressive in response to another person first being hostile. 23.RR.163.

Indeed, counsel focused on these disparities during closing arguments, especially in contrast to their expert, Dr. Patel. "Dr. Coons did not interview or evaluate Brittany Holberg. Dr. Patel did." 25.RR.194.

But Dr. Patel also told you that that level of violence was caused by three things, the battered woman syndrome, post traumatic stress disorder or PTSD, and the drug usage. Primarily the drug usage.

He told you that all three of those factors played a role in what happened on November 13th, 1996. Dr. Coons told you that the overkill indicated extreme anger and rage, the very things that Dr. Patel told you would be exhibited by a woman suffering from post traumatic stress syndrome who has been battered in her life. The very thing he told you described Brittany Holberg on November 13th, 1996.

25.RR.204. Holberg fails to show counsel was deficient in their preparation for or cross-examination of Dr. Coons. Moreover, she fails to overcome the procedural bar. Therfore, this Court should dismiss this claim.

### D.    Holberg fails to demonstrate the state court was unreasonable in finding that trial counsel was not deficient in their mitigation investigation and preparation of Dr. Patel (Claim 4d).

In her most expansive single ground for relief Holberg argues that trial counsel failed to conduct an adequate mitigation investigation and that this directly led to their failure to adequately prepare Dr. Patel. Pet.102–37. Holberg paints a picture of an unexperienced, underprepared defense team who did not even attempt to find mitigating evidence until the twilight of trial was upon them. Due to the rushed nature of preparing a mitigating case, Holberg alleges trial counsel failed to first conduct a proper investigation into the full panoply of Holberg's family and social history. Holberg chastises counsel for not exploring every branch and turning over every leaf it could find.

As such, Holberg argues, the defense team failed to find evidence related to mental illness, mood disorders, suicidal ideation or behaviors, and sexual and emotional abuse that permeated Holberg's family tree. According to Holberg, the

team also failed to uncover evidence relating to her history of in-utero drug and alcohol exposure, childhood neglect, brain damage or dysfunction, academic problems, learning disabilities, emotional neglect, and sexual assault. In yet another fallacious character assassination Holberg has further crafted an extensive story of the sexual abuses she suffered at the hands of John Schwartz, her step-father who is now deceased. Holberg claims this all resulted in counsel failing to provide Dr. Patel with critical records on which to formulate his opinion. Thus, Dr. Patel was "[u]nqualified, [u]nderprepared, and [u]nderutilized."

After Judge Estevez filed the first set of FFCLs, the CCA remanded this lone claim back to the district court for an evidentiary hearing. *Ex parte Holberg*, 2013 WL 2120253, at *1. The CCA explicitly ordered:

> We remand this application for the trial court to direct trial counsel Catherine Dodson and Candace Norris and defense investigators Jim Patterson and Kathy Garrison to respond to these claims in a live evidentiary hearing. Dodson and Norris shall explain their efforts to investigate and present mitigating evidence at the punishment phase of [Holberg]'s trial. Patterson and Garrison shall also explain their involvement, if any, in the investigation of evidence pertaining to the mitigation special issue. Following the receipt of live, testimonial evidence, the trial court shall make any findings of fact and conclusions of law relevant and appropriate to the disposition of these claims.

*Id*.[69] Judge Dambold, now the state habeas judge, presided at the hearing. Over the course of two weeks, Judge Dambold heard live testimony from the two investigators

---

[69] Judge Dambold found that after the remand, Holberg attempted to greatly expand this claim, especially to include other IATC claims. App.C.15–16. Judge Dambold correctly determined that the hearing should remain within the prescribed boundaries of the CCA's order. App.C.16–19. Even after the completion of testimony, Holberg attempted to proffer a number of affidavits, including one from current local federal habeas counsel. Judge Dambold found that the court should not consider any of them in deciding this claim.

and two trial counsel regarding the defense team's mitigation investigation and preparation of their expert, Dr. Patel. *See* 3.SHRR.58–211, 4.SHRR.7–195, 5.SHRR.5–106 (Kathy Garrison); 5.SHRR.107–242 (Jim Patterson); 6.SHRR.5–182, 7.SHRR.5–193, 8.SHRR.5–151 (Catherine Dodson); 8.SHRR.152–227, 9.SHRR.9–225, 10.SHRR.7–187 (Candace Norris).[70] Based on this extensive testimony and a number of other filings, exhibits, and affidavits, Judge Dambold entered eighty-nine pages of supplemental FFCLs finding the single remanded claim meritless. App.C.001-089.

The same standard of reasonableness announced in *Strickland* guides the analysis with regard to assessing counsel's investigation prior to trial. *Terry Williams*, 529 U.S. at 390. In assessing reasonableness in this context, a court can "look to such factors as what counsel did to prepare for sentencing, what mitigating evidence [counsel] had accumulated, what additional 'leads' [counsel] had, and what results [counsel] might reasonably have expected from these leads." *Neal*, 286 F.3d at 237.

The question of effectiveness of pretrial investigation is one of degree; it is not subject to precise measurement. *Strickland*, 466 U.S. at 680; *Dowthitt*, 230 F.3d at 743. And because this IATC claim was raised and rejected on state habeas, it must be viewed through the lens of § 2254(d) creating a "doubly" difficult to surmount presumption that favors the state court denial. *Richter*, 562 U.S. at 102. Therefore

---

[70] As laid out above, Holberg's examinations for all four witnesses covered 1,094 pages of the 1,574 total pages of testimony. *Supra* Argument II.A.

the question is whether Judge Dambold reasonably determined this IATC claim failed to satisfy both prongs of *Strickland*. *Schaetzle*, 343 F.3d at 444.

Based on the testimony at the hearing and other filings in the case, the SHDC found "Dodson, Norris, and Garrison reliable and credible as to the historical events surrounding Holberg's trial and their thoughts and impressions at the time." App.C.19. The court found Patterson's "general recollection of his thoughts and impressions at the time of the investigation and trial was also reliable and credible but Patterson's memory of the historical events surrounding the investigation was markedly less reliable than that of Dodson, Norris, and Garrison." *Id.* Garrison was the lead investigator, while Patterson's involvement was not as large as the other three team members. App.C.19–20. Patterson readily admitted that his memory of the events seventeen years ago was poor, that Garrison's memory was better than his, and that where they differed, Garrison's memory was more reliable and thus, more trustworthy. *Id.* These credibility determinations cannot now be disturbed on federal habeas review. *See Yount*, 467 U.S. at 1038; *Morales*, 714 F.3d at 303.

At the time they were appointed, Patterson and Garrison were a two person team. App.C.20. Patterson had served as a cop or a private investigator (PI) for twenty years. App.C.21. His PI experience included work on two death penalty cases. *Id.* Garrison began working for him eight years prior to their appointment. *Id.* She was the lead PI for most of the criminal investigations. *Id.*

For his part in the investigation, Patterson recalled several actions in his investigation, some more specifically than others. He visited the crime scene.

App.C.23. He testified it was one the worst he had ever witnessed. *Id.* He learned of Holberg's history of drugs. *Id.* He also recalled allegations of molestation, but he could not remember specifics. *Id.* Holberg did tell him about a sexual encounter with a counselor at a drug treatment facility, but she would not tell him the person's name. *Id.* He interviewed Holly Ruffin, as well as conducted other interviews, though he does not remember the specifics. *Id.*

He also traveled to Memphis, Tennessee in search of potential witnesses. *Id.* In 2011 local state habeas counsel (different that current local federal habeas counsel) asked Patterson to come to his office and prepare an affidavit. App.C.23–24. Against the better advice from colleagues, he went to that office and was presented with a prewritten affidavit. App.C.24. After asking local counsel to omit or modify certain statements, he signed it. *Id.* However, he now disavows the assertion therein that neither investigator did a mitigation investigation. *Id.* He stated that his understating of the term mitigation was not then what it is now. *Id.* Further, he recognized that several of the assignments he and Garrison carried out served to build the mitigation case, and that the decision of how to use a piece of evidence was ultimately at the discretion of the attorneys. *Id.*

For her part, Garrison was also an experienced criminal PI at the time of their appointment, having investigated over 100 criminal cases, including six death penalty cases. App.C.25. Dodson and Norris generally directed the investigation, and they informed Garrison early on they were going to use Battered Woman Syndrome (BWS) and Posttraumatic Stress Disorder (PTSD) as part of their mitigation case. *Id.*

In general Garrison found Dodson and Norris more involved in the investigation than other attorneys. *Id.* However here, they were especially so because they were very "protective" of Holberg and worked hard to avoid the death penalty. *Id.*

Garrison credibly stated that in 1997, mitigation cases were not conducted like they are today where there may be a particular distinction between the "fact" case and the "mitigation" case. App.C.26. As such, she could not some seventeen years later provide a meaningful division of time spent on one case or the other. *Id.* As it pertained to mitigation, Garrison reviewed a number of medical and drug treatment records from various facilities, school records, SAFP records, TDCJ records, and records pertaining to criminal and employment history. *Id.* Garrison also regularly reviewed the State's file with Dodson and Norris. App.C.27.

Garrison developed an ever growing list of potential witnesses and made numerous calls throughout the investigation. *Id.* A review of her phone records demonstrated that she made calls starting in early November 1997, and continued through February 1998, to a wide range of states including Texas, Oklahoma, California, Arkansas, Louisiana, and Virginia. App.C.26–27. Garrison regularly spoke with Holberg regarding the case and potential witnesses. App.C.27. Garrison averred Holberg never told her about any purported molestation by John Schwartz. App.C.27. Based on Garrison's extensive experience as an investigator, especially in death penalty cases, she never observed anything to indicate cognitive deficiency. *Id.* She found Holberg to be alert, coherent, attentive, and responsive. *Id.*

Garrison explained that the trial team had difficulties developing evidence that was not double-edged or otherwise unimpeachable. *Id.* Garrison and the trial team spoke with several individuals who gave false or inaccurate information regarding their knowledge of the case. *Id.* Further, several potential witnesses were addicted to drugs or alcohol, worked as prostitutes and exotic dancers, and had similar character issues in their backgrounds which could be used to call their credibility into question. *Id.* Indeed, Garrison recalled that during trial damaging information emerged from some witnesses that caused Dodson and Norris to make a last-minute decision. App.C.28. Trial counsel and Garrison also determined that even some family members and close friends who could potentially serve as mitigation witnesses might do more harm than good, in particular Pam Schwartz.[71] *Id.*

The SHDC found "that Garrison, serving as the primary investigator, conducted a thorough and proficient investigation with regard to possible mitigation evidence." App.C.28. The court provided a lengthy, though not exhaustive, list of Garrison's activities and assignments as part of the investigation. App.C.28–35. Due to her extensive experience as a PI, she had a good understanding of the type of punishment evidence that worked well with juries in that area. App.C.35. Through their investigation, the defense team's strategy was to help the jury, or at least one juror, see Holberg as an intrinsically good person worth saving. App.C.36. They hoped to further demonstrate this was an aberration for Holberg. *Id.* Garrison believed any testimony proffering a damaged-brain theory would have cut against that. *Id.*

---

[71] *See supra* Argument V.D.

Dodson was an extremely experienced criminal attorney at the time of her appointment. In her twenty year practice she handled over seventy felony cases, including one capital murder, all in Randall, Potter, and several other Panhandle Counties. App.C.40–41. Dodson evinced to the SHDC that at the time of her appointment she correctly understood what mitigating evidence was and how to craft a mitigation case. App.C.42. Dodson was not aware of any investigator in the surrounding counties who referred to themselves as a "mitigation specialist." App.C.43. However, she and Norris agreed at the time (and still do) that Patterson and Garrison were two of the best investigators in the area. *Id.*

Dodson began work on the case immediately after her appointment in February 1997. *Id.* Dodson interviewed Holberg and several family members within the first month of appointment. App.C.43–44. Based on lengthy testimony regarding her interview tactics, the court specifically found Dodson's method was professionally reasonable. App.C.45. These interviews presented a fairly consistent picture of Holberg. Her mother and step-father tried to care for her, but they "partied" a lot throughout her childhood and adolescence. *Id.* Holberg was a bright child who excelled at several things, including school; however; problems began to emerge in junior high, especially with drugs and alcohol, and continued throughout high school as Holberg suffered several tragedies. App.C.45–46. Yet, through these interviews, especially with Holberg, no mention was made of supposed molestation by John Schwartz. App.C.47. Holberg also never told Dr. Patel in their interviews about any

such sexual assault. Indeed, Holberg herself has never testified or otherwise averred that John Schwartz sexually abused her. Id.

Early on, Dodson and Norris determined they would need medical and school records. App.C.46. Dodson also conducted lengthy 'record interviews" with Holberg to assess what else they would need to start gathering. App.46–47. One fact that kept reemerging as an important milestone in Holberg's life was the murder of her adoptive aunt Karen, John Schwartz's sister. *Id.* Also early in their case development, they began gathering names of potential witnesses from several sources—the State's file, their records, other witness interviews, etc.—and began sorting them into categories according to which phase of trial they would testify. App.C.48. They kept this categorization on a wall in the office. *Id.*

From the outset, Holberg was insistent on presenting a case of self-defense and testifying at trial. *Id.* Trial counsel advised her as to the advantages and disadvantages of both the strategy and her taking the stand, but she remained firm. *Id.* Dodson knew they were facing an uphill battle at both phases of trial, but they remained steadfast in preparing and mounting a mitigation defense. App.C.49. As trial counsel kept uncovering information, it became clear to both that drug addiction was a major factor in Holberg becoming a prostitute and in murdering Towery. *Id.* Indeed, upon a thorough review of Holberg's medical records, there was no indication of serious mental health issues, especially of a genetic origin; but, it was clear that drug addiction played a major role in the ups and downs of Holberg's life. App.C.50.

Norris was also a very experienced attorney. Having practiced since 1988, she had taken at least forty cases to a jury verdict and handled five or six capital murder cases. App.C.54. Due to her experience in the area, she was also familiar with the type of jury they were likely to face. *Id.* Norris was very familiar with Garrison having worked with her on two to five capital cases. App.C.55. Norris considered Garrison an excellent investigator. *Id.* Norris also noted that no one used the term "mitigation specialist" in that area at that time. *Id.*

Norris did not believe funding or time-limitations had an adverse effect on the investigation. *Id.* She felt she had the necessary resources to be effective. *Id.* Norris began work on Holberg's case before her formal appointment. *Id.* She "ate, slept, and drank this case" and worked more hours than for what she billed. App.C.55–56. Norris regularly checked the State's file. App.C.56. She also regularly talked with Holberg, including a transcribed interview days after her appointment. *Id.* She maintained that she acted in self-defense; however, the physical evidence did not comport with some of her statements about the murder. *Id.*

To help reconcile these inconsistencies, the team hired Bobby Henderson, a blood spatter expert, as a consulting expert. *Id.* Norris recognized that facts developed for the first phase of trial have an effect on the punishment phase. *Id.* Further, Norris was aware that the case during guilt-innocence had to comport with the mitigation case; otherwise, they risked alienating the jury. App.C.57. Norris new the difficulties they faced in mitigation, especially due to the horrific nature of the crime scene.

112

App.C.57–58. She brainstormed mitigation ideas with fellow attorneys in the area, including current local federal habeas counsel. App.C.58.

Trial counsel was focused on humanizing Holberg for the mitigation case. *Id.* Norris sought out individuals who knew or had contact with Holberg. App.C.59. This included trips to West Memphis, Arkansas and Memphis, Tennessee. *Id.* Norris and Garrison constantly walked the streets looking for particular potential witnesses, including going into a "crack house" at 1:00 a.m. to try an interview a witness. *Id.* An important part of gathering statements and witnesses was corroborating what they said. *Id.* Indeed, trial counsel interviewed, spoke with, took statements from a large number of witnesses, many of whom they used at trial. App.C.71–83. Some were not utilized because they were untrustworthy or damaged Holberg's credibility. *See, e.g.,* App.C.67 (Pam Schwartz), 79–80 (Susan Lawrence). Some offered conflicting evidence. App.C.82–83.

Norris reviewed medical and school records. App.C.60. Prior to retaining an expert, Dodson and Norris were gathering documents which they knew that expert would need, and they began developing Holberg's family history. App.C.51. The trial team wanted to retain a mental health expert specifically to explore issues of brain damage or mental illness. App.C.61. They first sought the appointment of Dr. Jaye Crowder, a well-respected and credentialed psychiatrist; however, he declined to take the case. App.C.51, 61. Dr. Crowder referred them to Dr. Patel, who agreed to become their expert. App.C.51. Once appointed, Dodson asked him what type of records he would need. *Id.*

Trial counsel asked Dr. Patel to examine Holberg for the presence of mental illness or cognitive deficiency and advise counsel as to what testing would be necessary. App.C.52, 62. While neither Dodson nor Norris prepared or kept an index of what records were given to Dr. Patel, they averred they would have submitted to him a copy of all records received. *Id.* Dr. Patel billed the case for record review, and he conducted two clinical interviews of Holberg. App.C.52, 64.

Indeed, both counsel's testimony during the state habeas proceeding and Dr. Patel's testimony at trial indicated he reviewed boxes of medical and school records, SAFP records, probation and other criminal records, and records involving the particular crime. App.C.63. The SHDC found Holberg's claims that Dr. Patel was not provided with all relevant records in trial counsel's possession wholly "unpersuasive." App.C.64. Trial counsel continued to ask Dr. Patel if he needed any further records. App.C.51, 64.

Dr. Patel did not find Holberg was suffering from any mental disease or defect, and he did not advise counsel to conduct any additional testing or neuroimaging. App.C.53, 65. He diagnosed Holberg with PTSD and BWS. *Id.* He believed those conditions played a major role in Towery's murder. *Id.* Dodson believed this was key to their mitigation theory. *Id.* The SHDC found that trial counsel reasonably relied on Dr. Patel's professional expertise and diagnosis. App.C.50, 53, 65–66. The court further found that trial counsel reasonably prepared Dr. Patel to testify. App.C.53.

After all testimony and evidence properly before the court was presented, the SHDC entered the following conclusions of law:

3.      Trial counsel did not perform deficiently in their investigation of mitigating evidence.

4.      The choices made by trial counsel concerning which witnesses to call in mitigation were made after diligent investigation and were strategic decisions that were well within the range of reasonable professional judgment.

5.      Trial counsel did not perform deficiently in selecting a mental health expert to evaluate Holberg.

6.      Trial counsel did not perform deficiently in relying upon that expert to tell counsel what kinds of documents the expert needed in order to evaluate Holberg, or in relying on that expert to advise counsel if the expert believed he needed more documentation or information.

7.      Trial counsel did not perform deficiently by relying on their mental health expert to advise them whether further neuropsychological or other cognitive testing was necessary for Holberg.

8.      Trial counsel did not perform deficiently in the presentation of mitigation evidence at Holberg's trial.

9.      Trial counsel did not perform deficiently in their preparation of Dr. Patel to testify at Holberg's trial.

10.     The undersigned hereby re-enters the findings previously entered by this Court as to claim twenty-eight, including its finding that no prejudice occurred.

11.     Because she has not established deficient performance by trial counsel or prejudice resulting from counsel's alleged deficiencies, Holberg is not entitled to relief under *Strickland*. Accordingly, relief should be denied . . . .

App.C.88–89.

Holberg fails to show these findings and conclusions are unreasonable. Indeed,

this claim must fail because trial counsel were allowed to hire a qualified expert,

which Dr. Patel was, and reasonably rely upon his expertise. *See Couch v. Booker*,

632 F.3d 241, 246 (6th Cir. 2011) ("Trial counsel may rely on an expert's opinion on a

matter within his expertise when counsel is formulating trial strategy."); *McClain v.*

115

*Hall*, 552 F.3d 1245, 1252 (11th Cir. 2008) ("McClain's counsel reasonably relied on Dr. Maish's opinion that McClain suffered from 'Antisocial Personality Disorder' but did not suffer from a frontal lobe disorder or from any 'significant emotional disorder.'"); *Sims v. Brown*, 425 F.3d 560, 585–86 (9th Cir. 2005) ("[A]ttorneys are entitled to rely on the opinions of mental health experts, and to impose a duty on them to investigate independently of a request for information from an expert would defeat the whole aim of having experts participate in the investigation."); *Smith v. Cockrell*, 311 F.3d 661, 676–77 (5th Cir. 2002); *Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) ("In general, an attorney is entitled to rely on the opinions of mental health experts in deciding whether to pursue an insanity or diminished capacity defense.").

Such "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983). That Dr. Patel would now include a diagnosis of genetic brain disorder—or a wholly unfounded account of sexual abuse by John Schwartz which could be easily impeached—along with the diagnoses he provided at trial does not turn against counsel. Trial counsel provided him with medical records. They provided him access to Holberg. He in turn was to provide them with an accurate opinion, which he did.

That opinion notably did not entail any of Holberg's allegations she now makes that John Schwartz sexually assaulted her. Indeed, the SHDC entered several

116

findings when determining trial counsel did not fail in uncovering or pursuing further investigation on this matter.

72.    Holberg has suggested that John Schwartz sexually assaulted Holberg as a child and that the trial team did not adequately investigate this allegation. The assertion fails for a variety of reasons:

a.    In the March 17, 1997, interview with Holberg concerning her background, Holberg never stated that John Schwartz sexually assaulted her. She denied that anyone, other than a babysitter named "Pete" had sexually assaulted her as a child. RX.4, at 117–20.

b.    Norris spoke with Holberg about the allegation that John Schwartz had sexually assaulted her and Holberg denied that it occurred. 9.SHRR.143, 214.

c.    The trial team interviewed numerous individuals close to Holberg during her formative years and none of them said that John Schwartz sexually assaulted Holberg as a child. 9.SHRR.219–20.

d.    Holberg, to date, has never provided sworn testimony that John Schwartz sexually assaulted her as a child. 9.SHRR.220.

e.    Holberg told the trial team that she felt like she had been molested, however, at one point she said it was a babysitter and at another she said it was a family member. "There was a lot of confusion over the issue." 9.SHRR.218.

f.    The factual bases of Holberg's assertions of sexual abuse by John Schwartz are partially vague. Corena Norrell does not differentiate whether the alleged sexual abuser was John Schwartz or Jimmy Brodgon, both of whom are referred to as "dad" by Holberg. 9.SHRR.213; RX.5, at 209. Holly Ruffin stated that Holberg was sexually abused as a child by a "family member," but did not specifically name the perpetrator as John Schwartz. 9.SHRR.216; RX.4, at 225.

g.    The trial team had reason to question the veracity of the prospective witnesses. Holberg stated that Corena Norrell was a liar, had mental issues and was an alcoholic. 9.SHRR.214–16; RX.4, at 162; RX.5, at 213. Holly Ruffin was an exotic dancer and involved in the drug world. 9.SHRR.216; RX.4, at 325. The alleged reports of sexual abuse made to Corena Norrell and Holly Ruffin

by Holberg were no more probative of the issue than Holberg's own statements to the trial team.

h. Dr. Patel, an expert in eliciting difficult admissions from clients as a mental health expert, told Norris that Holberg stated there had been no sexual abuse by John Schwartz. 9.SHRR.224. The Court notes that Dr. Patel's notes say "no physical abuse absolutely (from any family)." DX.44 (first page). It was reasonable for the trial team not to pursue allegations of sexual assault by John Schwartz any further than they had based on the above.

73. Another allegation in an attempt to support the allegation that John Schwartz sexually abused Holberg as a child was his attendance at "naked hot tub parties" between Holberg and her adolescent friends. *See* 9.SHRR.130–31. Norris specifically asked Holberg about these allegations and was told by Holberg that the only time the girls got naked was when they were by themselves. If "guys" were around they had their clothes on. 10.SHRR.9–10; RX.16, at 2. Given Holberg's denial of sexual impropriety, it was not unreasonable for the trial team to do no further investigation of the alleged incident.

App.C.71–73.

Holberg chastises counsel for not exploring every nook and cranny of the earth to find potential witnesses they now claim to have discovered (over a decade later and after years of searching on their own part). Holberg asserts that the ABA guidelines demand nothing less. Of course, *Strickland* spoke precisely to this problem when evaluating trial counsel's strategy using the lens of the ABA guidelines:

No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system.

118

The purpose is simply to ensure that criminal defendants receive a fair trial.

466 U.S. at 688–89.

Indeed, even if trial counsel left some stone unturned, the Supreme Court has never held, in *Strickland* or any other case, that an investigation must result in constructing a fully blossomed family tree complete with every knot, blemish, and dark mark. *Wiggins v. Smith* provides a stark clarity as to what true ineffectiveness looks like and, by contrast, the capable and proficient efforts of Holberg's trial counsel. 539 U.S. 510 (2003).

In *Wiggins* the trial counsel's investigation drew from three sources: a report by the defense's psychologist (report), the presentence investigation report (PSI), and Department of Social Services (DSS) records. *Id.* at 523. The report contained no details regarding Wiggins's personal history, the PSI included only a one-page account, and the DSS records only documented the various placements for Wiggins while in the foster system. *Id.* At trial, counsel implored the jury to consider who Wiggins was as a person during her opening statements of the punishment phase. *Id.* at 526. However, because of a true lack of investigation counsel never offered such details; rather they followed with a "halfhearted mitigation case" taking a "'shotgun'" approach. *Id.*

Further, the Court found that counsel ended their investigation surprisingly early. *Id.* at 525–26, 534. The Court concluded: "Counsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigation case suggest that

119

their incomplete investigation was the result of inattention, not reasoned strategic judgment." *Id.* at 534. Still, the Court was careful to temper their holding:

> "In finding that [counsel's] investigation did not meet *Strickland*'s performance standards, we emphasize that *Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the 'constitutionally protected independence of counsel' at the heart of *Strickland*, 466 U.S. at 689[.] We base our conclusion on the much more limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.' *Id.*, at 690–91[.] A decision not to investigate thus 'must be directly assessed for reasonableness in all the circumstances.' *Id.*, at 691[.]"

*Id.* at 533.

In contrast, the trial counsel in *Roberts v. Dretke* was deemed effective for conducting just enough of an investigation. 381 F.3d 491, 501 (2004). With regards to a potential claim of incompetence, counsel employed a psychiatrist to evaluate Roberts. Counsel did not review any medical records, did not contact Roberts's treating physician regarding his client's suicidal ideations, and did not contact family members. *Id.* at 499. Further, he failed to inform the psychiatrist of the suicidal ideations or a head injury Roberts suffered as a child. *Id.* Roberts simply relied on the opinion from the psychiatrist that Roberts was competent and did not seek a hearing in the trial court. *Id.*

Even assuming counsel was somehow deficient, Holberg cannot show prejudice. Indeed, the heinous nature of the crime was sufficient in itself for the jury to answer the future dangerous issue in the affirmative. *See Wong v. Belmontes*, 130

S. Ct. 383, 391 (2009) ("It is hard to imagine expert testimony and additional facts about Belmontes'[s] difficult childhood outweighing the facts of McConnell's murder . . . . [T]he notion that the result could have been different if [counsel] had put on more than the nine witnesses he did, or called expert witnesses to bolster his case, is fanciful."); *Leavitt v. Arave*, 646 F.3d 605, 616 (9th Cir. 2011) ("Given the exceptional depravity of this murder, it is unlikely that additional evidence . . . would have made a difference.").

*Neal v. Puckett* provides a thorough explanation of the interplay with regard to *Strickland*'s prejudice and AEDPA deference. 286 F.3d 230. During the punishment phase, Neal's trial counsel presented only two witnesses: his mother, who detailed his troubled background, and a psychologist who testified as to Neal's mental and emotional difficulties. *Neal*, 286 F.3d at 237. The latter's "testimony, excluding voir dire, includes twenty-four pages in the transcript, about a third of which is cross-examination." *Id.* The state habeas court concluded that there was no prejudice because the new evidence presented was "'substantially redundant and cumulative.'" *Id.* at 243 (quoting the state habeas court).

The Fifth Circuit, after determining there was deficient performance, determined this reasoning was "erroneous." *Id.* at 244.

> Our conclusion that the state court's prejudice determination is incorrect, however, is not enough to afford federal habeas relief to Neal because, under AEDPA, we owe considerable deference to the Mississippi Supreme Court. . . . . Neal must go further yet and demonstrate that the prejudice determination of the Mississippi Supreme Court "involved an unreasonable application" of *Strickland*.

*Id.* Citing *Terry Williams*, 529 U.S. at 409, the court noted the application must be objectively unreasonable. *Id.* The Fifth Circuit held:

> Although the additional mitigating evidence was of a significantly better quality than that actually presented, much of it was similar in nature to the original evidence. With those considerations in mind, the Mississippi Supreme Court concluded that the additional evidence was not substantial enough to outweigh the overwhelming aggravating circumstances.
>
> Under the deferential standard of Section 2254(d), and given the circumstances of this case, we cannot conclude that the Mississippi Supreme Court unreasonably applied *Strickland* to the facts of Neal's case. It was not unreasonable, in other words, to conclude that the outcome would have been the same because the additional evidence did not serve to reduce further his moral culpability for such a heinous and unforgivable crime beyond the evidence already presented.

*Id.* at 247.

If the Mississippi Supreme Court was not objectively unreasonable in finding no prejudice in *Neal*, then Judge Dambold (based on an extensive trial, direct appeal, and state habeas record and a two-week state habeas hearing) was certainly reasonably finding the same here.

Holberg cannot overcome the credibility determinations made by the SHDC necessary in deciding this claim. She cannot show the state habeas court was unreasonable in its determination. And finally, she fails to show that trial counsel was deficient in their mitigation investigation or preparation of Dr. Patel and that she was prejudiced by their deficiency, especially given the heinous nature of the crime: stabbing an 80-year-old man fifty-seven times with a number of instruments and then shoving a lamppost five inches down his throat. Based on the above, the Court should deny relief on this claim.

**E.    Holberg cannot show the state court was unreasonable in finding that trial counsel never resolved to "throw the trial" (Claim 4e).**

In her fifth ground Holberg asserts that trial counsel told John Schwartz, Holberg's now deceased step-father, and several other people they were going to "throw the trial." Pet.132–33. Based on the extensive state habeas proceedings on remand laid out above,[72] the SHDC found that neither Dodson nor Norris claimed to throw the trial. App.C.53, 82. Further, the court found they did not in fact try to throw the trial. *Id.* Both Dodson and Norris were found credible on this point. *Id.* Holberg cannot overcome the deference owed to those determinations. *See Yount*, 467 U.S. at 1038; *Morales*, 714 F.3d at 303. Nor can she show the court was unreasonable in this determination. Thus, the claim should be denied.

**F.    Holberg fails to show the state court was unreasonable in their determination under state law that counsel was not deficient for not objecting to the State's closing arguments (Claim 4f).**

In her final ground Holberg argues that trial counsel was deficient in failing to object to several statements made by the prosecution during closing arguments. Pet.134–37. "Only where improper prosecutorial comments substantially affect the defendant's right to a fair trial do they require reversal." *Styron v. Johnson*, 262 F.3d 438, 449 (2001). In other words an "improper jury argument by the state does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair . . . ." *Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988).

---

[72] *Supra* Argument VI.D.

> When a claim regarding the impropriety of the prosecution's argument
> is framed as a violation of due process, the appropriate inquiry is not
> whether the remarks were undesirable or even universally condemned
> but, rather, whether the prosecution's comments so infected the trial
> with unfairness that there is a reasonable probability that the result
> would have been different if the proceeding had been conducted
> properly.

*Jackson v. Johnson*, 194 F.3d 641, 653 (5th Cir. 1999) (citations omitted). Thus,

Holberg bears the burden to show "a reasonable probability that but for [the

objectionable] remarks the result would have been different." *Nichols v. Scott*, 69 F.3d

1255, 1278 (5th Cir. 1995). Again, Holberg fails to carry his burden.

Under Texas law "[p]roper jury argument includes four areas: (1) summation

of the evidence presented at trial, (2) reasonable deduction drawn from that evidence,

(3) answer to the opposing counsel's argument, or (4) a plea for law enforcement."

*Jackson v. State*, 17 S.W.3d 664, 673 (Tex. Crim. App. 2000); *see also Alejandro v.*

*State*, 493 S.W.2d 230, 231 (Tex. Crim. App. 1973).

> The first two of the *Alejandro* tests deal explicitly with the prohibition
> on arguing outside the record. The third—answer to argument of
> opposing counsel—deals with the doctrine of invited argument and
> permits an argument outside the record to be made if required to
> respond to an opposing argument that was outside the record.
>
> The fourth—plea for law enforcement—simply denotes an argument
> that is otherwise unobjectionable. It is merely a label given to an
> argument that is determined to be proper and is not an independent
> ground for assessing the propriety of an argument. Presumably, every
> argument by an effective prosecutor is a plea for law enforcement.

43 George E. Dix & John M. Schmolesky, *Texas Practice Series: Criminal Practice*

*and Procedure* § 45:9 (3rd ed. 2010). Prosecutors have wide latitude in the language

and manner of arguing their side of the case consistent with the evidence. *Montelongo*

*v. State*, 644 S.W.2d 710, 716 (Tex. Crim. App. 1980).

Holberg complains of eleven specific arguments[73] by the State to which, she asserts, counsel should have objected. The CCA considered each of these on direct review and rejected them as it held the prosecution's statements were not an improper jury argument under state law.

*The first argument*. The CCA held this statement "was part of the prosecutor's lengthy, somewhat rambling exhortation to the jurors to remember their duty to answer the punishment issues according to the evidence and not according to their sympathy for [Holberg]." App.A.31–32 (citing 25.RR.176–181). The court found that, understood in context, the State was referring to core values such as "duty, honor, and promises," not to religion. App.A.32 (citing 25.RR.177).

*The second argument*. The CCA found this was still part of the "prosecutor's exhortation . . . to do its duty to answer the punishment issues according to the evidence and not mere sympathy." App.C.32. The CCA held that a reasonable juror hearing the prosecutor's argument in context would not have felt unduly pressured to go beyond the evidence presented when answering the punishment issues. *Id.*

*The third and fourth arguments*. The CCA held these were a permissible plea for law enforcement because the prosecutor did nothing more than tell the jury they should answer the issues according to the evidence presented and not be swayed by mere sympathy for Holberg. App.A.34.

---

[73] Instead of requoting the arguments from Holberg's brief, the Director simply refers to them in the order they are raised, e.g., "first argument," "second argument," etc.

*The fifth argument.* The CCA held that this was a summation of the testimony presented by Dickson and, thus, not improper. App.A.36. As discussed above,[74] Dickson's testimony did show that Holberg may have attempted to recruit her to kill Kirkpatrick before she could testify. 23.RR.34–38.

*The sixth argument.* The CCA held this was also a proper plea for law enforcement. App.A.37.

*The seventh argument.* The CCA found that immediately after the complained of statements the prosecutor summarized the State's punishment evidence and argued that, in light of that evidence, answering the special issues in that manner was the correct thing to do. App.A.39–40. Thus, the statements were either a summation of the evidence or reasonable deductions therefrom. *Id.*

*The eighth argument.* Here, the CCA, assuming arguendo counsel should have objected, held that Holberg failed to show prejudice.

> Reasonable jurors, hearing the prosecutor's argument, could have understood him to mean that they could completely ignore the punishment stage evidence when they answered the punishment issues. However, in general, the prosecutor's closing argument was not tied in substantial part to that misstatement of the law. Moreover, the trial court explicitly instructed the jurors that they "shall consider all the evidence submitted to [them] in this trial" when answering the punishment issues, and, in the absence of evidence to the contrary, we must presume the jurors followed their instructions. Thus, appellant has shown no reasonable probability that, but for trial counsel's failure to object, the result of the punishment stage would have been different.

App.A.41 (citing *Hutch v. State*, 922 S.W.2d 166, 170 (Tex. Crim. App. 1996)).

---

[74] *Supra* Argument IV.A, C.

*The ninth and tenth arguments.* Again assuming arguendo trial counsel should have objected, the CCA held for each of these that Holberg

> still has shown no reasonable probability that, but for trial counsel's error, the result of the punishment stage would have been different. As we have noted, the State's case with respect to punishment was strong, and it is unlikely that the argument in question had a substantial impact on the jury's deliberations.

App.A.44.

*The eleventh argument.* The CCA put this statement in the context of the full argument. App.A.37–38. In so doing the court held that it was a permissible plea for law enforcement. App.A.38 (citing *Whittington v. State*, 580 S.W.2d 845, 847 (Tex. Crim. App. 1979); *Williams v. State*, 575 S.W.2d 30, 33–34 (Tex. Crim. App. 1979); *Cortez v. State*, 683 S.W.2d 419 (Tex. Crim. App. 1984)).

Because the CCA's holding was based on a determination under state law, it may not be disturbed on federal habeas review. *Charles*, 629 F.3d at 500; *Weeks*, 55 F.3d at 1062–63. Further, as the court found most of these arguments to be non-objectionable, trial counsel was not deficient for failing to raise frivolous objections. *See Koch*, 907 F.2d at 527; *Clark*, 19 F.3d at 966. Moreover, the brutality of the murder and the strength of the State's punishment case weigh against Holberg in showing a reasonable probability that, but for trial counsel's failure to object, the result of the punishment stage would have been different. Because she ultimately fails to show the CCA was unreasonable, this Court should deny the claim.

At the end of this claim Holberg again argues that all of the alleged errors during the punishment phase, when taken together, establish IATC. Pet.136–37. However, there are no errors to cumulate. *See Westley*, 83 F.3d at 726; *Bell*, 367 F.3d

at 471. As such, the CCA denied this claim, and Holberg cannot show that decision was unreasonable. *See* App.A.45. As Holberg's other claims of IATC are meritless, so too is this one. Therefore, this Court should deny all claims for relief (dismissing as procedurally barred where appropriate) alleging IATC during the guilt phase of trial.

## VII. The CCA Held that the Evidence at Trial was Legally Sufficient as to Each of the Two Aggravating Factors, and Holberg Fails to Show This Decision was Unreasonable (Claim 5).

On direct appeal Holberg clearly raised a legal sufficiency challenge to each of the aggravating factors proffered at trail: robbery (point of error eighteen) and burglary (point of error nineteen). Brief of Appellant at 114–18 (robbery), 118–24 (burglary), *Holberg*, 38 S.EW.3d 137 (No. AP-73,127). She now asserts that the CCA only ruled on her challenge to the robbery aggravator. Pet.137–38. She then argues that the evidence at trial was legally insufficient to support the burglary aggravator. Therefore, Holberg claims, her conviction for capital murder must be overturned.

First, Holberg is mistaken that the CCA did not rule on her challenge to the sufficiency of the burglary aggravator. She clearly raised this challenge in point of error nineteen, and the CCA expressly overruled that point. App.A.2–4. And although the CCA did not expressly discuss the burglary in its analysis as it did the robbery, AEDPA's "presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez*, 274 F.3d at 948 n.11. Therefore, Holberg must overcome the deference owed to the CCA's holding that there was legally sufficient evidence as to both aggravators.

128

Holberg does not even challenge the CCA's holding as to the robbery aggravator. And her attack as to the burglary is based merely on her view of the evidence. However, in determining an insufficiency claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the *prosecution*, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979) (emphasis added). Stated another way, when a presumptively valid state court conviction is under federal habeas review, the question is whether the evidence is constitutionally sufficient to support the conviction. *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991).

This inquiry must be conducted with "explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. All credibility choices and conflicting inferences are to be resolved in favor of the verdict. *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999). The court "should not substitute our view of the evidence for that of the fact-finder." *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1989). "[T]he jury has the sole responsibility to judge the weight and credibility of the evidence" *Cobb v. Wainwright*, 666 F.2d 966, 971 (5th Cir. 1982); *see also United States v. Green*, 180 F.3d 216, 220 (5th Cir. 1999). "The habeas corpus statute obliges federal judges to respect credibility determinations made by the trier of fact." *Pemberton v. Collins*, 991 F.2d 1218, 1225 (5th Cir. 1993).

As to the burglary Rocky, Tietz, and Crisp all testified that they did not know Towery to ever have prostitutes in his home. 18.RR.303–319 (Rocky); 19.RR.122–39 (Tietz), 152–64 (Crisp). Owens, Crisp, and Corporal Richard Weathers each gave testimony that demonstrated Holberg did not go to the Princess Apartments looking for Towery. 19.RR.39–53 (Owens), 152–64 (Crisp); 21.RR.249–52 (Weathers). As discussed above,[75] there was indeed at least some evidence as to both the robbery and burglary aggravators. Thus, Holberg fails to show the CCA's decision was unreasonable, and this claim should be denied.

### VIII. Holberg's Claim that the State Made Direct Appeals to a Retributive Religious Sentiment Throughout her Trial is Procedurally Barred and Meritless (Claim 6).

In her sixth claim for relief Holberg asserts that the State continually appealed to a "retributive religious sentiment" among the jury. Pet.138–39. On direct appeal, the CCA found that Holberg waived this error by failing to object during trial. App.A.16–18. The Fifth Circuit has consistently held the contemporaneous objection rule is an IASG on which to bar a claim in state court. *Allen v. Stephens*, 805 F.3d 617, 635–36 (5th Cir. 2015); *Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999). As such, the claim is procedurally defaulted and barred from federal habeas relief. *See Frazier v. Dretke*, 145 F. App'x 866, 872 (5th Cir. 2005).

However, the CCA also stated that, based on a full review of the record, there was nothing that reasonably support[ed]" Holberg's claim. App.A.18. As discussed above,[76] Holberg fails to point to any statements in closing arguments that was truly

---

[75] *Supra* Argument V.A.2, 3.
[76] *Supra* Argument VI.F.

prejudicial. And as discussed above and below,[77] there was nothing objectionable during the voir dire of juror Carpenter, the person to whom Holberg attaches "blood atonement." Moreover, the CCA also denied an IATC claim based on counsel's failure to object during voir dire to the State's supposed religious appeals. App.A.21–22. Thus, the Court should dismiss as procedurally barred Holberg's meritless claim.

## IX.    Holberg Fails to Show the CCA's Decision was Unreasonable Where it Held that Veniremember Balderas was Properly Excused for Cause (Claim 7).

In a lone paragraph Holberg asserts the trial court erred in granting the State's challenge for cause as to veniremember Arlene Balderas. Pet.139. In *Witherspoon v. Illinois*, the Supreme Court held that a death sentence cannot be carried out where the jury that imposed that punishment was "chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. 510, 522 (1968); *see also Adams v. Texas*, 448 U.S. 38, 46 (1980). The critical inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424 (1985) (quoting *Adams*, 448 U.S. at 45). A veniremember must, therefore, be willing not only to accept that the death penalty in certain circumstances is an acceptable punishment, but also to answer the statutory questions without conscious distortion or bias. *Mann v. Scott*, 41 F.3d 968, 981 (5th Cir. 1994) (citing *Adams*, 448 U.S. at 46).

---

[77] *Infra* Argument V.B.; s*upra* Argument X

For one of the answers on her questionnaire, Balderas wrote, "I cannot vote to assess the death penalty under any circumstances." 15.RR.111. She then adopted this view on the stand during voir dire. 15.RR.112. In response to the State's questions, she also stated, "I don't go for the death penalty." *Id.* And later, "Well, if a person commits a crime, I wouldn't want them to die, go to prison, not the death penalty." *Id.* She averred this was, at least in part, based on her deep Catholic convictions. 15.RR.112–13. Trial counsel attempted to rehabilitate her, but ultimately failed as Balderas had trouble understanding particular issues involved in a capital case (e.g., the special issues). 15.RR.122–29.

Based on this, the CCA held that "Balderas' views concerning the death penalty would have prevented or substantially impaired the performance of her duties as a juror in accordance with her instructions and her oath." App.A.16. Indeed, in no way could she answer the statutory punishment issues "without conscious distortion or bias," as the bias she harbored would "substantially impair" her performance as a juror in a capital murder trial. *Witherspoon*, 391 U.S. at 523, n.21; *Mann*, 41 F.3d at 981.Holberg cannot show the CCA's denial of her claim was unreasonable. Thus, this Court should also deny the claim as meritless.

## X.    Holberg's Claim that juror Carpenter Should Have Been Excluded for Cause is Procedurally Barred and Meritless (Claim 8).

In her eighth claim Holberg again complains about the seating of Billy Carpenter on her jury. Pet.140. As the claim reasserts IATC, Holberg fails to show the CCA's decision was unreasonable.[78] As this claim alleges trial court error because

---

[78] *See supra* Argument V.B.

Carpenter was "committed to a death sentence," the claim is procedurally barred. Because Holberg failed to object during trial, the CCA applied the contemporaneous objection bar. App.A.14. This is an IASG on which to bar the claim, and as such, the claim is procedurally defaulted and barred from federal habeas relief. *Allen*, 805 F.3d at 635–36; *Frazier*, 145 F. App'x at 872.

As support for her claim, Holberg proffers a 2006 affidavit from Carpenter.[79] Pet.140; 2.SHCR.193–94. When dealing with Holberg's *Brady* claim involving Dickson,[80] the SHDC found this affidavit was inadmissible under Texas law. App.B.119. Further, it is wholly inadmissible under federal law. Federal Rule of Evidence 606(b) prohibits the consideration of this affidavit as evidence. *See Williams v. Collins*, 16 F.3d 626, 636 (5th Cir. 1994); *Byrne v. Butler*, 845 F.2d 501, 509–10 n.8 (5th Cir. 1988).

Rule 606(b) "is grounded in the common-law rule against admission of jury testimony to impeach a verdict and the exception for juror testimony relating to extraneous influences." *Tanner v. United States*, 483 U.S. 107, 120 (1987) (citations omitted). As explained by the Fifth Circuit, Rule 606(b) bars juror testimony regarding four topics: (1) the method or arguments of the jury's deliberations; (2) the effect of any particular thing upon an outcome in the deliberations; (3) the mindset or emotions of any juror during deliberations; and (4) the testifying juror's own mental processes during deliberations. *United States v. Ruggerio*, 56 F.3d 647, 652

---

[79] Holberg also cites to "XVII, at pp. 73–76" to support that Carpenter was committed to death, rejected rehabilitation, and espoused eye-for-an-eye justice. Pet.140. Yet, there is no "XVII;" and while those pages do encompass her briefing on the IATC issue, those assertions are not present there. *See* Pet.74.
[80] *See supra* Argument IV.C.

(5th Cir. 1995); *United States v. Ortiz*, 942 F.2d 903, 913 (5th Cir. 1991). As with the common-law rule, Rule 606(b) also makes juror testimony incompetent to impeach a jury verdict, unless there were "extraneous influences" brought upon the jury. *Tanner*, 483 U.S. 117-23.

Moreover, the Supreme Court recently held "that Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the ground that a juror lied during *voir dire*. In doing so, we simply accord Rule 606(b)'s terms their plain meaning." *Warger v. Shauers*, 135 S. Ct. 521, 525 (2014). This affidavit is inadmissible in these proceedings. As discussed above,[81] Holberg's claim is completely meritless. Therefore, this Court should deny relief.

## XI.   Holberg Fails to Show the Unreasonableness of the CCA's Decision, based on state law, that the Trial Court Did not Err in Regards to the Questioning of Veniremember Barbara Fritzmeyer (Claim 9).

Holberg argues the trial court erred when it prevented trial counsel from questioning veniremember Barbara Fritzmeyer on parole law during voir dire. Pet.140–41. The CCA has consistently held that parole law is not a proper subject for voir dire. *Collier v. State*, 959 S.W.2d 621, 623 (Tex. Crim. App. 1997); *Eldridge v. State*, 940 S.W.2d 646, 651 (Tex. Crim. App. 1996); *Morris v. State*, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996). Following that state law precedent, the CCA denied this claim. Because Holberg cannot overcome the deference owed to this determination of state law, this Court should deny this claim. *Charles*, 629 F.3d at 500; *Weeks*, 55 F.3d at 1062–63.

---

[81] *Supra* Argument V.B.

XII.  **Holberg's Claims that the Texas Death Penalty Statutory Scheme is Unconstitutional, Both Facially and as Applied, Are Foreclosed by Supreme Court or Fifth Circuit Precedent, Procedurally Barred in Part, and Otherwise Meritless (Claims 10 & 11).**

In her tenth ground for relief Holberg argues Texas's death penalty statutory scheme, specifically Texas Code of Criminal Procedure Article 37.071 and Penal Code Section 19.03, is facially unconstitutional because it violates the Eighth Amendment's prescription against cruel and unusual punishment and the Fourteenth Amendment's due process requirements. Pet.141. For decades, the Supreme Court has continually found Texas's capital punishment scheme to be facially constitutional. *See, e.g., Johnson v. Texas*, 509 U.S. 350, 367–68 (1993); *Jurek v. Texas*, 428 U.S. 262, 270–72 (1976). In other words, the Court is "bound by Supreme Court precedent which forecloses any argument that the death penalty violates the Constitution under all circumstance[s]." *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998). As such, Holberg cannot show the CCA was unreasonable in denying her claim on direct review. App.A.10–11.

In claim eleven Holberg lodges seven "as applied" challenges. Pet.141. First, Holberg attacks capital juries for being "death-prone." On direct appeal Holberg raised this as part of her first point of error. Brief of Appellant at 4–5, *Holberg*, 38 S.W.3d 137 (No. AP-73,127). In deciding these claims, the CCA determined that an objection was needed because Holberg complained about her jury in specific, as she does here. App.A.17. Because Holberg failed to object during trial, the CCA applied the contemporaneous objection bar. App.A.18. This is an IASG on which to bar the

135

claim, and as such, the claim is procedurally defaulted and barred from federal habeas relief. *Allen*, 805 F.3d at 635–36; *Frazier*, 145 F. App'x at 872.

Moreover, this claim is foreclosed by Supreme Court precedent. "[T]he Constitution does not prohibit the States form 'death qualifying' juries in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 173 (1986). To the extent she seeks recognition of a new rule, it is barred by the non-retroactivity principles of *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion). *See Barbee v. Stephens*, No. 4:09-CV-074-Y, 2015 WL 4094055, at *63 (N.D. Tex. July 7, 2015) (unpublished).

Second, Holberg asserts Texas juries are inherently biased towards voting for death. She did not directly raise this claim in either her direct appeal or state habeas proceedings. *See Picard*, 404 U.S. at 275–77; *Nobles*, 127 F.3d at 420 (exhaustion requires the petitioner to raise a claim with the same facts and legal theory in state court). Because this claim is now procedurally defaulted in state court, it is barred from federal habeas relief. *See Ogan*, 297 F.3d at 358 n.6; *Fuller*, 158 F.3d at 906. Further, this claim is not an as-applied challenge; it does not attack the statutory scheme, but Texas juries as a whole. Thus, it is wholly meritless.

Third, Holberg argues Article 37.071 prevented the jury from considering evidence of Towery's supposed provocation during the mitigation phase. As the CCA held in denying this claim, Holberg is simply wrong on this point:

> Evidence that the defendant acted in part because of provocation tends to show that the defendant is not usually a dangerous person. Provocation on the part of the victim can also be considered an extenuating circumstance. Therefore, [Holberg]'s jury could consider and give effect to any evidence of provocation when it answered the first punishment issue, concerning [Holberg]'s future dangerousness, and

when it answered the second punishment issue, concerning mitigation. See Article 37.071, § 2(e)(1).

App.A.12. Holberg fails to show this determination of state law was unreasonable.

Fourth, Holberg complains that the statutory scheme prevented Holberg from raising issues on direct appeal where trial counsel failed to object or otherwise preserve error. In her state habeas proceedings, she raised IATC claims attacking counsel for not preserving error on claims and, thus, defaulting them on appeal. App.A.79–92. But she did not directly raise a statutory challenge on this issue; thus it is now procedurally defaulted and barred from federal habeas relief. *See Picard*, 404 U.S. at 275–77; *Nobles*, 127 F.3d at 420; *Ogan*, 297 F.3d at 358 n.6; *Fuller*, 158 F.3d at 906. To the extent this can be construed an as-applied challenge (and not a mere reassertion of IATC), the Fifth Circuit has not only found the contemporaneous objection bar to be appropriate, but also a ground on which to bar federal habeas relief. *Allen*, 805 F.3d at 635–36; *Frazier*, 145 F. App'x at 872.

Fifth, Holberg protests that she could not receive "meaningful review" of the mitigation special issue. The CCA denied this claim noting that it had previously rejected such arguments. App.A.13 (citing *Ladd v. State*, 3 S.W.3d 547, 574 (Tex. Crim. App. (1999)). Moreover, Fifth "Circuit precedent has specifically rejected the argument that there is a constitutional requirement that mitigation special issue evidence be subject to appellate review by the state." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). Because the requirement of appellate review would be a new rule of law, such a claim is also *Teague*-barred. *See Moore v. Quarterman*, 526 F. Supp. 2d 654, 725 (W.D. Tex. 2007).

Sixth, Holberg contends that the mitigation special issue allows juries to much discretion in sentencing. The CCA denied this claim along with the prior one and for the same reasoning. App.A.13 (citing *Ladd*, 3 S.W.3d at 574). Further, juries during the selection phase of a capital trial may be "given 'unbridled discretion in determining whether the death penalty may be imposed.'" *Turner v. Quarterman*, 481 F.3d 292, 299 (5th Cir. 2007) (quoting *Tuilaepa v. California*, 512 U.S. 967, 979–80 (1994)). A challenge to the open ended discretion of Texas capital sentencing juries violates *Teague. See Moore*, 526 F. Supp. at 704.

Seventh, Holberg asserts she should receive a factual sufficiency review for both the future dangerousness and mitigation special issues. Again, the CCA denied this claim noting that it had been previously decided by that court. App.A.13 (citing *Ladd*, 3 S.W.3d at 574). As the Fifth Circuit has held, factual sufficiency is a matter of state law. *Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002) ("The [factual-sufficiency standard] is rooted in the Texas constitution."). The claim is therefore not cognizable. "We cannot impose a Texas constitutional standard for the factual review of the elements of a crime on the state's courts of appeals when reviewing the issue of a defendant's future dangerousness." *Id.*; *see also Runnels v. Stephens*, No. 2:12-CV-0074-J-BB, 2016 WL 1274132, at *25 (N.D. Tex. Mar. 15, 2016) (unpublished). Further, because a requirement of factual sufficiency review is new rule, the claim is *Teague*-barred. This Court should dismiss as barred where appropriate and deny as meritless Holberg's tenth and eleventh grounds for relief.

### XIII. Holberg Fails to Show the CCA Was Unreasonable in Holding that the Trial Court Properly Excluded Impact Testimony from her Family and Friends (Claim 12).

In her twelfth claim Holberg argues that the trial court erred in excluding testimony of her family and friends regarding the impact on them if Holberg were executed. Pet.142–43. The CCA denied this claim noting that it had previously rejected such arguments. App.A.19 (citing *McFarland v. State*, 928 S.W.2d 482, 522 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997); *Fuller v. State*, 827 S.W.2d 919, 935–936 (Tex. Crim. App. 1992), *cert. denied*, 509 U.S. 922 (1993)). Holberg cites to *Payne v. Tennessee*, 501 U.S. 808 (1981), for the proposition that a court must permit the defendant's family and friends to testify as to the impact of execution if it allows victim impact testimony. Pet.142. Thus, she claims the CCA's decision was an unreasonable application of Supreme Court law. Pet.143.

However, *Payne* simply held that a court cannot have a per se bar to victim impact testimony. 501 U.S. at 825–26. Moreover, "the Supreme Court has never included friend/family impact testimony among the categories of mitigating evidence that must be admitted" during the punishment stage of a capital murder trial. *Jackson v. Dretke*, 450 F.3d 614, 617–18 (5th Cir. 2006). And because such evidence "does not reflect on [the defendant's] background or character or the circumstances of [the] crime," a state court does not unreasonably deny such claims. *Id.* at 618. Further, "the Supreme Court has never held that execution impact evidence must be admitted in capital cases." *United States v. Snarr*, 704 F.3d 368, 402 (5th Cir. 2013). Therefore, this claim is both meritless and *Teague*-barred.

139

**XIV.  Holberg Fails to Show the CCA was Unreasonable in Holding that the Trial Court Properly Denied the Defense from Informing the Jury about the Result of a "Holdout" Juror (Claim 13).**

Holberg next complains the trial court erred when it denied trial counsel's objection to the prescription against informing the jury regarding the effect of non-unanimity during punishment phase deliberations. Pet.143. The CCA rejected this claim, noting: "The United States Supreme Court has held, however, that the Eighth Amendment does not require that juries be informed as to the effect of a failure to reach unanimous agreement on punishment issues." App.A.12 (citing *Jones v. United States*, 527 U.S. 373, 381 (1999). The Fifth Circuit has also denied claims based on the failure to inform jurors about the result of non-unanimity or holdouts on the special issues. *Turner v. Quarterman*, 481 F.3d 292, 300 (5th Cir. 2007); *Alexander v. Johnson*, 211 F.3d 895, 897 n.5 (5th Cir. 2000); *Webb v. Collins*, 2 F.3d 93, 95–96 (5th Cir. 1993). It has repeatedly held that indistinguishable claims require the creation of new constitutional law in violation of *Teague. See Roach v. Quarterman*, 220 F. App'x 270, 276–77 (5th Cir. 2007) (unpublished); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 466 (5th Cir. 1995). As such, this Court should deny the claim.

140

## XV. Holbeg's Claim that Texas's Definition of Mitigating Evidence is Unconstitutional Has Been Squarely Rejected by the CCA and Fifth Circuit (Claim 14).

In her fourteenth ground Holberg asserts that Texas's "mitigating evidence" definition is unconstitutional because it prevented the jury from considering Holberg's potential rehabilitation. Pet. 143–44. In denying the claim the CCA stated:

> First, we have previously upheld the constitutionality of the statutory definition in question. Second, [Holberg]'s jury could consider and give effect to any evidence of "potential for rehabilitation" when it answered the first punishment issue, concerning her future dangerousness, and when it answered the second punishment issue, concerning mitigation.

App.A.14 (citing *Ladd*, 3 S.W.3d at 574). The Fifth Circuit has also consistently rejected this argument. *Blue*, 665 F.3d at 664–68. Further, because "[n]o federal court has held the Texas capital sentencing scheme's definition of 'mitigating evidence' deprives a criminal defendant of any right recognized by the United States Constitution . . . *Teague v. Lane* precludes this Court from adopting the 'new rule' advocated by petitioner[.]" *Bartee v. Quarterman*, 574 F. Supp. 2d 624, 708 (W.D. Tex. 2008). As such, this Court should deny the claim.

## XVI. Holberg Fails to Show the CCA's Decision Was Unreasonable Regarding the Jury Instruction Definitions (Claim 15).

In her fifteenth claim Holberg contends that the jury instructions failed to properly distinguish between capital murder with the robbery/burglary aggravator and murder followed by theft. Pet.144–45. As discussed above,[82] the CCA held the instructions tracked the statutory language and definitions. App.A.11–12. Further, the Fifth Ciruit has rejected the argument that the jury could have been confused by

---

[82] *Supra* Argument V.H. (incorporating the CCA's holding for this claim).

the phrase "in the course of committing or attempting to commit." *Anderson*, 18 F.3d at 1222–23 (finding that the definition of "in the course of" adequately channeled jurors' discretion). Thus, this claim is foreclosed.

## XVII. Holberg Cannot Show the CCA Was Unreasonable in Denying Based on State Law Her Claim that the Trial Court Erred in Failing to Require the State to Prove Lack of Provocation by Towery (Claim 16).

In her sixteenth ground Holberg inexplicably asserts that the trial court erred when it did not require the State to prove a lack of provocation by Towery during the punishment phase. Pet.145–46. As she notes, Article 37.0711, § 3(b)(3) requires such proof, but this statute is applicable to capital offenses committed before September 1, 1991. Holberg murdered Towery after this date, so the statute does not apply. She also incorrectly argues that although the claim was raised in her direct appeal and state habeas application, it was "never adjudicated on the merits." This is simply false.

The SHDC, in addressing this claim, found, "The CCA reviewed the merits of this claim on direct appeal and rejected it. *Holberg*, slip op. at 7 (discussing and overruling the claim)." App.B.24. Indeed, the CCA on direct appeal noted that neither Penal Code Section 19.03 nor Code of Criminal Procedure Article 37.071, as opposed to 37.0711, required the State to prove provocation; therefore, the court overruled the point of error. App.A.7. Further, this claim seems analogous to *Ring* and *Apprendi* challenges, i.e., arguments that the State must disprove mitigation beyond a reasonable doubt. *See Ring v. Arizona*, 536 U.S. 584 (2002); *Apprendi v. New Jersey*, 530 U.S. 466 (2000). This has been repeatedly rejected. *Scheannette v. Quarterman*,

482 F.3d 815, 828 (5th Cir. 2007). And such claims are *Teague*-barred. *Rowell*, 398

F.3d at 378–79. As such, the claim should be denied.

## XVIII.   Holberg Fails to Show the CCA's Decision Was Unreasonable in Denying Her Claim that the Trial Court Prevented the Jury from Considering Provocation as Mitigating Evidence (Claim 17).

In a twin claim Holberg argues that the trial court also erred in preventing the

jury from considering provocation by Towery as mitigating evidence. Pet.146–47. In

rejecting this argument on direct appeal, the CCA disagreed with Holberg's

interpretation of the law:

> Evidence that the defendant acted in part because of provocation tends to show that the defendant is not usually a dangerous person. Provocation on the part of the victim can also be considered an extenuating circumstance. Therefore, [Holberg]'s jury could consider and give effect to any evidence of provocation when it answered the first punishment issue, concerning [Holberg]'s future dangerousness, and when it answered the second punishment issue, concerning mitigation.

App.A.12 (citing Tex. Code Crim. Proc. art. 37.071, § 2(e)(1)).

In support of her claim Holberg states, "Yet, Texas law now expressly forbids

this in capital cases: there can be no argument to the jury or any special charge by

the Court on provocation, *see Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998), .

. . ." Pet.146. However, *Raby* does not stand for this proposition. Indeed, the pinpoint

citation which Holberg provides is to a discussion on appropriate voir dire regarding

the mitigation special issue. There the CCA held:

> that the law does not require a juror to consider any particular piece of evidence as mitigating; all the law requires is that a defendant be allowed to present relevant mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating. A trial court does not abuse its discretion by refusing to allow a defendant to ask venire members questions based on

143

facts peculiar to the case on trial (e.g. questions about particular mitigating evidence).

*Raby*, 970 S.W.2d at 3. This does not aid Holberg in showing the CCA's decision to be unreasonable. As discussed above,[83] any claim attacking the Texas capital sentencing scheme's definition of mitigating evidence is *Teague*-barred. *Bartee*, 574 F. Supp. 2d at 708. As such, this Court should deny the claim.

## XIX. Holberg's Claim of Total Cumulative Error is Procedurally Barred and Meritless (Claim 18).

In her eighteenth ground for relief Holberg asserts that all these errors so infected her trial as to render it fundamentally unfair. Pet.147. She did not directly raise this claim in either her direct appeal or state habeas proceedings. *See Picard*, 404 U.S. at 275–77; *Nobles*, 127 F.3d at 420 (exhaustion requires the petitioner to raise a claim with the same facts and legal theory in state court). Because this claim is now procedurally defaulted in state court, it is barred from federal habeas relief. *See Ogan*, 297 F.3d at 358 n.6; *Fuller*, 158 F.3d at 906. The rule of exhaustion applies to a claim of cumulative error, even where all the errors to accrue were properly exhausted. *Nickleson v. Stephens*, 803 F.3d 748, 753 (2015).

> It might be contended that [Holberg] effectively raised in the state courts each of the underlying errors on which [her] claim of [cumulative error] depends, and it is but a small step for this court consequently to evaluate their ultimate impact. . . . . To take this step here, however, would displace the federal habeas authorities just cited and ignores the distinction between direct and collateral review of criminal convictions.

*Id.* Moreover, there are no errors to cumulate. *See Westley*, 83 F.3d at 726; *Bell*, 367 F.3d at 471. As Holberg's other claims are meritless, so too is this one.

---

[83] *Supra* Argument XV.

## XX.  Holberg's Fundamental Miscarriage of Justice Claim is Procedurally Barred, Not Cognizable, and Meritless (Claim 19).

Finally, Holberg argues that her conviction was a fundamental miscarriage of justice because she is actually innocent.[84] Pet.147–48. She did not directly raise this claim in either her direct appeal or state habeas proceedings. *See Picard*, 404 U.S. at 275–77; *Nobles*, 127 F.3d at 420 (exhaustion requires the petitioner to raise a claim with the same facts and legal theory in state court). Because this claim is now procedurally defaulted in state court, it is barred from federal habeas relief. *See Ogan*, 297 F.3d at 358 n.6; *Fuller*, 158 F.3d at 906. Moreover, a freestanding claim of actual innocence is not cognizable on federal habeas review. *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *Rocha*, 626 F.3d at 827; *Dowthitt*, 230 F.3d at 741. Further, this claim is meritless.

A fundamental-miscarriage-of-justice claim requires the petitioner to make a persuasive showing that he is actually, as opposed to legally, innocent of the crime of which he was convicted. *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). "Actual innocence means 'factual innocence, and not mere legal insufficiency.'" *United States v. Jones*, 172 F.3d 381, 384 (5th Cir. 1999) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). "A prototypical example of 'actual innocence' in a colloquial sense is the case where the

---

[84] To the extent Holberg complains of the denial of DNA testing, this claim is not cognizable on federal habeas review. The "right to postconviction DNA testing arises solely under Texas law, and the denial of a motion for DNA testing does not implicate a federal constitutional violation." *Figueroa v. Dretke*, No. 4:05-CV-074-Y, 2005 WL 1108109, at *1 (N.D. Tex. May 5, 2005) (unpublished); *see also Sykes v. Dretke*, No. 3:02-CV-784-G, 2004 WL 1856826, at *8 (N.D. Tex. Aug. 19, 2004) (unpublished); *King v. Cockrell*, No. 3:02-CV-2197, 2002 WL 31906378, at *2 n.3 (N.D. Tex. Dec. 27, 2002) (unpublished).

State has convicted the wrong person of the crime." *Sawyer*, 505 U.S. at 340. It is an extremely difficult showing to make.

A petitioner must show either: (1) as a consequence of the identified constitutional error in the guilt-innocence phase and in light of new evidence, "it is more likely than not that no reasonable juror would have convicted him," *Schlup v. Delo*, 513 U.S. 298, 329 (1995); or (2) "by clear and convincing evidence that, but for the constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law. *Sawyer*, 505 U.S. at 350. "It is not the district court's independent judgment as to whether a reasonable doubt exists . . . [but] what reasonable, properly instructed jurors would do." *Schlup*, 513 U.S. at 329; *see Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999). As discussed throughout this brief, Holberg simply fails to make this showing; thus, the claim should be denied.

## CONCLUSION

Several of Holberg's claims are either unexhausted or were procedurally barred in state court and, thus, procedurally barred here. She also asserts grounds for relief that are not cognizable on federal habeas review. All of her claims are ultimately meritless. Because she fails to meet her burden under AEDPA showing the state court unreasonably denied those claims properly presented therein, and because she otherwise raises procedurally barred or uncognizable claims for which there is no relief, this Court should dismiss with prejudice Holberg's petition and deny her a COA.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
   For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

_ s/ Travis G. Bragg_        
TRAVIS G. BRAGG
Assistant Attorney General
State Bar No. 24076286
   *Counsel of Record*

Post Office Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel: (512) 936-1400
Fax: (512) 936-1280
Email: Travis.Bragg@oag.texas.gov

*Counsel for Respondent*

**CERTIFICATE OF SERVICE**

      I do hereby certify that on December 19, 2016, I electronically filed the forgoing pleading with the Clerk of the Court for the United States District Court, Northern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following counsel of record, who consented in writing to accept the Notice as service of this document by electronic means:

Philip Wischkaemper             Alan J. Lazarus
Law Office of Philip Wischkaemper    Drinker Biddle & Reath LLP
915 Texas Avenue               50 Fremont Street, 20th Floor
Lubbock, Texas 79401          San Francisco, California 94105-2235
miglit@aol.com                alan.lazarus@dbr.com

                              *s/ Travis G. Bragg*
                              TRAVIS G. BRAGG
                              Assistant Attorney General