IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| BRITTANY MARLOWE HOLBERG, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | 2:15-CV-285-Z |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Brittany Marlowe Holberg ("Holberg") is a Texas prisoner sentenced to death for capital murder. In March 1998, a Texas jury convicted Holberg for the November 1996 death by stabbing of A.B. Towery, Sr. ("Towery"), in his home. *See State v. Holberg*, 38 S.W.3d 137 (Tex. Crim. App. 2000).[1] She now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In relevant part, Holberg filed an amended federal petition alleging:

---

[1] The Texas Court of Criminal Appeals ("TCCA") chose to publish only a small portion of its lengthy November 29, 2000 opinion in case no. AP-73,127 affirming Holberg's conviction and sentence. For this reason, citations to that opinion will be to the page numbers in the original opinion. Copies of the full TCCA opinion appear in various places among the state court records filed in this cause. *See, e.g.*, ECF no. 143 at 102-47; ECF no. 174 at 1-46.

Citations to the 28 record volumes of the verbatim transcription of Holberg's trial court proceedings and the testimony and documents admitted into evidence at trial will be to "#/28 RR." Citations to the record volumes of the verbatim transcription of the hearing held in Holberg's state habeas corpus proceeding and the testimony and documents admitted into evidence during Holberg's state habeas evidentiary hearing before Judge Dambold will be to "#/27 SHRR." Citations to page numbers in the volumes from Holberg's trial court and state habeas corpus proceedings will be to the page numbers in the respective volumes of the verbatim transcriptions from those proceedings and, unless otherwise specified, not to the .pdf pagination of those volumes as they appear in ECF nos. 99-325.

Citations to the volume numbers of the pleadings, motions, and other documents filed in Holberg's state trial court proceedings will be "# CR." Citations to the volume numbers of the eighteen volumes of pleadings, motions, and other documents filed in Holberg's state habeas corpus proceeding before Judge Estevez will be referenced as "#/18 SHCR." Citations to the volume numbers of the subsequent pleadings, motions, and other documents filed in Holberg's state habeas corpus proceeding are "#/6 Supp.SHCR" "#/5 Supp.SHCR," and "#/29 Supp.SHCR." There is also a two-

- Prosecutorial Misconduct;

- Ineffective Assistance of Trial Counsel;

- Insufficient Evidence;

- Improper Jury Argument;

- Voir Dire Error;

- Improper Exclusion of Evidence;

- Jury Charge Error;

- Cumulative Error; and

- Challenges to the Texas Death Penalty Statute.

For the reasons stated below, Holberg is not entitled to federal habeas corpus relief or a certificate of appealability from this Court. The following sections will restate relevant background information that the record contains elsewhere.[2]

## I.   GUILT-INNOCENCE PHASE

The guilt-innocence phase of Holberg's capital murder trial began on March 3, 1998. The prosecution and defense presented the following evidence and arguments:

### A.  Prosecution's Evidence

On the morning of November 14, 1996, A.B. Towery, Jr. ("Towery, Jr."), traveled to the Princess Apartments to check on his father Towery because Towery was not answering the telephone. Towery, Jr., found his father's body on the floor with a lamp protruding from his mouth

---

volume set of additional pleadings, motions, and other documents filed in the state habeas proceeding before Judge Dambold that will be referenced as "#/2 Supp.SHCR" and a one-volume set of pleadings, etc. before Judge Dambold that will be referenced as "1/1 Supp.SHCR." For unknown reasons, Holberg's original state habeas corpus application appears as a stand-alone single-volume document in the state court pleadings in her state habeas corpus proceeding.

[2] When the Court restates the testimony of a witness in this section, the events recounted in the testimony are generally described from the witness's point of view and therefore are not explicitly ascribed to him in each sentence. The Court has chosen to summarize witness testimony in this way to enhance readability.

and a paring knife in his abdomen. Towery's pants pockets were inside out, and his billfold, which contained $1 in cash, lay open on his body. 18/28 RR 54–56, 61–62, 308–10, 315–16, 319; 19/28 RR 35–36; 27/28 RR 82 (SX SP26A); 28/28 RR 52 (DX 19). Towery suffered 58 sharp-force injuries to his head, face, and body, as well as a chipped skull and a "pulverized" nose. 19/28 RR 289–300. Holberg forced a lamp down Towery's throat nicking his carotid artery while he was still alive. 19/28 RR 302–03, 316; 27/28 RR 41; 7 CR (2010–2012) 1740. Towery was 80 years old, measured 5 feet and 6 inches, and weighed 162 pounds. 19/28 RR 287. The police recovered the following bloodied items at the scene: a hammer, three forks, a butcher knife with hair on it, a grapefruit knife, a cast-iron skillet, and a steam iron. 18/28 RR 105, 108–14. A $10 bill lay next to Towery's body, a $20 bill was on the bathroom floor, and a $100 bill and another $20 bill were in the bedroom. 19/28 RR 55, 65, 67. Nine bloody palm prints or fingerprints at the scene matched Holberg's fingerprints. 18/28 RR 94–103, 151–53.

Law enforcement arrested Holberg three months later in Memphis, Tennessee. 18/28 RR 172–75. Holberg told the Memphis police that she had killed Towery in self-defense. She stated that she had been using cocaine for ten days prior to the murder. She further stated that a friend told her that Towery was a "good trick."[3] This prompted her to travel by cab to his apartment, knock on his door, and tell him that she had to use the telephone. Once inside, she asked Towery if he wanted to have sex. Towery agreed to have sex and gave her $200. She further told the police that while she was removing her pants, Towery began to beat her severely on the head without provocation. Holberg and Towery then fought for forty-five minutes.

---

[3] A "trick" is a slang term used to refer to a client or customer of a prostitute.

Ultimately, Holberg claimed she killed Towery using a knife and a pan in self-defense. Holberg dressed in Towery's clothes, traveled to a truck stop, and left town. She could not remember the name of the apartment complex where Towery lived. Contrary to what she would later testify at trial, Holberg stated that she met Towery for the first time on the day that she killed him. Holberg denied taking any of his money other than the $200 that he paid for sex. 18/28 RR 180–83, 191–200; 27/28 RR 28–31 (SX 167).

On February 20, 1997, a Randall County deputy sheriff and an Amarillo police officer transported Holberg back to Texas. During the drive, Holberg again related that (1) a friend had set up the date with Towery, (2) she used a pretense about needing to make a telephone call to gain access to his apartment, (3) she killed him in self-defense, and (4) he had given her two $100 bills. 19/28 RR 68–72, 89–92. Holberg asked the officers rhetorically why she would "kill a man for $1,400" when she was making $2,000 daily and had a drug addiction costing her $900 each day.[4] 19/28 RR 69–73.

### 1. *Testimony of Towery's Relatives*

Towery's relatives testified at trial that Towery had between $1,200 to $1,300 in $100 bills in his wallet before he died. 18/28 RR 291–92, 308–10; 19/28 RR 32. They also testified that he suffered from ulcers and gout in both knees, shuffled slowly when he walked, and abused pain medication — as evidenced by the dozens of prescription pill bottles littering his apartment. 18/28 RR 289, 300–301, 305–06; 19/28 RR 6, 13–14, 17–20, 23–24, 32. Towery's sons testified that their father previously abused alcohol but stopped drinking about ten years before his death. They

---

[4] According to a supplemental police report, Holberg was making $2,000 *a week*. 1/5 SHCR 132. According to her own trial testimony, however, Holberg earned $900 to $1,500 per day and spent $900 to $1,000 daily on her drug habit. 20/28 RR 262.

further testified that Towery did not invite female visitors or possess sexually explicit material in his apartment. 18/28 RR 293–97, 310–14. Towery, Jr., testified that his father's doorbell at the Princess Apartments did not work at the time of his death and had not worked for quite some time. 18/28 RR 316–17.

## 2. *Testimony of Donald Owens and Jamie Tietz*

Taxi driver Donald Owens ("Owens") testified that he transported Holberg via taxi to the Princess Apartments on November 13, 1996. Holberg told Owens that her boyfriend lived at the apartment complex and would pay the cab fare. Owens stated that he had never seen Holberg prior to that day. At Holberg's request, Owens stopped at a grocery store where she unsuccessfully attempted to fill a drug prescription. When Owens and Holberg arrived at the Princess Apartments shortly before 5:00 p.m., Holberg exited the cab and proceeded to ring the call buttons for every apartment, "hoping somebody would open the door." 19/28 RR 47. When this plan failed, Holberg instructed Owens to drive her to the manager's office in a different building so that the maintenance man could grant her entrance. Holberg exited the cab, entered the office, but never returned to the cab. The apartment manager Jamie Tietz ("Tietz") later told Owens that Holberg had walked through the door leading to the apartments' interior courtyard. 19/28 RR 40–49.

Although Tietz could not identify Holberg at trial, Tietz testified that a young lady had asked to use the bathroom that day. Tietz requested the assistance of maintenance personnel because the situation seemed "strange." 19/28 RR 132–38. The two maintenance men assisting Tietz watched Holberg exit the office. These men testified that Holberg walked toward an access gate in the courtyard. At the same time, Towery approached the gate from outside the courtyard with groceries in hand. Towery and Holberg spoke briefly, and Towery pointed in the direction of

his apartment. Holberg walked in that direction, went around the corner, and entered the apartment building. 19/28 RR 114–18, 155–58.

### 3.  Testimony of Misty Votaw's and Cody Mayo

At about 7 p.m. that evening, a couple in a nearby apartment complex, Misty Votaw ("Votaw") and Cody Mayo ("Mayo"), agreed to drive Holberg to a different destination. They testified before the jury that Holberg identified herself as "Brittany," stating that her boyfriend had physically assaulted her. Votaw and Mayo noticed blood on the corner of Holberg's mouth and offered to summon medical attention, but she declined their offer. Holberg paid them with two $100 bills, one of which had blood on it. Holberg had at least ten additional $100 bills that she counted in front of them. 19/28 RR 164–99; 21/28 RR 64.

### 4.  Dimitris Pettus's Testimony

Dimitris Pettus ("Pettus") observed Holberg exit Votaw's car near a residence used in the illicit distribution of crack cocaine — colloquially known as a "crack house." Pettus would later tell the police that Holberg had a deep cut on her thumb, bruises on her knuckles, and scratches on her face, neck, and chest. Holberg had initially told Pettus that random girls had physically assaulted her but later stated that she had been in a fight with a "trick." Pettus testified that Holberg had $100 bills and some twenties on her person. Holberg spent between $900 and $1,000 dollars on cocaine and paid for a motel room that evening. 19/28 RR 204–21.

### 5.  Vicki Kirkpatrick's Testimony

Vicki Kirkpatrick ("Kirkpatrick") testified that she and Holberg discussed the murder while incarcerated together in the county jail. Kirkpatrick's testimony is the source of several claims raised in Holberg's petition and discussed below. Kirkpatrick testified that Holberg described the victim as one of her "sugar daddies" who had given her money for years. Additionally, she testified

Holberg told her that Towery refused to give her money. Holberg told Kirkpatrick that they fought after she reached for money in his shirt pocket and he grabbed her arm in response. Kirkpatrick testified that Holberg described the blood issuing from Towery as "pretty, like a fountain" and described the stabbing as "fun and amazing." Kirkpatrick also testified that Holberg told her she jammed a lamp down his throat because he would not stop gurgling, and then Holberg showered and left the apartment without taking all of Towery's money. Kirkpatrick stated Holberg expressed no remorse and said that she would do it all over again for drug money. 19/28 RR 231–49.

### 6. *Pamela Schwartz's Testimony*

Pamela Schwartz ("Pamela") is Holberg's mother and a Potter County deputy sheriff. Pamela testified that Holberg called her from Memphis and admitted that she had killed Towery, though "it was not like they were making it sound." 19/28 RR 261. Holberg told her mother that she was living with Towery at the time and that she had killed him in self-defense after he attacked her for smoking crack. The only money that Holberg took from his apartment was money that she had earned. Pamela also testified that Holberg had previously lived with two other older men, E.R. Williams and a "Mr. Vanaman." 19/28 RR 261–74.

**B. Defense's Evidence**

The defense theorized that Towery was a regular customer of Holberg and other prostitutes, had a violent reputation, and had attacked Holberg in anger after seeing her pipe for smoking crack cocaine (her "crack pipe"). The defense introduced a cartoon and other items found in Towery's apartment that were of a sexual or pornographic nature. They also introduced testimony that about nineteen (19) empty prescription bottles and a half-empty prescription bottle found during the death investigation search of Towery's apartment. 20/28 RR 2–52.

### 1. *Criminologist Testimony*

A criminologist for the defense testified, based on DNA testing, that she found blood consistent with Holberg's blood on a fork, the butcher knife, a blue jacket, a pair of khaki pants, a yellow rubber glove, a washcloth, and the wall phone. She found no blood on Towery's wallet. 20/28 RR 54–86. The defense's hair and fiber expert testified that 23 hairs collected from the victim's body and surrounding crime scene could have originated from Holberg. All the hairs were either broken, torn, or forcibly removed from the scalp. 20/28 RR 120–43.

### 2. *Testimony of Other Prostitutes*

To establish Towery's prior relationship with Holberg and other prostitutes, the defense presented testimony from Johnny Scott Deaver ("Deaver"). This testimony stated that in September or October of 1996, Holberg called an individual named "A.B." from a half-way house and spoke to Deaver about her relationship with "A.B." 20/28 RR 101–15. Additionally, Diana Wheeler testified that she had "serviced" Towery as a prostitute about ten times in 1994 and 1995. 21/28 RR 196–232. Former prostitute Connie Baker testified that her pimp arranged a meeting with Towery at his apartment in the summer of 1996, though she refused to perform the sex acts Towery requested. 20/28 RR 144–70.

### 3. *Russell Towery's Testimony*

Defense counsel introduced evidence of two (2) prior episodes where Towery acted with physical violence. Specifically, Towery's younger son Russell Towery ("Russell") testified that he called the police in 1983 because his father had cut him with a knife during a fight. In 1992, Russell called the police again because Towery—who was living with him—had a "temper tantrum" and was throwing his own property out of the house because he wanted to move. The

8

trial judge also permitted the defense to elicit testimony from Russell stating that when he was nine or ten, his parents would hit each other. 21/28 RR 182–90.

### 4.  *April Carter's and Kim Pirtle's Testimony*

April Carter testified that she and her children were in the apartment next to Towery's around the time of the murder and that she heard a loud disturbance and music coming from Towery's apartment. At about 5:15 or 5:30 P.M., she heard Towery yell "stop that" from an open window. 20/28 RR 88–99. The defense also recalled Pettus, who testified that on the night that she met Holberg, Holberg was frightened, nervous, scared, and devoid of laughter. 20/28 RR 118. Kim Pirtle testified that Vicki Kirkpatrick had a reputation for dishonesty. 21/28 RR 242–48.

### 5.  *Holberg's Testimony*

Holberg testified extensively at the guilt phase of trial.[5] She described how a male babysitter sexually molested her when she was 4 years old. She also described how a stranger sexually assaulted her when she was 13 years old. 20/28 RR 177–78, 182–86, 194–96. Holberg testified that she had a loving but chaotic childhood impacted by her parents' abuse of alcohol, marijuana, and prescription drugs. She testified that her parents provided these substances to her starting at age 10. She dropped out of high school at age 17, married her then-boyfriend, became addicted to prescription pain medicine after injuring her knee, divorced her abusive husband in 1994, and lost custody of her daughter. 20/28 RR 188–206; 21/28 RR 2–3.

Holberg and her aunt Teresa Cobb developed a fraudulent scheme for obtaining prescription pain killers from various dentists. 20/28 RR 211–12, 232–34; 21/28 RR 81–83. When Holberg's addiction reached the level of 100 pills a day, her adoptive father John Schwartz

---

[5] Holberg's guilt-innocence phase trial testimony appears at 20/28 RR 172-263 and 21/28 RR 2-177.

("Schwartz") helped admit her into a drug treatment program. 20/28 RR 213–16. However, the program expelled Holberg for taking pain pills that her aunt smuggled in. 20/28 RR 216–17. Schwartz next admitted her in a hospital for methadone therapy. 20/28 RR 217–18. When she completed this therapy, she attended support meetings as part of her out-patient therapy. It was in these meetings that she encountered drug addicts who introduced her to intravenous cocaine use. 20/28 RR 219–21. Her cocaine use escalated within a short amount of time. To support her habit, she began strip-dancing and topless dancing and later began prostituting. 20/28 RR 222–23. 20/28 RR 223–26; 21/28 RR 6–7. Holberg also testified about her criminal history. Schwartz reported to the police in 1993 that Holberg had taken his gun. 20/28 RR 227. That same year, Holberg received deferred adjudication for writing bad—or "hot"—checks because she was outspending the money that Schwartz put into her bank account. 20/28 RR 228. The State of Texas criminally charged Holberg in 1994 for possession of a controlled substance, possession of drug paraphernalia, and public intoxication, but a jury acquitted her. In 1995, the State of Texas criminally charged her with forgery, delivery of a controlled substance, theft, and unauthorized use of a motor vehicle. The State did not prosecute her for those offenses. 20/28 RR 235. Her mother also filed complaints of theft and forgery against her, but the State did not prosecute Holberg. 20/28 RR 237–39. In 1995, a "john"6 filed a complaint against her for aggravated assault and she was again not prosecuted. 20/28 RR 239–42. In the same year, she was charged with failing to identify herself to a police officer and for possession of a controlled substance. She was then admitted into a drug treatment program run by the state prison ("SAFPF"). She successfully completed the SAFPF's nine-month program and entered a half-way house in 1996. While situated there, a female

---

6 A "john" is a common term for a person who solicits and pays a prostitute for sex.

counselor took a romantic interest in her, provided her with cocaine and alcohol, and helped her pass the urine tests. 21/28 RR 4–5. Holberg obtained a weekend pass from the half-way house the month before she murdered Towery, but she did not return to the half-way house after the pass expired.

Holberg further testified that she first met Towery in 1994 and provided prostitution services to him. She recounted that she would knock on his door and tell him she needed to use the phone. Once inside the house, they then would talk about the true reason for her presence. 21/28 RR 8. She stated that Towery hated drugs and would become angry if she gave the appearance of having taken any drugs. 21/28 RR 9. He would use profanity and say "hateful" things. However, he never hurt her. 21/28 RR 9–10. On the day of Towery's murder, she had been using cocaine with Gary Warren for almost ten days. She had a car accident while driving and high on cocaine, leaving Warren at the scene of the accident because she had outstanding warrants for her arrest. 21/28 RR 11–12. Her plan was to wait for Warren's release and then flee the city. She visited a crack house, bought and smoked some crack, and then called a cab. She smoked more crack while she waited for it. 21/28 RR 13–15.

When the cab arrived, she requested to go to the Princess Apartments. Holberg did not remember stopping at the grocery store, but she also did not deny doing so. She stated that she exited the cab at the Princess Apartments and approached the door before realizing that she was at the wrong building. She told her cab driver Owens that they were at the wrong building and asked him to drive her to the manager's office instead. 21/28 RR 17. There, she exited the taxi and told Owens that her boyfriend would provide her money for the fare. 21/28 RR 17–18. She went to the manager's office and asked to use the restroom, where she cleaned herself up and smoked more

crack. 21/28 RR 18. She left the bathroom and exited the office into the courtyard to wait for Warren at Towery's apartment. She denied having any intent to burglarize the apartment or rob Towery. 21/28 RR 20. When she reached the courtyard gate, she saw Towery on the other side of the gate carrying his groceries. 21/28 RR 21. She asked Towery if she could come to his apartment. He stated that she could and pointed towards the apartment. She then walked in that direction and met him at his apartment door. 21/28 RR 22. After letting Holberg inside his apartment, Towery offered her food and drink while he put his groceries away. She smoked some crack out of his view and placed the pipe by the kitchen sink. 21/28 RR 24–27. When Towery saw the crack pipe, he began to abuse her verbally. 21/28 RR 27–28. Holberg testified that he opened his wallet and retrieved and tossed two $100 bills at her. 21/28 RR 59, 173. She saw that he had more money in the wallet but did not know its quantity or what eventually happened to it. Almost immediately after tossing the bills, Towery struck the back of her head with an unknown object, causing her to bleed. 21/28 RR 29. She pushed Towery away and cleaned her wound in the bathroom. 21/28 RR 30–31. She then went to the bedroom and picked up the telephone. However, Towery then entered the room and pushed her, stating she was not going to call her pimp from his phone. 21/28 RR 32–33. They began struggling against each other and fell into the closet. 21/28 RR 36–37. Holberg ran into the dining area, retrieved a knife from the table, and told Towery that she would stab him if he approached any closer. 21/28 RR 37–39. Nevertheless, Towery grabbed her by the hair. 21/28 RR 39. She thereafter stabbed him in the side multiple times after his refusal to release her hair despite her demands. 21/28 40–41. They stumbled and collapsed against the dining table, and Holberg saw Towery reach for something that she assumed was a knife. 21/28 RR 41–44. She then stabbed his hand, and he eventually released his grip on her hair. 21/28 RR 43.

12

Holberg testified that she had fallen to the kitchen floor and was unable to breathe or stand up. 21/28 RR 45–46. Despite having a knife in hand, Towery was "very wounded," and he rested in his recliner chair. 21/28 RR 44–46. Holberg testified that she asked Towery if he was hurt and he affirmed that he was. 21/28 RR 46. After some time, he arose and resumed attacking her, again grabbing her hair. 21/28 RR 47–49. Holberg then "lost it" and began stabbing him in the face. 21/28 RR 49–50. After falling again, both arose, seizing anything to use as a weapon. During the struggle, Towery struck numerous painful blows to her face. 21/28 RR 50–51. She eventually trapped Towery in a corner while she was striking him, and she tried binding him with an electrical cord. 21/28 RR 21–52. She testified that the struggle continued into the kitchen—with him holding her hair with one hand and a knife with the other—before she knocked him down to his knees. While he was on his knees, Holberg shoved a lamp in his throat "to get him off of" her. 21/28 RR 53. His body slid down the kitchen wall onto its back. 21/28 RR 54. She testified that she stabbed him in the stomach because his hand moved. 21/28 RR 55.

Holberg then undressed and cleaned herself. She had a cut on her chest, a small wound on her stomach, and multiple wounds on her hands. 21/28 RR 57. She stated that her left thumb was cut "very, very bad." She took one of Towery's t-shirts and a pair of pants and put them on before leaving the apartment. 21/28 RR 56, 60. She did not call the police, both because she did not think that they would have believed her and because she was still "extremely high." 21/28 RR 59–60.

In her testimony, Holberg denied sifting through Towery's pockets or placing his wallet on his body. 21/28 RR 60–61. She also denied searching his apartment for money or any pills. 21/28 RR 61. She stated that she instead walked to an apartment complex across the street. She then asked a man known as "Mayo" if she could pay him for a ride. 21/28 RR 62. She told Mayo that

she had fought with her boyfriend, and she asked Mayo not to drive by the Princess Apartments. 21/28 RR 63–64.

Holberg also testified that she visited a crack house where she met Pettus and changed clothing. She then paid for a motel room for the night. She testified that she had about $250 to $300, plus the $200 that Towery had given her. She spent all of the money on drugs. 21/28 RR 65–66. The following morning, a truck driver provided her cocaine, first aid supplies, and transportation out of town. 21/28 RR 66–67.

Holberg further testified that her statement to the Memphis police contained many inaccuracies because of excessive cocaine use and illness. 21/28 RR 72–74. She controverted Kirkpatrick's testimony, denying that she ever discussed her case in jail. 21/28 RR 74–75.

During cross-examination, Holberg made several important statements. Specifically, she admitted that:

- her story had changed significantly since her arrest, 21/28 RR 75–163;

- while the statement given to Memphis police following her arrest accurately reflected what she had told the Memphis police, she was mistaken about several details—including the fact that she knew Towery prior to the date of their fatal encounter, 21/28 RR 76, 78, 108–12, 125, 163;

- her work as a prostitute and stripper involved deception and that she had been successful at deceiving dentists, 28/28 RR 79–83, 95;

- she had filed false police reports and identified herself falsely, 21/28 RR 82–84, 95;

- she had deceived her AA groups and the people at her halfway house about her drug use, 21/28 RR 86-87;

- she had dealt crack cocaine, deceived her family and friends, fraudulently applied for credit, forged checks, written bad checks, and stolen wallets, 21/28 RR 87, 89, 91–93, 96, 168–69;   her stepfather admitted her into her initial drug treatment program and that, after it expelled her, he admitted her into

14

another program and furnished as much support as possible despite his alcoholism, 21/28 RR 101–02;

- she met with Towery 5 to 10 times before entering rehab;

- she was aware that Towery would become angry if she was high on drugs, 21/28 RR 103–07, 113–14, 121, 150;

- she telephoned Towery while in rehab, 21/28 RR 108;

- she intentionally refused to pay her cab driver upon reaching Towery's apartment complex, 21/28 RR 115–18;

- she lied to her own mother about her relationship with Towery, 21/28 RR 131–32;

- Towery was not an agile person and had difficulty moving quickly, 21/28 RR 135;

- she saw that Towery had additional money in his wallet when he gave her two hundred dollars, 21/28 RR 140.

This concludes the Court's summary of Holberg's extensive guilt-innocence phase testimony.

## C. Prosecution's Rebuttal Evidence

The prosecution introduced rebuttal testimony that the Princess II apartment building is known for drug activity. The prosecution offered this detail to suggest that this was Holberg's true destination when she entered Owen's cab—and that she only happened to encounter Towery through the locked gate in Princess I after failing to enter Princess II. 21/28 RR 249–52; *see* 19/28 RR 34, 44–46; 22/28 RR 22; SX SP-261 (map of apartment complex). The prosecution also introduced testimony that Connie Baker was a confidential informant for the police that had never mentioned to the police that she had once met Towery, despite having opportunities to do so. 21/28 RR 259.

### D. Guilt-Innocence Phase Closing Jury Arguments

The jury arguments during the guilt-innocence phase of the trial focused on two issues: (1) whether Holberg killed Towery while committing robbery or burglary and (2) whether she acted in self-defense.

#### 1. The Prosecution's Argument

The prosecution emphasized the evidence that:

- Towery possessed over $1,000 in cash before he died;

- between $100 and $200 was strewn about the apartment after the murder;

- Votaw and Mayo saw Holberg counting out ten to twelve $100 bills after the murder;

- Holberg spent about $1,000 on crack cocaine that evening; and

- Holberg inculpated herself shortly after her arrest by asking the police why she would kill a man for "$1,400 dollars" when at the time she made the statement, the police did not know how much money was missing from Towery's apartment.

The prosecution also argued that there was no other rational explanation for Towery's wallet lying open on his chest. This is because a third party entering the apartment after the murder and rifling through Towery's pockets would also have taken the other bills in plain view on the floor. 22/28 RR 6–12.

In response to Holberg's claim of self-defense, the prosecution noted that Holberg did not exit the apartment even after Towery was seriously injured and incapacitated in his recliner. The prosecution also argued that Holberg did not "inadvertently" shove the lamp into Towery's throat "to get him away." In support of their argument, the prosecution noted that by time Holberg shoved

16

the lamp down Towery's throat, he had fifty-seven stab wounds, a punctured lung, a chip in his skull, and a pulverized nose. The prosecutor challenged the credibility of Holberg's account of the conflict by pointing out that her story had changed over time. 22/28 RR 13-21.

The prosecution further argued that:

- Holberg asked Owens to transport her to Princess II to obtain more drugs;

- on the way to Towery's apartment, she attempted to fill a prescription for pain medicine using a fraud similar to the one she had conducted for several years with her aunt;

- when she was unable to fill the prescription, she proceeded to Princess II;

- when she could not enter the building, she concocted the story about having her boyfriend pay the cab fare and asked Owens to transport her to the manager's office in Princess I;

- Holberg dodged the cab fare by entering the courtyard through the manager's office;

- while she was locked inside the courtyard, Towery just happened to be on the other side, shuffling home from the grocery store;

- Towery pointed to where she could exit the courtyard and met her in the hallway of the building, where she asked to use his phone; and

- once inside she saw the prescription bottles in plain view and attempted to take them, and that is what led to the struggle that ended in his death.

The prosecution noted several additional reasons the jury should doubt Holberg's credibility. Specifically, the prosecution argued that if Holberg had actually provided prostitution services for Towery 5 to 10 times (as Holberg testified), or if she had lived with him (as her mother testified), then:

- Towery would not have had needed to point Holberg in the direction of his apartment;

- Holberg would not have told the Memphis police that she met him for the first

time on the night he died; and

- she would have referred to him by name, rather than as the "old man."

- she would not have initially taken the cab to the Princess II building because Towery lived in Princess I;

- she would not have pressed multiple buzzers to gain access to Towery's apartment;

- she would have known his buzzer was broken; and

- she might have asked the apartment manager for access to her boyfriend's apartment, rather than slip through the office into the courtyard.

The prosecution also argued that if Holberg had previously called Towery from the halfway house, then the defense could have provided phone records to prove it. The prosecution further argued if she had been in possession of $250 of her own money, then she could easily have paid Owen for her cab fare rather than deceiving him. 22/28 RR 21–28, 62–86.

### 2. *The Defense's Argument*

The defense's argument closely followed Holberg's testimony. The defense asserted that her actions were a result of fear heightened by cocaine use. The defense reminded the jury that Holberg's parents had introduced her to drugs and alcohol at a young age. The defense also argued that Towery entered into a state of rage akin to those witnessed years earlier by Towery's sons. The defense further argued that:

- Holberg resorted to force only after Towery struck her on the head and pursued her as she attempted to retreat;

- Towery attacked her by seizing and pulling out her hair;

- Holberg stabbed Towery only because her neck was exposed, she could not see his hands, and she thought he had picked up a weapon; and

- Holberg reasonably feared for her life throughout the confrontation.

18

The defense noted that most of Towery's stabbing-induced wounds were not serious, but rather only one-quarter to one-half inch deep. The defense further noted that the 5 to 8 potentially fatal wounds Holberg inflicted on Towery were necessarily inflicted at the end of the struggle. The defense argued that Holberg retreated from the confrontation a third time when she dropped the knife while sitting on the kitchen floor. However, Holberg could not exit the apartment because she could not breathe and thought she was having a heart attack. The defense argued that when Towery attacked her for the fourth and final time, Holberg:

- could not psychologically process the rapid trauma that she was experiencing;

- attempted to tie up Towery;

- shoved the lamp into his throat to repel him while he was doubled over; and

- became fearful when Towery's hand twitched, which prompted her to stab him in the abdomen.

The defense argued that Holberg intended only to call Warren from Towery's apartment when Warren finished processing the car accident, asserting that any theft was an afterthought. It also argued that Holberg experienced a heightened sense of fright due to the abuse and assaults in her past. The defense further argued that Holberg had freely admitted that there were times in the past when she had lied. The defense noted that the medical examiner had agreed that it was possible that the lamp entered Towery's mouth by means of a non-intentional act. The defense also noted that if Holberg had stolen as many pill bottles as the prosecution theorized someone would have seen them on her person. Further, the defense argued if Holberg had opened Towery's wallet, law enforcement would have found blood on the wallet because Votaw, Mayo, and Pettus all witnessed Holberg bleeding that night.

The defense argued that prostitutes Baker and Wheeler were necessarily credible witnesses because the police paid them to be confidential informants. It further argued that Kirkpatrick was not credible because she had criminal charges pending, her testimony conflicted with that of Pettus, and the physical evidence did not support her assertion that Holberg saw blood spurt "like a fountain." Finally, the defense argued that the evidence supported Holberg's version of events because most of Towery's stab wounds were to the back. 22/28 RR 28–62.

### E.  Guilt-Innocence Phase Verdict

The jury began deliberating at 12:33 P.M. on March 13, 1998. At 4:22 P.M., the jury sent two notes inquiring about the definitions of robbery and burglary. The trial judge referred the jury to the written instructions already provided and did not otherwise answer the questions. At 5:38 P.M. on the same day, the jury returned a unanimous verdict, finding Holberg guilty of capital murder as charged in the indictment. 22/28 RR 89–93; 8 CR 645.

## II.   PUNISHMENT PHASE

The punishment phase of Holberg's capital trial began ten days after the jury found Holberg guilty of capital murder.

### A.  Summary of Prosecution's Punishment-Phase Evidence

The prosecution began the punishment phase by re-introducing all of the evidence from the guilt-innocence phase of trial. 23/28 RR 19–20.

#### 1.  Linda Hagan's Testimony

Towery's daughter Linda Hagan ("Hagan") testified that Towery was limited in his physical capabilities, could not walk long distances, and required the assistance of a wheelchair during a trip to her home in the Pacific Northwest in 1993. 23/28 RR 24–26. Hagan was unaware of anything indicating that Towery was involved with any female. 23/28 RR 27, 29.

### 2. *Katina Dixon's Testimony*

Katina Dixon ("Dixon") testified that she was serving a state jail sentence for theft by check and was facing charges for parole violation and disorderly conduct. 23/28 RR 34–35, 42. She met Holberg prior to serving her sentence but became reacquainted in state jail. 23/28 RR 35, 45, 49. Holberg informed Dixon that Kirkpatrick was a close friend of Holberg's who had given the prosecution information to use against Holberg. 23/28 RR 36–37. Holberg then offered Dixon money to "shut Vickie up." 23/28 RR 37. Dixon did not believe Holberg to be serious until Holberg's persistence persuaded her otherwise. 23/28 RR 37–38. Dixon believed that Holberg had paid others inside the jail to assault an inmate named "Chuck" who had called Holberg a murderer. 23/28 RR 38–39. Dixon did not assault Kirkpatrick despite having the opportunity because she did not believe Holberg's earlier offer to have been serious. 23/28 RR 41–42, 44. Finally, Dixon had not received anything for her testimony at the trial. 23/28 RR 42–43, 55–56.

### 3. *Mary Jane Burnett's Testimony*

Mary Jane Burnett ("Burnett") testified that she met Holberg in 1995 inside the Randall County Jail prior to Towery's murder while detained on a charge of delivery of a controlled substance and on probation for theft. 23/28 RR 61, 63, 68. Burnett later entered a state drug and rehabilitation facility for treatment for a cocaine addiction. 23/28 RR 62. Holberg told Burnett that Holberg was concerned that police would discover an incident in which Holberg struck—and possibly killed—a different older man who was also one of Holberg's clients. 23/28 RR 63–66. Burnett believed Holberg was "a young kid bragging about her escapades," however, and did not believe her story. 23/28 RR 66. But when Burnett heard about the Towery murder, she contacted her probation officer to inform him of what Holberg had told her. 23/28 RR 67–68.

### 4. *Corena Sue Norrell's Testimony*

Corena Sue Norrell ("Norrell") testified that she had been in a substance abuse treatment center with Holberg about ten years prior to the trial. 23/28 RR 75. Holberg told Norrell about an incident in which Holberg feared that she might have killed a man after breaking into his house and striking him with a cane. 23/28 RR 77–78. Holberg later learned of the man's death and feared that she was responsible for it. 23/28 RR 78. Norrell did not initially believe Holberg's story, but after reading about the Towery murder, she came to believe that Holberg might have committed an earlier murder. 23/28 RR 79. She testified that she had made no deal in exchange for her trial testimony. 23/28 RR 81.

### 5. *Richard Bernal's Testimony*

Probation officer Richard Bernal ("Bernal") testified that he met Holberg in August 1995 while interviewing her. 23/28 RR 92–93. A court ordered Holberg to receive treatment at a residential substance abuse treatment center. 23/28 RR 94. Holberg made several statements to Bernal during this interview. Specifically, she:

- admitted to having dealt drugs to support herself, 23/28 RR 97;
- stated that she had a good, very happy, childhood in which she had everything she wanted, 23/28 RR 98, 100–01;
- stated that she adored and was close to her mother, 23/28 RR 99, 101, 103;
- denied either of her parents abused her, 23/28 RR 99–100;
- denied that her ex-husband abused her, 23/28 RR 102;
- admitted to having once broken her husband's nose and to having cut another person with a knife, 23/28 RR 110;
- failed to mention any drug abuse during her childhood but explained that her

22

drug use began after her divorce, 23/28 RR 111–12, 115–16;

- ▪ admitted that she neglected her child, 23/28 RR 116.

Holberg's records indicate that she cooperated during her residential drug treatment programs. 23/28 RR 122–23, 126–27. Holberg responded to a questionnaire with answers indicating that she did not like to obey the law, was disrespectful of authority, and did not take her responsibilities seriously. 23/28 RR 107–08, 124–25. Holberg once absconded from a halfway house after completing a drug treatment program. 23/28 RR 127.

### 6. Dr. Richard Coons's Testimony

Attorney and forensic psychiatrist Dr. Richard Coons ("Dr. Coons") testified that, based upon Holberg's statements, correspondence, the facts of the case as recited by the prosecution, and the statements of Holberg's mother and other trial witnesses, in his opinion there was a probability that Holberg would commit criminal acts of violence in the future that would constitute a continuing threat to society. 23/28 RR 153–56. The extreme level of sustained violence involved in the Towery murder—including the "gratuitous lamp down the throat"—convinced him that Holberg posed a threat of future dangerousness to society. 23/28 RR 154, 160.

### B. Summary of the Defense's Punishment Phase Evidence

The defense called upon several witnesses to support its theory that Holberg did not pose a threat of future dangerousness and that their circumstances that mitigated her crime.

### 1. John Schwartz's Testimony

Holberg's adoptive father Schwartz testified that he met Holberg's mother Pamela when Holberg was about three years old. He further testified that he and Pamela married about two years later, before Holberg began attending school. 24/28 RR 4. He and Holberg's mother have been divorced and have remarried several times. 24/28 RR 4, 25–26. He described Holberg as an

outgoing, energetic, healthy, friendly, and intelligent child, who performed well in school, was active in sports, and volunteered as a candy striper at the hospital. 24/28 RR 5, 8–9, 27–28. Schwartz's marriage to Holberg's mother grew difficult after his brother-in-law murdered Schwartz's sister. The crime devastated their entire family—including the teenage Holberg, who was 13 or 14 at the time and had been especially close to Karen. 24/28 RR 6. After Karen's murder, Holberg witnessed her mother and stepfather increase their drug and alcohol abuse to cope with Karen's death. 24/28 RR 6–8. As a result, Holberg learned to abuse drugs and alcohol as well. 24/28 RR 21–24.

Holberg reported to her mother that she had been sexually molested around the age of 5. 24/28 RR 40. Schwartz did not learn about that incident until 10 to 12 years later because Holberg's mother never told him about it. *Id.*

Around the age of 14 or 15, two men followed Holberg from a grocery store and assaulted her in an alley. 24/28 RR 17, 39. Holberg fought the men but she became distrustful of men in general following the incident. *Id.*

Schwartz testified that when Holberg entered high school, she became "boy crazy." 24/28 RR 9. Holberg earned her driver's license and found a job working as a physical therapist at a hospital. *Id.* At the age of 16, Holberg ran away from her home to California with her then-boyfriend Ward Holberg ("Ward"). 24/28 RR 10. Schwartz followed Holberg to California and brought her back to their home. 24/28 RR 10. Holberg threatened to run away again unless her parents allowed her and Ward to marry. *Id.* Both sets of parents agreed to the marriage conditioned upon Ward's receiving a high school diploma. *Id.* Holberg then married Ward and dropped out of high school, though she later earned a GED. 24/28 RR 11. Holberg worked while Ward entered

24

the military and moved to Alabama for basic training. *Id.* Holberg moved to Tulsa, Oklahoma, to live with Ward's parents. *Id.* While living in Oklahoma, Holberg suffered another assault and moved back to Texas. 24/28 RR 12.

After Ward completed basic training, Holberg moved to California with him. *Id.* There, she became pregnant. *Id.* During a visit to California in the summer of 1992, Schwartz noticed that Holberg was "doing way too many" prescription pain killers for her injured knee and was experiencing a difficult pregnancy. 24/28 RR 12. Shortly after the birth of her child, Holberg returned to Amarillo with her child and was addicted to pain pills. 24/28 RR 14. Holberg's mother—who still was abusing drugs and alcohol—allowed Holberg and a friend to live with her while forbidding Holberg from bringing her daughter with her. 24/28 RR 24. As a result, Holberg's daughter lived with Schwartz and his mother. This damaged Holberg's relationship with her daughter. 24/28 RR 24–25. Holberg's daughter currently lives with her biological father, Ward. 24/28 RR 47.

Schwartz admitted Holberg into multiple drug rehabilitation programs but told her that "as soon as insurance runs out, you're cured." 24/28 RR 14–15. Holberg's downward drug-related spiral continued. Schwartz testified that Holberg suffered multiple severe beatings and was gang-raped—all after doing crack cocaine. 24/28 RR 16–17, 42–43. Those incidents had a lasting psychological impact on her. *Id.* Holberg lived for a time with an older man named E.R. Williams who paid her for sex and allowed her to drive his car. 24/28 RR 53–54.

Holberg successfully completed a state-run drug treatment program ("SAFPF"), and her mental attitude improved until she went to a certain halfway house. Schwartz this halfway house

described as a "nice little drug house," where Holberg was exposed to "disturbing behavior" by both the staff and clients. 24/28 RR 19–21.

Schwartz testified that although he had seen Holberg defend herself, he did not believe that she was a violent person, even after her confrontation with Towery. 24/28 RR 36–38. Schwartz further considered Holberg's probation officer Bernal to be untruthful and incompetent. 24/28 RR 44–46.

### 2.   *Teresa Lynn Cobb's Testimony*

Schwartz's sister and Holberg's aunt Teresa Lynn Cobb ("Cobb") testified that she met Holberg shortly before Schwartz's and Pamela's marriage. At the time, Holberg was four years old, while Cobb was sixteen. 24/28 RR 56–57. In Cobb's senior year of high school, Schwartz and Pamela drank alcohol and smoked marijuana heavily in Holberg's presence. 24/28 RR 58–59. Cobb testified that Holberg learned from her parents to treat marijuana and alcohol as coping mechanisms, and Holberg's substance abuse continued into her adulthood. 24/28 RR 70.

Cobb testified candidly that she also struggled with drug abuse. Specifically, Cobb resigned from her position as a schoolteacher upon becoming addicted to prescription pain medication following oral surgery. She also was convicted of shoplifting around the same time. 24/28 RR 71, 75–76. A year later, Cobb began using cocaine. 24/28 RR 71. Upon returning to Texas from California, Holberg became addicted to prescription pain killers. 24/28 RR 63. Cobb and Holberg began abusing this medication together and deceiving dentists and doctors to get access to more medication. 24/28 RR 64. Cobb also abused marijuana, cocaine, Valium, and methamphetamine. 24/28 RR 78. Cobb and Holberg frequently used cocaine together and were mutually co-dependent in this regard. 24/28 RR 64–65, 67, 78–79.

Cobb achieved sobriety from drugs in June of 1995 and is now a licensed chemical dependency counselor. 24/28 RR 72, 78–79. She testified that there is a high rate of recidivism among drug addicts, and less than two percent ever recover fully. 24/28 RR 72. She also testified that long term cocaine abuse causes changes in the brain. 24/28 RR 91. Additionally, she stated addiction in children inhibits emotional development. 24/28 RR 90–91.

As a child, Holberg was bright, precocious, in the gifted and talented program at school. However, she was also manipulative and clever and had learned how to deceive her family. 24/28 RR 61, 85–86, 90–91. Cobb's mother was an educator who worked with her grandchildren, including Holberg. 24/28 RR 61. Holberg had good relationships with Cobb and Cobb's sisters Peggy, Karen, and Anne. 24/28 RR 62. The murder of Holberg's aunt Karen devastated their entire family. *Id.*

Cobb twice reported Holberg to police, once for stealing from her and once for breaking into her car. 24/28 RR 84, 88–89. Being manipulative and self-serving are two common attributes of those involved in the drug culture. 24/28 RR 85–86, 90–91. While Cobb did plead guilty to shoplifting and admitted to deceiving doctors for drugs, she has never committed a violent felony. 24/28 RR 64, 76, 80, 82.

### 3. Kristi Samperi's Testimony

Holberg's childhood friend Kristi Samperi ("Samperi") testified that she met Holberg in elementary school, where Holberg was very popular, happy, active in sports, and well-liked by everyone. 24/28 RR 96–97. Due to the considerable alcohol and drug use in Holberg's home, Holberg grew up surrounded by addiction. 24/28 RR 99, 125–26. The murder of Holberg's aunt Karen tore her family apart. 24/28 RR 105–06. Following that, Schwartz's and Pamela's drug and alcohol abuse worsened, and they began leaving Holberg unsupervised. 24/28 RR 106. Pamela

27

also provided Valium to Holberg and instructed her on how to acquire it from doctors and dentists. 24/28 RR 107, 123. In middle school, Holberg became depressed and began dating several boys. 24/28 RR 97–98. Although Schwartz was very protective of Holberg, Pamela showed little concern toward her 24/28 RR 98, 125, 127. At the age of 16, Holberg received beer and marijuana from Schwartz. 24/28 RR 100. At the same age, she ran away with her boyfriend Ward and was absent for 2 to 3 weeks. 24/28 RR 100–01. Holberg and Ward married when she was 17. 24/28 RR 101–02.

Samperi visited Holberg and Ward in California in January of 1993 and witnessed firsthand the constant fights that the couple had as well as Ward's abusive behavior. 24/28 RR 103, 122. Holberg and her daughter joined Samperi when she returned to Texas. 24/28 RR 104. Initially, Holberg and her daughter lived with Holberg's grandmother. *Id.* However, Holberg and Samperi later moved to live with Pamela, who forbade Holberg's daughter from joining them. *Id.* At the time, Holberg was abusing Vicodin and very hurt over her divorce. 24/28 RR 105. There was a "party atmosphere" at Pamela's house—lots of marijuana and alcohol abuse. 24/28 RR 107–08.

In 1994, Samperi and Holberg separated, and Samperi never saw Holberg's subsequent cocaine abuse. 24/28 RR 113, 115. Holberg wrote to Samperi from SAFPF and described her family life as "good." 24/28 RR 115–18. But Samperi believes Holberg's family was not an adequate one for a child. 24/28 RR 128. Samperi gave Holberg's letters to her to Ward, who was involved in a child custody dispute with Holberg's family at the time. 24/28 RR 114–15.

### 4. *Dr. Patel's Testimony*

The defense's mental health expert was Dr. Dhiren Patel ("Dr. Patel"), a psychiatrist with experience both directing substance abuse treatment programs and working with veterans experiencing post-traumatic stress disorder ("PTSD"). Dr. Patel testified that after conducting two

multi-hour clinical interviews with Holberg, reviewing records from Holberg's medical hospitalizations, probation, and substance abuse treatment programs, listening to the testimony of the defense witnesses summarized above, speaking with Holberg's grandmother, and examining relevant crime scene photographs, he believed there was a low probability Holberg would commit any violent acts if incarcerated. 24/28 RR 131–38, 169, 176. Dr. Patel emphasized repeatedly throughout his testimony that crack cocaine addicts such as Holberg act violently only when high on drugs, not when sober. 24/28 RR 138–39, 141–44, 146, 149–51, 188–89. He also opined that drug addiction is a disease, much like alcoholism. 24/28 RR 222–23. Dr. Patel repeatedly pointed to Holberg's crack cocaine addiction as the primary source of her extremely violent assault upon Towery.

Dr. Patel further testified that Holberg also suffers from the deleterious effects of Battered Women's Syndrome ("BWS") and post-traumatic stress disorder ("PTSD") resulting from a lifetime of numerous physical, sexual, and verbal assaults prior to her fatal encounter with Towery. 24/28 RR 144–51, 184–90. He linked her drug addiction to these two conditions as well. 24/28 RR 147, 151. He testified that there is a genetic basis for addiction in the children of alcoholics, like Holberg. 24/28 RR 190–91. His review of the crime scene photographs established that Holberg's encounter with Towery was extremely violent. But it was also consistent with the emotionally explosive behavior of a person suffering the effects of BWS and PTSD as well the paranoid behavior of a person high on crack cocaine. 24/28 RR 141–51. Dr. Patel explained that Holberg was high on crack at the time of her encounter with Towery, was the product of a very dysfunctional family life, and displayed symptoms typical of people suffering from BWS and PTSD—such as feelings of low self-worth, anger, frustration, depression, and pain, resulting in an

unpredictable explosion of emotions. *Id.* Dr. Patel testified that there is a tendency for people to become less violent as they age. 24/28 RR 152, 212. Dr. Patel testified that Holberg's incompatible accounts of her encounter with Towery were consistent with her extensive history of crack addiction. He explained that crack-cocaine addiction tends to generate confused memories—especially regarding the passage of time—and can lead to permanent brain damage. However, Dr. Patel was unaware of any tendency toward violence by inmates suffering from brain damage absent active drug abuse. 24/28 RR 153–54, 200–02.

When confronted during cross-examination by hearsay accounts of alleged violence by Holberg, Dr. Patel insisted that he needed to know *all* the circumstances of those incidents. Specifically, he stated that the most important circumstance to know is the identity of the aggressing party in each incident. Only then could he ascertain whether the incidents raised during cross-examination altered his opinion regarding Holberg's low probability of future violence. He also testified that he placed very little weight on reported instances of purely verbal comments, threats, or alleged solicitation of violence as indicators of future violence.[7] 24/28 RR 178–79, 182. He opined that manipulative behavior of the kind alleged against Holberg was consistent with drug abuse. 24/28 RR 210. Dr. Patel also emphasized that when dealing with incarcerated persons, it is important to acquire corroborative information from family and friends before relying upon what inmates report about themselves. 24/28 RR 16869, 174. Dr. Patel concluded that Holberg requires treatment for her chemical dependency, history of abuse, and BWS and PTSD. 24/28 RR 151.

---

[7] Holberg's trial counsel also showed Dr. Patel the death certificate for Elmer Ray Williams, which indicated that Williams died from pancreatic cancer, not from an alleged blow to the head as reported by a prosecution witness. 24/28 RR 156-57. Dr. Patel testified that pancreatic cancer is fast acting and relatively painless. 24/28 RR 158.

### 5.  *Sandra Jo Baker's and Pat Karnes's Testimony*

Holberg's middle school counselor, Sandra Jo Baker ("Baker"), testified that Holberg liked to spend time in Baker's office. Baker described Holberg as personable, outgoing, wanting to be liked, well-behaved. 25/28 RR 3–5. She testified that Holberg's teachers believed that Holberg was very bright but were concerned that Holberg failed to realize her potential. 25/28 RR 5. Baker recalled only one telephone conversation with Holberg's mother during which Pamela was angry and unhelpful. 25/28 RR 6. Baker tried to help Holberg work through her emotional trauma and grief after Holberg's aunt Karen's death. 25/28 RR 6–7.

Retired counselor and family friend Pat Karnes ("Karnes") testified that she met Holberg when Holberg was three or four and found her to be a lovely child. 25/28 RR 26–31. Holberg was a popular and successful little girl. 25/28 RR 32. Karnes lost touch with Holberg upon moving away but returned to attend the wedding of Holberg's aunt Peggy. 25/28 RR 33. By then, Holberg was in middle school, seemed "overexcitable," was "trying too hard to be too grown up," showed what Karnes believed was a premature interest in boys, and needed greater structure in her life. 25/28 RR 33–34. Karnes visited the Schwartz household once during Holberg's preschool years, where she witnessed Schwartz and Pamela smoking pot. 25/28 RR 35. Karnes wrote to Holberg while Holberg was in SAFP, but she lost contact shortly after Holberg moved to the halfway house. 25/28 RR 38. Karnes reconnected with Holberg after law enforcement arrested Holberg for capital murder. 25/28 RR 39.

### 6.  *Ella Gibbs's Testimony*

Randall County jail ministry volunteer Ella Gibbs ("Gibbs") testified that she had known Holberg for over three years, having first met her in September 1994 and then remained in contact with her release in January of 1995. 25/28 RR 10–11. Gibbs learned from Holberg's father that

Holberg was living with E.R. Williams. 25/28 RR 12. She offered to make room for Holberg in her own home. *Id.* Holberg lived briefly with Gibbs in January of 1995, at which time Holberg had an addiction to pain medication. *Id.* Holberg visited the home of Gibbs' daughter, where she experienced a drug overdose and exhibited convulsions requiring her hospitalization. 25/28 RR 13. Gibbs unsuccessfully attempted to admit Holberg into drug rehabilitation. 25/28 RR 15. However, Holberg was able to enter a drug rehabilitation program in Plainview. *Id.* Gibbs did not hear from Holberg again until February or March or 1997, and she did not see Holberg until May of 1997. *Id.* Since then, Holberg has been a member of Gibbs' jail Bible study, where she volunteered to help lead a study of the book of Exodus. She also has been very remorseful. 25/28 RR 16–17. During cross-examination, Gibbs admitted that Holberg had obtained prescription drugs illegally by using the names of Gibbs' children. 25/28 RR 20.

### 7.  *State Officials' and Employees' Testimony*

A Randall County Sheriff's Deputy and jail records custodian testified that although prosecution witness Burnett's stay in jail overlapped with Holberg's, Burnett never shared a cell with Holberg. 25/28 RR 54–59.

Cliff Marshall ("Marshall") is an investigator for the Texas Department of Criminal Justice's ("TDCJ's") State Council for Defenders, an agency which represents inmates primarily in civil proceedings. Marshall testified generally about the procedures for processing and classifying new inmates, cell life and work life inside TDCJ facilities, and visitation policies at different classification levels. 25/28 RR 61–78, 83, 88, 98. Marshall also testified that TDCJ requires all female inmates to work, and TDCJ opens and screens inmate correspondence for contraband. *Id.* Marshall explained sometimes contraband enters TDCJ when visitors pass contraband to inmates during visitation. Marshall testified he has investigated many serious

offenses committed inside the TDCJ system. Even so, Marshall stated he has never encountered cocaine inside a TDCJ facility. He also explained that violent offenses committed by female TDCJ inmates are extremely rare. 25/28 RR 78–90, 96–98.

Randall County Jail supervisor Cindy Risley ("Risley") testified that Holberg had difficulty sleeping, made "crying noises," but never shed tears. 25/28 RR 127–29. Jail staff disciplined Holberg for behavioral violations including incidents talking to male inmates through a wall and instigating an altercation with another female inmate. 25/28 RR 128–31. During a previous detention at the jail, Holberg was involved in five or six altercations with other inmates, the majority of which she initiated. 25/28 RR 131–32. No incident reports were ever prepared on most of these prior disciplinary incidents. 25/28 RR 134–35.

Randall County Jail deputy Mark James Boatman ("Boatman") testified that Holberg had not had any disciplinary infractions since February of 1997. He also testified that he had never encountered any disciplinary problems or difficulties with her. 25/28 RR 136–38. In an incident in 1995, Holberg pushed another inmate after a verbal exchange between the two of them about a "sugar daddy." However, Holberg obeyed Boatman's subsequent order to return to her cell. 25/28 RR 138–39.

### 8. Melissa Wiseman's Testimony

Melissa Wiseman ("Wiseman") is one of Holberg's former cellmates at the Randall County Jail. Wiseman testified TDCJ housed her with Holberg and prosecution witness Vicki Kirkpatrick for a month and a half. Wiseman further denied that Holberg had ever described stabbing Towery in the manner described by Kirkpatrick. 25/28 RR 104–06, 108, 111, 117. Instead, Holberg had nightmares about her encounter with Towery and often awoke with cold sweats. 25/28 RR 107.

33

Holberg also told Wiseman that Towery had been her "sugar daddy" and that Towery had started the confrontation on the day of the murder by attacking Holberg. 25/28 RR 121–24.

### C. Prosecution's Rebuttal Evidence

During its rebuttal, the prosecution called Royce Smithee ("Smithee"). Smithee is a chief investigator for the state's Special Prosecution Unit, an agency responsible for assisting local prosecutors with the investigation and prosecution of offenses committed within TDCJ facilities. 25/28 RR 141–42. Smithee stated several facts about Texas's criminal justice system:

- there are around 10,000 female inmates in the TDCJ out of about 145,000 total inmates, 25/28 RR 144;

- guards and visitors have smuggled contraband into TDCJ units , 25/28 RR 146–49;

- there are only six female inmates on Texas's death row, 25/28 RR 158;

- drugs and weapons are available inside TDCJ facilities;

- violence occurs in Texas prisons, 25/28 RR 161-62; and

- there is no mandatory drug treatment program for those convicted of capital murder, 25/28 RR 169.

### D. Punishment Phase Jury Arguments

In its initial closing argument, the prosecution recounted the grisly details of Holberg's capital offense and reminded the jury of its duty to follow the oath administered at the start of the trial. 25/28 RR 176, 178–80, 188–89. The prosecution argued the jury had a duty to answer the special issues and the jury should not neglect its duty out of sympathy for Holberg's age, gender, or difficult family background. 25/28 RR 180–81. The prosecution further argued that Holberg had admitted during her testimony that she had engaged in many other offenses—some of which involved elements of deception and manipulation. 25/28 RR 182. The prosecution argued that (1)

its witnesses—specifically, Dixon, Norrell, and Bennett—were credible, (2) Dr. Coons had concluded that Holberg posed a threat of future violence, and (3) Smithee had made it clear that TDCJ inmates seeking violence can fulfill that desire. 25/28 RR 185–86. Finally, the prosecution argued that Holberg's testimony attributing great strength to the elderly Towery was not credible. 25/28 RR 184.

The prosecution stated that it was unclear whether E.R. Williams died because of cancer. 25/28 RR 183. The medical examiner did not conduct an autopsy to determine whether Mr. Williams had a head injury because morticians cremated his body. *Id.* The prosecution argued that Dr. Patel was unaware of Holberg's many violent acts inside the Randall County Jail, the instances in which Holberg behaved violently toward E.R. Williams and her husband Ward, or Holberg's admission that she had cut someone with a knife. 25/28 RR 186. The prosecution also challenged Dr. Patel's dismissal of the allegation that Holberg solicited an assault on another inmate. 25/28 RR 187. Specifically, it insisted that paying another person to commit an assault is itself a violent act. *Id.*

The prosecution then turned to the evidence of Holberg's childhood difficulties, arguing that most people who are raised around alcohol and marijuana do not resort to the severity and level of violence that Holberg inflicted upon Towery. 25/28 RR 187–88. The prosecution further argued that Holberg's molestation at a young age and the death of her aunt did not destroy Holberg's character because she did not develop any drug problems until after she had left home and was married. 25/28 RR 188. The prosecution argued that Holberg was responsible for her choices as an adult, including her choices to use drugs, engage in prostitution, and lead a life filled with deception, manipulation, and violence. 25/28 RR 188–89. The prosecution concluded the first

part of its argument by making a call for the enforcement of the law and arguing rhetorically "where's the mitigating evidence?" 25/28 RR 190–91.

Defense counsel Catherine Dodson sought to explain that she was attempting to explain, not excuse, Holberg's offense. 25/28 RR 193. She pointed to the evidence showing the low level of violence among female TDCJ inmates. 25/28 RR 194. She also emphasized the special issue of future dangerousness required a finding of a probability of future violence, not merely a possibility. *Id.* Dodson pointed out that Holberg would be sixty-four before becoming eligible for parole, which drew a sustained objection from the prosecution. 25/28 RR 195. Dodson argued that:

- Holberg's other offenses had not been violent;

- there was no direct evidence that Holberg broke her ex-husband Ward's nose;

- there was no direct evidence that Holberg paid anyone to assault another inmate;

- Mary Burnett was held in a different part of the jail from Holberg;

- E.R. Williams died of natural causes in hospice;

- Dr. Patel emphasized the need to know who the aggressor was in any of the incidents identified by the prosecution; and

- there was no physical evidence there had been a fountain of blood as claimed by prosecution witness Kirkpatrick.

25/28 RR 196–201. She also argued that Holberg had complied with program rules while at the SAFP. 25/28 RR 195. Dodson argued that prosecution witness Dixon never stated that Holberg told or asked her to kill Kirkpatrick. Instead, Holberg wanted simply to "shut [her] up," and there were no letters or other evidence showing that Holberg ever paid Dixon at all. 25/28 RR 200–02. Dodson also argued that Wiseman credibly testified that the conversation reported by prosecution witness Kirkpatrick never transpired. 25/28 RR 201. Dodson concluded by reminding the jury of

36

Dr. Patel's conclusion that Holberg's level of violence during her encounter with Towery was the product of BWS, PTSD, and, primarily, drug usage, and that access to drugs inside the TDCJ, though possible, was not probable. 25/28 RR 204.

Holberg's other counsel Candace Norris explained that she was responsible for Holberg's clothing worn throughout the trial—including the hair bow mocked by the prosecution—and asked the jury not to punish Holberg for her trial attire. 25/28 RR 201. Norris also reminded the jury that they did not have to agree on what constituted mitigating evidence and that the defense's evidence had been intended to explain but not excuse Holberg's behavior. 25/28 RR 209. Norris argued that Holberg never learned how to make properly make choices but instead resorted to manipulating others to survive given her parents' failure to fulfill her needs at home. 25/28 RR 210, 213. Norris argued that Holberg's parents allowed Holberg to drop out of school, thereby forcing her to live as an adult when she was not ready to do so. 25/28 RR 211. Norris further reminded the jury of Holberg's trauma witnessed by Karnes regarding the death of Holberg's aunt and Dr. Patel's testimony about the impact of addiction. She then argued that Holberg deserved a life sentence, which describing it as "no treat." 25/28 RR 212–17.

The prosecution began the final portion of its closing punishment-phase argument by reminding the jury that Holberg stabbed Towery 58 times, struck him multiple times with multiple objects—including a hammer—and ended Towery's life by forcing a lamp five inches down his throat. Holberg then stole Towery's drugs and money and traveled immediately to a crack house, where she purchased even more drugs. 25/28 RR 220–21, 223, 230–31. The prosecution argued the future dangerousness special issue could be answered from the guilt-innocence phase evidence alone. 25/28 RR 22, 227. The prosecution also argued there was no reason for prosecution

witnesses Mayo and Votaw to testify falsely about seeing Holberg counting multiple $100 bills or Holberg's confession to others that she had broken her ex-husband's nose and stabbed another person. 25/28 RR 221, 227.

The prosecution again argued that while it could not say whether Holberg killed E.R. Williams, she clearly did assault another inmate while in jail and was engaged in a pattern of violence. 25/28 RR 229–30. The prosecution again reminded the jury that the extent of Towery's injuries made Holberg's claims of being unable to escape or withdraw from the confrontation incredible. 25/28 RR 231. Finally, the prosecution urged the jury to examine the crime scene photographs, asking rhetorically whether a life sentence for Holberg was fair to the Towery family and remarking that "there's 58 other reasons why the death penalty should be imposed." 25/28 RR 233–34.

### E. Punishment Phase Verdict

On March 26, 1998, the jury began its deliberations at 10:10 A.M. 25/28 RR 234. At 9:01 P.M. of the same day, the jury returned its verdict, finding (1) unanimously and beyond a reasonable doubt that there was a reasonable probability that Holberg would commit criminal acts of violence that would constitute a continuing threat to society and (2) unanimously that, taking into consideration all of the evidence, including the circumstances of the offense and the defendant's character, background and personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence be imposed. 25/28 RR 235–37; 8 CR 655–56. After polling the jury, the state trial court accepted its punishment phase verdict. 25/28 RR 238–39.

III.   POST-CONVICTION PROCEEDING

A.   Direct Appeal

Holberg appealed. On September 7, 1999, attorney David L. Botsford filed Holberg's

appellate, presenting 47 points of error.[8] On November 29, 2000, the Texas Court of Criminal

---

[8] As points of error in her 257-page direct appeal brief, Holberg argued that (1) she was denied her right to an impartial jury because the jury was "death qualified," i.e., organized to return a verdict of death" (point 1); (2) the prosecution improperly sought to have her sentenced based upon religious beliefs (point 2); (3) the state trial court erroneously failed *sua sponte* to exclude evidence and jury argument presented by the prosecution that improperly injected Christian religious beliefs into the jury's deliberations (point 3); (4) the trial court erred in failing to exclude juror B_ C_ as biased (point 6); (5) the trial court erred in excusing for cause venire member B_ F_ without first permitting defense counsel to attempt to rehabilitate the venire member (point 8); (6) the trial court erred in excluding venire member A_ B_ for cause (point 9); (7) the Texas capital sentencing statute constitutes an unconstitutional establishment of religion, violates due process principles, and violates the Eighth Amendment (points 10-11); (8) her constitutional rights were violated by virtue of the admission of uncorroborated evidence of unadjudicated bad acts and extraneous offenses during the punishment phase of her capital murder trial (point 12); (9) the trial court erred in admitting the testimony of prosecution witnesses Corena Norrell and Mary Burnett because they were not timely disclosed to the defense (point 14); (10) there was legally insufficient evidence to support the jury's affirmative answer to the future dangerousness special issue because clear proof of prior bad acts and unadjudicated extraneous offenses was absent (point 15); (11) there was factually insufficient evidence to support the jury's affirmative answer to the future dangerousness special issue (point 16); (12) the robbery/murder aggravator is unconstitutionally overbroad as applied to Holberg's case (point 17); (13) there was legally insufficient evidence to show Holberg was guilty of murder in the course of robbery (point 18); (14) there was legally insufficient evidence to show Holberg was guilty of murder in the course of burglary (point 19); (15) there was insufficient evidence Holberg was eligible for the death penalty because the prosecution failed to prove lack of provocation (point 20); (16) the trial court abused its discretion by failing to send a supplemental jury instruction in response to the jury's notes requesting guidance (point 21); (17) the trial court erred in refusing to permit Holberg's trial counsel to voir dire the jury on their knowledge of parole eligibility under Texas law (point 24); (18) the trial court erroneously instructed Holberg's jury on parole eligibility (point 25); (19) the trial court abused its discretion in preventing Holberg's trial counsel from instructing the jury regarding parole eligibility (point 26); (20) the Texas capital sentencing statute unconstitutionally fails to inform juries of the impact of a single holdout juror (point 27); (21) the trial court erred in refusing to permit testimony regarding the impact of Holberg's execution on her family and friends (point 28); (22) the Texas capital sentencing statute unconstitutionally precluded Holberg's jury from giving mitigating effect to evidence of the victim's provocation (point 29); (23) the Texas capital sentencing statute's mitigation special issue unconstitutionally grants a jury open-ended discretion whether to impose a death sentence (point 32); (24) the Texas statutory definition of mitigating evidence is unconstitutionally narrow (point 33); (25) as administered in Texas, the death penalty constitutes cruel and unusual punishment under both the U.S. and Texas Constitutions (points 35-36); (26) the trial court erred in failing to define the term "society" in the future dangerousness special issue (point 38); (27) the Eighth Amendment and Fourteenth Amendments prohibit the execution of a criminal defendant who becomes rehabilitated (points 44-47); (28) Holberg's trial counsel rendered ineffective assistance in violation of her Sixth Amendment rights by (a) failing to object to the prosecution's presentation of evidence and argument injecting religiously biasing evidence into the punishment phase of Holberg's trial (point 4); (b) failing to object to the prosecution's improper voir dire questions injecting religiously biased concerns into the jury selection process (point 5); (c) failing to challenge for cause juror B_ C_ (point 7); (d) failing to hold the prosecution to a burden of "clear proof" with regard to evidence of Holberg's bad acts and unadjudicated offenses (point 13); (e) failing to object to the trial court's supplemental charge given in response to the jury's notes (point 22); (f) failing to advise the jury during voir dire and jury argument regarding the difference between robbery/murder and post-homicide theft (point 23); (g) failing to object to the trial court's definition of "mitigating circumstances" in the punishment phase jury charge (point 34); (h) failing to object to the admission of

Appeals (the "TCCA") affirmed Holberg's conviction and sentence. *See Holberg v. State*, 38

S.W.3d 137 (Tex. Crim. App. 2000) (published in part), *cert. denied*, 534 U.S. 972 (2001).

## B. State Habeas Corpus Proceeding

While Holberg's direct appeal was pending, on July 19, 2000, attorney Kent Birdsong filed

her habeas corpus application, raising thirty-six claims for relief.[9] Given the global allegations of

Holberg's post-arrest unrecorded admissions to police officers (point 37); (i) failing to object during voir dire to the prosecution committing venire members to a definition of "criminal acts of violence" that fit the evidence to be introduced (point 39); (j) failing to object to improper prosecutorial jury argument at the punishment phase of trial (point 40); and (k) failing to object to the prosecution's use of prior arrests, i.e., unadjudicated offenses to impeach defense witnesses Diana Wheeler, Connie Baker, and Teresa Lynn Cobb (point 41); and (29) the cumulative effects of Holberg's defense counsel's ineffective assistance at both phases of her trial violate the Sixth Amendment (points 48-49).

The table of contents to Holberg's state direct appeal brief lists point of error 30 (arguing the different capital sentencing schemes utilized in Texas since 1989 operate to render capital punishment in Texas unconstitutionally arbitrary in violation of due process and equal protection principles) and point of error 31 (arguing the Texas capital sentencing scheme is unconstitutional because it does not permit meaningful appellate review [presumably of the jury's answer to the mitigation special issue]). The defense did not brief those claims in its appellate brief.

[9] In her first two grounds for state habeas relief, Holberg mirrored her 46th and 47th points of error on direct appeal. In her third ground for state habeas relief, she re-urged her 31st point of error on direct appeal. In her fourth state habeas ground she re-urged her first through third grounds for state habeas relief. In her fifth state habeas ground, she re-urged her 36th point of error on direct appeal. In her sixth state habeas ground she re-urged her 10th point of error on direct appeal. In her seventh state habeas ground she re-urged her 28th point of error on direct appeal. In her eighth state habeas ground she re-urged her 35th point of error on direct appeal. In her ninth state habeas ground, she re-urged her 27th point of error on direct appeal. In her tenth state habeas ground, she re-urged her 33rd point of error on direct appeal. In her eleventh state habeas ground she re-urged her 17th point of error on direct appeal. In her twelfth state habeas ground she re-urged her 29th point of error on direct appeal. In her thirteenth state habeas ground, she re-urged her 20th point of error on direct appeal. In her fourteenth state habeas ground, she re-urged her 30th point of error on direct appeal. In her fifteenth state habeas ground she re-urged her 32nd point of error on direct appeal. In her sixteenth state habeas ground she re-urged her 37th point of error on direct appeal. In her seventeenth state habeas ground she re-urged her 13th point of error on direct appeal. In her eighteenth state habeas ground she re-urged her 41st point of error on direct appeal. In her nineteenth state habeas ground, she re-urged her 40th point of error on direct appeal. In her twentieth state habeas ground she re-urged her 22nd point of error on direct appeal. In her twenty-first through twenty-ninth state habeas grounds, Holberg argued her trial counsel rendered ineffective assistance by failing to (21) impeach Vickie Kirkpatrick, (22)adequately present defense witness Sandra Jo Baker and object to the prosecution's improper cross-examination of Baker, (23) subpoena Susan Lawrence to testify at trial, (24) present evidence (such as the testimony of Jimmy Lee Campbell) showing Holberg was familiar with Towery's apartment complex, (25) present evidence showing Holberg knew her way around Towery's apartment complex, (26) cross-examine Rocky Towery regarding whether he took his late father's money when he discovered Towery Sr.'s body, (27) adequately cross-examine Towery's sons regarding their father's propensity for violence, (28) investigate Holberg's background more thoroughly, present mitigating evidence through Dr. Patel (and by telling Holberg's family they planned to throw the trial), (29) object to preserve error on a host of alleged trial court errors, including by not making timely objections to the trial testimony of Corena Norrell and Mary Burnett and not moving for a continuance. In her thirtieth and thirty-first state habeas grounds, Holberg argued cumulative error at both phases of

prosecutorial misconduct included in Holberg's state habeas corpus application, the District Attorney James Farren ("DA Farren") withdrew from the case, and the trial court appointed Warren Clark as special prosecutor. Clark filed the State's answer on January 12, 2001.

Because Holberg lodges complaints about the process afforded her in the state habeas proceedings, the Court will describe those proceedings in some detail. It appears from the record that after the State filed its answer, nothing happened until October 6, 2006. On that date, Mr. Birdsong withdrew and was replaced by Thomas Pulliam, Alan Lazarus, H. Christian L'Orange, and Selden Hale, among others. Thirteen days later, this new counsel submitted a 141-page "Reply Brief in Support of Application for Habeas Corpus" ("Reply") that provided further factual development on seven of Holberg's claims from her habeas corpus application, including a twelve-volume "Social History Documentation." The TCCA ruled that this was *not* an improper subsequent writ application and ordered the convicting court to address it alongside the original application. *Ex parte Holberg*, No. WR-68,994, 2008 WL 152725 (Tex. Crim. App. Jan. 16, 2008) (order remanding).

By this time, Judge Ana Estevez replaced Judge Patrick Pirtle as presiding judge of the convicting court. Again, there was no activity in the case until September 3, 2010, when the TCCA sent a letter inquiring as to the status of the litigation. Subsequently, in 2011, Assistant Texas

---

her trial warranted a new trial. In her thirty-second state habeas ground she argued her trial counsel rendered ineffective assistance by failing to investigate and present testimony from Mark Hunter, Valerie Mackensie, Ella Gibbs, Amber Terry, and Stacy Mock. In her thirty-third state habeas ground she argued the state knowingly used misleading testimony from Vickie Kirkpatrick, Yolanda English, and Mary Burnett to secure Holberg's conviction. In her thirty-fourth state habeas ground she argued the prosecution withheld favorable information known by Becky Bates in violation of the rule in *Brady* and knowingly used misleading testimony from Katrina Dixon a/k/a Yolanda English to secure Holberg's conviction. In her thirty-fifth state habeas ground she argued the prosecution withheld favorable information known by Corena Norrell and Mary Burnett in violation of the rule in *Brady* and knowingly used misleading testimony from Norrell and Burnett to secure Holberg's conviction. In her thirty-sixth state habeas ground she argued the indictment against her was invalid.

Attorneys General Leslie Kuykendall and Matthew Ottoway replaced Clark as special prosecutor. An evidentiary hearing was set for August 22, 2011.

While the hearing date was pending, Judge Estevez granted the State's motion to compel Holberg to share her mental health experts' raw data, and the State filed a motion to cancel the evidentiary hearing based on the assertion there were no controverted, previously unresolved factual issues material to Holberg's confinement. Judge Estevez also granted Holberg's application for subpoenas for bank, phone, forensic testing, and autopsy records. In a hearing held on July 14, 2011, Judge Estevez cancelled the evidentiary hearing and subsequently issued an order designating issues (the "ODI"), requiring further factual development of five ineffective-trial-counsel claims and two *Brady* claims. The ODI required affidavits from Holberg's trial counsel Catherine Dodson and Candace Norris, the elected District Attorney DA Farren, and the assistant district attorneys Charles Blount and Robert Love. It also ordered the deposition of Kirkpatrick regarding the claim that her trial testimony was misleading, and it allowed DA Farren to file a responsive affidavit to that deposition. The deadline for filing the affidavits and deposition was August 22, 2011. Judge Estevez denied Holberg's subsequent request to depose trial counsel and members of the prosecution team.

Kirkpatrick's videotaped deposition and the affidavits were timely filed on August 22, 2011. Holberg also filed two new motions on August 22, 2011.

First, Holberg filed a 291-page document entitled "Motion for Reconsideration, Bill of Exceptions and Assignments of Error, and Offer of Proof" ("Motion for Reconsideration") with about 4,000 pages of attached exhibits. The Motion for Reconsideration asked the court to reconsider the ODI and offered new evidence in support. To the extent the new evidence could

support issues raised in the original application, Judge Estevez considered it. 28/29 Supp.SHCR 8591, § 37. Judge Estevez held that the 2011 Motion for Reconsideration also included a new allegation under the Eighth Amendment, which she did not consider but forwarded to the TCCA as required by state law. The TCCA would ultimately dismiss the Motion for Reconsideration as a subsequent writ application, noting favorably in a footnote the assessments made by Judge Estevez. *Ex parte Holberg*, Nos. WR-68,994-01, -02, -03, 2014 WL 5389907, *1 n.1 (Tex. Crim. App. Sept. 17, 2014).

Second, Holberg moved for fingerprint and blood testing of the interior of Towery's wallet, which was denied. Holberg took an appeal from that order, which the CCA later dismissed as interlocutory. *Holberg v. Texas*, No. AP-76, 668 (Tex. Crim. App. Dec. 7, 2011) (per curiam).

Judge Estevez set a deadline of September 14, 2011, for the parties to file proposed findings of fact and conclusions of law. The parties met the deadline, but on September 23, 2011, Holberg moved for leave to respond to, or in the alternative, to strike affidavits previously filed on August 22, as well as portions of the State's proposed findings and conclusions. Holberg also moved for a hearing on the proposed findings. Judge Estevez granted leave for Holberg to file the responses and ordered Holberg to file her amended proposed findings and conclusions by November 16, 2011, which she did. On September 26, 2011, Holberg also filed a document entitled "Objections to Procedural Irregularities in Applicant Brittany Holberg's State Habeas Corpus Proceedings." On November 14, 2011, Holberg filed a "Motion for Leave to Depose District Attorney Investigator Darrell Dewey," which Judge Estevez denied on December 6, 2011.

On March 9, 2012, Judge Estevez ordered Holberg's trial counsel to file additional affidavits responding to new allegations raised in the Motion for Reconsideration that they

intended to "throw the trial." The affidavits were filed on March 14, 2012. On March 19, 2012, Holberg filed a "Motion for Reconsideration of Motion to Depose Applicant's Trial Counsel," which Judge Estevez denied. On May 14, 2012, Judge Estevez entered Findings of Fact and Conclusions of Law (the "FFCL") recommending that relief be denied on all claims. 28/29 Supp.SHCR 8580-8707.

On December 14, 2012, while the trial court's FFCL was pending in the TCCA, Holberg filed in the trial court a document entitled "Additional Evidence in Support of Applicant's Prosecutorial Misconduct Claims and Supplemental Request for Evidentiary Hearing" (the "Additional Evidence") containing new allegations of prosecutorial misconduct as to witness Owens. The TCCA later concluded this was an improper subsequent writ application. *Holberg*, 2014 WL 5389907, at *1. The TCCA remanded the application for the trial court to hold an evidentiary hearing on claim 28 and receive testimony from Holberg's trial counsel Catherine Dodson and Candace Norris, and defense investigators Jim Patterson and Kathy Garrison. *Ex parte Holberg*, No. WR-68,994-01, 2013 WL 2120253 (Tex. Crim. App. May 15, 2013) (not designated for publication).

Holberg moved to recuse Judge Estevez on remand, and the Judge voluntarily recused herself due to docket demands and time constraints. Judge Richard Dambold presided over a two-week evidentiary hearing in October of 2013 and heard extensive testimony from Holberg's trial counsel and investigators. Although Holberg filed a second amended witness list containing 158 potential witnesses for the hearing (including many for whom she lacked contact information and several deceased persons), Holberg did not seek permission to call any of them to testify except for attorneys Philip Wischkaemper and Walter Long (which the court denied). On December 30,

2013, Judge Dambold signed supplemental findings of fact and conclusions of law ("Supp. FFCL") recommending that relief be denied. 6/6 Supp.SHCR (remand) 1195–1283. The TCCA denied relief on September 17, 2014. *Ex parte Holberg*, WR-68,994-01, -02, -03, 2014 WL 5389907 (Tex. Crim. App. Sept. 17, 2014).

### C.  DNA Testing Motion

In November 2012, Holberg filed a motion for DNA testing of Towery's wallet, alleging that the absence of her biological material on the wallet would prove that she did not commit an act of theft against Towery—which she contended was the linchpin of her capital murder conviction. The trial court denied the motion, concluding that Holberg (1) failed to allege specific facts showing the evidence to be tested contained biological material and (2) failed to establish by a preponderance of the evidence that she would not have been convicted of capital murder had exculpatory results been obtained through DNA testing.

Holberg appealed. In an opinion issued April 2, 2014, the TCCA affirmed the trial court's denial of Holberg's motion, explaining that the legal premise underlying her request for DNA testing was fatally flawed:

> "A person commits [robbery] if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, [the person] , , , intentionally, knowingly, or recklessly causes bodily injury to another." Theft, in turn, occurs when "[a] person . . . unlawfully appropriates property with intent to deprive owner of property." Thus, while the offense of *theft* has an acquisitive component, commission of the offense of *robbery* requires only that the person be *in the course of committing* a theft. In this case, the jury was properly instructed that "[t]he term 'in the course of committing' an offense means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense."
>
> Thus, in applying these concepts to the facts of the case, the jury could reasonably have found that the appellant committed the capital-murder aggravator of robbery *even if* it also believed that the appellant did not leave Towery's apartment with the

$1,400 cash contained in the wallet. Indeed, the jury could reasonably have concluded that the appellant committed a robbery even if it believed that she did not take possession of the cash or wallet *at all*, but nevertheless had the *intent* to take possession (and, in furtherance of that intent, inflicted bodily injury on Towery). In either of these scenarios, the bodily injury inflicted on Towery, which ultimately resulted in his death, would have been carried out while the appellant was "in the course of committing" the theft, notwithstanding any exculpatory DNA evidence tending to indicate that she never *in fact* "rifled" through the wallet.

Moreover, even if exculpatory DNA evidence made it crystal clear that the appellant did not remove the $1,400 cash from Towery's wallet, the prosecution's alternate theory – that the appellant committed robbery by stealing the large quantity of prescription medications scattered throughout Towery's apartment – was thoroughly explored at trial. Witnesses testified that Towery had as many as "seven to ten" bottles, and "at times" more than ten bottles, of prescription pain medications scattered in plain view throughout his apartment. Indeed, "at times" there were so many prescription bottles that "it was hard to count" because "he had a lot." The jury learned that it "would be very unusual" if there were only two bottles of prescription pain pills in plain view at Towery's apartment, as was the case at the time police arrived. Much of the trial, moreover, centered around the appellant's history of prescription pain medication abuse and addiction.

*Holberg v. State*, 425 S.W.3d 282, 287-88 (Tex. Crim. App. 2014).

## IV.  AEDPA STANDARD OF REVIEW

Because Holberg filed this federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), this Court's review of her claims for federal habeas corpus relief is governed by AEDPA. *Penry v. Johnson*, 532 U.S. 782, 792 (2001). Under the AEDPA standard of review, this Court cannot grant Holberg federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of Title 28 U.S.C. Section 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown*, 544 U.S. at 141; *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite Supreme Court authority does not, per se, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell*, 540 U.S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly

47

established Federal law,' § 2254(d)(1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins*, 539 U.S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins*, 539 U.S. at 520; *Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner"). "Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U.S. 86, 101(2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

AEDPA also significantly restricts the scope of federal habeas review of state court fact findings. Section 2254(d)(2) of Title 28, United States Code, provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state

court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U.S. 290, 301(2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U.S. at 410 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood*, 558 U.S. at 301; *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

In addition, section 2254(e)(1) provides a federal habeas petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro*, 550 U.S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice*, 546 U.S. 333, 338-39 (2006) ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. § 2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood*, 558 U.S. at 300-01 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state court's factual

findings); *Rices*, 546 U.S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

The deference to which state-court factual findings are entitled under AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El*, 545 U.S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

Absent a showing that there is an absence of available state corrective process or that circumstances exist that render such process ineffective to protect the rights of a petitioner, this Court is statutorily precluded from granting federal habeas corpus relief on any claim that has not been fairly presented to the state courts. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (the exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first according the state courts an opportunity to correct a constitutional violation); 28 U.S.C. § 2254(b)(1). Nonetheless, this Court is authorized to deny federal habeas relief on the merits notwithstanding a petitioner's failure to exhaust available state court remedies. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005) (a federal habeas court abuses its discretion if it grants a petitioner a stay when his unexhausted claims are plainly meritless); 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In those instances in which the state courts failed to adjudicate a claim on the merits that Petitioner presents to this Court, the Court's review of the un-adjudicated claim is *de novo*. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (*de novo* review of the allegedly deficient performance

of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (*de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

Holberg asserts that all her claims were presented in state court. As previously explained, a claim adjudicated on the merits in state court may not be relitigated in federal habeas court unless it: (1) is contrary to federal law then clearly established in the holdings of the Supreme Court or involved an unreasonable application of such law, or (2) is based on an unreasonable determination of the facts in light of the record before the state court. *See* 28 U.S.C. ' 2254(d); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). This backward-looking language requires an examination of the state-court decision at the time it was made, limited to the record in existence before the state court. *See Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011); § 2254(d)(2).

Holberg contends that this re-litigation bar does not apply because there was no "adjudication on the merits" in state court. Citing *Panetti v. Quarterman*, 551 U.S. 930, 953-54 (2007) and *Simon v. Epps*, 463 F. App'x 339 (5th Cir. 2012), Holberg contends that, to qualify as an adjudication on the merits, the state court must have provided a "full and fair hearing and evaluation of the evidence and argument." Amended Petition, ECF no. 65 ("Am. Pet.") 20-21; Corrected Reply 8, n.4. This contention is based on (1) Judge Estevez's initial decision to cancel the August 22nd hearing and develop the record through affidavits and a deposition instead, (2) Judge Estevez's unfavorable credibility decisions, (3) Judge Estevez's unfavorable discovery rulings, (4) Judge Dambold's "truncated" two-week hearing on Claim 28 after remand, (5) Judge

Dambold's refusal to read "any of the underlying record to become familiar with the facts and issues," (6) Judge Dambold's adoption of the State's proposed findings and conclusions, which exceeded the scope of the hearing, and (7) unfavorable rulings by Judge Dambold that excluded impeachment evidence and only allowed the "State's witnesses" to testify. Am. Pet. 23-27.

Holberg's assertion that Judge Dambold refused to read any of the record is not supported by the record before this Court. Judge Dambold told the parties at a status conference he did not intend to read the entire record "between now and the hearing." *See* 2/27 SHRR 40. Moreover, the record does not support Holberg's complaint that the state process was incomplete, truncated, or somehow deficient. Rather, the record shows that Holberg filed lengthy subsequent habeas applications in the guise of a Motion for Reconsideration and Additional Evidence, as well as extremely lengthy requests and motions, including a motion for forensic testing, a Chapter 64 DNA motion, a motion to transfer Holberg for neurological testing, and a motion for the issuance of subpoenas. In some cases, Holberg refiled amended or corrected versions of these lengthy filings. The pleadings and motions contained a combination of old and new evidence and claims. Holberg even submitted new evidence with her proposed findings and conclusions to the convicting court. Once the convicting court had concluded its fact-finding tasks and submitted its proposed findings and conclusions of law to the TCCA, Holberg continued to file pleadings and evidence in the TCCA. Contrary to Holberg's suggestion that the convicting court did not complete its review of her case, it appears that she simply never stopped filing new evidence.

Nevertheless, assuming factual assertions (1) through (7) above are an accurate representation of the record, which this Court concludes they are not, Holberg's reliance on *Panetti* and *Simon* remains inapt. The process due in *Panetti* and *Simon* was the process required by the

Constitution, not the AEDPA, for an incompetency-to-be-executed claim, which was first recognized in *Ford v. Wainright*, 477 U.S. 399 (1986). *See Panetti*, 551 U.S. at 934-35 ("Under *Ford*, once a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, the Eighth Amendment . . . entitles him to an adjudication to determine his condition. These determinations are governed by the substantive federal baseline for competency set down in *Ford*."). Panetti claimed that the state-court proceedings used to determine his competency were insufficient to satisfy the procedural requirements mandated by the Eighth Amendment and *Ford*. The Supreme Court agreed that the state court did not provide Panetti the procedures required by the Constitution. *Id.* at 935, 948. It concluded that AEDPA deference did not apply because the state court's failure constituted an unreasonable application of clearly establish federal law: *Ford*.

Thus, *Panetti* does not hold that a "full and fair hearing" is required as a precondition to AEDPA deference. To the extent Holberg reads *Panetti* to imply a "full and fair hearing" requirement in its discussion of *Ford*, that is because *Ford* predates the AEDPA. *See Ford*, 477 U.S. at 410 (citing *Townsend v. Sain*, 372 U.S. 293, 312-13 (1984) and the "full and fair hearing" requirement in former § 2254(d)(2) and (d)(6)). The "full and fair hearing" rule in *Townsend* was superseded by the AEDPA in 1996, which "jettisoned all references to a 'full and fair hearing' from the presumption of correctness accorded state court findings of fact." *Valdez v. Cockrell*, 274 F.3d 941, 949 (5th Cir. 2001) (holding that a "full and fair hearing" is not a precondition to according a presumption of correctness to state court findings of fact nor to applying § 2254(d)'s standards of review). Holberg's argument fails because she is not challenging her competency to be executed and because the AEDPA governs her writ application. S*ee also Morrow v. Dretke*,

367 F .3d 309, 315 (2004) (holding that reliance on a paper record without live testimony does not preclude the AEDPA presumption of correctness that attaches to state court findings); *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009) (holding a federal district court improperly re-evaluated a state habeas court's credibility determination despite the fact the state habeas court's credibility finding was based solely upon an evaluation of conflicting affidavits).[10]

Factual "determinations" in a state court's decision are presumed correct under the AEDPA, and a petitioner bears the burden of rebutting them by clear and convincing evidence. § 2254(e)(1); *see Burt v. Titlow,* 571 U.S. 12, 18 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." 28 U.S.C. § 2254(d)(2); *Miller-El*, 537 U.S. at 340. A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 571 U.S. at 18 (citing *Wood*, 558 U.S. at 293); *Avila v. Quarterman*,

---

[10] The Fifth Circuit's ruling on the *Brady* claim in *Avila* is particularly illustrative of this principle. In that case, the federal district court confronted a pair of affidavits submitted to the state habeas trial court by prosecuting attorneys (in which they swore they were unaware of an opinion beneficial to the defense held by a prosecution consulting medical expert that the infant-victim's fatal injuries could have resulted from a single blow) and a controverting affidavit submitted to the same court by the medical expert who expressed that opinion and in which he insisted that he had communicated his opinion to the prosecution prior to trial. Without conducting an evidentiary hearing, the state habeas trial court, and later the TCCA, found the affidavits of the prosecuting attorneys (denying knowledge of their own consulting expert's opinion) were more credible than the medical expert's controverting affidavit. The federal district court evaluated all three affidavits, as well as the entire record from Avila's trial and state habeas corpus proceedings and concluded that because it found the medical expert's affidavit more credible than the prosecuting attorneys' affidavits, Avila had carried his burden to establish by clear and convincing evidence that the state habeas trial court's credibility determination was erroneous. *Avila v. Quarterman*, 499 F.Supp.2d 713, 744-55 (W.D. Tex. 2007). The Fifth Circuit reversed, concluding the medical expert's affidavit did not constitute clear and convincing evidence sufficient to rebut the presumption of correctness afforded the state court's credibility finding. *Avila v. Quarterman*, 560 F.3d at 307 (holding a state trial court's credibility determination based upon conflicting evidence is "virtually unreviewable" by a federal court (quoting *Pippin v. Dretke*, 434 F.3d 782, 792 (5th Cir. 2005)). Thus, insofar as Holberg argues this Court is free to either (1) disregard Judge Estevez's express or implied credibility determinations because those credibility findings were based on a review of conflicting affidavits or (2) make its own credibility findings based upon a *de novo* of the same conflicting affidavits that were before the state habeas court, Holberg is in error. The Fifth Circuit's holding in *Avila* forecloses both arguments.

560 F.3d at 307. Furthermore, the presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005) (quoting *Pondexter v. Dretke*, 346 F.3d 142 (5th Cir. 2003)). With these standards in mind, the Court turns to Holberg's claims for relief.

## V. CONSTITUTIONAL CHALLENGES TO THE TEXAS CAPITAL SENTENCING STATUTE, JURY INSTRUCTIONS, JURY SELECTION, AND TRIAL COURT EVIDENTIARY RULINGS

### A. Legal Sufficiency of the Evidence

#### 1. The Claim

In Holberg's "federal claim 5," she cites to the Supreme Court's holding in *Zant v. Stephens*, 462 U.S. 862 (1983). Holberg argues there was legally insufficient evidence to support the jury's verdict that she committed murder in the course of a burglary. Am. Pet. 137-38.

#### 2. State Court Disposition

In her eighteenth and nineteenth points of error on direct appeal, Holberg challenged the sufficiency of the evidence showing she committed murder in the course of committing or attempting to commit a robbery and a burglary. Brief of Appellant, 114-24. The Texas Court of Criminal Appeals rejected both points of error on the merits. *Holberg v. State,* 38 S.W.3d, 137, 139 (Tec. Crim. App. 2000).

#### 3. Clearly Established Federal Law

In *Jackson v. Virginia*, 443 U. S. 307 (1979), the Supreme Court declared the proper standard for evaluating the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lewis v. Jeffers*,

497 U. S. 764, 781 (1990) (quoting *Jackson*, 443 U. S. at 319). "Under *Jackson*, federal courts must look to state law for the 'substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012) (quoting *Jackson*, 443 U.S. at 324 n.16).

> #### 4.   AEDPA Analysis

A Randall County grand jury returned Holberg's indictment on March 19, 1997 charging in pertinent part that on or about November 13, 1996 in Randall County, Texas, Holberg "did then and there, in the course of committing and attempting to commit burglary of the habitation owned by A. B. Towery, Sr., and in the course of committing and attempting to commit robbery of A. B. Towery, Sr., intentionally commit murder by intentionally causing the death of an individual, to wit: A.B. Towery, Sr., by stabbing A. B. Towery, Sr., with a sharp object, and by putting a blunt object into the throat of A. B. Towery, . . . ." 2/2 Supp.SHCR 630.

The state trial court's guilt-innocence phase jury charge instructed Holberg's jury in pertinent part as follows:

> Now, if you find from the evidence beyond a reasonable doubt that the Defendant, BRITTANY MARLOWE HOLBERG, a/k/a BRITTANY MARLOWE JOHNSON, on or about the 13th day of November, 1998, in the County of Randall, and the State of Texas, as alleged in the indictment, did then and there, in the course of committing or attempting to commit burglary of a habitation owned by A. B. Towery, Sr., or in the course of committing or attempting to commit robbery of A. B. Towery, Sr., intentionally commit murder by intentionally causing the death of A. B. Towery, Sr., by stabbing A. B. Towery, Sr. with a sharp object or by putting a blunt object into the throat of A. B. Towery, Sr., then you will find the Defendant guilty of Capital Murder as charged in the indictment in Cause No. 11,492-C and so say by your verdict, but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the defendant of the offense of Capital Murder as alleged in the indictment in Cause No. 11,492-C and proceed to consider whether or not the Defendant is guilty of the lesser included offense of Murder.

2/2 Supp.SHCR 638.

Holberg argues that without legally sufficient evidence of burglary, her capital murder conviction and sentence are constitutionally invalid. Am. Pet. 137. Under well-settled Texas law, however, when a capital murder defendant is charged under alternate theories and the jury returns a general verdict of guilty, the verdict will be upheld if the evidence is sufficient to support a guilty finding under any of the allegations submitted. *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005); *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App, 1992). This is wholly consistent with clearly established federal law as set forth in United States Supreme Court's opinion in *Schad v. Arizona*, 501 U. S. 624, 631 (1991). In *Schad*, the Supreme Court recognized that: "Our cases reflect a long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." The four-Justice plurality in *Schad* cited several of that court's prior opinions, as well as Rule 7(c)(1) of the *Federal Rules of Criminal Procedure*, for the rule that, in cases of murder, it is "immaterial whether death was caused by one means or the other." *Id.*[11] Concurring separately, Justice Scalia explained the rationale for this long-established rule: "As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission. That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict." *Schad*, 501 U. S. 649-

---

[11] The Supreme Court plurality in *Schad* explained the principle in question applied to both the manner in which an offense was charged in an indictment and the manner in which the jury was charged at the guilt-innocence phase of trial: "We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone." *Schad*, 501 U. S. at 631. "We see no reason, however, why the rule that the jury need not agree as to mere means of satisfying the *actus reus* element of an offense should not apply equally to alternative means of satisfying the element of *mens rea*." *Id.*, 501 U. S. at 632 (emphasis in original).

50 (Scalia concurring and citations omitted).[12] Thus, where a defendant is charged with multiple factual theories underlying the same capital offense, there is no constitutional requirement of jury unanimity with regard to a particular theory of capital murder.

Correspondingly, there is no constitutional requirement that there be legally sufficient evidence to support a finding of guilt as to *every* alternate theory of capital murder submitted to the jury. *See Griffin v. United States*, 502 U.S. 46, 49 (1991) ("It was settled law in England before the Declaration of Independence, and in this country long afterwards, that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds – even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action."); *Turner v. United States*, 396 U.S. 398, 420 (1970) (when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict will stand if the evidence is sufficient with respect to any of the acts charged). Holberg's indictment charged her in the conjunctive with two separate theories of capital murder under Texas law. Her conviction stands if the evidence supports the jury's verdict as to either of those two theories. *See United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir. 2010) ("If the evidence was sufficient to support one theory, the fact that the evidence was insufficient to support another of the theories does not negate the verdict." (citing *Griffin*, 502 U.S. at 59-60)); *Santellan v. Cockrell*, 271 F.3d 190, 196 (5th Cir. 2001) (where a jury is given the option of choosing factually adequate and factually inadequate theories of guilt, jurors can be counted on to base their verdict upon the

---

[12] Justice Scalia explained the practical application of the rule as follows: "When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her." *Id.*, 501 U. S. at 650. Likewise, in Holberg's trial there was no constitutional mandate that the jury unanimously agree on a particular theory of capital murder.

factually adequate theory (citing *Griffin*, 502 U.S. at 59)); *United States v. Powers*, 168 F.3d 741, 754 (5th Cir. 1999) ("the case was submitted to the jury on two alternative, legally valid theories. If either theory was supported by sufficient evidence, we are bound to affirm."). Thus, Holberg's reliance on *Zant* and its progeny, which addressed consideration of an invalid aggravating circumstance at the punishment phase of a capital murder trial, and not the definition of a single capital offense submitted to the jury under alternate factual theories at the guilt-innocence phase of trial, is misplaced.[13]

Respondent correctly points out that Petitioner's argument also misperceives the appropriate standard of review for the sufficiency of the evidence. Under the *Jackson* standard, all the evidence before jury at the guilt-innocence phase of trial must be viewed *in the light most favorable to the jury's verdict*. *Jackson*, 443 U.S. at 319. The TCCA's opinion on direct appeal accurately reflected just such a review of the evidence, finding the evidence showed that:

> At approximately 4:30 p.m., November 13, 1996, in Randall County, 60-year-old A.B. Towery, Sr., purchased groceries at an Albertson's store and then walked to his apartment. As he neared his home, Towery was approached by appellant – an 23-year-old prostitute and drug addict – who asked to use his telephone. Towery consented, and the two proceeded into his apartment. Once inside, appellant asked Towery for money, but he refused. Appellant then tried to take Towery's money by force, and the two struggled. In the course of the struggle, appellant grabbed several objects (a cast iron skillet, a steam iron, a hammer, a paring knife, a butcher knife, and two forks) and used them to beat and stab Towery, fatally injuring him. After Towery fell to the floor, dying, appellant shoved the base of a lamp five inches down his throat, choking him and hastening his death. Appellant then searched Towery's pants pockets, found his wallet, and took $1,400 in cash. After showering

---

[13] Equally misplaced is Holberg's argument that "[w]ithout legally sufficient evidence of burglary, Holberg's conviction and sentence are constitutionally invalid." Am. Pet. 137. Holberg cited no legal authority in support of this proposition. The reason is obvious: there is none. The Supreme Court's holding in *Griffin* and the Fifth Circuit's holdings in *Garza-Robles, Santellan*, and *Powers* directly refute Holberg's argument. Holberg made no effort to distinguish any of these governing authorities in her Amended Petition. FED. R. CIV. P 11(b)(2) states an attorney filing a pleading in federal court certifies that the claims, defenses, and other legal contentions contained in that pleading are warranted by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law. Holberg's Amended Petition contained no such argument in support of her federal claim 5.

and changing into some of Towery's clothes, appellant left. She spent the evening using Towery's money to buy cocaine, which she snorted with a friend.

*Holberg*, 38 S.W.3d at 139 (footnote omitted).

The TCCA specifically concluded "a rational juror could have concluded beyond a reasonable doubt that, at the time and place in question, appellant intentionally committed murder in the course of committing robbery, i.e., that appellant intentionally caused the death of an individual while in the course of appropriating his property without his effective consent and with the intent of depriving him of that property." *Id.* Petitioner argues the TCCA did not expressly address the sufficiency of the evidence supporting the indictment's alternate theory of murder within the course of a burglary. However, the TCCA expressly declared, "[w]e overrule points of error numbers eighteen and nineteen." *Id.* As explained by the TCCA in its opinion rejecting Holberg's DNA testing motion, the evidence fully supported the theory that Holberg murdered Towery in the course of committing or attempting to commit, or in the immediate flight after committing, a robbery. *Holberg v. State*, 425 S.W.3d at 287-88.

Furthermore, Holberg's insufficient evidence argument fails to comprehend the nature of the offense of capital murder under applicable Texas law. On direct appeal, the TCCA concluded that:

> The trial court instructed the jury accurately on the pertinent elements of capital murder, murder, manslaughter, robbery, burglary, and theft. The trial court also instructed the jury accurately on the pertinent statutory definitions of "attempt to commit," "bodily injury," "appropriate," "unlawfully appropriate," "owner," "possession," "effective consent," "enter," and "habitation." Finally, the trial court instructed the jury accurately that "[t]he term 'in the course of committing' an offense means conduct that occurs in an attempt to commit, during the commission, or in the immediate flight after the attempt or commission of the offense."

*Holberg*, No. 73,127, at 11. The TCCA's conclusion that Holberg's guilt-innocence jury charge accurately reflected Texas substantive criminal law is binding on this court. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Holberg's trial court instructed her jury that the term "attempt to commit" an offense "means that a person, with specific intent to commit an offense, does an act amounting to kore than mere preparation that tends, but fails, to effect the commission of the offense intended." As the TCCA noted, this definition accurately reflects the statutory definition of "criminal attempt." *See Wood v. State*, 560 S.W.3d 162, 164 (Tex. Crim. App. 2018) (citing TEX. PEN. CODE § 15.01). Thus, under applicable Texas law, it was unnecessary for the prosecution to establish that Holberg committed an intentional murder while also committing a robbery or a burglary. The prosecution needed only to prove that Holberg committed an intentional murder while *attempting* to commit burglary or robbery. Proof that Holberg committed all the essential elements of either robbery or burglary was unnecessary under substantive Texas law.

Under Texas law, the offense of burglary is established by a showing that a person, without the effective consent of the owner, enters a habitation and commits a felony, theft, or an assault. TEX. PEN. CODE ANN. § 30.02(a)(3) (1995); *Gordon v. State*, 633 S.W.2d 872, 875 (Tex. Crim. App. 1982). Consent is not effective if induced by force, threat, or fraud. TEX. PEN. CODE ANN. § 1.07(a)(19)(A) (1994). Holberg's trial court instructed her jury that "[c]onsent is not effective if it is induced by deception or coercion." Out of an abundance of caution, this court conducted a *de novo* review of the sufficiency of the evidence supporting the jury's finding that Holberg

61

committed an intentional murder in the course of the committing *or attempting to commit* a burglary.

Viewed in the light most favorable to the jury's verdict, a rational jury could rationally have concluded beyond a reasonable doubt that Holberg gained access to Towery's apartment through deception, i.e., a fraudulent promise to engage in prostitution services or a fraudulent request to use his telephone, and thereafter committed an assault and a theft. Holberg admitted she took Towery's clothing after killing him. The jury was free to disregard Holberg's self-serving testimony asserting that her violent actions toward Towery resulted from her efforts to protect herself. The jury could rationally have believed the level of violence Holberg inflicted upon the elderly Towery was so excessive as to negate any reasonable possibility that she acted in self-defense and establish beyond a reasonable doubt that Holberg was the aggressor throughout their confrontation.[14] Towery's body had more than fifty stab wounds and numerous serious injuries from blunt force trauma. In sharp contrast, there was no evidence Holberg ever sought medical attention for any of the injuries she claimed to have sustained in her confrontation with Towery. By Holberg's own admission, after Towery informed her that he was badly injured, Holberg stabbed him multiple times in the face, forced a lamp down Towery's throat with sufficient force to damage his carotid artery, and then stabbed him in the abdomen, leaving the knife buried in his body. She then showered, put on some of Towery's clothes, and fled the scene. The following day, she fled the State of Texas. Evidence of flight evinces a consciousness of guilt. *Clay v. State*, 240

---

[14] In fact this is exactly how prosecution witness Vickie Kirkpatrick described Holberg's account of her fatal encounter with Towery: Kirkpatrick testified that Holberg said she went to Towery's residence on the date in question because she had a long-term relationship with Towery, he had given her money earlier the same day, she knew he had more money, she wanted it to buy drugs, and when Towery refused to give her his money, she reached for it, he grabbed her arm, and their fight began, with her grabbing a fork and stabbing Towery several times. 19/28 RR 234-37.

S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994). Towery's sons testified their father had a substantial amount of cash on his person just days before the incident and kept a large quantity of prescription medication on hand, both of which were absent after discovery of the victim's body.

### 5. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of Holberg's challenges to the sufficiency of the evidence supporting the theories of intentional murder in the course of her commission or attempted commission of robbery and burglary was an objectively reasonable application of the Supreme Court's *Jackson* standard and the long-settled principle reaffirmed in *Griffin* and was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. Federal claim 5 is denied.

### B. Appeals to Religious Sentiments

#### 1. The Claim

In a claim Holberg designates as "federal claim 6," she argues that the prosecution, without objection, made improper comments during voir dire suggesting Holberg might have an afterlife through religious conversion, asked questions of defense witness during cross-examination along similar lines, and made arguments during the punishment phase of trial with theological themes and a moral imperative. Am. Pet. 138-39.

#### 2. State Court Disposition

In her first two points of error on direct appeal, Holberg argued the prosecution improperly injected religious considerations during its voir dire of venire members and in its closing argument

at the punishment phase of trial. Brief of Appellant, 2-52. In her third point of error on direct appeal, Holberg argued the trial court had erred in failing to act *sua sponte* to interrupt prosecutorial argument which made references to a higher authority. *Id., 52-53.* The TCCA held on direct appeal that Holberg's failure to object in the trial court forfeited her right to complain on appeal. *Holberg v. State*, No. 73,127, at 18. Moreover, the TCCA went on to conclude there was nothing in the record to support Holberg's complaint of prosecutorial misconduct, holding that while the prosecution did question some venire members regarding whether their religious beliefs would adversely affect their ability to serve as impartial jurors, there was no improper questioning. *Id.* The TCCA also concluded the trial court did not abuse its discretion by failing to prevent prosecutorial conduct that violated no rule or constitutional principle. *Id.*

### 3. Clearly Established Federal Law

Supreme Court precedent addressing jury selection implicitly recognizes the need for inquiry during voir dire into whether a venire member will be able to set aside his or her personal views and render a verdict based upon the law and the evidence. For instance, in *Adams v. Texas*, 448 U.S. 38 (1980), the Supreme Court emphasized the limitations its previous holding in *Witherspoon v. Illinois*, 391 U.S. 510 (1968), imposed on the ability of the State to exclude members of a jury venire from service on a capital sentencing jury:

> A juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. The State may insist, however, that jurors will consider and decide the facts impartially and conscientiously apply the law as charged by the court.

*Adams*, 448 U.S. at 45. The Supreme Court emphasized in *Adams* that the State could, consistent with *Witherspoon*, exclude prospective jurors whose views on capital punishment are such as to

make them unable to follow the law or obey their oaths; but excluding jurors on broader grounds based on their opinions concerning the death penalty is impermissible. *Id.* at 44-48.

In *Wainwright v. Witt*, 469 U.S. 412 (1985), the Supreme Court further clarified its holdings in *Witherspoon* and *Adams*, holding the proper inquiry when faced with a venire member who expresses personal, conscientious, or religious views on capital punishment is "whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright*, 469 U.S. at 424. The Supreme Court also emphasized considerable deference is to be given the trial court's first-hand evaluation of the potential juror's demeanor and that no magical incantation or word choice  is needed in interrogating the potential juror in this regard. *Id.* at 430-35.

More recently, the Supreme Court identified the following "principles of relevance" from its *Witherspoon-Witt* line of opinions:

> First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause. Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes. Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the juror is not substantially impaired, removal for cause is impermissible. Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown*, 551 U.S. 1, 9 (2007) (citations omitted).

The proper scope of prosecutorial closing argument in Texas encompasses four areas: (1) summations of the evidence; (2) reasonable inferences or deductions from the evidence; (3) responses to opposing counsel's arguments; and (4) pleas for law enforcement. *Norris v. Davis*,

826 F.3d 821, 832 n.10 (5th Cir. 2016) (citing *Wilson v. State*, 938 S.W.2d 57, 59 (Tex. Crim. App. 1996)).

### 4.  AEDPA Analysis

Out of an abundance of caution, this court has undertaken *de novo* review of all the instances of allegedly improper prosecutorial voir dire cited by Holberg in her Amended Petition. This court concludes there was absolutely nothing inappropriate with any of the prosecution's voir dire questions inquiring into whether members of the jury venire could set aside their personal religious beliefs and render a verdict based upon the law and the evidence. Inquiries into venire members' personal religious views are wholly appropriate within the context of determining whether a venire member's personal beliefs, religious or otherwise, may conflict with his or her ability to render a verdict based on the evidence and the law. *Adams*, 448 U.S. at 45. It is difficult to imagine a fully comprehensive voir dire examination within the parameters of *Adams, Wainwright*, and *Witt* that did not inquire at least somewhat into whether a venire member's personal views would preclude him or her from rendering a verdict consistent with applicable law. The TCCA reasonably concluded that Holberg's complaints about the prosecution's religion-based voir dire questions, to which Holberg's trial counsel reasonably made no objection, failed to assert a viable federal constitutional issue.[15]

Holberg's complaints about the prosecution's religion-based prosecutorial jury arguments are equally unavailing. As explained above in § I.B.1., at the punishment phase of trial, the

---

[15] Holberg's citation to *Zant v. Stephens*, 462 U.S. 862 (1983), is wholly inapposite. Nothing in the Supreme Court's holding in *Zant* forecloses a prosecutor (or a criminal defense counsel for that matter) from inquiring during voir dire into whether a venire member's personal views might preclude him or her from rendering a verdict based solely upon the law and evidence. Neither *Zant* nor any of the other legal authorities cited by Holberg in her Amended Petition preclude any mention of religion during voir dire examination. On the contrary, the analysis employed by the Supreme Court in its *Adams/Witherspoon* line of decisions implicitly rejects such a bizarre contention.

prosecution urged the jurors to comply with the oath they took at the start of the trial, i.e., to render a verdict based on the law and the evidence, without being swayed by sympathetic appeals for mercy or religious conversion. In so doing, the prosecution's references to the jury's duty to comply with its oath did not constitute improper jury argument. Although the prosecution may not appeal to the jury's passions and prejudices, the prosecution may appeal to the jury to act as the conscience of the community. *United States v. Davis*, 809 F.3d 663, 688 (5th Cir. 2010); *Jackson v. Johnson*, 194 F.3d 641, 655 nn.55-56 (5th Cir. 1999). The prosecution's punishment phase closing jury arguments reminding the jury of its oath and urging the jury to decide the case based upon the law and evidence, i.e., to follow its duty as set forth in its oath, did not violate any provision of the Constitution.

Insofar as Holberg complains that the prosecution asked defense witnesses questions on cross-examination, without objection, that inquired into religious issues,[16] this court concludes after *de novo* review that the prosecution's brief allusions to religious topics, even if arguably objectionable, did not rise above the level of harmless error under the standard in *Brecht v. Abrahamson*, 507 U.S. 619, 623-24 (1993) (the test for harmless error in federal court is "whether

---

[16] Holberg complains (Am. Pet 138) about questions asked during the punishment phase of trial by her own trial counsel of defense witness Ella Gibbs which elicited an answer explaining that Holberg had been actively involved in a jail inmate Bible study group reading the Old Testament book of Exodus. 25/28 RR 16-17. Holberg does not offer any rational explanation suggesting how this information prejudiced her.

None of the foregoing questions or answers injected Holberg's personal religious views or beliefs as a factor for the jury's consideration when answering the Texas capital sentencing special issues. Moreover, Texas is not a weighing jurisdiction in which aggravating circumstances must be proved by the State and then weighed against mitigating factors to determine the propriety of a capital sentence. *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir. 1993). Rather, in Texas, the constitutionally required narrowing function occurs at the guilt-innocence phase of trial by virtue of the narrow manner with which Texas has statutorily defined the offense of capital murder. *Jurek v. Texas*, 428 U.S. 262, 268-72 (1976); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (recognizing the Texas capital sentencing special issues do not function as aggravating circumstances but rather guide and focus the jury's objective consideration of particularized circumstances of the individual offense and the individual offender). Thus, Holberg's citation to *Zant v. Stephens*, 462 U.S. 862, 885 (1983), which addressed an unconstitutionally vague aggravating circumstance in a weighing jurisdiction (but did not order a new trial), is inapposite to her case.

the error had a substantial and injurious effect or influence in determining the jury's verdict"). Moreover, having injected the issues of remorse and religious devotion into the punishment phase of trial through the defense's direct examination of a family friend (Karnes) and a religious counselor (Gibbs), Holberg had no legitimate basis for objection when the prosecution cross-examined those same defense witnesses regarding religious subjects. Such questions bore directly on the credibility of those defense witnesses. Finally, this is not a case in which a capital sentencing jury was instructed or authorized to consider a criminal defendant's race, religion, or political affiliation as an aggravating factor when weighing aggravating versus mitigating factors at the punishment phase of trial.

### 5. Conclusions

The Texas Court of Criminal Appeals' rejection on the merits of Holberg's first three points of error on direct appeal, i.e., Holberg's complaints about the prosecution's references to religious topics during voir dire, cross-examination of defense witnesses, and closing punishment phase jury argument, was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. Federal claim 6 is denied.

## C. Exclusion of Venire Member A_ B_

### 1. The Claim

In a claim Holberg designates as "federal claim 7," she argues the state trial court erred in granting the prosecution's challenge for cause to venire member A_ B_. Am. Pet. 139.

## 2. State Court Disposition

In her ninth point of error on direct appeal, Holberg argued the state trial court erroneously concluded venire member A_ B_'s questionnaire and voir dire answers rendered her properly subject to a prosecutorial challenge for cause.[17] Brief of Appellant, 70-79. The TCCA found venire member A_ B_ agreed on her juror questionnaire with the statement "I cannot vote to assess the death penalty under any circumstances" and, during voir dire examination A_ B_ "vacillated" as to whether she would follow the law and abide by her oath if obliged to sentence Holberg, despite her strongly held religious view that the death penalty was wrong. *Holberg v. State*, No. 73,127, at 15-16. The TCCA concluded the trial court had not abused its discretion in granting the prosecution's challenge for cause to A_ B_ because the trial court could have reasonably concluded A_ B_'s views on the death penalty would have prevented or substantially impaired the performance of her duties as a juror. *Id.*

## 3. Clearly Established Federal Law

The same Supreme Court precedents discussed above in § V.B.3. govern the disposition of this claim. Furthermore, the Supreme Court has admonished reviewing courts to defer to the trial court's resolution of questions of bias arising from a potential juror's conflicting voir dire answers because the trial court had the opportunity to observe the demeanor of the potential juror. *Uttecht*, 551 U.S. at 20 ("where, as here there is a lengthy questioning of a prospective juror and the trial court has supervised a diligent and thoughtful *voir dire*, the trial court has broad discretion."). "Courts reviewing claims of *Witherspoon-Witt* error, however, especially federal courts considering habeas petitions, owe deference to the trial court, which is in a superior position to

---

[17] The voir dire examination of venire member A_ B_ appears at 15/28 RR 107-29.

determine the demeanor and qualifications of a potential juror." *Id.* at 22. Moreover, judicial determinations of whether a potential juror possesses disqualifying bias is a question of fact to which a federal habeas court is required to give deference. *Skilling v. United States,* 561 U.S. 358, 396 (2010); *Wainwrigh*, 469 U.S. at 423-24; *Patton v. Yount*, 467 U.S. 1025, 1036-38 (1984).

### 4.   *AEDPA Review*

During her voir dire examination, A_ B_ admitted that she agreed with the statement listed on her juror questionnaire, which she had checked, that "I cannot vote to assess the death penalty under any circumstances." 15/28 RR 111-12. She testified that she agreed with the Pope's encyclical instructing members of the Catholic Church not to participate in anything where the death penalty might result. 15/28 RR 112. She repeatedly insisted that she did not believe she could answer the special issues in a way that resulted in a death sentence. 15/28 RR 114, 120, 122. She testified that she felt strongly about the matter. 15/28 RR 115. In response to a series of convoluted hypotheticals from defense counsel, A_ B_ did state there might be a scenario under which she could answer the special issues in a way that resulted in a death sentence. 15/28 RR 123-29. Ultimately, however, the trial court granted the prosecution's challenge for cause. 15/28 RR 129-31.

The TCCA concluded that A_ B_ was a vacillating juror and that it should defer to the trial court's assessment of A_ B_'s demeanor and the state trial court's implicit factual finding as to A_ B_'s credibility. Having independently reviewed *de novo* the entirety of A_ B_'s voir dire examination, this court concludes the TCCA's factual finding that A_ B_ was a vacillating juror was fully supported by the record before that court and its legal conclusion is wholly consistent with the Supreme Court's *Adams/Witherspoont/Witt* line of opinions, as well as the deferential directives set forth in *Uttecht*. A venire member's vacillating answers during voir dire, such as

those given by A_ B_, are sufficient grounds for exclusion. *Feldman v. Thaler*, 695 F.3d 372, 386 (5th Cir. 2012). Furthermore, a trial court's finding of bias during voir dire is a factual determination subject to a presumption of correctness. *Beazley v. Johnson*, 242 F.3d 248, 262 (5th Cir. 2001). Holberg has failed to overcome that presumption. A_ B_'s voir dire testimony fully supports the state trial court's factual finding of disqualifying bias.

### 5.  *Conclusions*

The Texas Court of Criminal Appeals' rejection on the merits of Holberg's ninth point of error on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. Federal claim 7 is denied.

### D.  Failure to Exclude Juror B_ C_

### 1.  *The Claim*

In a claim Holberg designates as "federal claim 8," she argues the state trial court erred in failing to exclude for cause *sua sponte* venire member, and later juror, B_ C_. Am. Pet. 140.

### 2.  *State Court Disposition*

In point of error seven in her direct appeal, Holberg argued that her trial counsel rendered ineffective assistance by failing to properly question and move to strike for cause venire member B_ C_. Brief of Appellant, 64-65. The TCCA found B_ C_ said nothing during voir dire examination indicating that he either rejected rehabilitation as a factor to consider when answering the special issues or adhered to a "blood atonement" theory of retribution; thus the record lacked any basis upon which Holberg's trial counsel could have challenged B_ C_ for cause. *Holberg v.*

*State*, No. 73,127, at 23. Accordingly, the TCCA concluded Holberg's complaint failed to satisfy the deficient performance prong of the *Strickland* standard. *Id.*

### 3. Clearly Established Federal Law

The same Supreme Court precedents discussed above in in § V.B.3. govern the disposition of this claim.

### 4. De novo Review

Because Holberg presented the state courts with a significantly different version of this claim, i.e., an ineffective assistance claim, and not the same straight-forward attack on the state trial court's failure to exclude B_ C_ *sua sponte* that she presents to this court, *de novo* review of what is essentially an unexhausted claim is necessary. *See Porter*, 558 U.S. at 39 (*de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts failed to address this prong of *Strickland* analysis); *Rompilla*, 545 U.S. at 390 (*de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U.S. at 534 (same).

In his answers to the juror questionnaire, B_ C_ explained in pertinent part that (1) while he had seen bits and pieces of news reports about Holberg's crime, he had formed no opinion regarding her guilt, (2) he worked as an associate pastor with a Baptist church, (3) his son had been involved in a misdemeanor proceeding in the criminal justice system in junior high, (4) he had never been opposed to the death penalty, (5) the only person he knew involved in law enforcement was a cousin of his wife who worked as prison detention officer, (6) he knew people involved in prison ministry, (7) he believed that sometimes the criminal justice system did not take into consideration all aspects of a situation, (8) if he were to change the criminal justice system, he

would have better accountability for lawyers, judges, and officers in the system, (9) he believed criminal laws seem to be unequal in some instances, (10) he had strong feelings about mental health testimony and believed he could only trust a mental health professional who was also a believer, (11) he believed in the deterrent effect of public executions for crimes that called for execution, (12) he believed the emphasis of the criminal justice system should be on rehabilitation whenever possible and proper punishment for crimes committed, (13) he was in favor of capital punishment except in a few cases where it would not be appropriate, (14) he agreed with the following statements: "I think capital punishment is necessary but I wish it were not," "Any person, man or woman, young or old, who commits capital murder should pay with his own life," and "Capital murder punishment is wrong, but it is necessary in our imperfect civilization," "We must have capital punishment for some crimes," "Capital punishment is just and necessary," "Capital punishment is justified only for premeditated murder," (15) his decision on whether to assess the death penalty after a conviction for a very serious crime "would depend upon the facts and circumstances of the case," (16) he believed a person is responsible for his or her own emotional development, and (17) he did not particularly want to be a juror in this case but would do so as party of his civic duty.[18]

During his voir dire examination by the court, B_ C_ indicated he was qualified to serve as a juror and understood and had no problems with any of the procedural concepts explained by the trial court. 14/28 RR 121-32. Under questioning by the prosecution, B_ C_ testified (1) he has filled out his juror questionnaire prior to the then-recent execution of Karla Faye Tucker but his answer had not changed since then, (2) he did not believe the gender of a person convicted of

---

[18] A copy of B_ C_'s juror questionnaire answers is in the record at ECF no. 114, at pp. 102-19 of 191.

capital murder should preclude imposition of the death penalty, (3) his somewhat negative questionnaire answers relating to mental health professionals related only to efforts by such individuals to discuss spiritual matters and would not affect his ability to entertain expert mental health testimony within the scope of their expertise, (4) he understood the difference between murder and capital murder as explained by the prosecutor, (5) he could imagine circumstances in which either the maximum or minimum sentence available for capital murder could be appropriate, (6) in answering the future dangerousness special issue, he would look to behavioral patterns in the past as an indicator of a person's character, (7) he understood the concept of mitigating evidence and the capital sentencing special issues as explained by the prosecutor, (8) he had done ministerial work in prison and counseled prison inmates, (9) he believed that a religious conversion after commission of a crime did not excuse the crime: "If you do something, you've got to pay the price.", (10) his wife had told him about a criminal case involving a Vietnam veteran whom he believed had been treated unfairly by the criminal justice system because the man needed psychiatric help and had not received it, which he considered to be mitigating, (11) he viewed child abuse and drug addiction in a similar way, (12) he believed the taking of a human life is justified in war and capital punishment, (13) he believed he could set aside his personal view that executions should be public and decide the case based on "the way the law is today," and (14) he did not have a problem with the fact Texas law did not require premeditation for a conviction for capital murder. 14/28 RR 132-70. When questioned by Holberg's defense counsel, B_ C_ testified in pertinent part that (1) he would not have trouble considering testimony from ministers, (2) he viewed the mental state of reckless as a lesser degree of culpability than intentional or knowing, (3) he understood "probability" to mean "something that will most likely happen," (4) he understood the

State had the burden to prove the future dangerousness special issue, (5) he understood that the jurors did not have to agree on what they considered to be mitigating evidence, and (6) he understood the law on self-defense as explained by defense counsel. 14/28 RR 171-88.

The TCCA found there was nothing in B_ C_'s questionnaire answers or voir dire examination suggesting B_ C_ was subject to a challenge for cause. This court's independent *de novo* review of the state court record compels the same conclusion. At no point did B_ C_ suggest he was unable to set aside his personal viewpoints and decide Holberg's case based solely upon the law and the evidence. Under the Supreme Court's *Witherspoon/Witt* line of decisions, B_ C_ was, therefore, eligible for serve as a juror during Holberg's trial. There is no fact-specific allegation, much less any evidence, before this court suggesting that B_ C_ ever indicated in his questionnaire answers or voir dire testimony that either (1) he would automatically vote to impose the death penalty without regard to the mitigating evidence or (2) he intended to vote to impose the death penalty regardless of the nature of any mitigating evidence. Thus, Holberg's citation to the Supreme Court's holding in *Morgan v. Illinois*, 504 U.S. 719, 738-39 (1992), is inapposite to this case. On the contrary, B_ C_'s voir dire examination clearly evidenced his understanding of the counsels' explanations of the nature of mitigating evidence and the proper role such evidence played in answering the Texas capital sentencing special issues. 14/28 RR 153-57, 180-81.

Insofar as Holberg attempts to rely upon a post-trial affidavit executed by B_ C_, that affidavit was not before the state trial court at the time of jury selection in 1998. Clairvoyance is not a required attribute of effective assistance. *United States v. Fields*, 565 F.3d 290, 295 (5th Cir. 2009); *Sharp v. Johnson*, 107 F.3d 282, 289 n.28 (5th Cir. 1997). Nor is it required of a state trial court supervising jury selection. Holberg's trial court cannot rationally be faulted for failing to

exclude a potential juror whom both parties accepted based upon information the venire member did not disclose until eight years after trial. There is no fact-specific allegation, much less any evidence, before this court suggesting that B_ C_ withheld any information or testified falsely during jury selection in a manner that would have rendered B_ C_ subject to a challenge for cause. Thus, the Supreme Court's holding in *McDonough v. Greenwood*, 464 U.S. 548, 556 (1983) (If a juror was dishonest during voir dire and an honest response would have provided a valid basis to challenge that juror for cause, the verdict must be invalidated), is inapplicable to Holberg's trial.

Moreover, as Respondent correctly argues, Rule 606(b), FED. R. EVID., precludes this court from considering B_ C_'s post-trial affidavit. *Young v. Davis*, 835 F.3d 520, 528-29 (5th Cir. 2016) (Rule 606(b) forbids consideration of juror affidavits in federal habeas corpus proceedings). More specifically, Rule 606(b)(1) provides that during an inquiry into the validity of a verdict or indictment (including a collateral attack upon a judgment), a juror may not testify about (1) any statement made or incident that occurred during the jury's deliberations, (2) the effect of anything on that juror's or another juror's vote; or (3) any juror's mental processes concerning the verdict or indictment. *Austin v. Davis*, 876 F.3d 757, 789 (5th Cir. 2017) (quoting Rule 606(b)(1)); *Young*, 835 F.3d at 529. "The court may not receive a juror's affidavit or evidence of a juror's statement on these matters." *Austin*, 876 F.3d at 789. The only exceptions noted in the Rule itself are for testimony regarding (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) an outside influence was improperly brought to bear on any juror, or (3) a mistake was made in entering the verdict on the verdict form. Rule 606(b)(2).

In *Warger v. Shauers*, 574 U.S. 40, 43-48 (2014), the Supreme Court held that Rule 606(b) applies to juror testimony during a proceeding in which a party seeks to secure a new trial on the

ground that a juror lied during voir dire. *Austin*, 876 F.3d at 789 (citing *Warger*). The only exception the Supreme Court has recognized is "when, after the jury is discharged, a juror comes forward with compelling evidence that another juror made clear and explicit statements indicating that racial animus was a significant motivating factor in his or her vote to convict." *Austin*, 876 F.3d at 790 (citing *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 869 (2017)). Holberg has not made any fact-specific allegation of a clear statement of race-based animus by any juror sufficient to invoke the exception recognized in *Pena-Rodriguez*. Thus, B_ C_'s post-trial affidavit is not properly before this court.

### 5. Conclusions

Having conducted a *de novo* review of this unexhausted claim, this court concludes there was no error, constitutional or otherwise, in the state trial court's failure to exclude venire member B_ C_ *sua sponte* from service on Holberg's jury. There is no evidence currently before this court suggesting B_ C_ was subject to a challenge for cause. Federal claim 8 is denied.

### E.  Failure to Permit Voir Dire of Venire Member B_ F_ on Parole Eligibility

### 1. The Claim

In a claim Holberg designates as "federal claim 9," she argues the state trial court erred in granting the prosecution's challenge for cause to venire member B_ F_ and in refusing to permit defense counsel to rehabilitate venire member B_ F_ by asking voir dire questions addressing Texas parole law. Am. Pet. 140-41.

### 2. State Court Disposition

In her eighth point of error on direct appeal, Holberg argued the state trial court erred in excluding venire member B_ F_ while refusing to allow the defense to rehabilitate her by asking questions addressing Texas parole eligibility laws (the state trial court had denied a pretrial motion

by the defense requesting permission to conduct voir dire on parole issues). Brief of Appellant, 65-69. The TCCA denied relief on the merits, concluding at the time of Holberg's March 1998 trial, parole law was not a proper subject for voir dire questioning. *Holberg v. State*, No. 73,127, at 14-15.

In her twenty-fourth point of error on direct appeal, Holberg argued the state trial court erred in denying her motion to allow voir dire examination of venire members regarding their views on Texas parole law (which at that time called for parole eligibility after forty years on a term of life imprisonment). Brief of Appellant, 141-53. The TCCA rejected this claim on the merits, concluding the parole law was not a proper subject for voir dire questioning. *Holberg v. State*, No. 73,127, at 16.

### 3. *Clearly Established Federal Law*

To be constitutionally compelled, it is not enough that requested voir dire questions be helpful; rather, the trial court's failure to ask, or permit counsel to ask, the questions must render the defendant's trial fundamentally unfair. *Morgan*, 504 U.S. at 730 n5; *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991).

### 4. *AEDPA Review*

At the time of Holberg's offense and capital murder trial, Texas law did not provide for a sentence of life without parole. Texas capital murder defendants did not then possess a constitutional right to a jury instruction on parole eligibility. *Gomez v. Quarterman*, 529 F.3d 322, 325 (5th Cir. 2008). Regarding capital murder trials conducted prior to September 1, 1999, the Fifth Circuit has consistently held that defendants had no constitutional right to question venire members regarding Texas parole laws. *Collier v. Cockrell*, 300 F.3d 577, 584 (5th Cir. 2002); *Wheat v. Johnson*, 238 F.3d 357, 362 (5th Cir. 2001); *Soria v. Johnson*, 207 F.3d 232, 243 (5th

Cir. 2000); *King v. Lynaugh*, 850 F.2d 1055, 1060-61 (5th Cir. 1988) (en banc). On direct appeal, the TCCA held Holberg had no right under Texas law to question venire members regarding parole law. *Holberg v. State*, No. 73,127, at 14-15, 16. This construction of state law is binding in this federal habeas corpus proceeding. *Bradshaw*, 546 U.S. at 76. Thus, Holberg had no right under federal or state law to question venire members regarding Texas parole law or her potential parole eligibility.[19] The state trial court's refusal to permit Holberg's defense counsel to voir dire B_ F_ regarding Texas parole law was consistent with both federal and state law and, therefore, did not render Holberg's trial fundamentally unfair.

Holberg also complains the state trial court erred in excluding venire member B_ F_. Holberg admits in her Amended Petition, however, that B_ F_ was a vacillating juror ("she waffled under questioning by the state"). This court's independent review of B_ F_'s voir dire testimony confirms this assessment. B_ F_ indicated in her juror questionnaire answers that she agreed with the statements "I cannot assess the death penalty under any circumstances" and "I'm opposed to capital punishment under any circumstances"; under voir dire questioning by both the prosecution and defense counsel B_ F_ reaffirmed those views and clearly indicated she could not answer the capital sentencing special issues in a manner that resulted in anything other than a life sentence.

---

[19] At least one other Texas district court has consistently recognized the Supreme Court has never declared that "constitutionally relevant mitigating evidence" includes information regarding state parole eligibility laws. *Renteria v. Davis*, 2019 WL 611439, *32 (W.D. Tex. Feb. 12, 2019); *Sells v. Thaler*, 2012 WL 2562666, *18-*19 (W.D. Tex. June 28, 2012); *Martinez v. Dretke*, 424 F.Supp.2d 403, 511 (W.D. Tex. 2006); *Brown v. Dretke*, 2004 WL 2793266, *17 (W.D. Tex. Dec. 3, 2004); *Bagwell v. Cockrell*, 2003 WL 22723006, *10-*12 (W.D. Tex. Aug. 19, 2003). In contrast, the Supreme Court has consistently used the term "relevant mitigating evidence" to describe evidence which tends to diminish a convicted capital murder defendant's moral blameworthiness or lessen the reprehensible nature of the offense, i.e., evidence which relates to the defendant's character or background or to the circumstances of the offense. *See, e.g., Brewer v. Quarterman*, 550 U.S. 286, 293-96 (2007) (depression, troubled childhood, substance abuse); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 259 (2007) (childhood deprivation and lack of self-control); *Tennard v. Dretke*, 542 U.S. 274, 283-88 (2004) (low intellectual functioning); *Penry v. Johnson*, 532 U.S. 782, 796-804 (2001) (mental retardation and history of childhood abuse); *Lockett v. Ohio*, 438 U.S. 586, 604-05, 608 (1978) (lack of intent to kill, relatively minor role in the offense, and age).

13/28 RR 86-97. B_ F_ did not merely "waffle" or vacillate, she adamantly insisted she could not answer the capital sentencing special issues in a manner that resulted in the imposition of a sentence of death, regardless of the evidence. *Id.* She was clearly ineligible for jury service under the *Witherspoon/Witt* standard. There was no error in the trial court's granting of the prosecution's challenge for cause to B_ F_. *Feldman*, 695 F.3d at 386.

### 5. *Conclusions*

The Texas Court of Criminal Appeals' rejections on the merits of Holberg's eighth and twenty-fourth points of error on direct appeal were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Nor did they result in a decision that was based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and direct appeal. Federal claim 9 is denied.

## F.  Facial Constitutionality of the Texas Capital Sentencing Scheme

### 1. *The Claim*

In a claim Holberg designates as "federal claim 10," she cites only to *Furman v. Georgia*, 408 U.S. 238 (1972), and argues cryptically that § 19.03 of the Texas Penal Code and Art. 37.071 of the Texas Code of Criminal Procedure are "facially unconstitutional" under the Eighth Amendment's Cruel and Unusual Punishment Clause. Am. Pet 141.

### 2. *State Court Disposition*

In her tenth and eleventh points of error on direct appeal, Holberg argued that the Texas capital sentencing scheme (1) violated the First Amendment because it effected an unconstitutional establishment of religion and (2) violated the Eighth Amendment's Cruel and Unusual Punishment Clause "due to inherent religious bias." Brief of Appellant, 79-95. The TCCA rejected both

arguments on the merits, concluding the primary effect of the statutes is penal in nature, not religious, and the fact the statutes may be consistent with the tenets of the Protestant faith does not implicate any of the Eighth Amendment's prohibitions. *Holberg v. State*, No. 73,127, at 7-11. In her sixth ground for state habeas corpus relief, Holberg re-urged her tenth point of error on direct appeal. The TCCA rejected this argument again on the merits, finding there was no violation of the First Amendment's Establishment Clause. FFCL 19-20; 28/29 Supp.SHCR 8598-99.

### 3. Clearly Established Federal Law

The Constitution allows capital punishment. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019). The manner in which the Supreme Court has analyzed the constitutionality of the Texas capital sentencing scheme has evolved over time. In *Furman*, a bare majority of the Supreme Court struck down capital sentencing schemes in several southern States, including Texas, but failed to reach any degree of consensus in terms of an analytical approach to the Eighth Amendment. The result was nine separate opinions issued from the Supreme Court in *Furman*, each reflecting a different analytical approach to the Eighth Amendment claims presented therein.

Four years later, a less than cohesive majority of the Supreme Court upheld the new capital scheme adopted by the Texas Legislature in response to *Furman*. *See Jurek v. Texas*, 428 U.S. 262, 268 (1976) (holding imposition of the death penalty does not *per se* violate the Eighth Amendment's proscription on "cruel and unusual punishment"). More specifically, the Supreme Court held the Texas statutory scheme limits the circumstances under which the State could seek the death penalty to a small group of narrowly defined and particularly brutal offenses. *Jurek*, 428 U.S. at 270. In answering the Texas capital sentencing special issues, a jury was permitted to consider any mitigating evidence the defendant wished to present. *Id.*, at 271-74. In sum, the new Texas system constitutionally narrowed the circumstances under which the defendant could be

found guilty of capital murder and focused the jury's objective consideration on the particularized circumstances of the individualized offense and individualized offender before imposing a sentence of death. *Id.*, at 273-74.

More than a decade later, the Supreme Court rejected an "as applied" challenge to the Texas capital sentencing scheme. *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73 (1988) (holding there is no constitutional right to have a capital sentencing jury consider "residual doubts" as to the defendant's guilt).

A degree of analytical consensus did begin to appear within the Supreme Court early the following decade when five Justices finally agreed on a single standard for reviewing the adequacy of jury instructions in a capital sentencing proceeding:

> We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation. Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California*, 494 U.S. 370, 380-381 (1990) (footnotes omitted).

In *Johnson v. Texas*, 509 U.S. 350 (1993), the Supreme Court rejected a claim that the Texas capital sentencing special issues did not permit a jury to consider mitigating evidence of the

defendant's youth (19 at the time of his capital offense). In so holding, the Court applied the standard it announced in *Boyde* and concluded there was no reasonable likelihood the jury was unable to give adequate mitigating consideration to evidence of Johnson's youth. *Johnson*, 509 U.S. at 368.

Consensus on an overarching analytical approach to Eighth Amendment claims did not emerge, however, until eight Supreme Court Justices agreed in *Tuilaepa v. California*, 512 U.S. 967 (1994), on the principle that the Eighth Amendment addresses two different but related aspects of capital sentencing: the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971. The Supreme Court's analysis of those two aspects of capital sentencing provided the first comprehensive system for analyzing Eighth Amendment claims a clear majority of the Supreme Court had ever offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.
>
> . . .
>
> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U.S. at 971-73 (citations omitted).

In *Tuilaepa*, the Supreme Court clearly declared its view that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Id.*, at 974. The Supreme Court also concluded, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly defined factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Id.*, at 978.

In *Loving v. United States*, 517 U.S. 748 (1996), the Supreme Court described the first part of the *Tuilaepa* analysis, i.e., the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U.S. at 755 (citations omitted).

The Supreme Court subsequently elaborated on the distinction between the narrowing function or "eligibility decision" and the "selection phase" of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U.S. 269 (1998):

> Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. *Ibid.* In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. *Id.,* at 972, 114 S.Ct., at 2634-

2635. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase must both have discretion to make an individualized determination and have that discretion limited and channeled. See, *e.g., Gregg v. Georgia,* 428 U.S. 153, 206-207, 96 S.Ct. 2909, 2940-2941, 49 L.Ed.2d 859 (1976). He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Tuilaepa, supra,* at 971-973, 114 S.Ct., at 2634-2636; *Romano v. Oklahoma,* 512 U.S. 1, 6-7, 114 S.Ct. 2004, 2008-2009, 129 L.Ed.2d 1 (1994); *McCleskey v. Kemp,* 481 U.S. 279, 304-306, 107 S.Ct. 1756, 1773-1775, 95 L.Ed.2d 262 (1987); *Stephens, supra,* at 878-879, 103 S.Ct., at 2743-2744.

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Penry v. Lynaugh,* 492 U.S. 302, 317-318, 109 S.Ct. 2934, 2946-2947, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978). However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. *Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); *Penry, supra,* at 326, 109 S.Ct., at 2951; *Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988). Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.,* at 380, 110 S.Ct., at 1198; see also *Johnson, supra,* at 367-368, 113 S.Ct., at 2669.

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And

indeed, our decisions suggest that complete jury discretion is constitutionally permissible. See *Tuilaepa, supra,* at 978-979, 114 S.Ct., at 2638-2639 (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); *Stephens,* supra, at 875, 103 S.Ct., at 2741-2742 (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg, supra*).

*Buchanan v. Angelone*, 522 U.S. at 275-277.

### 4. *De novo Review*

Because it is far from clear whether this cryptic claim truly mirrors the tenth and eleventh points of error Holberg raised on direct appeal, or her sixth ground for state habeas relief, out of an abundance of caution, this court will undertake *de novo* review.[20] After undertaking *de novo* review, this court concludes, for the reasons discussed in the Supreme Court's opinions in *Jurek*, *Johnson*, and *Tuilaepa*, the Texas capital sentencing scheme which existed at the time of Holberg's capital offense and trial was wholly consistent with the Supreme Court's Eighth Amendment jurisprudence. Texas law narrowly defined the capital offense for which Holberg was convicted, i.e., an intentional murder committed in the course of committing or attempting to commit two predicate felonies – robbery and burglary. *Jurek*, 428 U.S. at 270-71. The Texas capital sentencing special issues submitted at the punishment phase of Holberg's trial afforded her jury more than adequate opportunity to give effect to all the mitigating aspects of the evidence Holberg presented

---

[20] The Supreme Court made clear that federal habeas courts may deny writs of habeas corpus by engaging in *de novo* review when it is unclear whether AEDPA deference applies. A federal habeas petitioner is not entitled to a writ of habeas corpus if a court rejects her claim on *de novo* review. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010). The Supreme Court declined to address an issue of procedural default and chose, instead, to resolve a claim on the merits, holding that an application for habeas corpus may be denied on the merits notwithstanding a petitioner's failure to exhaust in state court. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005) (citing § 2254(b)(2)). "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (quoting 28 U.S.C. § 2254(b)(2)).

during her capital murder trial. *Johnson*, 509 U.S. at 368; *Jurek*, 428 U.S. at 271-73. The Eighth

Amendment's cruel and unusual punishment clause required nothing more. *Tuilaepa*, 512 U.S. at

971-73.

     *5.   Conclusions*

The Texas capital sentencing scheme in place at the time of Holberg's capital offense and

trial fully complied in all respects with the Supreme Court's Eighth Amendment jurisprudence and

did not violate the Cruel and Unusual Punishments Clause. Federal claim 10 is denied.

**G.  As Applied" Challenges to the Texas Capital Sentencing Scheme**

     *1.   The Claims*

In a multi-faceted claim Holberg designates as "federal claim 11," she presents seven

conclusory and overlapping arguments, unsupported by any relevant legal authority, that her

capital sentence is invalid because (1) capital juries, including hers, are "death prone" because of

religious bias (claim 1), (2) unidentified statistical evidence establishes that Texas juries are biased

and inadequately instructed (claim 2), (3) the Texas capital sentencing special issues prevented

adequate jury consideration of mitigating evidence of provocation (claim 3), (4) it was

fundamentally unfair for state appellate review of procedurally defaulted or forfeited claims to be

limited (claim 4), (5) she was denied meaningful state appellate review of the jury's answer to the

mitigation special issue (claims 5 & 7), and (6) the mitigation special issue allowed her jury too

much, or unfettered, discretion at sentencing in answering the capital sentencing special issues

(claim 6). Am. Pet. 141-42.

     *2.   State Court Disposition*

Petitioner presented some, but not all, of these "as applied" claims as points of error on

direct appeal. The TCCA's disposition of the Holberg's exhausted "as applied" claims will be

discussed below in the context of AEDPA review of those claims. This court will undertake *de novo* review of Holberg's unexhausted "as applied" claims.

        3.   *AEDPA/De novo Review*

        a.      "Death Prone" or "Death Qualified" Jury

In her first point of error on direct appeal, Holberg argued, in part, that the jury was unconstitutionally selected because the vast majority identified themselves as Christian and most of the jury venire indicated a belief in God. Brief of Appellant, 4-5. Holberg also argued that social science data indicated such persons possess what she argued was a disqualifying bias in capital murder cases in favor of retributive justice and a sentence of death. *Id.*, 25-37. The TCCA rejected these arguments on the merits, concluding the record reflected no improper questioning of the jury venire and no basis for a finding of excludable bias among the venire members based on their religious affiliation or personal religious views. *Holberg v. State*, No. 73,127, at 16-18.

Having independently reviewed the voir dire examination of Holberg's jurors, as well as those other venire members identified in Holberg's first and second points of error on direct appeal, this court concludes the TCCA accurately determined there was no improper questioning of the jury venire by either party concerning religious views. All the relevant questions regarding religion asked during voir dire concerned whether the venire members could serve as impartial jurors despite their personal religious views. Such voir dire questioning was wholly appropriate under the Supreme Court's *Witherspoon/Witt* line of decisions. *Lockhart v. McCree*, 476 U.S. 162, 178 (1986) ("an impartial *jury* consists of nothing more than '*jurors* who will conscientiously apply the law and find the facts.'" (quoting *Wainwright v. Witt*, 469 U.S. at 423) (emphasis in original)).

The Texas Court of Criminal Appeals' rejection on the merits of Holberg's first point of error on direct appeal (including the same legal arguments presented in her first and second "as

applied" claims) was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. *Lockhart*, 476 U.S. at 177-84.

Respondent also correctly argues that the view of jury impartiality urged by Holberg in her first two "as applied" claims is not only "illogical and hopelessly impractical," *Lockhart*, 476 U.S. at 178, but also barred by the nonretroactivity doctrine announced in *Teague v. Lane*, 489 U.S. 288 (1989), which forecloses adoption of the new principles of federal constitutional criminal procedure in federal habeas corpus proceedings. Under the holding in *Teague*, federal courts are generally barred from applying new constitutional rules of criminal procedure retroactively on collateral review. *Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994). A "new rule" for *Teague* purposes is one which was not dictated by precedent existing at the time the defendant's conviction became final. *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (holding a "new rule" either "breaks new ground," "imposes a new obligation on the States or the Federal Government," or was not "dictated by precedent existing at the time the defendant's conviction became final"). Under this doctrine, unless reasonable jurists hearing the defendant's claim at the time his conviction became final would have felt compelled by existing precedent to rule in his favor, a federal habeas court is barred from doing so on collateral review. *Id.*

The holding in *Teague* is applied in three steps: first, the court must determine when the petitioner's conviction became final; second, the court must survey the legal landscape as it then existed and determine whether a state court considering the petitioner's claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule

he seeks was required by the Constitution; and third, if the rule advocated by the petitioner is a new rule, the court must determine whether the rule falls within one of the two narrow exceptions to the nonretroactivity principle. *Caspari v. Bohlen*, 510 U.S. at 390.

The only two exceptions to the *Teague* nonretroactivity doctrine are reserved for (1) new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense and (2) "watershed" rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding, i.e., a small core of rules requiring observance of those procedures that are implicit in the concept of ordered liberty. *O'Dell v. Netherland*, 521 U.S. at 157. Holberg's proposed new rule barring voir dire examination or selection of jurors who profess religious affiliation with the tenets of the Judeo-Christian faith satisfies neither of these two exceptions. A conviction becomes final for *Teague* purposes when either (1) the United States Supreme Court denies a certiorari petition on the defendant's direct appeal or (2) the period for filing a certiorari petition expires. *Caspari v. Bohlen*, 510 U.S. at 390. Holberg's conviction became final for *Teague* purposes no later than October 15, 2001, *i.e.*, the date the United States Supreme Court denied her petition for writ of certiorari following the Texas Court of Criminal Appeals' affirmation of his conviction and sentence. *See Beard v. Banks*, 542 U.S. 406, 411-12 (2004) (recognizing a state criminal conviction ordinarily becomes final for *Teague* purposes when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for writ of certiorari has elapsed or a timely filed petition for certiorari has been denied); *Caspari v. Bohlen*, 510 U.S. at 390 ("A state conviction and sentence become final for purposes of retroactivity analysis when

the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.")

*Teague* remains applicable after the passage of AEDPA. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002) (applying *Teague* in an AEDPA context); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003) (recognizing the continued vitality of the *Teague* nonretroactivity doctrine under AEDPA). As of the date Holberg's conviction and sentence became final for *Teague* purposes no federal court had ever held a Texas capital murder jury must be selected without any voir dire inquiry and without any consideration of the religious viewpoints of venire members. On the contrary, such a rule is at odds with the type of inquiry necessary under the Supreme Court's *Witherspoon/Witt* line of decisions. This court lacks the authority to overrule that line of Supreme Court decisions. Thus, under *Teague*, Holberg's first two "as applied" claims do not warrant federal habeas corpus relief under even a *de novo* standard of review.

       b.     No "Meaningful" State Appellate Review of Mitigation Special Issue

In her thirty-first point of error on direct appeal, Holberg argued the Texas capital sentencing scheme did not afford her meaningful state appellate review of the jury's answers to the special issues, specifically pointing to the mitigation special issue. Brief of Appellant, 178-88.[21] The TCCA rejected these arguments on the merits. *Holberg v. State*, No. 73,127, at 13.

The Constitution requires states to provide an opportunity for review of capital sentences by appellate courts to guard against arbitrary imposition of the death penalty. *Clemons v. Mississippi*, 494 U.S. 738, 749 (1990). The Supreme Court has made clear, however, that capital

---

[21] For unknown reasons, Holberg listed point of error no. 31 in the table of contents in her appellate brief but no heading designating that point of error appears in the text of the brief. Furthermore, Holberg's state appellate counsel's discussion of this point of error begins at page 178, not page 181 as designated in the table of contents.

sentencing involves consideration of two related but distinct processes, i.e., the eligibility decision and the selection decision. *Tuilaepa*, 512 U.S. at 971-73. While the former must follow a process that is reviewable by appellate courts, the later "requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Id.*, at 973. In fact, "the sentencer may be given 'unbridled discretion in determining whether the death penalty should be imposed after it has found the defendant is a member of the class made eligible for that penalty.'" *Id.*, at 979-80. In Texas, the eligibility determination is made at the guilt-innocence phase of trial. *Jurek*, 428 U.S. at 268-72; *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002).

Because a Texas jury's answers to the capital sentencing special issues relate exclusively to the selection decision, they are not subject to a constitutional requirement of state appellate review, "meaningful" or otherwise. *Turner v. Quarterman*, 481 F.3d 292, 299 (5th Cir. 2007) ("at the selection step, the jury must be allowed to make 'an individualized determination' and to consider 'relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.'" (quoting *Tuilaepa*, 512 U.S. at 979-80)); *Rowell v. Dretke*, 398 F.3d 370, 377 (5th Cir. 2005) ("this court has consistently rejected the claim that a capital defendant is entitled to appellate review of the mitigating evidence."); *Beazley*, 242 F,3d at 261 ("regardless of whether the Texas court reviews the jury verdict under the mitigation special issue or the future dangerousness special issue, 'meaningful appellate review' has been afforded."); *Moore v. Johnson*, 225 F.3d 495, 506-07 (5th Cir. 2005) (Texas law bestows on the jury unbridled discretion to consider any mitigating factors submitted by the defendant and weigh it as it sees fit).

The TCCA's rejection on the merits of Holberg's thirty-first point of error on direct appeal (including the same legal arguments presented in her fifth and seventh "as applied" claims) was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. *Rowell*, 398 F.3d at 377-78; *Beazley*, 242 F,3d at 261.

c.      "Open-Ended" Jury Discretion on Mitigation Special Issue

In her thirty-second point of error on direct appeal, Holberg argued the Texas capital sentencing scheme unconstitutionally confers "open-ended" discretion upon the jury in answering the capital sentencing special issues, particularly the mitigation special issue. Brief of Appellant, 189-91. The TCCA rejected this claim on the merits. *Holberg v. State*, No. 73,127, at 13. Holberg re-urged the same arguments in her 15th ground for state habeas relief. The state habeas court rejected this argument on the merits once again. FFCL 25; 28/29 Supp.SHCR 8604.

For the same reasons discussed above in § V.G.3.b, Holberg's challenge to the "open-ended," "unfettered," or "unbridled" discretion the Texas capital sentencing scheme confers upon a capital sentencing jury in answering the special issues is without arguable merit. *Tuilaepa*, 512 U.S. at 979-80; *Turner*, 481 F.3d at 299; *Woods*, 307 F.3d at 359; *Moore*, 225 F.3d at 506.

The TCCA's rejections on the merits of Holberg's thirty-second point of error on direct appeal and fifteenth ground for state habeas relief (including the same legal arguments presented in her sixth "as applied" claim) was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the

evidence presented in Holberg's trial, direct appeal, and state habeas corpus proceedings. *Tuilaepa*, 512 U.S. at 979-80.

> d.    Adequate Consideration of Mitigating Evidence of Provocation

In her twenty-ninth point of error on direct appeal, Holberg argued the Texas capital sentencing scheme prevented the jury from giving adequate consideration to mitigating evidence of Towery's provocation. Brief of Appellant, 168-84. The TCCA rejected this argument on the merits, concluding Holberg's jury was able to give mitigating effect to evidence of provocation when it answered both the future dangerousness and mitigation special issues. *Holberg v. State*, No. 73,127, at 12:

> Evidence that the defendant acted in part because of provocation tends to show that the defendant is not usually a dangerous person. Provocation on the part of the victim can also be considered an extenuating circumstance. Therefore, appellant's jury could consider and give effect to any evidence of provocation when it answered the first punishment issue, concerning appellant's future dangerousness, *and* when it answered the second punishment issue, concerning mitigation (emphasis in original).

Holberg re-urged the same arguments as her twelfth ground for state habeas relief. The state habeas court rejected this argument once more on the merits. FFCL 22-24; 28/29 Supp.SHCR 8601-03.

At the punishment phase of Holberg's capital murder trial, the jury was presented not only with Holberg's guilt-innocence phase testimony that she had acted in self-defense after Towery assaulted her and continued to assault her but also Holberg's adopted father's testimony recounting the many instances in which Holberg had been assaulted, especially in recent years during her cocaine abuse, and Dr. Patel's expert testimony emphasizing Holberg's history of abuse and arguing that her violent actions toward Towery were in substantial part the products of battered women's syndrome and PTSD. The state trial court instructed Holberg's jury at the punishment phase of trial, in part, as follows: "In arriving at the answers to the Special Issues submitted, you

shall consider all the evidence submitted to you in this trial, which includes that phase of the trial wherein you were called upon to determine the guilt or innocence of the Defendant, as well as this phase of the trial, the punishment phase, wherein you are now called upon to determine the answers to the Special Issues submitted to you by the Court."[22] The trial court also instructed the jury that "you shall consider 'mitigating evidence' to be evidence that a juror might regard as reducing the defendant's moral blameworthiness."[23] The verdict form for Holberg's second special issue began "Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find . . . ."[24] Closing punishment phase jury arguments by counsel for both parties focused on Dr. Patel's testimony and Holberg's history of abuse, as well as the circumstances of her offense.

The standard for evaluating the constitutionality of a capital sentencing jury charge is whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde*, 494 U.S. at 380; *Sprouse v. Stephens*, 748 F.3d 609, 618 (5th Cir. 2014). The TCCA's conclusion that Holberg's jury was able to give mitigating effect to the evidence of provocation when answering both the future dangerousness and mitigation special issues was objectively reasonable. Furthermore, this court independently concludes after *de novo* review there is no reasonable likelihood that Holberg's jury applied the punishment phase jury charge in a way that prevented its consideration of Holberg's evidence of provocation.

---

[22] ECF no. 136, at 707 of 750.
[23] ECF no. 136, at 711 of 750.
[24] ECF no. 136, at 716 of 750.

The TCCA's rejections on the merits of Holberg's twenty-ninth point of error on direct appeal and twelfth ground for state habeas relief (including the same legal arguments presented in her third "as applied" claim) was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial, direct appeal, and state habeas corpus proceedings.

e.      "Unfair" Procedural Default Based on Ineffective Assistance

In her fourth "as applied" claim, which Holberg failed to fairly present either on direct appeal or in her state habeas corpus proceeding, she cites *Coleman v. Thompson*, 501 U.S. 722 (1991), and *Newby v. State*, 252 S.W.3d 431, 439 n.4 (Tex. App. – Houston [14th Dist.] 2008),[25] and argues that it was unfair for the state appellate courts to declare "forfeited" unidentified complaints that her trial counsel failed to preserve for review through "timely exception." Am. Pet. 142.

Holberg's citation to *Coleman* is perplexing. In that decision, the Supreme Court reaffirmed its longstanding rule that federal courts will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. *Coleman*, 501 U.S. at 729. Since *Coleman*, the Supreme Court has not only repeatedly upheld the rule in *Coleman* but has also held that a state procedural bar may count as an adequate and independent ground for denying a federal habeas petition even if the state court has discretion to reach the merits despite the default. *See Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016); *Walker v. Martin*, 562 U.S. 307, 311 (2011); *Beard v. Kindler*,

---

[25] Holberg erroneously attributes this opinion to the TCCA. The Texas Court of Appeals for the Fourteenth District issued this opinion.

558 U.S. 53, 60-61 (2009). Holberg cites no legal authority and offers no argument suggesting how the holding in *Coleman* and its progeny affords her a basis for federal habeas corpus relief. This court's independent research has disclosed none.

Likewise, Holberg's cryptic citation to the footnote in *Newby* furnishes no rational basis for federal habeas relief. The intermediate Texas Court of Appeals' footnote in *Newby* cited to two decisions by the TCCA which recognize the rule in Texas that a defendant's failure to timely object to allegedly improper prosecutorial jury argument waives any complaint about the alleged error on appeal. *See Wead v. State*, 129 S.W.3d 126, 130 (Tex. Crim. App. 2004); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). The Fifth Circuit has repeatedly recognized that non-compliance with the Texas contemporaneous objection rule, i.e., the rule at issue in *Newby*, *Cockrell*, and *Wead*, is a legitimate basis for a finding of procedural default precluding federal habeas corpus review. *See, e.g.*, *Norris v. Davis*, 826 F.3d 821, 832 (5th Cir. 2016); *Scheanette v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007); *Rowell*, 398 F.3d at 374. Holberg cites to no legal authority holding that a state appellate court's recognition or application of state procedural default rules violates any federal constitutional principles. On the contrary, the Supreme Court's holdings in *Coleman* and its progeny implicitly reject such a new rule.

While non-compliance with the Texas contemporaneous objection rule can bar state appellate review of a claim on direct appeal, that bar is far from insurmountable. Texas appellate courts review some complaints of trial court error even in the absence of a timely objection. *See, e.g., Blue v. State*, 41 S.W.3d 129, 132-33 (Tex. Crim. App. 2000) (trial judge's comments which undermined presumption of innocence were not waived by failure to object); *Jimenez v. State*, 32 S.W.3d 233, 238-39 (Tex. Crim. App. 2000) (explaining the nature of "fundamental error" under

Texas law). Federal habeas review of the merits of an otherwise procedurally defaulted claim is possible under either of the two exceptions to the federal procedural doctrine, i.e., the "cause and actual prejudice" and "fundamental miscarriage of justice" exceptions. *House v. Bell*, 547 U.S. 518, 536 (2006); *Dretke v. Haley*, 541 U.S. 386, 393 (2004); *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). One of the most common forms of "cause and actual prejudice" is a showing of ineffective assistance by the counsel (including the very counsel who failed to make the timely objection in question). *See, e.g.*, *Davila v. Davis*, 137 S. Ct. 2058, 2064-65 (2017); *Haley*, 541 U.S. at 387; *Edwards*, 529 U.S. at 447. Furthermore, a procedural default arising from a failure to make a timely objection will not bar federal habeas review of a claim if the last state court to address the federal claim reached the merits. *See, e.g., Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Harris v. Reed*, 489 U.S. 255, 262-63 (1989); *Rhoades v. Davis*, 852 F.3d 422, 430 (5th Cir. 2017) (granting a Certificate of Appealability to decide whether a state habeas court's alternative ruling on the merits of a federal claim removed the state procedural bar resulting from a failure to comply with the Texas contemporaneous objection rule).

There was nothing fundamentally unfair with the application of state procedural default rules, including the Texas contemporaneous objection rule, to Holberg's direct appeal or state habeas corpus proceedings. Multiple avenues existed through which Holberg could obtain merits review of even those federal constitutional claims for which her trial counsel failed to make a timely objection and which the state appellate court refused to the on the merits.[26] For the

---

[26] As explained throughout this Memorandum Opinion and Order, the TCCA addressed the merits of most of Holberg's federal constitutional claims; even those which it found had not been properly preserved through a timely objection. Moreover, out of an abundance of caution, this Court has undertaken *de novo* review of Holberg's claims that are procedurally defaulted from federal habeas review.

foregoing reasons, application of state procedural default rules to Holberg did not render her direct appeal or state habeas corpus proceedings fundamentally unfair. Finally, insofar as Holberg complains about the application of state procedural default rules in her state habeas corpus proceeding, it is axiomatic that procedural infirmities in state collateral proceedings do not furnish a basis for federal habeas corpus relief.[27]

After *de novo* review, this court concludes Holberg's fourth "as applied" claim furnishes no basis for federal habeas corpus relief. Insofar as Holberg argues for adoption of a new rule

---

[27] *See Rockwell v. Davis*, 853 F.3d 758, 761 n.5 (5th Cir. 2017) (state habeas court allegedly failed to adhere to Texas criminal procedural laws), *cert. denied*, 138 S. Ct. 215 (2017); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013) (state habeas court failed to hold an evidentiary hearing on petitioner's *Roper* claim); *In re Gentras*, 666 F.3d 910, 911 (5th Cir. 2012) (state appellate court allegedly used flawed procedures to review state petitions for post-conviction review); *Stevens v. Epps*, 618 F.3d 489, 502 (5th Cir. 2010) (allegedly inadequate funding and staffing of the Mississippi Office of Capital Post-Conviction Counsel); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (alleged ineffective assistance by initial state habeas counsel); *Brown v. Dretke*, 419 F.3d 365, 378 (5th Cir. 2005) (state habeas judge who issued findings of fact was not the same judge who presided over the petitioner's state habeas hearing); *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (alleged misapplication by state habeas court of state procedural rules did not furnish a basis for federal habeas relief because "an attack on the state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself" (quoting *Rudd v. Johnson*, 256 F.3d 317, 320 (5th Cir. 2001)); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004) (Supreme Court precedent does not recognize a general right to effective assistance in a state post-conviction proceeding); *Henderson v. Cockrell*, 333 F.3d 592, 606 (5th Cir. 2003) (state habeas court held that an alleged violation of a petitioner's state statutory right to effective representation in an initial state habeas proceeding did not furnish a basis for relief in a subsequent state habeas proceeding); *Rudd v. Johnson*, 256 F.3d 317, 319 (5th Cir. 2001) (petitioner denied access to the prosecution's file during state habeas corpus proceeding); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir. 2001) (state habeas court allegedly overburdened petitioner's state habeas counsel by assigning multiple state habeas cases to the same counsel at the same time); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir. 2001) (state habeas court's refusal to consider a supplemental state writ application); *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (an attack on a state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself and, therefore, will not furnish a basis for federal habeas relief (quoting *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995)); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (state habeas court adopted the prosecution's proposed findings of fact and conclusions of law only three hours after they were filed with the state court); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997) (state court policy against considering challenges to prison disciplinary proceedings in state habeas corpus proceedings); *Nichols v. Scott*, 69 F.3d at 1275 n.36 (state habeas judge had been the prosecutor in one of the petitioner's prior convictions that was introduced into evidence at the punishment phase of petitioner's capital murder trial, state habeas judge failed to recuse himself *sua sponte*, and state habeas judge signed prosecution's proposed findings and conclusions without change); *McCowin v. Scott*, 67 F.3d 100, 102 (5th Cir. 1995) (petitioner proceeded *pro se* and without a copy of the transcript in his state habeas proceeding and state habeas court failed to hold an evidentiary hearing); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992) (state habeas court quashed subpoenas *duces tecum* served on County District Attorney, State Attorney General, and U.S. Marshal); 28 U.S.C. § 2254(i) ("The ineffectiveness of incompetence of counsel during Federal or State post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

forbidding recognition or application of state rules of procedural default, such as the Texas contemporaneous objection rule, Holberg's argument is also foreclosed by the holding of *Teague.*

### 4. Conclusions

All Holberg's "as applied" challenges to the constitutionality of her conviction and sentence are without arguable merit. Federal claim 11 is denied in all aspects.

## H. Exclusion of Execution Impact Evidence

### 1. The Claim

In a claim Holberg designates as "federal claim 12," she argues the state trial court erred in excluding testimony from her family and friends regarding whether they want her to live or die and the impact on them if she were to be executed. Am. Pet. 142-43.

### 2. State Court Disposition

In her twenty-eighth point of error on direct appeal, Holberg argued her trial court erred in excluding evidence of the impact of her execution on her family and friends. Brief of Appellant, 161-68. The TCCA rejected this claim on the merits. *Holberg v. State*, No. 73,127, at 19. Holberg re-urged the same claim as her seventh ground for state habeas relief. The state habeas court once more rejected it on the merits. FFCL 20; 28/29 Supp.SHCR 8608.

### 3. Clearly Established Federal Law

In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court recognized that States have "a legitimate interest in counteracting mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." *Payne,* 501 U. S. at 825. The Supreme Court determined that a State may properly conclude that, "for the jury to assess meaningfully the defendant's moral culpability and

blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.*

### 4. AEDPA Review

As explained above in § V.E.4, the Supreme Court has consistently used the term "relevant mitigating evidence" to describe evidence which tends to diminish a convicted capital murder defendant's moral blameworthiness or lessen the reprehensible nature of the offense, i.e., evidence which relates to the defendant's character or background or to the circumstances of the offense. The Supreme Court has never included the testimony of a criminal defendant's family and friends concerning the speculative impact of the defendant's possible future execution upon them among the category of mitigating evidence that must be admitted at the punishment phase of a capital murder trial. *United States v. Snarr*, 704 F.3d 368, 402 (5th Cir. 2013); *Johnson v. Dretke*, 450 F.3d 614, 617-18 (5th Cir. 2006). Evidence of an execution's possible impact on a defendant's family and friends does not address either the circumstances of the defendant's capital offense or the defendant's character or background. *Johnson*, 450 F.3d at 318. Respondent correctly argues, insofar as Holberg argues for the adoption of a new rule compelling the admission of execution impact evidence, her claim is foreclosed by *Teague.*

### 5. Conclusions

The TCCA's rejections on the merits of Holberg's twenty-eighth point of error on direct appeal and seventh ground for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial, direct appeal, and state habeas corpus proceedings. Federal claim 12 is denied.

### I.   No Punishment Phase Hung Jury Instruction

#### 1.   *The Claim*

In a claim Holberg designates as "federal claim 13," she argues the state trial court erroneously refused to instruct the jury on the impact of a single hold-out juror at the punishment phase of trial. Am. Pet. 143.

#### 2.   *State Court Disposition*

In her twenty-seventh point of error on direct appeal, Holberg cited *Jones v. United States*, 527 U.S. 373 (1999), and *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and argued the trial court erroneously refused, consistent with a state statute, to instruct her jury on the impact of a single hold-out juror at the punishment phase of trial. Brief of Appellant, 158-61. The TCCA rejected this claim on the merits. *Holberg v. State*, No. 73,127, at 12 (citing *Jones*, 527 U.S. at 382).

#### 3.   *Clearly Established Federal Law*

The Supreme Court has held the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death. *Jones*, 527 U.S. at 382.

#### 4.   *AEDPA Review*

On numerous occasions, the Fifth Circuit has expressly rejected the legal premise underlying this same claim, i.e., the argument a Texas capital murder defendant is constitutionally entitled to have the punishment-phase jury instructed regarding the consequences of a hung jury or a single holdout juror. *See, e.g., Young v. Davis*, 835 F.3d 520, 528 (5th Cir. 2016) (the Eighth

Amendment does not "require the jury be instructed as to the consequences of a breakdown in the deliberative process" (quoting *Jones*, 527 U.S. at 382)); *Hughes v. Dretke*, 412 F.3d 582, 593-94 (5th Cir. 2005) (holding the same arguments underlying Holberg's twenty-seventh point of error on direct appeal were so legally insubstantial as to be unworthy of a certificate of appealability); *Alexander v. Johnson*, 211 F.3d 895, 897-98 (5th Cir. 2000) (holding the *Teague v. Lane* non-retroactivity doctrine precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466-67 (5th Cir. 1995) (same).

Holberg's reliance upon the Supreme Court's holding in *Caldwell* is misplaced. In *Caldwell*, the Supreme Court addressed an instance in which a capital murder prosecutor's jury argument suggested, in an erroneous and misleading manner, the jury was *not* the final arbiter of the defendant's fate.[28] To establish a *Caldwell* violation, "a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989). No such error occurred during Holberg's trial. Moreover, the Fifth Circuit has repeatedly rejected efforts identical to Holberg's to shoehorn the Supreme Court's holding in *Caldwell* into the wholly dissimilar context of a Texas capital trial. *See, e.g., Turner*, 481 F.3d at 300 (recognizing Fifth Circuit precedent foreclosed arguments the Eighth Amendment and Due Process Clause of the Fourteenth Amendment mandated jury instructions regarding the

---

[28] In *Caldwell*, the Supreme Court held the following statement by the prosecution during its closing argument undermined reliable exercise of jury discretion:

> Now, [the defense] would have you believe that you're going to kill this man and they know--they know that your decision is not the final decision. My God, how unfair can they be? Your job is reviewable. They know it.

*Caldwell v. Mississippi*, 472 U.S. at 325 & 329.

effect of a capital sentencing jury's failure to reach a unanimous verdict); *Alexandre*, 211 F.3d at 897 n.5 (same).

### 5. Conclusion

The TCCA's rejection on the merits of Holberg's twenty-seventh point of error on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. Federal claim 13 is denied.

## J. Definition of Mitigating Evidence & Adequate Consideration of Prospects for Rehabilitation

### 1. The Claim

In a claim Holberg designates as "federal claim 14," she argues the Texas capital sentencing scheme's special issues prevented her jury from giving mitigating effect to her evidence that she was potentially subject to rehabilitation. Am. Pet. 143-44.

### 2. State Court Disposition

In her thirty-third point of error on direct appeal, Holberg argued that the Texas capital sentencing special issues prevented her jury from giving mitigating effect to her evidence that she was subject to rehabilitation. Brief of Appellant, 191-99. The TCCA rejected this argument on the merits, finding Holberg's jury could give mitigating effect to her evidence of a "potential for rehabilitation" when answering both the future dangerousness and mitigation special issues. *Holberg v. State*, No. 73,127, at 14. Holberg re-urged the same argument as her tenth ground for state habeas relief. The state habeas court again rejected it on the merits. FFCL21-22; 28/29 Supp.SHCR 8600-01.

104

### 3.   Clearly Established Federal Law

The authorities discussed above in § V.G.3.d. also govern the disposition of this claim.

### 4.   AEDPA Review

For the same reasons discussed above in § V.G.3.d., the TCCA reasonably concluded that Holberg's jury could consider the mitigating aspects of evidence Holberg was potentially subject to rehabilitation when answering capital sentencing special issues. Multiple defense witnesses testified Holberg was remorseful for her crimes. Whether she could be rehabilitated was logically and rationally related to the question of whether there was a probability she would commit future acts of violence that constituted a continuing threat to society. Whether she possessed the type of character that made her a potential subject of rehabilitation was likewise logically something individual jurors could consider when answering whether there was anything in her character or background that warranted imposition of a life sentence. There was no reasonable likelihood that Holberg's jury considered themselves unable to give mitigating effect to the testimony of Holberg's friends and family regarding Holberg's intelligence, her struggles with drug addiction, her participation in charitable works as a child and adolescent, her participation in Bible study while a prisoner and pretrial detainee, or her willingness to help others. Holberg's defense counsel presented a wealth of testimony from her family and friends establishing Holberg's propensity for rehabilitation.

Dr. Patel's testimony repeatedly and emphatically emphasized that Holberg's violent assault upon Towery was fueled primarily by her massive consumption of crack cocaine in the hours leading up to their confrontation, which dovetailed with Holberg's own guilt-innocence phase testimony that she had an traffic accident the morning the murder while high on crack, she smoked crack in the restroom of Towery's apartment complex's office, and she smoked crack

again just minutes before their violent confrontation began. Dr. Patel also opined that Holberg was not likely to be violent if denied access to crack cocaine. Defense witness Cliff Marshall testified it was unlikely that Holberg would be able to get access to cocaine easily while in prison.

Given the punishment phase jury instructions summarized above in § V.G.3.d., this court independently concludes after *de novo* review that there was no reasonable likelihood any of Holberg's jurors construed those instructions as precluding them from giving mitigating effect to the foregoing evidence.[29]

### 5. *Conclusions*

The TCCA's rejections on the merits of Holberg's thirty-third point of error on direct appeal and tenth ground for state habeas relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial, direct appeal, and state habeas corpus proceedings. Federal claim 14 is denied.

---

[29] Furthermore, insofar as this claim can be construed as an attack upon the facial constitutionality of the Texas capital sentencing statute's definition of mitigating circumstance or mitigating evidence, the Fifth Circuit has repeatedly and consistently rejected such challenges. *See, e.g., Rhoades v. Davis*, 914 F.3d 357, 366 (5th Cir. 2019) ("This court has not accepted that it is unconstitutional to define mitigating evidence as evidence that recues moral blameworthiness." (citing *Blue v. Thaler*, 665 F.3d 647, 667 (5th Cir. 2011)), *cert. denied*, 140 S. Ct. 166 (2019); *Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018) ("Article 37.071 §2(e)(1) offers a 'broad definition of mitigating evidence' that is not limited by §2(f)(4)'s reference to 'moral blameworthiness.'" (citing *Blue*, 665 F.3d at 666)), *cert. denied*, 140 S. Ct. 180 (2019); *Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. 2014) (the Texas capital sentencing statute does not unconstitutionally preclude the jury from considering, as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that a defendant proffers as a basis for a sentence of less than death." (quoting *Beazley*, 242 F.3d at 260)). Insofar as Holberg argues to the contrary, Respondent correctly points out the holding in *Teague v. Lane* forecloses this claim.

### K.  Guilt-Innocence Phase Jury Instructions

#### 1.  *The Claim*

In a claim Holberg designates as "federal claim 15," she cites to *Beck v. Alabama*, 447 U.S. 625 (1980), *Espinosa v. Florida*, 505 U.S. 1079 (1992), and *Shell v. Mississippi*, 498 U.S. 1 (1990), and argues her guilt-innocence phase jury charge was unconstitutionally vague regarding the offense of robbery because the trial court refused to furnish the jury, in response to a written jury note, with a supplemental instruction regarding the definition of the term "in the course of committing or attempting to commit robbery." Am. Pet. 144-45.

#### 2.  *State Court Disposition*

In her seventeenth point of error on direct appeal, Holberg argued that the guilt-innocence jury charge left the jury without sufficient guidance for determining the presence or absence of the "in the course of committing or attempting to commit robbery" factor. Brief of Appellant, 111-13. The TCCA rejected this complaint on the merits, finding the trial court accurately instructed the jury under Texas law on the pertinent statutory elements of capital murder, murder, manslaughter, robbery, burglary, and theft and accurately instructed that the term "in the course of committing" an offense "means conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense." *Holberg v. State*, No. 73,127, at 11 (quoting *Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980)). The TCCA concluded that if the jury believed Holberg murdered Towery and only afterward decided to commit theft, it could have found her guilty of the lesser included offense of murder. *Id.*, at 12. Holberg re-urged the same arguments as her eleventh ground for state habeas relief. The state habeas court rejected it on the merits. FFCL 22; 28/29 Supp.SHCR 8601.

### 3.   Clearly Established Federal Law

In *Beck*, 447 U.S.at 637, the Supreme Court held it was constitutionally prohibited for a state trial court to fail to give an instruction on a lesser-included offense when the evidence "leaves some doubt with respect to an element that would justify conviction of a capital offense." In *Espinosa*, 505 U.S. at 1081, the Supreme Court struck down as unconstitutionally vague a punishment phase jury charge permitting a capital sentencing jury to consider as an aggravating circumstance evidence showing the offense was "especially wicked, evil, atrocious or cruel." In *Shell*, 498 U.S. at 1, the Supreme Court struck down a capital murder conviction premised upon an aggravating factor of "especially heinous, atrocious or cruel" despite the state trial court's effort to furnish a limiting instruction for that term.

### 4.   AEDPA Review

Texas courts define "in the course of committing" an offense as "conduct occurring in an attempt to commit, during the commission, or in the immediate flight after the attempt of commission of the offense." *Reed v. Quarterman*, 504 F.3d 465, 489 (5th Cir. 2007) (quoting *Garrett v. State*, 851 S.W.2d 851, 856 (Tex. Crim. App. 1993)). Texas law provides that "evidence is sufficient to support a capital murder conviction if it shows an intent to obtain or maintain control of property which was formed before or contemporaneously with the murder." *Id.* Proof of a robbery "committed as an 'afterthought' and unrelated to a murder" is insufficient to prove capital murder. *Id.* (quoting *O'Pry v. State*, 642 S.W.2d 748, 762 (Tex. Crim. App. 1982)). Insofar as the TCCA concluded Holberg's jury was properly instructed on the elements of both capital murder and ordinary murder under applicable state law, that finding binds this court. *Bradshaw*, 546 U.S. at 76. The Fifth Circuit has expressly rejected the same void-for-vagueness constitutional challenge to the Texas definition of the phrase "in the course of committing" that was included in

Holberg's jury charge. *Anderson v. Collins*, 18 F.3d 1208, 1222-23 (5th Cir. 1994). Thus, Holberg's reliance on the holdings in *Espinosa* and *Shell* is misplaced. *Id.*

Because Holberg's jury was properly instructed in accordance with applicable state law on the elements of both capital murder and the lesser-included offense of ordinary murder, her guilt-innocence jury charge did not violate the holding in *Beck. See Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir. 2005) (holding no *Beck* error occurred in capital murder trial where jury was instructed on the lesser-included offense of aggravated kidnaping); *Johnson v. Puckett*, 176 F.3d 809, 817-20 (5th Cir. 1999) (no *Beck* error occurred where trial court also instructed the jury on the lesser-included offense of non-capital murder); *Allridge v. Scott*, 41 F.3d 213, 218-20 (5th Cir. 1994) (no *Beck* error occurred where jury instructed on the lesser-included offense of ordinary murder, even if evidence would also have supported conviction for the lesser-included offense of felony murder).

### 5.  Conclusions

The TCCA's rejections on the merits of Holberg's seventeenth point of error on direct appeal and eleventh ground for state habeas relief were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. Federal claim 15 is denied.

### L.  Burden of Proof on Provocation

#### 1.  The Claim

In a claim Holberg designates as "federal claim 16," she argues without citation to any legal authority that her constitutional rights were violated because the prosecution was not required

to prove, as had been required by Texas statute prior to September 1, 1991, that her conduct in killing Towery was unreasonable in response to the provocation. Am. Pet. 145-46.

### 2. State Court Disposition

In her twentieth point of error on direct appeal, Holberg argued, without citation to any federal legal authority, that there was insufficient evidence showing she was eligible to receive the death penalty because the State failed to prove lack of provocation. Brief of Appellant, 124-41. The TCCA rejected this claim on the merits, holding that Texas statutes applicable at the time of her offense did not require the State to prove lack of provocation on the part of the victim. *Holberg v. State*, No. 73,127, at 7. Holberg re-urged the same argument as her thirteenth ground for state habeas relief. The state habeas court rejected it on the merits. FFCL 24; 28/29 Supp.SHCR 8603.

### 3. Clearly Established Federal Law

A state law establishing criminal liability – laying out either the elements of the offense or the defenses to a crime -- violates due process principles only "if it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Kahler v. Kansas*, 140 S. Ct. 1021, 1027 (2020) (quoting *Leland v. Oregon*, 343 U.S. 790, 798 (1952)). In *Powell v. Texas*, 392 U.S. 514, 533 (1968), the Supreme Court recognized the paramount role of the States in setting standards of criminal responsibility. In *Powell*, the Supreme Court upheld against constitutional challenge Texas' refusal to adopt the defense of chronic alcoholism as a defense to the offense of public drunkenness, concluding doctrines of criminal responsibility must remain the province of the States. *Id.*, 392 U.S. at 534-37.

### 4. AEDPA Review

Holberg has cited no legal authority establishing a constitutional prohibition against the State of Texas' adoption of the new statutory definition of murder which the Texas Legislature

enacted effective September 1, 1991. This court's independent research has likewise located no such legal authority.[30] Nothing in the Constitution required Texas to maintain the burden of disproving provocation as an element of the offense of murder, as opposed to making the issue of provocation an affirmative defense to that offense or a subject for consideration exclusively at sentencing. Insofar as Holberg argues the due process clause precluded the Texas Legislature's adoption of the 1991 amendment to applicable Texas law defining the elements of the offense of murder, which no longer mandated that the prosecution disprove provocation as an essential element of the offense, Holberg's argument is foreclosed by both the Supreme Court's holdings in *Leland* and *Powell* as well as the holding in *Teague v. Lane*.

As explained above in § V.G.3.d., there is no reasonable likelihood that Holberg's capital sentencing jury construed the punishment phase jury charge bas precluding it from being able to give mitigating effect to her evidence that Towery instigated the violent confrontation between them. This is all the Eighth Amendment required. *Boyde*, 494 U.S. at 380; *Sprouse*, 748 F.3d at 618.

The Fifth Circuit has repeatedly rejected arguments suggesting that the State of Texas was required to disprove the existence of mitigating evidence. *See, e.g.*, *Sprouse*, 748 F.3d at 643-44 (a finding of mitigating circumstances under the Texas capital sentencing scheme reduces a sentence from death rather than increasing it to death (quoting *Granados v. Quarterman*, 455 F.3d 529, 536 (5th Cir. 2006)); *Blue*, 665 F.3d at 668 ("no Supreme Court precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." (quoting *Druery v.*

---

[30] For thorough discussions of why the Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), have no application to Holberg's capital murder trial, see *Scheanette*, 482 F.3d at 828; *Gamboa v. Davis*, 2016 WL 4413280, *12-*20 (W.D. Tex. Aug. 4, 2016); and *Garza v. Thaler*, 909 F.Supp.2d 578, 673-79 (W.D. Tex. 2012).

*Thaler*, 647 F.3d 535, 546 (5th Cir. 2011)); *Scheanette*, 482 F.3d at 828 ("We have specifically held that the Texas death penalty scheme did not violate either *Apprendi* or *Ring* by failing to require the state to prove beyond a reasonable doubt the absence of mitigating circumstances."); *Rowell*, 398 F.3d at 378 (same).

### 5. Conclusions

The TCCA's rejection on the merits of Holberg's twentieth point of error on direct appeal and thirteenth ground for state habeas relief were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial, direct appeal, and state habeas corpus proceedings**.** Federal claim 16 is denied.

### M. Adequate Consideration of Mitigating Evidence of Provocation

#### 1. The Claim

In a claim Holberg designates as "federal claim 17," she again argues the trial court's jury instructions effectively prevented her jury from giving mitigating effect to evidence of Towery's provocation. Am. Pet 145-46.

#### 2. State Court Disposition

In her twenty-ninth point of error on direct appeal, Holberg argued the Texas capital sentencing scheme prevented her jury from giving adequate consideration to mitigating evidence of Towery's provocation. Brief of Appellant, 168-84. The TCCA rejected this argument on the merits, concluding Holberg's jury was able to give mitigating effect to evidence of provocation when it answered both the future dangerousness and mitigation special issues. *Holberg v. State*,

No. 73,127, at 12. Holberg re-urged the same argument as her twelfth ground for state habeas relief. The state habeas court denied it on the merits. FFCL 22-24; 28/29 Supp.SHCR 8601-03.

### 3.  Clearly Established Federal Law

The authorities discussed above in § V.G.3.d. also govern the disposition of this claim.

### 4.  AEDPA Review

For the same reasons discussed above in §§ V.G.3.d. & V.L.4., Holberg's complaints about the Texas capital sentencing scheme identify no constitutional error in her capital murder trial. Her jury was fully capable of giving mitigating effect to her evidence of Towery's alleged provocation when answering each of the punishment phase special issues. This is all the Eighth Amendment required. *Boyde*, 494 U.S. at 380; *Sprouse*, 748 F.3d at 618.

### 5.  Conclusions

The TCCA's rejection on the merits of Holberg's twenty-ninth point of error on direct appeal (including the same legal arguments presented in her seventeenth federal claim) was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and direct appeal. Federal claim 17 is denied.

## VI.   *BRADY* AND PROSECUTORIAL MISCONDUCT RELATED CLAIMS

### A.  False Testimony — Kirkpatrick (Claim 1a)

#### 1.  The Claim

Holberg asserts, as she did in her state habeas corpus proceeding, that District Attorney Farren ("DA Farren") scripted, coerced, and presented false testimony from former prosecution witness Vickie Kirkpatrick that was critical to negating Holberg's self-defense theory and proving

the aggravating elements of burglary and robbery, in violation of *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959). Am. Pet. 29-35, 56-57.

### 2.   *State Court Disposition*

In support of this claim, Holberg's thirty-third ground for state habeas relief, she presented her state habeas court with a videotaped deposition of Kirkpatrick, in which she recanted portions of her trial testimony, as well as multiple affidavits from other individuals. The state habeas court denied relief on the merits, finding that Holberg's evidence was either incredible or incompetent, and that this claim had no basis in fact. FFCL, 97-107, 124-27; 28/29 Supp.SHCR 8676-86, 8703-06. More specifically, the state habeas trial court found that Kirkpatrick testified accurately at Holberg's trial, i.e., in a manner consistent with both Kirkpatrick's pretrial statements to law enforcement and Kirkpatrick's subsequent testimony at her plea hearing, and Kirkpatrick's recanting deposition testimony to the contrary was not credible. FFCL, 101-06; 28/29 Supp.SHCR 8680-85. This Court must determine whether the factual determinations made by the state court were objectively unreasonable in light of the evidence before that court. *See* 28 U.S.C. § 2254(d)(2); *Miller-El*, 537 U.S. at 340.

### 3.   *Clearly Established Federal Law*

A state denies a criminal defendant due process when it knowingly uses perjured testimony at trial or allows untrue testimony to go uncorrected. *Giglio*, 405 U.S. at 153-54; *Napue*, 360 U.S. at 269-70. To succeed in showing a due process violation from the use of allegedly perjured testimony, a defendant has the burden of establishing that (1) the witness in question actually gave false testimony, (2) the falsity was material in that there was a reasonable likelihood that it affected the judgment of the jury, and (3) the prosecution used the testimony in question *knowing* that it was false. *Giglio*, 405 U.S. at 153-54. Thus, the deliberate deception of a court and jurors by the

114

presentation of known false evidence is incompatible with the rudimentary demands of justice and

violates due process. *See Giglio*, 405 U.S. 153 (citing *Mooney v. Hologan*, 294 U.S. 103 (1935));

*Napue*, 360 U.S. at 269 (applying *Mooney* to testimony that bore upon witness's credibility).

### 4.  AEDPA Analysis

To succeed in this type of claim, a defendant must show that the testimony was actually

false, the state knew or should have known that it was actually false, and the false testimony was

material. *In re Raby*, 925 F.3d 749, 756 (5th. Cir. 2019); *Canales v. Stephens*, 765 F.3d 551, 573

(5th Cir. 2014) (a conviction obtained through false evidence known to be such by representatives

of the State violates a defendant's constitutional rights); *Kinsel v. Cain*, 647 F.3d 265, 271 (5th

Cir. 2011) ("The Supreme Court has held that the Due Process Clause is violated when the

government knowingly uses perjured testimony to obtain a conviction."); *Reed v. Quarterman*,

504 F.3d at 473 (same). False testimony is material if there is "any reasonable likelihood" that it

could have affected the jury's verdict. *Raby*, 925 F.3d at 756; *Canales*, 765 F.3d at 573; *Goodwin

v. Johnson*, 132 F.3d 162, 185 (5th Cir. 1997) (citing *Westley v. Johnson*, 83 F.3d 714 (5th Cir.

1996)).

### a.  Holberg's Arguments

The Court observes at the outset that Kirkpatrick's trial testimony was consistent with her

sworn, 1997 statement to Police Sergeant Hudson, made before Holberg's trial while Kirkpatrick

was out on bond from a burglary charge. 19 RR 234-35; FFCL 34; 28/29 Supp.SHCR 8613, ¶ 5.

Holberg's present claim largely relies on Kirkpatrick's 2011 deposition, a video recording of

which is part of the record before this Court. *See* 7/29 Supp.SHCR 1630-1721. According to

Kirkpatrick's deposition testimony, after being arrested for burglary, she was placed in a cell with

four other women.[31] She was removed from the cell and brought to DA Farren's office, where he told her she had been placed in the cell to obtain information from Holberg about the murder. She was returned to her cell to speak with Holberg about the murder, and then brought back to DA Farren's office sometime after that. At this second visit, DA Farren had Kirkpatrick write down what Holberg said, but he tore it up and directed her to rewrite it, telling her what to say. These two meetings were with DA Farren alone in his office. After Kirkpatrick finished writing the second statement, Sergeant Hudson appeared and witnessed her signature. Kirkpatrick was then transferred to Potter County jail but was brought back to Randall County at least twice to meet with DA Farren and two or three assistants, to revise and clarify her testimony before the trial.

The Amended Petition emphasizes the following details from Kirkpatrick's deposition testimony:

- Holberg was actually very sad and remorseful when she discussed Towery's death, but DA Farren had Kirkpatrick falsely describe Holberg as smiling, laughing, and cutting up;

- Kirkpatrick, a prostitute, had been to Towery's apartment for sex and knew him as a violent drunk, but DA Farren forced her to say she never had any contact with him;

- DA Farren threatened Kirkpatrick with twenty years in prison for twelve to fifteen burglary charges she had pending if she did not cooperate;

- DA Farren promised Kirkpatrick three years or maybe even probation if she did cooperate;

---

[31] The verbatim transcription of the videotaped recanting deposition of Vickie Kirkpatrick a/k/a Vickie Jeanne Roach given August 15, 2011 appears at 7/29 Supp/SHCR 1623-1722. Her recanting affidavit dated July 13, 2011 appears at 7/29 Supp/SHCR 1615-19.

- DA Farren specifically told her to use the words "pretty," "like a fountain," and "fun and amusing," when describing Holberg's description of the stabbing;

- Holberg actually told Kirkpatrick that, after the fight started, it became self-defense;

- Kirkpatrick knew nothing about the lamp in Towery's throat, but DA Farren showed her the pictures and told her to write about the lamp and the gurgling noises;

- Holberg never said Towery was the source of her money and never mentioned bloody money;

- DA Farren told Kirkpatrick to testify that Holberg went to a motel and smoked dope all night, which Holberg never said;

- Right before she took the stand, DA Farren threatened Kirkpatrick if she did not cooperate;

- Kirkpatrick had hoped to get probation on the burglary charges, but she received three years.

The Amended Petition contends that a letter Kirkpatrick wrote to her sentencing judge and by affidavits of Melissa Wiseman, Michelle Lucero, and Roger Speir bolsters Kirkpatrick's deposition testimony. Am. Pet. 30-33; Corrected Reply 8.

DA Farren provided an affidavit to the state court stating that he never met Kirkpatrick until the morning of her testimony, that he did not "plant" her in the jail cell, and that he did not direct her to testify in any way other than to tell the truth. DA Farren points out that the affidavit signed before Sergeant Hudson, which he allegedly forced Kirkpatrick to sign, espouses the *defense theory* of the case (that Holberg killed a sugar daddy, not a hapless stranger). He asserts that Kirkpatrick is not credible because she refused to allow her attorney Greta Crofford to provide a clarifying affidavit, she did not accurately recall the unusual layout of Towery's apartment, and,

117

to the extent Kirkpatrick testified that she did not know Towery, this allegedly false testimony was elicited first by Holberg's counsel, not DA Farren. 4/29 Supp.SHCR 946-47.

Holberg argues that the state court findings are unreasonable because Judge Estevez "simply dismissed" her evidence based on the Judge's personal knowledge of DA Farren, while Kirkpatrick and other affiants offered in support of Holberg were "unknowns." This argument overlooks the fact that the state court viewed Kirkpatrick's recorded deposition testimony, including cross-examination, before determining Kirkpatrick's deposition testimony lacked credibility. FFCL 106; 28/29 Supp.SHCR 8685, ¶ 24. The argument also overlooks many conflicts between the deposition testimony and other information in the record--including Kirkpatrick's own prior statements--that objectively undermine her credibility. The conflicts are discussed below in loose chronological order.

> b.    Information in the Record that Refutes Kirkpatrick's Deposition Testimony

In her deposition, Kirkpatrick said that DA Farren had her removed from her cell on the day after her arrest, met with her alone, and then returned her to her cell. 7/29 Supp.SHCR 1630-32. She talked to Holberg that night and, within the next day or two, was called back to DA Farren's office where he told her what she would say in her sworn statement and testimony. 7/29 Supp.SHCR 1637-39. The record, however, contains Sergeant Hudson's police report dated June 18, 1997 showing that Kirkpatrick was released from the jail when she gave her statement. 5/18 SHCR 705. This report is corroborated by the subsequent testimony of Kirkpatrick's arresting officer, Corporal Eddie Stallings, who stated at Kirkpatrick's 1998 burglary trial that he had arranged for Kirkpatrick's release on bond so that she could help him recover stolen property. 2/2 SHCR 617, 624. The information that Kirkpatrick was out on bond refutes Kirkpatrick's deposition

testimony, given thirteen years later, that DA Farren removed her from her cell to take her statement and then returned her to her cell afterwards.

Some months after Kirkpatrick made her original statement to Sgt. Hudson, she sent a handwritten letter to the judge presiding in her burglary case, asking him to grant her probation. The letter stated that she had helped the police recover stolen merchandise and was willing to testify on the "brutal murder that Brittany Holberg did." It said that her statement of what she knows about the murder was "with SWAT." 17/29 Supp.SHCR 5270; 27/29 Supp.SHCR 8520. Holberg argues that this letter supports this claim because it shows Kirkpatrick "expected her testimony against Holberg would lead to probation." Am. Pet. 33.

Holberg overstates the letter's content, which shows a request for probation, not an expectation. It is an attempt to persuade the judge to grant probation in exchange for recovering the stolen property and testifying against Holberg and not indicative of any existing deal with Farren. The record of her subsequent burglary trial supports this interpretation. It shows that Kirkpatrick's arresting officer, Corporal Stallings, was on the SWAT team and that Kirkpatrick believed Stallings would recommend probation because she had helped him recover the property. 2/2 SHCR 611, 616-17, 624. Kirkpatrick's assertion in the letter that "SWAT" possessed her written statement is inconsistent with Kirkpatrick's deposition testimony that DA Farren, not "SWAT," fabricated the statement. Holberg presents no explanation for why DA Farren, after allegedly fabricating the statement in his office, would turn it over to the SWAT team or, more importantly, why Kirkpatrick would know that he did so. Kirkpatrick's letter to the judge corroborates the circumstances in Sgt. Hudson's report, that Corporal Stallings took Kirkpatrick to Sergeant Hudson to give her statement.

119

Kirkpatrick's testimony at her 1998 burglary trial also undermines this claim. 2/2 SHCR 554-629. Judge Gleason stated on the record that Kirkpatrick was pleading guilty *without* a plea bargain agreement because she had *rejected* the State's offer of five years. 2/2 SHCR 560-61. This refutes Kirkpatrick's deposition testimony that DA Farren had offered her three years or probation. 7/29 Supp.SHCR 1639. Judge Gleason ultimately sentenced Kirkpatrick to three years' confinement. 2/2 Supp.SHCR 627. A reasonable state court could conclude that Kirkpatrick had tailored her deposition testimony about DA Farren's alleged misconduct to match her actual sentence of three years. The burglary trial transcript also shows that Kirkpatrick had reached out to Tessa Cobb, Holberg's aunt and a drug abuse counselor, about potential rehabilitation centers. 2/2 Supp.SHCR 576; Am. Pet. 6; 24 RR 70. A state court could reasonably conclude that the relationship suggests a bias in favor of Holberg.

Glaringly absent from Holberg's Amended Petition is any reference to Greta Crofford, Kirkpatrick's defense counsel on the 1998 burglary charge. Under direct examination by Ms. Crofford, Kirkpatrick testified that her testimony at Holberg's trial was truthful and that she did not do it to get a better deal on the burglary charge. Kirkpatrick elaborated:

> *I'm the one who went to them. They didn't come to me asking me what I knew about it.* As soon as she [Holberg] told me what had happened, I went to the police myself willingly and made a statement. I didn't ask for no deal. If I had wanted any kind of a favor, I would have asked it before I made the statement. I didn't. She was wrong, just like I'm wrong, just like I'm willing to admit that I was wrong. She was wrong as well.

2/2 Supp.SHCR 585 (emphasis added).

Faced with her own sworn testimony directly conflicting her current narrative, Kirkpatrick testified at the deposition that DA Farren had coerced this testimony, too. 7/29 Supp.SHCR 1672-73. Kirkpatrick stated that Ms. Crofford had recommended that Kirkpatrick *not* testify at Holberg's

120

trial, but DA Farren called Kirkpatrick into his office (apparently without Crofford present) and told her that if she did not testify, she would be "hid for a very long time." 7/29 Supp.SHCR 1652-53. According to Kirkpatrick's deposition testimony, Ms. Crofford (1) knowingly allowed Kirkpatrick to give false testimony at Holberg's trial *and* (2) elicited false testimony at the burglary trial from Kirkpatrick, as well as DA Farren (2/2 SHCR 577-80), in an apparent cover-up.

When asked at the deposition if she thought Ms. Crofford provided ineffective assistance, Kirkpatrick replied, "I think she went against my will. I think she knew that was some dirty shit going on, and she still allowed it to happen." 7/29 Supp.SHCR 1710-11. When asked if she would waive the attorney-client privilege so that Ms. Crofford could be questioned, *Holberg's* counsel quickly interjected and advised Kirkpatrick not to do so. Kirkpatrick accordingly refused to waive the privilege. 7/29 Supp.SHCR 1711. Yet only a month earlier, Holberg's same attorney had informed Judge Estevez that they could get an affidavit from Greta Crofford. A state court could reasonably conclude, based on this record, that Ms. Crofford would have contradicted Kirkpatrick's narrative in the deposition testimony.

Kirkpatrick signed an affidavit on July 12, 2011, a mere month before her deposition testimony. In it, she states that DA Farren gave her the story he wanted her to tell on the first occasion of their meeting and that this meeting was in the jail. 7/29 Supp.SHCR 1616. At her deposition only four weeks later, she testified that DA Farren scripted her story on their second meeting and that this meeting was in his office. 7/29 SHCR 1637. Her affidavit states she was "threatened by DA Farren and at least three or four men" whom she believed were assistant district

attorneys, while her deposition estimates "two or three" assistants. 7/29 SHCR 1618, 1719. Thus, even within the scope of a month, Kirkpatrick did not tell the same story twice.[32]

Kirkpatrick's deposition testimony was also internally inconsistent regarding the serious accusation that DA Farren planted her in Holberg's cell. She testified initially that Farren placed her in a cell with Holberg because Farren wanted her to talk to Holberg about the murder. 7/29 Supp.SHCR 1631. When counsel for Respondent cross-examined Kirkpatrick about this, Kirkpatrick reversed course, stating, "He didn't actually put me in there." 7/29 Supp.SHCR 1686-87.

At the deposition, Kirkpatrick also denied knowing a woman named Lynette Voss Tucker and denied telling Tucker that Holberg "got off on killing Mr. Towery." 7/29 Supp.SHCR 1701-04. In fact, the record contains notes of the trial team's interview with Tucker and an affidavit from Tucker, which Holberg had filed with her original writ application. 1/2 Supp.SHCR 159, 237 (Ex. U, interview notes), 259 (Ex. AD, affidavit). These documents show that Tucker had known Kirkpatrick for about two years and describe the circumstances of their meeting. They show that Kirkpatrick had, in fact, informed Tucker that Holberg said Towery's blood got Holberg's

---

[32] The record before the state court includes two additional affidavits from Valerie Mackenzie, a Scottish petroleum economist who helped with writ counsel's fact investigation. 1/2 SHCR 249-54. The state court deemed Mackenzie's affidavits incompetent hearsay. 28/29 SHCR 8675. This Court considered their contents to give Holberg all possible benefit of the doubt. However, the Mackenzie affidavits relate statements by Kirkpatrick that also conflict with Kirkpatrick's 2011 narrative. For example, Kirkpatrick told Mackenzie she had admitted to 83 counts of burglary, but her deposition testimony estimates the number at "12, 15" burglaries. 1/2 SHCR 250; 7/29 SHCR 1638. Kirkpatrick told Mackenzie that she personally knew DA Farren because she and her "boyfriend, Roger" had been passing narcotics information to SWAT. 1/2 SHCR 250. In her deposition testimony, Kirkpatrick suggested she "really didn't know" who Farren was. 7/29 SHCR 1631. Kirkpatrick told Mackenzie that Farren had offered her a five-year plea deal but stated in her deposition that he offered her three years. 1/2 SHCR 251; 7/29 SHCR 1639. Kirkpatrick told Mackenzie that she had refused the plea bargain offer in anger, which contradicts her deposition testimony that DA Farren did her "a favor" because she "could have served 20." 7/29 SHCR 1714-15. Finally, Kirkpatrick purportedly told Mackenzie that she had broken down crying over having given false testimony and wanted to speak to Holberg's writ counsel and "anybody else who can help her to ensure the truth is told." *See* /2 SHCR 251, 252. Yet, in 2006, Kirkpatrick refused to sign a statement for Holberg's investigator stating that her trial testimony was false. 2/18 SHCR 254 (aff't of James C. Lohman, Esq.).

"adrenaline going" and Holberg "got off on it." 1/2 SHCR 237. These notes, made by the trial team when Tucker and the trial team had no apparent motive to lie, reasonably undermine Kirkpatrick's later assertion that she did not know Tucker.

The state habeas court could reasonably have found that Kirkpatrick also lied in her deposition testimony about whether Holberg's attorneys paid money to gain access to Kirkpatrick. 7/29 Supp.SHCR 1693. Holberg's attorneys represented to Judge Estevez a month earlier they had indeed paid for access to Kirkpatrick. They explained Kirkpatrick "keeps company with a gentleman [sic] who apparently controls her movements." They further explained the "State may have some unnecessary expenses for a hotel room or dinner in order to secure this gentleman's permission to make her available." When Judge Estevez asked Holberg's counsel if they had to hire Kirkpatrick for sex, counsel denied that, but said they basically had to hire the man. 1/1 SHRR (July 14, 2011) 74-75. Kirkpatrick's denial of these circumstances, which were discussed in open court, reasonably undermines her credibility.

Finally, when DA Farren mentioned Kirkpatrick's testimony during rebuttal argument at trial, he downplayed the very details that Holberg accuses him of fabricating:

> Finally, Ms. Kirkpatrick. Now why is there so much difference in the story she [Holberg] told Ms. Kirkpatrick? *Do I think in reality even Brittany Holberg is so callous and uncaring that she actually really did enjoy stabbing him, that she actually really did think the blood was a pretty fountain? No I don't. That's jailhouse talk. That's what you tell your roommate to let them know you're bad. . . . Is that really the way she felt? I'm not suggesting that to you.*
>
> I'm not trying to sell you on the fact that she actually is like a vampire and thought the blood was pretty, but I am telling you she really did talk to Ms. Kirkpatrick and she really did tell her these things.
>
> Jailhouse puffery but in the meantime, as is always with liars, she made some mistakes and this time the mistake was kind of reversed. She included some details that she had been better off to have left out.

123

22 RR 77-78 (italics added). It strains logic to conclude that DA Farren scripted, coerced, and "led Kirkpatrick through sensational testimony about Holberg's alleged jailhouse confession" (Am. Pet., p. 30), risking his career and livelihood, only to deny the truthfulness of that same testimony during closing argument. In short, the record contains significant, objective proof of Kirkpatrick's lack of credibility and fully supports the state habeas court's factual findings regarding the incredible nature of Kirkpatrick's recanting testimony. *See Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005) (recanting affidavits are viewed with extreme suspicion); *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) (recanting affidavits and testimony are disfavored and recanting affidavits must be compared to the trial record to determine if they are worthy of belief); *May v. Collins*, 955 F.2d 299, 314 (5th Cir. 1992) (the trial judge is in the optimal position to assess the credibility of affidavits).

c.    Additional Affidavits Offered in Support

The Amended Petition contends, however, that the declarations of Melissa (Pacheco) Wiseman, Michelle Lucero, and Roger Speir support and buttress Kirkpatrick's deposition testimony.[33] Am. Pet. 33-34; Corrected Reply 8. Holberg filed Wiseman's 2011 declaration with the Motion for Reconsideration. Respondent contends it is barred from this Court's consideration under *Pinholster*. To the extent the new information filed with the Motion for Reconsideration could support issues raised in the original application, however, Judge Estevez considered it, and the TCCA agreed. 28/29Supp. SHCR 8591, § 37; *Holberg*, 2014 WL 5389907, at *1, n.1. This Court will do likewise.

---

[33] Michelle Lucero's declaration dated August 18, 2011 appears at 7/29 Supp/SHCR 1744-45. The declaration of Melissa Wiseman dated August 21, 2011 appears at 13/29 Supp.SHCR 3891-93. The affidavit of Roger Speir dated September 16, 2006 appears at 2/18 SHCR 288-89.

Wiseman's declaration does not demonstrate Kirkpatrick's credibility, however. Wiseman shared a jail cell with Holberg and Kirkpatrick. 5/18 SHCR 706. She stated that she never heard Holberg talk to anyone about her crime. 13/29 Supp.SHCR 3890-93. This assertion does not prove a conversation did not occur between Holberg and Kirkpatrick. Wiseman admitted as much when she testified at Holberg's trial. 25/28 RR 113-17 (agreeing that the inmates who are asleep, in the shower, or in commissary cannot know what the others are doing or saying).

Likewise, Lucero shared a cell with Holberg and Kirkpatrick. 5/18 SHCR 706. Lucero stated in her declaration that she never heard Holberg talk to any of the other women about her crime. She was suspicious of Kirkpatrick, who asked Holberg all kinds of questions. As with Wiseman, this declaration does not show the conversation did not happen. It shows only that, if there was a conversation between Holberg and Kirkpatrick, Lucero was not around to hear it. 7/29 Supp.SHCR 1744-45.

Roger Speir, Kirkpatrick's co-defendant in the burglary cases, signed a declaration on September 16, 2006 stating that he and Kirkpatrick were "best friends" and heavily into the drug scene in 1997. Speir asserted that, before the murder, Kirkpatrick did not know Brittany Holberg "at all." Speir said Kirkpatrick told him she was planted in Holberg's cell and working with the police to make a deal on her own cases. Speir's affidavit asserts that he was so shocked and upset that he called the Amarillo Police Department and reported that Kirkpatrick was going to perjure herself. According to Speir, "whoever" answered the phone told him not to worry about it because the District Attorney was handling it. Speir said that he also reported the story to a television news team, but the segment was not aired. The next thing Speir knew, Holberg ended up going to death row "in part based on Vicki's lies." 2/18 SCHR 288-90.

As noted, Speir was Kirkpatrick's co-actor in the burglaries. Despite their apparently close relationship, his declaration that Kirkpatrick did not know Holberg conflicts with Kirkpatrick's assertions that she knew Holberg from the streets. 7/29 Supp.SHCR 1658; *see also* 23/28 RR 36 (trial testimony of Katina Dickson that, according to Holberg, Holberg and Kirkpatrick were close friends). His assertion that Kirkpatrick said she was planted in Holberg's cell conflicts with Kirkpatrick's concession at her deposition that she was not planted in Holberg's cell. 7/29 Supp.SHCR 1686-87. Speir's story is inherently unreasonable in that it asks the court to believe he was so upset about Kirkpatrick's potential testimony that he called the police and gave a media interview, but once Holberg was sentenced to death, he dropped the matter and did nothing. Given the body of evidence demonstrating Kirkpatrick's lack of credibility, Speir's affidavit does not undermine the reasonableness of the state court's ruling.

### d.   Additional Arguments Presented by Holberg

As mentioned above, DA Farren testified at Kirkpatrick's burglary trial regarding his plea offer to Kirkpatrick. In her Amended Petition, Holberg complains that he testified falsely that a plea bargain of five years had been "disclosed" in Holberg's trial when, in fact, there is no such disclosure in the Holberg record. Am. Pet. 33. This argument mischaracterizes DA Farren's testimony at Kirkpatrick's burglary trial.[34] Farren testified that the issue "came up" during Holberg's trial, not that the deal was disclosed on the record. Farren specifically said, "The issue came up during the trial and we represented to the Court in good faith and to the defense counsel that the offer of five years had absolutely nothing to do with—with her [Kirkpatrick] testifying in the Holberg case." 2/2 SHCR 579. In fact, Kirkpatrick's attorney, Greta Crofford, clarified that the

---

[34] The transcript from Kirkpatrick's April 17, 1998 guilty plea hearing appears at 2/2 Supp.SHCR 554-829.

offer during her examination of DA Farren at Kirkpatrick's trial: "And I believe that you have made a recommendation or plea offer to me earlier, *five years to do*. Is that correct?" 2/2 SHCR 578 (emphasis added). Farren's testimony at Kirkpatrick's trial was not false as Holberg alleges, and it supports the conclusion that Kirkpatrick rejected an offer of five years, not three as Kirkpatrick stated in her deposition.

Citing *Porter v. McCollum*, 558 U.S. 30, 42-43 (2009), Holberg concludes that the state court fact-finding is owed no deference under § 2254(d)(2) because the state court "consistently failed to engage" with her evidence by dismissing it, disregarding it, or conclusory discounting it. This case is not like *Porter*, however, where the Supreme Court held that the state court's determination of "no prejudice" on a claim of ineffective trial counsel was unreasonable in part because the state habeas court "either did not consider or unreasonably discounted the mitigation evidence." *Id.* at 41-42. The state court in *Porter* apparently found the habeas testimony to be true but simply discounted it, holding that it was "lacking in weight because of the specific facts presented." *Id*. at 37. The state court in this case, on the other hand, found Kirkpatrick's deposition testimony not credible. Federal habeas courts uphold such determinations unless the petitioner shows they are unreasonable or the factual premise was incorrect by clear and convincing evidence. *Miller-El*, 537 U.S. at 340 (noting that a federal court can disagree with the state court credibility determinations and, when guided by the AEDPA, conclude the decision was unreasonable or the factual premise incorrect by clear and convincing evidence). Holberg has not shown that the state court's credibility ruling was unreasonable in light record before it. Nor has Holberg presented this court with clear and convincing evidence showing the state habeas court's factual finding as to DA Farren's credibility was erroneous.

Holberg also complains that Judge Estevez did not give her an opportunity to cross-examine DA Farren, other prosecutors, or defense counsel. The record discussed at length above shows that Kirkpatrick lacks credibility independent of the fact that DA Farren was not cross-examined. Kirkpatrick's statements became more detailed and conflicting as the years passed, and her statements conflict with the record made contemporaneously with the actual events. If true, Kirkpatrick's recantation story suggests that Sergeant Hudson preemptively falsified his police report, that multiple assistants in the district attorney's office conspired with DA Farren, and that Judge Gleason conspired with Farren by making a false record of a five-year plea offer and then assessing the secretly-agreed-upon three-year sentence. It also means that Kirkpatrick's own defense counsel elicited false testimony from both DA Farren and Kirkpatrick at the burglary trial to cover up the conspiracy, after initially telling Kirkpatrick to stand on her Fifth Amendment rights. Overshadowing all of this is the fact that Kirkpatrick, on the advice of Holberg's counsel at the deposition, would not allow Ms. Crofford to disclose what she knows. The state court reasonably concluded that Kirkpatrick's recantation story was not worthy of belief.

In her Corrected Reply, Holberg cites to *Green v. Addison*, 500 F. App'x 712, 716 (10th Cir. Oct. 19, 2012), a case that is not binding on this Court. Nevertheless, the Court has reviewed it and concludes that *Green* does not dictate relief because, unlike the recanting witness in *Green*, Kirkpatrick's credibility was objectively tested. Over a period of fourteen years, she gave multiple declarations and affidavits, sworn testimony in her burglary trial, and recorded deposition testimony during which she was examined by both sides.

To the extent Holberg relies on *Green* to imply that she is entitled to a hearing under the AEDPA, this argument fails. As recognized in *Green*, a federal habeas applicant is not entitled to

a hearing if she did not adequately attempt to develop the facts in state court. *See* 28 U.S.C. § 2254(e)(2) (prohibiting a hearing, with certain exceptions, when applicant has failed to diligently attempt to develop the factual basis of the claim in state court); *Williams v. Taylor*, 529 U.S. 420, 432 (2000). *Green* further held, "The federal district court should not be required to conduct an evidentiary hearing on a claim when the applicant for relief has not presented evidence that would be readily available if the claims were true." *See Green,* 500 F. App'x at 717 (citing *Cannon v. Mullin*, 383 F.3d 1152 (10th Cir. 2004) (adopting *Dowthitt v. Johnson*, 230 F.3d 733, 758 (5th Cir.2000)).

Here, Holberg's writ team developed Kirkpatrick's recantation over a period of years (through investigators Mackenzie in 2000, Jimmy Lohman in 2006 and 2009, and Barnabas Batarseh in 2011). 1/2 SHCR 249 (Mackenzie affidavit); 7/29 Supp.SHCR 1695 (deposition testimony); 2/18 SHCR 254 (Lohman 2006 affidavit). These efforts culminated in Kirkpatrick's deposition in 2011. By that time, Kirkpatrick admitted she had felt responsible for Holberg's death sentence. 7/29 Supp.SHCR 1616-18, 1698. Kirkpatrick was also in bad health and undergoing cancer treatment and did not want "this" on her hands. 7/29 Supp.SHCR 1684-85. Yet, inexplicably, when the opportunity arose to obtain crucial confirmation from Greta Crofford potentially confirming the prosecutorial-misconduct narrative, Kirkpatrick refused to allow it under the advice of Holberg's writ counsel. 7/29 Supp.SHCR 1711. Only a month earlier, Holberg's writ counsel had informed Judge Estevez that they could get an affidavit from Greta Crofford. SHRR (2011) 66-67. Under these circumstances, it is reasonable to conclude that Crofford's statement was "readily available" to Holberg if her claims were true. Unlike *Green*, it

is easy to see "what more" Holberg could have done to satisfy the diligence requirement in state court. *Green*, 500 F. App'x at 717.

### 5. Conclusions

The TCCA's rejection on the merits during Holberg's state habeas corpus proceeding of Holberg's *Giglio/Napue* claim relating to Kirkpatrick's allegedly perjured trial testimony (Holberg's thirty-third state habeas claim), FFCL 119-20, 28/29 Supp.SHCR 8698-00, was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and state habeas corpus proceeding. The state habeas court reasonably concluded Kirkpatrick's recanting deposition testimony was unworthy of belief. In contrast, the state habeas court reasonably concluded DA Farren's affidavit, denying he or his office engaged in a widespread conspiracy to suborn perjury, was credible. This is especially so because Kirkpatrick's recanting deposition testimony must be examined in light of Kirkpatrick's sworn testimony to the contrary at both her own plea hearing and Holberg's trial. *Spence*, 80 F.3d at 1003 (credibility of recanting affidavits or testimony must be evaluated in view of the entire trial record).

Alternatively, after *de novo* review of the entire record from Holberg's trial, direct appeal, and state habeas corpus proceedings, as well as consideration of all the new evidence Holberg has presented to this court for the first time, this Court concludes Holberg's claims of a *Giglio/Napue* violation regarding Kirkpatrick's trial testimony fail to establish that Kirkpatrick furnished any "material" false testimony at trial. In its closing jury argument at both phases of trial, the prosecution expressly disavowed any assertion that Kirkpatrick's "fountain of blood" testimony was factually accurate, insisting that Holberg likely made that comment in an effort to bolster her

standing among jail inmates. Once Holberg testified at trial, much of Kirkpatrick's guilt-innocence phase testimony became superfluous. Holberg admitted that, after Towery confessed to her that he was badly injured, she stabbed him multiple times in the face, shoved a lamp down his throat, and buried a knife in his abdomen. Kirkpatrick's testimony did very little to undermine Holberg's self-defense assertion. Holberg's own inconsistent, self-contradictory, self-serving, trial testimony did that more than sufficiently. The state habeas court reasonably rejected as incredible Kirkpatrick's recanting deposition testimony.

Under such circumstances, there was no reasonable likelihood the jury would have returned a not guilty verdict at the guilt-innocence phase of trial had Kirkpatrick testified at trial in the same manner as her recanting deposition testimony. Moreover, Kirkpatrick's trial testimony offered very little to the overwhelming evidence the prosecution presented at the punishment phase of trial. By that point in Holberg's trial, the jury had seen her testify firsthand and had rejected as incredible her self-defense claim. The level of brutality Holberg, a healthy young woman, admitted she inflicted on the elderly Towery was horrific. In sharp contrast, Holberg offered no evidence showing she ever sought medical attention for any of the injuries she claimed she sustained during her altercation with Towery. The jury had an opportunity to evaluate for itself firsthand from her demeanor whether Holberg was sincerely remorseful for her actions. This court independently concludes after *de novo* review there is no reasonable likelihood the jury's answers to any of the special issues at the punishment phase of Holberg's capital murder trial would have been different had Kirkpatrick never testified.

### B.  False Testimony/*Brady* – Owens (Claim 1b)

#### 1.  *The Claim*

Holberg alleges under *Napue/Giglio* that DA Farren also coerced false testimony from the cab driver, Donald Owens, concerning the timing of Holberg's cab ride and other details. Am. Pet. 35-43. Holberg alleges that DA Farren suppressed a taxicab day log and investigator notes that would have revealed the falsity, in violation of *Brady v. Maryland*, 373 U.S. 83, 97 (1963). These claims rely on affidavits that Holberg filed as "Additional Evidence" in the convicting state court twelve years after her original habeas application and seven months after Judge Estevez issued her extensive FFCL and sent them to the TCCA. *See* 1/1 SHCR (WR-68,994-03).

#### 2.  *State Court Disposition*

The TCCA dismissed the claims and evidence as an abuse of the writ under § 5 of the Texas Code of Criminal Procedure, Article 11.071.[35] Section 5 provides that subsequent writ applications may not be considered on the merits unless they contain "sufficient specific facts" establishing one of three exceptions: (1) the new claims and issues could not have been presented in a previous timely application or previously considered application because they were factually or legally "unavailable," (2) but for a violation of the United States Constitution, no rational juror could have found the applicant guilty, or (3) but for a violation of the Constitution, no rational juror would have answered the special issues in favor of a death sentence. A factual basis of a claim is "unavailable" for purposes of this statute if it was not ascertainable "through the exercise of reasonable diligence." See TEX. CODE CRIM. PROC. Art. 11.071, § 5(a)(1)-(3), (e).

---

[35] Whether applicable state law procedurally defaults this claim is not determinative of its ultimate disposition in this Court. Analysis of the exceptions to the procedural default doctrine requires examination of the underlying merits of Holberg's *Brady* claims. For the reasons discussed below, Holberg's *Brady* claim relating to Owens lacks any arguable merit. Nonetheless, a discussion of the parties' respective positions on the procedural default issue furnishes procedural context for this and many of Holberg's subsequent claims.

The TCCA here held:

> Because these documents were filed in the trial court after the deadline provided for the filing of an initial application for habeas corpus, and because Applicant attempts to raise new claims within these documents, we find them to be subsequent applications. *See* Art. 11.071. **We further find that these subsequent applications fail to meet any of the exceptions provided for in Article 11.071, § 5. Therefore, Applicant's subsequent applications are dismissed as abuses of the writ.**

*Holberg*, 2014 WL 5389907, at *1 (emphasis added). Thus, the TCCA held that Holberg failed to meet "any" of the three exceptions in article 11.071, § 5(a)(1)-(3).

### 3.   *Clearly Established Federal Law*

The authorities discussed above in § VI.A.3 govern the *Giglio/Napue* aspect of this claim. Clearly established federal law addressing Holberg's *Brady* claims is very similar in nature. "'[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (quoting *Brady*, 373 U.S. at 87). The Supreme Court has consistently held the prosecution's duty to disclose evidence material to either guilt or punishment applies even when there has been no request by the accused. *Banks*, 540 U.S. at 690; *Strickler v. Greene*, 527 U.S. 263, 280 (1999); *United States v. Agurs*, 427 U.S. 97, 107 (1976). This duty also applies to impeachment evidence. *Strickler*, 527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 & 685, (1985). The rule in *Brady* encompasses evidence known only to police investigators and not personally known by the prosecutor. *Strickler*, 527 U.S. at 280-81; *Kyles v. Whitley*, 514 U.S. 419, 438 (1995). "'[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

Under clearly established Supreme Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," i.e., prejudice must have ensued from its non-disclosure. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281-82. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Smith v. Cain*, 565 U.S. 73, 75 (2012); *Cone v. Bell*, 556 U.S. 449, 469-70 (2009); *Banks*, 540 U.S. at 698-99. A reasonable probability does not mean that the defendant would more likely than not have received a different verdict with the evidence, only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial. *Smith*, 565 U.S. at 75; *Kyles*, 514 U.S. at 434.

The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does *not* require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *See Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice" prong of the *Strickland* analysis of ineffective assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is *not* a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. Third, once materiality is established, harmless error analysis has no application. *Id.* at 435-36. Finally, materiality must be assessed collectively, not item by item. *Id.* at 436-37.

### 4. Procedural Default Arguments & Merits Analysis

#### a. Procedural Default Principles Generally

A federal court will not review a question of federal law decided by a state court if the state court decision rests on a state-law ground that is independent of the merits of the claim and

adequate to support that judgment. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), *modified by*
*Martinez v. Ryan*, 566 U.S. 1 (2012). Respondent contends the TCCA dismissal rests on an inde-
pendent and adequate state law ground. *See McGowen v. Thaler*, 675 F.3d 482, 499 (5th Cir. 2012)
(Texas abuse-of-the-writ statute is valid state-law procedural ground that forecloses federal habeas
review where there is no indication the CCA's order relied on federal law in dismissing petition).

Holberg argues that the 11.071, § 5 bar is not "adequate" because the TCCA had previously
concluded that additional evidence offered in Holberg's *2006 Reply* was not deemed to be a
subsequent application. Am. Pet. 42. According to Holberg, this makes article 11.071, § 5
inadequate under *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) because it is not consistently
applied. Holberg fails to identify any inconsistencies, however. The mere fact that the TCCA ruled
differently as to a different pleading is not an inconsistent application of § 5.

Holberg contends the claims are reviewable under *Balentine v. Thaler*, 626 F.3d 842 (5th
Cir. 2010) and *Rocha v. Thaler*, 626 F.3d 815 (5th Cir. 2010), because the TCCA dismissal was
based on the merits of a federal claim. The Court in *Balentine* recognized the Supreme Court rule
that if (1) the state court decision rests primarily on federal law or the state and federal law are
interwoven and (2) the adequacy and independence of any possible state law ground is not clear
from the face of the opinion, then (3) the state court ruling should be construed as one applying
federal law. *Id.* at 849. Holberg's argument relies on the premise that the TCCA necessarily
determined that the facts alleged did not establish a *prima facie* constitutional violation under
§ 5(a) when it concluded that none of the exceptions were met.

According to *Balentine* 626 F.3d at 853 and *Rocha v. Thaler*, 626 F.3d at 833-34, there is
a federal law component to § 5(a)(1), while § 5(a)(2) and (a)(3) are based in federal law. The

TCCA reaches a federal law question, however, only if it determines that the new claim was previously unavailable. *Balentine*, 626 F.3d at 853 (citing *Ex parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. 2007)). "If an applicant fails to satisfy the unavailability requirement, the § 5(a)(1) inquiry is over, and no merits determination takes place." *Rocha.* 626 F.3d. at 834. It appears that is the case here. Holberg argued to the TCCA that her "Additional Evidence" was not a subsequent writ application at all. Only in the alternative did she address the possibility that it was a subsequent application, and then she argued for the exception in § 5(a)(1) that the underlying facts were not reasonably discoverable prior to the filing of the initial 2000 application. *See* Applicant's Opposition to Randall County District Court's January 3, 2013 Order Designating a Subsequent Application, p. 1, 29-38 (ECF No. 61-2, p. 12, 40-49). This argument requires no application or interpretation of federal law. Holberg did not argue the exceptions in § 5(a)(2) or (a)(3).

Thus, the argument entertained by the state court under § 5(a)(1) demonstrates that Holberg did not satisfy the unavailability requirement, that the TCCA never reached the merits, and that the procedural bar is intact. *See Balentine*, 626 F.3d at 854. A *per curiam* "abuse of the writ" dismissal, with no discussion of the merits, is not a "fair indication that the merits of the claims were reached." *See Balentine*, 626 F.3d at 854 ("There must be more than silence."). Furthermore, the TCCA's conclusion that *none* of the other exceptions in article 11.071 were met is at best an acknowledgment that no argument was presented for the Court to consider under § 5(a)(2) or (3).

Holberg argues, however, that the TCCA dismissal could not have been based on her failure to satisfy the unavailability requirement because her investigator only obtained Owens's declaration in 2012. This argument ignores the statutory definition of "unavailable," which

required Holberg to show that the evidence was previously "not ascertainable *through the exercise of reasonable diligence.*" *See* § 5(e) (emphasis added). It is not enough for Holberg to assert that her investigator obtained the affidavits in 2012. She had to show that the affidavits were not reasonably discoverable either in 2000, when she filed her initial application or in 2006 when she filed her Reply. *See* art. 11.071, § 5(a)(1).

Holberg contends that her evidence was nevertheless timely for purposes of article 11.071 under *Ex parte Chabot,* 300 S.W.3d 768 (Tex. Crim. App. 2009) and *In re Cain*, 137 F.3d 234 (5th Cir. 1998) such that the TCCA necessarily must have dismissed her claim on the merits. *Cain* addresses successive writs in federal court, however, and does not control here. As for *Chabot*, the TCCA did not rely on it or cite to it. To the extent Holberg alleges that the TCCA should have applied *Chabot*, an error of state law in the state habeas proceedings does not furnish a basis for federal habeas relief. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

Alternatively, this case is distinguishable from *Chabot*. In *Chabot,* DNA test results showed that Chabot's co-actor lied in his testimony at Chabot's trial when he denied sexually assaulting the murder victim. Chabot's habeas claim based on the co-actor's false testimony was previously "unavailable" under article 11.071 because the DNA testing and the DNA-testing statute did not exist in 1991 when Chabot filed his initial application. Here, on the other hand, the TCCA could reasonably conclude that Owens's recantation would have been available to Holberg through the exercise of reasonable diligence in 2000 or 2006 by simply talking to Owens.

Holberg also cites *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) for the assertion that the federal prohibition on successive applications is necessarily relaxed for policy reasons when the evidence shows that the prosecution elicited false testimony and covered up misconduct

in a capital case. This argument assumes that the misconduct allegations against DA Farren are true, but the state court ruled otherwise. The evidence discussed below supports the ruling. Moreover, *Workman* addresses the law for successive *federal* petitions, not the Texas subsequent writ bar, and the Tenth Circuit's interpretation of federal law is not binding on this Court.

b.      Cause and Prejudice

Respondent argues these claims are subject to procedural bar under *Coleman*, 501 U.S. at 729. Unless Holberg can demonstrate cause for the default and actual prejudice from the alleged violation of federal law or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Id.* at 750. To establish "cause," there must be something external to the petitioner that cannot be fairly attributed to her. *Coleman*, 501 U.S. at 753. Interference by officials is an objective factor that may constitute sufficient cause. *McCleskey v. Zant*, 499 U.S. 467, 494 (1991).

In the context of Holberg's *Brady* claim, these "cause" and "prejudice" requirements can parallel the *Brady* elements of "suppression" and "materiality," such that a petitioner who successfully demonstrates cause and prejudice will at the same time establish a *Brady* violation. *Banks*, 540 U.S. at 691; *Rocha v. Thaler*, 619 F.3d 387, 394 (5th Cir. 2010). The same rationale applies to *Giglio/Napue* claims. *See, e.g., Johnson*, 176 F.3d at 816. A discussion of the merits of Holberg's *Giglio/Naoue* and *Brady* claims is therefore required.

c.      Cause (Suppression under *Brady*)

Holberg contends that the State's misconduct impeded her discovery of Owens's false testimony, but the record does not bear this out. At trial, Owens testified that Holberg had asked him to stop at the grocery store to fill a drug prescription, but she was unsuccessful in doing so. 19 RR 40-44, 50. A sworn statement Owens provided to police two days after the murder in 1996,

138

supports this testimony. In the statement, Owens describes stopping at a Homeland Grocery for Holberg to "pick up some medicine." *2 CR (77,023) 534.* Owens stated that Holberg said "they wouldn't sell her the medicine" and "they said they would have to call the Doctor first." *Id.*

Sixteen years later, in an October 31, 2012 declaration, Owens stated that Holberg never told him what she did at the grocery store. 1 CR (77,023) 164-65, ¶¶ 5-7. Holberg claims that this recantation is supported by files, previously suppressed by the State in violation of *Brady*, showing that the State had investigated "whether Holberg had been denied a prescription that day at the Homeland #529 Pharmacy – but turned up *no* such evidence." Am. Pet. 36. Holberg does not discuss when she received the investigator notes that purportedly led to her discovery of Owens's allegedly false testimony. She fails to demonstrate that their alleged suppression had anything to do with her procedural default in state court.

More importantly, the notes do not demonstrate that Owens's trial testimony was false. Holberg either grossly misstates their contents or misunderstands the nature of the trial testimony: the notes do not show that the State found no evidence that Holberg had been denied prescription drugs. *See* White Declaration (Ex. 157 (subpoena requests) and Ex. 163 (investigator notes) in Cause No. AP-73,127. The notes reflect an effort to track down existing *medical prescriptions* that Holberg and Towery had on file at various pharmacies around the city. The notes in question show that Holberg did not have a medical prescription on file at the Homeland Pharmacy Nos. 529, 601, and 603. This in no way refutes Owens's trial testimony that Holberg told him that she attempted to obtain prescription drugs anyway. Obtaining prescription drugs without a doctor's prescription was a scam that Holberg admitted she and her aunt used for years. *See* 20/28 RR 211-12, 232-34; 21/28 RR 81-83. These notes *corroborate* Owens's police statement and trial testimony that

139

Holberg was denied the medication because she did not have a prescription on file. Assuming without deciding that the State suppressed the investigator notes, they are not the *Brady* material that Holberg contends.

Holberg next contends that the State suppressed a taxi dispatcher's log that would have refuted the timeline Owens presented at trial. Am. Pet. 38. Owens testified that he picked up Holberg around 4:05 p.m., stopped at the grocery, stopped at the Princess II building where she rang call buttons "hoping somebody would open the door," then drove to the manager's office in another building where he dropped her off around 4:50 p.m. Owens then waited 15 minutes for her to return with his fare but eventually left around 5:05 p.m. 19/28 RR 40-49. In his October 2012 declaration, made sixteen years after the fact, Owens recalculates the drop-off time as 4:30 p.m. To accommodate this earlier time, Owens's declaration omits the stop at Princess II and shortens the time spent waiting for Holberg to return with his fare from 15 minutes to 2-3 minutes. The declaration also gives conflicting information about the amount of time he waited at the grocery (¶ 4 states 15 minutes while ¶ 16 states 7 minutes). See 1 CR (77,023) 165, ¶¶ 12, 14, 16-17. As explained further below, contrary to Holberg's argument, establishing the exact time Holberg arrived at Towery's apartment complex was not a critical aspect of the prosecution's case. Holberg admitted she fought with Towery for an extended period of time before she showered, changed into his clothes, and fled the scene. Towery's body was not discovered until considerably later.

As with the investigator notes discussed above, Holberg does not show that the suppression of the dispatcher's log had anything to do with her procedural default in state court. She does not describe the circumstances or timing of its disclosure. Tellingly, Owens does not mention the log

in his declaration of 2012, as would be reasonably expected if the log had, in fact, caused Holberg's writ team to contact him. Instead, in an astounding demonstration of recall, Owens's 2012 declaration calculates the length of the 1996 cab ride from memory, explaining that he remembered the amount of Holberg's fare ($18), the rates (25¢ per 20 seconds), and the time he spent waiting and then calculated how long the entire cab ride must have taken. *1 CR (77,023) 136,* § 16. Owens mentions the log only in his third declaration, which he signed four months later. *2 CR (77,023) 508* ("I recently viewed the ABC Cab Company log from November 13, 1996 that Brittany Holberg's investigator showed me."). Under the circumstances, Holberg fails to demonstrate the log or its alleged suppression had anything to do with her ability to raise this claim in state court.

Alternatively, the log does not establish the falsity of Owens's trial testimony. Two days after the murder in 1996, Owens went to Sergeant Hudson's office and brought the day log with him. According to the police report: "[The log] showed he picked up the suspect at 900 W. 6th at approximately 4:03 p.m. [Owens] drove the suspect to the store and then to the Princess Apartments at approximately 4:50 p.m. There, the suspect went into the office at the apartment complex and snuck out the back way without paying her cab fare." 1/5 SHCR 124; 19/28 RR 44. These times comport with Owens's trial testimony. Owens signed a sworn statement on November 15, 1996 with a similar timeline (pick up at 4:03, drop off at 4:50 p.m., waited for fare until 5:05). *2 CR (77,023) 534*.

According to Owens's third declaration dated March 1, 2013, however, the drop-off time of 4:50 is incorrect because line 16 of the dispatch log shows that he picked up his next customer in cab #3 at 4:40 p.m. *2 CR (77,023) 508.* The copy of the log in the record contains many undecipherable handwritten changes that undermine its reliability. Particularly, the cab identifica-

tion number "3" on line 16 appears to have been previously crossed out (not unlike line 19, where "3" was replaced by cab #18). If cab #3 did not make the 4:40 pick up, then cab #3's next pick up was at 5:24 p.m. (line 17), a time which corresponds to Owen's trial testimony that he left the apartments at 5:05. *2 CR (77,023) 510-11.* The Court has found no information in the record, such as an affidavit from the creator of the log, explaining the unusual appearance of the number "3" on line 16, or affirming that it is an accurate copy of the original. In addition, it is rank, unauthenticated hearsay.

Holberg has not shown that the alleged suppression of the investigator notes and dispatch log caused her procedural default in state court. More fundamentally, the notes and log do not show that Owens's trial testimony was false. Holberg has not demonstrated cause necessary to excuse her procedural default.

            d.      Prejudice/Materiality under *Brady* & Reasonable Likelihood under *Giglio/Napue*

Respondent argues that even if Holberg could demonstrate cause for the procedural default, federal review is precluded unless she can also demonstrate actual prejudice from the alleged constitutional violation. *Coleman*, 501 U.S. at 745; *Strickler*, 527 U.S. at 289. To show prejudice, Holberg must demonstrate that there is a "reasonable probability" that the result of the trial would have been different. *Strickler*, 527 U.S. at 289. The question is not whether she would have more likely than not received a different verdict, but whether she received "a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 289-90. As noted above, Holberg fails show that Owens's trial testimony was false. For purposes of argument, however, the following discussion assumes that it is false.

Holberg first contends that Owens's false testimony provided the drug-seeking mindset and motive needed for the State's capital murder theory. This argument borders on the frivolous because it overlooks Holberg's own testimony that she had been consuming $800 to $900 dollars' worth of cocaine daily for ten days preceding the murder, had smoked crack before calling the cab, smoked crack while waiting for the cab, smoked crack in the apartment manager's bathroom, and smoked crack in Towery's apartment. 20/28 RR 263; 21/28 RR 13-14, 26. The argument ignores Holberg's testimony to the jury that her cocaine habit was so problematic that she started topless dancing to support it and switched to prostitution after only seven months. 20/28 RR 223. She freely admitted she had a history of prescription drug abuse and at one point used 100 pills a day. 20/28 RR 212. In short, the State did not need to show that she had been denied prescription medicine at the Homeland grocery to provide a motive to rob Towery of his money or his prescriptions. Her history of severe drug abuse and her cocaine binge immediately preceding the murder were ample proof.

Holberg next asserts that Owens's allegedly false, shortened timeline was necessary for the State's theory of the crime. Am. Pet. 37-38. According to Holberg, a 90-minute timeline was necessary for the State's theory that Holberg found Towery, a stranger, entered his apartment, and *quickly* attacked him, followed by a 45-minute struggle and another 45 minutes during which Holberg "cleaned up and lingered" before soliciting a ride from Mayo and Votaw between 6:30 and 7:00 p.m. The state's 90-minute theory, according to Holberg, required Holberg to arrive at the apartments between 5:00 and 5:30 p.m. Holberg maintains that Owen's lengthier, recantation timeline with a 4:30 arrival supports the theory that she and Towery, already acquaintances,

socialized peacefully for 45 minutes to an hour before a "brief but intense altercation" in which she killed him.

This argument is nonsensical. First, Owens's recantation timeline calculates the drop-off time as 4:30 p.m. by (in part) omitting the first stop at Princess II, a stop which no party challenged at trial. Holberg herself testified that Owens pulled up to the wrong building at first, and she had to redirect him to the manager's office. 21/28 RR 16-17. Second, Holberg's current description of the murder as "brief" contradicts her own police statement and testimony of the 45-minute struggle implementing multiple household objects as weapons. 21/28 RR 29-55, 166 (testimony); 27/28 RR 29 (.pdf pagination) (statement, SX 167). The notion that Holberg quickly dispatched Towery conflicts with both the crime scene evidence and Holberg's self-defense testimony, which described a protracted struggle involving Holberg's continued retreat from Towery.

Even if the facts did support a longer timeline, however, it would not establish or foreclose an existing relationship between Holberg and Towery. Neither timeline dictates the conclusions that Holberg makes. Holberg simply hypothesizes a series of events to match each timeline, the longer of which includes hypothetical socialization time that she offers as proof of their prior relationship. But there is no factual support for this hypothetical socialization time, and even if there were, it would not imply an existing relationship between the two, given that prostitutes are paid to socialize with strangers. Thus, Owens's recantation timeline (which, as noted above, also contains conflicting information about the wait time at the Homeland grocery store), does not compel the conclusions that Holberg suggests. Simply put, Holberg's speculative timeline theories do not furnish a factual or legal defense to the charges of intentional murder in the course of a burglary or robbery. Regardless of exactly when Holberg concluded her fatal assault on Towery

on the day in question or the exact duration of their confrontation, there was more than ample evidence from which the jury could rationally conclude that she intentionally murdered Towery in the course of committing or attempting to commit a burglary or a robbery.

For the sake of thoroughness, particularly as it relates to DA Farren's alleged intimidation tactics during state habeas proceedings, the Court has reviewed Owens's three statements and the related evidence in detail. Owens's first declaration dated October 31, 2012 does not accuse DA Farren of creating a false narrative for his trial testimony. It states that the prosecution "did not seem concerned with the truth," that DA Farren told him to make sure to get his questions "right," and that Owens was concerned about what DA Farren might do to him if he did not testify the way Farren wished. These statements do not assert that DA Farren scripted Owens's testimony.

Owens's second affidavit dated November 17, 2012 avers that, after Owens signed the first declaration, DA Farren called him on the telephone and threatened him with a perjury charge if he did not sign another affidavit that DA Farren would write. Owens said he was so frightened, he immediately called Holberg's investigator. Two days later, on November 9, 2012, Farren's investigator came to his house, but Owens refused to speak to him. The affidavit then adds more details about his contacts with Farren before trial that were lacking in the first affidavit. It asserts that the police and a DA investigator told him things about Holberg's crime that he had no reason to believe were true, and that DA Farren scripted his false testimony during three restaurant meals, including a dinner at Joe's Crabshack. Owens states that Farren had his "rap sheet," which intimidated him because he was on felony probation at the time in another county. *1 CR (77,023)* 140-43.

Owens's stepson also signed an affidavit stating that he answered the door when the investigator visited on November 9, 2012. Under instructions from Owens, the stepson told the investigator that Owens was not home, and the investigator left. *1 CR (77,023) 145-46* (aff't of Peter Prosser).

DA Farren strongly denied these allegations in an affidavit filed January 10, 2013. More specifically, he asserted that the only Joe's Crabshack restaurant in Amarillo opened *after* Holberg's trial took place. DA Farren also stated that it is not his practice to meet with witnesses alone and has never done so. He asserted that on November 6, 2012 (six days after Owens gave his first declaration), *Owens called him* to talk about drug activity at a motel and met with one of the DA investigators to see if an investigation was feasible. On the following day, Farren learned about Owens's first declaration and called him on a speakerphone with his investigator present. He advised Owens that it would be impossible to work with him on the drug activity investigation because he had forfeited his credibility by providing perjured testimony. When Owens claimed to have no knowledge of false testimony, DA Farren explained that, in light of his recent declaration to Holberg's investigators, he had either lied at trial or lied in the declaration. Owens explained that Holberg's representatives had contacted him, that he was extremely ill, and that he signed the statement without reading it. Owens agreed to provide a statement reiterating this explanation but then refused to do so. DA Farren also accused Holberg's writ team of engaging in unethical behavior by failing to chronicle their interviews with witnesses to show the court what had actually occurred. *1 CR (77,023) 438-42.*

On March 1, 2013, Holberg's investigator, Barnabas Batarseh, signed a responsive declaration stating that Owen's initial declaration was the culmination of several interviews and

146

was not coerced, manufactured, paid for, or "otherwise incentivized." Batarseh stated that Owens suffers from COPD and is on oxygen but is not sick in a manner that would prevent him from understanding the contents of a declaration. Attached to Batarseh's declaration is a transcript of a pre-arranged phone call to Owens on November 7, 2012 to "go over the details one more time." *2 CR (77,023) 513-532.* In the call, Owens expressed anger that Farren had learned about his first declaration and feared retaliation in the form of Farren "pulling" his taxicab permits. Owens held Batarseh responsible, stating, "You're the one that told me it wouldn't" get back to Farren. Owens said he would contact his attorney to "take the case" because "somebody's got to pay something" and "this is not right." Notably absent from the eighteen-page transcription is any statement by Owens that he had told the truth in his recanting declarations.[36] Owens's statements suggest he helped Batarseh and received nothing but trouble in return. At the very least, the transcript reveals Owens's confusion about the purpose of his statement and that he never even received a copy of it. *2 CR (77,023) 525* ("Did I get a copy of this statement? No."), 531 ("how did it leak out?").

Owens provided a third declaration on March 1, 2013. In it, Owens admitted that he telephoned Farren on November 6, 2012 and told Farren to "clean up" the drug activity at a local motel. He also admitted he may have misremembered Joe's Crabshack as one of the dinner locations because it had been sixteen years since then. He otherwise stood by his declarations. *2 CR (77,023) 505-09.*

---

[36] Batarseh made what appear to be two obvious attempts to memorialize "the truth" of the recantations during this recorded phone call. Batarseh asked if Owens *told Farren* that he told the truth in the first affidavit, to which Owens replied, "Yep." 2 CR (77,023). And Batarseh later told Owens that he would tell the lawyers at Drinker Biddle that "Donald Owens who, who, uh, willingly cooperated with us, and, uh, decided that he was gonna tell the truth and gave us a statement is pissed off right now, and you need to call him." 2 CR (77,023) 527. Owens's, who clearly had no problem speaking his mind to Batarseh, never offered up such a statement about telling the truth.

At best, Owens's statements lack credibility. His initial declaration did not contain allegations that Farren scripted his testimony. It asserts that Owens had in fact *resisted* a police suggestion that Holberg stole the murder weapon from the grocery store. The first statement also purports to calculate Holberg's fare from memory sixteen years after the fact, including the pick-up time and wait times, yet Owens could not recall the name of a restaurant where he and Farren allegedly dined. Owens's statements became more extreme and detailed over time, accusing Farren of scripting his testimony, making a threatening phone call, and stating that Farren is known for "retaliating against those who are helpless to stop him." Owens's failure to disclose his apparent relationship with the DA investigator, *2 CR (77,023) 518,* and his phone call to DA Farren a few days after signing the first declaration--which would have provided a less nefarious reason for Farren's subsequent phone call him—further undermine Owens's credibility.

At the risk of stating the obvious, Owens's recantation theory conflicts with Sergeant Hudson's police report and the sworn statement Owens gave two days after the murder. *See 2 CR (77,023) 534-35* (November 15, 1996 statement); *1/5 CR 124* (police report). At that time, Holberg was still at large and her whereabouts unknown. Absent an ability to predict the future (and assuming for the sake of argument only that Owens's recantations undermine the State's case), Farren could not have knowingly coerced a statement from Owens to benefit the State in a trial that was more than a year away. Even after her arrest, Holberg repeatedly told the police that she met Towery for the first time on the day of his death. 18/28 RR 180-83, 191-200; 27/28 RR 28-31; 19/28 RR 68-72, 89-92. In other words, based on Holberg's own statements*, Farren had reason to believe she and Towery were strangers*. DA Farren would have had no reason to fabricate evidence to refute the theory that they had a prior relationship – such a theory did not even exist

until trial, when Holberg testified. Viewing Owens' recanting affidavits in light of the trial record, there is no logical reason to credit Owens' recanting affidavits, as opposed to DA Farren's affidavit.

### 5. Conclusions

Owens's new statements do not undermine confidence in the verdict and do not satisfy either the materiality prong of *Giglio/Napue* analysis or the materiality prong of *Brady* analysis. More specifically, this court denies claim 1B on the merits based after a *de novo* review of the relevant evidence presented to Holberg's state trial and habeas courts and to this court. For the reasons discussed above, this court concludes after *de novo* review that there is no reasonable likelihood the outcome of either phase of Holberg's trial would have been any different had Owens not testified at trial or testified at trial in the same manner as his affidavits created more than a decade after trial. Likewise, for the reasons discussed above, this court concludes after independent *de novo* review that there is no reasonable probability that, but for the testimony of Owens, the outcome of either phase of Holberg's trial would have been different. Holberg has failed to satisfy both the materiality prong of *Brady* analysis and the materiality prong of *Giglio/Napue* analysis. As was true for Kirkpatrick, once Holberg testified at the guilt-innocence phase of trial, Owens's trial testimony became largely irrelevant. The prosecution called Owens primarily to establish Holberg's presence at Towery's apartment on the date of the murder. Once Holberg testified (and admitted she arrived at Towery's apartment complex in a taxicab whose driver she stiffed and she later engaged in a violent confrontation with Towery), nothing Owens said during his testimony had any significance to the issues before the jury at either phase of trial.

### C.  Witness Intimidation (Claim 1c)

#### 1.  *The Claim*

Holberg contends that the prosecution engaged in a campaign of witness intimidation to present false evidence and prevent Holberg from presenting evidence at trial in her favor. Am. Pet. 43-44. The claim focuses on the testimony of Kirkpatrick and Owens, discussed above, and statements Holberg obtained in 2011 from Lynette Voss Tucker, Heather Woodard, and Michelle Lucero, who shared a jail cell with Holberg before trial. Holberg asserts that the State concealed a campaign of witness intimidation that convicted her with false evidence and prevented her from presenting evidence in her favor. *See* Am. Pet. 43-44; Corrected Reply 9-10.

#### 2.  *State Court Disposition*

Holberg asserts that this claim falls under the umbrella of her original, exhausted state habeas claims 33 and 34, which she expanded as to Kirkpatrick, Tucker, and Lucero in the 2006 Reply and her 2011 Motion for Reconsideration. 5/29 Supp.SHCR 1164 (Kirkpatrick), 1170-71 (Tucker), 1174 (Lucero); *see* Corrected Reply, p. 2-3 (table identifying exhausted state claims 33-34). The state court rejected state habeas claims 33 and 34 on the merits. FFCL 97-120; 28/29 Supp.SHCR 8676-99, 8703-06. This claim is therefore subject to deferential review under § 2254(d).

#### 3.  *Clearly Established Federal Law*

The law governing Holberg's *Giglio/Napue* claims is discussed above in § VI.A.3. The law governing Holberg's *Brady* claims is discussed above in § VI.B.3. Holberg relies on the clearly established federal law in *Mooney*, 294 U.S. at 112 (holding that the deliberate presentation of perjured testimony by the State violates federal due process rights), *Alcorta v. Texas*, 355 U.S. 28, 31 (1957) (same), and *Washington v. Texas*, 388 U.S. 14, 19 (1967) (holding that a Texas statute

prohibiting accomplices from testifying violates Sixth Amendment right to compulsory process); *see also United States v. Hammond*, 598 F.2d 1008, 1013 (5th Cir. 1979) (holding that government agent violated right to compulsory process by threatening witness for the defense and violation was harmful per se).

### 4. AEDPA Review

Respondent asserts, and Holberg does not contend otherwise, that Holberg first presented Heather Woodard's declaration to the state court in her Amended Proposed Findings of Fact and Conclusions of Law. *See* 26/29 SHCR 8100 (Claim 33); 26/29 SHCR 8131 (L'Orange Declaration); 27/29 SHCR 8529-31 (Ex. 47). Respondent contends the claim is subject to procedural default under *Coleman*, 501 U.S. at 729, because the CCA dismissed the 2011 Motion for Reconsideration as an abuse of the writ and because the claim as to Woodward is unexhausted. Answer 48. Holberg contends there is no procedural default because the Motion for Reconsideration was dismissed only as to the Eighth Amendment claim and that there is cause and prejudice to excuse any procedural default because the cause/prejudice inquiry merges with the merits. Corrected Reply 1, 9. To the extent the Motion for Reconsideration could support issues raised in the original application, Judge Estevez considered it, and the CCA agreed with her analysis. 28/29 Supp.SHCR 8591, § 37; *Holberg*, 2014 WL 5389907, at *1, n.1. Judge Estevez also considered the Woodard affidavit. FFCL 101; 28/29 Supp.SHCR 8680, ¶ 13. This court will do likewise. This court will address the merits of this claim. For the reasons discussed below, this court finds Holberg's complaints possess no arguable merit.

First, the record refutes Holberg's contention of concealment by the State. To the extent that law enforcement had a practice of interviewing and obtaining statements from the women housed with Holberg in the jail, it was known to Holberg's counsel and was the subject of a pretrial

151

discovery motion. 2 CR 401-09, ¶ 9. Defense counsel stated on the record that DA Farren had promised her he would obtain any such statements from Special Crimes and provide copies to defense counsel. 2 RR 63. Second, the record refutes Holberg's contention that the State convicted her with false evidence and prevented her from presenting evidence in her favor. As discussed in §§ VI.A-B above in connection with claim 1A and 1B, Holberg's claims that DA Farren coerced Kirkpatrick and Owens to give false testimony lack arguable merit. The remaining affidavits of Tucker, Woodard, and Lucero, discussed below, also fall short.

Tucker signed an affidavit in 2001 that Holberg filed in support of her original state habeas corpus application. In it, Tucker stated that she never heard Holberg boast about Towery's death and that Holberg was remorseful. She said the "District Attorney's office" told her it would be in her best interest to testify, falsely, that she knew Holberg longer than she did and that Holberg bragged about the killing. 1 SHCR 259. Ten years later, Tucker signed a 2011 declaration that contains considerably more detail related to DA Farren trying to persuade her to testify falsely. Tucker said Farren implied he would "escalate" her charges if she did not cooperate. 20/29 Supp.SHCR 6269-72.

Tucker did not testify, however, and she does not assert that DA Farren persuaded her *not* to testify for the defense. Instead, Holberg relies on the following notes in the defense files from an undated interview with Tucker to support the claim that Tucker was intimidated: "On advice of pts & atty—will not become involved . . . Rumor is – Death Penalty – *warned her to tell the truth* – or con. of court or perjury." 27/29 Supp.SHCR 8526-27 (emphasis added); Am. Pet. 43-44. These notes do not suggest that DA Farren or anyone in law enforcement intimidated Tucker. On the contrary, they suggest Tucker refused to become involved on the advice of her parents and her

152

attorney and that some unidentified source (likely the parents or attorney, or perhaps the note-taker) warned her that she would have to testify truthfully. Holberg's argument also overlooks another portion of the investigator notes that suggest Tucker did not want to become involved because she was pregnant. 27/29 Supp.SHCR 8527 ("she does not want to be involved preg.," "will not become involved + baby"); *see also* 1 SHCR 238 (investigator notes indicating Tucker was expecting a fourth child on May 26, 1998).

The state court reasonably concluded that Holberg failed to show Tucker was prevented by anyone from testifying for the defense. *See* FFCL 100, 28/29 Supp.SHCR 8679 ("The Court finds that the affidavit of Lynette Voss Tucker dated June 29, 2000, contains inadmissible hearsay and further is not credible. In addition, the Court finds her newly executed affidavit is also not credible."). Holberg has failed to present this court with any evidence, much less clear and convincing evidence, showing this credibility finding was erroneous.

Michelle Lucero's 2011 declaration states that the police were "pushy," and she relates being awakened and questioned in the middle of the night. She told the police she knew nothing about the crime and that Holberg was remorseful and cried a lot. The detectives told her that if they found out she was lying they would "escalate" the charges against her. 7/29 Supp.SHCR 1744-45. As with Tucker, Lucero did not testify for the State. And she does she relate any threats that caused her not to testify for the defense. Lucero's declaration does not even attribute any behavior to DA Farren.

Heather Woodard stated in her 2011 declaration that she had fallen in love with Holberg and suspected that the guards knew. When DA Farren questioned her about the case, he allegedly said she could remain housed with Holberg only if she told him what Holberg revealed about the

murder. When Woodard denied knowing anything, Farren became very angry and threatened to make things worse for her if she did not cooperate. But she had nothing to tell him, so he left. She stated that she was rearrested years later, and she believed DA Farren "escalated" her charges in retaliation for her not helping with the Holberg trial. 27/29 Supp.SHCR 8529-31. As with Tucker and Lucero, however, Woodard she does not relate any threats that caused her not to testify for the defense.

### 5. Conclusions

Holberg has not shown that the state court's rejection on the merits of her witness intimidation claim was unreasonable. The TCCA's rejection on the merits of Holberg's thirty-third and thirty-fourth claims for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and state habeas corpus proceedings. Furthermore, after *de novo* review of the records from Holberg's trial, direct appeal, and state habeas corpus proceedings, as well as all the additional evidence Holberg has submitted to this court, this court concludes all Holberg's complaints of witness intimidation fail to satisfy both the reasonable likelihood standard of *Giglio/Napue* analysis and the materiality prong of *Brady* analysis. The Court denies Claim 1C on the merits after *de novo* review independent of any AEDPA review.

### D.  Guilt Phase *Brady* Claims (Claim 1d)

#### 1.  The Claims

In a claim designated as "1D," Holberg alleges the State failed to disclose *Brady* evidence that was either exculpatory, mitigating, or impeaching with respect to Becky Bates (aka Rebecca Britt), Vicki Kirkpatrick, Roger Speir, Donald Owens, and John Sneed. Am. Pet. 45-48.

#### 2.  State Court Disposition

Holberg raised the claim as to Bates and Kirkpatrick in her original state application for habeas relief, 1/2 SHCR 189-90, and amplified the claim in her 2006 Reply as to Kirkpatrick, Speir, and Sneed, 2/18 SHCR 29 n.3, 118-40. Holberg raised the claim as to Owens in her 2012 Additional Evidence, which the CCA dismissed as an abuse of the writ. *See* 1/1 SHCR (WR-68,994-03); *Holberg*, 2014 WL 5389907, at *1. The TCCA rejected this claim on the merits when it denied Holberg's thirty-third and thirty-fourth claims for state habeas relief. FFCL 97-120, 124-27; 28/29 SHCR 8676-99, 8703-06.

#### 3.  Clearly Established Federal Law

Supreme Court precedent governing *Brady* claims is discussed above in § VI.B.3.

#### 4.  AEDPA Review

##### a.  Becky Bates (aka Rebecca Britt)

When Holberg testified before the jury in this case, she identified Rebecca Bates as one of the women who introduced her to prostituting. 20 RR 223-24. In this claim, Holberg contends the prosecution suppressed information from Bates that Holberg was not violent, that Towery frequented strip clubs and used prostitutes, that Towery was violent, sadistic, and feared by prostitutes, and that Holberg had an ongoing relationship with Towery. Holberg contends this

information would have countered the State's themes at trial that Towery was a sweet old man and a stranger to Holberg. Am. Pet. 46.

This *Brady* claim rests on Bates's 2000 affidavit. 1/2 SHCR 190-91, 260-61. In it, Bates states that she has known Holberg since 1994 and that they had a sexual relationship. Bates said that, while she was in prison, the guards told her she had a telephone call from the Randall County District Attorney's office. Bates said she told the caller that she knew Towery "through the strip clubs," that Towery used prostitutes, that she had gone to Towery's apartment with another prostitute, Gayla McLendon, because McLendon was afraid of Towery, that Holberg was not violent, and that Holberg had sugar-daddy relationships with both Towery and E.R. Williams. 1/2 SHCR 261.

Six years later, however, Bates provided a second, more detailed affidavit. 2/18 SHCR 169-71; 3/29 Supp.SHCR 523-25. In her 2006 affidavit, Bates asserted for the first time that she (Bates) had sex with Towery and described Towery as "mean, abusive and perverted." She said she refused to have anything more to do with "his sick ways" after he wanted to inflict pain on her, and he was especially mean and forceful when he drank. Bates stated that other women had trouble with Towery's perverted, violent behavior, that it was a very scary situation to be in when he "got carried away with his violence," and that there was no doubt in her mind "that is what happened with Brittany and Towery." Bates did *not* say that she had ever provided these additional details to the District Attorney. 2/18 SHCR 170-71; 3/29 Supp.SHCR 524-25.

The District Attorney and his assistants submitted responsive affidavits in 2011. Charles Blount stated he had never spoken with Bates and was never informed that Bates had spoken with any representative of the District Attorney's office. 4/29 Supp.SHCR 938. Robert Love stated he

did not know Bates, has never spoken to her, and had no knowledge of any member or former member of the District Attorney's office speaking with Bates. Love elaborated that he had no knowledge of the factual assertions in Bates's affidavits and that the first time he became aware of allegations that Towery had used prostitutes was defense counsel's opening statement at trial. 4/29 Supp.SHCR 940. DA Farren stated that he never met or talked to Bates in person or by phone and was confident that no one else in his office had contact with her before or after trial. 4/29 Supp.SHCR 944.

The state court found that Bates' affidavits were not credible, and that DA Farren, Blount, and Love were credible because they were well-known to the court and the court never had occasion to question their veracity or ability to recall. FFCL 111-12; 28/29 Supp.SHCR 8690-91. Holberg argues that this credibility determination is unreasonable because it is conclusory and based on a paper record. Corrected Reply 10. As discussed above, however, a paper hearing does not prevent the application of the AEDPA's presumption of correctness to the state habeas court findings of fact or its deferential standards of review. *See Valdez*, 274 F.3d at 948.

Whether Bates relayed information in a telephone call she received from the District Attorney while in prison is a question of fact. The Court presumes that the state court's factual determinations are correct absent clear and convincing evidence to the contrary. *See* § 2254(e)(1); *Morrow*, 367 F.3d at 315 (holding that AEDPA requires habeas court to presume correct the state court's findings of fact unless the petitioner rebuts by clear and convincing evidence, even if the state court hearing was a paper hearing). Holberg fails to present clear and convincing evidence to rebut the trial court's factual finding as to Bates's lack of credibility.

As with other post-conviction statements provided by Holberg, Bates's credibility is undermined by the additional and somewhat studied details that emerged years after the first written statement was made. Specifically, in 2006, Bates stated that she had sex with Towery. If this were true, Holberg offers no reason why Bates would have omitted it from the first affidavit in which Bates described visiting Towery's apartment with another prostitute. The 2006 affidavit also states that Towery was mean, abusive, and perverted during sex and that Bates had "no doubt" that Towery got carried away with his violence on the night he was murdered. By all appearances, these belated details are a tailored response to the State's original answer, which had argued that the "relationship" evidence in the first affidavit was merely cumulative of the testimony admitted at trial. *See* 2/2 SHCR 541-47 (State's Answer); 2/18 SHCR 118-19 (Holberg's Reply) (asserting that Reply cures insufficiencies alleged in State's Answer). Bates offers no reason why she omitted these scandalous details, if true, from her first affidavit. Finally, Holberg fails to proffer any evidence to counter the bias that the state court could reasonably infer from her prior romantic relationship with Bates.

In short, while Holberg complains about the state court process, she has not identified any evidence, let alone clear and convincing evidence, that might refute the trial court's credibility determinations. Holberg fails to show that the state court's ruling was unreasonable in fact or law. *See* § 2254(d); *Duncan v. Cockrell*, 70 F. App'x 741, 746 (5th Cir. 2003) (applying presumption of correctness to a state court's credibility determination based on a paper hearing where petitioner did not submit clear and convincing evidence to the contrary).

b.    Vicki Kirkpatrick & Roger Speir

Holberg alleges that the prosecution also suppressed evidence that would have exposed Kirkpatrick's allegedly false testimony, particularly, that: (1) Kirkpatrick knew DA Farren, (2) DA

158

Farren placed Kirkpatrick in Holberg's cell as a police informant, (3) DA Farren threatened Kirkpatrick, and (4) DA Farren promised a lenient sentence on Kirkpatrick's pending burglary charge. Holberg alleges the State suppressed evidence that Kirkpatrick's boyfriend and burglary codefendant, Roger Speir, had called the Amarillo Police Department and reported that Kirkpatrick was going to testify falsely at Holberg's trial in exchange for leniency on her own charges. The state court rejected these claims on the merits, finding both Speir and Kirkpatrick not credible. *See* FFCL 106, 119-20, 126; 28/29 Supp.SHCR 8685, 8698-99, 8705.

This Court extensively reviewed the factual underpinnings of these claims in Claim 1A above. To summarize, Kirkpatrick's multiple post-trial statements are inconsistent with each other and with facts in the contemporaneous record, and, when the opportunity arose to confirm Kirkpatrick's story with Greta Crofford, Kirkpatrick refused to allow it under the advice of Holberg's writ counsel. Speir, despite his asserted close relationship with Kirkpatrick, denies too much by incorrectly claiming that Kirkpatrick did not know Holberg. His story about calling the police and the local news media is inherently unreasonable in that he did nothing about the alleged perjury after the jury convicted Holberg. The state habeas court accurately noted that Speir's affidavit appears to be based entirely on hearsay and lacks specific facts showing he ever possessed personal knowledge of the facts he purports to assert. FFCL 120, 28/29 Supp.SHCR 8699. Holberg presents no clear and convincing evidence to rebut the state court factual determinations as to the lack of credibility displayed by Kirkpatrick and Speir, and the state court reasonably denied these related *Brady* claims on the same factual grounds.

This claim also contains an assertion that the State never revealed Kirkpatrick's history as a police informant. This claim was raised and rejected in state court. 1/2 SHCR 189 (Original

Application); 2/18 SHCR 121; (Reply); FFCL 107, 127; 28/29 Supp.SHCR 8686, 8706 (state court

findings and conclusions). The AEDPA deferential standard of review therefore applies. *See*

' 2254(d).

  To be clear, there is no suggestion or evidence that Kirkpatrick was a paid informant against

Holberg in this case. *Cf. Banks*, 540 U.S. at 691 (finding *Brady* violation where prosecution

withheld evidence that law enforcement paid a testifying witness for information and assistance in

the case). Corporal Stallings's testimony at Kirkpatrick's burglary trial reflects that Kirkpatrick

received cash for making drugs buys that helped the SWAT team obtain about forty search

warrants. 2/2 SHCR 613-20. Until this testimony occurred in 1998, it is unclear whether Holberg's

trial counsel, or anyone outside the police department, knew about Kirkpatrick's role as a narcotics

informant. 4/29 Supp.SHCR 922; 2/2 SHCR 620 (testimony that, to Stallings's knowledge, no one

outside of the department knew Kirkpatrick's role as confidential informant). The record shows

that Holberg's trial team interviewed Kirkpatrick before Holberg's trial, and Kirkpatrick told them

she had no deal with the State, but it does not show whether Kirkpatrick disclosed her role as an

informant. 4/29 Supp.SHCR 908 (Dodson aff't), 922 (Norris aff't). The court will assume, without

deciding, that the State suppressed Kirkpatrick's status as a narcotics informant.

  Kirkpatrick's history as a drug informant may be favorable evidence to the defense if it

serves to impeach her as a witness. *See Bagley*, 473 U.S. at 677. Holberg articulates no argument

in this regard.[37] Am. Pet. 46; Corrected Reply 10. The Ninth Circuit case she cites for support

---

[37] In this claim, and throughout her Amended Petition, Holberg refers the Court to her Original Petition "for additional detail." *See* Am. Pet. 35, 43, 44, 48, 53, 63, 65, 74, 77, 86, 88, 89, 90, 91, 96, 98, 105, 109, 110, 119, 122, 124, 132, 133, 136, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147. The Court previously ordered the parties not to use incorporation by reference to avoid page limits, yet Holberg offers these references "solely for the Court's information." *See* ECF No. 53, p. 5 (Memorandum Opinion and Order for Amended Petition with Scheduling Order); Am. Pet. 35 n. 14. Whatever Holberg may intend by this phrase, the referenced materials are not part of Holberg's argument before this Court and have not been reviewed by the Court.

refutes this claim because the impeachment material in that case consisted of persistent *misconduct* by an informant who testified in the case under review. *See Benn v. Lambert*, 283 F.3d 1040, 1054 (9th Cir. 2002). There is no suggestion here that Kirkpatrick acted improperly as a narcotics informant. On the contrary, as Holberg's trial counsel recognized, a challenge to Kirkpatrick's credibility would have invited the State to emphasize her role as a trusted, confidential informant. 4/29 Supp.SHCR 922 ("The State in all likelihood would then call law enforcement officers to testify that Kirkpatrick has a reputation in the community for truth and veracity because she has provided them truthful information to solve other crimes."). To the extent Holberg now suggests trial counsel could have used Kirkpatrick's role as an informant on cross-examination to imply that she made a deal in exchange for her testimony, this tactic would have backfired because trial counsel knew there was no deal. The prosecution could have readily used this fact on redirect examination, bolstering Kirkpatrick's testimony by emphasizing she was testifying only "because it was the truth." *See* 4/29 Supp.SHCR 920-21. The state habeas court could reasonably conclude that Holberg has failed to demonstrate under *Brady* that Kirkpatrick's informant status was favorable to the defense or material in a way that undermines confidence in the verdict. In any event, this court concludes after *de novo* review that Holberg's new evidence relating to Kirkpatrick's recanting deposition fails to satisfy the materiality prong of *Brady*.

c.      John Sneed

In 2006, Holberg filed an affidavit from 89-year-old John Sneed. In it, Sneed states that he was told by E.R. Williams that Towery paid for sex and liked to physically abuse the girls by pushing them and hitting them with his fists "to get their attention." 2/18 SHCR 286. Holberg contends that the State suppressed this information in violation of *Brady*. The state court found that the portion of Sneed's affidavit described above was inadmissible hearsay. FFCL 113; 28/29

161

Supp.SHCR 8692. The state court found that Sneed's affidavit was credible only to the extent it described his friendship with Williams and how Williams died in hospice. FFCL 114; 28/29 Supp.SHCR 8693.

As with the other credibility determinations discussed elsewhere, Holberg fails to provide clear and convincing evidence to rebut the presumption of correctness that attends the state court findings. *See* § 2254(e)(1). Moreover, assuming the hearsay is true, Sneed's affidavit contains no statement that he told law enforcement the information he allegedly heard from Williams about Towery's proclivities. There is no *Brady* claim here. Sneed's affidavit states only that he spoke to a detective about whether Holberg could have killed Williams. 2/18 SHCR 286. Holberg makes no attempt to demonstrate that the state court's ruling on this claim was based on an unreasonable determination of facts or an unreasonable application of *Brady*.

Furthermore, after *de novo* review, this court independently concludes Holberg's complaint of an alleged *Brady* violation regarding Sneed fails to satisfy the materiality prong of *Brady* analysis. There is no reasonable probability that, but for the prosecution's suppression of any of the information in Sneed's affidavit, the outcome of either phase of Holberg's trial would have been different. At both phases of trial, the prosecution's closing argument expressly disavowed any assertion that Holberg caused the death of E.R. Williams. As it explained in its closing jury argument at both phases of trial, the prosecution's point in introducing testimony regarding what Holberg said to others about her assault upon Williams was to sow that such an assault occurred, not to show that she had caused Williams' demise. Moreover, the state habeas court expressly found that Holberg admitted to her counsel that she had, in fact, been involved in an altercation

with Williams. FFCL 114, 28/29 Supp.SHCR 8693. Holberg has failed to present this court with any evidence showing this factual finding was erroneous.

> ### d.    Donald Owens

Holberg contends that the prosecution suppressed the alleged threats and promises that induced Owens's allegedly false trial testimony. Respondent asserts that this claim is procedurally barred. Answer, p. 51-53. As discussed above in § VI.B, Holberg presented the claims related to Owens in a document entitled "Additional Evidence," filed twelve years after the original habeas application and seven months after Judge Estevez sent her recommendation to the CCA. *See* 1/1 SHCR (WR-68,994-03). The TCCA dismissed it as an abuse of the writ. *Holberg*, 2014 WL 5389907, at *1. This court has already determined in § V Claim (denying claim 1B on the merits) that Holberg has not shown cause or prejudice necessary to excuse the procedural default. Moreover, this court concluded after *de novo* review of all the evidence in the state court record, as well as all the new evidence Holberg has submitted, that the alleged suppression of the new information contained in Owens' recanting affidavits did not satisfy the materiality prong of *Brady* analysis.

Holberg has not shown that the alleged suppression of the investigator notes and taxicab log prevented her discovery of Owens's allegedly false trial testimony. The notes and log do not show that Owens's trial testimony was in fact false. Even assuming Owens's recantation story were true, Holberg has not shown that it is sufficient to undermine confidence in the verdict (specifically, as to motive and the timing of the murder) for the reasons already discussed. Holberg presents no additional arguments to avoid procedural default of the claims related to Owens. *See* Am. Pet. 47.

### 5. Conclusions

The TCCA's rejection on the merits during Holberg's state habeas corpus proceeding of Holberg's *Brady* claims relating to the recanting deposition of Kirkpatrick and the affidavits of Bates, Speir, and Sneed was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and state habeas corpus proceedings. This portion of claim 1D is denied pursuant to the AEDPA.

Furthermore, after *de novo* review of the records from Holberg's trial, direct appeal, and state habeas corpus proceedings, as well as all the additional evidence Holberg has submitted to this court, this court concludes Holberg's *Brady* claim relating to the recanting affidavits of Owens fails to satisfy the materiality prong of *Brady* analysis. The Court denies this portion of claim 1D on the merits after *de novo* review independent of any AEDPA review.

### E. Guilt-Phase Catch-All *Brady* Claims (Claim 1e)

#### 1. The Claims

In a claim designated as "1E," Holberg next presents what she characterizes as an undeveloped *Brady* claim based on her calculation the prosecution's disclosure in 2009 and 2010 of nine boxes of prosecutorial work product account for only sixty percent of the "prosecution files currently known to habeas counsel." Holberg asserts these disclosed files contained the following *Brady* material:

> (1) handwritten notes suggesting possible contamination of the crime scene, material to both aggravators; (2) complete disciplinary records for several witnesses, never disclosed to the defense or the jury; (3) a history of Kirkpatrick serving as a confidential informant for Amarillo SWAT; (4) the probationary status of several witnesses; (5) undisclosed deals that had been struck with several

witnesses in exchange for their false testimony; (6) impeachment materials related to Owens, including handwritten interview notes of DA personnel contradicting the State's theory of motive, and a cab log contradicting the timing of Holberg's arrival at the apartments, material to the burglary aggravator; (7) impeachment material relating to the robbery aggravator, showing the victim and his family had a documented history of lying to the police about money being stolen from his wallet – police incident reports showing Towery and his son falsely reported a theft of $1,200 from his wallet at the Big Dipper bar; (8) handwritten notes suggesting the police manipulated media coverage with information about the brutality of the offense, including information later shown by Texas Department of Public Safety records to be false; (9) crime lab letters about blood testing of the wallet, the lamp, and other critical items of evidence material to the robbery aggravator showing Holberg's blood was not on the wallet; (10) work product from Cathy McCord suggesting the selective testing of evidence, and testing results showing Towery wielded weapons that DA Farren claimed had been used by Holberg; (11) notes relating to the Princess Apartments tenant population, showing Towery lived in a den of thieves—several neighbors had criminal histories for theft and other *crimen falsi*, and any one of them could have stolen money from his open apartment; and (12) investigator pharmacy notes indicating there was no attempt by Holberg to fill a prescription on the way to the Princess Apartments, undermining the State's motive theory.

Am. Pet. 48-53. Holberg's Amended petition appears to discuss these allegations. Significantly, none of the above allegations cites to the record for support. Instead, Holberg bases her allegations on a cursory review of the prosecutor's files. Holberg also complains the State never disclosed handwritten notes of, or recorded interviews by, key law enforcement and prosecutorial personnel. She further asserts the architecture of the State's files strongly implies additional *Brady* violations.[38]

---

[38] As an initial matter, Holberg suggests in a footnote that discovery is necessary to establish the full panoply of *Brady* violations and that she "was denied any discovery related to them." Am. Pet. 48-49 n.19, 20. This footnote presents no legal argument, and there is no discovery motion pending before the Court. The court struck Holberg's September 22, 2015, discovery motion without prejudice for excessive length. ECF No. 51, 56 ("The striking of the motion for discovery is without prejudice to Petitioner resubmitting a motion that complies with the local rules governing page limits."). Holberg never resubmitted her motion, however. The Court denies Holberg's request for discovery. Holberg fails to allege specific facts showing good cause for discovery. *See Lave v. Dretke*, 416 F.3d 372, 381 (5th Cir. 2005) ("Conclusional allegations are insufficient to warrant discovery; the petitioner must set forth specific allegations of fact.").

## 2. The Parties' Arguments Regarding Exhaustion and Procedural Bar

Respondent contends this catch-all *Brady* claim is unexhausted and procedurally barred because Holberg never raised it in state court. Answer 56-57. To properly exhaust a claim, a habeas petitioner must fairly present its factual and legal basis to the highest available state court for review in a procedurally correct manner allowing the state court to consider the merits of the claim. *Picard v. Connor*, 404 U.S. 270, 275 (1971); *Carty v. Thaler*, 583 F.3d 244, 254 (5th Cir. 2009) (citing *Beazley*, 242 F.3d at 263). In her Corrected Reply, Holberg asserts the claim is "of a piece" with Claim 34 in Holberg's Original Petition, as amplified in the 2006 Reply, and points out the state court prevented her from developing it until "2007 [sic] and 2010," when the prosecution disclosed nine boxes of work product. Corrected Reply 5-6.

In this claim, the Amended Petition combines the individual *Brady* claims Holberg exhausted in state court with a broader *Brady* claim based on the architecture of the prosecution's files. The catch-all portion of the claim was not "fairly presented" to the state courts in an application for post-conviction relief: Claim 34 in the Original Petition is the Becky Bates *Brady* claim based on a phone call Bates allegedly received while in prison. 1/2 SHCR 190. The Reply enlarged Claim 34 to include additional affidavits from Bates, Sneed, Kirkpatrick, and Speir (all discussed in Claim 1D above), and Katina Dickson, Corena Norrell, Mary Lynn Burnett (discussed below in connection with claim 2C) and Ray Frazier. 2/18 SHCR 118-40. The exhaustion requirement is not satisfied as to the catch-all claim because it is factually different from the claims raised in the state court. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998) (citing *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997)). Simply combining the unexhausted claim with exhausted claims does not satisfy the exhaustion requirement.

Holberg also urges the Court to consider her unexhausted omnibus *Brady* claim as part of her "cumulative error" argument in Claim 18 under *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (en banc). Reply 6. This argument relies on an interpretation of *Derden* by the Third Circuit Court of Appeals in *Collins v. Sec'y of Pa. Dep't of Corrs.,* 742 F.3d 528, 541-42 (3d Cir.), *cert. denied sub nom., Collins v. Wetzel*, 135 S. Ct. 454 (2014). A panel of the Fifth Circuit held the Third Circuit's interpretation of *Derden* was incorrect because the exhaustion issue never arose in *Derden*. *See Nickelson v. Stephens,* 803 F.3d 748, 753 n. 5 (5th Cir. 2015). This Circuit's interpretation in *Nickelson* controls, and *Collins* does not avail Holberg. This Court has found no other argument in Holberg's briefing to excuse the exhaustion requirement under Section 2254(b)(1)(B). *See* Am. Pet. 29, 48-53, 148; Corrected Reply 5-6, 11. This claim is therefore unexhausted and subject to dismissal.

Prior to the enactment of the AEDPA in 1996, a federal habeas court could not adjudicate "mixed" petitions containing both exhausted and unexhausted claims. The petitioner had to withdraw the unexhausted claims, or the Court had to dismiss the petition without prejudice. *See Rose v. Lundy*, 455 U.S. 509, 518-19 (1982) (adopting "total exhaustion" doctrine to reduce piecemeal litigation and protect state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings). The petitioner could refile after exhausting all claims in state court. *Id.* After the AEDPA imposed a one-year statute of limitations for federal habeas petitions, however, it became apparent the dismissal of a petition could result in the petitioner refiling his federal petition after the limitations period had passed. *See Rhines v. Weber*, 544 U.S. 269, 275 (2005). For this reason, the Supreme Court approved a procedure whereby the federal district court could stay the case, rather than dismiss, and hold it in abeyance while petitioner

pursued exhaustion proceedings in state court. *Id.* at 275-76 (describing "stay-and-abeyance" procedure). Holberg's counsel have not requested a stay and abeyance. The Court addresses this matter in an abundance of caution and concludes a stay and abeyance[39] is not appropriate.

The stay and abeyance procedure can frustrate the AEDPA's objective of encouraging finality by allowing a petitioner to delay resolution of the federal proceedings, particularly in capital cases. *See id.* at 276-77. The procedure also decreases a capital-case petitioner's incentive to exhaust all claims in state court prior to filing a federal petition. *See id.* For these reasons, the procedure is available in limited circumstances where there is (1) "good cause" for the failure to exhaust, (2) potential merit to the claim, and (3) no indication the petitioner engaged in intentionally dilatory litigation tactics. *Id.* at 278.

Despite Holberg's assertion this claim was first available to her through the disclosure of prosecutorial work product in 2010, Holberg does *not* argue she presented it in her 2011 Motion for Reconsideration or in her 2012 Additional Evidence. *Holberg*, 2014 WL 5389907, at *1. Not only did Holberg's writ team have the prosecution files in their possession when they filed these subsequent writ applications, but they used the timing of the disclosure of the prosecution files to justify the belated filing of those applications. *See* 1/1 SHCR 4 (Additional Evidence filed in 2012, asserting the investigator's pharmacy notes were "buried in a file" of Farren's work product and surfaced only in October 2010); Am. Pet., p. 41. Holberg's failure to include this catch-all *Brady* claim in her second and third subsequent writ applications appears to be matter of choice and

---

[39] *E.g., Busby v. Thaler*, No. 4:09-CV-0160-Y, *2 n.2 (Aug. 17, 2012) (Means, J.) (Amended Stay and Abeyance Order).

strategy. No "good cause" for the failure to exhaust exists. Dilatory litigation tactics are likely in play. A stay and abeyance would thus be inappropriate.

Respondent asserts *Coleman* bars this unexhausted claim. Specifically, a Court would dismiss the claim as procedurally barred by Article 11.071, Section 5, if the petitioner presented it in state court. *See Coleman*, 501 U.S. at 736 n.1. The Court agrees. Nonetheless, this Court does retain the authority to deny relief on the merits on an unexhausted claim. *Berghuis*, 560 U.S. at 390 (federal courts "may deny writs of habeas corpus under Section 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies."); *Rhines*, 544 U.S. at 277 (citing 28 U.S.C. Section 2254(b)(2)).

### 3. *De novo Review*

Holberg's broad *Brady* claim has no merit and lacks specific factual support. Conclusory assertions are insufficient to furnish a basis for federal habeas corpus relief. *Johnson v. Scott*, 68 F.3d 106, 112 (5th Cir. 1995). As explained below, to the extent Holberg supports her catch-all *Brady* allegation with specific argument and factual assertions, the allegations are either unsupported or refuted by the record.

For example, in support of the Owens claim already addressed above, Holberg offers an additional exhibit she filed with her Amended Petition — an affidavit from pharmacist Franz Fuhrbach. *See* Ex. I (ECF No. 68-19). Holberg concedes this affidavit is not in the state court record Respondent filed with the Court. Petitioner's Response to April 13, 2018 Order, p. 2 (ECF No. 98). As such, the Court cannot consider this claim for purposes of Section 2254(d) if -- as Holberg contends -- she exhausted this claim in state court and the state court ruled on the merits. *Pinholster*, 563 U.S. at 181-82. Moreover, Holberg's belief that Fuhrbach's affidavit was "part of the record in the state courts" (ECF No. 98, p. 2) is incorrect. In fact, Fuhrbach dated the affidavit

March 26, 2014, three months *after* Judge Dambold transmitted the trial court's records to the CCA. *See* 6/6 SHCR 1284 (Order transmitting pleadings, hearing record, and supplemental findings and conclusions, dated December 30, 2013). It was Judge Dambold's task, as the presiding judge in the convicting court, to create the record and enter proposed findings. *See* Tex. Code Crim. Proc. art. 11.071, §§ 8, 9.

Nevertheless, the Court considers the affidavit in a *de novo* review of the unexhausted claims and concludes Fuhrbach's affidavit does not support the *Brady* claim. The affidavit asserts Fuhrbach, a pharmacist, never spoke with anyone from the prosecution or the police department prior to Holberg's trial. *See* Ex. I ("I do not recall ever speaking to anyone from the Randall County District Attorney's Office or from the Amarillo Police Department concerning Brittany Holberg prior to her trial in March 1998."). Thus, it does not allege the existence of any information the prosecution could have suppressed. Also, it adds nothing to Holberg's claim that Owens lied at trial because it does not pertain to events on the day of the murder. It only asserts Fuhrbach did not *recall* Holberg *ever* stopping by the Homeland #529 Pharmacy; it does not establish Fuhrbach was even working on the day of the murder. *See United States v. Dillman*, 15 F.3d 384, 390 (5th Cir. 1994) ("Although exculpatory and impeachment evidence fall within the purview of Brady, neutral evidence does not.").

The next unexhausted claim asserts the prosecution withheld a letter from the Texas Department of Public Safety Crime Laboratory stating the lab detected no blood on Towery's wallet. For the reasons discussed at length by the TCCA in denying Holberg's DNA motion, this claim is frivolous. The lab report Holberg relies upon to support this claim does not contain any

reference to a wallet. *See* 14/29 Supp.SHCR 4488-92.[40] Moreover, the argument conflicts with the

trial record, which shows Holberg called criminologist, Cathy McCord, who testified she found no

blood on the wallet:

> Q.      . . . I'll show you what's been marked as Defendant's Exhibit 19 and see if
> you recognize that as what you have the report there as Item 40.
> A.      Yes.
> Q.      And did you find any blood on that wallet?
> A.      No, I did not.

20 RR 83; *see* 18 RR 246 (testimony identifying Towery's wallet, Item 40, as Defendant's Ex.

19). Obviously, the prosecution did not withhold this evidence because Holberg's counsel

presented it to the jury through McCord's testimony.

Holberg next argues the State withheld the tenant manifest for Towery's apartment

complex, which showed Towery lived in a "den of proven thieves, any one of whom could have

wandered into his apartment—after summoned by Rocky's screams—and taken money from

Towery's wallet." Am. Pet. 52-53. Holberg's citation to the record does not lead to evidence

supporting this allegation. *See* Am. Pet. 53 ("AP-76,668, CR v. 2 at 350-52"). This part of the

record contains diagrams of the Princess Apartments. *See* 2 CR 305, ¶ 6 (aff't describing contents

of Ex. E). The Court observes no tenant manifest or criminal history of Towery's neighbors.

In sum, Holberg fails to allege any specific facts in support of this claim, much less furnish

any evidence, showing the prosecution withheld any information favorable to the defense and

which, if disclosed, could reasonably have altered the outcome of either phase of her capital murder

trial.

---

[40] The Amended Petition cites to the .pdf page numbers for this volume, rather than the Bates stamp. *See* Am.
Pet. at 67 ("WR.CSR v. 14/29 at 381-385").

### 4.   Conclusions

After independent *de novo* review, this Court concludes Holberg's unexhausted catch-all *Brady* claim fails to allege sufficient specific facts in support of this claim establishing the prosecution withheld or suppressed favorable evidence and there is a reasonable probability that, but for the prosecution's failure to disclose the evidence in question, the outcome of either phase of Holberg's capital murder trial would have been different. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281-82. Holberg's catch-all *Brady* claim does not warrant federal habeas corpus relief under a *de novo* standard of review. This Court denies claim 1E.

## F.   Punishment Phase Prosecutorial Misconduct (Claim 2a)

### 1.   The False Testimony Claims

Holberg asserts the prosecution engaged in misconduct at the punishment phase by intentionally presenting false testimony (1) from Katina Dickson that Holberg orchestrated violence against others while in jail and (2) from Mary Burnett that Holberg had killed E.R. Williams. Am. Pet. 53-57.

### 2.   State Court Disposition

Holberg asserts the claims fall under the umbrella of her exhausted Claims 33 and 34 in state court, as amplified in her 2006 Reply and 2011 Motion for Reconsideration. Corrected Reply, p. 2-3 (table of claims). Respondent asserts the claim is unexhausted and procedurally barred because Holberg raised it in her 2011 Motion for Reconsideration, which the TCCA dismissed as an abuse of the writ. Answer 58; *Holberg*, 2014 WL 5389907, at *1. Holberg replies that the TCCA dismissed the Motion for Reconsideration as to an Eighth Amendment claim only. Corrected Reply, p. 1, 11.

172

To the extent the Motion for Reconsideration could support issues raised in the original application, Judge Estevez considered it and denied relief on the merits. FFCL 12; 28/29 Supp.SHCR 8591, § 37; *Holberg*, 2014 WL 5389907, at *1, n.1. Judge Estevez specifically considered the declarations underlying this claim and found the declarations of Dickson and Burnett not credible. *See* FFCL 99-100, 119; 28/29 Supp.SHCR 8678-79 ¶ 5-8, 8698 ¶ 21. Therefore, the TCAA decided the claim on the merits. Accordingly, Holberg's claim is exhausted, and, therefore, Section 2254(d) controls.

### 3.  *Clearly Established Federal Law*

Section IV.C discusses Supreme Court on *Giglio/Napue* claims. To reiterate, for "false testimony" claims, the clearly established federal law requires a defendant to show that the testimony was actually false, that the state knew or should have known that it was actually false, and that the false testimony was material. *See Canalas*, 765 F.3d at 573; *Reed*, 504 F.3d at 473 (citing *Napue*). False testimony is material if there is "any reasonable likelihood" that it could have affected the jury's verdict. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016); *Canales*, 765 F.3d at 573.

### 4.  *AEDPA Review*

This Court must assess whether the state court's disbelief of the recantations by Dickson and Burnett is objectively unreasonable, considering the evidence before the state court. *See* Section 2254(d)(2); *Miller-El*, 537 U.S. at 340.

#### a.    Katina Dickson (aka Katina Dixon aka Yolanda English) Trial testimony

At the punishment phase of Holberg's trial, Katina Dickson testified she and Holberg met in jail, and Holberg had offered her money to "shut up" Vicki Kirkpatrick. Dickson did not take

Holberg seriously and thought she was just "blowing off some steam." But Dickson came to believe Holberg was serious because Holberg repeated the request and because Holberg had paid someone else to assault another inmate, Chuck Collins. Dickson said Holberg passed her a note in Bible study confirming that Collins suffered a broken jaw. 23/28 RR 34-48. Dickson, who was serving a state-jail sentence at the time of Holberg's trial, denied anyone offered her incentives to testify. Dickson also admitted she refused to speak to Holberg's attorneys before testifying upon the advice of her own lawyer. 23/28 RR 42-43.

i.    Recantation

Thirteen years later, in 2011, "Yolanda English" signed a recanting declaration while incarcerated in the Tarrant County jail. 7/29 Supp.SHCR 1581-85. The parties agree that English and Dickson are the same person but do not identify proof of this in the record. The Court assumes without deciding they are the same person and will refer to English as "Dickson" for the sake of clarity.

Dickson stated in her 2011 declaration that what Holberg told her was, "I wish" Kirkpatrick "would just shut the fuck up." Dickson said DA Farren threatened to charge her with failing to report a crime if she did not lie in her trial testimony. Dickson also recanted her testimony about the assault on Chuck Collins, and Dickson denied Holberg ever passed any note about "murder for hire." Dickson further stated DA Farren, not Dickson's lawyers, told Dickson not to speak to Holberg's lawyers before trial and that DA Farren made Dickson testify falsely that she and Holberg were in a relationship. Dickson stated she is nervous DA Farren will retaliate against her. Dickson also stated she terminated her first visit with Holberg's investigator because a guard told her he would not speak to the investigator if he were her. 7/29 Supp.SHCR 1581-94.

174

ii.   Analysis

Respondent argues the state habeas court reasonably rejected this claim because Dickson's 2011 declaration contradicts an affidavit that Dickson signed in 2001. 5/18 SHCR 710-11. A discussion of the 2001 affidavit is absent from Holberg's Amended Petition. In the 2001 affidavit, Dickson confirmed her testimony that Holberg had asked her to "shut up" Kirkpatrick. Dickson also confirmed Holberg had passed her a note in Bible study stating that "Kelly broke Chuck's jaw," but downplayed Holberg's involvement in that incident. Dickson said DA Farren led her to believe she would be in big trouble for not reporting Holberg's threat, and she stated she was "somehow pushed into this situation."

Signed at a time when her memory would have been better, the 2001 affidavit undermines Dickson's 2011 recantation. For example, in 2011, Dickson stated she could not recall the Bible study note in detail but "knows" it was not about "murder for hire." Assuming this is true, Dickson provides no explanation as to how DA Farren would have known about an innocuous note to have her falsify its contents. 7/28 SHCR 1584. Dickson could have included a clear explanation for the extreme changes in her story over the ten-year period but did not.

To support Dickson's recantation, Holberg proffers declarations by her investigator, Barnabas Batarseh, and her attorney, Karl Saddlemire, about their efforts that culminated in Dickson's 2011 recantation. Investigator Batarseh said that while visiting Dickson in jail with her counsel present, Dickson excused herself after ten minutes to use the restroom and never returned. Batarseh suggests that Dickson's attorney then purposely refused to help arrange an immediate contact visit with Dickson. According to attorney Saddlemire, jail personnel then moved Dickson the following day to another jail. When Saddlemire called to arrange a contact visit, the jail

administrator immediately knew who he was (which Saddlemire found suspicious) and told Saddlemire that Dickson "broke off the interview last week" and had no desire to speak with him. Nevertheless, Batarseh traveled to Fort Worth the following day with another investigator, Amber Kaset. According to Batarseh, the new jail had more "stringent" security: he had to show his identification and investigator's badge, and they waited half an hour or more "beneath a video camera" to receive instructions on the visitation process. According to *Batarseh's* declaration, Dickson was convinced DA Farren had a hand in moving her to the other jail "after she started to reveal his web of lies." Batarseh also stated it took approximately seven hours before Dickson "overcame her fear" and provided the recantation. 20/29 Supp.SHCR 6054-55, 6059-60.

The declarations of Batarseh and Saddlemire reflect a subjective belief that the Tarrant County Sheriff's Department limited access to Dickson to protect the elected district attorney in another county more than 300 miles away.[41] The state court could reasonably conclude otherwise, however. The declarations of Batarseh and Saddlemire show that Dickson enlisted the assistance of her attorney, Edward Castillo, in dealing with them. They show that attorney Castillo first allowed Holberg's investigators to question Dickson but refused to coordinate a contact visit after Dickson abruptly ended the interview. Dickson moved to another jail where Holberg's team tracked her down and questioned her without her counsel present for *seven hours* before overcoming her reluctance. Although *Batarseh* implies that Dickson's reluctance was due to menacing behavior by the Tarrant County sheriff employees, on behalf of the Randall County district attorney, *Dickson's* own declaration stops short of making this connection. Certainly, Dickson would have unequivocally connected her reluctant change in narrative to the guards'

---

[41] The court takes judicial notice of the fact Randall County and Tarrant County are 350 miles apart.

behavior if it were true. But she did not. Dickson expressed she was nervous, that she feared retaliation by DA Farren, that a guard's statement scared her into terminating the first visit, and that the jail moved her to evade Holberg's writ team. But all these things could be true -- and may be especially true -- if Dickson knew that the recantation Holberg's writ counsel sought from her would be false.

In support of this claim, Holberg also presents a jail incident report of the Chuck Collins assault (17/29 Supp.SHCR 5309-15) and a 2011 declaration by Roberto Moran that he believed the Collins assault was a spontaneous fight over commissary (White Declaration (Ex. 149) in Cause No. AP-73,127). The jail incident report simply relates Collins's statement to jail authorities that another inmate struck him in the eye after saying "the commissary was his." 17/29 Supp.SHCR 5312. This does nothing to refute the assertion that Holberg instigated the assault. Roberto Moran's declaration is likewise ambiguous. Moran, who assisted Kelly Sinclair in the assault, makes it clear that he *believes* Holberg did not pay or solicit Sinclair to conduct the assault because he *believes* Sinclair "would have told" him so. This declaration simply states what Moran believes fourteen years after the event and does not foreclose the conclusion that Sinclair fabricated a commissary disagreement to hide Holberg's involvement or payment. *See* White Declaration (Ex. 149) in Cause No. AP-73,127.

Lastly, Holberg contends that a telephone conversation between Chuck Collins and Amber Kaset, her investigator, supports Dickson's recantation. During that call, Collins denied ever calling Holberg a murderer. *See* White Declaration (Ex. 145) in Cause No. AP-73,127; Am. Pet. 54-55. First, the fact Collins denied calling Holberg a murderer does not mean that Holberg did

not organize his assault based on her mistaken belief that Collins did. Second, the phone call transcript refutes Holberg's claim.

Investigator Kaset set up a recorded telephone call with Collins (apparently without his knowledge) after he refused to sign a declaration that she and Investigator Batarseh had drafted for him and after Collins cancelled or postponed meetings. *See* White Declaration (Ex. 145) in Cause No. AP-73,127 (declaration of Kaset). The transcript shows Collins was angry because he had told Batarseh to call his lawyer, and Batarseh instead called Collins's family seeking Collins's whereabouts. *Id.* (Ex. A, p. 1). Collins explained to Kaset that he had a DWI charge pending and had to face DA Farren and his assistants in court "three or four months down the road." *Id.* (Ex. A, p. 2). Collins stated to Kaset that he wanted his lawyer to review the statement they wanted him to sign, that he wanted privacy, and that if Batarseh "keeps it up," he was "going to go to the DA" to "file harassment charges on him." *Id.* (Ex. A, p. 3). Kaset persisted in trying to persuade Collins to cooperate, telling him Farren was "putting words in" his mouth and that she would be glad to show him the proof in person. *Id.* (Ex. A, p. 3-4).

Having no success, Kaset asked the following question during the recorded phone call:

Kaset: So you're thinking that if you were to sign an affidavit on this thing just telling the truth about what happened back then, about how Brittany [Holberg] wasn't involved in beating you beat up . . .
Collins: *Well I don't know if that's the truth or not.*
Kaset: Okay.
Collins: I don't know exactly what happened. I know what I was told.
* * * * *
. . . I was told by jailers, I was told by other inmates that Brittany had it done.

Kaset: So you heard from jailers, you heard it from the jailers and other inmates that Brittany had it done?

Collins: Inmates said Brittany had me attacked, yeah. Some of 'em come down the hall, guys that walked down the hall passing out clothes and stuff in the mornings

178

said that they heard that Brittany had it done. I told [Batarseh] that. I explained to
him.

*Id.* (Ex. A, p. 2, 4) (emphasis added). In the face of this unequivocal statement, Kaset continued

her questioning. Finally, Collins explained he talked to Holberg in jail through the wall a couple

times and had an altercation with one of her friends. He said Holberg "got mad," and he thought

that is "what stimulated all this other stuff." In the end, Collins told Kaset she could subpoena him,

but that if they kept harassing him, he would file charges "first thing Monday." Then he hung up

on her. *Id.* (Ex. A, p. 5-7).

It is obvious from this telephone call that Collins believed Holberg participated in his

assault, and he even had a suspicion as to what instigated it. This claim misrepresents evidence

and fails to acknowledge the facts against Holberg. Holberg has failed to establish that the state

court unreasonably rejected Dickson's recantation as incredible. *Summers*, 431 F.3d at 873

(recanting affidavits and witnesses are viewed with extreme suspicion); *Graves v. Cockrell*, 351

F.3d 143, 153 (5th Cir. 2003) (same); *Spence*, 80 F.3d at 1003 (the credibility of recanting

affidavits must be reviewed in the context of the trial record).

b.     Mary Burnett

The Court now turns to Holberg's argument that the prosecution engaged in misconduct

by intentionally presenting false testimony from Mary Burnett that Holberg had "killed" E.R.

Williams.

i.     Trial Testimony

First, Burnett never testified Holberg "killed" anybody. The trial court admitted Williams's

death certificate showing he had died of pancreatic cancer. 24/28 RR 156. The trial court further

prevented the State from referring to Williams's death as "murder." 23/28 RR 7. And DA Farren

179

told the jury in opening remarks, "[W]e don't know whether she killed E.R. Williams or not." 23/28 RR 11.

What Burnett said in her testimony was that Holberg was worried the authorities would find out about an incident where Holberg *thought* she had killed E.R., her sugar daddy. Holberg explained to Burnett that she had wanted money for drugs, and E.R. would not give it to her so "she hit him over the head" with a cane. At the time, Burnett dismissed the story as a "young kid bragging about her escapades." Burnett later saw Holberg in a prison drug-treatment unit, after Holberg had been sober for a while. Holberg told Burnett the story again and, this time, Burnett "kind of believed it." After her release from treatment, Burnett heard about Towery's murder and knew immediately that what Holberg had been saying about E.R. was true. While Holberg was still at large, Burnett reported this information to her probation officer, Richard Bernal. Burnett testified no one offered her a deal for her testimony, and that prosecutor's office first contacted her by the on the Friday evening before her testimony. 23/28 RR 63-69 (Burnett testimony).

Richard Bernal also testified at Holberg's trial. He knew Holberg because he had evaluated her for substance abuse while she was on probation in 1995. Two days after Towery died, he received separate calls from Corena Norrell and Mary Burnett passing on the information they had learned from Holberg while they were all in the prison drug-treatment unit ("SAFPF"). 23/28 RR 92-118. In fact, Corena Norrell, like Burnett, testified at Holberg's trial that Holberg said she feared she had caused E.R.'s death. 23/28 RR 77-78. Holberg does not challenge the veracity of Norrell's testimony.

ii.    Recantation

In 2011, Burnett provided a declaration that forms the basis of this claim. 27/29 Supp.SHCR 8491-97. In it, Burnett stated she could not believe her testimony at the trial "had such a negative effect on [Holberg's] life," she felt terrible, and she wanted to "help make this right." Burnett stated she was "honestly not clear" whether Holberg or one of her friends had hit the old man over the head. Burnett had no idea if Holberg had anything to do with E.R.'s death. Burnett also said she was on probation and had a newborn son at the time of trial, and DA Farren threatened, "If you want to continue to raise that child and be able to care for that child, you'd better do what we say." Burnett said DA Farren told her how he wanted her to answer questions on the stand. *See* White Declaration (Ex. 152) in Cause No. AP-73,127.

iii.    Analysis

As with Dickson and others, Burnett provided an earlier affidavit that Holberg does not address. In a 2006 affidavit, Burnett stated she was reluctant to testify, and DA Farren said that if she refused to testify, her probation "would be very difficult" for her. He also told her not to tell anyone that they met. *See* 2/18 SCHR 195 (2006 affidavit of Mary Lynn Burnett). The 2006 affidavit *confirms* Burnett's trial testimony. Nothing in Burnett's 2011 declaration explains why she changed her story five years later to include the possibility that Holberg was talking about something a friend had done to E.R. Williams. *See* White Declaration (Ex. 152) in Cause No. AP-73,127. The state court could reasonably have concluded the 2006 affidavit undermines the credibility of Burnett's 2011 declaration.

Yet, Holberg contends contemporaneous chronological notes of her probation officer, Richard Bernal, support the 2011 declaration because they show a friend of Holberg's, not

Holberg, assaulted E.R. Williams. *See* Am. Pet. 56. The Amended Petition cites to these documents as "WR.CSR v. 18/29 at 5619-30; WR.CSR v. 22/29 at 7187-90." The court has found what appear to be the salient notes at 18/29 Supp.SHCR 5630, which state:

> 11/15/96: Received a call from a Corena Norell who stated she was at the Dayton SAFPF Unit with the Def. She stated the Def. had [told] her one time that she had killed an old man prior to her going to SAFPF as he would not give her the amount of money that she wanted. She stated she was not sure who the Def. had said it was but say that she really did think she did it. She was informed that this officer would report this to Special Crimes here in town and that they would possibly be contacting her. She said that she would have no problem with this as she would give them whatever information she knew. (r.bernal)
>
> 11/15/96: Received a phone another of this officer's client who stated she had heard about the Def. in the news and that this office may be interested to know that the *Def. may have committed another offense*. She stated the Def. had told her while they were in Randall Co. together back in 95 that *a friend of her had killed her sugar daddy*. She stated the guy went by E.R. and he lived on prospect. She also said that the Def. was able to give her all kinds of details about the incident which she thought was weird. PO will inform special crimes of this later. (r. bernal)

18/29 Supp.SHCR 5630 (emphasis added). Bernal's trial testimony indicates that the second paragraph above relates to Burnett's call. (23 RR 118). To the extent that the paragraph suggests that a friend of Holberg's killed E.R. Williams, it also states that "Def. may have committed another offense." Together, these sentences reasonably suggest Holberg may not have acted alone. They do not undermine Burnett's trial testimony and do not refute Holberg's involvement in an assault upon Williams.

The notes do not undermine the reasonableness of the state court's credibility determination for the additional reason that Corena Norrell's trial testimony, which Holberg does not challenge as false, was substantively the same as Burnett's testimony. 23/28 RR 76-83. Norrell had the opportunity to recant her testimony in an affidavit that Holberg filed in 2006, but she did not. 2/18 SHCR 256; 1/5 SHCR 205.

Finally, Holberg fails to acknowledge the affidavit of her trial counsel, Catherine Dodson, in which Dodson states that Holberg informed counsel she "had an altercation with Mr. Williams, did not know how he died, and was upset that she might have caused his death." 4/29 Supp.SHCR 912. The fact Holberg told her counsel substantially the same information that Burnett and Norrell testified about is additional support for the reasonableness of the state habeas court's credibility finding.

### 5. Conclusions

The TCCA's rejections on the merits during Holberg's state habeas corpus proceeding of Holberg's *Giglio/Napue* claims relating to the recanting affidavits of Dickson and Burnett were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial and state habeas corpus proceedings. The Court denies Holberg's claim 2A.

### G. Punishment Phase Prosecutorial Misconduct (Claim 2b)

### 1. The Claim

In a claim designated as "2B," Holberg once more asserts the prosecution engaged in misconduct at the punishment phase by intentionally presenting false testimony from prosecution witness Vickie Kirkpatrick. Am. Pet. 56-57.

### 2. State Court Disposition

As explained above in § VI.A., the state habeas court denied on the merits this *Giglio/Napue* claim, *i.e.*, Holberg's thirty-third state habeas claim arguing that the prosecution knowingly elicited false testimony from prosecution witness Kirkpatrick. FFCL 97-107, 124-27; 28/29 Supp.SHCR 8676-86, 8703-06.

### 3. AEDPA Review

For the same reasons discussed at length above in § VI.A.4, the state habeas court's rejection on the merits of this same claim was objectively reasonable considering the evidence presented during Holberg's state habeas corpus proceeding. Holberg has failed to present this Court with clear and convincing evidence showing the state habeas court's factual credibility finding (i.e., that Kirkpatrick's recanting video-deposition testimony was not credible) was erroneous.

### 4. Conclusions

For the reasons explained above in § VI.A, Holberg's complaints of allegedly false trial testimony by prosecution witness Kirkpatrick do not warrant federal habeas corpus relief under the AEDPA. The Court denies Holberg's claim 2B.

## H. Punishment Phase *Brady* Claim (Claim 2c)

### 1. The Claim

In a claim designated as "2C," Holberg once more asserts the prosecution violated the rule in *Brady* in connection with John Sneed and the allegedly false trial testimony of prosecution witnesses Burnett, Norrell, and Dickson. Am. Pet 57-60.

### 2. State Court Disposition

Holberg presented the state habeas court with *Brady* claims relating to Sneed, Burnett, Norrell, and Dickson, as well as Bates, Kirkpatrick, and Speir, in her thirty-fourth claim for state habeas relief. The state court denied Holberg's *Brady* claims related to all these individuals on the merits. FFCL 107-20, 124-27; 28/29 Supp.SCHR 8686-99, 8703-06. The Court therefore applies the deferential standard of review under Section 2254(d).

184

3.   *AEDPA Review*

a.    Dickson & Burnett

Holberg contends the State suppressed "the truth" and information about the threats and promises DA Farren made to secure the allegedly false testimony of Dickson, Burnett, and Norrell. Am. Pet. 57-58; Reply 12. As discussed above in § VI.F, the state habeas court rejected the allegations of false testimony, based on reasonable credibility determinations, as to Dickson and Burnett. Because the state habeas court found as fact that Holberg failed to establish as credible the post-trial affidavits furnished by these two trial witnesses, the factual premise underlying this *Brady* claim does not exist. Therefore, the Court denies the *Brady* claims grounded on the alleged falsity of their testimony.

b.    Norrell

Regarding Corena Norrell, Holberg does not challenge the veracity of her substantive testimony but contends that DA Farren lied about *when* his office discovered the testimony of both Norrell and Burnett (relating to Holberg's assault on E.R. Williams).[42] Holberg claims the prosecution's belated disclosure inhibited defense counsel's ability to investigate and develop a response.

The trial court held a hearing on March 23, 1998 about the timing of the State's disclosure of Burnett and Norrell as potential witnesses. DA Farren told the judge that his office learned about Burnett and Norrell after visiting Richard Bernal on Friday, March 20. 23/28 RR 2-3. Defense

---

[42] In her Reply, Holberg states, "In addition to the exculpatory evidence of Kirkpatrick, Dickson, Burnett and Sneed, the State withheld another surprise witness, Norrell." Reply 12. This Court does not perceive this sentence as raising a claim regarding perjured testimony from Norrell. Although the prejudice argument refers collectively to the "false testimony" of Dickson, Burnett, and Norrell, (Am. Pet., p. 60), the Amended Petition only alleges DA Farren withheld notice of Norrell's testimony and does not allege her testimony was false. Indeed, Norrell's 2006 affidavit does not recant her trial testimony in any way.

counsel's investigator had been able to reach Norrell but not Burnett, and defense counsel said she would need "all day" to develop collateral matters. 23/28 RR 4-5. Defense counsel sought a continuance, which the trial court took under advisement while Norrell and Burnett testified on direct examination. 23/28 RR 6-7. Importantly, Norrell's testimony was nearly identical to Burnett's: Norrell testified Holberg had confided she thought she had killed a man in a struggle over money after breaking into his house and hitting him on the head with a cane. Norrell did not believe Holberg until she read about Towery's murder in the paper, which prompted Norrell to report what she knew to their probation officer, Bernal. 23/28 RR 76-83. Burnett and Norrell both testified the prosecutor's office first contacted them on "Friday." 23/28 RR 69, 81. The trial court allowed a fifteen-minute break so trial counsel could interview Burnett, after which counsel conducted a brief cross-examination of both Burnett and Norrell. 23/28 RR 70-72, 79-80, 83.

Holberg now contends that the state knew about Burnett and Norrell *sixteen months* before trial. Am. Pet. 58. Holberg's supporting cite to the record, "WR.CSR v. 19/29 at 5960-61," does not appear to relate to this allegation, however. *See* 19/29 Supp.SHCR 5743 (table of contents). Holberg also cites to affidavits signed in 2006 by Burnett, Norrell, and Norrell's husband (Jay Frasier), essentially stating that the district attorney's office first contacted Burnett and Norrell about one month before trial and then again before they testified. They do not explain why their trial testimony differs regarding the timing of their first contact with the prosecution. 1/5 Supp.SHCR 203, 205, 208.

DA Farren and Assistant District Attorneys Love and Blount provided responsive affidavits in 2011 refuting Holberg's allegations of timing. 4/29 Supp.SHCR 938-47; 23/29 Supp.SHCR 7129-38. Assistant District Attorney Love said the allegation made no sense because their office

had timely disclosed seventy-five other extraneous offenses, and intentional concealment would have risked the trial judge excluding important evidence. 4/29 Supp.SHCR 940-42; *see* 1/8 CR 52 (rule 404(b) notice), 78 (supplemental rule 404(b) notice); 4/29 Supp.SHCR 943-44; *see also* 4/29 Supp.SHCR 938 (Blount aff't). The state court found the affidavits of Burnett, Norrell, and Norrell's husband were not credible, and credited the affidavits of DA Farren, Blount, and Love. FFCL 87; 28/29 Supp.SHCR 8666, ¶ 12-14.

In her argument under *Brady*, Holberg contends the nature of the testimony and by the "State's ploy to deprive the defense of adequate time to investigate and develop a response" by "violating court orders directing disclosures on a 'timely basis.'" prejudiced her case. Am. Pet. 58. To establish a due process violation under *Brady*, Holberg must show that the State failed to disclose evidence that is "favorable" to the accused and "material" to guilt or punishment. *Brady*, 373 U.S. at 86-87. Assuming for the sake of argument that the prosecutors failed to disclose the actual date they first learned of Burnett and Norrell this information is not favorable to the defense. It is not exculpatory information or mitigating evidence and would not be effective for impeachment purposes. To the extent Holberg contends she lacked adequate time to prepare to meet the substantive testimony of Burnett and Norrell, as Holberg contends, this is not a claim under *Brady,* either. The State disclosed the information known to Norrell and Burnett in advance of their testifying and, in any event, the information was favorable *to the State*. A defendant has no general constitutional right to discover inculpatory evidence. *See, e.g., Wooten v. Thaler*, 598 F.3d 215, 219-20 (5th Cir. 2010) (holding there is no constitutional duty to disclose inculpatory evidence made stronger by state investigative efforts that continue after the defendant's arrest, after any plea negotiation, or during trial).

Finally, even if these facts could support a *Brady* claim, Holberg fails to allege materiality because she does not state with specificity what counsel could have done differently with more notice. Bernal's contemporaneous notes supported the testimony of both Burnett and Norrell, their testimony corroborated each other's, and Holberg reiterated the substance of their testimony to her trial counsel. 4/29 Supp.SHCR 912; *see Bagley*, 473 U.S. 683 (holding that "materiality" encompasses any adverse effect that the failure to disclose might have had on the preparation or presentation of the defense case). Holberg does not even speculate as to how trial counsel could have countered the testimony under these circumstances.

c.      Dickson's Criminal History

Holberg next contends that the State suppressed Dickson's criminal history, including charges that were pending against her at the time of trial. Am. Pet. 58. It appears that the state court's findings of fact and conclusions of law did not address this allegation. Instead, the state court discussed only the alleged coercion of false testimony from Dickson. FFCL 99, 115-19; 28/29 Supp.SHCR 8678, 8694-98. Holberg also does not identify where in the State court record she raised Dickson's criminal history in a *Brady* claim, if at all. The Court will assume, as do the parties, that Holberg did exhaust this claim and that the state court rejected it based on a credibility determination. Holberg must therefore demonstrate such a ruling is unreasonable given the record before the state court. 28 U.S.C. § 2254(d).

The Amended Petition identifies records indicating that Dickson faced criminal charges in Potter County and Randall County for theft by check, issuance of a bad check, and robbery. 17/29 Supp.SHCR 5451-5529; 18/29 Supp.SHCR 5652-53; 20/29 Supp.SHCR 6152-54.[43] Dickson wore

---

[43] Holberg also cites to pages 715-719 and 839 – 842 of "Exhibit A" to the Amended Petition, but the Court

188

orange prison coveralls in court and told the jury she was in jail for theft by check and had other charges, including a parole violation, disorderly conduct, and "many" different kinds of misdemeanor offenses and a felony offense. 23/28 RR 34-35. Dickson discussed her time in jail for robbery and her disciplinary problems. 23/28 RR 46-47. Thus, Dickson's criminal history was disclosed, and Holberg's counsel had the opportunity to use it on cross-examination, which she did. 23/28 RR 46-47. Holberg fails to demonstrate the state court's denial of this *Brady* claim was unreasonable. Alternatively, as far as this *Brady* claim is unexhausted, the Court must deny Holberg's claim premised upon the prosecution's alleged failure to disclose Dickson's criminal history under a *de novo* standard of review because no evidence of suppression or showing of materiality exists.

The Amended Petition also includes a one-sentence argument that, "The prosecution also withheld notice that Dickson would testify to the solicitations of violence against Kirkpatrick and Collins." Am. Pet. 59. In support, Holberg cites to a Texas Court of Criminal Appeals opinion holding that "absent a showing of unfair surprise, proof of unadjudicated, extraneous offenses at the 'sentencing proceeding' of a capital case is admissible." *See Williams v. State*, 622 S.W.2d 116, 120 (Tex. Crim. App. 1981). Holberg identifies no ruling on this claim in state court, the claim does not rely on clearly established federal law, and the assertion is meritless under the Texas case she cites because Holberg does not allege or show unfair surprise. The Court denies this portion of this claim after *de novo* review because it is unexhausted, inadequately briefed, and fails to satisfy the materiality prong of *Brady* analysis.

---

has no way of ascertaining what these citations reference. Am. Pet. 58 n. 24. Exhibit A is 1,280 pages long, divided among 34 separate .pdf files in the docket, and is not Bates-stamped. As discussed *infra*, The Court strikes the exhibits attached to the Petition as unnecessary and unauthorized.

d.      John Sneed

Holberg contends the State suppressed information from John Sneed that Holberg "could not have killed E.R. Williams" because Sneed was with Williams when he died of cancer in hospice. Am. Pet. 59. Sneed provided an affidavit in 2006 attesting to his friendship with Williams, stating that he was with Williams when he died in hospice and had told this to an unnamed person in the Sheriff's Department around the time of Holberg's arrest. 2/18 SHCR 286. In denying this claim, the state court found, based on Holberg's own statements to her trial counsel, that Holberg did assault Williams (FFCL 114; 28/29 Supp.SHCR 8693 ¶¶ 13-14) and there was no trial testimony that Holberg had killed Williams. FFCL 115; 28/29 Supp.SHCR 8694. Rather, Norrell and Burnett testified Holberg said she had assaulted Williams and feared she may have killed him. FFCL 114-15; 28/29 Supp.SHCR 8693-94. The state court also found Sneed's allegation lacked credibility and was too vague to impute knowledge to the State. FFCL 114; 28/29 Supp.SHCR 8693 ¶ 14.

The evidence discussed above in § VI.D.3 supports the state court's factual findings denying Holberg's *Brady* claim regarding Sneed. Holberg argues the state-court procedure does not qualify as an adjudication on merits, which the Court rejected above in the Standard of Review discussion. Holberg fails to argue the state court ruling was unreasonable as to Sneed. Am. Pet. 59; Reply 12. Because the jury received evidence that Williams died of cancer, and because the witnesses did not testify Holberg killed Williams, the state court could reasonably conclude any suppression of Sneed's statement that Holberg "could not have killed" Williams was not material to the trial's outcome.

190

### 4. *Conclusions*

The TCCA's rejection on the merits during Holberg's state habeas corpus proceeding of Holberg's thirty-fourth claim for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. Furthermore, as far as Holberg complains about the prosecution's alleged failure to disclose Dickson's criminal history, that claim fails to satisfy the materiality prong of *Brady* analysis and does not warrant federal habeas relief under a *de novo* standard of review. The Court denies Holberg's claim 2C in all respects.

## I.   Punishment Phase Catch-All *Brady* (Claim 2d)

### 1. *The Claim*

In a claim designated as "2D," Holberg presents what appears to be another undeveloped *Brady* claim based on work product that the prosecution disclosed "ten years after Holberg's trial." Holberg asserts the disclosed files contained the following "material evidence relevant to the punishment phase":

(1) disciplinary records for the testifying witnesses;
(2) undisclosed deals with them;
(3) impeachment materials showing a lack of commissary payments from Holberg to witness Dickson, that Holberg never paid her money to murder Kirkpatrick;
(4) impeachment material showing Holberg did not hire prisoners to assault Collins;
(5) impeachment material relating to the testimony of prison conditions expert Royce Smithee;
(6) impeachment material that Burnett originally reported that a friend of Holberg's—not Holberg—may have caned E.R. Williams, and notes inconsistent with Norrell's testimony; and
(7) interviews with Mildred Kitchens and John Sneed, further impeaching the Williams caning pretense.

191

*See* Am. Pet. 60-63. Holberg does not brief all seven of these allegations. The Court will address the three categories of allegedly suppressed information that she has briefed, i.e., evidence regarding her assault on E.R. Williams, her involvement in an assault on a jail inmate named Collins, and the criminal histories of various prosecution witnesses. *See Garcia v. Davis*, 704 F. App'x 316, 327 n. 5 (5th Cir. 2017) (holding that inadequate briefing will not be considered).

### 2. *State Court Disposition*

Holberg presented this *Brady* claim to her state habeas court for the first time in her "Motion for Reconsideration." 5/29 Supp.SHCR 1164-76. The TCCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, *1. This claim discusses allegedly suppressed evidence related to the assault on E.R. Williams, purportedly showing the State "knew all along that Williams was not killed by a blow to the head." Am. Pet. 61. The Motion for Reconsideration raised this information as part of Holberg's Eighth Amendment claim, which amplified the *Brady* claims previously raised. 5/29 Supp.SHCR 1202-07. Respondent contends that the TCAA dismissed the Motion for Reconsideration as an abuse of the writ, and the TCAA's dismissal procedurally bars the claim from federal review. Answer 68. To the extent the Motion for Reconsideration could support issues raised in the original application, however, Judge Estevez considered it, and the TCCA agreed with her analysis. 28/29 Supp.SHCR 8591, § 37; *Holberg*, 2014 WL 5389907, at *1, n.1. Further, the cause and prejudice required to excuse a procedural default connects to the merits of the *Brady* claim. The Court therefore will consider the merits of this claim under both a deferential standard of review for claims decided on the merits, Section 2254(d), and a *de novo* review in the alternative.

### 3. AEDPA/De novo Review

This Court retains the authority to deny relief on the merits on this otherwise procedurally defaulted claim. *Berghuis*, 560 U.S. at 390 (federal courts "may deny writs of habeas corpus under Section 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies."); *Rhines*, 544 U.S. at 277 (citing 28 U.S.C. § 2254(b)(2)).

#### a.   Holberg's Assault on E.R. Williams

To be clear, Holberg's claim that the State suppressed evidence that "Williams was not killed by a blow to the head," is based on the false premise that the jury received evidence that Holberg killed Williams with a blow to the head. As stated previously, the testimony was that Holberg had confessed to assaulting Williams with a cane and *feared* she had killed him. No witness testified at trial that Holberg caused Williams' death.

In addition, Holberg overstates the contents of her evidence. Holberg provides an Amarillo Police report dated August 22, 1995 showing a woman named Susan Hernandez filed a disorderly conduct complaint against E.R. Williams and said he "used to be sick quite a bit." 17/29 Supp.SHCR 529. Holberg also refers to a police report filed November 30, 1995 by Williams's son, who came to town to settle his father's estate. The son complained Hernandez defrauded his father out of a car, jewelry, and cash after he was "diagnosed with terminal cancer." 17/29 Supp.SHCR 5295-96. None of these documents establishes that the State knew Williams's cause of death. At best, they show that the State knew doctors diagnosed Williams with terminal cancer, and he died on October 17, 1995. This does not preclude the fact Holberg assaulted him.

Holberg also provides a page of undated handwritten notes from a conversation with Norell that she claims were in the State's file. They are undated and therefore not probative as to the timing of the information therein. 27/29 Supp.SHCR 8364, 8408. Holberg also provides undated

notes by an unknown author from interviews with Mildred Kitchens and John Sneed. 27/29 Supp.SHCR 8364, 8410-14. These are not probative as what the State knew or when. Additionally, the comments of Williams's sister, Mildred Kitchens, that she "looked at his body – no marks" does not preclude the possibility that Holberg struck Williams on the head with a cane. On the contrary, Sneed's comments that Williams "lost a lot of ground in few days' time" could support the assertion that Holberg's assault in fact hastened Williams' death. 27/29 Supp.SHCR 8413. The notes further show that Williams had mentioned "Brittany" by name to his sister and his son, which corroborates Holberg's tale to Norrell and Burnett that she knew him well enough to ask for money. In short, none of this information shows the State "knew all along that Williams was not killed by a blow to the head," and, in any event, which was not the theory before the jury.

Holberg fails to demonstrate the state habeas court unreasonably denied this claim on the merits. Holberg's evidence does not show that State suppressed material evidence favorable to Holberg. For the same reasons, the claim lacks merit, and the Court denies it under a *de novo* standard of review because it fails to satisfy the materiality prong of *Brady* analysis.

b.      The Assault on Chuck Collins

Holberg next asserts the State withheld the prison Incident Report "revealing that the assault [on Chuck Collins] had nothing to do with Holberg." Am. Pet. 62. The 2011 Motion for Reconsideration discussed this information, which amplified the *Brady* claims previously raised. 5/29 Supp.SHCR 1212-13. The court assumes without deciding it was properly exhausted and will address the merits under both a deferential standard of review, Section 2254(d), and *de novo* in the alternative.

Holberg's assertion that the Incident Report "reveals" that Holberg had nothing to do with the Collins assault is not merely misleading, it is patently false. The victim gave this report with

no first-hand knowledge of Holberg's involvement one way or the other. The Incident Report states in pertinent part:

> [Collins] stated on 9/2/97 at approximately 2 p.m., a fellow inmate by the name of JOE MOORE . . . had given him his commissary supply before being transferred to the Tulia Jail. [Collins] said on this date at approximately 3 p.m., he was standing in the B Run Dayroom when another inmate identified as KELLY WAYNE SINCLAIR . . . stated the commissary was his (Kelly's) and that Joe Moore had wanted him to have it. At this time, [Collins] said Kelly struck him in the left eye.

This report does not preclude the possibility that the attacker used the commissary claim as a ruse to approach Collins, and it does not preclude a finding that Holberg instigated the assault. On the contrary, Holberg's own evidence in the form of Collins's telephone call confirms that Holberg instigated the assault and theorizes why: Collins told Holberg's investigator that he had received information from others that Holberg had instigated the assault, and Collins described an altercation he had with one of her friends that he believed precipitated the beating. *See* White Declaration (Ex. 145, Ex. A, p. 5) in Cause No. AP-73,127 (telephone call transcription attached to Kaset declaration). This information refutes Holberg's claim that she had "nothing to do with" the assault on Collins and further undermines the materiality of the Incident Report as potential *Brady* material.

Finally, the state has no obligation to point the defendant toward potentially exculpatory evidence in the defendant's possession or that Defendant could discover through due diligence. *See Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997). Holberg has not shown that the prison report was undiscoverable through the exercise of due diligence, such as a subpoena to the prison's custodian of records.

In sum, Holberg fails to demonstrate either suppression by the State, favorability of the evidence, or materiality to her conviction or sentence, as required under *Brady*. This claim fails to

demonstrate the denial of this claim was unreasonable under clearly established federal law. For the same reasons, the claim lacks merit, and the Court denies it under a *de novo* standard of review because it fails to satisfy the materiality standard of *Brady* analysis.

c.      Witness impeachment evidence

i.      Donald Owens

Holberg maintains that the State withheld the criminal history of Donald Owens, who was on probation for a felony conviction of theft by check at time he testified. Am. Petition 62. Holberg does not state where the state-court ruling on this claim is in the record. Respondent asserts the TCAA dismissed the claim, presented it, and decided it was meritless, which procedurally bars the claim from federal review. Answer 68. Respondent also asserts Owens testified about his criminal history, but the Court has not found such testimony in the trial record. 19/27 RR 39-56. Holberg makes no argument to overcome procedural default. Reply 13. Under the circumstances, the Court resolves this claim by ignoring any procedural default and addressing the claim *de novo*. *See Berghuis*, 560 U.S. at 390; *Busby v. Dreke*, 359 F.3d 708, 720 (5th Cir. 2004) (noting that habeas court may look past any procedural default if the claim may be resolved more easily on the merits).

Owens stated in his second post-trial affidavit, dated November 17, 2012, that he was on probation in Potter County for a felony charge "before" trial and that DA Farren "was clearly lording this over me." 1 CR (77,023) 140-42. For proof, Holberg cites to a collection of what appear to be Owens's criminal history records attached to the Declaration of Sally White located in the direct-appeal record. These records are from the National Criminal Information Center ("NCIC"), the Texas Department of Public Safety, the City of Amarillo, and the FBI depicting arrests for mainly alcohol-related and property crimes dating back to 1974. 1 CR (73,127) (White Decl., Ex. 156). While the NCIC summary shows Owens had two convictions or probations for

196

"theft" and one conviction or probation for "forgery," the summary does not identify them as felonies and does not provide any dates. In fact, the NCIC record indicates that Owens's last arrest was in 1992 by the Bonham Police Department for theft, well before Towery's murder in 1996. 1 CR (73,127) (White Decl., Ex. 156, p. 4). There is also a Laramie County arrest for check fraud, which a state court disposed in 1993. *Id.* at 6. These records suggest Owen's memory is unreliable. This would also explain why he did not testify about his criminal history at Holberg's trial.

Even if Owens had been on probation for theft, Holberg fails to establish prejudice. Holberg never disputed she caused Towery's death. As explained at length above in § VI.B, Owens's testimony was background information that had little, if anything, to do with the disputed issues of self-defense and the aggravating elements of theft and burglary. Towery's apartment manager and maintenance workers repeated Owens's testimony and placed Holberg in the apartments, in the company of Towery, shortly before his death. Holberg admitted to all these facts in her own trial testimony. To the extent Owens's also provided information that Holberg had attempted to enter the apartments by ringing all the call buttons, this testimony tended to undermine the defense theory that she went to the apartments specifically to visit Towery. Owens does not, however, disavow that this happened, and to the extent his post-conviction statements simply omit this part of the taxicab ride, the state habeas court reasonably found they lack credibility. Holberg fails to demonstrate Owens was on felony probation at the time he testified, fails to demonstrate the State withheld evidence of such, and fails to demonstrate materiality under *Brady* analysis.

ii.   Vickie Kirkpatrick

Holberg states that the State suppressed Kirkpatrick's "extensive criminal history and status as a police informant." Am. Pet. 62. Again, Holberg does not identify this claim in the record

or how the state court ruled. As with the foregoing claim, Respondent argues this claim is procedurally barred and meritless. Answer. 68. The Court will again look past any procedural bar and review the claim *de novo. See Berghuis*, 560 U.S. at 390; *Busby*, 359 F.3d at 720.

Holberg fails to identify any evidence demonstrating that the State withheld Kirkpatrick's criminal history. On the contrary, Kirkpatrick testified with her lawyer present, wearing "jailhouse orange." 19/28 RR 229. The trial judge advised her before the jury of her right to remain silent. 19/28 RR 230. Kirkpatrick admitted having experience with drugs and prostitution on the streets. 19/28 RR 233, 246. Defense counsel elicited information about her pending criminal charge. 19/28 RR 241. The entire story she related to the jury had taken place while she was in jail with Holberg, facing criminal charges. Holberg's assertion that the state suppressed Kirkpatrick's "extensive criminal history" is frivolous.

As discussed above in § VI.A-D, Holberg also fails to demonstrate Kirkpatrick's status as a police informant was favorable to the defense or that her criminal history was material in a way that undermines confidence in the verdict. There is no suggestion that Kirkpatrick acted improperly as a narcotics informant. As trial counsel recognized, a challenge to Kirkpatrick's credibility would have invited the State to emphasize her role as a trusted, confidential informant in narcotics cases. 4/29 Supp.SHCR 922.

### 4.  *Conclusions*

The TCCA's rejection on the merits of these *Brady* claims during Holberg's state habeas corpus proceeding was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. Furthermore, as far as this claim is

unexhausted, the record now before this Court does not support it. The claim fails to satisfy the materiality prong of *Brady* analysis, and does not warrant federal habeas relief under a *de novo* standard of review. The Court denies Holberg's claim 2D in all respects.

**VII.   INEFFECTIVE ASSISTANCE OF COUNSEL – GUILT PHASE (CLAIM 3)**

**A.   Overview of the Claims and Clearly Established Federal Law**

Holberg's ineffective assistance claims reference her trial counsels' alleged failure to comply with the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. Am. Pet. 63-64. As far as Holberg relies upon the 2003 version of the ABA's Guidelines, the ABA adopted the recommendations for the performance of trial counsel after the date of her trial. They have no relevance to this Court's evaluation of the actual performance of Holberg's trial counsel in 1998. *See Bobby v. Van Hook*, 558 U.S. 4, 8 (2009) (it was error to judge counsel's conduct because of the 2003 Guidelines without considering whether they reflected the prevailing professional practices at the time of trial in the 1980's); *Druery*, 647 F.3d at 541 n.2 (probative value of Texas guidelines diminished by virtue of the fact they were adopted three years after the defendant's trial). Moreover, the earlier versions of the ABA Guidelines are merely aspirational; they do not set forth the operative standard of *judicial* review for the performance of trial counsel. *Bobby*, 558 U.S. at 8 (recognizing the ABA Guidelines are "only guides" to what reasonableness means, not its definition); *Druery*, 647 F.3d at 541 n.2 ("Best practices urged by the ABA do not necessarily track the contours of the Sixth Amendment. Consequently, the guidelines do not function as 'inexorable commands' with which all capital defense counsel 'must fully comply.'").

> No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.

*Strickland v. Washington*, 466 U.S. 668, 688-89 (1984).

The Supreme Court announced the standard for ineffective assistance of trial counsel in

*Strickland*, 466 U.S. at 687:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was

constitutionally deficient, a convicted defendant must show that counsel's representation "fell

below an objective standard of reasonableness." *Wiggins*, 539 U.S. 510, 521 (2003); *Williams v.*

*Taylor*, 529 U.S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of

proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide

range of reasonable professional assistance. *Strickland*, 466 U.S. at 687-91. Courts are extremely

deferential in scrutinizing the performance of counsel and make every effort to eliminate the

distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding the proper analysis under the

first prong of *Strickland* is an objective review of the reasonableness of counsel's performance

under prevailing professional norms, which includes a context-dependent consideration of the

challenged conduct as seen from the perspective of said counsel at the time). Under the well-settled

*Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell*, 535 U.S. at 698; *Strickland*, 466 U.S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694.

In those instances, in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo*. *See Porter*, 558 U.S. at 39 (*de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla*, 545 U. S. at 390 (*de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins*, 539 U. S. at 534 (same).

Claims of ineffective assistance adjudicated on the merits by a state court receive a doubly deferential form of federal habeas review under AEDPA. AEDPA sets forth necessary predicates before state-court judgments may be set aside and "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 571 U.S. 12, 19 (2013). Under Section 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 572 U.S. 415, 419-20 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of Section 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington v. Richter*, 562 U. S. at 101 (citations omitted).

A federal habeas petitioner carries the burden of proving both prongs of the *Strickland* standard.

*Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012) (citing *Pinholster*, 563 U.S. at 181); *Blanton v. Quarterman*, 543 F.3d 230, 235 (5th Cir. 2008).

### B.  Failure to Investigate, Present Evidence, and Call Certain Witnesses Relevant to Guilt-Phase Defenses (Claim 3B)[44]

#### 1.  The Complaints

Holberg argues her trial counsel failed to (1) investigate and present available evidence relating to the burglary charge and her claim of self-defense, including her prior relationship with

---

[44] There is no claim designated as "3A" in Holberg's Amended Petition. Respondent's Answer fails to acknowledge this fact and thereafter mis-identifies Holberg's ineffective assistance complaints. Section 3A of Holberg's Amended Petition is a summary of what Holberg perceives to be the legal standard of review for her ineffective assistance claims. As explained above in § VII.A**,** however, Holberg's reliance on the ABA Guidelines is misplaced.

Towery and his bad character, (2) investigate and present available evidence regarding the robbery and burglary charges, including evidence that others could have taken Towery's money after his death, (3) failed to investigate forensic evidence, specifically the absence of her blood from Towery's wallet, and (4) failed to investigate and present expert testimony showing the confrontation between Holberg and Towery was over quickly and Holberg was partially undressed during the struggle. Am. Pet. 66-74.

### 2. State Court Disposition

Holberg raised parts of this claim in state court in her 24th through 27th and 32nd grounds for state habeas relief. FFCL 46-74, 93-97; 28/29 Supp.SHCR 8625-53, 8672-76. Holberg twice expanded the claim with additional affidavits in her 2006 Reply and her 2011 Motion for Reconsideration. The state habeas court denied Holberg's 24th, 25th, 26th, 27th, and 32nd claims on the merits. FFCL 46-74, 93-97, 122-24; 28/29 Supp.SHCR 8625-53, 8672-76, 8701-03. The Court reviews these ineffective assistance claims under the doubly deferential standard from *Harrington*, 562 U. S. at 101. In reviewing the state habeas court's rejection on the merits of Holberg's 24th through 27th and 32nd claims for state habeas relief, this Court may examine only those documents that were part of the record before the state habeas court. *Pinholster*, 563 U.S. at 181-82; 22 U.S.C. § 2254(d)(2).

Respondent correctly points out that Holberg first presented her assertions of ineffective assistance based on an alleged failure to investigate forensic evidence and challenge the prosecution's forensic experts in her "Motion for Reconsideration." 5/29 Supp.SHCR. 948-1238. The TCCA held this was a subsequent application and dismissed it as procedurally barred. *Holberg*, 2014 WL 5389907, *1. This Court's review of that portion of this claim will be *de novo*. *Berghuis*, 560 U.S. at 390.

203

3.  *AEDPA/De novo Review*

Holberg asserts counsel failed to adequately investigate and present evidence that would have (1) proven her long-standing relationship with Towery, thereby refuting the burglary aggravator, (2) proven that she did not steal pills or money from Towery, thereby refuting the theft component of both the burglary and robbery aggravators, (3) proven that Towery was an abusive sadist prone to violence, thereby proving he was the aggressor and she acted in self-defense, and (4) proven a different timeline than the one advocated by the prosecution actually took place on the date of the offense. Am. Pet. 66-70.

Complaints of uncalled witnesses "are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Nelson v. Davis*, 952 F.3d 651, 669 (5th Cir. 2020) (quoting *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009)). To prevail on such claims, a petitioner must name the witness, demonstrate the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Nelson*, 952 F.3d at 669; *Day*, 566 F.3d at 538 (citing *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985)).

In evaluating this claim, this Court is necessarily mindful of Texas law, because counsel is not ineffective for failing to investigate and offer witness testimony that would be inadmissible. *See Harrington*, 562 U.S. at 108 (holding that attorney need not pursue an investigation that would be fruitless). In Texas, a defendant may offer evidence of the victim's character trait for violence or specific acts of violence (that are relevant *apart* from character conformity) to demonstrate the victim was the first aggressor. *See* TEX. R. EVID. 404; *Ex parte Miller*, 330 S.W.3d 610, 619-20 (Tex. Crim. App. 2009); *Torres v. State*, 117 S.W.3d 891, 894-95 (2003). The Court may exclude

irrelevant acts of aggression under evidence Rule 404(b), and trial counsel would not be deficient for failing to present those acts as evidence.[45] [46]

### 4. Holberg's Prior Relationship with Towery, Towery's Bad Character, & Timeline

Holberg asserts she "was the only witness at trial to the facts that Towery was not a stranger to her and was not 'feeble' but strong and able." Corrected Reply 13-14. Holberg fails to identify where, in the record, Holberg described Towery as "strong and able," and the Court has found no such testimony. *See* 20/28 RR 175-263; 21 RR 2-176. On the contrary, Holberg agreed he was not agile and had difficulty getting around quickly. 21/28 RR 135. A summary of the relevant trial testimony follows.

Shortly after her arrest on February 17, 1997, Holberg gave a written statement asserting that she first met Towery on the day he died. 18/28 RR 188; 27 RR 31 (SX 167). Three days later, en route to Texas, Holberg repeated the story that another prostitute had set up the date with Towery. 19/28 RR 67, 71, 76. Holberg changed her story at trial, however. She testified she met Towery in 1994 and provided prostitution services to him "once, maybe twice a month . . . occasionally . . . Rare." 21/28 RR 8. She testified Towery would get angry "if things weren't going the way that he wanted" or if she looked high, because he "really hated drugs." 21/28 RR 9. He never hurt her but would say hateful things. *Id.* Holberg's mother also denied Holberg ever told her about a violent or "dark side" to Towery. 19/28 RR 269.

---

[45] Texas Evidence Rule 404(b) provides that specific acts, though not admissible to prove a person's character, may be admissible for another purpose, such as to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

[46] The Court is aware that the trial judge in this case admitted extraneous bad acts by Towery, specifically, matters of domestic abuse and destroying furniture during a "temper tantrum," 21/28 RR 178-92, based on case law that predated the rules of evidence regarding the admission of extraneous bad acts.

Contrary to Holberg's assertion in her Amended Petition, she was not the only witness to so testify about her relationship with Towery. Vicki Kirkpatrick, a State's witness, described Towery as one of Holberg's "old sugar daddies that had took care of her for years." 19/28 RR 234. Johnny Deaver testified for the defense that Holberg had a relationship with "A.B." 20/28 RR 107. Holberg's mother testified for the prosecution that Holberg said she was living with Towery (which Holberg later explained was a lie to avoid telling her mother he was simply a trick) and that Towery attacked upon seeing her crack pipe. 19/28 RR 262.

The defense presented testimony that Towery used prostitutes. Connie Baker, a prostitute, testified she once had an appointment with Towery but refused to do what he wanted. 20/28 RR 146-47, 155. Diana Wheeler testified she provided prostitution services to Towery approximately ten times. 21/28 RR 198-99, 201, 205. The defense also presented items found in Towery's apartment to show that Towery was not an innocent and feeble old man: a nude cartoon entitled "Mexican firing squad," a story about "Jack Schitt," a "Bull Shit Bag," and a telephone book with the words "piece of pussy" written on it. 20/28 RR 5, 21; 28 RR 81-88 (DX 49-DX 52). The defense presented expert testimony that twenty-three hair samples collected from the scene, consistent with Holberg's hair, had been "broken in the middle or torn or they had roots that were forcibly removed from the scalp," thus demonstrating Towery's relative strength in combat with Holberg. 20/28 RR 123, 128-30.

Towery's sons testified for the prosecution that Towery, who had been married four times, would drink and become abusive when they were young, especially after their mother had committed suicide. They had "pretty serious" confrontations resulting in police involvement. 18/28 RR 281, 295-97, 314. The brothers elaborated on their father's pain medication abuse and three

possible suicide attempts by overdose. 19/28 RR 6-7, 14. The defense recalled Rusty Towery to testify his father pulled a knife on him and cut him in 1983. 21/28 RR 183-84.

Despite the history of domestic discord, the undisputed testimony showed, at the time of his death, Towery was an elderly man who did not move quickly, but on good days was able to shuffle four blocks to the grocery store. 19/28 RR 30-31. Apartment manager Jamie Shuffield Tietz testified Towery was one of several elderly tenants that the management "kept an eye out for." She said he was a friendly, nice man and she had never seen him angry or hostile. He often walked around the complex and moved slowly with his head down and scooted his feet in "sort of a shuffle." 19/28 RR 130-32. Maintenance man Gary Crisp testified Towery was a "wonderful man" with "a real slow, slow step" and scooted his feet when he walked. 19/28 RR 109, 153-54. Towery's neighbor's daughter-in-law, April Carter, testified Towery moved slowly and "it would take him a while to get from his door to the mailbox." 20/28 RR 96-97. Towery's two sons, his daughter, and his daughter-in-law testified about Towery's bad knees and legs, gout in his feet, and his shuffling gait. 18/28 RR 288-89, 308; 19/28 RR 24-25, 29-30.

Holberg herself agreed Towery was "not an agile 80-year-old" and "had difficulty getting around real quick." 21/28 RR 135. The jury also viewed three life photos of Towery, one from approximately two months before his murder, showing his stature and build. 28/28 RR 40-42; 18/28 SHCR 232-83. Finally, the medical examiner testified Towery was only five feet, six inches tall and weighed 162 pounds. 19/28 SHCR 287.

Holberg now asserts trial counsel failed to uncover or present evidence of her dating relationship with Towery, his physical strength and vigor, and his "dark side." Am. Pet. 67-70.

The Court will address the uncalled witnesses and additional defensive theories offered by Holberg individually below.

a.    Becky Bates

Holberg relies on the statements of Becky Bates (aka Rebecca Britt). The Court discussed Bates's 2000 and 2006 affidavits in § VI.D.4.a. The state habeas court correctly found Bates did not state in her first affidavit that she was available to testify at the trial. FFCL 54; 28/29 Supp.SHCR 8633, ¶ 16. The state court also found Bates was not on the list of about 45 potential witnesses that Holberg provided to counsel, and Holberg was not forthcoming with counsel concerning the information she now says Bates could have provided. FFCL 56-57; 28/29 Supp.SHCR 8635-36. The state court found it was objectively reasonable *not* to call Bates when counsel knew that Bates and whom Holberg fought in the jail. The prosecution could have used this information to emphasize Holberg's violent behavior. FFCL 54, 56-57; 28/29 Supp.SHCR 8633, 8635-36. The record supports these findings and conclusions. *See* 4/29 Supp.SHCR 911-12 (aff't of Dodson); 4/29 Supp.SHCR 930 (aff't of Norris); 1/2 Supp.SHCR 257 (aff't of Ella Gibbs stating that Holberg had altercation with Bates); 1/2 SHCR 260 (2000 aff't of Bates). Holberg fails to acknowledge these findings and conclusions and does not demonstrate or argue they were unreasonable in fact or law. Am Pet.; Corrected Reply 13-14.

In addition to Bates' personal knowledge of Holberg's propensity for violence in jail, the state habeas court found Bates admitted in her 2000 affidavit that she had once had a sexual relationship with Holberg and that, like Holberg, she entered "sugar daddy" relationships with older men when she was engaged in prostitution. FFCL 54; 28/29 Supp.SHCR 8633. Holberg's trial counsel could reasonably have believed the prospect the foregoing information surfacing during cross-examination outweighed benefit of calling Bates as a witness. Moreover, the state

habeas court accurately found any beneficial information Bates could have offered Holberg at trial was merely cumulative of testimony the defense presented through other witnesses. FFCL 57; 28/29 Supp.SHCR 8636. A failure to present cumulative testimony cannot be the basis of a claim of ineffective assistance. *Howard v. Davis*, 959 F.3d 168, ___, 2020 WL 2316672, *4 (5th Cir. May 11, 2020) (citing *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009)); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016) (defendant was not prejudiced by failure of counsel to present cumulative evidence). The state habeas court reasonably concluded based upon the evidence before it that the failure of Holberg's trial counsel to call Bates to testify at trial was neither objectively unreasonable nor prejudicial within the meaning of *Strickland*.

> b.    Jimmy Lee Campbell

Jimmy Lee Campbell provided an affidavit in 2000 that Holberg filed with her original petition. 1/2 SHCR 230. In it, Campbell stated he knew Holberg in 1996-1997. They did drugs together and had an adulterous relationship. He went with Holberg twice to the Princess Apartments so she could see an old man and turn a trick. Each time she came back with money. Campbell did not remember if Holberg ever mentioned the old man's name. Campbell said that, prior to and during Holberg's trial, he was living in Amarillo and there was no reason Holberg's trial team could not have located him.

The Amended Petition does not discuss this 2000 affidavit. Am Pet. 68 n.27. Holberg relies instead on a declaration that Campbell provided eleven years later. 7/29 Supp.SHCR 1551-52. In the 2011 declaration, Campbell stated he was in jail prior to Holberg's trial, and he thought Holberg's attorney had telephoned him prior to trial, but it could have been a state's attorney. He stated Holberg's investigator showed him a photograph of A.B. Towery and, after seeing a picture of Towery for the first time, Campbell identified Towery as "the older man Brittany would talk

about and would visit" at the Princess Apartments. Campbell recalled the man in the picture visited the "strip clubs" and was someone who had sex with prostitutes. Campbell also recalled Holberg telling him this same older man was sometimes violent and verbally abusive with her and the other girls. Campbell said that, because of Holberg's fear, he "made it a point to stay close enough just in case she needed" his help. He recalled one occasion when he saw Holberg and Towery arguing inside the apartment. Campbell stated he was available and willing to testify to this information at trial, had anyone asked. The state habeas court found Campbell's affidavits were not credible. FFCL 49; 28/29 Supp.SHCR 8628. The state habeas court found, instead, the affidavits of Holberg's trial counsel explaining their rationale for not calling Campbell as a witness were credible. *Id.*

A comparison of Campbell's two statements supports the state court finding that Campbell lacked credibility. FFCL 47, 49; 28/29 Supp.SHCR 8626, ¶¶ 2-3, 8628, ¶ 8. In 2000, Campbell could not remember if Holberg identified the old man by name and did not even see the old man or go to his apartment. 3/29 Supp.SHCR 527-28. Eleven years later, Campbell claimed to remember Towery's name and face, recast himself as Holberg's protector, and recited a story of seeing Holberg and Towery argue through an open doorway. Campbell could have provided these allegations in the first affidavit, even if she did not know Towery's name. There is no explanation for this radical change in Campbell's story. Campbell's statement implies a photograph of Towery triggered her memory in 2011. But in 2000, Campbell never mentioned seeing Towery or even knowing his name. Accordingly, his independent recall of Towery's name and face eleven years later is questionable, particularly since Holberg's investigator apparently supplied this information when he showed Campbell the picture. 7/29 Supp.SHCR 1551, § 5 ("I have recently been contacted

by an investigator working with attorneys in the representation of Brittany on appeal. This investigator showed me a photograph of A.B. Towery."). Campbell's affidavits conflict even as to basic historical facts, such as where Campbell was living at the time of the trial and whether the trial lawyers contacted him. Finally, and critically, although Campbell stated in 2011 that he would have been available to testify, he did not make this assertion in 2000.

The state court found trial counsel were credible on this claim. Counsel stated in their affidavits that Holberg identified Campbell only as a man who had raped her in 1994 and did not say Campbell knew Towery as a regular customer of hers. Trial counsel's investigation revealed Campbell was a crack dealer. They attempted to locate Campbell through various means, including leaving messages with people who claimed to know him. The state court found trial counsel reasonably concluded Campbell's testimony would have little value since he did not know Towery by name and would probably deny the rape. FFCL 49-50; 28/29 Supp.SHCR 8628-29.

The affidavits of Holberg's trial counsel support these findings. *See* 4/29 Supp.SHCR 911, 929-30. The state habeas court found Campbell stated in his 2000 affidavit that he met Holberg through an adulterous relationship. FFCL 49; 28/29 Supp.SHCR 8628, trial counsels' files support their affidavits, which show that counsel investigated Campbell and identified him as a potential witness. 13/29 Supp.SCHR 3944-60, 3964. The notes described Campbell as a "crack dealer, in the joint now (maybe on a revocation). Allegedly raped Df in 8/94. When df lived w/Gary Warren, they were buying their crack from Jimmy Lee Campbell." 13/29 Supp.SHCR 3945 and 3959 (note that Campbell had been shipped to prison). Trial counsels' files contain a lengthy criminal history on Campbell, including property crimes, drug crimes and assault. *Id.* at 3948-58.

The state habeas court concluded Holberg's complaint about her trial counsels' failure to call Campbell as a witness at trial failed to satisfy either prong of *Strickland* analysis. FFCL 50; 28/29 Supp.SHCR 8629. Holberg fails to demonstrate or argue the state court unreasonably decided this claim against her. Am. Pet. 68. The record shows counsel investigated Campbell and identified him as a crack dealer who had once raped Holberg. Campbell's conflicting post-trial declarations do not undermine trial counsel's investigation or the reasonableness of the decision not to call him as a witness. Holberg's trial counsel could reasonably have concluded calling Campbell to testify at trial posed more potential harm than benefit, especially if Campbell admitted he had engaged in an adulterous relationship with Holberg, assisted Holberg in her prostitution business, and introduced Holberg to cocaine abuse.

c.      "Babes" Witnesses

Holberg contends that there were six witnesses from the strip club where Holberg worked who could testify Towery was a regular customer, solicited prostitutes, had a relationship with Holberg, and frequently abused her and other women: Mark Hunter, Loretta Warren-Martinez, Amber Terry, Gregory Swain, Stacy Mock, and Holly Ruffin Stauder.

i.      Mark Hunter

Mark Hunter provided an affidavit in 2000 that Holberg filed in support of her original state habeas petition. 1/2 SHCR 247-48. In this affidavit, Hunter stated he worked for various strip clubs. *Id.* He knew Towery to be regular customer. Dancers at the club would complain about Towery's behavior and, as a result, security asked Towery to leave more than once. *Id.* Hunter also knew Towery was Holberg's sugar daddy. *Id.* Hunter stated no one ever spoke with him regarding

212

Holberg's trial, and he did not indicate whether he was available at the time and willing to testify. *Id.*

Holberg ignores this affidavit in her Amended Petition. She relies instead upon a second affidavit Hunter provided in 2011 that Holberg filed in support of her Motion for Reconsideration. 7/29 Supp.SHCR 1592-95. As seen multiple times throughout this record, the 2011 affidavit is strikingly more detailed than the one Hunter signed eleven years earlier. Hunter said he worked at "Babes" from 1991 to 2001 and that Holberg started working there in 1994. He describes Towery as an "old pervert" and "nasty old bastard" who frequently dropped his pants in the strip club and was physically aggressive with the dancers, hitting, shoving, and groping them. Towery struck "prostitution deals" with the girls in the club and had a relationship with Holberg. Hunter did not think Holberg deserved to die for "standing up to" Towery. Hunter said he had used drugs during that time and that Towery did not like it when Holberg used drugs, even though "Towery was always hopped up on pills." Unlike his first affidavit, Hunter stated he would have testified. *Id.*

The state court considered Hunter's 2011 affidavit and found it was not credible to the extent it departs from the 2000 affidavit. FFCL 47-48, 59; 28/29 Supp.SHCR 8626-27, 8638; *see also 95; FFCL 05;* 28/29 Supp.SHCR 8674, n.8. Holberg presents no argument that the state court's ruling was unreasonable. She fails to acknowledge the 2000 affidavit or the differences between the affidavits. Am. Pet. 83; Corrected Reply 13-14. Holberg fails to demonstrate the state court's credibility finding was erroneous.

### ii.   Loretta Warren-Martinez

Loretta Warren-Martinez provided an affidavit dated May 7, 2001 stating that she bonded with Holberg in a drug rehabilitation facility. 5/18 SHCR 717-19. After rehab, Warren-Martinez

saw Holberg in 1995 and Holberg was trading sexual favors to support a crack addiction. *Id.* Warren-Martinez also saw Holberg with Towery while dancing at "Babes" in 1997. *Id.* Once, they left Babes with Towery and went to a motel. *Id.* Warren-Martinez knew Towery from various strip clubs since 1989. *Id.* Towery was insulting and rude and told Warren-Martinez that he liked to sodomize prostitutes and tie them up. *Id.* Warren-Martinez did not say whether she was available to testify at Holberg's trial.

Holberg murdered Towery in 1996, so Warren-Martinez's statement that she saw Holberg with Towery in 1997 is false. Holberg's Amended Petition ignores this detail and relies on a declaration that Warren-Martinez provided ten years later, while incarcerated in the Randall County Jail. In the newer declaration, Warren-Martinez changed the date from 1997 to 1995. She also stated, in contrast to the first affidavit, that she would have testified at trial if asked. 13/29 Supp.SCHR 3885-89.

The state court considered the 2011 declaration of Warren-Martinez (13/29 Supp.SHCR 3885-89) and found it was not credible. FFCL 47, 59; 28/29 Supp.SCHR 8626, 8638. Holberg makes no argument and fails to show that the State court credibility findings as to Warren-Martinez are unreasonable. Am. Pet. 68; Corrected Reply 13-14. Holberg's trial counsel could have reasonably concluded, given the ferocity of Holberg's assault upon Towery (to which Holberg herself testified) and the extent of Towery's injuries (which were both extreme and not in genuine dispute), attacking the elderly victim's character could alienate the jury. The Court can deny this claim for this reason alone. Further, information that Holberg went to a motel with Towery, and others observed them together at Babes is substantially like testimony presented to the jury regarding Towery's "sugar daddy" role. 19/28 RR 234. Failure to present cumulative testimony

cannot support an ineffective assistance claim. *Howard*, 959 F.3d at ___, 2020 WL 2316672, *4. For the same reason, the state court could have reasonably denied this claim for lack of *Strickland* prejudice. *Mays v. Stephens*, 757 F.3d 211, 216 (5th Cir. 2014) (failure to present additional mental health evidence cumulative of evidence already in record did not prejudice defendant).

Testimony about Towery's alleged proclivity to tie up prostitutes and sodomize them could have had a double-edged effect by opening the jury's eyes to an alternative motive for the murder. Such evidence reasonably suggests that Holberg's attempt to bind Towery with an electrical cord and "sodomize" him with the lamp stand was payback rather than an act of self-defense, as she claimed. *See* 21/28 RR 53, 127-29, 142-43, 146 (Holberg's testimony); 22/28 RR 34 (closing argument); *see* 1/5 SHCR 117 (supp. police report describing extension cord entangled in Towery's right arm). Failure to present evidence that is double-edged in nature generally lies within the discretion of trial counsel. *See Ayestes v. Davis*, 933 F.3d 384, 392 (5th Cir. 2019) ("this Court has repeatedly denied claims of ineffective assistance of counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it." (quoting *Hopkins v. Cockrell* 325 F.3d 579, 586 (5th Cir. 2003)), *cert. denied*, 140 S. Ct. 1107 (2020); *Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019) (defense counsel acted reasonably in choosing not to present mental health evidence because doing so could have opened the door to evidence showing the defendant displayed antisocial personality disorder and had confessed to feigning mental illness while incarcerated), *cert. denied*, 140 S. Ct. 1299 (2020).

Once Holberg testified she engaged in a lengthy confrontation with Towery in which she stabbed him more than fifty times, beat him with multiple objects, shoved a lamp down his throat, and buried a knife in his abdomen post-mortem, the issue of whether she and Towery were

strangers or long-time acquaintances became largely irrelevant to the issues before the jury at the guilt-innocence phase of trial. A showing Holberg had a long-term relationship with Towery and that Towery frequented strip clubs where Holberg worked would have supported an argument from the prosecution that Holberg was familiar with Towery's penchant for carrying large sums of money on his person and having large quantities of prescription medication at his residence. From the foregoing, the prosecution could reasonably have urged the jury to infer that Holberg went to Towery's residence on the date in question for the purpose of fraudulently gaining entry into his apartment and then robbing him or stealing from him. Holberg's trial counsel could also have reasonably believed testimony emphasizing Holberg's roles as a prostitute and stripper might not aid her efforts to convince the jury of her credibility.

iii.    Amber Terry

On December 19, 1997, Holberg's trial team learned about Amber Terry. 13/27 SHCR 248 (.pdf page number). Holberg's trial investigator interviewed Terry in person and by telephone in 1998. Holberg attached the notes from these interviews to her original state application for habeas corpus relief. 1/2 SHCR 174 (brief), 216-18 (exhibits); 5/27 SHCR 41 (Garrison testimony). According to the notes, Terry and Holberg met when they were thirteen years old. At age fifteen, the girls danced at "Babes" for two months, and Towery would watch Holberg dance and give her money. When Holberg was eighteen, Towery gave her money for an abortion. Towery was nice unless he had been drinking. Terry saw Towery hit Holberg once. Terry told the trial investigator she had been to Towery's residence with Holberg three times, the last occasion being about three months before the murder. Five years prior, Holberg had supplied Towery's son, Rusty, with cocaine, and Towery yelled at Holberg for it. According to the investigator's notes, however, Terry

216

was confused about the location and layout of the Princess Apartments, and the investigator had planned to take Terry to the apartments on "Sunday at 2:00." The notes also state that Holberg had called Terry from Tennessee shortly before her arrest. Terry was later in jail with Holberg for about two months and briefly shared a cell. They both had Cathy Dodson for a lawyer. 1/2 SHCR 216. The investigator notes do not address whether Terry was available or willing to testify at Holberg's trial. 1/2 SHCR 216-18.

The state habeas court found Holberg did not show that Terry was available and willing to testify at the capital murder trial. FFCL 68, 69, 97; 28/29 Supp.SHCR 8647, 8648, 8676. Holberg asserts Terry was "prepared to testify," (Am. Pet. 68) but does not support this claim with a record cite. The Court defers to the state court ruling regarding Terry's availability and denies the claim for this reason alone. Holberg has failed to present this Court with any clear and convincing evidence showing the state habeas court's factual finding that Holberg failed to establish Terry's availability to testify at trial was erroneous.

In addition, the state court record contradicts Terry's statements in important respects. Terry said that Towery hit Holberg, yet Holberg testified at trial that Towery never physically assaulted her (prior to his murder) but only said hateful things. 21/28 RR 9, 106. Second, Terry's statement that Holberg sold cocaine to Rusty conflicts with Holberg's statement to her trial team that she did not know Towery's sons. 6/6 Supp.SHCR (remand) 1277. When asked if Towery's sons dealt drugs, Holberg replied, "I don't know? And I'm not going to say anything on this. I may have seen them in passing over at Jimmy Lee's house, but I do not know them personally." 13/27 SHCR 178 (.pdf page). Holberg fails to address these conflicts and presents no authority that counsel was ineffective for relying on her statements. On the contrary, counsel is not ineffective

for failing to discover evidence that the defendant knows but withholds from counsel. *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997). Reasonable counsel could have concluded Terry was not a dependable witness or that her testimony might even have undermined Holberg's credibility. Likewise, Holberg's trial counsel could reasonably have believed testimony about Holberg having danced in a strip club at age fifteen and had a teenage abortion paid for by Towery might alienate the jury in conservative Randall County.

iv.    Gregory Swain

Gregory Swain provided a declaration that Holberg filed in support of her Motion for Reconsideration. 5/29 Supp.SHCR 948, 1023; 13/29 Supp.SHCR 3871-73 (Swain declaration). The 291-page Motion for Reconsideration included about 4,000 pages of exhibits consisting of both new evidence and evidence already before the state court. *See* 5/29 Supp.SHCR 958 n.1 ("Applicant now tenders new evidence and already tendered evidence in support of all existing claims"). Holberg filed these voluminous exhibits on the last day the trial court was to receive all the evidence necessary to make its ruling, including trial counsel's affidavits. 5/29 Supp.SHCR 948. As a result, trial counsel's 2011 affidavits do not address the newly filed declaration of Swain.

Respondent asserts *Pinholster* bars Swain's declaration because was trial counsel did not present it properly in state court. Answer 72. To the extent new evidence filed with the Motion for Reconsideration could support issues raised in the original application, Judge Estevez said she considered it. FFCL 12; 28/29 Supp.SHCR 8591, ¶ 37. To the extent the Motion for Reconsideration attempted to raise new claims, the CCA dismissed it as an abuse of the writ. *Holberg*, 2014 WL 5389907, *1 n.1. The problem here is that Judge Estevez did not discuss the Swain declaration, even though she addressed other "newly acquired affidavits" that Holberg

218

submitted with the Motion for Reconsideration. *See* FFCL 48, 59; 28/29 Supp.SHCR 8627, 8638. This is because Judge Estevez concluded either the declarations could not support any issues in the original application (i.e., they supported a new claim dismissed as an abuse of the writ) or she overlooked them in the 4,000 pages of mixed exhibits. Nonetheless, the Court review the claim regarding Swain *de novo*.

Swain's 2011 declaration stated he sold crack to Holberg in the 1990's. He said he went to Towery's apartment twice with Holberg around 1996 to get money that she owed him for crack. Towery called her a crack whore and gave her the money but said she was "on her own" after that. Towery yelled so much that Swain worried Towery might start fighting him. Swain agreed with Towery that Holberg should not use drugs but said that she had to "help herself." On the second visit, Towery was nicer to Swain because Swain understood Towery's sentiments against drugs. Swain got the impression that Holberg was staying with Towery at least temporarily, and Swain later saw them together at a store. Swain said Towery was also seeing another prostitute and there was a ring of old men in Amarillo who functioned as sugar daddies for young prostitutes. While incarcerated on an unrelated matter at the Potter County jail, Swain told Holberg's mother, Pamela Schwartz, that he would be happy to testify for Holberg. 13/29 Supp.SHCR 3872-73.

Swain's information about the relationship between Holberg and Towery is duplicative of the "sugar daddy" information before the jury. Reasonable trial counsel could conclude Swain's testimony added no new helpful information and came with the risk that Swain would also testify to Towery's good side—that he supported Holberg, gave her a place to stay, and took her shopping, but wanted her to quit drugs even as he paid her drug debts. Such information does little to advance

219

Holberg's theory of self-defense. Holberg fails to demonstrate trial counsel's alleged failure to contact Swain was deficient or prejudicial under *Strickland*.

v.   Stacy Mock

Stacy Mock provided a brief affidavit dated March 28, 2001 stating that she had known Holberg from the streets and saw her twice at Towery's apartment. 5/18 SHCR 715; 3/29 Supp.SHCR 530; 1/2 CR (AP-76,668) 54. Mock stated she had "tricked" with Towery twice and was under sixteen the first time. *Id.* The affidavit does not say whether she was available and willing to testify at Holberg's trial.

The state court found Holberg did not show that Mock was available and willing to testify at trial. FFCL 97; 28/29 Supp.SHCR 8676. The state court held, based on all the evidence, that Holberg failed to show a deficient pretrial investigation or prejudice under *Strickland*. *Id.* at ¶ 13. Holberg does not attempt to explain how the state court ruling was unreasonable. Specifically, Mock's affidavit is cumulative of evidence that Towery used prostitutes, and Holberg's original state habeas counsel apparently did not even consider it worth presenting to the state court with the initial application. Holberg did not file the affidavit until 2006 with her Reply. 2/18 SHCR 29 (fn. 3); 5/18 SHCR 548 (Ex. 34 to Affidavit of Karen Thro filed in support of Reply). Finally, to the extent it reflects specific immoral acts unknown to Holberg and unrelated to Towery's propensity for violence, the trial court would not err in excluding it.

vi.   Holly Ruffin Stauder

In an affidavit dated March 28, 2000, Holly Ruffin Stauder ("Ruffin") stated defense investigator Jim Patterson interviewed her and asked if she knew anyone who could place Holberg at the Princess Apartments regularly prior to Towery's death. 1/2 Supp.SHCR 232-33. Ruffin told

220

him the name of a person and made an appointment for Patterson to meet this person, but Patterson never showed. *Id.* Ruffin stated she knew Towery as a patron of a strip club where she danced, and he had once grabbed her waist while she was dancing and suggested a sexual act. *Id.* She did not say that she was available and willing to testify at trial. *Id.* Holberg submitted the affidavit to the state court with her initial state habeas application.

Ruffin signed a second, more detailed affidavit on October 9, 2006. 2/18 SHCR 292-93; 3/29 Supp.SHCR 532-33; 29/29 Supp.SHCR 56-57; ½ CR (AP-76,668) 56-57. In this affidavit, she stated she was available to testify during Holberg's trial and would have done so if asked. She stated she had taken Holberg to Towery's apartment fifteen to twenty times. Towery paid Holberg $100 to $200 for these visits. On the occasions when Holberg did not want to perform sexual acts for Towery, Ruffin would wait outside his door so Holberg could use her as an excuse to leave. Towery was often ornery; he cursed and used the word "whore" to describe Holberg. Finally, Ruffin stated she believed she had discussed these matters with Holberg's original habeas counsel, Kent Birdsong. She was surprised to learn that Birdsong did not include her statements her 2000 affidavit.

Holberg's trial counsel addressed this claim in their affidavits. They had obtained a statement from Ruffin before Holberg's trial. Ruffin told them that she recognized Towery from the strip club, which seemed to be of marginal value. Ruffin had no knowledge of any relationship between Holberg and Towery. Ruffin did not mention the incident where Towery allegedly grabbed her while dancing. Ruffin provided the name of a person who might have been able to place Holberg at the Princess Apartments before Towery's murder, but this person did not wait for Patterson to show up, and Ruffin was unable to provide the person's real name or an address. 4/29

221

Supp.SHCR 911, 928-29. Investigatory Garrison's Counsel's notes from trial counsel's file supports his affidavits. 11/27 SHRR 32-36. Thus, trial counsel's file and trial counsel's affidavits correspond closely with Ruffin's 2000 affidavit.

The state court reasonably found Ruffin's 2006 statement was not credible to the extent it differed from her 2000 affidavit. FFCL 32; 28/29 Supp.SHCR 8631, ¶ 13. The state court found Holberg did not establish deficient performance or prejudice because Ruffin could not provide sufficient evidence that Towery had a "dark side" and because Ruffin's testimony came with the risk that she might testify Holberg and Towery had no prior acquaintance. FFCL 53-54; 28/29 Supp.SHCR 8632-33. Moreover, to the extent Ruffin's testimony would have simply related sexual acts against Ruffin that were non-violent and unknown to Holberg, they would have been inadmissible. Holberg fails to argue or demonstrate how the state court ruling was unreasonable. Am. Pet. 68.

> d.   Mark Fields & Police Officer Richardson

Holberg states that Officer Richardson's incident report establishes that cab driver, Mark Fields, had picked up Holberg at the Princess Apartments about one week prior to Towery's death. 1/2 CR (AP-76,668) 124-25. The state court found Holberg presented no evidence that Fields or Officer Richardson were available and willing to testify at trial. FFCL 61; 28/29 Supp.SHCR 8640, ¶ 4. The trial court further found the police report was unauthenticated hearsay. FFCL 62; 28/29 Supp.SHCR 8641. Moreover, the state court found this information would show that Holberg was familiar with the Princess Apartments and nothing more, and therefore cumulative of evidence at the trial. *Id.* The record supports the state court findings. Holberg's familiarity with the Princess Apartments was known to the jury and not challenged by any party. The absence of evidence that Fields took Holberg to the apartments a week before the murder does not support a finding of

222

deficiency or prejudice under *Strickland*. Holberg makes no argument to the contrary. The state

court reasonably found Ruffin's 2006 statement was not credible to the extent it differed from her

2000 affidavit. FFCL 32; 28/29 Supp.SHCR 8631, ¶ 13. The state court found

e.     Michael Tietz & Jamie Shuffield Tietz

Michael Tietz ("Mr. Tietz") and Jamie Shuffield Tietz ("Ms. Tietz") supplied declarations

that Holberg filed among the 4,000 pages of exhibits in support of her 2011 Motion for Recon-

sideration. 5/29 Supp.SHCR 1023, 1026-27; 13/29 Supp.SHCR 3862 (Ms. Tietz), 3875 (Mr.

Tietz). Respondent asserts her trial counsel never presented Mr. Tietz's declaration properly in

state court. Answer 72. She further argues *Pinholster* bars its review. *Id*. Respondent does not

make this argument with respect to Ms. Tietz's declaration. Answer 77. Nevertheless, the Court

finds the state court did not address the 2011 declarations of either Mr. or Ms. Tietz.[47] As with

Swain, the Court will give Holberg the benefit of the doubt, assume the state court overlooked the

statements and review them *de novo* as they relate to this claim.

Mr. Tietz's 2011 declaration states that he was Ms. Tietz's ex-husband and current boy-

friend and worked part-time as a maintenance man at the Princess Apartments at the time of the

murder. He stated Towery was "really strong" and "got around really well." He believed Towery

was an ex-military man and seemed much younger than his eighty years. Mr. Tietz said he was

willing to testify to this information had trial counsel asked. 13/29 Supp.SHCR 3875-77.

Ms. Tietz's 2011 declaration states that Towery was "a military man . . . strong and

independent for his age." She said he was in good health, not feeble or frail, and did not appear to

---

[47] The state court addressed Ms. Tietz's deposition testimony, taken in a civil lawsuit against the apartment complex by Towery's survivors but not her declaration. *See* 28/29 Supp.SHCR 8640, ¶ 5.

be over 60 years old. But she also stated, as she did at trial, that Towery shuffled when he walked. Tietz further stated Towery fell and hit his head months before he died. 13/29 Supp.SHCR 3862.

Holberg asserts her trial counsels were ineffective for assuming Towery was old and feeble. She further argues they failed to present testimony from Mr. and Ms. Tietz about Towery's strength and vigor. Am. Pet. 68-69. As noted by Respondent, Holberg presents no authority that counsel is responsible for failing to predict a witness would change their testimony thirteen years after trial. Counsel need not be clairvoyant to provide effective assistance. *Fields*, 565 F.3d at 295; *Sharp*, 107 F.3d at 289 n.28. The undisputed trial evidence showed Towery was old, small in stature, shuffled when he walked, and moved slowly. 21/28 RR 135 Yet, on good days, he could shuffle four blocks to the grocery store. In her testimony before the jury, Holberg agreed he was *not* agile for an 80-year-old and moved slowly. *Id*. Ms. Tietz's 2011 declaration confirms Towery shuffled, despite her assertions of his strength and independence. Because of this, information that Towery was nevertheless strong and vigorous "for his age" would have had little probative value. *See Williams v. Stephens*, 761 F.3d 561, 570 (5th Cir. 2014) (defense counsel not ineffective for failure to present records that had low probative value). The assertion that Towery hit his head months before his death also undermines any probative value.

Counsel also addressed this issue during trial. Holberg testified on direct examination that Towery had no trouble moving during their struggle because he "never got far enough away from [her] to have to walk anywhere." 21/28 RR 51. She further stated Towery had enough upper body strength to hold her head so she could not get away and to strike her face. 21/28 RR 51. Torn and ripped strands of hair at the crime scene consistent with Holberg's testimony confirmed her assertions of a violent struggle. The present contention that counsel should have done "more" rates

as inappropriate judicial second-guessing. *See Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743). The Court views Ms. Tietz's 2011 declaration with extreme suspicion as far as it is inconsistent with her trial testimony. *Summers*, 431 F.3d at 872; *May*, 955 F.2d at 314.

> f.   April Carter

April Carter signed a declaration in 2011 saying that Towery walked slowly but appeared "strong and independent for his age." 7/29 Supp.SHCR 1554-57. Of note, trial counsel called Carter to testify at trial. 20/28 RR 88. Carter testified Towery seemed like any other senior citizen, and she agreed he "got around pretty slow." 20/28 RR 96-97. Again, Holberg presents no authority that counsel is ineffective for failing to predict the change in Carter's testimony that, despite his lack of mobility, Towery was "strong and independent for his age." Again, the key qualifier is that Towery was strong "for his age" of eighty. This has no more impact on the jury than the evidence already admitted via Holberg's testimony that Towery held her by the hair and struck painful blows to her face while she was stabbing him with a knife and striking him with various objects.

> g.   Timeline & Burglary/Robbery

Holberg asserts trial counsel never attempted to develop a timeline. Am. Pet. 69. In Holberg's estimation, the timeline was crucial evidence to prove Holberg did not burglarize or rob Towery. *Id*. The Court already addressed and rejected this timeline theory in § VI.B (addressing claim 1B). As the Court determined, Holberg's assertion that Owens's timeline was necessary for the State's theory of the crime relies on the assertion that that the murder was "brief" rather than the culmination of a 45-minute struggle, as Holberg herself testified. Furthermore, even if the Court accepts Holberg's new timeline, it does not "torpedo" the State's theory of the case, which did not depend on the time of the attack. *See* § V.A.4. above. Even considering Holberg's new

evidence and theories, the record contained sufficient evidence from which the jury could find beyond a reasonable doubt that Holberg went to Towery's residence for the purpose of fraudulently gaining entry to his residence and then robbing him or stealing from him. In fact, Holberg's new evidence, including the proffered testimony of Amber Terry, Stacy Mock, and Holly Ruffin, corroborates the theory that Holberg went to Towery's residence *because* she knew Towery to carry U.S. currency and to possess prescription medications.

### 5. Conclusions

The defense theory at trial was that Holberg, binging on cocaine, fled the scene of an accident and went to Towery's apartment to wait for Gary Warren. Holberg testified (1) Towery paid her for sex before, (2) he had never been violent to her, (3) and that he hated it when she used drugs. She claimed Towery offered her food and drink, saw her crack pipe, and then struck her on the head. After Towery struck Holberg, the two began to struggle. To the extent the witnesses allegedly overlooked by trial counsel would have proven that Towery used prostitutes and had a long-standing relationship with Holberg, it was cumulative of the testimony from Holberg, Connie Baker, and Diana Wheeler. Trial counsel reasonably believed "there is a limit to the jury's endurance in listening to repetitive testimony." 4/29 Supp.SHCR 913. To the extent such witnesses would have described Towery's alleged sexual perversions and visits to strip clubs, such testimony had no relevance to Holberg's self-defense theory. Further, the testimony might have alienated the jury as a cynical attempt to denigrate Holberg's elderly victim.

Strategies proposed by post-conviction counsel to support ineffective trial-counsel claims often do not account for the realities of a trial and the consequences of a chosen strategy. This case offers an example. Trial counsel could have presented all evidence tending to show Towery in a negative light. Yet, that strategy overlooks Holberg's testimony that Towery was never violent to

her before, and that he did not restrain her prior to the confrontation. It also ignores the rules of evidence. Holberg does not assert, and no evidence shows, this murder occurred during a sexual tryst. Nor does she assert Towery tried to restrain her.

This theory also ignores the reality that a defense strategy must cultivate the jury's trust. Trial counsel needed to refute Holberg's two prior custodial statements that she did not know Towery. Holberg's testimony required the jury to believe that she inserted a lamp five inches down his throat after stabbing him over fifty-times and buried a knife in his abdomen in self-defense. This theory required trust so the jury might accept Holberg's version of events, even after Holberg testified at the guilt-innocence phase of trial against the advice of counsel. Thus, reasonable trial counsel could conclude a strategy highlighting the parties' comparative morality risked losing the jury's trust given the moral failings of Holberg's own witnesses. *See* 4/29 Supp.SHCR 907, ¶ e (the fact most of the persons named by Holberg as helpful witnesses had criminal histories for drugs and prostitution constrained the construction of viable defense). Even if the evidence of Towery's character were admissible, Holberg's trial counsel could reasonably conclude introducing that evidence could alienate the jury.

Holberg assumes evidence of Towery's strength and abilities would have supported her self-defense theory. This theory is unpersuasive. Such testimony is too vague and anecdotal given the evidence already before the jury on Towery's ability to restrain Holberg during the fight, and three photos depicting Towery's physical stature. 28/28 RR 40-42 (.pdf pagination).

Holberg's argument also overlooks the fact there was a pause in the struggle during which Towery sat in his recliner for an indeterminate period, bleeding and injured, while Holberg sat on the kitchen floor with a knife. 21/28 RR 45-50, 129. Holberg had no rational explanation for why

she did not flee through the kitchen door at this time. The apartment diagram refutes her implausible testimony that Towery's recliner blocked her exit. 21/28 RR 22-23, 129; 27/28 RR 68 (SX 998); *see also* 22/28 RR 15 (closing argument); 5/18 SHCR 627, 1/2 CR (AP-76.668) 455 (apartment diagram). Trial counsel's affidavit confirms that Holberg had no explanation for why she did not flee. 4/29 Supp.SHCR 907, ¶ c. Holberg's actions refute her suggestion at trial that she was too tired. Instead, Holberg rose from the kitchen floor after this pause and stabbed Towery in the face. She described her own behavior as "blowing a gasket" and "flipping out." 21/28 RR 49-50. Holberg also claimed while she and Towery fought — each holding a knife in one hand and holding on to the other — she seized a lamp and shoved it down Towery's throat. No matter how absurd Holberg's trial testimony, her counsel attempted to convince the jury it was the truth because Holberg insisted on both testifying and asserting self-defense.

Holberg fails to demonstrate a reasonable probability that the result of the guilt-innocence phase of her trial would have been different but for her trial counsel's failure to present the evidence discussed above.

### C.  Failure to Investigate Evidence Regarding Burglary & Robbery (Claim 3B)

#### 1.  *The Complaints*

Holberg argues her trial counsel failed to (1) investigate and present available evidence showing individuals other than Holberg had access to Towery's apartment immediately after his death ("anybody could have taken Towery's money"), (2) impeach or cross-examine the witnesses who saw Holberg with a large amount of U.S. currency after Towery's murder, and (3) present evidence that the theft of Towery's money was an after-thought. Am. Pet. 70-72.

### 2.   State Court Disposition

Holberg raised parts of this claim in state court in her 24th through 27th and 32nd grounds for state habeas relief. FFCL 46-74, 93-97; 28/29 Supp.SHCR 8625-53, 8672-76. Holberg twice supplemented the claim with affidavits in her 2006 Reply and her 2011 Motion for Reconsideration. The state habeas court denied Holberg's 24th, 25th, 26th, 27th, and 32nd claims on the merits. FFCL 46-74, 93-97, 122-24; 28/29 Supp.SHCR 8625-53, 8672-76, 8701-03. The Court reviews these ineffective assistance claims under the doubly deferential standard from *Harrington*, 562 U. S. at 101. In reviewing the state habeas court's rejection on the merits of Holberg's 24th through 27th and 32nd claims for state habeas relief, the Court may examine only those documents that were part of the record before the state habeas court. *Pinholster*, 563 U.S. at 181-82; 22 U.S.C. § 2254(d)(2).

### 3.   AEDPA/De novo review

The Court applies the same review as announced above in § VII.B.3.

### 4.   Evidence Others Had Access to Towery's Apartment

Holberg argues Towery's apartment remained unlocked after his death. Thus, other individuals could have taken money from Towery's wallet. Holberg ignores the more than $100 in U.S. Currency scattered on the floor of Towery's apartment when police arrived. Holberg's trial counsel reasonably could have believed it would have been difficult to convince the jury that someone other than Holberg entered Towery's apartment following the murder, removed cash from his wallet, but left behind the cash scattered on the floor. The state habeas court found Holberg's trial counsel were aware evidence existed showing Towery had cashed a check for $1,200 just days before his murder. FFCL 64; 28/29 Supp.SHCR 8643. Holberg admitted during her trial testimony that she received two hundred dollars from Towery and saw more cash in his

wallet. 21/28 RR 59, 173. The state habeas court concluded Holberg's trial counsel reasonably concluded the suggestion that Towery's sons took Towery's money would have been ineffective considering Holberg's testimony admitting that Towery had given her money. FFCL 65; 282/9 SHCR 8644.

Holberg argues her trial counsel should have accused Towery's sons or the police officer who investigated Towery's murder of taking Towery's cash, but she supplies absolutely no evidence to support such accusations. Moreover, Holberg's trial counsel could reasonably have believed pointing an accusatory finger at the victim's family or the police, without any evidentiary support, when Holberg admitted she left Towery's residence and went to a crack house to purchase crack could alienate the jury. The state habeas court concluded Holberg's trial counsel made a strategic and intelligent decision to limit the aggressiveness with which they cross-examined Towery's survivors because counsel reasonably believed an aggressive cross-examination would risk alienating the jury. FFCL 64-65; 28/29 Supp.SHCR 8643-44. The state habeas court also concluded Holberg's trial counsel reasonably concluded any suggestion Rocky Towery or an unknown third-party took the money from Towery's body "would likely have provoked a response of outrage from the jury." FFCL 65; 28/29 Supp.SHCR 8644.

Holberg also argues law enforcement did not find her fingerprints or her blood on Towery's wallet. For the reasons explained by the TCCA in its opinion discussed above in § III.3. denying Holberg's motion for DNA testing, the absence of Holberg's blood and fingerprints from Towery's wallet was probative of nothing relevant to the capital murder charge against Holberg. *See Holberg v. State*, 425 S.W.3d at 287-88.

a.      Testimony Holberg Had a Large Amount of Cash After the Murder

Holberg is simply wrong that her trial counsel did not cross-examine the prosecution witnesses who testified they saw Holberg with a considerable sum of cash immediate after Towery's murder. Her defense counsel cross-examined each of these witnesses, i.e., Misty Sue Votaw (19/28 RR 199-200), Cody Bill Mayo (19/28 RR 180-82, 183), Demitris Pettus (19/28 RR 218-26, 227). Mayo's November 14, 1996 affidavit to police in which he states that he saw Holberg count at least ten $100 bills appears at 3/29 Supp/SHCR 642-44. Holberg alleges no specific facts showing what other questions her trial counsel should have asked these witnesses on cross-examination. Nor does Holberg allege any specific facts showing what other witnesses were available at the time of her trial to testify in a manner that would have impeached this aspect of these three witnesses' direct testimony. As far as Holberg alleges any of these witnesses later recanted their sworn trial testimony, the Court cannot fault trial counsel for failing to anticipate in 1998 that one of more of these three prosecution witnesses would years later recant their sworn trial testimony. Trial counsel need not be clairvoyant to provide effective assistance. *Fields*, 565 F.3d at 295; *Sharp*, 107 F.3d at 289 n.28.

b.      After-Thought Theory

Holberg argues her trial counsel should have presented evidence and argued anything she took from Towery was an after-thought following an intense struggle. Am. Pet. 72. Holberg does not name what other evidence her trial counsel should have presented to support this after-thought contention. Moreover, during her trial testimony, Holberg claimed she had received two hundred dollars from Towery but denied taking any more of his money after their confrontation ended. As

231

far as Holberg complains her trial counsel did not argue in support of this after-thought theory, once again she is in error.[48]

        c.      Forensic Evidence Relating to Towery's Wallet

Holberg argues once again that the absence of her fingerprints and blood on Towery's wallet was exculpatory. Am. Pet. 72-73. She faults her trial counsel for not obtaining forensic examination and testing of Towery's wallet. As explained above in § III.3., the TCCA's opinion denying Holberg's motion for DNA testing establishes why, under applicable state law, the absence of Holberg's blood and fingerprints from Towery's wallet was not probative of anything relevant to the capital murder charge against Holberg. *See Holberg v. State*, 425 S.W.3d at 287-88. Thus, trial counsel's failure to obtain forensic testing of Towery's wallet did not prejudice her. Holberg's cannot reasonably fault her trial counsel for not doing something that would not have furnished Holberg with a defense under applicable state law. Holberg does not address the theft of Towery's prescription medication or his clothes. After *de novo* review, the Court concludes this complaint does not satisfy both prongs of *Strickland.*

        d.      Forensic Evidence Relating to Crime Scene & Towery's Autopsy

In another unexhausted complaint, Holberg complains her trial counsel failed to obtain an independent forensic examination of the crime scene and Towery's body, which she claims would have shown a "frenzied, heat-of-the-moment struggle which was over in a few minutes" and suggested Holberg was partially naked during the struggle. Am. Pet. 73-74. Holberg does not allege any facts showing it was objectively unreasonable for her trial counsel to rely upon the

---

[48] At the guilt-innocence phase of trial, Holberg's trial counsel argued as follows during closing jury argument: "And, I submit to you that even if you believe that Ms. Holberg took the money from his wallet, if she was acting in self-defense up until that was over and as an afterthought committed that, you don't have a capital murder." 22/28 RR 60.

medical examiner's report and testimony concerning Towery's autopsy. Nor does Holberg allege any specific facts suggesting an independent forensic examination of Towery's body or review of Towery's autopsy by a different forensic pathologist might have produced exculpatory evidence.[49] "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992).

Moreover, evidence showing the struggle between Holberg and Towery was brief would have undermined Holberg's detailed account of what she described as a 45-minute confrontation. It would also have been inconsistent with the medical examiner's account of Towery's extensive injuries and the photographic evidence of the crime scene, which showed the confrontation stretched from multiple locations throughout Towery's apartment and involved the use of a wide variety of knives, kitchen implements used to inflict blunt trauma, and a lamp shoved far enough down Towery's throat to damage his carotid artery. As far as Holberg alleges additional forensic evidence would have shown she and Towery engaged in civil, even polite, social discourse prior to their violent confrontation, no reasonable probability exists that, but for the failure of her trial counsel to introduce such evidence, the outcome of the guilt-innocence phase of her trial would have been different. After *de novo* review, the Court concludes this complaint does not satisfy both prongs of *Strickland*.

---

[49] On the contrary, Holberg furnished the state habeas court with an affidavit from pathologist Dr. Robert P. Lawrence dated August 15, 2011 in which Dr. Lawrence describes Towery's autopsy as "well done," repeats Dr. Patel's conclusion at trial that Holberg was suffering from toxic paranoid psychosis at the time of the offense and confirms the lamp shoved down Towery's throat nicked his carotid artery. 7/29 Supp.SHCR 1737-41.

### 5.   Conclusions

The TCCA's rejections on the merits of the ineffective assistance claims contained in Holberg's 24th through 27th and 32nd claims for state habeas corpus relief were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. Furthermore, as far as any of these ineffective assistance claims are unexhausted or procedurally defaulted, the Court concludes after *de novo* review that all such claims fail to satisfy both prongs of *Strickland*. The Court denies Holberg's claim 3B in all respects.

### D.   Failure to Challenge Venire Member B_ C_ for Cause (Claim 3C)

#### 1.   The Complaint

Holberg complains his trial counsel did not raise a challenge for cause for venire member, and later juror, B_ C_. Am. Pet. 74.

#### 2.   State Court Disposition

In point of error seven in her direct appeal, Holberg argued her trial counsel rendered ineffective assistance by failing to properly question and move to strike for cause venire member B_ C_. Brief of Appellant, 64-65. The TCCA found B_ C_ said nothing during voir dire examination indicating that he either rejected rehabilitation as a factor to consider when answering the special issues or adhered to a "blood atonement" theory of retribution; thus, the record lacked any basis upon which Holberg's trial counsel could have challenged B_ C_ for cause. *Holberg v. State*, No. 73,127, at 23. So, the TCCA concluded Holberg's complaint did not satisfy the deficient performance prong of the *Strickland* standard. *Id.*

### 3.   AEDPA Review

On direct appeal the TCCA reasonably concluded there was no legitimate basis for a challenge for cause against venire member B_ C_. For the reasons discussed above in § V.D, this complaint does not satisfy both prongs of *Strickland*. Failure to make a meritless motion or objection cannot be grounds for a finding of deficient performance. *Clark*, 673 F.3d at 429; *Paredes v. Quarterman*, 574 F.3d 281, 291 (5th Cir. 2009). Likewise, trial counsels' failure to raise a meritless, baseless challenge for cause to venire member B_ C_ did not prejudice Holberg within the meaning of *Strickland. Garza v. Stephens*, 738 F.3d 669, 677 (5th Cir. 2013); *Paredes*, 574 F.3d at 291.

### 4.   Conclusions

The TCCA's rejection on the merits of this ineffective assistance claim, i.e., Holberg's seventh point of error on direct appeal, was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and direct appeal. The Court denies Claim 3C.

### E.  Failure to "Counter" the Testimony of Vickie Kirkpatrick (Claim 3D)

### 1.   The Complaint

Holberg complains her trial counsel did not adequately impeach and cross-examine prosecution witness Vickie Kirkpatrick. Am. Pet. 75-77.

### 2.   State Court Disposition

In her 21st and 27th grounds for state habeas relief, Holberg argued her trial counsel was ineffective by failing to adequately impeach and cross-examine Kirkpatrick. The TCCA denied both claims on the merits. FFCL 33-38, 66-74; 28/29 Supp.SHCR 8612-17, 8645-53.

3.   *AEDPA Review*

Holberg premises both claims on her contention that Kirkpatrick committed perjury during her trial testimony, a contention the state habeas court reasonably found to be incredible. For the reasons explained above in§ VI.A-D, the evidence before the state habeas court supported the state habeas court's factual finding that Kirkpatrick's recanting deposition testimony was not credible. FFCL 106, 119-20; 28/29 Supp.SHCR 8685, 8698-99. The Court views recanting testimony with extreme suspicion. *Summers*, 431 F.3d at 872; *Spence*, 80 F.3d at 1003. As explained above, Kirkpatrick's sworn testimony at her own plea hearing, in the presence of her own criminal defense counsel and after Holberg's capital murder trial, established Kirkpatrick testified accurately during Holberg's trial. Moreover, the state habeas court had before it the affidavits of DA Farren and other prosecutors denying Kirkpatrick's allegations of a massive conspiracy by the Randall County District Attorney's Office to suborn perjury by Kirkpatrick and others at Holberg's trial. Also as explained above, the state habeas court reasonably found the affidavits of Michelle Wiseman and Roger Speir which Holberg submitted in support of her ineffective claims, were either incompetent hearsay, incredible, or both. FFCL 33-36, 70, 120; 28/29 Supp.SHCR 8612-15, 8649, 8699. As explained above in § VI.C.4, when viewed in proper context Lucero's declaration has little evidentiary weight.

a.      Failure to Impeach

As explained above, Holberg has failed to prove by clear and convincing evidence that the state habeas court credibility finding vis-a-vis Kirkpatrick's recanting deposition testimony was erroneous. Moreover, the state habeas court reasonably concluded Holberg's trial counsels' decision not to call Michelle Wiseman to impeach Kirkpatrick was objectively reasonable because Wiseman had not been in the same jail cell as Kirkpatrick and Holberg when Holberg made the

comments to which Kirkpatrick testified at trial and Wiseman possessed no personal knowledge of any information that could corroborate Holberg's self-defense theory. FFCL 35-36, 28/29 Supp.SHCR 8614-15. The state habeas court concluded Holberg's trial counsel made a reasonable strategic decision not to call Lynette Voss Tucker to impeach Kirkpatrick because Tucker's testimony would have tended to corroborate, rather than refute, Kirkpatrick's trial testimony, i.e., Tucker admitted Kirkpatrick had told her the same things, if not worse, that Kirkpatrick had told the police. FFCL 37; 28/29 Supp.SHCR 8616. The state habeas court reasonably concluded, under state evidentiary rules, Roger Speir's affidavit was not based on personal knowledge and, therefore, was not competent evidence. FFCL 100; 28/29 Supp.SHCR 8679. A state court's ruling on evidentiary matters binds a federal habeas court. *Garza*, 738 F.3d at 677 ("The Texas habeas court's interpretation of Texas evidentiary rules is therefore binding in this case."); *Wood v. Quarterman*, 504 F.3d 408, 414 (5th Cir. 2007). The state habeas court reasonably concluded the failure of Holberg's trial counsel to try to impeach Kirkpatrick's testimony in the manner urged by Holberg was itself objectively reasonable.

Holberg has alleged no specific facts showing the decision by her trial counsel not to object to the prosecution's use of leading questions during Kirkpatrick's direct examination allowed the admission of any testimony that would not have been admissible had Holberg's counsel raised a timely objection to the leading nature of the prosecution's questions. Therefore, this aspect of Holberg's complaint does not satisfy the prejudice prong of *Strickland. Moreover, a*bsent a showing of how the scope or content of a witness's testimony would have been different, but for the failure of defense counsel to object to a leading question or leading questions from the prosecution, a decision to withhold such an objection falls within the broad range of objectively

reasonable professional legal assistance permitted under the Sixth Amendment. Holberg's conclusory complaint about her trial counsel's failure to object to unspecified leading prosecutorial questions does not overcome the presumption of reasonableness afforded her counsel's performance. *Day*, 566 F.3d at 536 (federal habeas court must give great deference to counsel's performance, strongly presuming counsel exercised reasonable professional judgment (citing *Strickland*, 466 U.S. at 690)).

b.      Cross-Examination

The state habeas court found, and the Court's independent review of the trial record confirms, that Kirkpatrick, who wore jailhouse orange, admitted during her trial testimony that she was in jail pending criminal charges and had engaged in prostitution in both Texas and Tennessee. 19/28 RR 229-30, 240, 242-43, 246; FFCL 72; 28/29 Supp.SHCR 8651. More specifically, on cross-examination by Holberg's counsel, Kirkpatrick admitted she had never been to Towery's apartment, she was then a resident of the Potter County Jail, she had worked in Memphis as a prostitute, and Holberg told Kirkpatrick Towery's money was in his shirt pocket. 19/28 RR 239-45. The state habeas court concluded, based upon the defense's pretrial interview of Kirkpatrick and the fact Holberg planned to testify at the guilt-innocence phase of trial, Holberg's trial counsel made a reasonable strategic decision not to aggressively cross-examine Kirkpatrick by inquiring into whether Kirkpatrick had a deal with prosecutors and not to focus on Kirkpatrick's history of prostitution and criminal misconduct. FFCL 72-73; 28/29 Supp.SHCR 8651-52. Holberg's trial counsel made those decisions because (1) Kirkpatrick had earlier informed them she had no deal with the prosecution and (2) they believed it would be counter-productive to attack Kirkpatrick's credibility because of her history of prostitution and criminal misbehavior because Holberg would be subject to a similar attack when she later testified for the defense. *Id.* The state habeas court

238

reasonably concluded Holberg's complaints about her trial counsel's cross-examination of Kirkpatrick done not satisfy both prongs of *Strickland*. FFCL 74; 28/29 Supp.SHCR 8563.

### 4. Conclusions

The TCCA's rejection on the merits of Holberg's 21st and 27th claims for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. Furthermore, as far as any of these ineffective assistance claims are unexhausted or procedurally defaulted, the Court concludes after *de novo* review of all the evidence currently before the Court, including the testimony of Holberg's trial counsel and investigators, all such claims fail to satisfy both prongs of *Strickland*. The Court denies Holberg's claim 3D in all respects.

### F. Failure to Adequately Cross-Examine Multiple Prosecution Witnesses (Claim 3E)

### 1. The Complaints

Holberg complains her trial counsel did not adequately cross-examine "almost every material State witness presented at Holberg's trial." Am. Pet. 78-86. More specifically, she complains about her trial counsels' allegedly inadequate cross-examination of Towery's sons, Towery's apartment manager Jamie Shuffield Tietz, apartment maintenance worker Garry Crisp, Holberg's paid chauffeur Misty Sue Votaw and Votaw's boyfriend Cody Bill Mayo, Holberg's fellow crack abuser Dimitris Pettus, Holberg's former cellmate Vicki Kirkpatrick (for the same reasons discussed above), Holberg's mother Pamela Schwartz, law enforcement Sgt. Modeine Holmes, and medical examiner Dr. Jeffrey Barnard. *Id.*

239

## 2.   State Court Disposition

In her 26th and 27th grounds for state habeas relief, Holberg argued her trial counsel did not adequately cross-examine Kirkpatrick and Towery's sons. The state habeas court rejected those claims on the merits, finding, in part, Holberg's trial counsel reasonably believed (1) aggressively attacking the Towery sons on cross-examination would likely provoke a response of outrage from the jury and (2) aggressively cross-examining Kirkpatrick based upon her criminal background would prove counter-productive considering Holberg's plan to testify at the guilt-innocence phase of trial. FFCL 63-74, 122-24; 28/29 Supp.SHCR 8642-53, 8701-03. The state habeas court also found Votaw and Mayo had not truly recanted their trial testimony. FFCL 74; 28/29 Supp.SHCR 8653. Holberg first presented her complaints of allegedly inadequate cross-examination of prosecution witnesses Garry Crisp, Pamela Schwartz, Sgt. Holmes, and Dr. Barnard in her Motion for Reconsideration which the TCCA dismissed as an unauthorized subsequent application. *Holberg*, 2014 WL 5389907, *1.

## 3.   AEDPA/De novo Review

For the first time in the Court, Holberg has asserted a host of new factual arguments in support of her global inadequate cross-examination claims. Out of an abundance of caution, the Court will undertake *de novo* review of all her complaints of inadequate cross-examination. *Berghuis*, 560 U.S. at 390.

### a.    Vickie Kirkpatrick

For the same reasons discussed above in § VII.E.3.b, Holberg's complaints about her trial counsel's cross-examination of prosecution witness Vickie Kirkpatrick do not satisfy either prong of *Strickland*. The state habeas court reviewed Kirkpatrick's videotaped recanting deposition and, considering Kirkpatrick's sworn testimony at both Holberg's trial and Kirkpatrick's plea hearing,

reasonably found Kirkpatrick's recanting testimony incredible. Furthermore, Holberg's trial counsel testified in their affidavits they deliberately chose not to cross-examine Kirkpatrick aggressively after interviewing her and reasonably deciding (1) Kirkpatrick would likely testify she had no deal with prosecutors and (2) attempting to impeach Kirkpatrick by emphasizing her history of prostitution and other criminal misconduct could undermine Holberg's credibility when she later testified at the guilt-innocence phase of trial. FFCL 72-73; 28/29 Supp.SHCR 8651-52. Holberg's trial counsel later gave live testimony reiterating these same points. More specifically, Holberg's trial counsel testified they did not believe Holberg's self-defense assertions would prove successful at trial because Holberg was young and vigorous while Towery's medical records showed him to be old and frail, Holberg sustained very few injuries, the offense was horrific, and because Holberg's accounts of her confrontation with Towery were inconsistent over time and inconsistent with the physical evidence. 6/27 SHRR 53-54, 122, 132; 8/27 SHRR 41, 43, 49, 170-71, 173, 198; 10/27 SHRR 38-39, 41.

After *de novo* review, the Court finds Holberg's complaints about her trial counsel's cross-examination of Kirkpatrick do not satisfy either prong of *Strickland.* Holberg's trial counsel reasonably concluded aggressively attacking Kirkpatrick on cross-examination in the manner now urged by Holberg had more potential downsides than upsides. Furthermore, Kirkpatrick's trial testimony, which portrayed Holberg as the aggressor during the confrontation with Towery, was far more consistent with the physical evidence (as reported to defense counsel by their own independent forensic experts)[50] than the account Holberg gave to her defense counsel prior to trial

---

[50] Holberg's trial counsel testified (1) they consulted with independent forensic experts who informed them Holberg's account of her confrontation with Towery was inconsistent with the physical evidence, (2) they informed Holberg of this information, but (3) Holberg insisted on testifying at trial that she had acted in self-defense, which effectively limited the type and scope of cross-examination her defense counsel could employ with prosecution witnesses who

and the account Holberg gave during her trial testimony. Holberg admitted after Towery retreated to a chair and informed Holberg he was severely injured, she stabbed him multiple times, shoved a lamp down his throat, and then stabbed him again and left a knife buried in his abdomen.[51] No reasonable probability exists that, but for the failure of Holberg's trial counsel to attack Kirkpatrick on cross-examination in the manner now urged by Holberg, the outcome of the guilt-innocence phase of trial would have been different,

b.   Towery's Sons

Holberg criticizes her trial counsel for failing to accuse Towery's son Rocky of stealing Towery's money and failing to point out alleged inconsistencies in Rocky's account of his actions on the morning he discovered his father's lifeless and bludgeoned body.[52] Holberg also complains her trial counsel failed to attack both Towery sons based upon their own history of drug abuse, their own criminal records, their father's history of alcohol abuse and prescription drug addiction, and their father's history of violence. Holberg has not presented the Court with any fact-specific allegations, much less any evidence, showing Towery's son took any of his father's money.

The state habeas court reasonably concluded Holberg's trial counsel made a strategic and reasonable decision not to aggressively challenge Rocky Towery's testimony because doing so could likely alienate the jury and cause the defense to lose all credibility with the jury and because

___

shared Holberg's history of prostitution and criminal misconduct. 6/27 SHRR 53-54; 7/27 SHRR 122, 132; 8/27 SHRR 23-24, 131, 170; 9/27 SHRR 198. For example, Holberg informed her trial counsel that a particular blood stain at the crime scene was her blood, but the defense's forensic expert reported the blood in question was from Towery. 10/27 SHRR 38-41.

[51] As Holberg's defense attorney Candace Norris put it succinctly during her testimony at Holberg's state habeas corpus hearing: "I think the fact, in guilt/innocence, that that jury was confronted with a picture of a man leaning up against a closet with an object down his throat sets the tone for the entire scene." 8/27 RR 173.

[52] The affidavits Towery's sons furnished to police shortly after their father's murder appear at 14/29 Supp.SHCR 4152, 1454-55, 4192. Towery's autopsy report dated November 15, 1996, together with the notes from the autopsy and a toxicology report dated December 6, 1996, appear at 16/29 Supp.SHCR 5124-41, 5147-84, 5193-98.

the defense knew from Towery's bank records that he had made a substantial withdrawal of cash just days before his murder. FFCL 64-66, 71-74; 28/29 Supp.SHCR 8643-45, 8650-53. The state habeas court also reasonably concluded Holberg's trial counsel reasonably concluded courtroom attacks upon the victim's family members "are a dangerous strategy to pursue because jurors almost universally perceive family members as additional victims of the crime." FFCL 71; 28/29 Supp.SHCR 8650. The state habeas court also reasonably concluded trial counsels' decision that the jury's natural sympathies for Towery's sons likely would have outweighed any potential benefit of attacking their credibility via cross-examination into their prior drug use. FFCL 71-72; 28/29 Supp.SHCR 8560-51. After *de novo* review, the Court finds Holberg's complaints about her trial counsel's cross-examination of Towery's sons do not satisfy either prong of *Strickland.*

Holberg admitted at trial that she continued to assault Towery after he informed her of his injuries. She also admitted she stabbed Towery multiple times and shoved a lamp down his throat after Towery retreated to a chair. Holberg's trial counsel obtained Towery's medical records, which showed he was frail. 8/27 SHRR 41. Holberg's trial counsel obtained Towery's bank records, which showed a withdrawal of $1,200 just days before his murder. FFCL 64; 28/29 Supp.SHCR 8643. It was undisputed Holberg stabbed Towery more than fifty times. As the TCCA explained in its opinion denying Holberg's DNA testing motion, evidence of theft of Towery's money by others would not have proven exculpatory for Holberg considering the evidence showing Towery's prescription medications were also missing after his murder. Under such circumstances, the decisions by Holberg's trial counsel to forego accusations that Towery's son stole his late father's money and to forego aggressive cross-examination of Towery's sons were eminently reasonable. Furthermore, the Court concludes after *de novo* review no reasonable

probability exists that, but for the failure of Holberg's trial counsel to cross-examine Towery's sons in the manner now urged by Holberg, the outcome of the guilt-innocence phase of trial would have been different.

c.     Jamie Shuffield Tietz

Holberg criticizes her trial counsel for failing to elicit testimony from Ms. Tietz showing Towery was vigorous and that she did not hear Towery's son screaming the morning he discovered Towery's body.[53] Holberg also complains her trial counsel failed to elicit testimony showing Holberg appeared to know her way around the apartment complex. This last complaint is factually inaccurate. The state habeas court found, and the trial transcript confirms, that Holberg's trial counsel elicited testimony from Tietz on cross-examination suggesting Holberg appeared to know her way around the complex. FFCL 61-62; 28/29 Supp.SHCR 8640-41 (citing 19/28 RR 142).

As far as Holberg complains her trial counsel did not foresee Tietz's recantation of her trial testimony that Towery had difficulty walking, this complaint does not satisfy the deficient performance prong of *Strickland*. Clairvoyance is not a required attribute of effective assistance. *Fields*, 565 F.3d at 295; *Sharp*, 107 F.3d at 289 n.28. Tietz's alleged failure to hear Rocky Towery screaming on the morning he discovered his father's lifeless, bludgeoned, body was probative of nothing relevant to any issue before the jury at the guilt-innocence phase of Holberg's trial. Holberg admitted she stabbed Towery multiple times, shoved a lamp down his throat, and then stabbed him again in his abdomen before she showered, changed into Towery's clothes, went on a crack cocaine binge, and fled the jurisdiction. After *de novo* review, the Court concludes

---

[53] The declaration of Jamie Shuffield, formerly Jamie Shuffield Tietz, dated August 20, 2011 appears at 13/29 Supp.SHCR 3862-65.

244

Holberg's complaints about her trial counsel's cross-examination of Ms. Tietz do not satisfy either prong of *Strickland*.

### d.    Garry Crisp

Holberg complains her trial counsel failed to elicit testimony from apartment complex maintenance worker Garry Crisp regarding the timeline for Towery's murder, the demeanor of Towery's son the morning Towery's body was discovered, and whether Towery had access to a car.[54] For the reasons discussed above in § VI.B neither the exact time of Towery's demise nor the precise duration of Holberg's fatal confrontation with Towery were relevant to any issue before the jury after Holberg testified. She admitted she stabbed Towery multiple times, shoved a lamp down his throat, and stabbed him again, all after she and Towery had engaged in a lengthy violent confrontation and after Towery retreated to a chair and informed Holberg he was gravely injured. Likewise, Crisp's alleged testimony regarding the demeanor of Towery's son on the morning Towery's body was discovered would have done nothing to alleviate the impact of Holberg's admissions, the crime scene photos, or the forensic evidence offered by the medical examiner detailing the scope of Towery's injuries. Towery's access to a vehicle was not probative of any issue properly before the jury at the guilt-innocence phase of Holberg's trial. Furthermore, Holberg's trial counsel reasonably concluded attacks upon the credibility of Towery's survivors might alienate the jury. No reasonable probability exists that, but for the failure of Holberg's trial counsel to cross-examine Crisp in the manner Holberg now urges, the outcome of the guilt-innocence phase of Holberg's trial would have been different. The Court concludes after *de novo*

---

[54] Crisp's declaration dated August 19, 2011 appears at 7/29 Supp.SHCR 1570-72.

review that Holberg's complaints about her trial counsel's cross-examination of Crisp fail to satisfy either prong of *Strickland*.

e.      Cody Bill Mayo & Misty Sue Votaw

Holberg complains her trial counsel should have elicited testimony from Votaw and Mayo, contrary to their trial testimony, saying that they did not see Holberg counting $100 bills during their car ride. In fact, Votaw testified at trial that when she stopped her car at a stop sign, she saw Holberg pull out ten-to-twenty $100 bills along with a bunch of twenties and Holberg counted and straightened the $100 bills. 19/28 RR 195-96. Mayo testified at trial both on direct and cross-examination that Holberg paid two hundred dollars for a car ride and had at least ten $100 bills along with a wad of ones and fives. 19/28 RR 166, 180-84. Whether either of these witnesses has recanted their testimony claiming Holberg possessed a "wad" of cash or that they witnessed Holberg "count" her money is irrelevant to the outcome of Holberg's trial. Both Votaw and Mayo testified Holberg paid them two-hundred dollars cash for a car ride at once after Towery's murder. The jury did not have to accept at face value Holberg's self-serving trial testimony that Towery voluntarily gave her the money before their violent altercation began. Instead, the jury was free to believe that Kirkpatrick's account of the confrontation, in which Holberg claimed she attacked Towery because he refused to give her any money, was the more accurate version of relevant events.

Moreover, as far as Holberg contends that Mayo and Votaw have recanted their trial testimony, the Court cannot reasonably fault Holberg's trial counsel for not predicting such recantations. *Fields*, 565 F.3d at 295; *Sharp*, 107 F.3d at 289 n.28. Moreover, as Respondent correctly points out, attacking Mayo and Votaw's credibility too vigorously would have had negative consequences for Holberg – Mayo and Votaw were the defense's best witnesses when it

246

came to establishing that Holberg displayed injuries immediately after her confrontation with Towery. Mayo testified Holberg was bleeding from the corner of her mouth. 19/28 RR 172, 176-77. Votaw observed a small amount of blood on the front passenger seat where Holberg had been sitting after she exited Votaw's vehicle. 19/28 RR 198. Mayo saw a drop of blood on one of the $100 bills Holberg gave them for her ride. 19/28 RR 183-84. Moreover, for the reasons explained by the TCCA in its opinion denying Holberg's DNA testing motion, Holberg's focus on the amount of money Holberg had in her possession immediately after Towery's murder ignores the prosecution's alternative theory that Holberg stole Towery's prescription medication in addition to his cash. Even if Holberg's trial counsel had somehow convinced the jury that Holberg was bereft of cash as soon as she left Towery's apartment, the jury was free to conclude Holberg had taken Towery's prescription medication. Under such circumstances, the Court concludes after *de novo* review no reasonable probability exists that, but for the failure of Holberg's trial counsel to cross-examine Mayo and Votaw in the manner Holberg now urges, the outcome of the guilt-innocence phase of trial would have been different. Holberg's complaints about her trial counsel's cross-examinations of Votaw and Mayo do not satisfy either prong of *Strickland*.

f.      Dimitris Pettus[55]

Pettus testified at trial that Holberg approached Pettus the night of Towery's murder, had a large amount of cash, and asked where she could buy drugs. 19/28 RR 206, 210. Pettus testified further Holberg made two large purchases of drugs, she had a cut on her thumb, bruises on her knuckles, a mark on her neck, and a scratch on her face. *Id.*, at 211-12. Pettus testified further she

---

[55] In their pleadings and briefs, the parties have employed a variety of spellings for this witness's name. Alphonzo Cross, who claims to be the brother-in-law of "Demitri Pettis," has furnished a declaration offering yet another spelling. *See* 27/29 Supp.SHCR 8831-33. The Court will employ the spelling used by the state trial court reporter as it appears in the official transcription from Holberg's capital murder trial, i.e., 19/28 RR.

went to a motel with Holberg, who paid for the room and made additional purchases of cocaine later that night. *Id.*, at 213-14, 216. Contrary to Holberg's contentions in her Amended Petition, Holberg's trial counsel did elicit helpful testimony from Pettus. On cross-examination, Pettus testified Holberg wrapped her hand in a white rag, the hand had a deep cut which bled profusely that night, and that Holberg bought a total of about $900 to $1,000 of crack. *Id.*, 220-25. Holberg's trial counsel recalled Pettus later during the guilt-innocence phase of trial and elicited testimony showing Holberg appeared "kind of like scared" on the evening of the murder and was not laughing or joking. 20/28 RR 117-18. Holberg faults her trial counsel for failing to call additional witnesses, specifically Linda Dudley, Alphonzo Cross, and Wanda McDaniel, whom Holberg alleges could have testified Holberg was bleeding badly, cut up, covered in bruises, visibly distraught (i.e., scared and upset), did not smoke crack, and did not have any $100 bills in her possession.[56] Holberg does not allege any specific facts, however, showing how her trial counsel could have elicited any of this new testimony from Pettus on cross-examination.

Having reviewed the entire record from Holberg's trial and state habeas corpus proceedings, the Court concludes after *de novo* review that Holberg's complaints about her trial counsel's cross-examination of Pettus satisfy neither prong of *Strickland.* Holberg's trial counsel did elicit helpful information from Pettus on cross-examination. The Court cannot reasonably fault Holberg's trial counsel for not predicting that Pettus might one day recant her trial testimony. Nor is there any reasonable likelihood that, but for the failure of Holberg's trial counsel to cross-examine Pettus in the manner Holberg now urges, the outcome of the guilt-innocence phase of

---

[56] As far as Holberg complains about her trial counsels' failure to call Dudley, Cross, and McDaniel to testify at trial, their testimony did little to refute or rebut the trial testimony of Votaw and Mayo regarding Holberg's possession of U.S. currency the night of Towery's murder and did nothing to refute or rebut the prosecution's alternative theory that Holberg stole Towery's prescriptions medications after murdering him.

Holberg's trial would have been different. Pettus did little more than corroborate Votaw and Mayo's trial testimony showing Holberg had a considerable amount of cash in her possession immediately after Towery's murder. As the TCCA explained when it denied Holberg's DNA testing motion, successfully refuting the prosecution's evidence regarding Holberg's possession of a large amount of cash immediately after Towery's murder would not have prevented a capital murder conviction based on the prosecution's equally compelling theory that Holberg stole Towery's missing prescription medications.

g.      Pamela Jean Schwartz

Holberg faults her trial counsel for not using the testimony of her mother at the guilt-innocence phase of trial in an unspecified manner to explore "numerous issues." The prosecution called Pamela Jean Schwartz, Holberg's biological mother and a Potter County law enforcement officer, to testify at the guilt-innocence phase of trial. She testified on direct examination in pertinent part that (1) she spoke with Holberg via the telephone shortly after Holberg's arrest in Memphis, (2) Holberg admitted she had killed Towery but claimed it was not the way the media were making it seem, (3) Schwartz later visited Holberg in the Randall County Jail, where Holberg said she had been living with Towery and that Towery suddenly attacked her the day of the confrontation, (4) Holberg claimed to have acted in self-defense, (5) Holberg claimed the money allegedly taken from Towery belonged to her, (6) Holberg's descriptions of her encounter with Towery were monotone, emotionless, (7) Holberg had lived with other elderly men before Towery, and (8) Holberg never described Towery as possessing a dark side or a violent nature. 19/28 RR 257-71. On cross-examination, Schwartz testified Holberg claimed she had screamed for help during her encounter with Towery. *Id.*, at 271-74.

249

Conclusory assertions of ineffective assistance are insufficient cross- to support federal habeas corpus relief for not presenting evidence. *Woodfox v. Cain*, 609 F.3d 774, 809 n.17 (5th Cir. 2010) (citing *Green v. Johnson*, 160 F.3d 1029, 1040 (5th Cir. 1998)); *Gregory v. Thaler*, 601 F.3d 347, 353 (5th Cir. 2010) (conclusory statements regarding the contents of uncalled witnesses' testimony are insufficient to demonstrate ineffective assistance). Holberg alleges no specific facts showing what helpful or beneficial testimony Schwartz could have given at the guilt-innocence phase of trial had Holberg's trial counsel chosen a different approach on cross-examination. Holberg does not allege any specific facts showing any of the testimony Schwartz did give at the guilt-innocence phase of trial was inaccurate. Holberg's conclusory complaints about her trial counsel's cross-examination of Pamela Schwartz do not satisfy either prong of *Strickland*.

Holberg's trial counsel testified during Holberg's state habeas corpus proceeding that they interviewed Pamela Schwartz prior to trial. A copy of the verbatim transcription of that interview appears in the state habeas record. Holberg's trial counsel and chief investigator all testified they did not trust Pamela Schwartz because (1) she was a law enforcement officer, (2) John Schwartz informed them Pamela was concerned about protecting her job and might lie to protect herself, (3) Pamela Schwartz had let Holberg down in the past, (4) Pamela Schwartz had acted more as a best friend than a parent during Holberg's childhood and later abandoned Holberg, leaving her in the care of John's mother, (5) the defense team had discovered extensive evidence of drug and alcohol abuse by Pamela and John Schwartz during Holberg's childhood, (6) John and Pamela Schwartz appeared to have "checked out" emotionally from Holberg's life after John's sister Karen was murdered, and (7) Pamela Schwartz appeared to be more concerned about her then-upcoming vacation than in testifying for her daughter at the punishment phase of trial. 4/27 SHRR 36-37,

153-54; 5/27 SHRR 23; 6/27 SHRR 81-82, 90-93, 125-26, 164-65; 7/27 SHRR 84; 8/27 SHRR 53, 78-80, 87; 9/27 SHRR 107; 10/27 SHRR 42-44, 78, 132.

The Court concludes after de novo review that Holberg's complaints about her trial counsel's cross-examination of Pamela Schwartz did not satisfy either prong of *Strickland*. Holberg's trial counsel has objectively reasonable reasons for not calling Pamela Schwartz to testify at the guilt-innocence phase of trial. Furthermore, Holberg has failed to allege any specific facts showing what helpful or beneficial testimony Pamela Schwartz could have given at the guilt-innocence phase of trial had the defense called her or had Schwartz been subject to a more extensive cross-examination.

### h.    Sergeant Modeina Holmes

Holberg complains her trial counsel failed to object when the trial court permitted prosecution witness Holmes (1) to furnish unqualified lay opinion testimony regarding the crime scene, (2) to speculate regarding how the altercation between Holberg and Towery progressed through the apartment, and (3) to speculate on the cause of death. But no genuine dispute at trial occurred as to Towery's cause of death.[57] Medical examiner Dr. Barnard testified without contradiction that the cause of death was multiple sharp force injuries (i.e., stab wounds) and multiple blunt force injuries, none of which were immediately fatal but several of which would have proven fatal. 19/28 RR 289-308. Holmes's trial testimony described the crime scene as reflected in the videotaped recording, which she narrated, and in the still photographs which she identified, including an apparent bite mark on Towery's arm. 19/28 RR 45-82, 87-120, 124-68, 223-76; 19/28 RR 275-78. Holmes also identified assorted items of physical evidence, including

---

[57] Copies of Towery's autopsy report dated November 15, 1996, including a toxicology report dated December 10, 1996, appear at 16/29 Supp.SHCR 5124-41, 5147-84, 5193-98; 17/29 Supp.SHCR 5231-51.

latent palm and fingerprints, a bent fork, a butcher knife, a hammer, and other items, which she secured at the crime scene. *Id.* Sgt. Holmes also gave her opinions, based upon her more than two decades as a crime scene investigator and her experience with more than three thousand crime scene reconstructions, as to how, based upon the physical evidence, the autopsy results, and bloodstains and blood spatter found at the crime scene, regarding how the altercation appeared to have progressed through Towery's apartment, i.e., she testified it appeared the bloodshed started in the living room, moved to the dining room table, into the kitchen, toward the door, then back to the kitchen, before ending near the entry way. 18/28 RR 148-53, 160, 162-65, 262-63.

 Holberg complains Sgt. Holmes could express lay opinions but does not identify any legal authority mandating the exclusion of Sgt. Holmes' opinions. In Texas, lay opinions are generally admissible under Rule 701 of the Texas Rules of Evidence if (1) they are rationally based on the witness's personal perceptions and (2) the lay opinions are helpful to a clear understanding of the witness's testimony or to determination of a fact in issue. *Fairow v. State*, 943 S.W.2d 895, 897-900 (Tex. Crim. App. 1997). Holberg's trial counsel could reasonably have believed Holmes' lay opinions were admissible under applicable Texas evidentiary rules and that an objection would have proven fruitless. Failure to make a meritless objection does not satisfy either prog of *Strickland. Paredes*, 574 F.3d at 291.

Holberg complains her trial counsel did not object to Holmes' narrative testimony describing the videotaped recording of the crime scene that Holmes shot. Holberg does not identify with specificity, however, any of Holmes' narrative testimony that would have been properly subject to exclusion had her trial counsel objected to Holmes testifying in narrative form. Holberg's veteran trial counsel testified during Holberg's state habeas corpus proceeding that the

trial court would have admitted the video and photographic evidence of the crime scene regardless of any defense objections. 8/27 SHRR 44, 173. Holberg has not identified any legal authority showing conclusion was objectively unreasonable. Having reviewed the entirety of the record from Holberg's trial, the Court concludes after *de novo* review that all Holberg's complaints about her trial counsel's performance vis-a-vis Holmes's testimony do not satisfy both prongs of *Strickland.*

      i.     Medical Examiner Dr. Jeffrey Barnard

Holberg complains her federal habeas counsel only recently learned through examination of "the autopsy notes" that medical examiner Dr. Jeffrey Barnard testified falsely when he asserted at trial that he "participated" in Towery's autopsy examination. Holberg faults her trial counsel for not exploring this subject during cross-examination of Dr. Barnard. Am. Pet. 85. Holberg does not allege any specific facts showing her trial counsel had any reason to suspect Dr. Barnard had testified falsely during Holberg's trial or identifying any legal authority suggesting a timely objection to Dr. Barnard's testimony would have excluded evidence obtained during Towery's autopsy. For purposes of argument, the Court will assume that Holberg's trial counsel should have discovered Dr. Barnard did not personally perform Towery's autopsy (a fact not established by Holberg's conclusory assertions) and should have clairvoyantly anticipated in 1998 both the Supreme Court's decisions in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321-29 (2009) (holding the Confrontation Clause prohibited the admission in a criminal prosecution of lab reports stating that a tested substance was cocaine), and *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011) (holding a criminal prosecutor is prohibited by the Confrontation Clause from introducing a forensic laboratory report containing a testimonial certification – made for the purpose of proving a particular fact – through the testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification).

Nonetheless, the Court concludes no reasonable probability exists that a timely defense objection to Dr. Barnard's testimony would have resulted in anything more than a last-minute substitution by the prosecution of another member of the SWIFS staff to testify regarding Towery's autopsy and cause of death. Holberg alleges no specific facts showing Dr. Barnard played no part in *observing* Towery's autopsy. Unlike the situation in *Bullcoming*, Dr. Barnard signed the autopsy report on Towery and testified he had done so.[58] Even more significantly, Holberg alleges no specific facts showing Dr. Barnard's testimony regarding the contents of Towery's autopsy report or the cause of Towery's death was in any way factually inaccurate. The Court concludes after *de novo* review that Holberg's complaints about her trial counsels' performance via-s-vis Dr. Barnard's trial testimony do not satisfy either prong of *Strickland*.

### 4. Conclusions

The TCCA's rejections on the merits of Holberg's 26th and 27th grounds for state habeas relief were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. The Court concludes after *de novo* review that all Holberg's complaints about her trial counsels' cross-examinations of prosecution witnesses A.B. Towery, Jr., Russell Lee Towery, Jamie Shuffield Tietz, Garry Crisp, Misty Sue Votaw, Cody Bill Mayo, Dimitris Pettus, Vicki Kirkpatrick, Pamela Schwartz, Modeine Holmes, and Dr. Jeffrey

---

[58] Towery's autopsy report appears multiple times in the voluminous state court record in this case, including at 3/29 Supp.SHCR 675-92. Even after its opinion in *Bullcoming*, the Supreme Court has recognized the general rule that an expert witness may voice an opinion based upon facts concerning the events at issue even if the expert lacks first-hand knowledge of those underlying facts. *Williams v. Illinois*, 567 U.S. 50, 69 (2012). In his concurrence in *Williams*, Justice Breyer pointed out that reading *Bullcoming* and *Melendez-Diaz* as expansively as Holberg implicitly suggests would be highly impractical, especially regarding autopsy reports. *Id.*, 567 U.S. at 97-98 (Breyer concurring).

Barnard fail to satisfy either prong of *Strickland*. The Court denies Holberg's Claim 3E in all respects.

### G.  Failure to Effectively Present Defense Witness Connie Baker (Claim 3F)

#### 1.  The Complaints

Holberg complains her trial counsel rendered ineffective assistance by failing to effectively present defense witness Connie Baker and not objecting to the prosecution's allegedly improper cross-examination of Baker. Am. Pet 86.

#### 2.  State Court Disposition

Holberg presented the same complaints in her 22nd claim for state habeas corpus relief. The TCCA rejected those complaints on the merits, finding Holberg's trial counsel acted reasonably in calling Baker to testify for a limited purpose and in not objecting to the prosecution's cross-examination, because the prosecution's questions were proper. The TCAA also found Holberg's trial counsel's performance vis-à-vis Baker's trial testimony did not prejudice her. FFCL 38-43; 28/29 Supp.SHCR 8617-22.

#### 3.  AEDPA Review

On direct, defense witness Baker testified she had previously lived in Amarillo, where she had worked as a prostitute, and on one occasion prior to November 13, 1996 she went to Towery's apartment but refused to perform the unspecified sexual act he requested. 20/28 RR 146-47. On cross-examination, the prosecution elicited testimony regarding Baker's limited opportunity to observe Towery, her failure to mention Towery to police when interviewed previously, her work as a prostitute, her criminal record, and her knowledge of the criminal justice system. 20/28 RR 148-62. On re-direct, Holberg's counsel elicited testimony showing police questioned Baker about other murders but not specifically about Towery's murder. 20/28 RR 163. The state habeas court

concluded Holberg's trial counsel acted reasonably in (1) calling Baker to testify for the limited purpose of establishing that Towery had dealings with prostitutes in his residence, (2) not objecting to the prosecution's wholly proper cross-examination of Baker, and (3) in clearing up on re-direct that police did not question Baker regarding Towery's murder. FFCL 38-43; 28/29 Supp.SHCR 8617-22.

Baker testified she met Towery only once and that she refused to perform the unspecified sexual act he requested. Holberg complains her trial counsel did not elicit testimony from Baker establishing that Towery had a "dark side." But Holberg does not allege any specific facts showing Baker possessed any personal knowledge of facts arising from her lone encounter with Towery that would have established she possessed personal knowledge of such a fact. As far as Baker's trial testimony on direct did not delve into exactly what unspecified sex act she refused to perform at Towery's request, Holberg's trial counsel could reasonably have believed attempting to accuse Holberg's victim of sadistic and violent acts to which Baker apparently had never been a party or witness was unlikely to outweigh the potential downside of offending the jury. Holberg left Towery brutally beaten, stabbed over fifty times, with a lamp shoved down his throat, and a knife protruding from his abdomen. Since Baker refused to perform any sex act for Towery, and admitted she had only one encounter with Towery, she could not have testified from personal knowledge about Towery's dealings with other prostitutes or furnished additional testimony regarding his alleged "dark side." The state habeas court's conclusion that Holberg's trial counsel oversaw Baker's direct and re-direct testimony in an objectively reasonable manner was itself eminently reasonable.

Likewise, the state habeas court concluded the prosecution's cross-examination of Baker was unobjectionable. FFCL 41; 28/29 Supp.SHCR 8620. The state habeas court's conclusion that the scope of the prosecution's cross-examination of Baker was wholly unobjectionable under state law binds this federal habeas court. *Bradshaw*, 546 U.S. at 76. Holberg's trial counsel's failure to make a meritless objection to the prosecution's proper cross-examination of Baker was neither deficient performance nor prejudicial under the standard of *Strickland*. *Paredes*, 574 F.3d at 291. The state habeas court reasonable concluded all Holberg's complaints about her trial counsels' conduct vis-a-vis defense witness Baker do not satisfy both prongs of *Strickland*.

### 4.  *Conclusions*

The TCCA's rejection on the merits of Holberg's 22nd claim for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. The Court denies Holberg's Claim 3F in all respects.

### H.  Failure to Call Potential Defense Witness Susan Lawrence (Claim 3G)

### 1.  *The Complaint*

Holberg complains her trial counsel rendered ineffective assistance by not calling Susan Lawrence to testify at the guilt-innocence phase of trial. Am. Pet. 87-88.

### 2.  *State Court Disposition*

Holberg presented a similar complaint about her trial counsels' failure to call Susan Lawrence to testify at trial in her 23rd ground for state habeas corpus relief. The TCCA rejected this claim on the merits, finding there was no evidence showing Lawrence was available and willing to testify at Holberg's trial, finding Holberg's trial counsel attempted to call Lawrence to

testify on March 10, 1998 but Lawrence was not present, concluding Holberg's trial counsel reasonably chose not to continue to pursue Lawrence as a witness after Lawrence's failure to appear, finding Lawrence's potential testimony was cumulative of other testimony, and concluding Holberg's trial counsels' actions vis-a-vis Lawrence were neither objectively unreasonable nor prejudicial under *Strickland*. FFCL 43-46; 28/29 Supp.SHCR 8622-25.

> 3.  *AEDPA Review*

The state habeas court found, when Lawrence did not appear to testify at trial, Holberg's trial counsel reasonably decided not to pursue locating her because (1) Lawrence's credibility and familiarity with Towery were subject to serious attack and that the remainder of her testimony was double-edged at best; (2) any favorable information Lawrence could convey could be communicated to the jury through other witnesses with less potential damage to Holberg's defense; and (3) calling too many witnesses to establish that Towery and Holberg had a relationship risked tiring the jury with repetitive, cumulative testimony. FFCL 45; 28/29 Supp.SHCR 8624. The affidavits of Holberg's trial counsel given to the state habeas court fully supported the foregoing factual findings.

Ineffective assistance complaints premised upon uncalled witnesses are disfavored in the federal habeas context because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Nelson*, 952 F.3d at 669 (quoting *Day*, 566 F.3d at 538). To prevail on such claims, a petitioner must name the witness, demonstrate the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Nelson*, 952 F.3d at 669; *Day*, 566 F.3d at 538 (citing *Alexander*, 775 F.2d at 602). Holberg did not present the state habeas court with any evidence showing

Lawrence was available and willing to testify at Holberg's 1998 capital murder trial. Holberg's trial counsel took reasonable steps to secure Lawrence's testimony but, when Lawrence failed to appear at trial, they reasonably decided not to continue to pursue her as a witness.

Holberg now faults her trial counsel to giving up on obtaining Lawrence as a witness and alleges Lawrence could have testified about Towery's violent tendencies, the drug use of Towery's sons, Holberg's battered past, and Holberg's prior relationship with Towery. As explained above, however, the state habeas court concluded Holberg's trial counsel made a reasonable strategic decision, considering the extreme violence perpetrated on Towery by Holberg, not to attack Towery's character too aggressively and not to attack the character of Towery's sons as the jury was likely to respond to such attacks in a manner not beneficial to the defense. Moreover, the testimony Holberg now claims Lawrence could have furnished would have been cumulative of other testimony. Holberg testified at the guilt-innocence phase of trial about her history of abuse. Prosecution witness Pamela Schwartz testified without contradiction that Holberg told Schwartz she was living with Towery at the time of the murder. Re-called by the defense, Russell Lee Towery testified (1) as a child he witnessed his late father strike and argue with his mother and (2) years later when Towery was living with him, but wanted to move out, Towery grabbed numerous items and threw them into the front yard — a "temper tantrum" leading the police to visit Russell's residence. 21/28 RR 191-92. Also as explained above, evidence emphasizing Holberg's prior relationship with Towery dovetailed nicely with the prosecution's alternative theory that Holberg went to Towery's apartment the date of his murder for the purpose of stealing both his money and his prescription medication.

259

After *de novo* review, the Court concludes, given Lawrence's demonstrated reluctance to testify, Holberg's trial counsels' decision not to continue to pursue Lawrence as a witness was objectively reasonable.[59] Furthermore, the Court concludes after *de novo* review there is no evidence currently before the Court establishing that Lawrence was available and willing to testify at Holberg's trial. The TCCA reasonably concluded Holberg's complaint regarding her trial counsels' failure to call Lawrence to testify satisfied neither prong of *Strickland*.

### 4.   Conclusions

The TCCA's rejection on the merits of Holberg's 23rd claim for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. The Court denies Holberg's Claim 3G in all respects.

## I.   Failure to Move to Suppress Holberg's Post-Arrest Statements (Claim 3H)

### 1.   The Complaint

Holberg complains her trial counsel rendered ineffective assistance by failing to move to suppress Holberg's post-arrest statements to law enforcement officers. Am. Pet. 88-89.

---

[59] Holberg's co-defense counsel attorney Candace Norris testified during Holberg's state habeas corpus proceeding that she interviewed Lawrence prior to trial and Lawrence informed the defense that Holberg's biological father was a heroin addict. 9/27 SHRR 121. Attorney Norris also testified when the defense team took Lawrence to Towery's apartment complex and asked her to locate Towery's apartment, Lawrence led them to the wrong building; this and other things Lawrence told the defense led the defense to conclude Lawrence would not be a credible witness. 9/27 SHRR 211-12. Norris believed it was essential for the defense to maintain credibility with the jury. 10/27 SHRR 49. In his supplemental findings of fact and conclusions of law, Judge Dambold concluded the decision by Holberg's trial counsel not to call Lawrence to testify was based on Lawrence's inability to furnish accurate information to the defense team regarding the location of Towery's apartment unit within his complex and, therefore, was objectively reasonable. Supp.FFCL 79-80; 6/6 Supp.SHCR 1273-74.

2.   *State Court Disposition*

In her 37th point of error on direct appeal, Holberg argued her trial counsel rendered ineffective assistance by failing to move to suppress the highly incriminating oral statements Holberg made to law enforcement officers following her arrest as a violation of an applicable state statute. Brief of Appellant, 203-09. The TCCA rejected this ineffective assistance complaint on the merits, concluding that Holberg made the oral statements voluntarily and spontaneously, there was no legitimate legal basis upon which to seek the suppression of the oral statements, and the failure of Holberg's trial counsel to seek to suppress the oral statements did not constitute deficient performance. *Holberg v. State*, No. 73,127, at 24-25. Holberg re-urged the same ineffective assistance claim as her sixteenth ground for state habeas relief. The state habeas court rejected this claim on the merits. FFCL 26-27; 28/29 Supp.SHCR 8605-06.

3.   *AEDPA Review*

The TCCA's conclusion on direct appeal that Holberg's incriminating oral statements were admissible under state law binds this federal habeas court. *Bradshaw*, 546 U.S. at 76. Thus, the TCCA reasonably concluded the failure of Holberg's trial counsel to move to suppress the oral statements in question under state law principles failed to satisfy the deficient performance prong of *Strickland*. *Paredes*, 574 F.3d at 291.

As far as Holberg complains in the Court for the very time about the failure of her trial counsel to challenge the admissibility of her post-arrest oral statements on federal constitutional grounds, rather than solely on state statutory grounds, the Court's *de novo* review finds no deficient performance and no prejudice under *Strickland*. *See Rhode Island v. Innis*, 446 U.S. 291, 302-03 (1980) (holding admissible a defendant's post-arrest custodial statements made during transport where there was no showing a reasonable officer would have anticipated a conversation between

the transporting officers would have elicited incriminating statements from the defendant). Holberg alleges no specific facts, much less furnishes any evidence, showing the officers who transported her did or said anything reasonably likely to elicit incriminating comments from Holberg. Nor does Holberg allege any specific facts, or furnish any evidence, showing her oral statements were anything other than the spontaneous and voluntary statements the TCCA concluded they were.

*4. Conclusions*

The TCCA's rejections on the merits of Holberg's 37th point of error on direct appeal and 16th ground for state habeas relief were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial, direct appeal, and state habeas corpus proceedings. As far as Holberg now claims that her trial counsel should have challenged the admissibility of her oral statements on federal constitutional grounds, the Court concludes after *de novo* review that this new complaint fails to satisfy either prong of *Strickland*. The Court denies Holberg's Claim 3H in all respects.

**J. Failure to Request a Supplemental Jury Instruction on Burglary & Robbery (Claim 3I)**

*1. The Complaint*

Holberg complains, when the jury sent out a note seeking clarification of the guilt-innocence phase jury charge, her trial counsel failed to request a supplemental jury instruction clarifying the distinction between "robbery/murder" and "murder/theft," as well as various terms relevant to the offense of burglary as defined under Texas law and failed to properly explain the

262

distinction between capital and non-capital murder under Texas law during closing jury argument. Am. Pet 89-90.

### 2.    State Court Disposition

In her 22nd point of error on direct appeal, Holberg argued her trial counsel rendered ineffective assistance by failing to request a supplemental charge responsive to the jury's questions about robbery/murder and burglary/murder and by mis-informing the jury during closing jury argument on the distinction between capital murder arising from murder during a robbery or attempted robbery and a murder followed by an unrelated robbery or attempted robbery and non-capital murder. Brief of Appellant, 139-40. The TCCA rejected this point of error on the merits, finding the state trial court accurately defined all relevant legal terms for the jury, finding the state trial court did not issue a supplemental just instruction in response to the jury's note, concluding there was no legal basis for seeking a supplemental jury instruction, and concluding the failure of Holberg's trial counsel to seek a supplemental jury instruction did not constitute deficient performance under *Strickland*. *Holberg v. State*, No. 73,127, at 23-24.[60] Holberg re-urged this same ineffective assistance complaint as her 20th ground for state habeas relief. The state habeas court rejected this claim on the merits. FFCL 32-33; 28/29 Supp.SHCR 8611-12.

### 3.    AEDPA/De novo Review

Out of an abundance of caution, the Court will undertake *de novo* review of this ineffective assistance complaint. *Berghuis*, 560 U.S. at 390.    The TCCA's conclusion that the state trial

---

[60] While rejecting Holberg's 21st point of error on direct appeal, the TCCA found the trial court's response to the jury's note requesting further guidance merely referred the jury back to the guilt-innocence phase jury charge and did not, therefore, constitute a supplemental jury charge. *Holberg v. State*, No. 73,127, at 19-20. While denying Holberg's 17th point of error on direct appeal, the TCCA concluded the state trial court accurately instructed the jury on the relevant Texas statutes, gave guidance on the distinction between murder during robbery, murder during burglary, and the lesser-included offense of non-capital murder, and gave the jury the option of finding Holberg guilty of any or none of those offenses. *Holberg v. State*, No. 73,127, at 11-12.

court accurately defined all relevant state law terms for the jury in Holberg's guilt-innocence phase jury charge binds this federal habeas court. *Bradshaw*, 546 U.S. at 76. Thus, as far as Holberg complains her trial counsel failed to object to the guilt-innocence phase jury charge and failed to request a supplemental jury instruction on the distinction between capital and non-capital murder under Texas law, the Court concludes after *de novo* review that her complaints fail to satisfy either prong of *Strickland*. *Paredes*, 574 F.3d at 291.

During closing jury argument at the guilt-innocence phase of trial, Holberg's trial counsel argued to the jury in pertinent part as follows:

> When you have a capital murder and you're talking about the underlying felonies, and you're talking about whether or not somebody intentionally caused the death of an individual in the course of committing or attempting to commit a robbery or a burglary, you have to prove the underlying felonies.
>
> And, I submit to you that even if you believe that Ms. Holberg took the money from his wallet, if she was acting in self-defense up until that was over and as an afterthought committed that, you don't have a capital murder. You don't have it.
>
> That murder has to be committed in the course of committing or attempting to commit that underlying robbery.
>
> Burglary. I believe one of the things that Mr. Farren will talk to you about is the issue of effective consent. He will talk to you about the issue of using the telephone.
>
> But you heard Ms. Holberg tell you she asked him to use the telephone because she wanted to call Gary Warren. He lets her in the apartment.
>
> So, whether you look at her statement from Memphis or whatever you have heard that she went – she went into the apartment to use the telephone to call Gary Warren. She went to the bedroom to use the telephone to call Gary Warren. There's no deceit.

22/28 RR 60-61.

Holberg now complains her trial counsel should also have argued Holberg was not guilty of capital murder if she entered Towery's apartment "with consent and without an intent to steal."

264

But, as quoted above, this is precisely what Holberg's trial counsel did argue. More importantly, the specific contention Holberg now argues in her Amended Petition, i.e., that her entry into Towery's apartment "with consent and without intent to steal" absolved Holberg of capital murder is an inaccurate, perhaps even deceptive, description of relevant Texas law. As the state trial court accurately instructed Holberg's jury at the guilt-innocence phase of trial, under Texas law relevant to burglary, consent to enter is not "effective" if induced by deception or coercion, a point Holberg's trial counsel stressed during closing jury argument. 22/28 RR 61. The Court cannot fault Holberg's trial counsel for failing to request, or arguing in closing, for an erroneous construction of applicable state law, i.e., one which failed to recognize the distinction under Texas law between "effective consent" and mere "consent." Holberg does not explain to the Court, just as she failed to explain on direct appeal to the TCCA, what additional or supplemental jury instructions her trial counsel should have requested regarding the distinction between capital and non-capital murder under Texas law. Nor does Holberg explain with any reasonable degree of specificity what added, legally correct, arguments her trial counsel should have made at the guilt-innocence phase of trial.

After *de novo* review, the Court concludes Holberg's complaints regarding her trial counsels' failure to request a supplemental guilt-innocence phase jury charge, and to argue in closing jury argument, on the distinction between capital and non-capital murder fails to satisfy either prong of *Strickland*. The TCCA concluded the trial court accurately instructed Holberg's jury on all relevant aspects of Texas law, including the distinction between capital and non-capital murder. The Court presumes the jury to have followed its instructions. *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993).

### 4. *Conclusions*

The TCCA's rejections on the merits of Holberg's 22nd point of error on direct appeal and 20th ground for state habeas relief were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial, direct appeal, and state habeas proceedings. After *de novo* review, the Court concludes Holberg's complaints about her trial counsels' failures to either request a supplemental jury instruction regarding the distinction under Texas law between capital and non-capital murder or to argue more extensively regarding that same distinction both fail to satisfy either prong of *Strickland*. The Court denies Holberg's Claim 3I in all respects.

## K. Failure to (1) Voir Dire Jury Venire, (2) Request a Supplemental Jury Instruction, & (3) Argue on the Distinction Between Capital & Non-Capital Murder (Claim 3J)

### 1. *The Complaint*

In an expanded version of her immediately preceding ineffective assistance complaint, Holberg complains her trial counsel failed to adequately voir dire the jury venire, request a supplemental jury instruction, and argue at the closing of the guilt-innocence phase of trial regarding the distinction between capital and non-capital murder. Am. Pet. 90-91.

### 2. *State Court Disposition*

As explained above, the TCCA rejected on the merits Holberg's ineffective assistance complaints about her trial counsels' failures to request a supplemental jury instruction or to make additional jury arguments regarding the difference under Texas law between capital and non-capital murder when it rejected on the merits Holberg's 22nd point of error on direct appeal,

*Holberg v. State*, No. 73,127, at 23-24, and Holberg's 20th ground for state habeas relief, FFCL 32-33, 28/29 Supp.SHCR 8611-12.

### 3. AEDPA/De novo Review

For the same reasons discussed above in § VII.J, the Court concludes after *de novo* review that Holberg's complaints about her trial counsels' failures to either request a supplemental jury instruction regarding the distinction under Texas law between capital and non-capital murder or to argue more extensively regarding that same distinction both fail to satisfy either prong of *Strickland*. The TCCA concluded the trial court accurately instructed Holberg's jury on the definitions of all relevant terms and on the difference between capital and non-capital murder under Texas law. Holberg's trial counsel argued at the conclusion of the guilt-innocence phase of trial that Holberg was only guilty of non-capital murder in connection with Towery's murder. 22/28 RR 60-61.

The Court concludes after *de novo* review no reasonable probability exists that, but for the failure of Holberg's trial counsel to more thoroughly voir dire the jury venire on the difference under Texas law between capital and non-capital murder, the outcome of the guilt-innocence phase of Holberg's trial would have been different. The trial court provided Holberg's jury accurate instructions on applicable Texas law, including the difference between capital and non-capital murder, and the Court presumes the jury followed its instructions. Holberg's trial counsel made that exact jury argument, albeit in legally correct form.

### 4. Conclusions

The TCCA's rejections on the merits of Holberg's 22nd point of error on direct appeal and 20th ground for state habeas relief were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state direct appeal. After *de novo* review, the Court concludes Holberg's ineffective assistance complaint about her trial counsels' failure to adequately voir dire the jury venire on the difference under Texas law between capital and non-capital murder also does not satisfy either prong of *Strickland*. The Court denies Holberg's Claim 3J in all respects.

### L.  Cumulative Deficient Performance (Claim 3K)

#### 1.  The Complaint

Holberg argues all the foregoing alleged defects in the performance of her trial counsel at the guilt-innocence phase of trial collectively satisfy the dual prongs of *Strickland*. As pointed out at length above, however, either the TCCA reasonably rejected on the merits all Holberg's complaints about the performance of her trial counsel at the guilt innocence phase of trial or the Court did so after *de novo* review. Am. Pet 91-92.

#### 2.  State Court Disposition

In her 48th point of error on direct appeal, Holberg argued the cumulative errors of her trial counsel during voir dire and the guilt-innocence phase of trial combined to violate her constitutional right to the effective assistance of counsel. Brief of Appellant, 254-55. The TCCA denied this point of error on the merits, concluding this cumulative error point presented nothing for review. *Holberg v. State*, No. 73,127, at 45.

#### 3.  AEDPA/De novo Review

As Respondent correctly points out, because the TCCA reasonably rejected on the merits all Holberg's ineffective assistance claims arising from the voir dire and guilt-innocence phases of her trial and the Court after *de novo* review has denied all Holberg's unexhausted or procedurally

268

defaulted ineffective assistance complaints arising from the same portions of her trial, there is nothing left to cumulate. "Meritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated." *Hughes v. Dretke*, 412 F.3d 582, 597 (5th Cir. 2005) (quoting *Westley v. Johnson*, 83 F.3d 716, 726 (5th Cir. 1996)). "Twenty times zero equals zero." *Derden v. McNeel*, 978 F.2d 1453, 1458 (5th Cir. 1992) (quoting *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987)).

### 4.  Conclusions

The TCCA's rejection on the merits of Holberg's 48th point of error on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state direct appeal. After *de novo* review, the Court concludes all Holberg's ineffective assistance complaints about her trial counsels' performance during voir dire and the guilty-innocence phases of trial fail to satisfy both prongs of *Strickland*. The Court denies Holberg's Claim 3K in all respects.

## VIII.  INEFFECTIVE ASSISTANCE OF COUNSEL – PUNISHMENT PHASE (CLAIM 4)

### A.  Overview of the Claims and Clearly Established Federal Law

Holberg presents multiple claims of ineffective counsel relative to the punishment phase of her capital murder trial. Am. Pet. 92-137.

The same legal principles discussed above in § VII.A also govern the disposition of Holberg's complaints about her trial counsels' performance at the punishment phase of trial. In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence

(had the petitioner's trial counsel chosen a different course). *Wong*, 558 U.S. at 20; *Wiggins*, 539 U.S. at 534. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong*, 558 U.S. at 27. Within the context of *Strickland* analysis, "prejudice" means a reasonable probability the result of the proceeding would have been different. *Hinton v. Alabama*, 571 U.S. 263, 1089 (2014). To satisfy the prejudice prong, the likelihood of a different result must be substantial, not just conceivable. *Harrington*, 562 U.S. at 112; *Strickland*, 466 U.S. at 693.

### B. Failure to Compel State to Carry its Burden on Extraneous Bad Acts and Offenses (Claim 4A)

#### 1. The Claim

Holberg argues her trial counsel failed to object to the admission of testimony concerning Holberg's alleged participation in unadjudicated extraneous offenses and failed to counter such evidence. Am. Pet. 92-96.

#### 2. State Court Disposition

Holberg admits, however, that her trial counsel filed a pretrial motion seeking to exclude evidence of Holberg's bad acts and the state trial court denied the motion. Am. Pet. 92. In her 13th point of error on direct appeal, Holberg argued her trial counsel rendered ineffective assistance at the punishment phase of trial by failing to hold the State to its burden of proving by "clear proof" Holberg's unadjudicated extraneous offenses. Brief of Appellant, 101-04. The TCCA rejected this point of error on the merits, finding Holberg's out-of-court admissions that she committed acts of misconduct constituted "clear proof" of same and concluding there was, therefore, no legitimate

legal basis under Texas law for an objection to the State's proof of Holberg's extraneous unadjudicated offenses. *Holberg v. State*, No. 73,127, at 29-30.

### 3. AEDPA/De novo Review

The TCCA's conclusion on direct appeal there was no legitimate basis for an objection to the admission of evidence of Holberg's unadjudicated extraneous offenses binds this federal habeas court. *Bradshaw*, 546 U.S. at 76. As far as Holberg now argues the State bore a burden of proving beyond a reasonable doubt that Holberg committed each of her unadjudicated extraneous offenses, Holberg ignores the state trial court's jury instructions at the punishment phase of trial, which instructed the jury in pertinent part as follows:

> In arriving at the answers to the Special Issues submitted, you are instructed that if there is any testimony before you in this case regarding the Defendant having committed offenses other than the offense alleged against her in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the Defendant committed such other offense or offenses, if any were committed, and even then you may only consider the same as they bear upon the Special Issues submitted, and for no other purpose.

2/2 Supp.SHCR 647. Thus, the state trial court instructed Holberg's jury in precisely the manner Holberg now argues. The Court presumes the jury followed its instructions. *Zafiro*, 506 U.S. at 540-41.

Holberg also complains about the fact the prosecution introduced testimony at the punishment phase of trial from a variety of witnesses quoting Holberg as admitting that she had engaged in a wide range of unadjudicated offenses, including breaking her husband's nose, cutting someone with a knife, striking an elderly man (E.R. Williams) over the head with a cane, and asking a cellmate to "shut up" a witness against her. Holberg does not, however, cite any arguable legal authority her trial counsel could have used to seek exclusion of this testimony.

271

Moreover, Holberg's trial counsel did attempt to counter this evidence by (1) having Dr. Patel read Williams' death certificate and explain to the jury that it indicated Williams had died of natural causes, (2) cross-examining prosecution witnesses Hagan, Bernal, Coons, Dixon, Burnett, Norrell, and Kirkpatrick, and (3) calling Michelle Wiseman to contradict Kirkpatrick's account of Holberg's incriminating confession. The state habeas court reasonably found the vast majority of Holberg's proffered new evidence addressing the Texas capital sentencing special issues was either incredible, incompetent, or both. Having reviewed the entire record from Holberg's trial, direct appeal, and state habeas corpus proceedings, the Court concludes after *de novo* review that all Holberg's complaints about her trial counsels' performance at the punishment phase of trial regarding the prosecution's evidence of Holberg's extraneous unadjudicated offenses fail to satisfy both prongs of *Strickland.*

### 4. Conclusions

The TCCA's rejection on the merits of Holberg's 13th point of error on direct appeal was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state direct appeal. After *de novo* review, the Court concludes all Holberg's ineffective assistance complaints about her trial counsels' performance during the punishment phase of trial via-a-vis the prosecution's evidence of Holberg's unadjudicated extraneous offenses fail to satisfy both prongs of *Strickland*. The Court denies Holberg's Claim 4A in all respects.

272

### C.  Failure to Preserve Error re the Surprise Witnesses (Claim 4B)

#### 1.  *The Claim*

Holberg argues her trial counsel failed to object or otherwise properly preserve error about the prosecution's allegedly untimely disclosure of the testimony of prosecution witnesses Mary Lynn Burnett and Corena Sue Norrell. Am. Pet. 96-98.

#### 2.  *State Court Disposition*

Holberg raised this ineffective assistance complaint as part of her 28th ground for state habeas corpus relief. The state habeas court found the prosecution acted in good faith regarding the disclosures of Burnett and Norrell and concluded Holberg's trial counsel had no legitimate basis under Texas law for objecting to the admission of either of these two witnesses' testimony. FFCL 87-88; 28/29 Supp.SHCR 8666-67.

#### 3.  *AEDPA/De novo Review*

The prosecution disclosed Norrell's and Burnett's testimony to the defense three days before they both testified at Holberg's trial on March 23, 1998. Defense investigator Kathy Garrison interviewed Norrell on March 21 but was unable to interview Burnett prior to her testimony because Burnett refused to return Garrison's calls. 3/27 SHRR 85, 89-90, 92, 107-11, 143; 9/27 SHRR 141-43. Holberg's trial counsel moved for a continuance, but the trial court denied their motion. 23/28 RR 4-7.

Both witnesses testified they met Holberg prior to Towery's murder (Burnett while she and Holberg were inmates at the Randall County Jail and Norrell while she and Holberg were inmates in a Substance Abuse Felony Punishment Facility) and that Holberg related to them her concern that she struck an elderly man on the head with a cane and worried she had killed him. 23/28 RR 63-65, 76-77. Both Norrell and Burnett testified they were initially skeptical of Holberg's

admission but, after learning months later that a Grand Jury charged Holberg with Towery's murder, they contacted their probation officer to inform him what Holberg had told them. 23/28 RR 68, 79, 83.

The state habeas court's conclusion regarding the scope and application of Texas evidentiary rules, i.e., its conclusion that these two witnesses' testimony was timely disclosed and therefore admissible pursuant to Texas law, binds this federal habeas court. *Bradshaw*, 546 U.S. at 76; *Garza*, 738 F.3d at 677. The failure of Holberg's trial counsel to make what the state habeas court concluded would have been a futile objection satisfies neither prong of *Strickland*. *Paredes*, 574 F.3d at 291. The state habeas court reasonably concluded trial counsels' failure to object to the testimony of Burnett and Norrell as having been untimely disclosed did not prejudice Holberg. *Id.*

Furthermore, the Court concludes after *de novo* review no reasonable probability exists that, but for the failure of Holberg's trial counsel to object to the admission of Burnett's and Norrell's testimony, the outcome of the punishment phase of Holberg's capital murder trial would have been different. The prosecution established evidence of Holberg's violent assault upon Towery during the guilt-innocence phase of trial. The crime scene eyewitnesses and medical examiner testified without contradiction to the extraordinary level of violence inflicted on the elderly Towery. Holberg admitted during her testimony that she stabbed Towery in the face multiple times, shoved a lamp down his throat, and stabbed him in the abdomen, all *after* Towery retreated to a chair and informed Holberg that she injured him gravely. At the guilt-innocence phase of trial, the jury examined Holberg's demeanor firsthand and unanimously and beyond a reasonable doubt rejected her self-defense claim.

274

The prosecution took great care during its closing jury argument at the punishment phase to avoid asserting that Holberg had killed E.R. Williams. Instead, the prosecution argued Williams' cause of death was unascertainable due to the cremation of his body. But the point of Norrell's and Burnett's testimony was not to establish that Holberg murdered Williams. Rather it was simply to establish that Holberg had told two different people on separate occasions that she had struck an elderly man on the head with a cane. Given the undisputed level of ferocity evidenced by Towery's autopsy and the jury's implicit factual finding that Holberg murdered Towery in the course of at least attempting to commit either burglary or robbery, the Court concludes after *de novo* review no reasonable probability exists the outcome of the punishment phase of Holberg's trial would have been different if her trial counsel had objected or otherwise preserved error regarding the allegedly untimely disclosure of prosecution witnesses Norrell and Burnett.

### 4. Conclusions

The TCCA's rejection on the merits of this aspect of Holberg's 28th ground for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. The Court concludes after *de novo* review that Holberg's complaints about her trial counsels' failure to object or otherwise preserve error regarding the admission of Norrell's and Burnett's testimony satisfy neither prong of *Strickland*. The Court denies Holberg's Claim 4B in all respects.

275

### D.  Failure to Prepare for, Object to, and Cross-Examine Dr. Coons (Claim 4C)

#### 1.  The Claim

Holberg complains her trial counsel rendered ineffective assistance by failing to adequately prepare for, object to, and cross-examine prosecution expert Dr. Richard E. Coons, specifically, failing to raise an objection to Dr. Coons' testimony at Holberg's trial along the same lines as the objection the TCCA found to be meritorious in *Coble v. State*, 330 S.W.3d 253, 272-73 (Tex. Crim. App. 2010), i.e., that Dr. Coons' opinions on Holberg's future dangerousness were inadmissible because his methodology had never been validated and he could not identify any objective source to show his predictions of future dangerousness were generally accurate. Am. Pet. 98-102.

#### 2.  State Court Disposition

Holberg first presented this same ineffective assistance complaint in her Motion for Reconsideration, which the TCCA held to be a subsequent application and dismissed under state writ abuse principles. *Holberg*, 2014 WL 5389907, *1.

#### 3.  De novo Review

The Court will undertake *de novo* review of the merits of this ineffective assistance claim. *Berghuis*, 560 U.S. at 390. Both before and after Holberg's March 1998 capital murder trial, Dr. Coons, who is both a licensed attorney and psychiatrist, had a very long track record for testifying and furnishing his professional opinions as to future dangerousness in Texas capital sentencing proceedings.[61] The United States Supreme Court upheld the admissibility of expert opinion

---

[61] During Holberg's state habeas corpus proceeding, her state habeas counsel furnished the state habeas court with excerpts from dozens of trials throughout the State of Texas and trials in federal district courts in Texas, in which Dr. Coons testified as to the issue of a criminal defendant's future dangerousness. *See, e.g.*, ECF nos. 122-23, 151 (at pp. 488-918), 152 (at pp. 5-937), 153 (at pp. 6-174, 202-47, 249-466), 154 (at pp. 5-163), 219 (at pp. 90-197), 220 (at pp. 7-11, 16-48, 68-106, 114-205), 221 (at pp. 7-110, 118-43, 149-65, 183-96), 271 (at pp. 315-886), 272 (at pp. 2-73, 88-

testimony about future dangerousness extremely similar to Dr. Coons' testimony during Holberg's trial as early as *Barefoot v. Estelle*, 463 U.S. 880, 898-99 (1983). The TCCA upheld the admissibility of Dr. Coons' opinions regarding future dangerousness as late as February 2009. *See Ramey v. State*, 2009 WL 335276, *14-*15 (Tex. Crim. App. Feb. 11, 2009) (rejecting a Rule 703 challenge to the admissibility of Dr. Coons' opinions as to future dangerousness). The Court cannot fault Holberg's trial counsel for failing to anticipate in 1998 that the TCCA would, in 2010, abandon almost two decades of its own precedent and hold for the first time that Dr. Coons' methodology was subject to attack sufficient to exclude his opinions on future dangerousness from admission at the punishment phase of a Texas capital murder trial. That Holberg's trial counsel failed to anticipate the TCCA's holding in *Coble* more than a decade later and failed to raise an objection to the admission of Dr. Coons' expert testimony based upon the TCCA's holding in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992), did not cause the performance of Holberg's counsel in 1998 to fall below an objective level of reasonableness. Long after Holberg's trial, Dr. Coons continued to testify on future dangerousness at the punishment phase of Texas capital murder trials and the TCCA continued to uphold the admissibility of his expert opinions on that subject.

Holberg's attacks on her trial counsel's cross-examination of Dr. Coons and preparation for Dr. Coons' trial testimony are equally unpersuasive. On cross-examination, Holberg's trial counsel pointed out with success what the defense perceived to be the weaknesses in Dr. Coons' opinion that Holberg posed a substantial risk of future dangerousness: Dr. Coons failed to interview Holberg or any members of her family, he based his opinions on a selective review of

---

244, 375-882), 311 (at pp. 6-21, 24-182). The same excerpts of Dr. Coons' testimony can be found at 21/27 SHRR through 27/27 SHRR (WR-68,994).

records, he gave greater weight to those records that supported his opinions than those which undermined his opinions, and, unlike Dr. Patel, Dr. Coons failed to consider the possibility that Holberg's resort to violence had been at times a response to aggressive or violent behavior by others. 23/28 RR 157-64. Holberg's trial counsel also obtained an admission from Dr. Coons there was no indication in her records that Holberg had ever made good on any of the verbal threats she had made while in custody. *Id.*, at 164. Holberg's trial counsel pointed out those distinctions during closing punishment phase jury argument. 25/28 RR 194.

More significantly, Holberg's trial counsel retained the services of Dr. Patel, who opined Holberg's violent capital offense reflected primarily the fact she was binging on crack cocaine at the time of her encounter with Towery and that Holberg was unlikely to have access to crack cocaine if sentenced to a term of life imprisonment. Dr. Patel personally evaluated Holberg, reviewed far more records relating to Holberg's background than did Dr. Coons (particularly Holberg's SAFP records), and expressed his professional opinion that Holberg posed a minimal risk of future dangerousness if incarcerated. Dr. Patel discounted the importance of Holberg's history of verbal threats and emphasized it was necessary to know who started a physical altercation before one could draw any valid conclusions from the mere fact that Holberg had been involved in confrontations with other inmates while in custody. In addition to Dr. Patel, Holberg's defense team also conferred with another mental health expert, specifically Dr. Veazey, regarding Holberg's defense. 4/27 SHRR 124, 130-31. In sum, the record now before the Court establishes the antithesis of deficient performance by Holberg's trial counsel vis-a-vis Dr. Coons' testimony. Holberg's trial counsel prepared extensively for Dr. Coons' testimony, obtained and presented

their own mental health expert to counter Dr. Coons' opinion testimony, and effectively cross-examined Dr. Coons.

The Court concludes after *de novo* review no reasonable probability exists that, but for the failures of her trial counsel to prepare for Dr. Coons' trial testimony more thoroughly, object on Rule 703 grounds to the admission of Dr. Coons' opinions, or to cross-examine Dr. Coons more thoroughly, the outcome of the punishment phase of Holberg's capital murder trial would have been different.

### 4. *Conclusions*

For the foregoing reasons, the Court concludes after *de novo* review that Holberg's complaints about her trial counsels' performance vis-a-vis Dr. Coons all fail to satisfy both prongs of *Strickland*. Holberg's claim 4C is in all respects denied.

## E. Failure to Adequately Investigate and Present Available Mitigating Evidence (Claim 4D)

### 1. *The Claim*

Holberg complains her trial counsel rendered ineffective assistance by failing to adequately investigate Holberg's background and present all available mitigating evidence. Am. Pet. 102-32.

### 2. *State Court Disposition*

Holberg presented a much more factually limited version of this ineffective assistance complaint as her 28th ground for state habeas corpus relief. More specifically, Holberg's 28th ground for state habeas corpus relief focused on whether Holberg's trial counsel (1) adequately investigated Holberg's background, (2) failed to present available mitigating evidence through Dr. Patel, and (3) informed John Schwartz and others that they planned to "throw" Holberg's trial. The state habeas court made findings of fact, conclusions of law, and recommended denial of the

abridged version of these complaints. FFCL 75-78, 122-24; 28/29 Supp.SHCR 8654-78, 8701-03.

The TCCA remanded for an evidentiary hearing on Holberg's assertions of ineffective assistance

in connection with her trial counsels' handling of Dr. Patel's testimony and the allegation that

Holberg's trial counsel informed people they planned to "throw" her trial. *Holberg*, 2013 WL

2120253, *1. Judge Dambold presided over an evidentiary hearing during which Holberg's court-

appointed investigators and trial counsel all testified extensively. Judge Dambold then issued his

supplemental findings of fact and conclusions of law and recommended denial of Holberg's state

habeas corpus application. 6/6 Supp.SHCR 1195-1283. The TCCA adopted the state trial court's

findings and conclusions on all claims and denied state habeas relief. *Holberg*, 2014 WL 5389907,

*1.

### 3.   *AEDPA/De novo Review*

#### a.      No Deficient Performance

After *de novo* review of the entire record from Holberg's trial, direct appeal, state habeas

corpus proceeding, as well as all the new documents Holberg has submitted to the Court for the

first time, the Court concludes Holberg's defense team undertook an extensive, objectively

reasonable, investigation into Holberg's offense and background. In addition to multiple

interviews of Holberg, who furnished inconsistent, ambiguous, often conflicting, information

about her own background,[62] Holberg's defense team interviewed Holberg's mother Pamela

---

[62] For instance, John Schwartz, Pamela Schwartz, and Corena Norrell all told Holberg's defense team that Holberg's former live-in paramour Loren Knight got Holberg hooked on cocaine but Holberg told her defense team a fireman named "Don" introduced her to cocaine. 4/27 SHRR 39; 8/27 SHRR 87; 10/27 SHRR 126, 128-32. Holberg admitted she had been involved in a sexual relationship with a female counselor at a drug treatment facility but refused to furnish her defense team with the name of the counselor. 5/27 SHRR 161; 10/27 SHRR 132. Both Holberg's investigator Jim Patterson and her attorney Candace Norris made separate trips to the Memphis, Tennessee area to search for anyone who had anything good to say about Holberg; tellingly, they found none. 5/27 SHRR 165, 225; 8/27 SHRR 175, 178; 10/27 SHRR 115-16. The consensus in Memphis among the people Norris located was Holberg was "mean." 10/27 SHRR 115-16. The defense team retained an independent forensic expert (Bobby Henderson), trace

Schwartz, Holberg's maternal grandmother Delphine "Debbie" Schwartz, Holberg's adopted father John Schwartz, Holberg's aunts Teresa Lynn "Tessa" Cobb and Peggy Eitzen, dozens of Holberg's fellow prostitutes, drug addicts, and strippers (including Holly Ruffin, Melissa Wiseman, Susan Lawrence, Vickie Kirkpatrick, and Corena Norrell), Holberg's acquaintances (including Kristi Samperi, Tammy Hembry McKinney, Gary Don Warren, and Ella Gibbs), Holberg's paternal grandfather John Brogdon, Holberg's former school counselors Sandra Jo Baker and Pat Karnes (both of whom testified for the defense at trial), Holberg's former "sugar daddy" Marty Vannaman, and multiple jail personnel who had personal knowledge of Holberg's conduct while in custody.[63] "The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith*, 977 F.2d at 960. After *de novo* review, the record now before the Court reveals that Holberg's defense team completed an extensive investigation into Holberg's offense and background.[64]

---

evidence expert (Myron T. Scholberg) and blood expert (Edward Blake) who both informed the defense team that Holberg's account of her confrontation with Towery was inconsistent with their findings based upon the physical evidence. 8/27 SHRR 169-70, 198, 201, 215; 9/27 SHRR 198; 10/27 SHRR 38-41. Blake's reports on blood analysis appear at 12/29 Supp.SHCR 3679-09 and 16/29 Supp.SHCR 4912-33 (report dated February 18, 1998) and 15/29 Supp. SHCR 4856-72 (report dated December 23, 1997). Scholberg's inconclusive report on his hair fiber analysis of hair police found at the crime scene dated January 28, 1997 appears at 15/29 Supp.SHCR 4786-90. Holberg insisted on facts her defense team found were clearly refuted by other evidence. 7/27 SHRR 132, 170-75.

[63] Notes from the interviews Holberg's defense team obtained from these and other potential witnesses appear at 11/29 Supp.SHCR 3164-3241, 3261-73, 3283-09; 12/29 Supp.SHCR 3373-3484, 3498-99, 3502-67, 3583-3604, 3607-33; 14/29 Supp.SHCR 4194-4205, 4263-68. Transcripts from the recorded interviews Holberg's defense team obtained with Holberg, her parents, and her paternal grandfather appear in the record now before the Court: John Brogdon's March 6, 1997 interview appears at 11/29 Supp.SHCR 3034-63; Holberg's March 17, 1997 interview appears at 11/29 Supp/SHCR 3061-2118; Holberg's March 25, 1997 interview appears at 11/29 Supp/SHCR 3119-63; Pamela Schwartz's February 25, 1997 interview appears at 11/29 Supp.SHCR 2954-3015; John Schwartz's February 28, 1997 interview appears at 11/29 Supp.SHCR 3016-33.

[64] Holberg's state habeas counsel presented the state habeas court with a document identified as Defendant's Exhibit 145, which appears at the end of 27/27 SHRR, and purports to summarize the mitigation-related materials said counsel found in the files of Holberg's defense team. Tellingly, that *summary* comprises 180 pages.

The Court also concludes after *de novo* review that Holberg's trial counsel made objectively reasonable decisions regarding the scope of their investigation. For instance, Holberg's defense team interviewed Holberg's paternal grandfather, John Brogdon, who informed them Holberg's biological father Jimmy Brogdon was a heroin addict who was in prison at that time, Jimmy had no contact with Holberg after she was age two, and he (John Brogdon) had no contact with Holberg whatsoever until she was an adult. 9/27 SHRR 206-08, 210; 10/27 SHRR 71, 74-75. Holberg's trial counsel reasonably chose not to call John Brogdon to testify because he admitted he had no contact with Holberg until she was an adult, and he informed the defense that Holberg appeared beaten when he saw her shortly before the Towery murder. *Id.* Holberg's defense team was aware she had corresponded with her biological father Jimmy Brogdon following her arrest for Towery's murder. Yet they reasonably chose not to pursue an interview with Jimmy Brogdon because there was no reason to believe that he could offer any helpful information given his lack of contact with Holberg during her formative years and his own criminal history and drug addiction. 3/27 SHRR 150; 6/27 SHRR 111-12; 8/27 SHRR 27-28; 9/27 SHRR 68. 113, 121, 206-08, 210; 10/27 SHRR 71. After consulting with Dr. Patel, the defense team reasonably concluded Holberg's mental health issues were cocaine-related and not genetic in origin. 8/27 SHRR 27-28. Furthermore, the defense team reasonably concluded any evidence showing Jimmy Brogdon, a long-time heroin abuser and then-Texas prison inmate, was delusional was double-edged in nature and could prove problematic for the defense at the punishment phase of trial. 9/27 SHRR 206-07. The defense team was initially informed that Holberg witnessed her parents' alcohol and drug abuse while she was a child. They subsequently heard from multiple witnesses that Holberg's own drug problems began after she was married and living in California, at which time she became

addicted to prescription pain medications. 6/27 SHRR 77-82, 93. Later, however, the defense learned Holberg's drug use began much earlier. *Id.* Holberg's defense team did not rely exclusively on the information furnished by Holberg and her parents in conducting their investigation for mitigating evidence.

The defense reasonably decided not to interview Holberg's former husband Ward or his parents. At the time, Ward and his family engaged in a custody dispute with Holberg over her daughter, the defense team learned during its investigation that Ward had furnished the prosecution with correspondence from Holberg, and the defense reasonably believed Ward would simply deny Holberg's allegations that Ward had been abusive during their marriage and would likely be hostile toward the defense. 3/27 SHRR 192, 194; 5/27 SHRR 33, 8/27 SHRR 116-17; 9/27 SHRR 67, 72, 202-04. Holberg has not furnished the Court with any fact-specific allegations, much less any evidence, showing Ward Holberg or his family were available at the time of Holberg's trial and willing to testify in a manner favorable to Holberg.

The defense team reasonably chose not to emphasize that Holberg was someone who had been (1) exposed to rampant drug and alcohol abuse as a child, (2) involved in a sexual relationship from age twelve to fifteen, (3) an abuser of drugs and alcohol while in her early teens, (4) a dancer at strip clubs in her teens, and (5) later a drug-addicted prostitute (all information Holberg's family and friends could have furnished the prosecution on cross-examination).[65] The defense reasonably

---

[65] Defense investigator Garrison and attorneys Dodson and Norris testified extensively regarding the potentially harmful testimony that Holberg's family and acquaintances could have furnished had they been called to testify at the punishment phase of trial. Among the potentially problematic aspects of Holberg's background were comments her defense team received from Holberg, her friends (especially Amber Terry and Holly Ruffin), and her family members suggesting that (1) Holberg's parents John and Pamela Schwartz abused alcohol to the point of being alcoholics, used drugs, including marijuana, crank, and prescription medications, openly in Holberg's presence during Holberg's early childhood and made both alcohol and drugs available to her when she was in her early teens, (2) both John and Pam "checked out emotionally in terms of acting as Holberg's parents after John's sister Karen was murdered, (3) thereafter Holberg became "boy crazy" to the point of engaging in a sexual relationship with an acquaintance of John Schwartz

beginning when she was 12 or 13 and continuing through age 15, (3) as a teenager Holberg danced in strip clubs, (4) Holberg learned at an early age how to play her parents off one another to manipulate them to get what she wanted, (5) at age sixteen, Holberg ran away to California with her boyfriend Ward Holberg, (6) when John Schwartz went to California and brought Holberg back to Texas, Holberg threatened to run away again unless she and Ward were allowed to marry immediately, (7) John and Pamela reluctantly agreed with Ward's parents to permit the teenage couple to marry conditioned upon the teenage couple agreeing that Ward would complete his high school education, (8) thereafter the couple resided with John and Pamela, (9) while Ward went through Army basic training in Alabama, Holberg resided with Ward's parents un Tulsa, Oklahoma until Holberg was attacked while jogging and returned to Amarillo, (10) after Ward completed basic training and was sent to California, Holberg went to live with him there, (11) in California, Holberg became pregnant and gave birth to a girl, (12) Holberg's marriage disintegrated and she and her daughter returned to Texas, (13) Holberg and her daughter initially resided with Delphine "Debbie" Schwartz, Holberg's maternal grandmother, (14) Debbie Schwartz informed Holberg's defense team that Holberg was addicted to prescription pain medications upon her return to Texas and Holberg and Tessa Cobb were soon scamming doctors and pharmacists for medication, (15) Holberg abandoned her daughter with Debbie Schwartz to move in with Pamela Schwartz, who by then had divorced John and was "partying" regularly, (16) Holberg went into a residential rehab program from which she was kicked out because Tessa Cobb smuggled drugs in to Holberg, (17) while in her teens, Holberg received money from Towery for an abortion, (18) shortly after she became addicted to cocaine, Holberg began turning tricks, (19) some of the girls with whom Holberg worked described her as crazy, (20) Holberg's mother was once a heroin addict, (21) Holberg's acquaintance Gary Don Warren described Holberg as a drug addict who wanted to smoke crack continuously, (22) Holberg's former ""sugar daddy"" Marty Vannaman informed the defense team that he had sex with Holberg, he had given her crack, while Holberg had a temper he had never been afraid of her, but when Holberg was on drugs she was out of her head, (23) Holberg threatened to destroy Vickie Kirkpatrick, which threat led to Kirkpatrick's transfer to the Potter County Jail, (24) Holberg became a heavy drinker at age twenty, (25) Holberg began using cocaine daily in August 1994, (26) Holberg perceived herself as alienated from her mother's side of the family because she had taken John's side during one of the divorce proceedings between John and Pamela, and (27) Holberg had absconded from a halfway house. 3/27 SHRR 171. 180; 4/27 SHRR 38-39, 46, 75, 144-45; 5/27 SHRR 24-32, 42; 6/27 SHRR 84-85, 88, 90-93, 125-26; 8/27 SHRR 53-59, 61, 75-76, 78-80, 83-93; 9/27 SHRR 69, 76-77, 87, 95-97; 10/27 SHRR 81-82, 85, 118, 132.

Thus, Holberg's trial counsel were confronted with a wealth of extremely problematic, highly double-edged evidence, which the prosecution could have presented on cross-examination had the new witnesses Holberg now identifies been called to testify at the punishment phase of trial. For example, Holberg furnishes the June 21, 2006 declaration of her teenage friend DeAndra Marie Smith a/k/a DeAndra McCarthy (found at 13/29 Supp.SHCR 3895-08), in which Smith (1) describes John and Pam Schwartz as a pair of mercurial alcoholics and Pam as a cocaine abuser, (2) describes Holberg's boyfriend Loren Knight as imposing and both physically and emotionally abusive toward Holberg, and (3) recounts Holberg's abuse of amphetamines, propensity to spend money she and Ward did not have, and arguments with Ward after the couple ran away to California as teenagers. Holberg's defense team was also aware that Holberg had stolen a credit card from DeAndra McCartthy, 9/27 SHRR 210, a fact which the prosecution could have brought out on cross-examination had the defense called her to testify at Holberg's trial. Likewise, the potential testimony of Amber Terry and Marty Vannaman, both as described by Holberg's defense team during their state habeas hearing testimony and as reflected in the defense team's notes of their interviews, appears especially problematic. The defense's interview notes record that Terry told the defense team Holberg behaved like an out-of-control teenager, danced in a strip club, and received money for an abortion from Towery. Vannaman informed the defense team he had paid Holberg for sex on multiple occasions, that Holberg had a temper, and he had observed her "out of her head" when high on crack. 11/29 Supp. SHCR 3177-79, 3181-82. It was objectively reasonable for Holberg's defense team to wish to keep as much of the foregoing testimony as possible from the jury at the punishment phase of trial.

The same is true for the declarations and affidavits created in the Fall of 2013 which Holberg's state habeas counsel presented to the state habeas court as Defendant's Exhibit nos. 121 through 136. While the state habeas court did not admit or consider these affidavits, the Court has done so as part of its *de novo* review of the entire record in this federal habeas corpus proceeding. Those affidavits appear in 19/27 SHRR and collectively describe (1) Holberg's biological mother as promiscuous, a heavy drug abuser, verbally abusive, hostile, and resentful toward Holberg, neglectful of

chose instead to present mitigating evidence showing Holberg was a person who once possessed tremendous potential, a bright, energetic, popular student, who had her potential taken away by the violent murder of her aunt Karen, which traumatized her and her parents. 4/27 SHRR 150-52, 160-64, 173-74; 7/27 SHRR 82-84, 96, 122-23, 172-75; 8/27 SHRR 53-54, 78-80; 10/27 SHRR 113-14. Holberg's defense team reasonably believed the jury wound not view in a favorable light the evidence showing Holberg suffered from brain damage caused by extended drug abuse. 4/27 SHRR 150-52, 161-63, 173-75; 8/27 SHRR 38, 172-73. The defense reasonably chose to present evidence at the punishment phase of trial that would (1) humanize Holberg, (2) allow the jury to relate to Holberg as a daughter, sister, or friend, not as someone who was rotten to the core, and (3) show Holberg had resolvable problems, i.e., that she possessed good qualities, and was not just a drug addict. *Id.* Toward this end, Holberg's defense team presented Holberg's friend Kristi

---

her parental duties, and encouraging Holberg to engage in hypersexual behavior from an early age, (2) Holberg's adoptive father as physically abusive toward Holberg, encouraging Holberg to engage in hypersexual behavior from an early age, and a heavy drug abuser, (3) both of Holberg's parents as exposing Holberg to rampant drug and alcohol abuse within their home and treating Holberg like an adult her whole life, (4) Holberg as having grown up in an environment dominated by drugs, chronic substance abuse, hypersexual behavior by her mother which Holberg modeled, and a wholesale lack of parental affection, discipline, and guidance, and (5) Holberg as having been repeatedly molested by one of her mother's live-in paramours during her early teen years. *See* Affidavits of Teresa Lynn Grant a/k/a Tessa Cobb (Defendant's Exhibit 121); Rebeccah McGilvary (Defendant's Exhibit 122); Pat Karnes (Defendant's Exhibit 123); Lisa Karnes (Defendant's Exhibit 124); Sandra Baker (Defendant's Exhibit 125); Peggy Eitzen (Defendant's Exhibit 126); Delphine "Debbie" Schwartz (Defendant's Exhibit 127); Kristi Samperi (Defendant's Exhibit 128); Corena Sue Norrell (Defendant's Exhibit 129); Loren Wade Knight (Defendant's Exhibit 131); Thomas Grimes (Defendant's Exhibit 134); Andrew Grimes (Defendant's Exhibit 135); Catherine Hodges (Defendant's Exhibit 136). The same collection of affidavits also described other potentially mitigating but clearly double-edged evidence. *See* Affidavits of Corena Sue Norrell (Defendant's Exhibit 129) (alleging Holberg had an affair with a female counselor at a drug rehab facility); Angela Johnson (Defendant's Exhibit 130) (alleging Holberg had an affair with a female counselor at a drug rehab facility); Loren Wade Knight (Defendant's Exhibit 131) (describing Holberg's injuries from a 1993 auto accident); Gary Warren (Defendant's Exhibit 132) (describing Holberg as addicted to crack and having binged on crack immediately prior to an auto accident the day of Towery's murder); Valerie DeWeese (Defendant's Exhibit 133) (describing rampant sexual abuse of children, including the childhood molestation of Holberg's biological mother, in the family of Holberg's mother). Despite the foregoing, Holberg describes these witnesses in sympathetic terms. *See* Affidavits of Pat Karnes (Defendant's Exhibit 123) (Holberg described as having no problems at school); Sandra Baker (Defendant's Exhibit 125) (Holberg described as lacking love at home so she sought it elsewhere); Catherine Hodges (Defendant's Exhibit 136) (Holberg described as never having had a chance growing up).

Samperi who testified at the punishment phase of trial regarding the difficult circumstances inside

the Schwartz household, especially after Karen's murder, and the difficulties Holberg suffered,

including physical, emotional, and sexual abuse, during her marriage to Ward Holberg.[66] 24/28

RR 95-129.

    The defense team focused on presenting evidence, through John Schwartz and Dr. Patel,

showing Holberg's violent actions toward Towery were an isolated incident in an otherwise non-

violent life in which others brutalized Holberg but, until her encounter with Towery, she had not

responded in kind. 24/28 RR 4-54; 24/28 RR 131-223; 5/27 SHRR 39; 7/27 SHRR 131, 165, 172-

75; 8/27 SHRR 38-39, 171-73; 10/27 SHRR 113-14. The defense also presented testimony from

---

[66] Samperi executed a declaration on August 7, 2006 in which she elaborated upon her trial testimony, specifically (1) furnishing additional details concerning the extent to which alcohol and marijuana dominated Holberg's home life growing up, (2) stating that Holberg participated in a sexual relationship with an adult male beginning when she was thirteen years old, and (3) explaining that Holberg's boyfriend Loren Knight pushed Holberg deeper into drugs. 2/18 SHCR 273-76.

Other affidavits and declarations Holberg furnished to the state habeas court furnished more of the information describing the abuse and neglect Holberg suffered as a child. John Schwartz, who like Samperi testified at the punishment phase of Holberg's capital murder trial, executed an affidavit August 6, 2007 in which he declared (1) both he and Holberg's biological mother were heroin abusers during Holberg's childhood, (2) by age 13 Holberg was allowed to drink alcohol and to party naked with her friends in the family's hot tub, and (3) his acquaintance A_ G_ had sex with Holberg from the time she was thirteen through age fifteen. 2/18 SHCR 278-84. Loren Knight executed an affidavit on June 22, 2006 in which he stated (1) Holberg's parents was "horrible," (2) he believed John Schwartz was attracted to Holberg sexually, and (3) as a teenager, Holberg was depressed, compulsive, hopeless, and overwhelmed. 2/18 SHCR 251-53.

Holberg's defense team testified extensively during the evidentiary hearing in her state habeas corpus proceeding that they were well aware of the difficult circumstances of Holberg's childhood and her history of abusive relationships as an adult (including the fact Holberg appeared to be a battered woman), but they believed testimony describing a teenage Holberg hot tubbing naked and smoking pot, describing Holberg as brain damaged, or describing Holberg primarily as a drug addict who supported her habit by engaging in prostitution would not endear Holberg to a Randall County jury in a capital murder case as violent and with as graphic crime scene photographs as were present in her case. 3/27 SHRR 149-50, 171, 178, 180, 192, 195; 4/27 SHRR 19, 38-39, 41, 46, 75, 79-80, 139, 144-45, 150-52, 161-63, 173-74; 5/27 SHRR 23-28, 31-33, 42, 44-45; 6/27 SHRR 30, 59, 84-85, 88, 90-93, 125-29; 7/27 SHRR 82-83, 122-23; 8/27 SHRR 19-25, 29, 38, 43-44, 49, 54-59, 79-99, 166, 171-73, 202-03; 9/27 SHRR 15, 17, 69, 150; 10/27 SHRR 45-46, 49, 53, 61-63, 65, 67, 78, 81-82, 113-14. Likewise, the defense team testified they believed evidence showing Holberg came from a protracted line of drug addicted, mentally damaged, individuals would not play well before a Randall County jury if the same jury had already convicted Holberg of a capital offense. 4/27 SHRR 150-52, 161-63, 173-74; 5/27 SHRR 39; 6/27 SHRR 59; 7/27 SHRR 122-23; 8/27 SHRR 19-22, 29, 38, 133-34, 171-73; 9/27 SHRR 95-97, 202-03; 10/27 SHRR 113-14.

Holberg's aunt Tessa Cobb, who detailed Holberg's redeeming characteristics, including Holberg's potential as a child, as well as Cobb's own struggles with drug addiction, which culminated with Cobb getting sober and working as a drug counselor. 24/28 RR 56-93. Through these efforts, Holberg's defense counsel attempted to present evidence showing Holberg was redeemable as a human being and not someone who, because of their dysfunctional background, was beyond the capacity of society to fix.[67]

The strategic decision by Holberg's trial counsel to focus their efforts on attempting to prevail on the future dangerousness special issue, on which the prosecution bore the burden of proof beyond a reasonable doubt, was objectively reasonable. Holberg's trial counsel also

---

[67] Holberg presented the state habeas court with publications describing the best or recommended practices for attorneys defending a capital murder case. These included the ABA's 1989 and 2003 Guidelines, a July 1994 publication by a St. Mary's School of Law Professor named Jeff Pokorak titled "Capital Sentencing Strategy: A Defense, Primmer," the Texas Resource Center's "Texas Criminal Appellate Manual 1996" and February 1989 manual "Defending Capital Cases in Texas," as well as law review articles and articles on defending capital cases appearing in *The Champion*. These materials appear in the record as appendices to the August 21, 2011 affidavit of attorney/mitigation investigator Danalynn Recer at 7/29 Supp.SHCR 1851-1907; 8/29 Supp.SHCR 1908-2299; 9/28 Supp.SHCR 2300-2612; 10/29 Supp.SHCR 2614-2865. Ironically, one of the articles Holberg furnished to the state habeas court is an undated piece that appeared in *The Champion* authored by Dennis Balske titled "The Penalty Phase Trial," in which he urges defense counsel to "give the jury a reason not to kill." 10/29 Supp.SHCR 2798-2801. The new mitigating evidence Holberg furnished the state habeas court and furnishes to the Court does just the opposite, however. Instead of giving the jury a reason to save Holberg's life, Holberg's state and federal habeas counsel seem intent on (1) vilifying Holberg as a promiscuous, moody, self-centered, manipulative drug addict; (2) portraying every member of her biological parents' families as mentally defective and a chronic substance abuser; and (3) describing every person with whom Holberg has ever been romantically involved as physically and emotionally abusive. For example, Holberg furnished the state habeas court with sworn declarations from her biological father Jimmy Brogdon and members of his family describing the entire Brogdon family as suffering from mental and emotional problems as well as chronic substance abuse. *See* Declarations of Jimmy Larry Brogdon (2/18 SHCR 172-84); Sharon Kay Arney (2/18 SHCR 165-68); Tony Buie (2/18 SHCR 185-92); Robyn Brogdon Thrash (2/18 SHCR 295-98). Holberg's state and federal counsel attempted to cast both Pamela and John Schwartz as well as Pamela's family in the same extremely bad light. *See* Declarations of Robert Carter (2/18 SHCR 196-203, 7/29 Supp.SHCR 1563-68) (describing Pamela's mother as depressed, Pamela's father as a depressed alcoholic, Pamela is unstable and emotionally labile from her mid-teens on, John Schwartz and Jimmy Brogdon as both abusive, and describing the environment in which Holberg was raised as "highly toxic"); Loren Knight (2/18 SHCR 251-53) (describing Pamela as a horrible parent, John as being attracted to Holberg sexually, and Holberg as depressed, compulsive, hopeless, and overwhelmed); Kristi Samperi (2/18 SHCR 273-76) (describing Holberg's sexual relationship with A_ G_ starting when Holberg was 13); John Schwartz (2/18 SHCR 278-84) (describing Holberg's sexual relationship with A_ G_ as beginning while Holberg was 12 or 13 and continuing through age 15, even after A_ G_ married someone else, and admitting that both he and Pam were heroin abusers during Holberg's childhood); Linda Moore Dudley (7/29 Supp.SHCR 1574-79) (describing John Schwartz as abusive and violent toward women).

287

presented evidence clearly intended to cast Holberg in a sympathetic light and to hopefully gain a jury verdict in Holberg's favor on the mitigation special issue. The strategic decision by Holberg's defense counsel to downplay Holberg's history of teenage misconduct, rampant drug abuse, and promiscuity in favor of evidence showing Holberg to be a redeemable, fixable, human being was objectively reasonable.

Holberg complains her trial counsel chose not to call Holberg's mother, Pamela Schwartz, to testify at the punishment phase of trial. That decision was objectively reasonable, however. Pamela Schwartz, a law enforcement officer, testified for the prosecution at the guilt-innocence phase of trial. The defense team interviewed Pamela Schwartz in a recorded interview that is now part of the record. 11/29 Supp.SHCR 2954-3015; 10/27 SHRR 42-43. Holberg's trial counsel later concluded Pamela was not an accurate historian of Holberg's childhood and found she became less cooperative with the defense over time. 6/27 SHRR 102, 105, 165. Pamela described Holberg as a child who needed attention, but Pamela admitted she was not sober or present enough to give Holberg the attention she needed. 6/27 SHRR 91-92. Pamela informed Holberg's defense counsel that she did not want to attend the punishment phase of trial. 6/27 SHRR 165. Holberg's defense team did not have confidence in Pamela's testimony. 8/27 SHRR 174; 10/27 SHRR 43-44. Ultimately, Holberg's defense team reasonably chose not to call Pamela Schwartz to testify at the punishment phase of trial because they felt Pamela had let Holberg down in the past (including when Holberg reported being molested at age five and later by furnishing Holberg with alcohol and drugs while Holberg was underage), unlike John Schwartz, Pamela appeared reluctant to discuss her own drug use, and Pamela appeared to be more concerned about her upcoming vacation

than in helping to save Holberg's life. 4/27 SHRR 36-38, 153-54; 6/27 SHRR 77-83, 165; 8/27 SHRR 175; 10/27 SHRR 42-44.

Holberg's defense team obtained a recorded interviewed from Holberg's adoptive father John Schwartz. 11/29 Supp.SHCR 3016-33. He informed Holberg's defense team that he believed Pamela would lie rather than risk her career by admitting to her extensive history of drug abuse and poor parenting years before. 4/27 SHRR 36-37, 153-54; 5/27 SHRR 32; 6/27 SHRR 77-83, 91-93.

The Court concludes Holberg's trial counsel had objectively reasonable reasons for selecting the trial witnesses they called to testify at the punishment phase of trial and for failing to call the additional witnesses Holberg now complains trial counsel should have called to testify at that time. For instance, Holberg's attorney Candace Norris testified after interviewing Delphine "Debbie" Schwartz, Peggy Eitzen, and Tammy McKinney Henbry, the defense team concluded those witnesses could not furnish any mitigating evidence different from that presented by the defense through its trial witnesses Teresa "Tessa" Cobb, Kristi Samperi, Pat Karnes, and Sandra Baker. 10/27 SHRR 90-112. Holberg's defense team reasonably chose not to present witnesses who would present cumulative testimony or who possessed personal knowledge of double-edged evidence and potentially could be subject to damaging cross-examination.

As far as Holberg complains her defense team acted unreasonably in terms of the scope of their investigation into Holberg's mental health, the Court's *de novo* review of the entire record now before the Court belies any such assertion. Holberg's school records indicated she had been a participant in her school's gifted and talented program. 4/27 SHRR 164. The defense team observed no indication of insanity or incompetence in Holberg, whom the defense believed to be

highly intelligent, but whom the defense wanted an expert to examine and decide if more testing on Holberg was necessary. 4/27 SHRR 160-64; 10/27 SHRR 20-22. Holberg's defense team obtained medical records showing, among other things, doctors diagnosed her with a normal MRI, logical thought processes, an intact memory. 7/27 SHRR 149, 159. Yet, the MRI also showed indications of cocaine abuse and traits of Antisocial Personality Disorder. Holberg's defense team reasonably believed evidence of brain damage or mental problems linked to Holberg's crack cocaine addiction would be unlikely to sway a Randall County jury that had found her guilty of capital murder in such horrific circumstances. 4/27 SHRR 150-52; 8/27 SHRR 38.

A defense attorney preparing for the sentencing hearing of a capital trial need not "scour the globe on the off chance something will turn up." *Rompilla*, 545 U.S. at 382-83. Rather, diligent counsel may draw the line when they have good reason to think that further investigation would be a waste. *Rompilla*, 545 U.S. at 383. Absent evidence showing reliance is objectively unreasonable, defense counsel may rely upon the views of their own mental health expert in determining whether to seek additional mental health evaluation of their client. *See Dowthitt v. Johnson*, 230 F.3d 733, 747-48 (5th Cir. 2000) (defense counsel reasonably chose not to seek a different mental health expert's testimony after the defense team's retained psychiatrist furnished a report containing statements detrimental to Dowthitt on future dangerousness and indicating an unwillingness to testify in Dowthitt's favor).

Holberg's trial counsel testified they supplied Dr. Patel with all available medical records on Holberg, including a large banker's box full of such records which attorney Norris personally delivered to Dr. Patel's office in Dallas. 6/27 SHRR 133, 143, 149, 177; 7/27 SHRR 188-89; 8/27 SHRR 33, 39; 9/27 SHRR 151-52, 154-55, 157, 159, 161-62, 170-72, 183-86, 199-200. Holberg's

290

trial counsel testified they relied on Dr. Patel's conclusions that further testing of Holberg for brain damage or mental illness was unnecessary. 10/27 SHRR 54-55. Dr. Patel never informed Holberg's defense team that Holberg suffered from any mental illness or brain damage. 8/27 SHRR 99. Dr. Patel did inform Holberg's defense counsel that he believed Holberg suffered from PTSD and Battered Women's Syndrome and the debilitating effects of cocaine abuse psychosis at the time of her capital offense. 10/27 SHRR 51-55. Dr. Patel testified at trial to precisely these findings. 24/28 RR 141-51. There was nothing objectively unreasonable with the decision by Holberg's trial counsel to rely on, and present at trial, the findings and conclusions of Dr. Patel.

The Court's independent, *de novo* review of Holberg's trial belie her complaints that Dr. Patel was inexperienced, unqualified, and unprepared to testify. Dr. Patel testified capably and resisted the efforts of the prosecutor on cross-examination to place diagnostic value on hearsay reports of Holberg's alleged acts of violence against her former husband and other jail inmates. 24/28 RR 178-79, 182, 184-89. Instead, Dr. Patel testified he placed little value on reports of simple verbal threats. *Id*. He also emphasized he needed hard information on who had instigated or been the aggressor in the incidents the prosecutor called to his attention, information the prosecution could not provide. *Id*. Dr. Patel admitted the evidence from Towery's autopsy and crime scene indicated a very violent offense, but he emphasized Holberg's ingestion of a large quantity of cocaine immediately before the confrontation explained the level of violence reflected therein, calling her drug use "the biggest factor" in explaining her behavior with Towery. 24/28 RR 184-89. Dr. Patel admitted long-term cocaine abuse can cause brain damage but insisted he had not seen any instances in which drug-induced brain damage made an individual more prone to violence. 24/28 RR 200-02. He also insisted on cross-examination that drug addiction like

alcoholism, is a disease. 24/28 RR 222. In sum, Dr. Patel's trial testimony, particularly his performance on cross-examination, was the antithesis of that of an inexperienced, unqualified, unprepared mental health expert.

Likewise, Holberg's conclusory attacks on the experience and qualifications of her trial counsel are legally and factually frivolous. Attorney Catherine Dodson had been a criminal defense practitioner for more than twenty-years before Holberg's trial. 6/27 SHRR 22-24. Dodson tried her first capital murder case more than ten-years before Holberg's trial. *Id*. Attorney Candace Norris practiced law for a decade before Holberg's trial, served as counsel for the State Counsel for Offenders — defending prison inmates against criminal charges across the entire State — and defended a separate capital murder case before she tried Holberg's. 9/27 SHRR 190-93.

Holberg complains her trial counsel failed to adequately investigate allegations that Holberg's adopted father, John Schwartz, who testified as a defense witness at the punishment phase of her capital murder trial but was dead by the time of the evidentiary hearing in Holberg's state habeas corpus proceeding, had molested Holberg when she was a child. The record establishes why the strategic decisions of Holberg's trial counsel regarding these allegations were reasonable to an objective observer. Holberg informed the defense team that a baby-sitter or family friend named Pete molested her in Oklahoma when she was five years old. 3/27 SHRR 108-09; 6/27 SHRR 127; 8/27 SHRR 53, 76-77; 9/27 SHRR 217-18; 10/27 SHRR 78. Yet, Holberg's mother, did not take Holberg's report seriously. 3/27 SHRR 108-09; 6/27 SHRR 127; 8/27 SHRR 53, 76-77; 9/27 SHRR 217-18; 10/27 SHRR 78. Holberg's inability to provide a consistent account of the molestation hampered the defense team's efforts to investigate it. In the end, Holberg's inconsistent account made it unclear whether anyone molested her. 9/27 SHRR 217-18.

Likewise, Holberg told other people different versions of the molestation incident. The defense team first became aware of the allegation that John Schwartz molested Holberg on the eve of the punishment phase of trial when Corena Sue Norrell informed defense investigator Garrison that Holberg had informed Norrell that Holberg's "dad" molested her. 3/27 SHRR 92-94, 107-13; 4/27 SHRR 79-80; 5/27 SHRR 76, 105; 7/27 SHRR 101; 8/27 SHRR 108, 112; 9/27 SHRR 138-39, 163, 168-69, 213-14. Holly Ruffin told the defense team's investigators that Holberg informed Ruffin that (1) someone in Holberg's family molested her as a child, but Holberg did not identify that individual to Ruffin and (2) Holberg believed John Schwartz was interested in a sexual relationship with her. 3/27 SHRR 207; 4/27 SHRR 79; 5/27 SHRR 44-45, 60; 8/27 SHRR 113-14; 9/27 SHRR 216-17. Thus, the only information Ruffin and Norrell had about the childhood molestation incident came to them from Holberg. They possessed no personal knowledge of Holberg's childhood molestation incident. The defense team did not view the accusations against John Schwartz made by Norrell and Ruffin to be credible. 8/27 SHRR 112-14. More importantly, Holberg never told anyone in her defense team that John Schwartz molested her. 4/27 SHRR 155; 7/27 SHRR 110-11; 8/27 SHRR 105, 108, 124; 9/27 SHRR 217-18. Attorney Norris testified both she and investigator Garrison interviewed Holberg after the defense became aware of the molestation allegations against John Schwartz and Holberg informed them that while John Schwartz had not molested Holberg as a child, she believed Schwartz was making overt overtures to her suggesting he now wanted to engage in a sexual relationship with her. 9/27 SHRR 141-43. The defense interviewed other witnesses who were close to Holberg, including Peggy Eitzen, Pamela Schwartz, and Delphine Schwartz, who all failed to report that John Schwartz had ever molested Holberg. 4/27 SHRR 145; 8/27 SHRR 106-07; 9/27 SHRR 219-21. John Schwartz

informed the defense team that he was not aware of Holberg's claim that he molested her at age five until years after Holberg informed her mother of the incident in question. 7/27 SHRR 82-84. John Schwartz testified to those facts at the punishment phase of trial as part of the defense's presentation of mitigating evidence, in part to corroborate Holberg's own testimony at the guilt-innocence phase of trial. 24/28 RR 40; 6/27 SHRR 129. Attorney Norris testified Holberg's medical records conveyed Jimmy Brogdon — her biological father—molested her. 9/27 SHRR 163. Finally, attorney Norris testified after Dr. Patel interviewed Holberg, he informed the defense team there had been no sexual abuse of Holberg by John Schwartz or any other family member. 9/27/SHRR 224. It was objectively reasonable for Holberg's trial counsel not to question John Schwartz at trial regarding the allegation that he molested Holberg at age five and not to pursue further last-minute investigation into the allegation after Holberg denied the incident had occurred to both her attorneys and Dr. Patel.

Consistent with the Court's independent, *de novo* review of the record, Judge Dambold concluded Holberg's trial counsel reasonably chose to present evidence at the punishment phase of trial which humanized Holberg and portrayed Holberg as "basically and intrinsically good," rather than "someone with incurable problems." Supp/FFCL 36, 58; 6/6 Supp.SHRR 1230, 1252. Judge Dambold found Holberg's defense team reasonably chose not to call Pamela Schwartz to testify at the punishment phase of trial because they believed Pamela Schwartz was paranoid about testimony concerning her drug abuse, was hostile toward Holberg, and could give harmful testimony. Supp.FFCL 28, 67; 6/6 Supp.SHRR 1222, 1261. Judge Dambold found Holberg never testified or furnished an affidavit alleging that John Schwartz sexually abused her as a child. Supp.FFCL 47; 6/6 Supp.SHRR 1241. Judge Dambold found it was reasonable for Holberg's

defense team not to interview Holberg's biological father Jimmy Brogdon because he had been out of her life for years and Dr. Patel did not diagnose Holberg as suffering from any genetic mental health condition. Supp.FFCL 50; 6/6 Supp.SHRR 1244. Judge Dambold found the evidence before Holberg's defense team, which included a clean MRI, showed her drug addiction was the overwhelming factor contributing to Towery's murder. *Id.* Judge Dambold found Dr. Patel received copies of all Holberg's medical records in attorney Dodson's file as of the date of the evidentiary hearing in Holberg's state habeas corpus proceeding. Supp.FFCL 52; 6/6 Supp.SHRR 1246. Judge Dambold found both attorney Dodson and attorney Norris possessed sufficient criminal defense experience at the time of Holberg's trial. Supp.FFCL 40-41, 54; 6/6 Supp.SHRR 1234-35, 1248. Judge Dambold found Holberg's defense team reasonably chose not to interview Ward Holberg after learning that he had furnished documents to the prosecution and participated in a custody battle with Holberg and her relatives over Holberg's daughter. Supp.FFCL 74-76; 6/6 Supp.SHRR 1268-70. Judge Dambold found Holberg's defense team reasonably chose not to contact Holberg's maternal grandparents or Holberg's former boyfriend Loren Knight. Supp.FFCL 76-77; 6/6 Supp.SHRR 1270-71. Judge Dambold found Holberg's defense team interviewed — but reasonably chose not to call — Holberg's paternal grandmother, Debbie Schwartz, to testify at the punishment phase of trial because her testimony was materially similar to that of other witnesses and Holberg had stolen credit cards and checks from her. Supp.FFCL 77; 6/6 Supp.SHRR 1271. Judge Dambold found Holberg's trial counsel reasonably chose not to call Marty Vannaman or Peggy Eitzen to testify at the punishment phase of trial because Vannaman could have offered testimony conflicting with Holberg's trial testimony and Eitzen's testimony would have been materially similar to that of other witnesses. Supp.FFCL 78; 6/6 Supp.SHRR

1272. Judge Dambold found Holberg's defense team reasonably chose not to call Susan Lawrence to testify at the punishment phase of trial because of inaccuracies in the information she gave to the defense team. Supp.FFCL 79-80; 6/6 Supp.SHRR 1273-74. Judge Dambold found Holberg's defense team reasonably chose not to call Gary Warren, Vickie Kirkpatrick, Ike Hughes, Amber Terry, and Holberg to testify at the punishment phase of trial because of inconsistencies in the information they had furnished to the defense team and their possession of information that would have been harmful to the defense. Supp.FFCL 82-83; 6/6 Supp.SHRR 1276-77. Holberg did not present the state habeas court with any clear and convincing evidence showing the foregoing findings were erroneous or objectively unreasonable.

Given the information reasonably available to Holberg's defense team at the time of Holberg's March 1998 capital murder trial, including the information conveyed to the defense team by defense mental health expert Dr. Patel, the relevant questions are whether her trial counsel conducted an objectively reasonable investigation into Holberg's background and presented an objectively reasonable range of the available mitigating evidence. *See Sears v. Upton*, 561 U. S. 945, 953-54 (2010) (the proper focus of an evaluation of trial counsel's performance at the punishment phase of a capital murder trial is on whether counsel fulfilled their obligation to conduct a thorough investigation of the defendant's background; the objective reasonableness of trial counsel's tactical decisions must be viewed in the context of the objective reasonableness of counsel's investigation into the defendant's background). In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him suggesting additional mitigating evidence -- such as mental illness or a history of childhood abuse -- may be available. *See Porter*, 558 U.S.

296

at 39-40 (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's competency evaluation suggesting possible mitigating evidence -- including evidence of mental illness -- could be gleaned from investigation into the defendant's family background and military service); *Rompilla*, 545 U.S. at 381-90 (counsel failed to investigate available prosecution records from the defendant's prior conviction for a similar offense that the prosecution had made known it would use in aggravation at the sentencing phase of trial); *Wiggins*, 539, U.S. at 524-26 (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams*, 529 U. S. at 395-96 (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison). Unlike the situations in *Porter*, *Wiggins*, *Rompilla*, and *Williams*, the Court concludes, as did the state habeas court, that Holberg's trial counsel conducted an objectively reasonable search for available mitigating evidence and made objectively reasonable decisions regarding the mitigating evidence they chose to present at the punishment phase of Holberg's capital murder trial.

Counsel in a death penalty case have a duty to make reasonable investigations or to make a reasonable decision — making investigations unnecessary. *Andrus v. Texas*, ___ S. Ct. ___, 2020 WL 3146872, *4 (June 15, 2020) (quoting *Wiggins*, 539 U.S. at 521); *Strickland*, 488 U.S. at 691.

297

That is precisely what Holberg's trial counsel did. Despite lengthy and extensive examination during the evidentiary hearing held in Holberg's state habeas corpus proceeding, Holberg's state habeas counsel were unable to identify any potentially mitigating aspects of Holberg's background with which Holberg's defense team were unfamiliar.[68] There was nothing objectively unreasonable about the scope or depth of Holberg's defense team's investigation for potentially mitigating evidence.

### b.   No Prejudice

In connection with Holberg's 28th ground for state habeas relief, the state habeas trial court made extensive factual findings and legal conclusions concerning the deficient performance prong of *Strickland* but did not specifically address the prejudice prong. Supp.FFCL 87-89; 6/6 Supp.SHRR 1281-83. Accordingly, the Court's analysis of the prejudice prong of this aspect of Holberg's ineffective assistance claim will be *de novo*. *See Rompilla*, 545 U. S. at 390 (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice).

In making the prejudice determination, a federal habeas court must consider the totality of the available mitigation evidence, both adduced at trial and in the habeas proceeding, and reweigh

---

[68] Holberg's state habeas counsel spent their time interrogating Holberg's investigators Kathy Garrison and Jim Patterson, as well as Holberg's trial counsel Catherine Dodson and Candace Norris, on the information the defense team gleaned from its efforts to interview Holberg's friends and family, obtain relevant medical records and other documents, and locate witnesses identified by Holberg or found in the prosecution's comprehensive list of potential witnesses. 3/27 SHRR 135-44, 171, 178-79, 191-92, 197, 199, 204, 207; 4/27 SHRR 7, 21, 30, 36-40, 46, 50, 75, 77, 80-81, 97, 118-19, 124, 130-33, 144-45, 164, 166; 5/27 SHRR 7-11, 23-33, 37, 42, 44-45, 54, 60-63, 76, 105, 161, 217; 6/27 SHRR 77-165; 7/27 SHRR 75-118, 149-88; 8/27 SHRR 24-32, 41-44, 53-117; 9/27 SHRR 19-97, 113, 123-63, 199-218; 10/27 SHRR 9-11, 24-28, 38-44, 65-110, 115-18, 125-32. Significantly, Holberg's defense team testified they were aware of all the potentially mitigating evidence in question, as well as potentially harmful evidence the same witnesses could have furnished on cross-examination. *Id.* More importantly, despite the scope of interrogation during the evidentiary hearing held in Holberg's state habeas corpus proceeding, Holberg's state habeas counsel identified no evidence about Holberg's background of which the defense team was unaware. *Id.*

it against the evidence in aggravation. *Andrus*, ___ S. Ct. at ___, 2020 WL 3146872, *8. Holberg submitted a host of new affidavits to the state habeas court which Judge Dambold refused to consider. Supp.FFCL 83-87; 6/6 Supp.SHRR 1277-81; 19/27 SHRR & 20/27 SHRR. The Court has undertaken *de novo* review of all this new and additional mitigating evidence. Having reviewed the entire record from Holberg's trial, direct appeal, and state habeas corpus proceedings, the Court concludes after *de novo* review no reasonable probability exists that, but for the failure of Holberg's trial counsel to present any of this new or additional evidence, the outcome of the punishment phase of Holberg's trial would have been different. For the most part, this new or additional evidence reinforces the view of Holberg as the product of a very dysfunctional family, who began engaging in promiscuous, self-destructive behavior far earlier than indicated by Holberg's trial witnesses, who was willfully self-centered, and who showed a propensity for violence long before her fatal encounter with Towery in November 1996.[69] In short, Holberg's

---

[69] *See* notes 59-65 *supra*.

The other affidavits furnished by Holberg to the state habeas court are equally problematic. For example, the affidavits of attorneys Philip Wischkaemper (Defendant's Exhibit 119) and Walter Long (Defendant's Exhibit 120) report little more than hearsay statements attributed to Holberg's trial counsel Candace Norris. As such they are not based on the personal knowledge of the purported affiants and do not qualify as competent evidence of anything probative in this proceeding.

The affidavits of various expert witnesses Holberg furnished to the state habeas court and which she furnishes to the Court likewise contain considerable double-edged evidence. These affidavits are in 19/27 SHRR and 20/27 SHRR. For example, the affidavit of neuropsychiatrist Dr. George Woods dated October 16, 2013 (Defendant's Exhibit 137) diagnosed Holberg with (1) PTSD, (2) characteristics consistent with bipolar disorder (including sleep disorder, hypersexuality, depression, and chemical dependency), (3) Fetal Alcohol Spectrum Disorders, (4) mild traumatic brain injury, and (5) major cognitive disorder. Yet Dr. Woods apparently never personally evaluated Holberg, which could render his diagnoses subject to the same evidentiary challenge found persuasive by the TCCA when raised against Dr. Coons in *Coble*. Moreover, Dr. Woods expressly relied upon (1) affidavits furnished by Holberg's family and friends years after her conviction became final, a time when the motivation for exaggeration and outright deception must be considered, and (2) reports generated by other mental health experts years after Holberg's conviction became final, none of which were available at the time of Holberg's 1998 capital murder trial.

The October 15, 2013 affidavit of neuropsychologist Dr. Paul J. Moberg (Defendant's Exhibit 138) diagnosed Holberg with a history of multiple head injuries, significant dysfunction in the right hemisphere frontal and temporal regions of the brain, and risk factors for prenatal exposure to alcohol and drugs. Dr. Moberg's clinical evaluation of Holberg took place on October 13, 2013, years after her conviction became final, i.e., at time when Holberg had little motivation

to report information accurately.

The October 13, 2013 affidavit of clinical psychologist Dr. Julie A. Kriegler (Defendant's Exhibit 139) supplements her psychological assessment of Holberg dated August 1, 2006 which appears at both 2/18 SHCR 206-50 and 6/18 SHCR 764-828 and relies on clinical interviews of Holberg in 2006 and 2013. In her 2006 assessment, Dr, Kriegler reported Holberg suffers from PTSD, anorexia, dissociative phenomena, childhood and adult trauma, and chronic substance dependence. In her 2013 affidavit, Dr. Kriegler reported Holberg (1) was beaten as a child by John Schwartz, (2) molested as a child by a family friend named "Pete," (3) exposed to her mother's hypersexuality from an early age, (4) verbally and emotionally abused by her mother, (5) behaved precociously sexually as a child, and (6) was exposed to rampant drug abuse within her family, including that of her late aunt Karen, who cooked methamphetamine in bathtubs.

The October 15, 2013 affidavit of neuropsychologist Dr. Erin David Bigler (Defendant Exhibit 140) relies, in part, on a September 28, 2013 clinical interview and reported Holberg has a history of head injuries and sexual abuse and shows indications of mild traumatic brain injury.

The October 11, 2013 affidavit of neuropsychologist Dr. Ruben C. Gur (Defendant's Exhibit 141) relies, in part, on a June 10, 2013 clinical interview and reports generated by Dr. Myla Young in 2006 and Dr. Watson in 2012. Dr. Gur reported Holberg shows indications of probable brain damage (specifically moderately impaired working memory and verbal memory) and performed in the mildly impaired range in the domains of language and spatial ability. Curiously, Dr. Gur's report makes no mention of Holberg's history of crack cocaine abuse.

The undated and unsigned affidavit of Statistics Professor Dr. Fred L. Bookstein (Defendant's Exhibit 142) reports Holberg has risk factors for Fetal Alcohol Spectrum Disorder.

The October 15, 2013 affidavit of clinical and forensic psychologist Dr. Thomas J. Reidy (Defendant's Exhibit 143) supplements his August 1, 2006 affidavit found at 13/29 Supp.SHCR 3757-3805. Dr. Reidy argues the trial testimony of prosecution witnesses Royce Smithee and Dr. Coons was invalid because there is no scientific support for the intuitive risk factors thought to be predictive of future violence in prison attacks. He also argues Dr. Patel failed to cite to specific scientific authority to support his opinion that Holberg represented a low probability of future violence. The problematic aspects of Dr. Reidy's opinions are (1) they are based in part on his erroneous assumption in his 2006 report that Holberg would be eligible to receive a sentence of life without parole ("A low probability of future violent behavior is anticipated if Ms. Holberg is sentenced to life-without-parole." 13/29 Supp.SHCR 3804), (2) his reliance on Holberg's TDCJ disciplinary reports covering the years after Holberg's capital murder conviction, i.e., 1999-2011 (cited at 13/29 Supp.SHCR 3804), (3) his reliance in his 2013 affidavit on studies of other TDCJ inmates and their disciplinary infractions in the years after Holberg's conviction, and hence (4) the questionable availability of most of the data relied upon by Dr. Reidy at the time of Holberg's 1998 capital murder trial. Holberg committed her capital offense in November 1996 and, therefore, was not eligible to receive a term of life without parole.

The July 31, 2006 declaration of Dr. Myla Young appears at 2/18 SHCR 206-50. Dr. Young conducted a clinical interview of Holberg and concluded, growing up, Holberg experienced genetic and environmental risk factors and neuropsychiatric insults beginning in utero and continuing thereafter. Dr. Young diagnosed Holberg with (1) neurocognitive deficits, (2) chronic and severe mood disorders, (3) PTSD, (4) dissociative phenomena, (5) chronic substance dependence, and (6) a recurrent eating disorder. 2/18 SHCR 248-49.

Holberg also presented the state habeas court with an affidavit executed July 9, 2011 by clinical psychologist Dr. Diana S. Goldstein, found at 2/29 Supp.SHCR 249-58, in which she questions the efficacy of the clinical interviews performed on Holberg by Dr. Kriegler and Dr. Young due to the fact they conducted their clinical interviews in the presence of third parties. The attachments to Dr. Goldstein's affidavit appear at 2/29 Supp.SHCR 458-702.

Holberg's defense team reasonably believed a Randall County jury sitting in 1998 would be unlikely to view favorably evidence showing that Holberg suffered from drug-induced brain damage (because it would make her appear broken

new and additional mitigating evidence strengthens the prosecution's case for future dangerousness while doing little, when compared to its own downside, to offer a compelling justification for her jury to answer the mitigation special issue affirmatively.

Holberg's trial counsel made a reasonable decision in March 1998 to attempt to portray Holberg as someone who was basically good but had succumbed to the ravages of drug addiction, not as a person who, as the product of a completely dysfunctional environment, was rotten to the core. The new or additional evidence Holberg now presents to the Court was highly double-edged in nature in that it tends to reinforce the prosecution's case on the issue of future dangerousness. *See Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012) (explaining mitigating evidence is "double-edged" when it might permit an inference the defendant is not as morally culpable for his behavior but also might suggest, as the product of his environment, the defendant is likely to continue to be dangerous in the future); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002) ("Although the evidence of Ladd's inadequate supervision as a child might permit an inference he is not as morally culpable for his behavior, it also might suggest Ladd, as a product of his environment, is likely to continue to be dangerous in the future.").

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong*, 558 U.S. at 20; *Wiggins*, 539 U.S. at 534. The new and additional mitigating evidence Holberg presents to

---

and unfixable) or was the product of a completely dysfunctional family situation (for the same reason). 4/27 SHRR 150-52, 161-63, 173-75; 5/27 SHRR 39; 6/27 SHRR 59; 7/27 SHRR 122, 129; 8/27 SHRR 19, 26, 38, 49, 171-73; 9/27 SHRR 206-07, 218; 10/27 SHRR 110-14. Holberg's defense team also reasonably believed (1) shifting their approach at the punishment phase of trial to emphasize the dysfunctional aspects of Holberg's background could alienate the jury by making it appear the defense had attempted to hoodwink or deceive the jury during the guilt-innocence phase of trial and (2) it was essential for the defense to maintain credibility with the jury throughout the entire trial. 10/27 SHRR 49, 164.

the Court does little to ameliorate the prosecution's evidence at trial, or the new aggravating evidence now before the Court, showing Holberg (1) stabbed Towery more than fifty times, including multiple times in the face *after* Towery informed her he was badly injured, (2) shoved a lamp down Towery's throat far enough to damage his carotid artery and then stabbed Towery in the abdomen and left the knife there in an apparent post-mortem act, (3) then showered, dressed in Towery's clothing, and fled both the crime scene and later the jurisdiction, offering a couple two hundred dollars for a ride to a crack house, (4) admitted to her trial counsel she threatened to destroy Vickie Kirkpatrick, (5) was described by her acquaintance Gary Warren as someone who wanted to smoke crack continuously, (6) was described by her family and acquaintances as someone who was mean, crazy, having a temper, and, when high on drugs, "out of her head," (7) informed her own investigator she had an affair with a female counselor at a drug rehab facility but refused to furnish the name of the counselor, (8) was kicked out of a drug rehab facility for receiving drugs smuggled into the facility by a relative, (9) told two different acquaintances she had struck E.R. Williams on the head with a cane and feared she might have killed him, (10) told her probation officer she had broken her former husband's nose and once cut someone with a knife, (11) told her own mother she had been living with Towery prior to his death, (12) had a normal MRI in January 1994 but was also found to display traits of Antisocial Personality Disorder, (13) threatened, after being brought back to Texas, to run away with Ward Holberg a second time unless she were allowed to marry him at age sixteen, (14) while a teenager, accepted money from Towery for an abortion, (15) never reported any alleged sexual abuse by any member of her family to either Dr. Patel or her defense team, (16) admitted to her defense team she had engaged in a sexual relationship from age twelve to fifteen, (17) had participated in the gifted and talented program at

her school and was described by her defense team as intelligent and engaging, (18) abandoned her daughter with her paternal grandmother to go live with her mother who was then partying extensively, (19) admitted to her defense team, as a teenager, she had smoked pot and spent time naked in a hot tub with female friends but insisted there had been no males present at the time, (20) described herself as alienated from her mother's side of their family, and (21) absconded from a halfway house.

The new expert opinions Holberg proffers in support of this ineffective assistance complaint offer little of substance that is genuinely new, other than possibly speculation that Holberg might suffer from Fetal Alcohol Spectrum Disorder or brain damage. Yet, the Court views this evidence considering the trial testimony of Dr. Patel admitting that long term crack cocaine abuse can cause brain damage. Holberg's trial counsel believed testimony showing Holberg suffered from brain damage related to drug abuse would prove highly problematic in front of a Randall County jury.

Unlike the situations in *Porter*, *Rompilla, Wiggins*, and *Williams*, the Court concludes after *de novo* review that Holberg's defense team undertook a thorough investigation into both Holberg's offense and background and presented a thorough and objectively reasonable case in mitigation. Holberg's trial counsel were fully aware of the double-edged evidence Holberg presented to the state habeas court and now presents to the Court. 6/27 SHRR 84-165; 7/27 SHRR 75-118, 149-88; 8/27 SHRR 24-32, 41-44, 53-117; 9/27 SHRR 19-97, 113, 123-63, 199-218; 10/27 SHRR 9-11, 24-28, 38-44, 65-110, 115-18, 125-32. No reasonable probability exists that, but for the failure of Holberg's trial counsel to present any or all Holberg's new or additional, highly

303

double-edged, mitigating evidence the jury's answers to the Texas capital sentencing special issues would have been different.

### 4. Conclusions

The TCCA's rejection on the merits of this aspect of Holberg's 28th ground for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. The Court concludes after *de novo* review that Holberg's complaints about her trial counsels' alleged failure to adequately investigate Holberg's background and present available mitigating evidence fail to satisfy both prongs of *Strickland*. The Court denies Holberg's Claim 4D in all respects.

### F. Vowing to "Throw" the Trial (Claim 4E)

#### 1. The Claim

Holberg complains her trial counsel rendered ineffective assistance because, three days into her trial, her defense counsel revealed to John Schwartz (the same deceased man Holberg now alleges molested her as a child) that they had decided to "throw the trial." Am. Pet. 132-33.

#### 2. State Court Disposition

Holberg included a similar allegation as part of her 28th ground for state habeas corpus relief. Both of Holberg's trial counsel submitted affidavits to the state habeas court denying this assertion. After Judge Estevez recommended denial of this claim, the TCCA remanded for an evidentiary hearing. After hearing testimony from both of Holberg's trial counsel denying in clear and convincing terms that they ever made such an admission, the state habeas court found credible the testimony of both of Holberg's trial counsel that they never made such a statement, Judge

Dambold found the testimony of defense counsel credible and recommended denial of this ineffective assistance complaint. Supp.FFCL 53, 82; 6/6 Supp.SHCR 1247, 1276. The state habeas court also found Holberg's trial counsel did not, in fact, attempt to throw the trial. Supp.FFCL 53; 6/6 Supp.SHCR 1247.

### 3. AEDPA/De novo Review

Holberg submitted an affidavit from John Schwartz to the state habeas court alleging that Holberg's trial counsel informed him they intended to "throw the trial." 8/27 SHRR 5-6; 9/27 SHRR 165. The testimony of Holberg's trial counsel during the evidentiary hearing in her state habeas corpus proceeding the record from both phases of Holberg's capital murder trial support the state habeas court's express credibility finding in favor of Holberg's trial counsel.

In addition to the affidavit of John Schwartz which the state habeas court did consider in denying this complaint, the state habeas court also reviewed affidavits from Holberg's friends and family complaining about the alleged failure of Holberg's trial counsel to reassure them that Holberg would obtain a favorable jury verdict. The state habeas court did not consider these affidavits. Supp.FFCL 84-85; 6/6 Supp.SHRR 1278-79. The Court will do so. More specifically, Holberg's friends and family complained Holberg's trial counsel expressed pessimism regarding Holberg's chances of success at trial and even suggested Holberg stood a better chance of prevailing on appeal than at trial.[70]

---

[70] *See* Affidavits of Teresa Lynn Grant (Defendant's Exhibit 121); Rebeccah McGilvary (Defendant's Exhibit 122); Pat Karnes (Defendant's Exhibit 123); Sandra Baker (Defendant's Exhibit 125); Delphine Schwartz (Defendant's Exhibit 127); Kristi Samperi (Defendant's Exhibit 128). These affidavits at appear at 19/27 SHRR.

At the risk of stating the obvious, Holberg's trial counsel owed a duty of loyalty to their client, not to her friends or family. They likewise owed no duty to serve as cheerleaders for Holberg's family and friends, or to make light of a cause any rational attorney would have deemed daunting at best.

Having reviewed the affidavits of Holberg's family and friends, the testimony of Holberg's trial counsel during Holberg's state habeas corpus proceeding, and the record from Holberg's trial, the Court concludes after *de novo* review that the pretrial pessimism expressed by her trial counsel was far from objectively unreasonable. Her trial counsel reasonably concluded early on that the evidence of Holberg's guilt was overwhelming. 7/27 SHRR 122; 8/27 SHRR 173. The defense team's review of Towery's medical records disclosed to them that he was old and frail. 6/27 SHRR 54; 8/27 SHRR 41. The crime scene photographs, which defense counsel knew they would not be able to exclude at trial, revealed a horrific crime scene. 7/27 SHRR 122; 8/27 SHRR 173. It was undisputed Towery suffered more than fifty stab wounds. 8/27 SHRR 43-44. There was undisputed evidence showing Holberg struck Towery multiple times with multiple objects, including a claw hammer, an iron skillet, and an iron. Holberg shoved a lamp so far down Towery's throat as to damage his carotid artery. Further, a post-mortem stabbing took place with the paring knife remaining in his abdomen. Yet Holberg, a healthy young adult who suffered very few injuries, almost all of which were superficial in nature, claimed she fought Towery for 45 minutes before she ultimately prevailed. Holberg's account of her confrontation with Towery was inconsistent with the information furnished to defense counsel by the defense's independent forensic, blood stain, and blood spatter experts. 8/27 SHRR 169-70; 9/27 SHRR 198; 10/27 SHRR 38-41.

Most of the potential witnesses Holberg identified for her defense team shared Holberg's history of prostitution, drug addiction, and criminal misconduct; all possessed information the defense team deemed potentially harmful. 6/27 SHRR 169; 7/27 SHRR 37, 117-18, 122-23; 8/27 SHRR 23-25 These potential witnesses Holberg identified she knew only by street names. 6/27

SHRR 147.Holberg's friends and acquaintances kept changing their stories. 7/27 SHRR 67, 75-78.

Even after the defense team explained to Holberg that the physical evidence did not support a claim of self-defense, she insisted on testifying at the guilt-innocence phase of trial and asserting self-defense. 6/27 SHRR 53-55; 8/27 SHRR 23-24. Holberg's decision to testify at the guilt-innocence phase of trial and to assert a claim of self-defense hamstrung her defense counsel's approach to the prosecution's witnesses who shared Holberg's record as a prostitute, drug addict, and convicted felon. 7/27 SHRR 117. Holberg's decision to testify at the guilt-innocence phase of trial (against the advice of her trial counsel) also meant that her criminal record would be before the jury when it decided her guilt. 8/27 SHRR 23, 131.

Finally, Holberg's decision to testify at the guilt-innocence phase of trial made her credibility a key aspect of the trial. Her defense team knew the prosecution could attack Holberg's credibility reasons beyond her lengthy criminal record, which included fraudulent misconduct like obtaining prescription medications using fake scripts. 8/27 SHRR 115; 10/27 SHRR 24. Holberg lied to the police in Tennessee after her arrest when she denied knowing Towery prior to the date of his murder. Holberg lied to her own mother shortly thereafter when she claimed in a telephone call that she had been living with Towery prior to his murder. More significantly, Holberg fled the state after Towery's murder, a move her trial counsel reasonably believed the jury would construe as evidence of her guilt. 8/27 SHRR 22, 44. Equally concerning to her defense counsel was the fact Holberg's recollection of events changed over time. 7/27 SHRR 132. Holberg sometimes could not remember what she had previously told her defense counsel. *Id.*

More importantly, any pessimistic comments Holberg's defense team made to Holberg's friends and family did not prevent Holberg's defense counsel from mounting a defense for Holberg at both phases of her capital murder trial. Having reviewed the entirety of the record now before the Court *de novo*, the Court concludes Holberg's complaints regarding her trial counsels' allegedly pessimistic comments about the likelihood of Holberg achieving success at trial satisfy neither prong of *Strickland*. Holberg's decision to testify at the guilt-innocence phase of trial effectively tied her trial counsels' hands. As explained above, Holberg's defense counsel presented an extensive case in mitigation at the punishment phase of trial. The jury had an opportunity to view Holberg's demeanor firsthand and to make its own credibility finding regarding her assertion of self-defense. No credible evidence before the Court shows Holberg's defense counsel attempted to "throw" her trial or that such actions prejudiced Holberg.

### 4.   *Conclusions*

The TCCA's rejection on the merits of this aspect of Holberg's 28th ground for state habeas corpus relief was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts considering the evidence presented in Holberg's trial and state habeas corpus proceedings. The Court concludes after *de novo* review that Holberg's complaints about her trial counsels' alleged vow to "throw" her trial fail to satisfy both prongs of *Strickland*. The Court denies Holberg's Claim 4E in all respects.

### G.  Failure to Object to Prosecutorial Jury Arguments (Claim 4F)

#### 1.  The Claim

Holberg complains her trial counsel rendered ineffective assistance by failing to object at the punishment phase of trial to eleven specific instances of allegedly improper prosecutorial closing jury argument. Am. Pet 134-37.

#### 2.  State Court Disposition

In her 40th point of error on direct appeal, Holberg complained her trial counsel rendered ineffective assistance by failing to object to 28 specific instances of improper jury argument by the prosecution at the punishment phase of her trial. Brief of Appellant 220-27. The TCCA rejected each of these complaints on the merits, finding all the prosecutor's comments in question fell within one or more of the four areas of proper prosecutorial jury argument recognized under Texas law. *Holberg*, No. 73,127, at 31-45. Holberg re-urged the same ineffective assistance complaints in her 19th ground for state habeas corpus relief. The state habeas court concluded once again there was nothing inappropriate or prejudicial with any of the prosecutorial jury arguments identified by Holberg and denied relief on the merits. FFCL 30-32; 28/29 Supp.SHCR 8609-11.

#### 3.  AEDPA Review

The TCCA's conclusions on both direct appeal and during Holberg's state habeas corpus proceeding that the prosecutorial arguments about which Holberg complains were not subject to legitimate objection under state law binds this federal habeas court. *Bradshaw*, 546 U.S. at 76. The failure of Holberg's trial counsel to make meritless objections to the prosecution's closing punishment phase jury argument satisfies neither prong of *Strickland*. *Paredes*, 574 F.3d at 291.

The TCCA reasonably construed the prosecution's closing punishment phase jury arguments as urging the jury to make reasonable factual inferences from the evidence and to honor

its oath apply the law as contained in the court's jury instructions and not reject naked appeals to emotion. In Texas proper prosecutorial jury argument consists of either (1) a summation of the evidence, (2) a reasonable deduction from the evidence, (3) a response to an opponent's argument, or (4) a plea for law enforcement. *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008); *Ward v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005). Improper jury argument is a basis for federal habeas relief only if it is so prejudicial as to render the trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 182-83 (1986); *Hughes*, 530 F.3d at 347 (quoting *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002)). Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or the evidence was so insubstantial that in probability but for the remarks no conviction would have resulted. *Geiger v. Cain*, 540 F.3d 303. 308 (5th Cir. 2008); *Hughes*, 530 F.3d at 347 (quoting *Harris*, 313 F.3d at 245).

Having independently reviewed the entire record from Holberg's trial, the Court concludes the state appellate court and state habeas court both reasonably construed all the prosecutorial arguments identified by Holberg as either proper inferences drawn from the evidence or as proper and appropriate pleas for law enforcement, i.e., pleas for the jury to fulfil its obligation under the oath the jurors took at the start of trial and to render a punishment phase verdict based only upon the evidence before the jury and the trial court's jury instructions. As to those prosecutorial jury arguments the state appellate court and state habeas court concluded were problematic, the TCCA reasonably concluded those arguments had not prejudiced Holberg within the meaning of *Strickland*. In fact, the Court independently concludes the constructions Holberg imposes on the prosecutorial arguments in question are, when viewed in the context of the entire jury argument,

wholly implausible.[71] The Court concludes none of the prosecution's closing punishment phase jury arguments identified by Holberg, whether viewed individually or collectively, rendered the punishment phase of her trial fundamentally unfair. In the same manner, the Court independently concludes no reasonable probability exists that the outcome of the punishment phase of Holberg's trial would have been different but for the failure of Holberg's trial counsel to object to any or all the prosecutorial jury arguments identified in this claim, the outcome of the punishment phase of Holberg's trial would have been different. Because there was nothing objectionable or prejudicial about any of the prosecution's closing punishment phase jury arguments, Holberg's complaints about her trial counsels' failure to object to those arguments satisfies neither prong of *Strickland*. *Paredes*, 574 F.3d at 291.

### 4. *Conclusions*

The TCCA's rejections on the merits of Holberg's complaints about her trial counsels' failure to object to the prosecution's closing punishment phase jury arguments during both

---

[71] For example, Holberg argues the prosecution urged the jury to answer the punishment phase special issues based upon a "higher duty" (citing 25/28 RR 176-78). Viewed in proper context, however, the prosecutor's argument was simply that the jury should perform its duty as set forth in its oath and answer the capital sentencing special issues based upon the evidence and the law as instructed by the trial court. The same can be said for the prosecution's arguments urging the jury not to permit naked emotional appeals for mercy to prevent the jury from answering the special issues based upon the evidence and the trial court's instructions. Anti-sympathy arguments are a proper plea for law enforcement under Texas law. *Holberg*, No. 73, 127, at 35-36 (citing *Tong v. State*, 25 S.W.3d 707, 710-11 (Tex. Crim. App. 2000)). As far as the prosecution argued the proper answers to the special issues were "yes" on future dangerousness and "no" to the mitigation special issue, that argument was little more than an inference reasonably drawn from the evidence, as viewed from the perspective of the prosecution. This is the essence of proper jury argument. As far as Holberg complains the prosecution argued the horrific facts and circumstances of her capital offense as detailed in the guilt-innocence phase evidence effectively trumped or dwarfed the mitigating evidence Holberg presented during the punishment phase of trial, this was likewise a reasonable inference drawn from the evidence and could not reasonably have been construed by the jury as a suggestion that the jury abandon its duty to render a verdict based on the evidence. The prosecution's suggestion that the evidence showed Holberg had attempted to recruit a fellow inmate to "shut up" prosecution witness Vickie Kirkpatrick was likewise a reasonable inference drawn from the evidence. Moreover, the court instructed the jury properly at the punishment phase of trial to consider all the evidence in answering the capital sentencing special issues. The Court presumes the jury followed the instructions. *Zafiro*, 506 U.S. at 540-41.

Holberg's direct appeal and state habeas corpus proceedings (i.e., rejections on the merits of Holberg's 40th point of error on direct appeal and 19th ground for state habeas relief) were neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in Holberg's trial, direct appeal, and state habeas corpus proceedings. The Court denies Holberg's Claim 4F in all respects.

### H. Cumulative Error (Federal Claim 18)

#### 1. The Claim

Holberg argues in her "federal claim 18," that she is entitled to federal habeas relief because of the cumulative effect of all the alleged errors identified in her first 17 claims. Am. Pet. 147.

#### 2. No State Court Disposition

Holberg did not fairly present this cumulative error claim in either her direct appeal or her state habeas corpus proceeding.

#### 3. De novo Review

Because Holberg failed to present this claim on direct appeal or in her state habeas corpus application, the Court's review will be *de novo*. *Berghuis*, 560 U.S. at 390. For the same reasons explained above in § VII.L, and because the Court concludes there is no arguable merit to any of Holberg's substantive claims and all her ineffective assistance claims fail to satisfy both prongs of *Strickland*, there is nothing available for the Court to cumulate. *Hughes*, 412 F.3d at 597 (quoting *Westley*, 83 F.3d at 726). "Twenty times zero [still] equals zero." *Derden*, 978 F.2d at 1458 (quoting *Mullen*, 808 F.2d at 1147).

### 4. *Conclusion*

Holberg's "federal claim 18," does not warrant federal habeas corpus relief, and the Court

denies it.

## IX. FINAL MISCELLANEOUS POINTS

### A. Fundamental Miscarriage of Justice (Federal Claim 19)

#### 1. *The Claim*

Holberg argues in her "federal claim 19," that she is entitled to federal habeas corpus relief

because she is actually innocent of the crimes of burglary and robbery. Am. Pet. 147-48.

#### 2. *No State Court Disposition*

Holberg did not fairly present this claim in either her direct appeal or her state habeas

corpus proceeding.

#### 3. *De novo Review*

Because Holberg failed to present this claim on direct appeal or in her state habeas corpus

application, the Court's review will be *de novo*. *Berghuis*, 560 U.S. at 390. For the reasons

explained at length above in § V.A., it was unnecessary for the prosecution to prove that Holberg

committed either the offense of burglary or the offense of robbery to secure her conviction for

capital murder. As the TCCA explained in its opinion rejecting Holberg's motion for post-

conviction DNA testing, under Texas law, a showing Holberg committed an intentional murder

while *attempting* to commit either of those two offenses was sufficient to support her capital

murder conviction. Also as explained above in § V.A., when viewed in the light most favorable to

the jury's verdict, there was ample evidence showing Holberg intentionally murdered Towery

while attempting robbery and burglary.

Moreover, Holberg's "actual innocence" claim is legally frivolous. The Fifth Circuit does not recognize federal habeas claims based on freestanding assertions of actual innocence. *See Floyd v. Vannoy*, 894 F.3d 143, 155 (5th Cir. 2018); *Coleman v. Thaler*, 716 F.3d 895, 908 (5th Cir. 2013) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." (quoting *Dowthitt*, 230 F.3d at 741)); *Reed v. Stephens*, 739 F.3d 753, 766 (5th Cir. 2014) ("actual innocence is not an independently cognizable federal habeas claim" (quoting *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006))).

### 4.  Conclusions

Holberg's "federal claim 19" does not warrant federal habeas relief and is denied.

## B.  Request for a Federal Evidentiary Hearing

Holberg requests an evidentiary hearing. Am. Pet 150. Yet, under AEDPA, the proper place for development of the facts supporting a federal habeas claim is the state court. *See Harrington v. Richter*, 562 U. S. at 103 ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court). As a result, the Court will not conduct a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of her claims. Where a state court rejects petitioner's claims on the merits, the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170, 181-82 (2011) effectively precludes a federal hearing:

314

> We now hold that review under Section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, Holberg is not entitled to a federal evidentiary hearing on any of her claims which state courts rejected on the merits, either on direct appeal or during her state habeas corpus proceeding. *See Halprin v. Davis*, 911 F.3d 247, 255 (5th Cir. 2018) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of Section 2254(d)(1) on the record that was before that state court." (quoting *Cullen*, 563 U.S. at 185)), *cert. denied*, 140 S. Ct. 167 (2019).

Regarding the new factual allegations, new evidence, and new legal arguments Holberg failed to present to the state courts in her unexhausted claims for relief, and for which the Court has undertaken *de novo* review, she is likewise not entitled to an evidentiary hearing. While conducting *de novo* review of her claims that the TCAA did not resolve on the merits, the Court has assumed the factual accuracy of (1) all the specific facts alleged by Holberg in support of her claims for relief and (2) the documents Holberg has presented in support of her claims that were unadjudicated on the merits in the state court. Even when the Court assumes the truth of all Holberg's new factual allegations supporting her unadjudicated claims, those claims do not warrant federal habeas relief. *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the

applicant to federal habeas relief."). Thus, Holberg is not entitled to an evidentiary hearing regarding any of her claims which the TCCA has not yet rejected on the merits.

### C.  Certificate of Appealability

Under AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a Certificate of Appealability ("CoA"). *Miller-El v. Johnson*, 537 U.S. 322, 335-36 (2003); 28 U.S.C. § 2253(c) (2). Likewise, under AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002) (holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted. *Crutcher*, 301 F.3d at 658 n.10; 28 U.S.C. § 2253(c) (3).

A CoA will not be granted unless a petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983). To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. The Court must issue or deny a CoA when it enters a final Order adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the way the District Court has disposed of a claim. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy Section 2253(c) is straightforward: The petitioner must demonstrate reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El*, 537 U.S. at 338 (quoting *Slack*, 529 U.S. at 484). In a case in which the petitioner wishes to challenge on appeal the Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether the Court was correct in its procedural ruling. *See Slack*, 529 U.S. at 484 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct). The Court did not dispose of any of Holberg's federal habeas corpus claims on procedural grounds. The Court addressed the merits of all Holberg's claims.

In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Thompson v. Davis*, 916 F.3d 444, 453 (5th Cir. 2019); *Halprin*, 911 F.3d at 255. Nonetheless, a CoA is not granted automatically in every death penalty habeas case. *See Miller-El*, 537 U.S. at 337 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."). The deferential standard of review applied to claims of ineffective assistance adjudicated on the merits in the state courts has bite in evaluating the appealability of ineffective assistance claims—the Supreme Court requires federal courts "use a 'doubly deferential' standard

317

of review that gives both the state court and the defense attorney the benefit of the doubt." *Burt,* 571 U.S. at 15.

Reasonable minds could not disagree with the Court's conclusions that (1) all Holberg's ineffective assistance claims fail to satisfy both prongs of *Strickland*, (2) the TCCA reasonably found as a matter of fact that the evidence underlying Holberg's complaints of withheld evidence (Holberg's *Brady* claims) and an alleged conspiracy by the prosecution to elicit perjured testimony (Holberg's *Giglio/Napue* claims) was incredible, (3) all Holberg's federal claims challenging the constitutionality of the Texas capital sentencing scheme are without arguable legal merit, (4) there was legally sufficient evidence to support Holberg's capital murder conviction, (5) Holberg's cumulative error and actual innocence claims are legally frivolous, (6) Holberg's ineffective assistance claim premised upon the allegation her trial counsel attempted to "throw" her trial is legally and factually frivolous, and (7) Holberg is not entitled to an evidentiary hearing in the Court.

## X.   CONCLUSION

Accordingly, it is hereby **ORDERED**: all relief requested in Holberg's first amended petition and reply brief (ECF nos. 65 & 86) is **DENIED**. Holberg's request for an evidentiary hearing is **DENIED**. Holberg is **DENIED** a Certificate of Appealability on all her claims. All other pending motions are **DISMISSED AS MOOT**.

**SO ORDERED**.

August 13, 2021.

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

**APPENDIX**

Holberg finds no remedy under federal habeas corpus law. However, the statutes and Constitution of the State of Texas may provide a measure of relief.

The Governor may grant "reprieves and commutations of punishment," or executive clemency, upon the recommendation of a majority of the State's Board of Pardons and Paroles ("Board"). TEX. CONST., Art. IV, § 11; TEX. CODE. CRIM. PRO. ANN., Art 48.01 (Vernon 2017). The Defendant, her representatives, or the Governor, himself, may request the Board consider making such a recommendation. In capital murder cases, the Board can consider requests for (1) a full pardon, (2) a commutation of a death sentence to "life imprisonment or the appropriate maximum penalty, or (3) a temporary reprieve of execution. *See* TEX. ADMIN. CODE TIT. 37, § 143 *et seq*. The Governor may, independent of a recommendation from the Board, grant a single reprieve of execution not exceeding 30 days. *Id.* § 143.41(a).

Title 37, Section 143.57 of the Texas Administrative Code contains the specific procedures for commutations of a death sentence to a lesser penalty. The Board will consider applications for commutation of a death sentence upon receipt of the following materials: "(1) a request from the majority of the trial officials of the court of conviction; or (2) a written request of the offender or representative setting forth all grounds upon which the application is based, stating the full name of the offender, the county of conviction, the execution date, and contain the information outlined in §143.42(1) - (6) of this chapter." *Id.* § 143.57(a)(1 – 2). The Board "shall consider and decide" such an application and "may: (1) recommend to the Governor the commutation of the death sentence to a lesser penalty; (2) not recommend commutation of the death sentence to a lesser

319

penalty; or (3) set the matter for a hearing pursuant to Section 143.43 of this chapter." *Id.* § 143.57(g).

Having reviewed the law and procedure for the commutation of a death sentence, the Court ascertains the Board has complete discretion to recommend or not recommend such a reprieve. Considering the facts and circumstances of Brittany Marlowe Holberg's childhood and adolescence, the Court ascertains that this case may warrant at least further *review* by the Board.

Specifically, Holberg's actions the evening of November 13,1996, are an example of the alarming symptoms of what John Paul II termed a widespread and growing "Culture of Death."[72] Almost every man in Holberg's life prior to her arrest treated her as a sexual object.[73] When she was four years old, a family friend or a babysitter sexually assaulted her. When Holberg did what a toddler is supposed to do and reported the incident, her mother chose to ignore her daughter's outcry and did nothing. Another man assaulted Holberg in the alley outside of a grocery store when she was 13 years old — again with no consequences. During a sojourn in Oklahoma as a young adult, another man raped Holberg while she was jogging.

---

72 JOHN PAUL II, EVANGELIUM VITAE, 2006. ("This reality is characterized by the emergence of a culture which denies solidarity and in many cases takes the form of a veritable "culture of death" …. Looking at the situation from this point of view, it is possible to speak in a certain sense of a war of the powerful against the weak: a life which would require greater acceptance, love and care is considered useless, or held to be an intolerable burden, and is therefore rejected in one way or another. A person who, because of illness, handicap or, more simply, just by existing, compromises the well-being or life-style of those who are more favored tends to be looked upon as an enemy to be resisted or eliminated.")

73 Andrea Dworkin, *Against the Male Flood: Censorship, Pornography, and Equality*, *in* OXFORD READINGS IN FEMINISM: FEMINISM AND PORNOGRAPHY 30-31 (Drucilla Cornell et al. eds., 2000) ("Objectification occurs when a human being, through social means, is made less than human, turned into a thing or commodity, bought and sold. When objectification occurs, a person is depersonalized, so that no individuality or integrity is available socially or in what is an extremely circumscribed privacy. Objectification is an injury right at the heart of discrimination: those who can be used as if they are not fully human are no longer fully human in social terms; their humanity is hurt by being diminished.").

320

As a result of this repeated sexual victimization, family friends and acquaintances reported Holberg became overtly flirtatious, even sexual in her conduct beginning in her early teen years. By age fourteen, Holberg hosted nude hot tub parties for her classmates and, by age fifteen, she danced in local strip clubs.[74] When she returned to Texas following her failed marriage, Holberg became a stripper and prostitute, who charged male clients two-hundred dollars to perform sexual services.

In addition to repeated sexual victimization, Holberg's family exposed her to rampant abuse of prescription medication and illicit drugs — enabling Holberg to become an addict. Holberg's aunt synthesized methamphetamine in her own bathtub. Her mother and stepfather gave Holberg and her friends marijuana and prescription narcotics for their high school parties. Unsurprisingly, this casual indifference to Holberg's dignity predictably accelerated Holberg's spiral into addiction. When she returned to Texas in her early adulthood, Holberg and her paternal aunt engaged in a scheme to obtain prescription pain medications fraudulently from pharmacies and dentists. Later, a male acquaintance introduced Holberg to crack cocaine. Holberg's resulting addiction to crack induced her to dance at strip clubs and prostitute herself to fund her habit.

The confluence of Holberg's sexual victimization and addiction resulted in deadly consequences. On the night she murdered A.B. Towery, Holberg was binging on crack cocaine and searching for one of her regular prostitution customers. The circumstances of Towery's assault

---

74 The Court grieves — but is not surprised — that powerful decisionmakers who occupy and control the Commanding Heights continue to celebrate the overt sexualization of young girls. *See, e.g.*, Madeline Kearns, *The Problem with Cuties*, NATIONAL REVIEW ONLINE (Sept. 13, 2020, 6:30 AM) https://www.nationalreview.com/2020/09/the-problem-with-cuties/ ("In critiquing the sexualization of children, the filmmakers sexualized children."); *see also* Nicholas Kristoff, *The Children of Pornhub*, NY TIMES ONLINE (Dec. 4, 2020), https://www.nytimes.com/2020/12/04/opinion/sunday/pornhub-rape-trafficking.html (describing the scourge of child rape and human trafficking depicted on the popular online pornography repository, Pornhub.com). Holberg's case is a sober reminder that the Culture of Death often culminates in . . . death.

and murder are stark evidence that Holberg's family and her community allowed her to "slip through the cracks."

Brittany Marlowe Holberg, *alone*, bears responsibility for the violent murder of A.B. Towery. For reasons the Court outlined in depth in this Order, neither the Constitution nor federal statutes entitle her to federal habeas corpus relief. While the Court may only apply the law as Congress authored it, the political branches of the State of Texas — namely the Board of Pardons and Paroles and Governor Greg Abbott — have the authority to consider how the Culture of Death failed Holberg. For these reasons, the Court encourages the appropriate Texas authorities to review Holberg's case and afford her the grace and dignity that have been absent from her life to date.