# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### AMARILLO DIVISION

| | | |
|---|---|---|
| BRITTANY MARLOWE HOLBERG, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CASE NO. 2:15-cv-285-Z |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

## PETITIONER'S MOTION TO ALTER JUDGMENT AND MOTION FOR ISSUANCE OF CERTIFICATE OF APPEALABILITY

Petitioner Brittany Marlowe Holberg ("Holberg") moves the Court to alter its

Memorandum Opinion, Order, and Judgment of August 13, 2021, under Rule 59(e) of the Federal

Rules of Civil Procedure, and to issue a Certificate of Appealability, under 28 U.S.C. § 2253.

Date: September 10, 2021

Respectfully submitted,

/s/ Alan J. Lazarus

Alan J. Lazarus
(admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
Four Embarcadero Center, 27th Floor
San Francisco, California 94111
Tel.: (415) 591-7551
Fax: (415) 591-7510
alan.lazarus@faegredrinker.com

Paul E. Mansur
Attorney at Law
114 S. Main Street
Seminole, Texas 79360
Tel.: (432) 847-4649
Fax: (806) 592-9136
paul@paulmansurlaw.com

**ATTORNEYS IN CHARGE FOR PETITIONER
BRITTANY MARLOWE HOLBERG**

1

## <u>TABLE OF CONTENTS</u>

**Page**

I.   NATURE AND STAGE OF THE PROCEEDINGS ...........................................................7

II.   STANDARD OF REVIEW ................................................................................................8

III.   ARGUMENT .....................................................................................................................9

      A.   The Court Should Reconsider Its Application of AEDPA Deference, or, at
           Minimum, Issue a COA ......................................................................................9

      B.   The Court Should Grant Relief, or at Least a COA, on the Claim of
           Prosecutorial Misconduct Related to the Coercion of False Testimony
           From Vicki Kirkpatrick......................................................................................14

      C.   The Court Should Grant Relief, or at Least a COA, on Holberg's Claim
           That the State Violated Due Process by Withholding Impeachment
           Evidence Related to Kirkpatrick.......................................................................24

IV.   CONCLUSION AND PRAYER .......................................................................................31

CERTIFICATE OF SERVICE ......................................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Banister v. Davis,*
    140 S. Ct. 1698 (2020)..................................................................................8

*Banks v. Dretke,*
    540 U.S. 668 (2004)...........................................................................28, 29

*Blue v. Thaler,*
    665 F.3d 647 (5th Cir. 2011) ....................................................................12

*Boone v. Poderick,*
    541 F.2d 447 (4th Cir. 1976) ....................................................................26

*Brady v. Maryland,*
    373 U.S. 83 (1963).............................................................................. *passim*

*Commonwealth v. Davis,*
    751 N.E.2d 420 (Mass. App. Ct. 2001) ...................................................26

*Davis v. Alaska,*
    415 U.S. 308 (1974)..................................................................................25

*Douglas v. Workman,*
    560 F.3d 1156 (10th Cir. 2009) ...............................................................27

*Edward H. Bohlin Co. v. Banning Co.,*
    6 F.3d 350 (5th Cir. 1993) ..........................................................................8

*Ford v. Wainwright,*
    477 U.S. 399 (1986)..................................................................................10

*Gentry v. Morgan,*
    2008 WL 4162998 (W.D. Wash. Sept. 4, 2008)................................27, 29

*Giglio v. United States,*
    405 U.S. 150 (1972)......................................................................22, 26, 27

*Green v. Addison,*
    500 F. App'x 712 (10th Cir. Oct. 9, 2012) ..............................................16

*Harshman v. Superintendent,*
    368 F.Supp.3d 776 (M.D. Pa. 2019) ........................................................27

*Hernandez v. Johnson,*
    213 F.3d 243 (5th Cir. 2000) .......................................................................9

*Kremer v. Chemical Construction Corp.,*
    456 U.S. 461 (1982).................................................................................11

*Kyles v. Whitley,*
    514 U.S. 419 (1995).................................................................................30

*Landers v. Warden,*
    776 F.3d 1288 (11th Cir. 2015) ..............................................................12

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803)..................................................................11

*Matthews v. Eldridge,*
    424 U.S. 319 (1976)............................................................................11, 12

*Miller-El v. Cockrell,*
    537 U.S. 322 (2003)...................................................................................8

*Napue v. Illinois,*
    360 U.S. 264 (1959)............................................................................25, 29

*On Lee v. United States,*
    343 U.S. 747 (1952).................................................................................28

*Panetti v. Quarterman,*
    551 U.S. 930 (2007)............................................................................10, 11

*Perillo v. Johnson,*
    79 F.3d 441 (5th Cir. 1996) ....................................................................15

*Register v. Thaler,*
    681 F.3d 623 (5th Cir. 2012) ............................................................13, 14

*Reutter v. Solem,*
    888 F.2d 578 (8th Cir. 1989) ..................................................................27

*Rice v. Collins,*
    546 U.S. 333 (2006).................................................................................13

*Rockwell v. Davis,*
    853 F.3d 758 (5th Cir. 2017) ..................................................................10

*Schiller v. Physicians Res. Grp. Inc.,*
    342 F.3d 563 (5th Cir. 2003) ....................................................................8

4

*Simon v. Epps*,
    463 F. App'x 339 (5th Cir. 2012) ............................................................10, 11, 12

*Slack v. McDaniel*,
    529 U.S. 473 (2000)............................................................................................8

*Smith v. Dretke*,
    422 F.3d 269 (5th Cir. 2005) ............................................................................9

*Taylor v. Maddox*,
    366 F.3d 992 (9th Cir. 2004) ..........................................................................12

*Tercero v. Stephens*,
    738 F.3d 141 (5th Cir, 2013) ..........................................................................10

*Thomas v. Lumpkin*,
    995 F.3d 432 (5th Cir. 2021) ............................................................................8

*United States v. Bagley*,
    473 U.S. 667 (1985)...........................................................................26, 27, 29

*United States v. Cervantes-Pacheco*,
    826 F.2d 310 (5th Cir. 1987) ..........................................................................28

*United States v. Garcia Abrego*,
    141 F.3d 142 (5th Cir. 1998) ..........................................................................28

*United States v. Meinster*,
    619 F.2d 1041 (4th Cir. 1980) ........................................................................30

*United States v. Narviz-Guerra*,
    148 F.3d 530 (5th Cir. 1998) ..........................................................................28

*United States v. Ramirez*,
    608 F.2d 1261 (9th Cir. 1979) ........................................................................26

*United States v. Shaffer*,
    789 F.2d 682 (9th Cir. 1986) ..........................................................................29

*Valdez v. Cockrell*,
    274 F.3d 941 (5th Cir. 2001) ...............................................................10, 12, 13

*Wisehart v. Davis*,
    408 F.3d 321 (7th Cir. 2005) ..........................................................................27

## STATUTES, RULES & REGULATIONS

28 U.S.C. § 2253 ......................................................................................................8

28 U.S.C. § 2254(d) ...................................................................................................12, 13

28 U.S.C. § 2254(d)(1) ......................................................................................................12

28 U.S.C. § 2254(d)(2) ............................................................................................8, 12, 13

28 U.S.C. § 2254(e)(1) .......................................................................................................13

28 U.S.C. § 2254(f) .............................................................................................................13

28 U.S.C. § 2854(d) ............................................................................................................31

28 U.S.C. § 2854(e) ............................................................................................................31

Fed. R. Civ. P. 59 .................................................................................................................8

Fed. R. Civ. P. 59(e) ............................................................................................................8

**OTHER AUTHORITIES**

*Federal Jury Practice and Instructions, Criminal* § 15.02 (5th ed. 2000) ...................................29

Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47
    Hastings L.J. 1381, 1385 (1996)......................................................................................29

U. S. Constitution, 5th Amendment...................................................................................12

U. S. Constitution, 8th Amendment..............................................................................10, 11

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| BRITTANY MARLOWE HOLBERG, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CASE NO. 2:15-cv-285-Z |
| | § | |
| LORIE DAVIS, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

**BRIEF IN SUPPORT OF PETITIONER'S MOTION TO ALTER JUDGMENT AND
MOTION FOR ISSUANCE OF CERTIFICATE OF APPEALABILITY**

Petitioner Brittany Marlowe Holberg ("Holberg" or "Petitioner") submits this Brief in support of her Motion to Alter Judgment and Motion for Issuance of Certificate of Appealability.

**I.      NATURE AND STAGE OF THE PROCEEDINGS**

This matter is before the Court on a petition for habeas corpus relief.  ECF No. 65.  Holberg is a Texas inmate in Respondent's custody improperly sentenced to death for capital murder. Holberg was convicted by a jury in March 1998 and the state courts have upheld the conviction and sentence of death.

In her Amended Petition, Holberg pleads, *inter alia*, constitutional claims for prosecutorial misconduct; ineffective assistance of trial counsel; insufficient evidence; improper jury argument; voir dire error; improper exclusion of evidence; jury charge error; cumulative error; and challenges to the Texas death penalty statute.

On August 13, 2021, following extensive briefing by the parties, the Court denied Holberg's Petition and issued Judgment. ECF Nos. 334 and 335.  The Court further declined, *sua*

*sponte*, to issue a Certificate of Appealability to Holberg.  *Id.*  For the reasons stated below, Holberg now moves the Court to alter its August 13 Judgment and to issue a Certificate of Appealability, under Rule 59 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2253.

## II.    STANDARD OF REVIEW

Rule 59(e) motions "enable[] a district court to reverse a mistaken judgment," clarify its reasoning, and address the misunderstood arguments of the parties. *Banister v. Davis*, 140 S. Ct. 1698, 1708 (2020).   The parties aid the court by pointing out the manifest errors of law or fact in the judgment, presenting newly discovered evidence, and re-urging any arguments overlooked by the court. *See id.; Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003).

The court has "considerable discretion" in deciding whether to reopen a case under Rule 59(e). *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 355 (5th Cir. 1993). The parties may generally refine their earlier arguments to persuade the court to exercise that discretion. *See Banister*, 140 S. Ct. at 1708 ("[Rule 59(e) motions] give habeas courts the chance to clarify their reasoning or address arguments . . . passed over or misunderstood before"); *Thomas v. Lumpkin*, 995 F.3d 432, 440 (5th Cir. 2021) (overruling precedent that a Rule 59(e) motion urging new grounds for habeas relief constituted a successive habeas corpus petition).

For a Certificate of Appealability ("COA") to issue, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2254(d)(2), *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  In making a COA determination, the court conducts a "threshold inquiry," asking if "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The court's task is not to address the ultimate merits, but to decide whether the petitioner has demonstrated that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further." *Smith v. Dretke*, 422 F.3d 269, 273 (5th Cir. 2005).  When

the habeas petitioner has been sentenced to death, "any doubts as to whether a certificate of

appealability should [be] issued must be resolved in [the petitioner's] favor." *Hernandez v.*

*Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

## III.    ARGUMENT

### A.    The Court Should Reconsider Its Application of AEDPA Deference, or, at Minimum, Issue a COA

Holberg's Petition raises substantial concerns over the limitations the state courts

imposed on her ability to develop her constitutional claims, particularly the *Brady*/prosecutorial

misconduct claims and the ineffective assistance claims related to the mitigation investigation.

In particular, even though Judge Estevez did not preside over the trial, she rejected the sworn

testimony of all of Holberg's witnesses on every issue and favored the affidavits of every State

witness – all of the prosecutors charged with misconduct and the defense attorneys charged with

ineffectiveness – based solely on her familiarity with and general respect for the latter acquired

in separate proceedings.  Further, she denied Holberg the opportunity to test the evidence against

her by conducting discovery, and denied Holberg an evidentiary hearing on every issue.  When

the TCCA reversed her and remanded for an evidentiary hearing on the ineffective assistance –

mitigation issue (and after Judge Estevez recused herself with a motion to recuse her pending),

Judge Dambold placed strict limits on the scope of the hearing and then proceeded to make

State-drafted findings on issues he had declined to hear and evidence he had declined to consider

during the hearing.

The issue Holberg asks the Court to reconsider is what impact these limitations have on

the application of deference under the AEDPA.

In its opinion, the Court concludes that even if such procedural limitations were imposed, they are no obstacle to deference under the AEDPA – that procedural deficiencies in the proceedings in the state courts are irrelevant based on *Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001).

Respectfully, the Court overstates *Valdez* and misapplies AEDPA deference.

At the outset, the Court misinterprets Holberg's argument, framing it as the contention that the absence of a "full and fair hearing" precludes AEDPA deference. This focuses too rigidly on the term "full and fair hearing" and ignores the broader language and standard Holberg actually invoked. Holberg argued in the Petition that deference was not applicable because, in the words of the Supreme Court in *Panetti*, "the factfinding procedures upon which the [state] court relied were not adequate for reaching reasonably correct results or … appeared to be seriously inadequate for the ascertainment of the truth." Amended Pet. at 21 (quoting *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)). "*And* the state court proceedings must satisfy Due Process. *Id.* at 953." *Ibid.* (emphasis added). It was based on these standards arising from the post-AEDPA decision in *Panetti* that Holberg summed up as follows:

> Thus, to qualify as an "adjudication on the merits" and bar relief, the state court must have provided a full and fair hearing and evaluation of the evidence and arguments on the claim. *Id.* at 953-54. [Amended Pet. at 21][1]

---

[1] The Court rejects the "full and fair hearing" requirement it assigns to Holberg's argument in part because *Panetti* pulled the "procedural inadequacy" language from *Ford v. Wainwright*, 477 U.S. 399 (1986), a pre-AEDPA decision, and because *Ford* and *Panetti* (as well as *Simon v. Epps*, 463 F. App'x 339 (5th Cir. 2012)) were addressing 8th Amendment incompetency-to-be-executed claims. But both *Pannetti* and *Simon* postdate the AEDPA, and nothing about their descriptions of the general standards of due process required in state court adjudications is limited to the 8th Amendment incompetency context. *See, e.g.*, *Tercero v. Stephens*, 738 F.3d 141, 148 (5th Cir, 2013) (holding that even outside the 8th Amendment incompetency context, where there is a substantive liberty interest at stake, the petitioner is entitled to "a set of core procedural due process protections: the opportunity to develop and be heard on his claim that he is ineligible for the death penalty"); *Rockwell v. Davis*, 853 F.3d 758, 761 & n.5 (5th Cir. 2017) (AEDPA deference was properly applied to ineffective assistance and 8th Amendment claims; though the court acknowledged that a full and fair hearing is not a prerequisite under *Valdez*, it found that Rockwell nevertheless had "ample opportunity to 'develop his claims' before the state habeas court" (citing *Tercero*)). Life, of course, is a substantive liberty interest implicating the due process clause, and the procedural deficiencies raised by Holberg went to her ability to develop her claims – for example, the ability to challenge the denials of the prosecutors through some form of cross-examination.

Thus, Holberg's argument is not *dependent* on the constitutional shorthand phrase "full and fair hearing"; rather, it depends on the broader concept (best expressed in *Panetti*) that due process limits and application of reasonably adequate legal procedures are required for deference to apply.

Regardless of semantics and phraseology, "full and fair hearing" describes one aspect of the "opportunity to be heard" element of due process, and often functions as a shorthand proxy for what due process requires when state courts adjudicate a prisoner's constitutional claims. *Cf. Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 483 n.24 (1982) (a "full and fair opportunity to litigate " is synonymous with "the procedural requirements of due process"). Whether phrased as "full and fair" process or process reasonably adequate to get to the truth or reach a correct result, the consequence is the same – the federal court has a duty to consider and decide whether the deprivation of the prisoner's life or liberty offends the federal constitution, and whether the petitioner had, in light of the interests at stake and the demands of due process, an adequate opportunity to develop and present the claim.  Nothing in the AEDPA did, or could, erase that due process obligation. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

*Simon* illustrates the connection.  There the Court held that due process had been denied by the Mississippi Supreme Court in adjudication of the prisoner's habeas petition claiming he was incompetent, and therefore his execution would violate the 8th Amendment.  The Court cited to the Supreme Court's preeminent procedural due process decision, *Matthews v. Eldridge,* 424 U.S. 319, 349 (1976), for the proposition that due process requires that a person whose rights are at stake be provided a meaningful opportunity to present his case, and explained that the hallmark of due process is "fundamental fairness." Elaborating on the requirements of due process in the habeas context, the court, relying on and quoting from *Panetti* (551 U.S. at 954),

11

recited the language Holberg employed to argue that she had not received the type of

adjudication on the merits that could support deference to the factual and legal determinations of

the state courts:

> The process that someone receives will violate the due process clause where
> the factfinding procedures upon which the court relied were not adequate for
> reaching reasonably correct results or, at a minimum, resulted in a process that
> appeared to be seriously inadequate for the ascertainment of the truth.

*Simon*, 463 F'Appx 339 n.4.

Accordingly, the procedures employed by the state court to adjudicate Holberg's claims

violated due process and therefore the state court's determinations of fact and law are not entitled

to deference from this Court under 28 U.S.C. §2254(d).[2]  The absence of fundamentally fair

procedures and an adequate opportunity to develop these claims precludes the state court's

determination from qualifying as an adjudication on the merits, thereby precluding deference at

the threshold.  Additionally, deference is precluded under §2254(d)(1) because the state court's

determination that Holberg had not established a constitutional claim was contrary to, or based

on an unreasonable application of, clearly established law – the requirements of the due process

clause as clearly established by the Supreme Court.  *E.g., Matthews; see Blue v. Thaler*, 665 F.3d

647, 656 (5th Cir. 2011); *Landers v. Warden*, 776 F.3d 1288, 1296 (11th Cir. 2015).  And,

notwithstanding *Valdez*, deference is also not due under §2254(d)(2) because any determination

of fact by the state court that relied upon factfinding procedures "not adequate for reaching

reasonably correct results" is not reasonable.  *See, e.g., Taylor v. Maddox*, 366 F.3d 992, 1001

(9th Cir. 2004); *Landers*, 776 F.3d at 1297 ("we do not foreclose the possibility that a state

court's fact-finding procedure could be so deficient and wholly unreliable as to result in an

---

[2] Indeed, insofar as the Court relies on findings that are the product of defective state procedures, the 5th
Amendment due process clause is also implicated.

unreasonable determination of the facts under §2254(d)(2) and to strip its factual determinations of deference"). *Valdez* cannot be read to the contrary.[3]

In any event, *Valdez* does not – and cannot – abrogate constitutional due process protections. *Valdez* addressed the deference issue solely on the basis of statutory interpretation, comparing the former statute's language (expressly requiring a "full and fair hearing" for deference to apply) with the statute as amended by the AEDPA (omitting any explicit reference to a "full and fair hearing"), concluding that Congress did not intend that full and fair process be a precondition for deference. The court did not address, however, the impact of the due process clause on interpretation and application of the statute. Due process requirements cannot be abrogated by an Act of Congress; Congress cannot be deemed to have intended to have overridden due process protections.[4] Put another way, the statute cannot require district courts to defer to the results of state decisions that violate due process.

To hold otherwise would be anomalous. If due process were not required for deference, then the Court would be forced to defer to findings by the state court no matter how arbitrary, biased, or whimsical. Life or death determinations under the AEDPA could be predicated on rolls of the dice or rock-paper-scissors contests. The Great Writ simply cannot be read to have been crippled in this manner.

At minimum, resolving any doubts in favor of a COA in this death penalty case, a reasonable jurist could agree that due process is implicated by the failure of the state courts to

---

[3] The Court also appears to apply 28 U.S.C. §2254(e)(1) to factual determinations that were based entirely on the state court record. Whether or not that provision applies to determinations based entirely on evidence presented to the state court, and how it interacts with 28 U.S.C. §2254(d)(2), is an open question. *See, e.g., Rice v. Collins*, 546 U.S. 333, 341 (2006) ("Although the Ninth Circuit assumed §2254(e)(1)'s presumption applied in this case, the parties disagree about whether and when it does. We need not address that question."); *Register v. Thaler*, 681 F.3d 623, 629 (5th Cir. 2012) ("While the relationship of §§2254(e)(1) and (f) to §2254(d) remains unresolved, we need not confront that issue here."). The Court should clarify how the statutory provisions interact, or at least issue a COA so the issue can be reviewed.

[4] At minimum, the statute must be interpreted with the constitutional implications in mind, and construed, under the doctrine of constitutional avoidance, to comport with due process.

provide Holberg a reasonable opportunity to develop her claims, or that this issue deserves further review.  "[T]he state should not win by default when a petitioner is stymied by circumstances of the state's making."  *Register*, 681 F.3d at 627.  Holberg asks this Court to reconsider its application of deference, or at least the denial of a COA, and grant the certificate as to these issues.

**B.**   **The Court Should Grant Relief, or at Least a COA, on the Claim of Prosecutorial Misconduct Related to the Coercion of False Testimony From Vicki Kirkpatrick**

The Court not only rejects Holberg's claim that her conviction and death penalty were constitutionally marred by prosecutorial misconduct and perjured testimony, but also denies a COA on the issue.  Because a reasonable jurist could disagree, and at least find the issue worthy of review, a COA should issue.

The record contains ample support for Holberg's claim.  There is no question that Kirkpatrick was vulnerable to D.A. Farren's coercion.  She was facing the prospect of substantial jail time on multiple burglary charges at the time she was placed in Holberg's cell.  She emerged with a story that Holberg had confessed to her in a manner consistent with the State's theory of the case, providing disturbing details of lurid enjoyment that conveniently painted a portrait of Holberg as a remorseless, soulless monster who was more than willing to kill again if only she had a chance.  The prosecution took full advantage of Kirkpatrick's testimony.

Facing cancer and overwhelming remorse for the role she played in Holberg's death sentence, and no longer subject to D.A. Farren's coercive tactics, Kirkpatrick recanted her account of Holberg's supposed jailhouse confession and tried to set the record straight.  She swore under oath that Holberg had not uttered the damaging lurid statements, and that, in fact, Holberg had been remorseful and shaken by the violent encounter with Towery – testimony corroborated by several other witnesses.  Kirkpatrick also testified that D.A. Farren had scripted

her trial testimony and threatened her to compel her cooperation – a pattern of intimidating behavior corroborated by several other witness.

Notwithstanding these troubling assertions of egregious misconduct sworn under oath and the corroboration from independent witnesses with no apparent motive to lie, Holberg's repeated efforts to examine D.A. Farren and other prosecutors to develop the claim were rebuffed by the post-conviction state court. Holberg sought to depose the prosecutors and sought an evidentiary hearing. Both requests were denied. Accordingly, Holberg never had the opportunity to develop evidence from the critical prosecution witnesses. The State, on the other hand, was not so limited. It had ample opportunity to confront and depose Kirkpatrick, test her memory, and develop inconsistencies in the fine details of her account. Anyone who has ever taken a deposition years after the events in question knows how the inherent frailty of human memory can produce minor marginal inconsistencies in the testimony – even inconsistencies internally during the deposition itself.

The record is clear that Judge Estevez chose to reflexively believe the prosecutors she knew and to disbelieve Kirkpatrick and the other affiants that she didn't, precisely for that reason. Credibility determinations made on this basis and without a hearing by a judge who had not presided over the trial, are inherently suspect. *Cf. Perillo v. Johnson*, 79 F.3d 441, 446-47 (5th Cir. 1996) (adequacy of making findings on papers is reviewed case-by-case, and often turns on whether or not the habeas judge presided over the trial). Having not allowed Holberg to develop the claim, despite Holberg's diligent efforts to do so, and having substituted arbitrary factfinding for cross-examination of the State's protagonists, the state court's "findings" deserve no deference under the AEDPA.

This Court's de novo review is, of course, plagued by the same lack of any evidence developed from the prosecution witnesses pursuant to discovery or an evidentiary hearing. The Court holds that a hearing is not warranted because Holberg failed to develop her claim in state court.[5] Op. at 128-29. But in the very next paragraph the Court notes the years-long effort by Holberg to develop her claim. *Ibid.* And it is undisputed that Holberg has repeatedly sought to develop her claim through requests for discovery and an evidentiary hearing, and been rebuffed at every turn. In this credibility clash between the prosecution and one of its star witnesses, only the State was ever given the opportunity to cross-examine a witness. That is not a process adequate for ascertainment of the truth. And it defeats the Court's effort to distinguish *Green v. Addison*, 500 F. App'x 712 (10th Cir. Oct. 9, 2012) (witness recantation is clear and convincing evidence that conviction rests on perjury and defeats the presumption of correctness).[6]

A reasonable jurist could disagree with the Court's view of the record and its conclusion that Kirkpatrick's recant, not her trial testimony, was a lie. Engaging in an analysis the state court never did, the Court parses the record to isolate several relatively minor and inconsequential inconsistencies in Kirkpatrick's testimony to find that Kirkpatrick's more recent testimony is not credible. But none of these variances relied on by the Court, nor all of them, justify wholesale rejection of Kirkpatrick's testimony, the denial of a hearing, and the denial of a

---

[5] The Court suggests that it received "new evidence" from Holberg. But the record before this Court consists entirely of the record developed in State court; Holberg's requests for discovery and a hearing have been denied. It remains true, and troubling, that 23 years after her conviction based on alleged perjured testimony fabricated and coerced by the State, Holberg has never had the opportunity to confront and ask a single question of a single member of the prosecution team to test their credibility and to develop the claim beyond the affidavits of third party witnesses that were rejected out of hand by Judge Estevez because the witnesses were unknown to her. Holberg maintains, that is a reason to investigate their credibility, not dismiss it.

[6] The Court's primary basis for distinguishing *Green* is the view that Holberg was not sufficiently diligent in pursuing her claim because "crucial evidence" from Kirkpatrick's former defense attorney, Greta Crofford, was "readily available" to Holberg. But there is no evidentiary basis to believe that Crofford had anything critical to add or that Holberg actually had any access to such evidence. The Court's reliance on a stray statement of counsel in colloquy with Judge Estevez is addressed below.

COA.  Imperfections in Kirkpatrick's memory of the details of events occurring 13 years beforehand should not pave the way for Holberg's execution.

- The Court cites uncertainty in the precise sequence of events for the meetings Kirkpatrick had with D.A. Farren.  But this does not detract from Kirkpatrick's unequivocal testimony that D.A. Farren obtained a written account from Kirkpatrick of Holberg's statements in jail, ripped it up as insufficient, and then scripted an account more to his liking, nor that he coerced Kirkpatrick's acquiescence by threats and inducements.  These details could be examined and potentially explained at an evidentiary hearing or at depositions and discovery from the witnesses – but Holberg was never given that opportunity, in any court.

- The Court cites uncertainty over the precise details of, and variances between, D.A. Farren's informal promises to Kirkpatrick of potential lenience and the actual plea offer ultimately presented.  None of that serves to substantially undermine Kirkpatrick's account that D.A. Farren essentially told her "That he was going to send me to prison for a long time if I didn't say what he wanted me to say."  7/29 Supp.SHCR 1638. These details could be pursued and potentially explained at an evidentiary hearing or through the depositions and discovery that Holberg was never given the opportunity to take.

- Whether the letter Kirkpatrick sent to her sentencing judge, before she had testified at Holberg's trial, reflected an "expectation" or a "hope" that she would get probation does nothing to undermine Kirkpatrick's account of her interactions with D.A. Farren.[7] Whether Kirkpatrick had a "deal" with D.A. Farren or just vague informal assurances

---

[7] The legal import of the difference between a formal deal and a tacit understanding is discussed below.

(if she worked with him, he would work with her") combined with his threats that she

would go away for a very long time, up to 20 years, if she failed to adequately assist

him, practically viewed, is a distinction without any substantive difference.[8]  In any

event, that difference should not be the difference between life and death, or serve to

deny Holberg the opportunity to appeal this Court's determination.[9]

- The notion that Kirkpatrick was biased in favor of Holberg because she had at one point

  reached out to Holberg's aunt for information about rehabilitation centers is also

  speculative, at best.

- The absence of any evidence from Kirkpatrick's defense lawyer on the burglary

  charges, Crofford, also does nothing to diminish the credibility of Kirkpatrick's

  testimony.  Certainly it does not justify the Court's conclusion that it can infer "that

  Crofford would have contradicted Kirkpatrick's narrative in the deposition testimony."

  Op. at 121. [10]

---

[8] The same is true of Judge Gleason's sentencing statement that there was no plea agreement and Kirkpatrick had rejected an offer of five years, 7/29Supp.SHCR 1672-74, and the uncertainty over exactly how much time D.A. Farren had dangled for Kirkpatrick on a potential deal.  Kirkpatrick's testimony demonstrates that there was no formal plea agreement, or even a concrete deal; just a suggestion that led Kirkpatrick to believe she would get three years, or "little time", or maybe even probation, and that she would avoid the lengthy sentence D.A. Farren threatened her with if she did not cooperate. *See id.* at 1632, 1638-39, 1653, 1714-15.

[9] Likewise, if Kirkpatrick was also seeking sentencing assistance from the "SWAT" team (who, it turned out, she had assisted before) does not mean she had not been coerced by D.A. Farren.  And her belief that SWAT had a copy of her statement is not inconsistent with her testimony that D.A. Farren had required her to fabricate the statement.

[10] The Court draws this inference because Crofford likely had material testimony about these events, Holberg's counsel represented to the court they "can" get an affidavit from her but did not, and Holberg's counsel suggested to Kirkpatrick on the record at deposition that she should not agree to waive attorney-client privilege at the deposition.  The Court's implicit suggestion that *Holberg and her counsel* suppressed material evidence from Crofford is unwarranted and speculative.  Neither Holberg nor her counsel had any control over Crofford (or Kirkpatrick); it is not clear that Crofford had any specific material information about Kirkpatrick's interactions with D.A. Farren; and advising an unrepresented witness at deposition not to waive a privilege without consulting an attorney where there is no obvious benefit *to the witness* is entirely professional, customary, and benign.  That Holberg's counsel mistakenly thought he could get an affidavit from Crofford is immaterial.  And there is no basis to assume, much less find, that Crofford actually had anything significant to add.  That Holberg did not produce any evidence from Crofford is not relevant.  The inference drawn by the Court is impermissibly speculative and unsupported.

- Kirkpatrick's testimony at her sentencing hearing in 1998 that she had testified truthfully at Holberg's recent trial is hardly surprising; it is entirely consistent with Kirkpatrick's effort to capitalize on her perjured testimony and cooperation with the prosecution, and her obvious interest in avoiding admitting to the judge responsible for sentencing her that she had committed perjury.  That attorney Crofford solicited that testimony suggests nothing more than that she was insulated from Kirkpatrick's direct dealings with D.A. Farren.  Kirkpatrick testified that Farren had warned her not to reveal their interactions, suggesting Crofford's ignorance of D.A. Farren's coercion was itself a product of that coercion.  Kirkpatrick testified that she had told Crofford – who she had met for the first time when she was getting ready to take the stand at Holberg's trial – only that D.A. Farren had turned her words around.  7/29Supp.SHCR 1709.

- Kirkpatrick's lack of a precise memory as to the number of people in D.A. Farren's office when they met on two occasions – "2-3" vs. "3-4" – is not a reason to doubt the general credibility of her account.

- The Court's reading of the record applies innocent semantics to challenge Kirkpatrick's credibility; clarifications become contradictions.  For example, the Court says Kirkpatrick testified first that D.A. Farren planted her in the cell, but later clarified that he summoned her when he learned she was there and then sent her back to the cell to draw a confession from Holberg.  The Court finds this undermines her credibility, but a reasonable jurist could read this as what it was, a benign imprecision by a layperson who did not see the marginal difference and cleared it up under clarifying questioning.

- Other readings of the record by the Court misinterpret the evidence.  Kirkpatrick's testimony is not reasonably read to state she did not know who D.A. Farren was. *See*

Op. at 122 n.32.  Kirkpatrick was asked for her understanding at the time as to who D.A. Farren was, but objectively read, her answer demonstrates that she plainly misunderstood the question.  "A.  I really did not know until I – when they called me out, I thought maybe some more burglaries or something had showed up.  I was really not sure where I was going or who I was going to talk to."  In context, Kirkpatrick was testifying as to her lack of understanding as to why and to whom she was being summoned.

- The Court also finds significant that Kirkpatrick did not remember Lynette Voss-Tucker at her deposition, though the record indicates she knew her.  The significance is simply unwarranted; people often do not recall people they have met on a few occasions, especially when the individuals have name changes or aliases.

- That Kirkpatrick told Voss-Tucker the Farren-scripted story about Holberg's statements in jail does not serve to corroborate the initial account.  Hewing to the lie at that point makes sense.  This conversation presumably would have occurred in the period between Kirkpatrick signing of the Farren-scripted affidavit and her testimony at Holberg's trial.

- There is no basis for the inference hypothetically drawn by the Court that Kirkpatrick lied at deposition "about whether Holberg's attorneys paid money to gain access to Kirkpatrick."  Kirkpatrick unequivocally testified that she had received no benefit for her deposition testimony and did not know of any benefit to anyone else.  There is no evidence to the contrary, only speculation based on statements by counsel in colloquy with the court concerning expenses in gaining access to Kirkpatrick through a pimp-like figure.

20

Notably, none of these justifications for disbelieving Kirkpatrick and crediting D.A. Farren's terse affidavit were made by Judge Estevez, and in fact belie her analysis, which was based entirely on knowing the prosecutors and not knowing Kirkpatrick or the corroborating witnesses. Nothing in Judge Estevez's findings and conclusions address any other reason for choosing to believe the prosecutors and reject Kirkpatrick's testimony.

Moreover, the affidavits of several other witnesses suggest that Kirkpatrick's trial testimony was false. No one else in the cell heard Holberg say similar things. The Court rejects this as not dispositive. Not dispositive, to be sure, but still relevant. Moreover, if this was Holberg's mind-set at the time then why would she share these thoughts only with Kirkpatrick? Particularly if, as the prosecution argued, this was jailhouse talk designed to craft a tough image among the inmates? To the contrary, cellmates Michelle Lucero, Melissa Wiseman, Heather Woodard, and Voss-Tucker, all swore that Holberg's demeanor was remorseful and 180 degrees from the bragging, delighted attitude Kirkpatrick described. And Roger Speir, a close confidante of Kirkpatrick at the time, testified that she had confided in him about being exploited by D.A. Farren to obtain inculpatory information against Holberg and to offer fabricated testimony against her. Voss-Tucker testified she too had been pressured by D.A. Farren to testify falsely about Holberg in order to secure the conviction, as had other cellmates. In addition, the sworn testimony of Katina Dickson, Donald Owens, Mary Lynn Burnett, and Heather Woodard all support Kirkpatrick's subsequent testimony, and each other's. They all demonstrate that D.A. Farren engaged in a pattern and practice of intimidating witnesses to coerce them to offer false testimony against Holberg.

Finally, Kirkpatrick at the time of her original statement and trial testimony was a drug addict, prostitute, and serial burglar with every incentive to lie and no fidelity to the truth. As

21

plainly appears from her deposition testimony, Kirkpatrick's later recantation came at a time of relative clarity and redemption.  Her motivation at that point was not to get out from under a lengthy prison sentence at all costs, but to get a regrettable lie with mortal consequences off her soul and conscience and correct an injustice in which she had played a central role.

Under the circumstances, a reasonable jurist could disagree with the Court's conclusion that Kirkpatrick's deposition and other evidence in the record make her testimony "inherently incredible" and that Holberg had failed to take advantage of a fair opportunity to develop her claim.

A reasonable jurist could also disagree with the Court's conclusion that Kirkpatrick's testimony was not material.  At the guilt-innocence phase, her testimony undermined Holberg's core defense, that she had killed Towery in self-defense in the course of a fight for her life.  And at the punishment phase, Kirkpatrick's testimony painted a disturbing portrait of a remorseless monster who was a ticking time bomb primed to explode again, even in the prison environment. Her testimony also laid the foundation for part of Dr. Coons' testimony that she was a danger to others even in prison, and it was exploited by the prosecution to undermine Dr. Patel's testimony that she wasn't.  Given the jury's 11-hour deliberation on special issues and the dramatic and widespread impact of the testimony, a reasonable jurist could easily conclude that Kirkpatrick's testimony had a material impact on the outcome.  Because there is a reasonable likelihood that Kirkpatrick's testimony affected the judgment of the jury, relief in the form of a new trial is appropriate.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Materiality is not eliminated by the prosecutor's closing argument, strategically reframing Kirkpatrick's testimony in response to Holberg's argument that the blood spatter evidence was thoroughly inconsistent with Kirkpatrick's testimony that Holberg delighted in a

"fountain of blood." The prosecution retreated, claiming he did not really believe Holberg was a "vampire" who delighted at the sight of blood, but rather thought Holberg was probably just talking tough for a jailhouse audience.[11] Even if the jury took his cue, this did not blunt the impact of Kirkpatrick's false testimony on the self-defense issue, and the jury was still left with the sought-after impression that Holberg lacked any remorse and was a dangerous psychopath. Perhaps not a vampire, but still a dangerous monster. And the jury may have disregarded the prosecutor's reframing and taken the testimony at face value to draw the inference that Holberg really did delight in the violence and was eager, or at least quite willing, to do it again. Certainly the prosecution's questioning of Coons and Patel did not make the fine distinction the prosecution suggested in the punishment phase closing and relied on here by the Court. The critical point remains: Kirkpatrick testified at trial that Holberg said these horrifying things, and there is substantial evidence before the Court that Holberg did not.

Contrary to the Court's conclusion, nothing about Holberg's trial testimony serves to neutralize the devastating impact of Kirkpatrick's trial testimony. Holberg testified she killed Towery in self-defense, a clear contrast with Kirkpatrick's testimony that Holberg described what ultimately amounted to a thrill kill. And as to the sentencing, it is inconceivable that anything about Holberg's testimony blunted the impact of Kirkpatrick's testimony that Holberg was a cold-blooded animal who delighted in the bloody fountain she had created, wanted more, and would do it again.[12]

This claim is backed by sworn testimony of witnesses with nothing to gain and no motive to lie. Given the significant evidence that Holberg's death sentence was procured by egregious

---

[11] Even that suggestion lacks coherence with the record. Again, if Holberg was spinning this tale of blood lust for effect on her cell mates, then it's baffling that Kirkpatrick was the only cell mate who heard her say it.

[12] The prosecutorial misconduct claim is further supported by Kirkpatrick's associated false, coerced testimony at Holberg's trial that she had never met D.A. Farren until that day.

prosecutorial misconduct, a hearing before this Court is warranted.  At minimum, a COA should issue.

**C.**     **The Court Should Grant Relief, or at Least a COA, on Holberg's Claim That the State Violated Due Process by Withholding Impeachment Evidence Related to Kirkpatrick**

*Brady v. Maryland*, 373 U.S. 83 (1963) requires the State to disclose all information in its possession (1) favorable to the accused and (2) material, i.e., its suppression would undermine confidence in the outcome.  The withholding of significant impeachment evidence undermining Kirkpatrick's credibility and testimony – including the evidence discussed above, that D.A. Farren met with her and coerced her to give fabricated testimony – was plainly material.  As discussed above, Kirkpatrick was a key prosecution witness against Holberg in two respects: Her testimony about Holberg's jailhouse confession was the only non-circumstantial evidence that contradicted Holberg's testimony on the self-defense issue.  And on the special issues, the false evidence of Holberg's psychopathic reaction to the violent encounter with Towery was indelible, and repeated and exploited in examination of the punishment phase experts, Dr. Coons and Dr. Patel.  Under these circumstances, a reasonable jurist could readily agree that the failure to disclose significant impeachment evidence is sufficient to undermine confidence in the rejection of Holberg's self-defense theory and the jury's ultimate death sentence.

The prosecution also suppressed two other species of significant impeachment evidence: that Kirkpatrick had a tacit promise of assistance with her pending burglary charges that fueled an expectation of favorable sentencing treatment, and Kirkpatrick's relationship with the police as a paid drug informant.

The State failed to disclose to Holberg that Kirkpatrick's testimony had been induced by threats and inducements.  Though she had no formal agreement with the prosecution for any specific sentencing recommendation on her pending burglary charges, D.A. Farren made the tacit

promise that if she worked with him, then he would work with her, leading her to believe that she would do little time, and perhaps even get probation. More importantly, she understood the state would not seek to put her in prison for a long time, up to 20 years, as long as she cooperated and gave the desired testimony.

Under clearly established federal law, the due process clause requires the government to disclose any evidence or information regarding any inducements or benefits that may be offered or awarded to the witness if she assists the prosecution and/or provides helpful testimony. *Napue v. Illinois*, 360 U.S. 264 (1959). The obligation to disclose does not depend on any magic words or the existence of a formal deal – a tacit agreement producing an expectation by the witness that her testimony may lead to some benefit, such as a favorable sentencing decision or recommendation, impairs the credibility of the witness's testimony and must therefore be disclosed to the defense under *Brady*. *Ibid.*

As indicated above, Kirkpatrick testified that her testimony was secured through threats and promises by D.A. Farren. The threat was going away for a very long time, up to 20 years. The promise was that if she worked with him, he would work with her to limit the amount of time she would spend in prison. Their conversations left her with the impression that she would do a "little time," perhaps 3 years, though she hoped she would receive probation. The government never disclosed any of these conversations or promises, and consequently, defense counsel had no basis to confront her with the impact of the threats and inducements on her testimony.

The Supreme Court has long recognized the importance of being able to confront an adverse witness with evidence of a motive to lie or aggrandize testimony to please a benefactor and obtain some benefit to their own personal freedom. *See Davis v. Alaska*, 415 U.S. 308, 320

(1974) (Confrontation Clause violated by exclusion of evidence that witness was a juvenile

probationer and had a motive to retain his probation; "The State's policy interest in protecting

the confidentiality of a juvenile offender's record cannot require yielding of so vital a

constitutional right as the effective cross-examination for bias of an adverse witness"); *Giglio*,

405 U.S. at 154-55 (credibility of a key witness was "an important issue in the case, and

evidence of any understanding or agreement as to a future prosecution would be relevant to his

credibility and the jury was entitled to know it").

A tacit or sub rosa agreement or understanding is perhaps even more insidious than a

formal deal, both in its effect and the opportunity for abuse.  As explained in *United States v.*

*Bagley*, 473 U.S. 667, 683 (1985), the fact that the benefit to the witness

> was not guaranteed through a promise or binding contract but was expressly
> contingent on the Government's satisfaction with the end result, served only to
> strengthen any incentive to testify falsely in order to secure a conviction.

*See also Boone v. Poderick*, 541 F.2d 447, 451 (4th Cir. 1976) (rather than weakening the

significance of an agreement for favorable treatment, the tentative nature of the agreement may

increase its relevance; a promise without assurance may be interpreted as contingent upon the

quality of the evidence produced; the more uncertain the agreement, the greater the witness's

incentive to frame the testimony to please the anticipated benefactor); *Commonwealth v. Davis*,

751 N.E.2d 420, 423 n.7 (Mass. App. Ct. 2001) (by withholding any advance *express* promise of

leniency, "the Commonwealth could presumably craft a reward post hoc that conformed to the

quality of the service.  This approach has the added advantage of permitting a prosecutor to tout

the fact to the jury that no specific promises have been made to the witness.  Needless to say, this

tactic provides a witness who faces pending charges with an even stronger motive to lie than a

witness with whom a bargain is made before trial."); *United States v. Ramirez*, 608 F.2d 1261,

1266 n.9 (9th Cir. 1979) ("we are not unaware of the reality that the Government has ways of

indicating to witness's counsel the likely benefits from cooperation without making bald promises….").

Thus, tacit agreements too are required to be disclosed under *Brady*. *Bagley*, 473 U.S. at 683. "Express or tacit, either way there would be an agreement, it would be usable for impeachment, and it would have to be disclosed to the defense." *Wisehart v. Davis*, 408 F.3d 321, 324 (7th Cir. 2005); *see Reutter v. Solem*, 888 F.2d 578, 582 (8th Cir. 1989) (*Brady/Bagley* violation "does not depend on a finding of either an express or an implied agreement … regarding the prosecution's favorable recommendation to the parole board"); *Douglas v. Workman*, 560 F.3d 1156, 1186 (10th Cir. 2009) (even tacit agreements must be disclosed under *Brady* and *Giglio*); *Harshman v. Superintendent*, 368 F.Supp.3d 776, 790 (M.D. Pa. 2019) (firmly established Supreme Court precedent that requires the prosecution to disclose evidence favorable to the accused applies to actual agreements for favorable treatment "or even the possibility or expectation of favorable treatment").[13]

Accordingly, the failure to disclose the inducement of potential favorable sentencing treatment, even if uncertain and informal, violates clearly established federal law. *Gentry v. Morgan*, 2008 WL 4162998, *8 (W.D. Wash. Sept. 4, 2008) ("the obligation to disclose is undisputable"). D.A. Farren's cryptic promise that if Kirkpatrick worked with him, he would work with her, but if she did not, she would go away for a long time and perhaps as much as 20 years, clearly runs afoul of *Brady* and calls for relief. At least it calls for discovery and an evidentiary hearing. At very minimum, it calls for a COA.

---

[13] *Harshman* observed that the impeachment value of a tacit promise to write a letter to the parole board on behalf of the accused "is self-evident" and the lack of a formal agreement was "irrelevant." *Id.* at 791. Even in the absence of a quid pro quo, the witness had a strong reason to lie and to testify in a manner that would help the prosecutor, establishing the potential bias that would have been extremely compelling impeachment evidence. *Id.* at 792.

There is also clearly established federal law that a key witness's relationship with the government as a police informant is favorable impeachment evidence and material information under *Brady* that the prosecution is duty-bound to disclose to the defense prior to trial. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). It is well-established that an informant relationship with the police establishes an obvious motive for the witness to lie, either pursuant to the relationship or out of a desire to maintain it. It is undisputed that Kirkpatrick was a longstanding police informant. The Court assumed, without deciding, that her status was not disclosed, but recognized there is no evidence that it was. Op. at 160.

Nevertheless, the Court rejects this claim on the basis that Holberg has not shown that the evidence would have been favorable to the defense. That analysis is refuted by the case law and the accepted reality of the serious credibility issues posed by the witness's status as a paid informant for the government. "This Court has long recognized the 'serious questions of credibility' informers pose." *Banks*, 540 U.S. at 701-02 (citing *On Lee v. United States*, 343 U.S. 747, 757 (1952)). "As to the first *Brady* component (evidence favorable to the accused), beyond genuine debate, the suppressed evidence relevant here, Farr's paid informant status, qualified as evidence advantageous to Banks." *Id.* at 691; *see also United States v. Garcia Abrego*, 141 F.3d 142, 153 (5th Cir. 1998) (due process requires instructing jurors to view the testimony of a paid informant or similarly incentivized witness "with greater caution than other testimony"); *United States v. Narviz-Guerra*, 148 F.3d 530, 538 (5th Cir. 1998) (affirming instruction that "the testimony of one who provides evidence against a defendant as an informer pursuant to the terms of a plea agreement, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses"); *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315-16 (5th Cir. 1987) (en banc) (to protect

against abuse and satisfy due process, and to allow the jury to adequately evaluate credibility of a witness receiving benefit for their testimony, the government must not use or encourage perjured testimony from the informer (*Napue*) and must make a complete and timely disclosure of the arrangement with the informant (*Brady*), the defense must be given an adequate opportunity to cross-examine the informant and government agents about the relationship (*Bagley*), and the court must carefully instruct to alert the jury to the witness's suspect credibility); *Federal Jury Practice and Instructions, Criminal* § 15.02 (5th ed. 2000) (instructing on the special caution appropriate in assessing an informant's testimony).   "Jurors suspect [informants'] motives from the moment they hear about them in a case, and they frequently disregard their testimony altogether as highly untrustworthy and unreliable . . ."  *Banks*, 540 U.S. at 702 (quoting Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings L.J. 1381, 1385 (1996)).[14]

The Court concludes that the evidence Kirkpatrick was a paid informant for the government would not have been favorable to Holberg because it would have opened the door to rebuttal evidence that Kirkpatrick was a "trusted" snitch, and therefore would have *bolstered* Kirkpatrick's credibility.  But there is no basis for this explanation; if that were true here then it would have been true in *Banks* and every other decision compelling disclosure of a witness's status as a paid informant, and it flies in the face of the common instruction to juries to regard an informer's testimony with great caution.  Nor was this explanation ever proffered as a justification by the state courts.

---

[14] The disclosure obligation applies whether or not the witness is acting as a paid informant in the case at hand.  *See, e.g., United States v. Shaffer*, 789 F.2d 682, 688-89 (9th Cir. 1986) (*Brady* violated by failure to disclose witness was a paid informant in a separate heroin investigation and the nature of the witness's compensation for that work); *Gentry*, 2008 WL 4162998, *5 (witness "willingness to work and testify for the government in exchange for money and other benefits before suggests to the jury that even if he has not received an explicit promise, he might harbor hopes that persuasive testimony might allow him to maintain his favorable relationship with [his handler]")

To the extent the Court was suggesting that Kirkpatrick's status as a paid informant *was not material*, that would be an unreasonable application of *Brady/Giglio*. *See United States v. Meinster*, 619 F.2d 1041, 1045 (4th Cir. 1980) ("We think it obvious that promises of immunity or leniency premised on cooperation in a particular case may provide a strong inducement to testify falsely in that case."). Again, Kirkpatrick's testimony about Holberg's jailhouse confession was the only non-circumstantial evidence that undermined the self-defense/provocation defense, had a major impact on the examinations of the experts in the penalty phase, and painted a potent portrait of a cold-blooded animal for the jury to take into the jury room as it pondered Holberg's ultimate fate, a deliberation that still took eleven hours. It is reasonably probable that the result would have been different, and that it undermines confidence in the outcome. *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995). It warrants discovery and a hearing to help uncover the truth. At minimum, a reasonable jurist could find that the information was material under these standards, justifying a COA.

Finally, whether the prosecution's suppression of favorable evidence undermined the confidence in the outcome is to be considered cumulatively, not item by item. *Kyles*, 514 U.S. at 433-34. Taken separately, and *a fortiori* taken together, the failure to disclose that Kirkpatrick was a paid informant for the police, had been pressured into testifying against Holberg and had been led to believe she would receive some favorable treatment on charges pending against her, had met with D.A. Farren to script her testimony, and had been a conduit for false testimony significant to the self-defense, future dangerous, and mitigation issues, raise serious doubts about whether Holberg received the fair trial to which she was constitutionally entitled. A reasonable jurist could so conclude. The Court should reconsider its order; at least it should reconsider and issue a COA and allow these issues to be addressed on the merits by the Court of Appeals.

## IV.   CONCLUSION AND PRAYER

For the foregoing reasons, Holberg prays the Court reconsider its determination that neither relief, nor discovery, nor a hearing, nor a COA, is warranted as to Holberg's due process claims of prosecutorial misconduct in connection with the knowing procurement and presentation of perjured testimony from Vicki Kirkpatrick and the failure to disclose impeachment evidence related to her testimony, and that the state court's determinations on these issues are entitled to deference under the AEDPA, 28 U.S.C. §2854(d), (e).

Date: September 10, 2021                         Respectfully submitted,

   /s/ Alan J. Lazarus
Alan J. Lazarus
(admitted *pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH LLP
Four Embarcadero Center, 27th Floor
San Francisco, California 94111
Tel.: (415) 591-7551
Fax: (415) 591-7510
alan.lazarus@faegredrinker.com

Paul E. Mansur
Attorney at Law
114 S. Main Street
Seminole, Texas 79360
Tel.: (432) 847-4649
Fax: (806) 592-9136
paul@paulmansurlaw.com

**ATTORNEYS IN CHARGE FOR PETITIONER
BRITTANY MARLOWE HOLBERG**

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a true and correct copy of the foregoing document to be served via

the court's ECF system upon the following:

Travis Bragg, Assistant Attorney General
Office of the Attorney General
Criminal Appeals Division
300 West 15th Street
Austin, Texas 78701
(512) 936-1400

*Attorney for Respondent*


Date: September 10, 2021                     /s/ Alan J. Lazarus

32